Duane C. Miller, #57812
dmiller@toxictorts.org
Michael D. Axline, #229840
maxline@toxictorts.org
Tracey O'Reilly , #206230
toreilly@toxictorts.org
Bryan Barnhart #222693
bbarnhart@toxictorts.org
**MILLER & AXLINE**
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4225
Telephone: (916) 488-6688
Facsimile: (916) 488-4288

(Exempt from filing fees
per Govt. Code, § 6103)

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNOCAL CORPORATION, et al.,<br><br>Defendants. | Case No. 8:03-cv-01742 CJC (Anx)<br><br>*Assigned to: Hon. Cormac J. Carney*<br><br>**DECLARATION OF TRACEY O'REILLY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE DAMAGES AND DECLARATORY RELIEF**<br><br>*[Plaintiff's Statement of Genuine Disputes, Memorandum of Points and Authorities, and Proposed Order submitted concurrently herewith]*<br><br>Date: November 7, 2016<br>Time: 1:30 p.m.<br>Dept: 9B |

## DECLARATION OF TRACEY L. O'REILLY

I, Tracey L. O'Reilly, declare:

1.      I am an attorney at Miller & Axline, counsel of record for plaintiff Orange County Water District. I have been a lead attorney on the above-titled suit since its inception in 2003. I make this declaration from personal knowledge, and I could and would testify competently hereto. I was personally involved in all discovery related to the District's damages and costs.

2.      This declaration is made in opposition to Defendants' Motion for Summary Judgment re Damages and Declaratory Relief filed in this Court on October 3, 2016.

### Response to Declaration of Whitney Jones Roy

3.      Response to Paragraph Nos. 7-8: Defendants' suggestion that the District was required, at any time, to allocate its damages and or costs on a station-by-station basis is incorrect. The District contended in its discovery responses, and continues to contend, that the MTBE plumes from focus stations commingled in the off-site groundwater.

4.      Response to Paragraphs 9-12: At the very end of fact discovery in this matter, defendants served an overly broad and somewhat duplicative deposition notice purportedly for the District's damages and costs at the very end of discovery. The deposition notice sought substantial testimony on a number of other non-damages or cost related issues. The matter was raised with the Special Master and defendants were required to substantially revise the notice to narrow the issues, and avoid duplication. The process of narrowing the issues and agreeing upon the scope of discovery, as well as all other matters relating to the scheduling a deposition, including document productions, took a substantial amount of time. Depositions on the District's damages and costs, and thus discovery on the District's damages and costs, finally occurred in July and August

1    of 2012. All costs of which the defendants' complain were not only disclosed to

2    defendants during fact discovery, but also during expert discovery.

3    **Evidence In Support of the District's Opposition to Defendants' Motion**

4         5.      Attached as **Exhibit 1** is a true and correct copy of the Memorandum

5    of Law in Support of Defendants' Motion For Stay or Dismissal Without Prejudice

6    Based on Primary Jurisdiction, dated January 27, 2006.

7         6.      Attached as **Exhibit 2** is a true and correct copy of the Declaration of

8    William T. Costley III in Support of Defendants' Motion for Summary Judgment

9    Based on the Statute of Limitations, dated February 14, 2006.

10         7.      Attached as **Exhibit 3** is a true and correct copy of the Declaration of

11    Roy L. Herndon in Support of Plaintiff's Opposition to Defendants' Motion for

12    Stay or Dismissal Without Prejudice Based on Primary Jurisdiction, dated

13    February 23, 2006.

14         8.      Attached as **Exhibit 4** is a true and correct copy of the Supplemental

15    Declaration of David Bolin in Support of Plaintiff's Opposition to Defendants'

16    Motion for Summary Judgment Based on Statute of Limitations, dated March 28,

17    2008.

18         9.      Attached as **Exhibit 5** is a true and correct copy of the Supplemental

19    Declaration of Roy Herndon in Opposition to Statute of Limitation, dated March

20    28, 2008.

21        10.      Attached as **Exhibit 6** are true and correct copies of Defendants'

22    Opposition to Plaintiff Orange County Water District's Motion for Partial

23    Summary Judgment, filed on March 15, 2011.

24        11.      Attached as **Exhibit 7** is a true and correct copy of the Declaration of

25    Roy Herndon in Support of Plaintiff Orange County Water District's Response to

26    Court's Order to Show Cause Why Partial Summary Judgment Should Not be

27    Granted to Defendants with Respect to OCWD Act Claims for Investigatory Costs

28

Declaration of Tracey O'Reilly In Support of Plaintiff's Opposition to Defendants' MSJ Re Damages and
Declaratory Relief

1 and Trespass Claims, dated July 25, 2011.

2   12.   Attached as **Exhibit 8** is a true and correct copy of the Declaration of

3 Stephen W. Wheatcraft, Ph.D. in Support of Plaintiff's Opposition to Motion for

4 Summary Judgment, dated July 21, 2014.

5   13.   Attached as **Exhibit 9** is a true and correct copy of relevant pages

6 from the April 11, 2007, Direct Testimony of Craig D. Miller, P.E., On Behalf of

7 Orange County Water District for Water Rights Application 31174, produced in

8 this action as OCWD-MTBE-001-199678 through OCWD-MTBE 10-001-199708.

9   14.   Attached as **Exhibit 10** is a true and correct copy of State Water

10 Resources Control Board Permit 21243 (Application 31174A), Santa Ana River

11 Tributary to Pacific Ocean, in Orange and Riverside Counties.

12   15.   On May 31, 2011, the District's experts Anthony Brown and Robert

13 Stollar produced a 4,106-page report in this matter, which included detailed and

14 site-specific analyses of each station that currently is at issue in this phase of this

15 case.  True and correct copies of the site-specific summaries from those reports are

16 **Exhibit 11** to this Declaration.

17   16.   Attached as **Exhibit 12** is a true and correct copy of relevant pages of

18 an email from Joe Haseman, dated May 6, 2010, Bates Number STUDY07001-

19 25087 through -25090.

20   17.   Attached as **Exhibit 13** is true and correct copy of relevant pages

21 from the deposition of Barbara Beck, Ph.D., DABT in the matter of

22 *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.*

23   18.   Attached as **Exhibit 14** is a true and correct copy of relevant pages

24 from a Orange County Water District publication entitled G W R S: Groundwater

25 Replenishment System.

26   19.   Attached as **Exhibit 15** is a true and correct copy of relevant pages

27 from the Orange County Water District's Budget Report for FY 2015-2016.

28

20.    Attached as **Exhibit 16** is a true and correct copy of Case Management Order # 116 in this matter, dated July 16, 2014.

21.    In 2002 – after hearing evidence of the defendants' malfeasance dating back decades – the jury in *South Lake Tahoe Public Utility District v. Atlantic Richfield Company* found MTBE-gasoline suppliers liable for punitive damages based on a subset of the evidence that the District will present during the Phase I trials in this case.  Attached as **Exhibit 17** is a true and correct copy of Special Verdict [Phase I] in the matter of *South Tahoe Public Utility District v. Atlantic Richfield, et al.*, dated April 15, 2002.

22.    Attached as **Exhibit 18** is Case Management Order #60 in this matter, dated March 11, 2010.

23.    Attached as **Exhibit 19** is the relevant pages of the transcript from the November 15, 2000 deposition of Ben Thomas, Ph.D. in the matter of *South Tahoe Public Utility District v. Atlantic Richfield, et. al.*  Exxon, Chevron, and Conoco were members of the American Petroleum Institute during the time period relevant to the excerpted testimony and Exhibit 5.

24.    Attached as **Exhibit 20** is a true and correct copy of an internal Exxon memorandum dated August 23, 1984, from B.J. Mickelson to V.M. Dugan regarding MTBE Contamination of Ground Water, bates numbered EX EnFI00048-00049, admitted into evidence at trial *In Re MTBE Products Liability Litigation* MDL 1358, *City of Merced v. Chevron U.S.A., Inc., et al.*, Case No. CU148451.

25.    Attached as **Exhibit 21** is is a true and correct copy of an internal Chevron memorandum dated May 23, 1986, regarding MTBE in Groundwater, bates numbered NJDEP-MTBE-CONTENTION-000184.

26.    Attached as **Exhibit 22** is a true and correct copy of an internal Chevron memorandum dated June 11, 1986, regarding Marketing Environmental

Declaration of Tracey O'Reilly In Support of Plaintiff's Opposition to Defendants' MSJ Re Damages and Declaratory Relief

1   Concerns Regarding the Use of MTBE in Mogas, bates numbered CHEV 14902-

2   14903, admitted into evidence at trial *In Re MTBE Products Liability Litigation*

3   MDL 1358, *City of Merced v. Chevron U.S.A., Inc., et al.*, Case No. CU148451.

4       27.   Attached as **Exhibit 23** is a true and correct copy of an internal

5   Chevron memorandum dated February 13, 1987, regarding MTBE, bates

6   numbered NJDEP-MTBE-CONTENTION-000055-57, admitted into evidence at

7   trial *In Re MTBE Products Liability Litigation* MDL 1358, *City of Merced v.*

8   *Chevron U.S.A., Inc., et al.*, Case No. CU148451.

9       28.   Attached as **Exhibit 24** is a true and correct copy of relevant pages

10   from a February 27, 1987, <u>STATEMENT OF MTBE COMMITTE SUBMITTED</u>

11   <u>TO EPA</u>, bates numbered EX EPA 00094-00097, admitted into evidence at trial *In*

12   *Re MTBE Products Liability Litigation* MDL 1358, *City of Merced v. Chevron*

13   *U.S.A., Inc., et al.*, Case No. CU148451.

14       29.   Attached as **Exhibit 25** is a true and correct copy of relevant pages

15   from the June 18, 2015 reporter's transcript of the hearing with Judge Shira A.

16   Scheindlin.

17       30.   Attached as **Exhibit 26** is a true and correct copy of a letter from

18   Tracey O'Reilly to Whitney Jones Roy, dated November 7, 2013.

19   **<u>Compliance with Local Rule 7-3</u>**

20       31.   The District has conducted extensive meet and confer over the years

21   regarding the issues raised in Defendants' Motion for Summary Judgment re

22   Damages and Declaratory Relief, particularly with respect to the status of the

23   District's declaratory relief claims.  In advance of the present motion, defendants

24   sent an additional meet and confer letter, to which the District responded on

25   ////

26   ////

27   ////

28

1    September 29, 2016.  Attached as **Exhibit 27** is a trued and correct copy of a letter

2    from Tracey O'Reilly to Whitney Jones Roy, dated September 29, 2016.

3           I declare under penalty of perjury under the laws of the State of California

4    that the foregoing is true and correct.

5           Executed this 17th day of October, 2016, at Sacramento, California.

7                                        TRACEY L. O'REILLY

Exhibit 1



Jan 27 2006
3:28PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)

The Honorable Shira A. Scheindlin

---

This document relates to:

*Orange County Water District v. Unocal Corp., et al.*, No. 04 Civ. 04968 (SAS)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR STAY OR DISMISSAL WITHOUT PREJUDICE BASED ON PRIMARY JURISDICTION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   LEGAL ARGUMENT.............................................................................4

    A.    The Relief Sought by OCWD Involves Technical and Policy
        Considerations Within the Agencies' Particular Field of Expertise and
        Outside the Conventional Experience of Judges. .....................................4

        1.    OCWD's Request for Relief to Clean Up MTBE and TBA
            Contamination Requires the Court to Duplicate Precisely What the
            Agencies Are Charged With and Are Currently Accomplishing.................4

        2.    A Comprehensive Administrative System Already Exercises
            Jurisdiction Over the Remediation of Groundwater to Provide
            Exactly the Same Remedy OCWD Asks this Court to Order......................6

        3.    The Special Competence of the Regulators Is Illustrated By the
            Three Designated Sites. ...........................................................8

            a.    The Union 76 Station Has Undergone Extensive
                Remediation and Is Now Nearing Closure. .....................................9

            b.    The Mobil Site Illustrates the Same Process...................................10

            c.    OCWD Has Expressed No Interest In or Concern With The
                Chevron Site, Which is Being Successfully Remediated. ..............10

        4.    The Technical Questions Presented by OCWD's Request for Relief
            Fall Outside Courts' Conventional Experience and Should Caution
            this Court to Abstain from Exercising its Jurisdiction............................10

    B.    The Issue of How and How Completely to Investigate, Monitor, and
        Remediate Groundwater Falls Uniquely Within the Agencies' Discretion..........13

        1.    The Regulatory Agencies Have Been Granted Discretion to
            Determine How Groundwater Remediation Should Proceed. ...................13

        2.    The Agencies' Discretion Is Subject to Appeal by any Interested
            Party—Including OCWD—to the State Board and to State Court
            Under the Procedures Outlined in the Regulations.  OCWD Has
            Never Done So..........................................................................14

        3.    OCWD Does Not Have The Statutory Authority of the Lead
            Regulatory Agencies.................................................................15

a.      OCWD Can Take Reasonable Remedial Measures in Cases
        of Urgent Threats. ..........................................................................17

b.      Not Once Has OCWD Invoked Such Authority Regarding
        MTBE or TBA Contamination. ....................................................18

C.   Prior Application to the Agencies Has Been Made. ...............................20

     1.   The Agencies Are Addressing The Contamination at All Sites. ...............20

     2.   In The Single Instance That A Drinking Water Well Was Impacted
          With MTBE Above The MCL, The Regulatory Structure Worked
          To Resolve the Well Owner's Concerns.................................................20

D.   If This Court Were to Exercise Jurisdiction in Place of the Agencies, the
     Risk of Inconsistent Rulings Would Be Guaranteed. ............................22

E.   On Balance, the Advantages of Deferring to Agency Jurisdiction
     Outweigh the Potential Costs Arising from Complications and Delay in
     the Administrative Proceedings. .........................................................24

III.   CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

*Far East Conference v. United States,*
    342 U.S. 570 (1952) ........................................................................23

*Friends of Santa Fe County v. LAC Minerals, Inc.,*
    892 F. Supp. 1333 (D.N.M. 1995) ........................................4, 12, 13

*Johnson v. Nyack Hospital,*
    964 F.2d 116 (2d Cir. 1992) ..............................................................4

*In re: Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
    175 F. Supp. 2d 593 (S.D.N.Y. 2001) ..........................................3, 4

*New Mexico v. General Electric Co.,*
    335 F. Supp. 2d 1185 (D.N.M. 2004) ...............................................11

*New Mexico v. General Electric Co.,*
    322 F. Supp. 2d 1237 (D.N.M. 2004) ........................................12, 25

*United States v. Western Pac. R.R.,*
    352 U.S. 59 (1956) ............................................................................4

### STATE BOARD CASES

*In re Exxon Co.,*
    No. WQ 85-7, 1985 WL 20026 (Cal. St. Wat. Res. Bd. Aug. 22, 1985) ...............14, 15

*In re Lois Green and Patricia Kelly,*
    No. WQ 2005-002-UST (Cal. St. Wat. Res. Bd. Jan. 20, 2005) ....................14

*In re Ernest Panosian,*
    No. WQ 2004-0018-UST (Cal. St. Wat. Res. Bd. Nov. 18, 2004) ..................14

### STATE STATUTES AND REGULATIONS

Cal. Civ. Proc. Code § 1094.5(c) ...........................................................15

Cal. Code Regs., tit. 23, §§ 2650-2652 .....................................................7

Cal. Code Regs., tit. 23, §§ 2720-2728 .....................................................7

Cal. Code Regs., tit. 23, § 2722(a) ..........................................................7

Cal. Code Regs., tit. 23, § 2723(a) ..........................................................7

Cal. Code Regs., tit. 23, § 2724 .................................................................................7

Cal. Code Regs., tit. 23, § 2725(a) ............................................................................8

Cal. Code Regs., tit. 23, §§ 2725, 2726(d)................................................................8

Cal. Health & Safety Code § 25295(a) ......................................................................7

Cal. Health & Safety Code § 25296.10......................................................................7

Cal. Health & Safety Code § 116275(c)(1) .............................................................20

Cal. Water Code § 13000-14958 ...............................................................................6

Cal. Water Code § 13000...........................................................................................13

Cal. Water Code § 13001 .....................................................................................6, 16

Cal. Water Code § 13225.......................................................................................6, 8

Cal. Water Code § 13241 ..........................................................................................13

Cal. Water Code § 13261 ............................................................................................8

Cal. Water Code § 13301 ............................................................................................8

Cal. Water Code § 13304 .......................................................................................7, 8

Cal. Water Code § 13320 ..........................................................................................15

Cal. Water Code § 13323(a) .......................................................................................8

Cal. Water Code § 13330 ..........................................................................................15

Cal. Water Code § 13350(g) .......................................................................................8

Cal. Water Code App. § 40-2....................................................................................15

Cal. Water Code App. § 40-8........................................................................16, 17, 18

## MISCELLANEOUS

Exec. Order D-5-99 (Mar. 26, 1999) ........................................................................22

Exec. Order D-52-02 (Mar. 14, 2002) ......................................................................22

Defendants submit this brief in support of their motion for stay or dismissal without prejudice, based on the doctrine of primary jurisdiction, of those claims alleged in plaintiff Orange County Water District's ("OCWD") Second Amended Complaint ("SAC") that seek declaratory relief to adjudicate the rights and responsibilities of the parties, injunctive relief to abate the alleged nuisance, and money to fund future remediation costs.[1]

## I.   INTRODUCTION

OCWD is a limited-purpose special water agency that, by its own admission, seeks to accomplish by litigation exactly what the state regulatory agencies are already requiring the responsible parties to do under the agencies' supervision: to clean up MTBE and TBA so that drinking water is protected. OCWD, which does not seek compensation for injury to its own wells (because it does not own any), asks for declaratory and injunctive relief plus money that it says it will use to "investigate, monitor and clean up MTBE and other oxygenates from the groundwater basin."[2] In Orange County generally, and specifically at the three service stations chosen to illustrate the regulatory process (the "designated sites"), the regulatory agencies are currently accomplishing this very task.[3] OCWD's litigation consulting firm, hired eight months ago for the express litigation purpose of identifying MTBE release sites with "significant groundwater contamination problems," recently testified that it cannot say that any of the remediation work at the designated sites, or the supervision provided by the regulatory agencies,

---

[1] This motion does not seek to stay or dismiss that portion of OCWD's claim under the OCWD Act (SAC, Fifth Cause of Action, ¶¶ 103-108) seeking reimbursement of funds actually spent by OCWD to investigate MTBE releases.

[2] Deposition of Roy Herndon ("Herndon Dep.") 407:22-408:10 (all excerpts from the deposition testimony of OCWD's designated representative Roy Herndon cited herein are attached as Ex. 1 to the Declaration of Jon D. Anderson ("Anderson Decl."), filed concurrently herewith); Anderson Decl. Ex. 2 at 1; *accord* SAC at 35-36.

[3] OCWD claims there are approximately 400 MTBE plumes about which it has concerns. The list of sites produced by OCWD in discovery, however, numbers more than 525. *See* Anderson Decl. Ex. 15. Although defendants have not determined the nature of the discrepancy between the numbers OCWD has used, virtually all of the more than 525 sites are now, or have been, the subject of regulatory oversight for the specific purpose of protecting drinking water. *Id.*

should have been done any differently. This conclusion is not surprising. During the 10 years that OCWD has known there were as many as 400 MTBE plumes under regulatory supervision, not once did it write a letter to a regulatory agency complaining about or offering suggestions concerning any aspect of a single MTBE cleanup project.

All five of the factors courts evaluate in determining whether to invoke primary jurisdiction favor deferral here. First, the relief sought by OCWD involves technical and policy considerations within the expertise of California's regulatory structure. As OCWD concedes, "Prime responsibility for enforcement activities for groundwater contamination rests with the Regional Water Quality Control Board," whose "regulatory goal is to clean up the contamination so that it does not present a threat to drinking water." Herndon Dep. 236:1-17, 290:18-24. The agencies have the expertise necessary to evaluate the many technical decisions involved in remediation of groundwater, as well as the enforcement tools they need to compel the responsible parties to pay for and clean up their sites.

Second, the investigation, monitoring, and remediation of groundwater fall particularly within the discretion of the agencies, who are charged with making decisions in the best interest of the people of the state. The responsible party, other agencies, or any interested party may challenge an agency's decision by appeal to the state water board and the superior court. OCWD has never invoked that authority to challenge an agency's decision regarding the remediation of MTBE or TBA. Instead, it asks the Court to reject the agencies' discretion by adjudicating the remediation at each site. OCWD's lawsuit conflicts even with its own limited statutory powers, which authorize it to take remedial action itself only if necessary to address an emergency contamination situation, and then—and *only* then—to seek reimbursement from the responsible parties. OCWD has never done so. Instead, OCWD has ignored its limited statutory authority and filed a lawsuit contravening its enabling statute's procedure for addressing perceived threats.

Third, prior application to the agencies has been made. The Santa Ana Regional Water Quality Control Board has been notified of and has undertaken responsibility to address, either itself or via express delegation to local oversight agencies such as Orange County Health Care

2

Agency, contamination concerns at each of the release sites since at least 1998.

Fourth, were this Court to accept jurisdiction, inconsistent rulings would be guaranteed. Equipping OCWD with orders that certain actions be taken or paid for at sites where the lead agencies have already implemented remediation plans would subject both the agencies and the responsible parties to incompatible rulings. This result would prejudice the rights granted to the regulatory and regulated communities under the statutory scheme and could compromise the state's goal of "appropriate and consistent"[4] remediation of groundwater resources.

Fifth, the advantages of deferring to agency jurisdiction outweigh the potential costs of complications and delays in the administrative proceedings. There will be benefits, not costs, in doing so here. Deferring to agency jurisdiction will take advantage of the agencies' technical skills and years of experience with these release sites, utilize the efficiencies of continued exercise of jurisdiction by the interactive regulatory structure, and preserve the progress already made under regulatory oversight.

In *MTBE I*, this Court declined to invoke primary jurisdiction based in part on its concern that "the specific being sought by plaintiffs [was] not provided by the various administrative agencies, nor [did] such relief appear to be forthcoming." *In re: Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 618 (S.D.N.Y. 2001) ("*MTBE I*"). The opposite is true here. The remedy OCWD seeks is precisely "the specific relief" that regulatory agencies are actively providing. OCWD has asked this Court to inject itself into a complex regulatory process that already is underway, in order to reach the very goal (protection of drinking water) that existing regulatory agencies are pursuing. The result will be a morass of overlapping, and probably conflicting, directives from competing branches of government. "If Plaintiffs' goal is ultimate and complete remediation of the site[s], this goal would be achieved

---

[4] Santa Ana Regional Water Quality Control Board, "Supplemental Guidance for Prioritization of Investigation and Cleanup of Underground Storage Tank Releases Containing MTBE" (June 1, 2001) ("Santa Ana Regional Board Supplemental MTBE Guidance") at 1, available at http://www.waterboards.ca.gov/santaana/pdf/mtbeguidance.pdf.

faster and more efficiently through the efforts of the [agencies] without interference from the Court." *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1350 (D.N.M. 1995).

## II.  LEGAL ARGUMENT

In determining whether to invoke primary jurisdiction, the five factors to which courts generally look are (1) whether the question is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise, (2) whether the issue is particularly within the agency's discretion, (3) whether a prior application to the agency has been made, (4) whether there exists a substantial danger of inconsistent rulings, and (5) whether the advantages of applying the doctrine outweigh the potential costs.[5] Each of these factors supports deferral to the jurisdiction and expertise of the regulatory agencies that are actively overseeing hundreds of MTBE and TBA remediation projects in north Orange County.

### A.  The Relief Sought by OCWD Involves Technical and Policy Considerations Within the Agencies' Particular Field of Expertise and Outside the Conventional Experience of Judges.

#### 1.  OCWD's Request for Relief to Clean Up MTBE and TBA Contamination Requires the Court to Duplicate Precisely What the Agencies Are Charged With and Are Currently Accomplishing.

Primary jurisdiction deferral is appropriate where "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ." *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir. 1992) (quoting *United States v. Western Pac. R.R.*, 352 U.S. 59, 64 (1956)).  Such is the case here.  The remedy OCWD seeks is not the ordinary tort remedy of damages to compensate an

---

[5] *MTBE I*, 175 F. Supp. 2d at 617.  Although originally applied to jurisdictional conflicts between federal courts and federal agencies, the primary jurisdiction doctrine is applicable where state agencies have jurisdiction over issues sought to be raised before federal district courts. *Id.*

injured party for injury to its property.[6] Rather than seeking compensatory damages, OCWD prays for money or orders prospectively to "investigate, monitor and clean up MTBE and other oxygenates from the groundwater basin." Herndon Dep. 407:22-408:10, Anderson Decl. Ex. 2 at 1; *accord* SAC at 35-36. This is exactly the remedy the agencies exist to provide, and it requires the resolution of issues that have already been delegated to them.

OCWD admits that the regulatory process is currently undertaking efforts that, if allowed to proceed, can provide the full relief OCWD seeks in this lawsuit. Herndon Dep. 385:2-22. Moreover, OCWD's litigation consultants have been unable to conclude that a single act of remediation or regulatory oversight should have been done differently. Deposition of Lee Paprocki ("Paprocki Dep.")[7] 125:20-126:22, 192:18-194:21.[8]

Awarding money for future remediation costs or ordering injunctive relief to force defendants to abate the alleged nuisance would call upon the Court to:

- Oversee investigations of releases and require implementation of the appropriate cleanup and abatement measures;

- Adjudicate preliminary site assessment plans to confirm the discharge and identify dischargers, identify affected or threatened waters and their beneficial uses, and develop information on the nature and extent of the discharge;

- Adjudicate soil and groundwater investigation plans to determine the source, nature, and extent of the discharge with sufficient detail to provide the basis for

---

[6] OCWD does not own any drinking water wells. *See* Plaintiff's Responses and Objections to Defendants' Requests for Admission, Nos. 6, 7 (Ex. 2 to Declaration of David Schrader in support of Defendants' Motion for Summary Judgment of Plaintiff's Claim for Damages Based on MTBE Detections Below the MCL (filed Jan. 23, 2005) ("Defendants' MCL Motion") at 4-5); OCWD's Response to Defendants' CMO #15 Submission (filed Dec. 16, 2005) at 3.

[7] All excerpts from the deposition testimony of OCWD's consultant Komex's designated representative Lee Paprocki cited herein are attached as Anderson Decl. Ex. 3.

[8] Defendants have had an opportunity to take only limited discovery from OCWD and its consultants prior to bringing this motion, and anticipate that further discovery would provide additional information supporting deferral based on primary jurisdiction.

decisions regarding subsequent cleanup and abatement actions;

- Adjudicate feasible and effective cleanup and abatement action plans and develop preferred cleanup and abatement alternatives;

- Monitor cleanup and abatement work to confirm effectiveness; and

- Determine when no further action is necessary.

All of these functions are currently being handled by the regulatory agencies, who have particular expertise in all of them.

> ### 2.   A Comprehensive Administrative System Already Exercises Jurisdiction Over the Remediation of Groundwater to Provide Exactly the Same Remedy OCWD Asks this Court to Order.

In 1969, the California Legislature passed the Porter-Cologne Water Quality Control Act, a comprehensive water-quality protection program. Cal. Water Code §§ 13000-14958. The Porter-Cologne Act provides a rigorous program for the regulation of waste discharges, including the investigation, monitoring, and cleaning up of groundwater contamination. *Id.* The Legislature specified that the State Water Resources Control Board ("State Board") and each of the nine regional water quality control boards ("Regional Boards") would serve as the "principal state agencies with primary responsibility for . . . water quality." *Id.* § 13001. The State Board passed a resolution outlining its policies and procedures for investigating and cleaning up discharges[9] and issued comprehensive guidelines for the investigation and clean up of MTBE.[10]

Concurrently, each of the nine Regional Boards, including the Santa Ana Regional Water Quality Control Board ("Santa Ana Regional Board") with jurisdiction over Orange County, is charged with the "prevention and abatement of water pollution and nuisance." Cal. Water Code § 13225. The Regional Boards and the State Board "coordinate their respective activities so as

---

[9] State Water Resources Control Board Resolution No. 92-49 (Apr. 21, 1994, Oct. 2, 1996) ("Res. 92-49"), available at http://www.waterboards.ca.gov/resdec/resltn/other/rs92-49.html.

[10] State Water Resources Control Board, Guidelines for Investigation and Cleanup of MTBE and Other Ether Base Oxygenates (Mar. 27, 2000), available at http://www.waterboards.ca.gov/ust/cleanup/docs/mtbe_finaldraft.pdf.

to achieve a unified and effective water quality control program in the state." Res. 92-49 at 1. The Santa Ana Regional Board, which claims to be "stricter" than other Regional Boards,[11] has promulgated procedures supplementing the State Board's guidance on MTBE remediation.[12]

A variety of state, county, and local agencies assist the State and Regional Boards through the "Local Oversight Program."[13] The Santa Ana Regional Board has delegated responsibility to the Orange County Health Care Agency ("OCHCA") to oversee the investigation and remediation of certain MTBE groundwater contamination sites. Herndon Dep. 236:1-17. OCWD admits that the Santa Ana Regional Board and OCHCA have "prime responsibility" for these tasks in this region, and that the Santa Ana Regional Board has never delegated lead-agency responsibility to OCWD for any MTBE remediation site. Id. 339:14-23.

The regulators have enforcement tools to ensure responsible parties pay for and remediate the contamination. E.g., Cal. Health & Safety Code § 25296.10; Cal. Water Code § 13304(a). The regulations mandate that any unauthorized leak be reported within 24 hours to the Regional Board or its delegated local agency. Cal. Health & Safety Code § 25295(a); Cal. Code Regs., tit. 23, §§ 2650-2652. The agencies then work with the reporting party to investigate the cause, identify the responsible parties, quantify the extent, and develop a plan to address the release, including necessary corrective-action requirements. Cal. Code Regs., tit. 23, §§ 2720-2728.[14]

---

[11] Deposition of Ken Williams (Jan. 10, 2001) at 76:19-78:3. All excerpts from the deposition testimony of the Santa Ana Regional Board's Underground Storage Tank Section Chief Ken Williams cited herein are attached as Anderson Decl. Ex. 4.

[12] See Santa Ana Regional Board Supplemental Guidance, supra n. 4.

[13] A summary of the regulatory agencies and their powers and responsibilities is provided in the Table of California's Groundwater Regulations (Anderson Decl. Ex. 5), which also describes GeoTracker, California's internet portal to a data warehouse that tracks regulatory data.

[14] Corrective action typically consists of four phases: (1) preliminary site investigation, (2) soil and water investigation, (3) corrective action plan implementation, and (4) verification monitoring. Cal. Code Regs., tit. 23, § 2722(a). Preliminary site investigation includes the initial site investigation, abatement actions, site characterization, and remedial action. Id. § 2723(a). Corrective action continues if it is determined that site conditions warrant a soil and water investigation. Id. § 2724. The purpose of a soil and water investigation is "to assess the

These tasks, which are the responsibility of agency experts, require highly technical considerations in many scientific fields such as hydrogeology, geology, organic chemistry, engineering, and remediation technology, among others. The remedial plans are based on site-specific conditions including the size of the release, hydrogeologic conditions, the existence of any nearby plumes or remediation projects, and the proximity of any water production wells. Once developed, the plan is constantly reviewed and revised as site conditions change. *See* Cal. Code Regs., tit. 23, §§ 2725, 2726(d); Declaration of Dan Fischman ("Fischman Decl.") ¶¶ 2-21.

The agencies also have enforcement powers to punish responsible parties who fail to comply with agency directives. The Regional Boards may issue cease-and-desist orders as to a discharge or threatened discharge in violation of state law (Cal. Water Code § 13301), impose sanctions and fines, including against responsible parties that fail to file reports (*id.* § 13261), and issue cleanup and abatement orders requiring the responsible party to clean up waste and abate the effects of the waste discharge. *Id.* § 13304; *see also* Williams Dep. 263:13-268:7. If a party fails to comply with a Regional Board order, the board may request "enforcement by appropriate federal, state and local agencies of their respective water quality control laws." Cal. Water Code § 13225. The Regional Board also may request the Attorney General's office to petition the superior court for an enforcement order or for civil monetary remedies (*id.* §§ 13225, 13350(g)) or may itself impose administrative civil liability against violators by issuing a complaint and setting a hearing before the Regional Board. *Id.* § 13323(a).

3.    **The Special Competence of the Regulators Is Illustrated By the Three Designated Sites.**

Not only does California's extensive regulatory system work on paper, it works on the ground. Pursuant to this Court's direction, three sites were selected to illustrate why it is appropriate to defer to the regulatory agencies' jurisdiction in this case: a Union 76 station, a Mobil station, and a Chevron station. Each designated site demonstrates that the agencies are

---

nature and vertical and lateral extent of the unauthorized release and to determine a cost-effective method of cleanup." *Id.* § 2725(a).

8

actively engaged with the responsible parties, leading to substantial decreases in MTBE and
TBA concentrations and the successful prevention of any threat to drinking water.

### a.   The Union 76 Station Has Undergone Extensive Remediation and Is Now Nearing Closure.

The regulatory and remediation activity at the Union 76 site, described in additional
detail in the attached declaration of Dan Fischman, exemplifies how the responsible party and
the regulatory agencies work together to clean up contamination and protect drinking water
wells. The lengthy record of scientific assessments and technical decisions made by the
responsible companies, their consultants, lead agency OCHCA, and the Santa Ana Regional
Board demonstrates a dynamic process, requiring frequent interaction among the interested
parties over many years. Decisions at this site have involved multiple instances of soil
excavation, installation of monitoring wells, soil and groundwater sampling, geotechnical
analyses of samples, quarterly or more frequent monitoring, source analyses, aquifer tests,
preparation of assessment and feasibility studies and remediation plans, coordination with other
landowners and state agencies, negotiation regarding appropriate remediation technologies,
encroachment and discharge permitting, and reporting to several different agencies. Fischman
Decl. ¶¶ 2-21. Due to the presence of neighboring landowners, the site also shows the necessity
of considering the effect that remediation at one site may have on other sites in the area and the
need for a coordinated approach at all related sites under regulatory supervision. *Id.* ¶¶ 6, 8, 11.

Because a City of Westminster drinking water well is located approximately 900 feet
from the 76 station, OCHCA designated the site as a high priority. *Id.* ¶ 23. While this site
demonstrates that remediation projects are not simple or perfect, the MTBE levels have dropped
from an historical high of 480,000 parts per billion ("ppb") to a current high of 9.4 ppb, and there
has never been a detection of MTBE contamination at the drinking water well. *Id.* ¶ 22. In fact,
OCWD's litigation consultant Komex, hired eight months ago specifically to identify MTBE
release sites with "significant groundwater contamination problems," or so-called "problem
sites," has not concluded that further plume delineation, additional off-site remediation, or any

9

other action whatsoever should be undertaken at the 76 site, or that the site poses a risk to drinking water. Paprocki Dep. 127:18-128:1, 154:24-155:6, 168:10-14. Should OCHCA require that ConocoPhillips take further action to delineate the MTBE plume and remediate any contamination that has migrated off-site, OCWD acknowledges that the regulatory structure will provide the full relief it seeks in this case. Herndon Dep. 385:2-22.

### b.      The Mobil Site Illustrates the Same Process.

The Mobil site similarly demonstrates active agency involvement and the benefits of agency oversight and cooperation. The details of the remediation accomplished by the responsible party, under the supervision of the regulatory agency, are set forth in the accompanying declaration of Marla D. Guensler ("Guensler Decl."). Other than reading and filing a Komex summary report on the site and its remediation history, OCWD maintains no files and has made no effort to involve itself in any investigation or remedial actions at this site. Herndon Dep. 162:21-164:11, 392:14-22, 464:18-465:6, 467:13-16. Komex cannot say that <u>any</u> of the remediation work at this site, or the supervision provided by the regulatory agencies, should have been done differently. Paprocki Dep. 127:18-128:1, 154:24-155:6.

### c.      OCWD Has Expressed No Interest In or Concern With The Chevron Site, Which is Being Successfully Remediated.

The Chevron site has received no attention from OCWD. Herndon Dep. 390:8-13, 479:10-21. The significant and successful remediation work is described in the attached declaration of Dana Thurman ("Thurman Decl.").

### 4.      The Technical Questions Presented by OCWD's Request for Relief Fall Outside Courts' Conventional Experience and Should Caution this Court to Abstain from Exercising its Jurisdiction.

OCWD does not own wells that it alleges have been injured. Instead, OCWD seeks the remediation of groundwater, specifically through funds and orders to effect additional delineation of contaminant plumes and additional remediation of off-site contamination, where the current regulatory process has either not chosen to effect or has not yet effected such results. SAC at 34-35; Herndon Dep. 381:16-382:1, 386:14-387:8, 390:24-391:14, 407:22-408:10;

10

Anderson Decl. Ex. 2 at 1. Whether the existing remediation plans at hundreds of sites should be altered to encompass the alleged and newly stated goals of OCWD—which its own litigation consultant has *not* concluded are even warranted (Paprocki Dep. 125:17-126:2)—as well as the resolution of disputes arising between stakeholders not represented in the litigation, would involve technical and policy considerations directly within the agencies' traditional jurisdiction.

If successful at trial, OCWD's claims could logically result in three forms of judgments as to each station in the entire OCWD area: a judgment for money representing future environmental remediation costs, a judgment declaring the defendants liable for future environmental remediation costs, or a judgment for an injunction compelling the parties to perform specific remediation activities. To implement any of these judgments, the Court would be asked to adjudicate the proper remediation techniques for each site within the OCWD area. To determine an amount of money or to compel remedial conduct, the Court or a jury would need to master the highly technical scientific disciplines of environmental remediation and engineering and proceed to monitor the implementation of the chosen approach. The California regulatory process was designed to supply this detailed and regular oversight.

In *New Mexico v. General Electric Co.*, 335 F. Supp. 2d 1185 (D.N.M. 2004), the United States District Court for the District of New Mexico came face to face with the difficulties that arise when a court exercises jurisdiction over the remediation of groundwater contamination despite an ongoing regulatory process. The New Mexico Attorney General sued responsible parties for contamination that was already subject to remedial plans under the supervision of the U.S. EPA and state. *Id.* at 1194-95. Like OCWD, New Mexico asserted causes of action for trespass, nuisance, and negligence in its capacity as the public trustee for the groundwater, not as a water producer, and sought money damages to remediate the contamination that it contended would be left behind by the remediation plans already adopted. *Id.* at 1222. Initially, the court accepted jurisdiction to determine the measure of damages and ruled that, if plaintiff were successful, money could be placed in a court-supervised escrow account, and the court could approve payments from that account for specific remedial activities. *Id.* at 1259, 1263.

11

On a subsequent motion, however, the court found that the myriad decisions involved in carrying out such a remedy were suited to the expertise of the agencies, not the conventional experience of courts. *New Mexico v. General Electric Co.*, 322 F. Supp. 2d 1237 (D.N.M. 2004). The court ruled that the existing remedial projects were "a dynamic system, a system that's capable of adjustment, a system where people can complain and, if listened to by those who are in positions of decision-making authority, can effect a modification, a change, a reaching out, purportedly to achieve the stated goals of cleaning up a mess that someone has caused." *Id.* at 1271. Because the existing remediation plans were providing the relief New Mexico ultimately sought, and because the state could seek to modify those plans by working through the existing regulatory process, the court dismissed the state's case. *Id.* at 1271-72.

Similarly here, OCWD is suing for strict liability, trespass, nuisance, and negligence in order to seek remediation of groundwater that OCWD claims might not be ordered under existing remediation plans. As the court in *General Electric* ultimately concluded, such a remedy would require court supervision of further remediation efforts by reviewing and approving each step of future remediation proposals. *Id.* The same would be true for the declaratory orders OCWD seeks, all of which would require court supervision to enforce. As in *General Electric*, the agencies' ongoing participation and expertise provide a flexible approach to groundwater remediation to effect the same goals OCWD claims to seek here, while providing a specific regulatory process for interested parties to seek to modify the agencies' decisions.

In *Friends of Santa Fe County*, the defendants' primary jurisdiction motion was granted based upon strikingly similar reasoning to that applicable here. 892 F. Supp. 1333 (D.N.M. 1995). There, the plaintiff sued for alleged groundwater contamination resulting from the operation of a mine, asking the court to determine that "the acid mine drainage at the site [constituted] an imminent and substantial endangerment to health or the environment." *Id.* at 1347. In deciding to abstain based on primary jurisdiction, the court found that evaluating this claim would require the court to second-guess determinations being made by the New Mexico Environmental Department, the lead agency for remediation efforts at the mining site. "Should

12

the [p]laintiffs prevail, . . . the Court would then be required to fashion an appropriate order, [which] in turn would require evaluating whether Defendants have adequately investigated the groundwater contamination, or whether further investigation is necessary; whether the existing methods of remediation are adequate; what level of contamination is tolerable; and a myriad other technical matters." *Id.* at 1349-50.

Likewise, OCWD's request for injunctive relief and damages to compensate for all future costs associated with the investigation and remediation of groundwater in Orange County would require this Court to make the same types of judgments. Accepting jurisdiction would call upon the Court to review and evaluate the decisions being made by the agencies who are actively overseeing remediation of the groundwater contamination in Orange County and to resolve the same technical questions that led the court in *Friends of Santa Fe County* to abstain.

**B.    The Issue of How and How Completely to Investigate, Monitor, and Remediate Groundwater Falls Uniquely Within the Agencies' Discretion.**

**1.    The Regulatory Agencies Have Been Granted Discretion to Determine How Groundwater Remediation Should Proceed.**

The California Legislature entrusted the State Board with a "reasonableness" standard for statewide water quality regulation. Cal. Water Code § 13000. The Legislature explicitly "recognized that it may be possible for the quality of water to be changed to some degree without unreasonably affecting beneficial uses." *Id.* § 13241. Consistent with this charge, the State Board adopted a policy of remediating UST releases in order to achieve the best water quality that is "reasonable." Res. 92-49 § III.G. Similarly, each Regional Board establishes water quality objectives to ensure "reasonable protection of the beneficial uses" designated in the basin plan and the prevention of nuisance. Cal. Water Code § 13241. Like the State Board, the Regional Boards work to "attain the highest water quality which is reasonable, considering all demands being made and to be made on the[] waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." *Id.* § 13000.

Based on site-specific factors, the State Board's experts may determine that, despite persistent contamination, the absence of harm to the state's water quality objectives merits

termination of a remediation program. *E.g.*, *In re Ernest Panosian*, No. WQ 2004-0018-UST, at
13-14 (Cal. St. Wat. Res. Bd. Nov. 18, 2004) (closing remediation based on evaluation of site,
including no known drinking water wells within 1,000 feet down-gradient of the site and no
likelihood that contaminants will migrate or that contaminated area would be used as source of
drinking water)[15]; *In re Lois Green and Patricia Kelly*, No. WQ 2005-002-UST, at 11-12 (Cal.
St. Wat. Res. Bd. Jan. 20, 2005) (similar).[16] Remediating contaminated groundwater to non-
detect can often be "of little benefit to current or anticipated uses of groundwater," while "the
statewide technical and economic implications [would] be enormous." *In re Panosian*, at 11.
Determining what steps must be taken at a site and where those steps will cease is specifically
within the agencies' special discretion to undertake.

Another function delegated to the agencies is the determination of the party or parties
responsible for the contamination. *E.g.*, *In re Exxon Co.*, No. WQ 85-7, 1985 WL 20026, *5-6
(Cal. St. Wat. Res. Bd. Aug. 22, 1985). Often there are multiple parties with possible ties to a
release site. *See id.* As illustrated by the 76 site, a release from one station might result in the
installation of monitoring wells that detect a release from another station. Fischman Decl. ¶ 8.
When this happens, the agencies exercise their discretion to adjudicate who may be responsible
for commingled releases. *See, e.g., id.* ¶ 11. On a site-specific basis, the agencies determine
responsibility and impose on the responsible parties the financial obligation to remediate the
groundwater. These questions are particularly within the agencies' discretion to resolve.

2.   **The Agencies' Discretion Is Subject to Appeal by any Interested
Party—Including OCWD—to the State Board and to State Court
Under the Procedures Outlined in the Regulations. OCWD Has
Never Done So.**

When a dispute arises in the course of a site remediation, California law provides a
procedure for interested parties to appeal an agency's action or failure to act. Any person
aggrieved by a decision of the Regional Board may petition for State Board review. Cal. Water

---

[15] Available at http://www.waterboards.ca.gov/resdec/wqorders/2004/wqo/wqo2004-0018ust.pdf.

[16] Available at http://www.waterboards.ca.gov/resdec/wqorders/2005/wqo/wqo2005_0002ust.pdf.

Code § 13320. The State Board also retains a *sua sponte* power to review the Regional Boards'
action or inaction at any time. *Id*. The Porter-Cologne Act specifies what evidence will
constitute the record on appeal before the State Board and what standard of review will apply.
*Id.*; *see also In re Exxon Co.*, at *5-6. If the State Board determines that the Regional Board's
action is "inappropriate or improper," the State Board may remand, reverse the Regional Board,
or take the appropriate action itself. Cal. Water Code § 13320; *In re Exxon*, at *6.

After the State Board's decision, any person may petition the superior court for a writ of
mandate for review. Cal. Water Code § 13330. The superior court does not decide the issue *de
novo* but instead reviews the administrative agency's decision under the substantial evidence test.
Cal. Civ. Proc. Code § 1094.5(c). This comprehensive framework sets forth the procedures for
challenging the exercise of the agencies' discretion under the regulatory scheme.

In its entire existence, OCWD has not once exercised its right under the regulatory
appeals procedure to challenge the decision of the Santa Ana Regional Board, OCHCA, or any
other agency overseeing the remediation of MTBE or TBA contamination. Herndon Dep. 839:4-
21. Instead, OCWD now seeks in this action to bypass the regulatory procedure by asking the
Court to assume responsibility for regulating the remediation projects. Were the Court to
exercise jurisdiction, the primary agencies' discretion, as delegated by the Legislature and
supported by the regulatory system's formal procedures and standards of review, would be
summarily overruled in favor of another agency's (OCWD's) unilateral whim.

### 3. OCWD Does Not Have The Statutory Authority of the Lead Regulatory Agencies.

According to its enabling statute, OCWD operates within, not above, the law as
established by the California regulatory scheme. OCWD was formed in 1933 by special act of
the California Legislature to "manage and protect the common groundwater supplies of the
northwestern portion of Orange County." Anderson Decl. Ex. 6 at 1; Cal. Water Code App. §
40-2. The Porter-Cologne Act identified the State Board and Regional Boards as "the principal
state agencies with primary responsibility for the coordination and control of water quality."

15

Cal. Water Code § 13001. The OCWD Act must be read in a manner consistent with the Porter-Cologne Act. There can be no question, and OCWD cannot seriously refute, that OCWD must operate within the structure later enacted by Porter-Cologne's comprehensive regulatory scheme.

Not until 1989 was OCWD granted authority to remediate threatened and actual groundwater contamination in emergency situations (and, where it does so, to seek only reimbursement for the reasonable actual costs already incurred). Cal. Water Code App. § 40-8. The Legislature described these changes to the OCWD Act as "technical amendments." Anderson Decl. Ex. 7 at 2. This technical change, together with the absence of any suggestion that the Legislature intended to overhaul the 20-year-old regulatory structure, demonstrates that the 1989 amendment was not intended to usurp the State Board's or Regional Boards' authority.

OCWD's own written polices confirm this fact. OCWD's formal "Ground Water Protection Policy," adopted in 1987 and still in effect today ("1987 Policy"), acknowledges that OCWD's role is "to assist the responsible regulatory agencies in identifying sources of pollution to assure cleanup by the responsible [parties]." Anderson Decl. Ex. 6 at 1. In cases of significant threats to groundwater, OCWD's policy is to "work cooperatively with the . . . [agencies] to see that the responsible [parties] proceed swiftly with containment and cleanup measures." *Id.* at 3; Herndon Dep. 549:20-550:12. Any actions taken by OCWD to address perceived deficiencies in the regulatory program will "complement regulatory agencies' efforts." Anderson Decl. Ex. 6 at 4. "In this regard, the District shall attempt to negotiate agreements with the . . . [agencies] whereby the District formally assists in these agencies' groundwater protection program operations to the end that groundwater quality is better protected or enhanced." *Id.*

OCWD entered into such an agreement with the Santa Ana Regional Board in April 1989. *See* Anderson Decl. Ex. 8. The purpose of the agreement was to "establish[] a cooperative and coordinated framework for the investigation, cleanup and abatement of groundwater contaminants and pollutants . . . ." *Id.* at 1. The agreement identifies the Regional Board as the primary agency and characterizes OCWD's role as secondary and supportive. *Id.* at

16

4-6. OCWD acknowledges "the Regional Board has the power [and] authority to prevent, clean-up and abate any actual or threatened contamination of or pollution to surface or groundwater resources within its boundaries, and further has the responsibility to obtain coordinated action in water quality control, including the prevention and abatement of water pollution and nuisance." *Id.* at 2.

OCWD's internal documents acknowledge its supportive role in the regulatory scheme. In a June 30, 1998, email, OCWD acknowledged that the OCHCA "is the local implementing agency to have oversight on LUST [leaking UST] reporting and cleanup in our area. Information [is] reported and coordinated with the [Regional Board]. Sites with significant contamination to the [groundwater] are transferred to the [Regional Board] for final site remediation." Anderson Decl. Ex. 9. Consistent with the regulatory scheme, OCWD did not articulate any responsibilities of its own for the remediation of groundwater contamination. *See id.*[17]

### a.  OCWD Can Take Reasonable Remedial Measures in Cases of Urgent Threats.

The Legislature did not overlook the possibility that, in carrying out its water management function, OCWD might choose to take remedial measures beyond those implemented by the lead agencies. The 1989 amendment to the OCWD Act granted OCWD certain limited powers to remediate threatened and actual groundwater contamination in an emergency, and later to seek reimbursement for the reasonable actual costs incurred. Cal. Water Code App. § 40-8 ("Section 40-8"). The OCWD Act did not empower OCWD to direct other parties to clean up contamination or authorize OCWD to obtain monies in advance of remedial actions. *See id.*

---

[17] OCWD's interrogatory responses confirm the Santa Ana Regional Board's authority as the primary agency over remediation of contaminated groundwater and over OCWD. OCWD's Supplemental Responses to Certain Defendants' First Set of Interrogatories, No. 1 Subpart (d) (Anderson Decl. Ex. 10 at 3) ("The permit issued by the Santa Ana Regional Water Quality Control Board to the District for the recharge and replenishment activities makes the District financially responsible for the impacts caused by recharging or injecting water which is contaminated with . . . contaminants of concern.").

OCWD's own groundwater policy confirms its authority under Section 40-8 to act in
emergency situations and seek reimbursement later. Anderson Decl. Ex. 6 at 3-4. If OCWD is
dissatisfied with the progress of remediation at a particular site, it may "immediately undertake
remedial action" and implement an "interim cleanup process" until the Regional Board can take
over. *Id.* at 3. Only after OCWD takes remedial actions may it seek to recover the costs incurred
from the responsible parties. *Id.* at 4; *accord* Cal. Water Code App. § 40-8. By law, by contract,
and by its own admission, OCWD is authorized to act as a backstop remediator with power in
limited circumstances to abate imminent threats or actual contamination, and then to recover the
reasonable costs actually incurred.

### b.    Not Once Has OCWD Invoked Such Authority Regarding MTBE or TBA Contamination.

Despite having its Section 40-8 authority for more than 16 years, OCWD has never
undertaken remedial action of an MTBE or TBA release or implemented a remediation plan at
any MTBE or TBA site (Herndon Dep. 139:3-19; 201:5-19, 256:11-17), or even determined that
remediation of MTBE contamination by OCWD was necessary. *Id.* 139:20-141:15. Neither
have its litigation consultants. Paprocki Dep. 125:17-126:2. While OCWD claims that it has the
power, not shared by other agencies, to install monitoring wells rather than merely to order a
responsible party to install a well (Herndon Dep. 168:21-170:2), OCWD has never used this
power with respect to MTBE or TBA. *Id.* 179:19-180:1. OCWD has never offered any of its
alleged authority to assist in an MTBE or TBA remediation project. *Id.* 493:11-16, 606:7-
607:11. OCWD has never communicated with either the lead agencies or the responsible parties
about any concerns about the designated sites. *Id.* 382:7-20, 384:5-8, 385:2-25, 387:15-22.

One of OCWD's committees met formally about MTBE in 1997 yet took no action
concerning MTBE release sites. Specifically, OCWD's Water Issues Committee met to discuss
MTBE on April 16, 1997, but other than considering ways in which MTBE contamination might
allow OCWD to increase "potential future patent revenue derived from the development of
bioremediation technologies" (Anderson Decl. Ex. 11 at 1), it did not identify or seek to carry

out any role it might have in remediating MTBE contamination. The next year, OCWD entertained a proposal from an attorney urging it to "initiate litigation to force the cleanup of MTBE contamination" (*id.* at 5), but apparently declined, taking a public position that MTBE was "not a current threat . . . [as] MTBE was confined to upper, unused aquifers." *Id.* at 10, 11.

Instead, long after this action was filed, OCWD hired a litigation consultant, Komex, to identify problem sites and provide an assessment of MTBE threats. *See* Anderson Decl. Ex. 12. OCWD's Board of Directors went into closed session on May 18, 2005, to discuss this pending litigation and, immediately after reconvening in open session, announced that OCWD had entered into a contract with Komex titled "MTBE Litigation – Phase I: Preliminary Vulnerability Assessment." *Id.* Ex. 12 at 1; *id.* Ex. 11 at 13.

Yet, not one of the analyses Komex performed on various sites concluded that additional plume delineation, off-site remediation, or any other remedial activity beyond what the agencies have required should be conducted. Paprocki Dep. 125:17-126:2, 127:18-128:1, 154:24-155:6, 168:10-18. Moreover, the Komex summary reports have not prompted OCWD to take any actions concerning MTBE or TBA. The only thing OCWD has done with the reports is to read them and place them in the file. Herndon Dep. 462:24-463:15. OCWD has not even elected to share the reports with either the primary regulators or the responsible parties. *Id.* 384:2-8. Specifically with regard to the 76 and Mobil sites, OCWD has done nothing other than fund Komex's litigation analysis and file the reports. *Id.* 462:24-463:15. Komex has not analyzed the Chevron site at all, and OCWD does not even maintain a file on that site. *Id.* at 390:8-23, 476:7-21, 479:10-21. OCWD's actions to date corroborate the absence of urgent contamination situations that could call upon OCWD to intervene.

OCWD's stated goal in bringing this lawsuit is to obtain money to use to remediate MTBE-impacted groundwater. Herndon Dep. 263:15-264:3; Anderson Decl. Ex. 2 at 1. OCWD contends that it does not know what to do to remediate MTBE-impacted groundwater because it still needs more information on "how and where, and to what degree it would need to undertake remediation for MTBE." Herndon Dep. 226:25-227:11. OCWD has thus articulated exactly

19

why primary-jurisdiction deferral is appropriate: to permit the regulators to complete their work to investigate, remediate, and eliminate MTBE contamination before OCWD's request for relief is adjudicated.

**C.    Prior Application to the Agencies Has Been Made.**

    1.    The Agencies Are Addressing The Contamination at All Sites.

At each designated site, prior application to the agencies has been made. The Regional Board and OCHCA are actively engaged in overseeing the remediation of MTBE and TBA and have been for years. *See generally* Fischman Decl.; Guensler Decl.; Thurman Decl. While this motion is confined to the three designated sites, the agencies are actively managing the remediation issues at each of the alleged release sites OCWD has identified in discovery. *See* Anderson Decl. Ex. 15.

    2.    **In The Single Instance That A Drinking Water Well Was Impacted With MTBE Above The MCL, The Regulatory Structure Worked To Resolve the Well Owner's Concerns.**

The Concerto wellfield in Anaheim is the only drinking water well system in Orange County ever to have been impacted by MTBE at a concentration greater than the primary MCL for MTBE (13 ppb).[18] Anderson Decl. Ex. 13 at 1 (OCWD's General Manager wrote in 2003, shortly before this lawsuit was filed, "With the exception of one production well in the Yorba Linda area, MTBE is not found in any drinking water wells in the basin."). The Concerto MTBE problem was dealt with swiftly and aggressively by the potentially responsible parties, the well owner, and the regulators under the established regulatory system. *See* Transcript, Regional Bd. meeting (July 19, 2002) (Anderson Decl. Ex. 14) at 43-44. At each stage, every stakeholder, including OCWD, had an opportunity to comment. *Id.* at 43-44. By July 2002, OCWD stated, "we are very pleased with the activity the Regional Board has taken in terms of working with all of the parties, and working with the Southern California Water Company." *Id.* at 71.

---

[18] A primary MCL, or maximum contaminant level, is a drinking water standard set in California by the Department of Health Services ("DHS") at the level at which DHS determines there may be an adverse effect on human health. Cal. Health & Safety Code § 116275(c)(1); *see* Anderson Decl. Ex. 5 at 7.

With oversight from the Santa Ana Regional Board, well owner Southern California Water Company ("SCWC") and the responsible parties—Shell, ARCO, and Tosco—reached an agreement to reimburse SCWC for the alterations made to its well and to establish a contingency plan should MTBE contamination occur in Concerto well No. 2. The agreement was approved by the Regional Board and executed by the parties in December 2003. Settlement Agreement and Release (Ex. 1 to Request for Judicial Notice in support of Defendants' MCL Motion). OCWD has represented to this Court that it "is satisfied that the settlement in the prior litigation [sic] involving the 'Concerto' wells adequately addresses the MTBE problem at those wells, and those wells are not relevant to the District's claim in this case." Plaintiff's Reply On Motion For Enforcement of Instructions at October 7, 2005 Hearing (filed Oct. 25, 2005), at 3 n.1. The regulatory process that resolved Concerto is a key example of both the intent behind and the operation of the administrative structure imbued with primary authority to manage groundwater. OCWD is one participant of many in a complex and balanced regulatory scheme that, in design and in practice, accomplishes the goals that OCWD asks this Court to step into and take over.

OCWD's actions with respect to the designated sites stand in stark contrast to the cooperative regulatory efforts that led to the successes at Concerto. Before hiring its litigation consultant, OCWD did not keep a file on any of the designated sites (Herndon Dep. 162:21-164:11, 390:8-23), did not communicate with the regulators about the sites or otherwise participate in any way in the sites (*id.* 392:9-22), and did not know about or monitor the progress of the remediation projects. *Id.* 454:17-24, 476:7-21, 479:10-21. Allegedly at Komex's prompting, OCWD came to believe that the MTBE plumes associated with the 76 and Mobil sites are not fully delineated and that offsite contamination is not being satisfactorily addressed. *Id.* 381:16-382:1. But Komex reached no conclusion that anything further should be done at those sites. Paprocki Dep. 125:17-126:2, 127:18-128:1, 154:24-155:6, 168:10-18. After receiving the Komex report, OCWD's only action was to read the report and then put it into a file. Herndon Dep. 462:24-463:15. OCWD never asked OCHCA to take any action at the site. *Id.* 384:2-8, 385:14-25, 387:15-18. OCWD never communicated its alleged concerns about the

21

site to either OCHCA or the responsible party (*id.* 384:5-8, 387:15-22), despite conceding that

OCHCA has the responsibility to delineate the plume and address all on- and off-site

contamination. *Id.* 385:2-22. OCWD chose not to have any input. Instead, it did nothing

because "once the litigation occurred, staff resources are limited in what we can do and how

much time we can spend." *Id.* 271:16-272:11.

Other than Concerto, which was resolved by the agencies and responsible parties to

OCWD's satisfaction, as of January 17, 2006, OCWD has reported no detection of MTBE above

the primary MCL in any production well. *See* Plaintiff's Updated First & Last MTBE/TBA

Chart (Jan. 17, 2006) (Ex. 8 to Declaration of David Schrader in support of MCL Motion).[19] Not

a single drinking water well in this case has experienced an MTBE detection greater than 1 ppb

since 1998. *Id.* One active well in Fullerton had fleeting detections of TBA in 2002 and 2003

that have not been repeated. *Id.* MTBE has not been sold in California since December 31,

2003, when the Governor's ban on MTBE became effective,[20] and MTBE and TBA are simply

not showing up in drinking water wells in significant concentrations. The evidence shows that

the regulatory program in place to address MTBE releases has worked.

> **D.    If This Court Were to Exercise Jurisdiction in Place of the Agencies, the Risk
> of Inconsistent Rulings Would Be Guaranteed.**

By asking this Court to exercise jurisdiction under these circumstances, OCWD

guarantees inconsistent results that will jeopardize the ability of the regulatory system effectively

---

[19] Even near the secondary MCL of 5 ppb, MTBE detections have been few, scattered, and short-lived. *See* Ex. 8 to Declaration of David Schrader in support of Defendants' MCL Motion.

[20] In 1999, California Governor Davis issued an executive order banning the sale of gasoline containing MTBE by the end of 2002 (Exec. Order No. D-5-99 (Mar. 26, 1999)), and later extended the ban by one year because "it is not possible to eliminate use of MTBE on January 1, 2003, without significantly risking disruption of the availability of gasoline in California." Exec. Order No. D-52-02 (Mar. 14, 2002), available at http://www.energy.ca.gov/releases/ 2002_releases/2002-03-15_order_D-52-02.html. As of January 1, 2004, no gasoline sold in California has contained MTBE. California Energy Commission, Quarterly Report Concerning MTBE use in California Gasoline (Oct. 1-Dec. 31, 2003), available at http://www.energy.ca.gov/ mtbe/documents/ 2003_MTBE_4TH_QTR_REPORT.PDF.

to investigate and remediate groundwater contamination.  Through primary jurisdiction deferral, "[u]niformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference v. United States*, 342 U.S. 570, 574-75 (1952).  Historically, the lead agencies have exercised their jurisdiction without having to petition the District Attorney to enforce their orders.  Williams Dep. 266:13-268:7. OCWD has lauded the agencies' work on UST sites.  Herndon Dep. 527:20-528:12.  If the agencies' decisions become subject to second-guessing, outside of established regulatory review procedures, the agencies' ability to enforce their mandates may be jeopardized.

In addition, the responsible parties will suffer from the risk of inconsistent rulings.  In many instances, defendants are the responsible parties who are working with the lead agencies at release sites in north Orange County and who are funding many of the ongoing remediation projects.  These funding obligations are presently adjudicated through the iterative, ongoing dialogue with the agencies.  The responsible parties' commitment to continue funding the remediation projects until the lead agencies are satisfied that the sites may be closed is ongoing.

OCWD's remedy, by contrast, would amount to a static sum of money or set of orders that would be substantially inconsistent with this process.  In fashioning the award or crafting the orders, this Court or a jury would evaluate just one snapshot of time in the remediation process in order to determine what further techniques ought to be used, what the remediation goal ought to be, what timeline the goal should meet, and how to deal with the dynamic geophysical changes that arise during the course of the Court's subsequent oversight of the remediation effort.  These decisions would substitute an inflexible result for the adaptive expertise of the agencies closest to the sites.  A static assessment at the end of the litigation will certainly conflict with, and be less precise than, the agencies' ability on a regular basis to learn, adapt, and change based on the progress at the site and other sites in the vicinity.

23

**E.     On Balance, the Advantages of Deferring to Agency Jurisdiction Outweigh the Potential Costs Arising from Complications and Delay in the Administrative Proceedings.**

The advantages of deferring to California's expansive regulatory structure and procedural framework to remediate MTBE and TBA contamination are many. The agency professionals charged by the California Legislature with remediating groundwater contamination consistent with the best interests of the people of the state would remain as lead regulators over the release sites. The ongoing remediation projects that are successfully addressing contaminants at every site would continue. The agency experts, equipped with the expertise and tools to respond to changing site conditions, would proceed to direct the remediation decisions. The process would continue to benefit from agency professionals' technical backgrounds in hydrogeology, geology, organic chemistry, engineering, remediation technology, and other relevant fields as well as their experience with the hydrogeology and stratigraphy of Orange County and these release sites in particular. The efficiencies arising from the exercise of jurisdiction by the interactive regulatory structure would be maintained. Disputes among stakeholders about whether activities should or should not be taken would proceed through the established regulatory procedures, rather than continually reverting to the Court's docket.

The potential costs resulting from complications and delay would, in this case, actually be greater in litigation than in the ongoing administrative proceedings. Instead of preserving the discretion of the lead-agency experts, this litigation would elevate OCWD to a regulatory role not afforded it by the Legislature, and despite OCWD's admitted unbroken historical reliance on the Santa Ana Regional Board and OCHCA to direct the remediation decisions at every site. The many stakeholders not represented in this litigation who are certain to challenge OCWD's exercise of its Court-imposed authority would have only the courts, rather than the established regulatory procedures, to adjudicate their disputes. Like OCWD, the regulators would become involved in litigation, rather than being able to do their jobs. Accordingly, the advantages of applying the primary jurisdiction doctrine significantly outweigh the costs.

The court in *General Electric* reached just this conclusion in a similar case. Where the

exercise of jurisdiction would require the court to become involved in the ongoing investigation and remediation process, including decisions regarding payment for work that is already being done by the responsible parties, deferral to the agencies that exist for this very purpose was appropriate. *General Electric,* 322 F. Supp. 2d at 1271. Similarly here, the relief that agencies routinely provide by overseeing remediation efforts is dynamic, and the agencies are nimble and attentive enough to revise the relief based on changed circumstances.

## III.   CONCLUSION

The ultimate remedy OCWD seeks by means of this lawsuit—protection of the north Orange County aquifer—is relief that is currently being provided by administrative agencies in accordance with the state's comprehensive regulatory structure. OCWD's request for relief falls squarely within the expertise and discretion of the agencies. For these and the foregoing reasons, defendants respectfully request that the Court stay further judicial proceedings[21] or dismiss OCWD's claims without prejudice.

Dated:  January 27, 2006                     Respectfully submitted,

                                             By: _____

                                             Jon D. Anderson (JA 5198)
                                             LATHAM & WATKINS LLP
                                             650 Town Center Drive, 20th Floor
                                             Costa Mesa, CA  92626
                                             (714) 540-1235

                                             Counsel for Defendant ConocoPhillips Co. and

                                             *On behalf of each Defendant identified on
                                             Attachment A.*

---

[21] Should this Court decide to stay, rather than dismiss without prejudice, OCWD's claims as requested in this motion, the stay should be imposed at least until OCWD has engaged the regulatory procedures for resolving disputes among parties interested in groundwater investigation and remediation. Until the regulatory agencies have finally refused to order an investigative or remedial action that OCWD has requested at a particular site, despite all appeals via the regulatory process, deferral to the agencies' jurisdiction is appropriate and should continue.

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                             :

In Re: Methyl Tertiary Butyl Ether    :    MDL No. 1358 (SAS)
("MTBE") Products Liability Litigation  :

                             :    Master File C.A. No.
                             :    1:00-1898 (SAS)

This Document Relates To:         :

                             :

*Orange County Water District v. Unocal*  :
*Corp., et al.,* S.D.N.Y. No. 04 Civ. 4968  :
(SAS)                         :
-------------------------------------------------------X

## CERTIFICATE OF SERVICE

Paul Kihm, pursuant to 28 USC 1746, hereby declares under penalty of perjury, that on

the 27th day of January, 2006, I caused to be served by electronic means upon all parties to the

above-referenced matter via LexisNexis File & Serve a true and correct copy of the following

document:

> *Memorandum of Law in Support of Defendants' Motion for Stay or Dismissal Without Prejudice Based on Primary Jurisdiction*

_____
Paul Kihm

OC\799048.1

# Exhibit 2

LEONICUS' FILE & SERVE
10586156
E-SERVICE
Feb 15 2006
2:47PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ X

In re: Methyl Tertiary Butyl Ether ("MTBE")   :
Products Liability Litigation
                                               :

                                               :

This Document Relates To:
*Orange County Water District v. Unocal Corporation, et*   :
*al.*, Case No. 04 Civ. 4968 (SAS).
                                               :

                                               :

------------------------------------------ X

Master File No. 1:00-1898
MDL No. 1358 (SAS)

The Honorable Shira A. Scheindlin


# DECLARATION OF WILLIAM T. COSTLEY III IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON THE STATUTE OF LIMITATIONS

#391245

## DECLARATION OF WILLIAM T. COSTLEY III

I, William T. Costley III, hereby declare:

1.      I am a senior paralegal at the law firm of Arnold & Porter LLP, counsel of record for defendants Atlantic Richfield Company, BP Products North America Inc. and BP West Coast Products LLC in this litigation. I have personal knowledge of the matters stated herein, and if called upon to testify, could and would competently do so.

2.      As described below, this declaration is based on an investigation of readily available documents and data. The information provided in this Declaration is the product of efforts to assemble information regarding MTBE detections at the 527 Underground Storage Tank ("UST") locations identified by the Orange County Water District ("OCWD") on October 26, 2005. (Sartoris Decl. Ex. 18.)

3.      Attached hereto as Exhibit 1 is a compilation of data I prepared that illustrates how the vast majority of the above-referenced 527 UST locations identified by OCWD contain MTBE detections before May 6, 2000. The compilation lists the site addresses for all 527 UST locations identified by OCWD, MTBE detection dates for these sites, whether or not the detections were before May 6, 2000, and the source of the MTBE detection data.

4.      The MTBE detection dates reflected in Exhibit 1 were taken from five sources. The first source is the 1999 listing of UST MTBE sites received by the OCWD from the Santa Ana Regional Water Quality Control Board ("Santa Ana Regional Board") which was produced during discovery in this litigation. (Sartoris Decl. Ex. 15.) This 1999 listing contains 418 sites that have MTBE detections before May 6, 2000. The second source, the Santa Ana Regional Board MTBE database, a copy of which Defendants requested and obtained from that agency, was used to confirm an additional 57 sites with MTBE detections before May 6, 2000, and 32

sites with MTBE detections on or after May 6, 2000. The third, fourth and fifth sources for MTBE detection dates came from reviewing the publicly available site files at the Santa Ana Regional Board, the Orange County Health Care Agency ("OCHCA") and the San Diego Regional Water Quality Control Board ("San Diego Regional Board"). The Santa Ana Regional Board had data for an additional 9 site files with MTBE detections before May 6, 2000, OCHCA had data for an additional 5 site files with MTBE detections before May 6, 2000, and the San Diego Regional Board had data for one additional site file with MTBE detected before May 6, 2000. I was not able to determine MTBE detection dates for the remaining 5 sites contained on OCWD's listing of 527 MTBE sites.

5.     The compilation contained in Exhibit 1 shows that 490 of the sites contained on OCWD's listing of 527 MTBE UST sites (in excess of 92 percent of the total listed by OCWD) involve MTBE releases discovered and reported to the regulatory agencies, before May 6, 2000.

6.     Attached hereto as Exhibit 2 is a chart that graphically illustrates the 490 sites that have MTBE releases before May 6, 2000, the 32 sites with releases on or after May 6, 2000, and the 5 sites with unconfirmed MTBE release dates.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on February 14, 2006 at Los Angeles, California.

William T. Costley III

# EXHIBIT 1

| MTBE SITE | SITE NAME | ADDRESS | CITY | MTBE DETECTION (Yes/No)? | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 1 | CHEVRON | 700 IMPERIAL HWY | BREA | No | 7/31/00 | SA-RWQCB MTBE DB |
| 2 | LINCOLN & KNOTT CAR WASH | 6942 LINCOLN AVE | BUENA PARK | Yes | 10/15/97 | SA-RWQCB MTBE DB |
| 3 | PHILTON PROPERTIES | 7490 LA PALMA AVE | BUENA PARK | Yes | 1/21/00 | SA-RWQCB MTBE DB |
| 4 | ABE'S ARCO | 6242 BEACH BLVD | BUENA PARK | Yes | 12/1/99 | SA-RWQCB MTBE DB |
| 5 | WC FROELICH INC | 6371 WESTERN AVE | BUENA PARK | Yes | 3/22/99 | SA-RWQCB MTBE DB |
| 6 | CONROYS FLOWERS/8 OF A/MOBIL | 5952 BEACH BLVD | BUENA PARK | Yes | 8/20/96 | SA-RWQCB MTBE DB |
| 7 | JIFFY PLATING/JOHNNYS SPEED & CHROM | 6411 BEACH BLVD | BUENA PARK | Yes | 6/23/97 | OCHCA File |
| 8 | UNOCAL #6926 | 6971 ORANGETHORPE | BUENA PARK | Yes | 5/17/99 | SA-RWQCB MTBE DB |
| 9 | CHEVRON #9-5873 | 5241 BEACH BLVD | BUENA PARK | Yes | 9/28/99 | SA-RWQCB MTBE DB |
| 10 | HOUSE OF IMPORTS | 6282 MANCHESTER BLVD | BUENA PARK | Yes | 6/9/99 | SA-RWQCB MTBE DB |
| 11 | LUCKY OIL STATION | 5089 BEACH BLVD. | BUENA PARK | Yes | 10/1/98 | SA-RWQCB MTBE DB |
| 12 | SHELL OIL L&M VENTURES | 801 19TH ST | COSTA MESA | Yes | 2/25/99 | SA-RWQCB MTBE DB |
| 13 | WIMALL STATION #11 | 790 19TH ST | COSTA MESA | Yes | 12/15/99 | SA-RWQCB MTBE DB |
| 14 | SULLIVAN CONCRETE TEXTURES | 1111 BAKER ST | COSTA MESA | Yes | 8/29/99 | SA-RWQCB MTBE DB |
| 15 | HYATT DIE CAST AND ENGRING | 4658 LINCOLN AVE | CYPRESS | Yes | 1/6/00 | SA-RWQCB MTBE DB |
| 16 | O.C. FIRE STATION #17 | 4991 CERRITOS AVE | CYPRESS | Yes | 7/30/97 | SA-RWQCB MTBE DB |
| 17 | MOBIL | 9024 WARNER | FOUNTAIN VALLEY | No | 1/15/01 | SA-RWQCB MTBE DB |
| 18 | QUALITY GAS | 9880 WARNER AVE | FOUNTAIN VALLEY | Yes | 7/3/96 | SA-RWQCB MTBE DB |
| 19 | CHEVRON | 17980 MAGNOLIA | FOUNTAIN VALLEY | Yes | 8/20/99 | SA-RWQCB MTBE DB |
| 20 | MILE SQUARE GOLF COURSE | 10401 WARNER AVE | FOUNTAIN VALLEY | Yes | 2/11/99 | SA-RWQCB MTBE DB |
| 21 | TEXACO | 9475 WARNER AVE | FOUNTAIN VALLEY | Yes | 3/27/00 | SA-RWQCB MTBE DB |
| 22 | PRICE LESS FUEL | 11520 EDINGER AVE | FOUNTAIN VALLEY | Yes | 3/24/08 | SA-RWQCB MTBE DB |
| 23 | CHEVRON 9-7347 | 17971 BROOKHURST ST | FOUNTAIN VALLEY | Yes | 2/28/99 | SA-RWQCB MTBE DB |
| 24 | SHELL | 16889 BROOKHURST ST | FOUNTAIN VALLEY | No | 10/24/00 | SA-RWQCB MTBE DB |
| 25 | FAMILY FUN CENTERS | 9063 RECREATION CR | FOUNTAIN VALLEY | Yes | 2/21/01 | SA-RWQCB MTBE DB |
| 26 | CHEVRON | 11971 VALLEY VIEW ST | GARDEN GROVE | Yes | 2/22/00 | SA-RWQCB MTBE DB |
| 27 | CALDWELLS AUTO CENTER | 10602 WESTMINSTER BLVD | GARDEN GROVE | No | 9/4/01 | SA-RWQCB MTBE DB |
| 28 | SHELL OIL | 12161 GARDEN GROVE BLVD | GARDEN GROVE | Yes | 1/21/00 | SA-RWQCB MTBE DB |
| 29 | SUPER STOP DAIRY MART | 10521 BOLSA AVE | GARDEN GROVE | Yes | 3/7/00 | SA-RWQCB MTBE DB |
| 30 | CHEVRON #9-1085 | 12012 BROOKHURST ST | GARDEN GROVE | No | 11/3/00 | SA-RWQCB MTBE DB |
| 31 | STRAUB DISTRIBUTING | 11552 MONARCH ST | GARDEN GROVE | Yes | 4/28/99 | SA-RWQCB MTBE DB |
| 32 | ARCO SERVICE STATION | 13361 HARBOR BLVD | GARDEN GROVE | No | 11/16/00 | SA-RWQCB MTBE DB |
| 33 | RAM'S SERVICE | 10721 WESTMINSTER AVE | GARDEN GROVE | Yes | 12/22/98 | SA-RWQCB MTBE DB |
| 34 | COUNTY-WIDE CHRYSLER/JEEP | 10080 GARDEN GROVE BLVD | GARDEN GROVE | Yes | 1/17/00 | SA-RWQCB MTBE DB |
| 35 | HUNTINGTON CENTER CAR WASH | 15081 BEACH BLVD | HUNTINGTON BEACH | No | 12/1/00 | SA-RWQCB MTBE DB |
| 36 | MARINA HIGH SCHOOL | 15871 SPRINGDALE ST | HUNTINGTON BEACH | Yes | 3/15/96 | SA-RWQCB File |
| 37 | HUNTINGTON BEACH ARCO | 6002 BOLSA AVE | HUNTINGTON BEACH | Yes | 3/20/00 | SA-RWQCB MTBE DB |
| 38 | UNOCAL #5194 | 16971 GOLDEN WEST ST | HUNTINGTON BEACH | Yes | 11/4/99 | SA-RWQCB MTBE DB |
| 39 | G & M OIL CO #34 | 16971 GOLDEN WEST ST | HUNTINGTON BEACH | No | 2/4/02 | SA-RWQCB MTBE DB |
| 40 | CHEVRON | 6371 ADAMS AVE | HUNTINGTON BEACH | Yes | 5/15/00 | SA-RWQCB MTBE DB |
| 41 | CHEVRON STATION #9-3069 | 5002 EDINGER AVE | HUNTINGTON BEACH | No | 10/28/02 | SA-RWQCB MTBE DB |
| 42 | ARCO #9742 | 15507 EDWARDS ST | HUNTINGTON BEACH | Yes | 11/23/99 | SA-RWQCB MTBE DB |
| 43 | MOBIL | 19501 BEACH BLVD | HUNTINGTON BEACH | No | 1/28/02 | SA-RWQCB MTBE DB |
| 44 | ST JOHN KNITS | 17422 DERIAN | IRVINE | Yes | 6/21/95 | SA-RWQCB MTBE DB |
| 45 | CHEVRON | 18002 CULVER DR | IRVINE | Yes | 2/13/97 | SA-RWQCB MTBE DB |
| 46 | TREASURE FARMS MAIN YARD | 13052 WYFORD RD | TUSTIN | Yes | 1/27/98 | OCHCA File |
| 47 | CHEVRON | 17561 MAC ARTHUR BLVD | IRVINE | Yes | 6/9/99 | SA-RWQCB MTBE DB |
| 48 | C & W ACTION RENTALS | 16401 CONSTRUCTION CIR. WEST | IRVINE | Yes | 12/16/98 | SA-RWQCB MTBE DB |
| 49 | THE LUSK COMPANY | 17550 GILLETTE AVE | IRVINE | Yes | 11/26/98 | SA-RWQCB MTBE DB |
| 50 | SAVALA EQUIPMENT | 16402 CONSTRUCTION CR | IRVINE | Yes | 3/1/00 | SA-RWQCB MTBE DB |
| 51 | CHEVRON | 100 WHITTIER BLVD (W) | LA HABRA | Yes | 12/24/97 | SA-RWQCB File |
| 52 | MOBIL STATION II-FM | 5502 ORANGETHORPE AVE | LA PALMA | No | 7/23/00 | SA-RWQCB MTBE DB |
| 53 | BEACON BAY AUTO WASH #6 | 23602 EL TORO RD | LAKE FOREST | Yes | 10/1/03 | SA-RWQCB MTBE DB |
| 54 | SHELL | 23842 EL TORO RD | LAKE FOREST | No | 9/18/02 | SA-RWQCB MTBE DB |
| 55 | MOBIL | 22361 EL TORO RD | LAKE FOREST | Yes | 11/9/98 | OCHCA File |
| 56 | BIXBY LAND CO | 3502 CERRITOS AVE | LOS ALAMITOS | Yes | 12/30/98 | SA-RWQCB MTBE DB |
| 57 | NEWPORT LANDING FUEL SERVICE | 503 EDGEWATER AVE | NEWPORT BEACH | Yes | 5/10/95 | SA-RWQCB File |
| 58 | SHELL OIL | 1000 IRVINE AVE | NEWPORT BEACH | Yes | 3/17/99 | SA-RWQCB MTBE DB |
| 59 | BISSEE'S MARINE FUELS | 406 BAY FRONT | NEWPORT BEACH | No | 12/17/03 | SA-RWQCB MTBE DB |
| 60 | NEWPORT AUTO CENTER | 445 COAST HWY | NEWPORT BEACH | Yes | 2/17/03 | SA-RWQCB MTBE DB |
| 61 | NEWPORT LANDING SITE 1995 | 503 EDGEWATER AVE | NEWPORT BEACH | Yes | 12/27/96 | OCHCA File |
| 62 | CITY OF SEAL BEACH PUBIC WORKS | 1776 ADOLFO LOPEZ DR | SEAL BEACH | No | 7/3/00 | SA-RWQCB MTBE DB |
| 63 | 76 SERVICE STATION | 13890 SEAL BEACH BLVD | SEAL BEACH | No | 9/7/00 | SA-RWQCB MTBE DB |
| 64 | G&M OIL CO | 1000 PACIFIC COAST HWY | SEAL BEACH | Yes | 12/14/99 | SA-RWQCB MTBE DB |
| 65 | AUTO MART | 8505 KATELLA AVE | STANTON | Yes | 9/9/99 | SA-RWQCB MTBE DB |
| 66 | TOSCO #4778 | 10460 MAGNOLIA AVE | STANTON | Yes | 1/24/00 | SA-RWQCB MTBE DB |
| 67 | TUSTIN AUTO WASH | 535 MAIN STREET (E) | TUSTIN | No | 8/10/93 | SA-RWQCB MTBE DB |
| 68 | CITY OF WESTMINSTER | 14381 OLIVE | WESTMINSTER | Yes | 11/21/98 | SA-RWQCB MTBE DB |
| 69 | USA PETROLEUM STATION #141 | 14600 EDWARDS AVE | WESTMINSTER | No | 9/20/02 | SA-RWQCB MTBE DB |
| 70 | WESTMINSTER MAINT. YARD | 14381 OLIVE ST | WESTMINSTER | Yes | 11/21/96 | SA-RWQCB MTBE DB |
| 71 | CHEVRON #9-5401 | 5992 WESTMINSTER AVE | YORBA LINDA | Yes | 6/13/97 | SA-RWQCB MTBE DB |
| 72 | CHEVRON #9-7414 | 16121 IMPERIAL HWY | YORBA LINDA | No | 9/3/03 | SA-RWQCB MTBE DB |
| 73 | YORBA LINDA CAR WASH | 17091 IMPERIAL HWY | YORBA LINDA | No | 3/20/01 | SA-RWQCB MTBE DB |
| 74 | UNOCAL #5372 | 19861 ESPERANZA RD | YORBA LINDA | Yes | 5/17/99 | SA-RWQCB MTBE DB |
| 75 | YORBA COUNTRY CAR WASH | 17581 YORBA LINDA BLVD. | YORBA LINDA | Yes | 1/11/00 | SA-RWQCB MTBE DB |
| 76 | CHEVRON 202031 | 6392 BEACH BLVD. | BUENA PARK | Yes | 1/18/96 | SA-RWQCB MTBE DB |
| 77 | ROSSMOOR CAR WASH | 11031 LOS ALAMITOS BLVD | LOS ALAMITOS | Yes | 8/25/97 | SA-RWQCB MTBE DB |

387760_1.XLS

| MTBESITE | OCHCA_SITE | ADDRESS | ARC_CITY | MTBE DETECTION PRESENT? | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 78 | BUENA PARK TEXACO | 6000 ORANGETHORPE AVE | BUENA PARK | No | 6/21/00 | SA-RWQCB MTBE DB |
| 79 | A AND G GARAGE (RALPH IRWIN) | 488 OLD NEWPORT BOULEVARD | NEWPORT BEACH | Yes | 9/23/97 | OCWD-MTBE-001-028293 |
| 80 | ACS STATION R-25 | 984 BEACH BLVD. | ANAHEIM | Yes | 5/5/97 | OCWD-MTBE-001-028286 |
| 81 | ADEPT MANUFACTURING | 2990 GRACE LN. | COSTA MESA | Yes | 12/17/97 | OCWD-MTBE-001-028288 |
| 82 | ADP FACILITY | 5355 ORANGETHORPE AVE. | LA PALMA | Yes | 9/1/96 | OCWD-MTBE-001-028292 |
| 83 | ALEXANDER HAAGE QUALITY GAS | 7262 EDINGER AVE | HUNTINGTON BEACH | Yes | 7/24/97 | OCWD-MTBE-001-028290 |
| 84 | AMERICAN STORES | 777 S. HARBOR BLVD. | LA HABRA | Yes | 2/29/96 | OCWD-MTBE-001-028290 |
| 85 | ARCO #0192<br>ARCO STATION #0192 | 2100 SE. BRISTOL ST. | SANTA ANA | Yes | 5/15/96 | OCWD-MTBE-001-028295 |
| 86 | ARCO #0203 | 1700 W. LA PALMA AVENUE | ANAHEIM | Yes | 3/26/97 | OCWD-MTBE-001-028286 |
| 87 | ARCO #0629 | 13482 BROOKHURST ST. | GARDEN GROVE | Yes | 3/27/97 | OCWD-MTBE-001-028289 |
| 88 | ARCO #1023 | 1000 WEST VALENCIA AVENUE | FULLERTON | Yes | 2/28/96 | OCWD-MTBE-001-028286 |
| 89 | ARCO #1029 | 1201 BROOKHURST ST. | ANAHEIM | Yes | 11/27/96 | OCWD-MTBE-001-028286 |
| 90 | ARCO #1047 | 2848 W. 1ST ST. | SANTA ANA | Yes | 5/15/96 | OCWD-MTBE-001-028295 |
| 91 | ARCO #1055 | 9001 GARDEN GROVE BLVD. | GARDEN GROVE | Yes | 6/23/96 | OCWD-MTBE-001-028289 |
| 92 | ARCO #1064<br>ARCO #1064 | 14511 BROOKHURST ST. | WESTMINSTER | Yes | 7/29/96 | OCWD-MTBE-001-028297 |
| 93 | ARCO #1072 | 1202 E. ORANGETHORPE AVENUE | FULLERTON | Yes | 8/27/97 | OCWD-MTBE-001-028286 |
| 94 | ARCO #1077 | 13742 RED HILL AVENUE | TUSTIN | Yes | 10/7/96 | OCWD-MTBE-001-028297 |
| 95 | ARCO #1257 | 2990 BRISTOL ST. | COSTA MESA | Yes | 2/21/97 | OCWD-MTBE-001-028288 |
| 96 | ARCO #1365 | 8370 MANCHESTER AVENUE | BUENA PARK | Yes | 6/2/96 | OCWD-MTBE-001-028287 |
| 97 | ARCO #1578 | 1124 E. CHAPMAN AVE. | FULLERTON | Yes | 2/2/96 | OCWD-MTBE-001-028286 |
| 98 | ARCO #1583 | 7990 KNOTT AVENUE | BUENA PARK | Yes | 6/22/96 | OCWD-MTBE-001-028287 |
| 99 | ARCO #1633 | 6962 WESTMINSTER AVENUE | WESTMINSTER | Yes | 12/5/96 | OCWD-MTBE-001-028297 |
| 100 | ARCO #1687 | 5871 LINCOLN AVENUE | BUENA PARK | Yes | 7/25/96 | OCWD-MTBE-001-028286 |
| 101 | ARCO #1812 | 16502 BOLSA CHICA ST. | HUNTINGTON BEACH | Yes | 10/1/96 | OCWD-MTBE-001-028290 |
| 102 | ARCO #1831 | 18751 YORBA LINDA BLVD. | YORBA LINDA | Yes | 11/20/97 | OCWD-MTBE-001-028298 |
| 103 | ARCO #1887 | 16742 BEACH BLVD. | HUNTINGTON BEACH | Yes | 12/3/96 | OCWD-MTBE-001-028290 |
| 104 | ARCO #1886 | 16501 GOLDENWEST ST. | HUNTINGTON BEACH | Yes | 5/20/97 | OCWD-MTBE-001-028290 |
| 105 | ARCO #1905 | 18025 MAGNOLIA ST. | FOUNTAIN VALLEY | Yes | 7/20/96 | OCWD-MTBE-001-028289 |
| 106 | ARCO #1912 | 13460 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 8/5/97 | OCWD-MTBE-001-028289 |
| 107 | ARCO #1969 | 7760 CRESENT AVENUE | BUENA PARK | Yes | 10/22/96 | OCWD-MTBE-001-028287 |
| 108 | ARCO #1973 | 4968 BALL RD. | CYPRESS | Yes | 11/4/97 | OCWD-MTBE-001-028288 |
| 109 | ARCO #1977 | 2302 GRAND AVENUE | SANTA ANA | Yes | 3/10/00 | SA-RWQCB MTBE DB |
| 110 | ARCO #1998 | 5472 ORANGETHORPE AVE | LA PALMA | Yes | 8/25/96 | OCWD-MTBE-001-028292 |
| 111 | ARCO #3013<br>ARCO SS #3013 | 23742 EL TORO RD. | LAKE FOREST | Yes | 5/15/97 | OCWD-MTBE-001-028293 |
| 112 | ARCO #3016 | 12422 VALLEY VIEW STREET | GARDEN GROVE | Yes | 6/24/96 | OCWD-MTBE-001-028290 |
| 113 | ARCO #3042 | 13331 EUCLID ST. | GARDEN GROVE | Yes | 2/28/96 | OCWD-MTBE-001-028290 |
| 114 | ARCO #3045 | 14231 RED HILL AVE. | TUSTIN | Yes | 3/31/97 | OCWD-MTBE-001-028297 |
| 115 | ARCO #3060 | 2840 E. IMPERIAL HWY | FULLERTON | Yes | 7/23/96 | OCWD-MTBE-001-028286 |
| 116 | ARCO #3085 | 3381 S. BRISTOL ST. | SANTA ANA | Yes | 2/11/97 | OCWD-MTBE-001-028295 |
| 117 | ARCO #3088 | 5700 E. LA PALMA AVE. | ANAHEIM | Yes | 10/22/97 | OCWD-MTBE-001-028286 |
| 118 | ARCO #3091 | 14493 CULVER DR. | IRVINE | Yes | 4/10/96 | OCWD-MTBE-001-028291 |
| 119 | ARCO #5084 | 490 E. 17TH ST. | COSTA MESA | Yes | 3/31/97 | OCWD-MTBE-001-028288 |
| 120 | ARCO #5139 | 2401 LINCOLN AVENUE | ANAHEIM | Yes | 2/17/96 | OCWD-MTBE-001-028286 |
| 121 | ARCO #5147 | 2245 S. MAIN ST. | SANTA ANA | Yes | 11/6/96 | OCWD-MTBE-001-028295 |
| 122 | ARCO #5185 | 1450 BAKER ST. | COSTA MESA | Yes | 3/18/97 | OCWD-MTBE-001-028288 |
| 123 | ARCO #5202 | 12602 HARBOR BLVD. | GARDEN GROVE | Yes | 6/4/96 | OCWD-MTBE-001-028297 |
| 124 | ARCO #6036 | 13142 GOLDENWEST ST. | WESTMINSTER | Yes | 3/26/97 | OCWD-MTBE-001-028297 |
| 125 | ARCO #6060  ARCO | 21452 BROOKHURST ST. | HUNTINGTON BEACH | Yes | 8/20/97 | OCWD-MTBE-001-028290 |
| 126 | ARCO #6065  ARCO | 480 PACIFIC COAST HWY. | SEAL BEACH | Yes | 3/4/97 | OCWD-MTBE-001-028296 |
| 127 | ARCO #6071 | 3414 S. MAIN ST. | SANTA ANA | Yes | 3/22/95 | OCWD-MTBE-001-028295 |
| 128 | ARCO #6079 | 3901 RIVERDALE AVE. | ANAHEIM | Yes | 3/19/96 | OCWD-MTBE-001-028286 |
| 129 | ARCO #6110 | 1201 E. IMPERIAL HWY. | PLACENTIA | Yes | 10/16/97 | OCWD-MTBE-001-028294 |
| 130 | ARCO #6116  MOBIL | 17520 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 9/2/98 | OCWD-MTBE-001-028289 |
| 131 | ARCO #6131  ARCO SS #6131 | 3201 HARBOR BLVD. | COSTA MESA | Yes | 11/6/96 | OCWD-MTBE-001-028288 |
| 132 | ARCO #6191  ARCO PRODUCTS CO | 17502 GOLDEN WEST ST. | IRVINE | Yes | 2/22/96 | OCWD-MTBE-001-028290 |
| 133 | ATLAS CATERING | 16221 CONSTRUCTION CIRCLE WEST | IRVINE | Yes | 9/12/97 | OCWD-MTBE-001-028291 |
| 134 | AVIS RENT A CAR SYSTEM | 4101 S. MAIN ST. | SANTA ANA | Yes | 5/13/96 | OCWD-MTBE-001-028295 |
| 135 | B & B CHEVROLET, INC. | 17071 IMPERIAL HWY. | YORBA LINDA | Yes | 5/3/96 | OCWD-MTBE-001-028298 |
| 136 | BAKER EQUIPMENT<br>BAKER EQUIPMENT RENTALS | 1151 BAKER ST. | COSTA MESA | Yes | 3/31/98 | OCWD-MTBE-001-028288 |
| 137 | BARRY'S AUTOMOTIVE | 7870 COMMONWEALTH AVE. | BUENA PARK | Yes | 3/15/96 | OCWD-MTBE-001-028287 |
| 138 | BEACON BAY (LIDO) CAR WASH, CM | 481 E. 17TH STREET | COSTA MESA | Yes | 9/3/96 | OCWD-MTBE-001-028288 |
| 139 | BEACON BAY CAR BEACON BAY AUTO WASH | 10036 ELLIS AVE. | FOUNTAIN VALLEY | Yes | 1/27/98 | OCWD-MTBE-001-028289 |
| 140 | BEACON BAY CAR BEACON BAY CAR WASH | 4200 BIRCH ST. | NEWPORT BEACH | Yes | 6/8/98 | OCWD-MTBE-001-028293 |
| 141 | BIG CANYON COUNTRY CLUB | 1850 JAMBOREE RD. | NEWPORT BEACH | Yes | 2/19/96 | OCWD-MTBE-001-028293 |
| 142 | BREA REDEVELOPMENT AGENCY | 146 BREA BLVD. | BREA | Yes | 6/29/96 | OCWD-MTBE-001-028287 |
| 143 | BURCH FORD  BURCH FORD | 201 N. HARBOR BLVD. | LA HABRA | Yes | 5/1/96 | OCWD-MTBE-001-028292 |
| 144 | CHET'S SERVICE | 2252 FAIRVIEW RD. | COSTA MESA | Yes | 12/5/96 | OCWD-MTBE-001-028288 |
| 145 | CHEVRON #0141<br>CHEVRON SERVICE STATION #141 | 23891 BRIDGE RD. | LAKE FOREST | Yes | 2/18/96 | OCWD-MTBE-001-028293 |
| 146 | CHEVRON #0850 | 2051 E. EDINGER AVE. | SANTA ANA | Yes | 3/3/98 | OCWD-MTBE-001-028295 |
| 147 | CHEVRON #1202<br>CHEVRON SS #9-1202 | 9491 EDINGER AVE. | WESTMINSTER | Yes | 7/7/97 | OCWD-MTBE-001-028297 |

387760_1.XLS

| MTBE/SITE | OCHCA_SITE | ADDRESS | CITY | MTBE DETECTION PRE-KNOWN | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 148 | CHEVRON #1597 | 204 17TH STREET, EAST | COSTA MESA | Yes | 1/9/97 | OCWD-MTBE-001-028288 |
| 149 | CHEVRON #1660 | 3048 BRISTOL ST. | COSTA MESA | Yes | 4/30/96 | OCWD-MTBE-001-028288 |
| 150 | CHEVRON #1825 | 2281 N. FAIRVIEW ST. | SANTA ANA | Yes | 2/24/96 | OCWD-MTBE-001-028295 |
| 151 | CHEVRON #1921 | 3801 S. BRISTOL ST. | SANTA ANA | Yes | 9/9/98 | OCWD-MTBE-001-028295 |
| 152 | CHEVRON #2069 | 10972 KATELLA AVENUE | GARDEN GROVE | Yes | 2/7/97 | OCWD-MTBE-001-028290 |
| 153 | CHEVRON #2079 | 14122 NEWPORT AVE. | TUSTIN | Yes | 3/11/96 | OCWD-MTBE-001-028297 |
| 154 | CHEVRON #2214 | 1201 E. LA HABRA BLVD. | LA HABRA | Yes | 10/22/97 | OCWD-MTBE-001-028292 |
| 155 | CHEVRON #2250  CHEVRON | 7790 VALLEY VIEW BLVD. | BUENA PARK | Yes | 9/23/97 | OCWD-MTBE-001-028287 |
| 156 | CHEVRON #2378 | 2792 W. BALL RD. | ANAHEIM | Yes | 1/27/97 | OCWD-MTBE-001-028286 |
| 157 | CHEVRON #3630 | | | | | |
| | CHEVRON #9-3630 | 350 MAIN ST. | SEAL BEACH | Yes | 12/15/98 | OCWD-MTBE-001-028296 |
| 158 | CHEVRON #3558 | 2175 W. LA PALMA AVE. | ANAHEIM | Yes | 3/20/97 | OCWD-MTBE-001-028286 |
| 159 | CHEVRON #3803 | 7012 EDINGER AVE. | HUNTINGTON BEACH | Yes | 9/29/97 | OCWD-MTBE-001-028290 |
| 160 | CHEVRON #4650 | 3190 HARBOR BLVD. | SANTA ANA | Yes | 2/14/96 | OCWD-MTBE-001-028295 |
| 161 | CHEVRON #5418 | | | | | |
| | CHEVRON STATION #9-5418 | 18692 MacARTHUR BLVD. | IRVINE | Yes | 5/13/96 | OCWD-MTBE-001-028291 |
| 162 | CHEVRON #5492 | | | | | |
| | CHEVRON #9-5492 | 15482 BEACH BLVD. | WESTMINSTER | Yes | 3/26/98 | OCWD-MTBE-001-028297 |
| 163 | CHEVRON #5568 | | | | | |
| | CHEVRON | 12541 SEAL BEACH BLVD. | SEAL BEACH | Yes | 5/31/96 | OCWD-MTBE-001-028296 |
| 164 | CHEVRON #6515 | | | | | |
| | CHEVRON SS #6515 | 12452 VALLEY VIEW STREET | GARDEN GROVE | Yes | 9/24/97 | OCWD-MTBE-001-028290 |
| 165 | CHEVRON #7100 | | | | | |
| | CHEVRON SS #7100 | 3531 NEWPORT BLVD. | NEWPORT BEACH | Yes | 3/9/98 | OCWD-MTBE-001-028293 |
| 166 | CHEVRON #7842 | | | | | |
| | CHEVRON SS #7842 | 11025 WARNER AVE. | FOUNTAIN VALLEY | Yes | 10/2/96 | OCWD-MTBE-001-028289 |
| 167 | CHEVRON #8091 | | | | | |
| | CHEVRON 9-8091 | 17511 E. YORBA LINDA BLVD. | YORBA LINDA | Yes | 5/30/96 | OCWD-MTBE-001-028298 |
| 168 | CHEVRON #8310 | | | | | |
| | CHEVRON | 6971 BEACH BLVD. | BUENA PARK | Yes | 7/24/98 | OCWD-MTBE-001-028287 |
| 169 | CHEVRON #8655 | | | | | |
| | CHEVRON | 7777 EDINGER AVE. | HUNTINGTON BEACH | Yes | 5/13/97 | OCWD-MTBE-001-028290 |
| 170 | CHEVRON #8721 | 9971 ADAMS AVE. | HUNTINGTON BEACH | Yes | 12/24/96 | OCWD-MTBE-001-028290 |
| 171 | CHEVRON #9212 | 2303 S. BRISTOL ST. | SANTA ANA | Yes | 11/7/98 | OCWD-MTBE-001-028295 |
| 172 | CHEVRON #9384 | 24081 EL TORO RD. | LAGUNA HILLS | Yes | 6/15/98 | OCWD-MTBE-001-028292 |
| 173 | CHEVRON #9706 | 2801 HARBOR BLVD. | COSTA MESA | Yes | 5/15/97 | OCWD-MTBE-001-028288 |
| 174 | CHEVRON #9795 | 3490 LINCOLN AVE. | ANAHEIM | Yes | 6/2/98 | OCWD-MTBE-001-028286 |
| 175 | CHEVRON #9915 | 3000 FAIRVIEW RD. | COSTA MESA | Yes | 4/2/96 | OCWD-MTBE-001-028288 |
| 176 | CO. OF ORANGE, CENT. UTILITIES FAC. | 525 N. FLOWER ST. | SANTA ANA | Yes | 12/10/97 | OCWD-MTBE-001-028295 |
| 177 | JET GAS STATION | | | | | |
| | KAYO OIL COMPANY | 619 E. LA HABRA BLVD. | LA HABRA | Yes | 6/13/96 | OCWD-MTBE-001-028292 |
| 178 | CROWN AUTO | 8142 GARDEN GROVE BLVD. | GARDEN GROVE | Yes | 5/9/96 | OCWD-MTBE-001-028290 |
| 179 | EXXON #0755 | 14082 REDHILL AVE. | TUSTIN | Yes | 1/31/96 | OCWD-MTBE-001-028297 |
| 180 | EXXON #0769 | 2122 BRISTOL ST. | NEWPORT BEACH | Yes | 1/22/97 | OCWD-MTBE-001-028293 |
| 181 | EXXON #0833 | 13502 BROOKHURST ST. | GARDEN GROVE | Yes | 1/15/96 | OCWD-MTBE-001-028290 |
| 182 | EXXON #0865 | 1195 BAKER ST. | COSTA MESA | Yes | 1/19/98 | OCWD-MTBE-001-028288 |
| 183 | EXXON #0945 | 2791 E. LINCOLN AVE. | ANAHEIM | Yes | 2/2/96 | OCWD-MTBE-001-028286 |
| 184 | EXXON #7-1354 | | | | | |
| | EXXON #7-1354 | 12493 BEACH BLVD. | STANTON | Yes | 1/12/98 | OCWD-MTBE-001-028296 |
| 185 | EXXON #1433 | 11171 LOS ALAMITOS BLVD. | LOS ALAMITOS | Yes | 3/14/96 | OCWD-MTBE-001-028293 |
| 186 | EXXON #1488 | 1730 W. ORANGETHORPE AVE. | FULLERTON | Yes | 2/28/96 | OCWD-MTBE-001-028289 |
| 187 | EXXON #2217 | | | | | |
| | EXXON | 6001 EDINGER AVE. | HUNTINGTON BEACH | Yes | 4/28/97 | OCWD-MTBE-001-028290 |
| 188 | EXXON #2218 | 2180 W. BALL RD. | ANAHEIM | Yes | 12/1/95 | OCWD-MTBE-001-028286 |
| 189 | EXXON #2283 | 6011 WESTMINSTER AVE. | WESTMINSTER | Yes | 1/29/96 | OCWD-MTBE-001-028297 |
| 190 | EXXON #2314 | | | | | |
| | EXXON | 6392 BEACH BLVD. | BUENA PARK | Yes | 1/30/97 | OCWD-MTBE-001-028287 |
| 191 | EXXON #2646 | 17222 PACIFIC COAST HWY. | HUNTINGTON BEACH | Yes | 4/17/96 | OCWD-MTBE-001-028290 |
| 192 | EXXON #3333 | 3000 E. YORBA LINDA BLVD. | FULLERTON | Yes | 11/26/96 | OCWD-MTBE-001-028289 |
| 193 | EXXON #3515 | | | | | |
| | EXXON/MACHILL | 17551 MacARTHUR BLVD. | IRVINE | Yes | 1/14/98 | OCWD-MTBE-001-028291 |
| 194 | EXXON #3525 | 14781 SAND CANYON AVE. | IRVINE | Yes | 2/15/96 | OCWD-MTBE-001-028291 |
| 195 | EXXON #3561 | 15980 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 2/13/96 | OCWD-MTBE-001-028289 |
| 196 | EXXON #3573 | 18851 McFADDEN AVE. | TUSTIN | Yes | 11/6/96 | OCWD-MTBE-001-028297 |
| 197 | EXXON #3650 | 901 N. PLACENTIA AVE. | FULLERTON | Yes | 2/13/97 | OCWD-MTBE-001-028289 |
| 198 | EXXON #3676 | 3003 NEWPORT BLVD. | COSTA MESA | Yes | 1/23/96 | OCWD-MTBE-001-028288 |
| 199 | EXXON #3738 | | | | | |
| | EXXON | 17474 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 7/5/96 | OCWD-MTBE-001-028289 |
| 200 | EXXON #3792 | 13681 MAGNOLIA ST. | GARDEN GROVE | Yes | 7/29/97 | OCWD-MTBE-001-028290 |
| 201 | EXXON #3844 | 1201 YORBA LINDA BLVD. | PLACENTIA | Yes | 10/23/97 | OCWD-MTBE-001-028294 |
| 202 | EXXON #3915 | 20001 BEACH BLVD. | HUNTINGTON BEACH | Yes | 1/8/98 | OCWD-MTBE-001-028290 |
| 203 | EXXON #4160 | | | | | |
| | EXXON | 23852 EL TORO RD. | LAKE FOREST | Yes | 4/3/96 | OCWD-MTBE-001-028293 |
| 204 | EXXON #4283 | | | | | |
| | EXXON SS#7-4283 | 8980 WARNER AVE. | FOUNTAIN VALLEY | Yes | 11/18/96 | OCWD-MTBE-001-028289 |
| 205 | EXXON #4949 | 5951 KELLOGG DR. | YORBA LINDA | Yes | 1/9/98 | OCWD-MTBE-001-028298 |

3

387780_1.XLS

| MTBE SITE | OCHCA_SITE | ADDRESS | CITY | MTBE DETECTION PRE-5/6/97 | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 206 | EXXON #7987 | | | | | |
| | EXXON CO USA | 9001 ADAMS AVE. | HUNTINGTON BEACH | Yes | 2/5/97 | OCWD-MTBE-001-028290 |
| 207 | EXXON #8756 | | | | | |
| | EXXON STORE #7-8756 | 15991 MAGNOLIA ST. | WESTMINSTER | Yes | 11/13/97 | OCWD-MTBE-001-028290 |
| 208 | EXXON #8840 | | | | | |
| | EXXON | 5961 LA PALMA AVE. | LA PALMA | Yes | 4/18/96 | OCWD-MTBE-001-028292 |
| 209 | E-Z SERVE #100841 | 2409 W. EDINGER | SANTA ANA | Yes | 9/17/96 | OCWD-MTBE-001-028296 |
| 210 | E-Z SERVE #100842 | 3175 W. BALL ROAD | ANAHEIM | Yes | 12/18/97 | OCWD-MTBE-001-028288 |
| 211 | FAMILY OIL CO. #2 | 12491 HASLER ST. | GARDEN GROVE | Yes | 8/13/96 | OCWD-MTBE-001-028290 |
| 212 | FAST FUEL #920 | 3146 LINCOLN AVENUE | ANAHEIM | Yes | 10/8/96 | OCWD-MTBE-001-028288 |
| 213 | FAST FUEL #971 | 681 BEACH BLVD. | LA HABRA | Yes | 8/7/96 | OCWD-MTBE-001-028292 |
| 214 | FIRESTONE #71F7 | 6011 ORANGETHORPE AVENUE | BUENA PARK | Yes | 12/1/97 | OCWD-MTBE-001-028287 |
| 215 | FLEET WHITE | 1509 S. GREENVILLE ST. | SANTA ANA | Yes | 2/11/97 | OCWD-MTBE-001-028296 |
| 216 | FULLERTON AUTO ELECTRIC | 1565 W. COMMONWEALTH AVE. | FULLERTON | Yes | 9/26/96 | OCWD-MTBE-001-028289 |
| 217 | FULLERTON SCHOOL DISTRICT | 1401 W. VALENCIA DR. | FULLERTON | Yes | 8/27/96 | OCWD-MTBE-001-028289 |
| 218 | G and M OIL #01 | | | | | |
| | G&M OIL | 1300 PACIFIC COAST HWY. | SEAL BEACH | Yes | 11/16/98 | OCWD-MTBE-001-028286 |
| 219 | G and M OIL #03 | | | | | |
| | G&M OIL CO INC #3 | 110 HARBOR BLVD. | LA HABRA | Yes | 5/7/97 | OCWD-MTBE-001-028292 |
| 220 | G and M OIL #04 | | | | | |
| | G&M OIL #4 | 16990 BEACH BLVD. | HUNTINGTON BEACH | Yes | 9/21/97 | OCWD-MTBE-001-028291 |
| 221 | G and M OIL #14 | 6702 WESTMINSTER BLVD. | WESTMINSTER | Yes | 8/26/98 | OCWD-MTBE-001-028297 |
| 222 | G and M OIL #32 | | | | | |
| | TARGET GAS/G&M OIL | 14902 BEACH BLVD. | WESTMINSTER | Yes | 12/6/98 | OCWD-MTBE-001-028297 |
| 223 | G and M OIL #43 | 1740 NEWPORT BLVD. | COSTA MESA | Yes | 5/22/97 | OCWD-MTBE-001-028288 |
| 224 | GENERAL MOTORS | 2850 HARBOR BLVD. | COSTA MESA | Yes | 3/27/98 | OCWD-MTBE-001-028288 |
| 225 | HLP FAMILY | 23552 MOULTON PKWY. | LAGUNA HILLS | Yes | 9/10/96 | OCWD-MTBE-001-028292 |
| 226 | HANSEN AUTO TOW | 4620 LINCOLN AVE. | CYPRESS | Yes | 2/18/97 | OCWD-MTBE-001-028288 |
| 227 | HARBOR CLUB MARINA | 3333 W. PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 7/18/96 | OCWD-MTBE-001-028293 |
| 228 | HARBOR-FAIR TEXA | | | | | |
| | HARBOR-FAIR EXXON | 2502 HARBOR BLVD. | COSTA MESA | Yes | 12/15/97 | OCWD-MTBE-001-028288 |
| 229 | HRAKO SERVICE CENTER | 5001 CERRITOS AVE. | CYPRESS | Yes | 10/8/97 | OCWD-MTBE-001-028286 |
| 230 | HUNTINGTON HARBOR CAR WASH | 16021 ALGONQUIN ST. | HUNTINGTON BEACH | Yes | 3/11/98 | OCWD-MTBE-001-028291 |
| 231 | INDEPENDENT DEVELOPMENT CO., INC. | 9025 WARNER AVE. | FOUNTAIN VALLEY | Yes | 9/18/97 | OCWD-MTBE-001-028289 |
| 232 | JET GAS, FORMER JET GAS STATION | 13202 BROOKHURST ST. | GARDEN GROVE | Yes | 3/9/98 | OCWD-MTBE-001-028290 |
| 233 | K.H. DALE PROPERTY | 2230 E. LAMBERT RD. | LA HABRA | Yes | 5/23/96 | OCWD-MTBE-001-028292 |
| 234 | KAMIZOLES PROPERTY | 8001 W. ORANGTHORPE AVENUE | BUENA PARK | Yes | 12/15/97 | OCWD-MTBE-001-028287 |
| 235 | KRAFT FOOD SERVICE | 601 DYER RD. | SANTA ANA | Yes | 3/6/96 | OCWD-MTBE-001-028296 |
| 236 | LA MANCHA DEVELOPMENT | 1800 W. VALENCIA DR. | FULLERTON | Yes | 1/22/96 | OCWD-MTBE-001-028289 |
| 237 | LAMBERT PALM BUSINESS CENTER | 1901 E. LAMBERT RD. | LA HABRA | Yes | 4/1/96 | OCWD-MTBE-001-028292 |
| 238 | LOS ALAMITOS RACE COURSE | 4961 KATELLA AVE. | LOS ALAMITOS | Yes | 4/13/96 | OCWD-MTBE-001-028293 |
| 239 | METRO CAR WASH, SA#1 | 2402 S. BRISTOL ST. | SANTA ANA | Yes | 12/31/96 | OCWD-MTBE-001-028296 |
| 240 | MOBIL #11-D7E | | | | | |
| | MOBIL | 4995 WARNER AVE. | HUNTINGTON BEACH | Yes | 3/18/98 | OCWD-MTBE-001-028291 |
| 241 | MOBIL #11-D9R | | | | | |
| | MOBIL | 16001 BEACH BLVD. | HUNTINGTON BEACH | Yes | 11/20/98 | OCWD-MTBE-001-028291 |
| 242 | MOBIL #11-FEE | | | | | |
| | MOBIL SS#11-FEE | 6011 BALL RD. | CYPRESS | Yes | 3/17/97 | OCWD-MTBE-001-028289 |
| 243 | MOBIL #11-FXW | | | | | |
| | MOBIL | 5962 LA PALMA | LA PALMA | Yes | 8/11/98 | OCWD-MTBE-001-028292 |
| 244 | MOBIL #11-FYE | | | | | |
| | MOBIL | 8510 KNOTT AVE. | BUENA PARK | Yes | 2/1/96 | OCWD-MTBE-001-028287 |
| 245 | MOBIL #11-G2W | 15502 BEACH BLVD. | WESTMINSTER | Yes | 11/27/96 | OCWD-MTBE-001-028297 |
| 246 | MOBIL #11-G31 | | | | | |
| | MOBIL OIL | 5972 WARNER AVE. | HUNTINGTON BEACH | Yes | 11/20/98 | OCWD-MTBE-001-028291 |
| 247 | MOBIL #11-G3E | | | | | |
| | MOBIL #11-G3E | 14002 BEACH BLVD. | WESTMINSTER | Yes | 8/26/98 | OCWD-MTBE-001-028297 |
| 248 | MOBIL #11-G6R | | | | | |
| | MOBIL OIL | 6012 EDINGER AVE. | HUNTINGTON BEACH | Yes | 6/30/98 | OCWD-MTBE-001-028291 |
| 249 | MOBIL #11-G7G | | | | | |
| | MOBIL OIL S/S #G7G | 8961 BOLSA AVE. | WESTMINSTER | Yes | 8/20/98 | OCWD-MTBE-001-028297 |
| 250 | MOBIL #11-GLG | 6011 CHAPMAN AVE. | GARDEN GROVE | Yes | 6/20/97 | OCWD-MTBE-001-028290 |
| 251 | MOBIL #11-GTR | | | | | |
| | MOBIL OIL CORP | 13031 MAGNOLIA ST. | GARDEN GROVE | Yes | 4/11/96 | OCWD-MTBE-001-028290 |
| 252 | MOBIL #11-H9N | | | | | |
| | MOBIL #18-H9N | 1199 S. BEACH BLVD. | LA HABRA | Yes | 5/26/98 | OCWD-MTBE-001-028292 |
| 253 | MOBIL #18-106 | 1800 S. HARBOR BLVD. | ANAHEIM | Yes | 5/23/97 | OCWD-MTBE-001-028288 |
| 254 | MOBIL #18-532 | 295 E. 17TH ST. | COSTA MESA | Yes | 12/1/98 | OCWD-MTBE-001-028288 |
| 255 | MOBIL #18-568 | | | | | |
| | MOBIL #18-688 | 18230 HARBOR BLVD. | FOUNTAIN VALLEY | Yes | 3/26/98 | OCWD-MTBE-001-028289 |
| 256 | MOBIL #18-793 | 2800 E. IMPERIAL HWY. | FULLERTON | Yes | 7/23/97 | OCWD-MTBE-001-028289 |
| 257 | MOBIL #18-824 | | | | | |
| | MOBIL | 5333 UNIVERSITY AVE. | IRVINE | Yes | 12/17/97 | OCWD-MTBE-001-028288 |
| 258 | MOBIL #18-837 | | | | | |
| | MOBIL OIL #18-837 | 4800 BARRANCA PKWY. | IRVINE | Yes | 5/7/97 | OCWD-MTBE-001-028288 |
| 259 | MOBIL #18-AAA | 10972 WESTMINSTER AVE. | GARDEN GROVE | Yes | 7/22/97 | OCWD-MTBE-001-028290 |

387760_1.XLS

| MTBESITE | OCWA_SITE | ADDRESS | CITY | MTBE DETECTION PRE-5/6/97 | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 260 | MOBIL #18-D2H (MEDDOCK TRUST) | 100 E. KATELLA AVE. | ANAHEIM | Yes | 6/17/96 | OCWD-MTBE-001-028286 |
| 261 | MOBIL #18-F34 | | | | | |
| | MOBIL #18-F34 | 1124 E. LA HABRA BLVD. | LA HABRA | Yes | 5/20/96 | OCWD-MTBE-001-028292 |
| 262 | MOBIL #18-G6O | 19011 MAGNOLIA AVENUE | HUNTINGTON BEACH | Yes | 8/3/98 | OCWD-MTBE-001-028291 |
| 263 | MOBIL #18-GWV | 12711 BROOKHURST ST. | GARDEN GROVE | Yes | 2/1/96 | OCWD-MTBE-001-028290 |
| 264 | MOBIL #18-GX7 | 13172 GARDEN GROVE BOULEVARD | GARDEN GROVE | Yes | 6/6/97 | OCWD-MTBE-001-028290 |
| 265 | MOBIL #18-H7Q | | | | | |
| | MOBIL #18-H7Q | 13872 REDHILL AVE. | TUSTIN | Yes | 4/15/98 | OCWD-MTBE-001-028297 |
| 266 | MOBIL #18-HCN | 1351 E. DYER ST. | SANTA ANA | Yes | 9/26/96 | OCWD-MTBE-001-028296 |
| 267 | MOBIL #18-HD4, FORMER | 2799 HARBOR BLVD. | COSTA MESA | Yes | 4/21/98 | OCWD-MTBE-001-028288 |
| 268 | MOBIL #18-HDR | | | | | |
| | MOBIL OIL SS #18-HDR | 3195 HARBOR BLVD. | COSTA MESA | Yes | 5/29/96 | OCWD-MTBE-001-028288 |
| 269 | MOBIL #18-HE1 | 1465 S. MAIN ST. | SANTA ANA | Yes | 6/1/96 | OCWD-MTBE-001-028296 |
| 270 | MOBIL #18-HG7 | 1500 BALBOA BOULEVARD | NEWPORT BEACH | Yes | 9/18/96 | OCWD-MTBE-001-028293 |
| 271 | MOBIL #18-HGC | 100 W. MacARTHUR BLVD. | SANTA ANA | Yes | 12/29/98 | OCWD-MTBE-001-028296 |
| 272 | MOBIL #18-HJL | 1701 TUSTIN AVE. | COSTA MESA | Yes | 8/27/96 | OCWD-MTBE-001-028288 |
| 273 | MOBIL #18-HKF | 24382 EL TORO ROAD | LAGUNA HILLS | Yes | 5/29/97 | OCWD-MTBE-001-028292 |
| 274 | MOBIL #18-HND | 1000 E. PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 6/18/97 | OCWD-MTBE-001-028293 |
| 275 | MOBIL #18-J8X | | | | | |
| | MOBIL | 8991 ORANGETHORPE AVE. | BUENA PARK | Yes | 3/27/96 | OCWD-MTBE-001-028287 |
| 276 | MOBIL #18-JQY | | | | | |
| | MOBIL OIL S/S 18-JQY | 17591 YORBA LINDA BLVD. | YORBA LINDA | Yes | 6/21/98 | OCWD-MTBE-001-028288 |
| 277 | MOBIL #18-KA8 | 1701 WHITTIER BLVD. | LA HABRA | Yes | 6/21/97 | OCWD-MTBE-001-028292 |
| 278 | MOBIL #18-KBD | | | | | |
| | MOBIL | 9972 WESTMINSTER AVE. | GARDEN GROVE | Yes | 6/24/98 | OCWD-MTBE-001-028290 |
| 279 | MOBIL #18-KBV | 21502 BROOKHURST ST. | HUNTINGTON BEACH | Yes | 6/25/97 | OCWD-MTBE-001-028291 |
| 280 | MOBIL #99-A8Q | 3000 W. LINCOLN AVE. | ANAHEIM | Yes | 2/10/97 | OCWD-MTBE-001-028286 |
| 281 | MOBIL #99-384 | 24065 EL TORO RD. | LAGUNA HILLS | Yes | 12/22/96 | OCWD-MTBE-001-028292 |
| 282 | MONTGOMERY WARDS | 7777 EDINGER AVE. | HUNTINGTON BEACH | Yes | 2/20/96 | OCWD-MTBE-001-028291 |
| 283 | NEVADA INVESTMENT HOLDINGS | 1899 W. LINCOLN AVE. | ANAHEIM | Yes | 5/8/98 | OCWD-MTBE-001-028286 |
| 284 | NEWPORT IMPORTS | 3100 W. PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 3/10/97 | OCWD-MTBE-001-028293 |
| 285 | OCFA FIRE STATIC FIRE STATION #4 | 2 CALIFORNIA AVE. | IRVINE | Yes | 2/12/96 | OCWD-MTBE-001-028291 |
| 286 | OCTA | 11790 CARDINAL CIRCLE | GARDEN GROVE | Yes | 8/28/96 | OCWD-MTBE-001-028290 |
| 287 | ORANGE CO. FIRE STATION #10 | 18402 E. LEMON CIRCLE | YORBA LINDA | Yes | 8/26/97 | OCWD-MTBE-001-028288 |
| 288 | PARK TRAILER SALES | 5071 LINCOLN AVE. | CYPRESS | Yes | 6/10/96 | OCWD-MTBE-001-028289 |
| 289 | POMONA BOX COMPANY | 301 W. IMPERIAL HWY. | LA HABRA | Yes | 9/8/98 | OCWD-MTBE-001-028292 |
| 290 | RAPID GAS #25 | | | | | |
| | RAPID GAS STATION #25 | 601 W. IMPERIAL HWY. | LA HABRA | Yes | 3/20/98 | SA-RWQCB File |
| 291 | ROGER MILLER FORD | 230 S. MAIN ST. | ORANGE | Yes | 7/1/97 | OCWD-MTBE-001-028294 |
| 292 | S&M MOVING | 2481 ALTON PKWY | IRVINE | Yes | 12/4/96 | OCWD-MTBE-001-028291 |
| 293 | SADDLEBACK ASSOCIATES | 2615 ORANGE AVE. | SANTA ANA | Yes | 6/1/96 | OCWD-MTBE-001-028296 |
| 294 | SHELL #10002 | 10002 BOLSA AVE. | WESTMINSTER | Yes | 4/23/96 | OCWD-MTBE-001-028297 |
| 295 | SHELL #10961 | 10961 LOS ALAMITOS BLVD. | LOS ALAMITOS | Yes | 8/1/97 | OCWD-MTBE-001-028283 |
| 296 | SHELL #1201 | 1201 E. BAKER ST. | COSTA MESA | Yes | 3/4/97 | OCWD-MTBE-001-028288 |
| 297 | SHELL #15501 | 15501 BEACH BLVD. | WESTMINSTER | Yes | 5/2/96 | OCWD-MTBE-001-028297 |
| 298 | SHELL #16001 | 16001 BOLSA CHICA ST. | HUNTINGTON BEACH | Yes | 6/26/96 | OCWD-MTBE-001-028291 |
| 299 | SHELL #16972 | 16972 GOLDENWEST ST. | HUNTINGTON BEACH | Yes | 3/4/96 | OCWD-MTBE-001-028291 |
| 300 | SHELL #19002 | 19002 MAGNOLIA ST. | HUNTINGTON BEACH | Yes | 9/18/96 | OCWD-MTBE-001-028291 |
| 301 | SHELL #20001 | 20001 BROOKHURST ST. | HUNTINGTON BEACH | Yes | 2/17/97 | OCWD-MTBE-001-028291 |
| 302 | SHELL #23038 | 23038 LAKE FOREST DR. | LAGUNA HILLS | Yes | 6/18/97 | OCWD-MTBE-001-028292 |
| 303 | SHELL #23971 | 23971 EL TORO RD. | LAGUNA HILLS | Yes | 10/14/97 | OCWD-MTBE-001-028292 |
| 304 | SHELL #2500 | | | | | |
| | SHELL | 2500 SAN JOEQUIN HILLS RD. | CORONA DEL MAR | Yes | 2/10/97 | OCWD-MTBE-001-028293 |
| 305 | SHELL #300 | | | | | |
| | SHELL | 300 S. BREA BLVD. | BREA | Yes | 8/12/97 | OCWD-MTBE-001-028287 |
| 306 | SHELL #3045 | 3045 BRISTOL ST. | COSTA MESA | Yes | 4/1/96 | OCWD-MTBE-001-028288 |
| 307 | SHELL #3125 | 3125 ORANGETHORPE AVE. | ANAHEIM | Yes | 6/11/95 | OCWD-MTBE-001-028286 |
| 308 | SHELL #3601 | 3601 S. BRISTOL ST. | SANTA ANA | Yes | 4/11/95 | OCWD-MTBE-001-028296 |
| 309 | SHELL #510 | 510 N. BRISTOL STREET | SANTA ANA | Yes | 11/24/98 | OCWD-MTBE-001-028296 |
| 310 | SHELL #5231 | 5231 BEACH BLVD. | BUENA PARK | Yes | 8/9/96 | OCWD-MTBE-001-028287 |
| 311 | SHELL #5990 | | | | | |
| | CHARLES LYONS JR/FORMER SHELL | 5990 ORANGETHORPE AVE. | BUENA PARK | Yes | 5/2/96 | OCWD-MTBE-001-028287 |
| 312 | SHELL #6022 | 6022 CHAPMAN AVE. | GARDEN GROVE | Yes | 7/25/96 | OCWD-MTBE-001-028290 |
| 313 | SHELL #6502 | 6502 BOLSA AVE. | HUNTINGTON BEACH | Yes | 9/5/95 | OCWD-MTBE-001-028291 |
| 314 | SHELL #702 | 702 S. HARBOR BLVD. | SANTA ANA | Yes | 7/7/97 | OCWD-MTBE-001-028296 |
| 315 | SHELL #8990 | 8990 WESTMINSTER BLVD. | WESTMINSTER | Yes | 8/6/97 | OCWD-MTBE-001-028297 |
| 316 | SHELL #990 | | | | | |
| | FORMER SHELL STATION | 990 PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 4/25/98 | OCWD-MTBE-001-028293 |
| 317 | SOUTHLAND #18835 | 6491 WESTMINSTER BLVD. | WESTMINSTER | Yes | 11/18/96 | OCWD-MTBE-001-028297 |
| 318 | SOUTHLAND #18841 | 10001 ADAMS AVENUE | HUNTINGTON BEACH | Yes | 8/20/97 | OCWD-MTBE-001-028291 |
| 319 | SPITZER, ARTHUR | 9002 WESTMINSTER BLVD. | WESTMINSTER | Yes | 1/10/96 | OCWD-MTBE-001-028297 |
| 320 | SUPERIOR STATIONS | 2050 HARBOR BLVD. | COSTA MESA | Yes | 6/17/97 | OCWD-MTBE-001-028288 |
| 321 | TARGET STORE #T286 | 1330 E. 17TH ST. | SANTA ANA | Yes | 3/23/98 | OCWD-MTBE-001-028296 |
| 322 | TEXACO #100 | 100 W. KATELLA AVE. | ANAHEIM | Yes | 4/29/96 | OCWD-MTBE-001-028286 |
| 323 | TEXACO #12571 | 12571 VALLEY VIEW ST. | GARDEN GROVE | Yes | 2/23/96 | OCWD-MTBE-001-028290 |
| 324 | TEXACO #13712 | 13712 GOLDENWEST ST. | WESTMINSTER | Yes | 4/22/96 | OCWD-MTBE-001-028297 |
| 325 | TEXACO #1600 | 1600 JAMBOREE ST. | NEWPORT BEACH | Yes | 2/28/96 | OCWD-MTBE-001-028293 |

387760_1.XLS

| MTBESITE | OCWDA_SITE | ADDRESS | CITY | MTBE DETECTION (Y/N) | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 326 | TEXACO #1695 | 1695 SUPERIOR AVE. | COSTA MESA | Yes | 2/8/95 | OCWD-MTBE-001-028288 |
| 327 | TEXACO #22652 | 23652 ROCKFIELD BLVD. | LAKE FOREST | Yes | 1/21/97 | OCWD-MTBE-001-028293 |
| 328 | TEXACO #3311 | | | | | |
| | TEXACO SERVICE STATION | 3311 KATELLA AVE. | LOS ALAMITOS | Yes | 6/2/97 | OCWD-MTBE-001-028293 |
| 329 | TEXACO #4678 | 4878 CAMPUS DR. | NEWPORT BEACH | Yes | 3/12/96 | OCWD-MTBE-001-028293 |
| 330 | TEXACO #5850 | 5850 E. LA PALMA AVENUE | ANAHEIM | Yes | 3/5/96 | OCWD-MTBE-001-028286 |
| 331 | TEXACO #6011 | | | | | |
| | TEXACO | 6011 MANCHESTER BLVD. | BUENA PARK | Yes | 3/17/97 | OCWD-MTBE-001-028287 |
| 332 | TEXACO #61061/413 | 1131 W. LINCOLN AVENUE | ANAHEIM | Yes | 4/25/97 | OCWD-MTBE-001-028286 |
| 333 | TEXACO #61060031 | 17066 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 10/22/96 | OCWD-MTBE-001-028289 |
| 334 | TEXACO #611060 | | | | | |
| | TEXACO | 11250 LOS ALAMITOS BLVD. | LOS ALAMITOS | Yes | 5/29/98 | OCWD-MTBE-001-028293 |
| 335 | TEXACO #6982 | | | | | |
| | TEXACO | 6982 EDINGER AVE. | HUNTINGTON BEACH | Yes | 8/2/97 | OCWD-MTBE-001-028291 |
| 336 | TEXACO #8520 | | | | | |
| | TEXACO | 8520 WARNER AVENUE | FOUNTAIN VALLEY | Yes | 5/12/98 | OCWD-MTBE-001-028289 |
| 337 | THRIFTY OIL #008 | 704 N. BRISTOL ST. | SANTA ANA | Yes | 8/4/97 | OCWD-MTBE-001-028296 |
| 338 | THRIFTY OIL #014 | 120 E. IMPERIAL HWY. | BREA | Yes | 1/6/96 | OCWD-MTBE-001-028287 |
| 339 | THRIFTY OIL #182 | 7510 ORANGETHORPE AVE. | BUENA PARK | Yes | 7/11/96 | OCWD-MTBE-001-028287 |
| 340 | THRIFTY OIL #084 | 304 S. MAGNOLIA AVE. | ANAHEIM | Yes | 9/10/96 | OCWD-MTBE-001-028286 |
| 341 | THRIFTY OIL #085 | 17475 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 11/17/96 | OCWD-MTBE-001-028289 |
| 342 | THRIFTY OIL #134 | 1681 W. BALL RD. | ANAHEIM | Yes | 11/19/97 | OCWD-MTBE-001-028286 |
| 343 | THRIFTY OIL #151 | 751 BAKER ST. | COSTA MESA | Yes | 9/23/96 | OCWD-MTBE-001-028288 |
| 344 | THRIFTY OIL #302 | 718 S. BREA BLVD. | BREA | Yes | 10/19/96 | OCWD-MTBE-001-028287 |
| 345 | THRIFTY OIL #356 | 9511 VALLEY VIEW ST. | CYPRESS | Yes | 4/10/96 | OCWD-MTBE-001-028290 |
| 346 | THRIFTY OIL #357 | 2801 W. LINCOLN AVE. | ANAHEIM | Yes | 12/29/97 | OCWD-MTBE-001-028288 |
| 347 | THRIFTY OIL #360 | 2800 W. BALL ROAD | ANAHEIM | Yes | 1/1/299 | OCWD-MTBE-001-028286 |
| 348 | THRIFTY OIL #361 | 11500 BEACH BOULEVARD | STANTON | Yes | 7/3/96 | OCWD-MTBE-001-028290 |
| 349 | THRIFTY OIL #388 | 6311 WESTMINSTER BLVD. | WESTMINSTER | Yes | 8/16/96 | OCWD-MTBE-001-028297 |
| 350 | THRIFTY OIL #370 | | | | | |
| | THRIFTY OIL #370 | 13501 MAGNOLIA AVE. | GARDEN GROVE | Yes | 2/5/98 | OCWD-MTBE-001-028290 |
| 351 | THRIFTY OIL #372 | 14472 BROOKHURST ST. | GARDEN GROVE | Yes | 1/15/97 | OCWD-MTBE-001-028290 |
| 352 | THRIFTY OIL #374 | 2730 McFADDEN AVE. | SANTA ANA | Yes | 6/2/97 | OCWD-MTBE-001-028296 |
| 353 | THRIFTY OIL #376 | 901 N. BRISTOL ST. | SANTA ANA | Yes | 9/16/98 | OCWD-MTBE-001-028296 |
| 354 | THRIFTY OIL #380 | 15501 EDWARDS STREET | HUNTINGTON BEACH | Yes | 2/13/98 | OCWD-MTBE-001-028289 |
| 355 | THRIFTY OIL #383 | 18520 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 5/18/98 | OCWD-MTBE-001-028289 |
| 356 | THRIFTY OIL #384 | 18795 MAGNOLIA BLVD. | FOUNTAIN VALLEY | Yes | 6/11/98 | OCWD-MTBE-001-028289 |
| 357 | THRIFTY OIL #385 | 19971 BEACH BOULEVARD | HUNTINGTON BEACH | Yes | 6/9/97 | OCWD-MTBE-001-028291 |
| 358 | THRIFTY OIL #386 | 2021 NEWPORT AVENUE | COSTA MESA | Yes | 5/28/98 | OCWD-MTBE-001-028288 |
| 359 | TRANSIT MIXED CO. TRANSIT MIX CONCRETE CO. | 9981 VALENCIA AVE. | IRVINE | Yes | 12/4/97 | OCWD-MTBE-001-028291 |
| 360 | TRIANGLE ASSOCIA TOSCO OIL | 4825 W. PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 10/5/98 | OCWD-MTBE-001-028293 |
| 361 | TRI-COUNTY SANDBLASTING | 6402 MAPLE AVENUE | WESTMINSTER | Yes | 8/28/97 | OCWD-MTBE-001-028297 |
| 362 | UC AUTO SERVICE | 626 S. NEWHOPE ST. | SANTA ANA | Yes | 2/15/96 | OCWD-MTBE-001-028296 |
| 363 | ULTRAMAR #747 | 1150 W. LA HABRA BLVD. | LA HABRA | Yes | 3/17/98 | OCWD-MTBE-001-028292 |
| 364 | ULTRAMAR #750 | 1501 S. BROADWAY ST. | SANTA ANA | Yes | 9/1/97 | OCWD-MTBE-001-028296 |
| 365 | UNOCAL #7, FORMER | 13231 BROOKHURST ST. | GARDEN GROVE | Yes | 12/28/96 | OCWD-MTBE-001-028290 |
| 366 | UNOCAL #0079 | 10742 LOS ALAMITOS BLVD. | LOS ALAMITOS | Yes | 7/19/96 | OCWD-MTBE-001-028293 |
| 367 | UNOCAL #2908 | 244 S. BREA BLVD. | BREA | Yes | 9/27/97 | OCWD-MTBE-001-028287 |
| 368 | UNOCAL #3494 | | | | | |
| | UNOCAL #3404 | 100 E. WHITTIER BLVD. | LA HABRA | Yes | 4/9/98 | OCWD-MTBE-001-028292 |
| 369 | UNOCAL #3530 | 4002 N. HARBOR BLVD. | FULLERTON | Yes | 10/15/98 | OCWD-MTBE-001-028289 |
| 370 | UNOCAL #3797 | | | | | |
| | UNOCAL STATION #3797 | 2201 E. PACIFIC COAST HWY. | CORONA DEL MAR | Yes | 12/10/97 | OCWD-MTBE-001-028287 |
| 371 | UNOCAL #4050 | 2248 HARBOR BLVD. | COSTA MESA | Yes | 8/8/98 | OCWD-MTBE-001-028288 |
| 372 | UNOCAL #4629 | 820 W. CHAPMAN AVE. | PLACENTIA | Yes | 1/25/96 | OCWD-MTBE-001-028294 |
| 373 | UNOCAL #4727 | | | | | |
| | UNOCAL #4727 | 3501 CERRITOS AVE. | LOS ALAMITOS | Yes | 12/7/95 | OCWD-MTBE-001-028293 |
| 374 | UNOCAL #4773 | | | | | |
| | UNOCAL #4773 | 14866 SAND CANYON AVE. | IRVINE | Yes | 12/7/98 | OCWD-MTBE-001-028291 |
| 375 | UNOCAL #4814 | | | | | |
| | UNOCAL | 9011 WESTMINSTER AVE. | GARDEN GROVE | Yes | 4/25/96 | OCWD-MTBE-001-028290 |
| 376 | UNOCAL #4986 | | | | | |
| | UNOCAL | 24201 EL TORO RD. | LAKE FOREST | Yes | 11/18/98 | OCWD-MTBE-001-028293 |
| 377 | UNOCAL #4992 | | | | | |
| | UNOCAL SS #4992 | 1900 NEWPORT BLVD. | COSTA MESA | Yes | 8/4/98 | OCWD-MTBE-001-028288 |
| 378 | UNOCAL #5076 | | | | | |
| | UNOCAL #5076 | 9002 ADAMS AVE. | HUNTINGTON BEACH | Yes | 12/18/98 | OCWD-MTBE-001-028291 |
| 379 | UNOCAL #5089 | 377 SUPERIOR AVE. | NEWPORT BEACH | Yes | 6/25/96 | OCWD-MTBE-001-028294 |
| 380 | UNOCAL #5094 | | | | | |
| | UNOCAL STATION #5094 | 7995 KNOTT AVE. | BUENA PARK | Yes | 5/9/97 | OCWD-MTBE-001-028287 |
| 381 | UNOCAL #5106 | 5344 E. CHAPMAN AVE. | ORANGE | Yes | 1/24/96 | OCWD-MTBE-001-028294 |
| 382 | UNOCAL #5123 | | | | | |
| | UNOCAL | 14972 SPRINGDALE ST. | HUNTINGTON BEACH | Yes | 2/29/96 | OCWD-MTBE-001-028291 |
| 383 | UNOCAL #5156 | | | | | |
| | UNOCAL #5156 | 17499 YORBA LINDA BLVD. | YORBA LINDA | Yes | 7/17/96 | OCWD-MTBE-001-028298 |
| 384 | UNOCAL #5169 | | | | | |
| | UNOCAL #5169 | 16471 BOLSA CHICA ST. | HUNTINGTON BEACH | Yes | 3/7/97 | OCWD-MTBE-001-028291 |

| MTBESITE# | OCHCA_SITE | ADDRESS | | MTBE DETECTION PRE-SWRCP | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 385 | UNOCAL #5198 | 101 W. BASTANCHURY RD. | FULLERTON | Yes | 3/15/96 | OCWD-MTBE-001-028289 |
| 386 | UNOCAL #5224 | 16901 E. McFADDEN AVE. | TUSTIN | Yes | 7/8/96 | OCWD-MTBE-001-028297 |
| 387 | UNOCAL #5225 | 7001 WESTMINSTER AVE. | WESTMINSTER | Yes | 10/21/97 | OCWD-MTBE-001-028297 |
| 388 | UNOCAL #5226 | | | | | |
| | UNOCAL #5226 | 6322 WESTMINSTER AVE. | WESTMINSTER | Yes | 5/11/98 | OCWD-MTBE-001-028297 |
| 389 | UNOCAL #5274 | | | | | |
| | UNOCAL | 9025 GARFIELD AVE. | FOUNTAIN VALLEY | Yes | 6/6/96 | OCWD-MTBE-001-028289 |
| 390 | UNOCAL #5279 | 16621 PACIFIC COAST HWY. | SUNSET BEACH | Yes | 7/30/98 | OCWD-MTBE-001-028297 |
| 391 | UNOCAL #5280 | | | | | |
| | UNOCAL | 8502 EDINGER AVE. | HUNTINGTON BEACH | Yes | 5/14/96 | OCWD-MTBE-001-028281 |
| 392 | UNOCAL #5285 | | | | | |
| | UNOCAL | 21471 BROOKHURST ST. | HUNTINGTON BEACH | Yes | 9/12/96 | OCWD-MTBE-001-028291 |
| 393 | UNOCAL #5297 | 3067 BRISTOL ST. | COSTA MESA | Yes | 7/16/96 | OCWD-MTBE-001-028288 |
| 394 | UNOCAL #5310 | 3001 NEWPORT BLVD. | NEWPORT BEACH | Yes | 2/27/96 | OCWD-MTBE-001-028288 |
| 395 | UNOCAL #5330 | 5001 BALL RD. | CYPRESS | Yes | 12/13/95 | OCWD-MTBE-001-028289 |
| 396 | UNOCAL #5336 | | | | | |
| | UNOCAL | 6012 WARNER AVE. | HUNTINGTON BEACH | Yes | 8/26/97 | OCWD-MTBE-001-028281 |
| 397 | UNOCAL #5356 | 1913 W. EDINGER | SANTA ANA | Yes | 4/24/97 | OCWD-MTBE-001-028296 |
| 398 | UNOCAL #5371 | 5482 LA PALMA AVE. | LA PALMA | Yes | 2/1/96 | OCWD-MTBE-001-028292 |
| 399 | UNOCAL #5375 | 7811 BEACH BLVD. | BUENA PARK | Yes | 7/7/97 | OCWD-MTBE-001-028287 |
| 400 | UNOCAL #5376 | 8971 WARNER AVE. | HUNTINGTON BEACH | Yes | 6/4/96 | OCWD-MTBE-001-028291 |
| 401 | UNOCAL #5398 | | | | | |
| | UNOCAL | 5014 ORANGETHORPE AVE. | LA PALMA | Yes | 2/2/96 | OCWD-MTBE-001-028292 |
| 402 | UNOCAL #5399 | 8525 WARNER AVE. | FOUNTAIN VALLEY | Yes | 11/20/96 | OCWD-MTBE-001-028289 |
| 403 | UNOCAL #5404 | 3599 HARBOR BLVD. | COSTA MESA | Yes | 12/26/96 | OCWD-MTBE-001-028288 |
| 404 | UNOCAL #5408 | 24082 EL TORO RD. | LAGUNA HILLS | Yes | 1/29/98 | OCWD-MTBE-001-028292 |
| 405 | UNOCAL #5422 | 1502 E. EDINGER AVE. | SANTA ANA | Yes | 9/24/97 | OCWD-MTBE-001-028296 |
| 406 | UNOCAL #5429 | 16172 BEACH BLVD. | HUNTINGTON BEACH | Yes | 11/1/95 | OCWD-MTBE-001-028291 |
| 407 | UNOCAL #5436 | 1645 ADAMS AVE. | COSTA MESA | Yes | 8/6/96 | OCWD-MTBE-001-028288 |
| 408 | UNOCAL #5077 | 2701 N. BREA BLVD. | FULLERTON | Yes | 4/29/98 | OCWD-MTBE-001-028289 |
| 409 | UNOCAL #5552 | | | | | |
| | UNOCAL SS #5552 | 9500 VALLEY VIEW ST. | CYPRESS | Yes | 1/16/96 | OCWD-MTBE-001-028289 |
| 410 | UNOCAL #5592 | | | | | |
| | UNOCAL #5592 | 901 PACIFIC COAST HWY. | SEAL BEACH | Yes | 7/20/98 | OCWD-MTBE-001-028296 |
| 411 | UNOCAL #5599 | | | | | |
| | UNOCAL #5599 | 7250 ARTESIA BLVD. | BUENA PARK | Yes | 5/20/98 | OCWD-MTBE-001-028287 |
| 412 | UNOCAL #5607 | 11970 EDINGER AVE. | FOUNTAIN VALLEY | Yes | 3/5/97 | OCWD-MTBE-001-028289 |
| 413 | UNOCAL #5618 | 591 THE CITY DR. | ORANGE | Yes | 4/23/96 | OCWD-MTBE-001-028294 |
| 414 | UNOCAL #5635 | | | | | |
| | UNOCAL #5635 | 7501 KATELLA AVE. | STANTON | Yes | 9/25/96 | OCWD-MTBE-001-028289 |
| 415 | UNOCAL #5649 | 25912 LA PAZ RD. | LAGUNA HILLS | Yes | 10/18/95 | OCWD-MTBE-001-028292 |
| 416 | UNOCAL #5672 | | | | | |
| | UNOCAL 5672 | 9972 BOLSA CHICA AVE. | WESTMINSTER | Yes | 7/16/96 | OCWD-MTBE-001-028297 |
| 417 | UNOCAL #5676 | | | | | |
| | UNOCAL #5676 | 14081 REDHILL AVE. | TUSTIN | Yes | 7/8/98 | OCWD-MTBE-001-028297 |
| 418 | UNOCAL #5762 | 550 VISTA DEL ORO | NEWPORT BEACH | Yes | 7/11/96 | OCWD-MTBE-001-028294 |
| 419 | UNOCAL #5825 | | | | | |
| | UNOCAL SS #5825 | 13261 SPRINGDALE ST. | WESTMINSTER | Yes | 9/17/96 | OCWD-MTBE-001-028297 |
| 420 | UNOCAL #5868 | 676 S. STATE COLLEGE BLVD. | ANAHEIM | Yes | 8/5/96 | OCWD-MTBE-001-028286 |
| 421 | UNOCAL #5908 | 3000 S. BRISTOL ST. | SANTA ANA | Yes | 6/10/97 | OCWD-MTBE-001-028296 |
| 422 | UNOCAL #5909 | 1476 E. BRISTOL ST. | COSTA MESA | Yes | 10/29/98 | OCWD-MTBE-001-028288 |
| 423 | UNOCAL #5915 | | | | | |
| | UNOCAL #5915 | 9020 EDINGER AVE. | FOUNTAIN VALLEY | Yes | 8/8/97 | OCWD-MTBE-001-028289 |
| 424 | UNOCAL #5930 | | | | | |
| | UNOCAL SS #5930 | 18351 IMPERIAL HWY. | YORBA LINDA | Yes | 10/15/98 | OCWD-MTBE-001-028298 |
| 425 | UNOCAL #6355 | 12139 TRASK AVE. | GARDEN GROVE | Yes | 6/5/96 | OCWD-MTBE-001-028290 |
| 426 | UNOCAL #6356 | 1200 E. IMPERIAL HWY. | BREA | Yes | 1/2/98 | OCWD-MTBE-001-028287 |
| 427 | UNOCAL #6404 | | | | | |
| | UNOCAL #6404 | 18011 CULVER DR. | IRVINE | Yes | 5/5/96 | OCWD-MTBE-001-028291 |
| 428 | UNOCAL #6426 | | | | | |
| | UNOCAL CORP | 5021 LA PALMA AVE. | LA PALMA | Yes | 5/8/98 | OCWD-MTBE-001-028292 |
| 429 | UNOCAL #6521 | | | | | |
| | UNOCAL SS #8521 | 2960 SAN MIGUEL RD. | NEWPORT BEACH | Yes | 8/21/96 | OCWD-MTBE-001-028294 |
| 430 | UNOCAL #6537 | 4760 IRVINE BLVD. | IRVINE | Yes | 12/10/97 | OCWD-MTBE-001-028291 |
| 431 | UNOCAL #6839 | | | | | |
| | UNOCAL | 15275 CULVER DR. | IRVINE | Yes | 8/7/98 | OCWD-MTBE-001-028282 |
| 432 | VOTAW/DAVIS | | | | | |
| | VOTAW DAVIS PROPERTIES | 101 IMPERIAL HWY. | LA HABRA | Yes | 11/22/96 | SA-RWQCB File |
| 433 | WAYNE PERRY CONSTRUCTION | 8301 W. COMMONWEALTH AVE. | BUENA PARK | Yes | 9/26/96 | OCWD-MTBE-001-028287 |
| 434 | WEBER PLYWOOD | 15501 MOSHER AVE. | TUSTIN | Yes | 2/21/97 | OCWD-MTBE-001-028297 |
| 435 | WELLS FARGO ALAR | | | | | |
| | WELLS FARGO SECURITY CO. | 17882 COWAN AVE. | IRVINE | Yes | 10/20/97 | OCWD-MTBE-001-028292 |
| 436 | WOODBRIDGE CAR | | | | | |
| | WOODBRIDGE AUTO WASH | 4550 BARRANCA PKWY. | IRVINE | Yes | 7/23/98 | OCWD-MTBE-001-028292 |
| 437 | WORLD OIL #31 | 2040 S. BRISTOL ST. | SANTA ANA | Yes | 5/16/96 | OCWD-MTBE-001-028296 |
| 438 | WORLD OIL #30 | 3450 W. BALL RD. | ANAHEIM | Yes | 11/23/96 | OCWD-MTBE-001-028286 |
| 439 | WORLD OIL #41 | | | | | |
| | WORLD OIL | 7491 LA PALMA AVE. | BUENA PARK | Yes | 3/12/97 | OCWD-MTBE-001-028287 |

387760_1.XLS

| MTBE SITE | OCWCA SITE | ADDRESS | CITY | MTBE DETECTION PRE-3/2007 | SAMPLE DATE | SOURCE |
|---|---|---|---|---|---|---|
| 440 | WORLD OIL #42 | | | | | |
| | WORLD OIL #42 | 3401 NEWPORT BLVD. | NEWPORT BEACH | Yes | 6/15/96 | OCWD-MTBE-001-028294 |
| 441 | WORLD OIL #68 | | | | | |
| | WORLD OIL | 8972 ADAMS AVE. | HUNTINGTON BEACH | Yes | 6/20/97 | OCWD-MTBE-001-028291 |
| 442 | WORLD OIL #72 | 1201 S. BEACH BLVD. | ANAHEIM | Yes | 8/12/96 | OCWD-MTBE-001-028286 |
| 443 | ALRON OIL CO. | | | | | |
| | COX OIL | 305 W. CENTRAL | BREA | Yes | 3/12/97 | OCWD-MTBE-001-028287 |
| 444 | ARCO #1263 | | | | | |
| | ARCO/FOUR STAR VENTURE | 9372 WESTMINSTER BLVD. | WESTMINSTER | Yes | 3/2/00 | SA-RWQCB MTBE D9 |
| 445 | ARCO #1865 | 14244 NEWPORT AVENUE | TUSTIN | Yes | 10/8/98 | OCWD-MTBE-001-028297 |
| 446 | ARCO #3023 | 801 S. MAGNOLIA AVENUE | ANAHEIM | Yes | 12/6/98 | OCWD-MTBE-001-028296 |
| 447 | ARCO #3053 | | | | | |
| | ARCO | 5961 WARNER AVE. | HUNTINGTON BEACH | Yes | 3/20/97 | OCWD-MTBE-001-028290 |
| 448 | ARCO #3094 | 530 N. BROOKHURST AVENUE | ANAHEIM | Yes | 6/10/98 | OCWD-MTBE-001-028288 |
| 449 | ARCO #6226 | 102 E. YORBA LINDA BLVD. | PLACENTIA | Yes | 3/2/98 | OCWD-MTBE-001-028294 |
| 450 | ARCO/MASTER AUTO REPAIR | 2604 W. LA PALMA AVENUE | ANAHEIM | Yes | 3/26/98 | OCWD-MTBE-001-028296 |
| 451 | ASHTON PROPERTIES | 2527 S. MAIN ST. | SANTA ANA | Yes | 9/25/96 | OCWD-MTBE-001-028295 |
| 452 | BEACON BAY AUTO WASH #6 | 23602 EL TORO ROAD | LAKE FOREST | No | 10/1/03 | SA-RWQCB MTBE D9 |
| 453 | BEACON BAY CAR WASH, SA | 1501 W. MacARTHUR BLVD. | SANTA ANA | Yes | 1/9/97 | OCWD-MTBE-001-028295 |
| 454 | BERCAW PROPERTY | | | | | |
| | GRANDE MANUFACTURING | 1582 BROWNING | IRVINE | Yes | 9/4/96 | OCWD-MTBE-001-028291 |
| 455 | CAMPUS GAS | | | | | |
| | CAMPUS GAS | 4501 CAMPUS DRIVE | IRVINE | No | 11/13/02 | SA-RWQCB MTBE D9 |
| 456 | CHEVRON #3042 | | | | | |
| | CHEVRON SS #9-3042 | 1550 JAMBOREE ROAD | NEWPORT BEACH | Yes | 3/5/98 | OCWD-MTBE-001-028293 |
| 457 | CHEVRON #4887 | | | | | |
| | CHEVRON | 6972 WARNER AVE. | HUNTINGTON BEACH | Yes | 1/24/97 | OCWD-MTBE-001-028290 |
| 458 | CHEVRON #5833 | 1151 S. HARBOR BLVD. | LA HABRA | Yes | 7/26/96 | OCWD-MTBE-001-028292 |
| 459 | CHEVRON #8474 | | | | | |
| | CHEVRON # 9-8474 | 18501 BEACH BLVD. | HUNTINGTON BEACH | Yes | 4/28/98 | OCWD-MTBE-001-028290 |
| 460 | CIRCLE K #3217 | | | | | |
| | CIRCLE K | 12512 KNOTT AVENUE | GARDEN GROVE | Yes | 3/26/99 | SA-RWQCB MTBE D9 |
| 461 | CITY OF COSTA MESA | | | | | |
| | CITY OF COSTA MESA CORP YARD | 2310 PLACENTIA AVENUE | COSTA MESA | Yes | 5/19/98 | OCWD-MTBE-001-028288 |
| 462 | FRAZEE PAINT (DAVIS) | 411 E. 17TH ST. | COSTA MESA | Yes | 3/5/97 | OCWD-MTBE-001-028288 |
| 463 | DITCH WITCH OF S. CALIF. | 11771 MARKON DRIVE | GARDEN GROVE | Yes | 8/29/96 | SA-RWQCB File |
| 464 | EXXON #3643 | 2701 N. BRISTOL ST. | SANTA ANA | No | 8/23/01 | SA-RWQCB MTBE D9 |
| 465 | EXXON #6113 | 21762 LAKE FOREST | LAKE FOREST | Yes | 6/23/98 | OCHCA File |
| 466 | EXXON #7727 | 260 S. EUCLID | ANAHEIM | Unknown | | |
| 467 | FOUR STAR VENTURE, FORMER | 9359 WESTMINSTER BOULEVARD | WESTMINSTER | Yes | 1/7/97 | OCWD-MTBE-001-028297 |
| 468 | G AND M OIL #05 | 1201 ORANGETHORPE | FULLERTON | No | 4/12/02 | SA-RWQCB MTBE D9 |
| 469 | G AND M OIL #06 | | | | | |
| | G & M OIL | 13741 BEACH BLVD. | WESTMINSTER | Yes | 6/8/98 | OCWD-MTBE-001-028297 |
| 470 | G AND M OIL #21 | 2995 BRISTOL ST. | COSTA MESA | Yes | 9/30/98 | OCWD-MTBE-001-028288 |
| 471 | G AND M OIL #24 | 3301 BRISTOL ST. | SANTA ANA | Yes | 9/9/98 | OCWD-MTBE-001-028296 |
| 472 | G AND M OIL #28 | 19472 GOLDEN WEST ST. | HUNTINGTON BEACH | No | 8/11/02 | SA-RWQCB MTBE D9 |
| 473 | G AND M OIL #33 | | | | | |
| | G & M OIL CO | 8812 BEACH BOULEVARD | BUENA PARK | Yes | 3/19/98 | SA-RWQCB MTBE D9 |
| 474 | G AND M OIL #35 | | | | | |
| | G & M OIL COMPANY | 17501 BEACH BLVD. | HUNTINGTON BEACH | Yes | 8/17/97 | OCWD-MTBE-001-028291 |
| 475 | GOLDEN WEST COLLEGE | | | | | |
| | MAINTENANCE YARD | 7112 McFADDEN AVE. | HUNTINGTON BEACH | Yes | 3/30/98 | OCWD-MTBE-001-028291 |
| 476 | R & T SITE | 519 W. BALL ROAD | ANAHEIM | Yes | 1/22/97 | SA-RWQCB File |
| 477 | J & L CO. | | | | | |
| | ST. MICHAEL OIL CO. | 11470 EDINGER AVE. | FOUNTAIN VALLEY | Yes | 8/27/98 | OCWD-MTBE-001-028289 |
| 478 | JOE McPHERSON | | | | | |
| | JOE MacPHERSON CHEVROLET | 21 AUTO CENTER DRIVE | IRVINE | Yes | 2/10/97 | OCWD-MTBE-001-028291 |
| 479 | MARDEN SUSCO | 2840 W. 1ST STREET | SANTA ANA | Yes | 6/8/95 | OCWD-MTBE-001-028296 |
| 480 | METRO CAR WASH, CM | 2950 HARBOR BLVD. | COSTA MESA | No | 2/18/02 | SA-RWQCB MTBE D3 |
| 481 | MOBIL #11-E13 | 1950 LA HABRA BLVD. | LA HABRA | Yes | 10/31/97 | OCWD-MTBE-001-028292 |
| 482 | MOBIL #11-EBX | 17472 BEACH BLVD. | HUNTINGTON BEACH | Yes | 12/28/98 | OCWD-MTBE-001-028291 |
| 483 | MOBIL #18-826 | 25491 ALICIA PARKWAY | LAGUNA HILLS | Yes | 7/28/98 | OCWD-MTBE-001-028292 |
| 484 | MOBIL #18-GOE | 13521 BROOKHURST ST. | GARDEN GROVE | Unknown | | |
| 485 | MOBIL #18-GWN MOBIL # 1B-GWN | 11962 BROOKHURST ST. | GARDEN GROVE | Yes | 5/22/97 | OCWD-MTBE-001-028290 |
| 486 | MOBIL #18-HEP | 2921 S. BRISTOL ST. | SANTA ANA | Yes | 2/7/00 | SA-RWQCB MTBE D9 |
| 487 | MOBIL #18-HGK | | | | | |
| | MOBIL SS #18-HGK | 301 PACIFIC COAST HWY. | NEWPORT BEACH | Yes | 9/30/97 | OCWD-MTBE-001-028293 |
| 488 | MOBIL #18-HLB | 26051 LA PAZ ROAD | MISSION VIEJO | Yes | 12/28/98 | OCWD-MTBE-001-028293 |
| 489 | MOBIL #18-JMY | | | | | |
| | MOBIL SERVICE STATION #18JMY | 3470 FAIRVIEW ROAD | COSTA MESA | Yes | 3/18/98 | OCWD-MTBE-001-028288 |
| 490 | MOBIL #18-K3Q | 1169 S. STATE COLLEGE BLVD. | ANAHEIM | Unknown | | |
| 491 | ORANGE CO. REGISTER | 625 N. GRAND ST. | SANTA ANA | Yes | 12/22/98 | OCWD-MTBE-001-028296 |
| 492 | SANTIAGO HEATING AND AIR | 231 BLUERIDGE AVENUE | ORANGE | Yes | 10/28/98 | OCWD-MTBE-001-028294 |
| 493 | SEARS #84108 | 1701 BROADWAY | SANTA ANA | Yes | 8/25/97 | OCWD-MTBE-001-028296 |
| 494 | SHELL #1202 | 1202 E. EDINGER AVENUE | SANTA ANA | Yes | 10/8/98 | OCWD-MTBE-001-028296 |
| 495 | SHELL #665 | 965 S. BROOKHURST STREET | ANAHEIM | Yes | 4/23/98 | SA-RWQCB File |
| 496 | TEXACO #611060097 | 13471 MAGNOLIA AVENUE | GARDEN GROVE | Yes | 5/2/97 | OCWD-MTBE-001-028290 |
| 497 | TEXACO #14041 | 14041 NEWPORT BLVD. | TUSTIN | Unknown | | |

387780_1.XLS

| MTBEDTE | OCHCA_SITE | ADDRESS | CITY | MTBE DETECTION PRE-06/97? | SAMPLING DATE | SOURCE |
|---|---|---|---|---|---|---|
| 498 | TEXACO #18502 | | | | | |
| | TEXACO SERVICE STATION | 18502 BEACH BOULEVARD | HUNTINGTON BEACH | Yes | 10/28/98 | OCWD-MTBE-001-028291 |
| 499 | TEXACO #3370 | 3370 E. YORBA LINDA BLVD. | FULLERTON | Yes | 8/26/97 | OCWD-MTBE-001-028289 |
| 500 | THRIFTY OIL #015 | 2010 W. SEVENTEENTH STREET | SANTA ANA | Yes | 10/15/98 | OCWD-MTBE-001-028296 |
| 501 | THRIFTY OIL #075 | 14121 NEWPORT BLVD. | TUSTIN | Yes | 10/19/98 | OCWD-MTBE-001-028297 |
| 502 | THRIFTY OIL #139 | | | | | |
| | THRIFTY OIL CO STATION #139 | 799 W. 19TH STREET | COSTA MESA | Yes | 10/28/98 | OCWD-MTBE-001-028288 |
| 503 | THRIFTY OIL #150 | 1539 STANDARD AVENUE | SANTA ANA | Yes | 7/6/98 | OCWD-MTBE-001-028296 |
| 504 | THRIFTY OIL #358 | 300 S. BROOKHURST ST. | ANAHEIM | Yes | 1/12/99 | OCWD-MTBE-001-028286 |
| 505 | THRIFTY OIL #365 | 3101 E. LA PALMA AVE. | ANAHEIM | Yes | 4/16/98 | OCWD-MTBE-001-028286 |
| 506 | THRIFTY OIL #371 | 13511 EUCLID STREET | GARDEN GROVE | Yes | 12/2/98 | OCWD-MTBE-001-028290 |
| 507 | TOSCO/76 #4688 | | | | | |
| | CHEVRON | 12071 SEAL BEACH BLVD. | SEAL BEACH | No | 8/21/00 | SA-RWQCB MTBE DB |
| 508 | TOSCO/76 #4911 | | | | | |
| | UNOCAL #4911 | 17280 E. 17TH STREET | TUSTIN | Yes | 3/22/99 | SA-RWQCB MTBE DB |
| 509 | TOSCO/76 #5067 | | | | | |
| | UNOCAL #5067 | 2281 NEWPORT BLVD. | COSTA MESA | No | 6/17/03 | SA-RWQCB MTBE DB |
| 510 | TOSCO/76 #5792 | | | | | |
| | 76 STATION #5792 | 4002 BALL ROAD | CYPRESS | Yes | 5/17/99 | SA-RWQCB MTBE DB |
| 511 | UNOCAL #0807 | 120 S. PACIFIC COAST HIGHWAY | LAGUNA BEACH | Yes | 7/15/97 | OCWD-MTBE-001-028292 |
| 512 | UNOCAL #3670 | 741 COMMONWEALTH AVE. | FULLERTON | Yes | 6/15/99 | SA-RWQCB MTBE DB |
| 513 | UNOCAL #4614 | 100 S. BEACH BLVD. | ANAHEIM | Yes | 10/9/96 | OCWD-MTBE-001-028286 |
| 514 | UNOCAL #4914 | | | | | |
| | UNOCAL#4914 | 5282 S. BEACH BLVD. | BUENA PARK | Yes | 8/17/98 | OCWD-MTBE-001-028287 |
| 515 | UNOCAL #5366 | 13348 NEWPORT BLVD. | TUSTIN | Yes | 2/18/98 | OCWD-MTBE-001-028297 |
| 516 | UNOCAL #5511 | | | | | |
| | UNOCAL | 5100 KATELLA AVE. | LOS ALAMITOS | Yes | 4/28/97 | OCWD-MTBE-001-028293 |
| 517 | UNOCAL #5887 | 26171 LA PAZ ROAD | MISSION VIEJO | Yes | 2/28/96 | SD-RWQCB File |
| 518 | UNOCAL #5888 | | | | | |
| | UNOCAL #5888 | 15492 GOLDENWEST ST. | WESTMINSTER | Yes | 9/20/97 | OCWD-MTBE-001-028298 |
| 519 | UNOCAL #6297 | 2345 W. CHAPMAN AVENUE | ORANGE | Yes | 10/15/98 | OCWD-MTBE-001-028294 |
| 520 | UNOCAL #6435 | 26271 TRABUCCO ROAD | MISSION VIEJO | Yes | 9/24/96 | OCWD-MTBE-001-028293 |
| 521 | UNOCAL #6473 | 7221 WESTMINSTER BLVD. | WESTMINSTER | Unknown | | |
| 522 | UNOCAL #7470 | 114 BRISTOL | SANTA ANA | No | 11/7/02 | SA-RWQCB MTBE DB |
| 523 | USA GASOLINE #234 | 5142 W. FIRST STREET | SANTA ANA | Yes | 12/20/96 | OCWD-MTBE-001-028286 |
| 524 | WORLD OIL #35 | 1201 N. HARBOR BLVD. | ANAHEIM | Yes | 8/4/97 | OCWD-MTBE-001-028286 |
| 525 | SHELL #16976 | | | | | |
| | SHELL OIL | 16976 BROOKHURST ST. | FOUNTAIN VALLEY | Yes | 10/30/97 | OCWD-MTBE-001-028289 |
| 526 | SHELL #4001 | | | | | |
| | SHELL | 4001 BALL ROAD | CYPRESS | Yes | 9/7/99 | SA-RWQCB MTBE DB |
| 527 | ARCO #1994 | 700 S. STATE COLLEGE BLVD. | ANAHEIM | Yes | 7/2/98 | SA-RWQCB MTBE DB |

387700_1.XLS

# EXHIBIT 2



**When MTBE Release Sites Listed
By OCWD Were Reported to State Regulators**

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File C.A.
No. 1:00-Civ.
1898    MDL
No 1358 (SAS)

---

This Document Relates To:

*Orange County Water District v. Unocal Corp., et al.,* C-03CC00176

## DECLARATION OF ROY L. HERNDON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR STAY OR DISMISSAL WITHOUT PREJUDICE BASED ON PRIMARY JURISDICTION

1.      I am the Chief Hydrogeologist at Orange County Water District (the "District") with responsibility for managing the Hydrogeology Department. My responsibilities as head of the Hydrogeology Department include overseeing the construction of a basin-wide numerical groundwater flow model, development of a comprehensive data management and geographic information system, and design/construction of multidepth monitoring wells and municipal water wells. I also act as the District's liaison to state and local regulatory staff such as the Santa Ana Regional Water Quality Control Board and the Orange County Health Care Agency. A true and correct copy of my most recent curriculum vitae is attached as Exhibit 1.

2.      I am a California licensed Professional Geologist and California Certified Hydrogeologist with over twenty years of experience in hydrogeologic investigations, including the delineation of groundwater contaminant plumes.

3.      The District's Hydrogeology Department staff includes eight hydrogeologists, six of whom are licensed in California as professional geologists, three of whom are California-

1

certified hydrogeologists, and three of whom have post-graduate degrees in hydrogeology. The department also has a principal water resources engineer who holds a professional engineer license in California and a master's degree in engineering with an emphasis on groundwater hydraulics and modeling. Combined staff experience in conducting groundwater investigations and data analysis exceeds 115 years. Additional staff include database/GIS analysts who manage the District's "Water Resources Management System" (WRMS), a groundwater information database and mapping system.

4.     Staff in the District's Hydrogeology Department have spent over 15 years conducting local and regional investigations to understand groundwater flow and quality trends in aquifers that reach over 2,000 feet deep. Investigations of groundwater contamination plumes containing volatile organic chemicals ("VOC") throughout the basin and seawater intrusion evaluations along the coast, projects spanning several years or more and involving interpretation of data from dozens of monitoring wells, have provided the hydrogeology staff with a knowledge of the characteristics of the entire basin aquifer system that is unsurpassed.

Representative department accomplishments include:

Investigation and characterization of a 4-mile long VOC plume emanating from the former El Toro Marine Base and designing an 8-million gallon per day extraction well field to contain and cleanup the plume. Future estimated project construction costs of $45 million.

Characterization and delineation of a large VOC plume in the Anaheim/Fullerton area, including construction of over 20 monitoring wells that led to the design of a groundwater remediation system of 5 extraction wells and treatment system.

2

Future estimated project construction cost of $20 million.

· Construction of over 150 multi-depth monitoring wells to depths as great as 2,000
feet to evaluate groundwater quality and characterize the complex hydrogeology
of the basin.  Estimated costs of over $10 million.

· Development and calibration of a numerical groundwater flow model of the 350-
square mile Orange County groundwater basin.

· Compilation, organization and digitization of over one million records of
groundwater information into a relational database and geographic information
system.  Basin-wide information includes geologic borehole logs, well
construction details, water levels, water quality, and pumping and recharge data.
Estimated cost of over $3 million.

5.      In addition to the Hydrogeology Department, the District has an Engineering
Department which has seven California-licensed civil engineers who have collectively managed
the design and construction of numerous water-related projects, including:

· Constructing and designing the nation's largest recycled water purification and
treatment system, known as the Groundwater Replenishment System.  This
system, designed to provide 70-million gallons of water per day for basin
replenishment, is comprised of state-of-the-art water treatment technology
(microfiltration, reverse osmosis, and UV-oxidation).  The system is under
construction and will be operational in 2007.  Estimated cost: $490 million.

· Wellhead treatment systems to remove VOCs in Irvine (1,000 gallons per minute)
and Orange (500 gallons per minute).  Estimated cost:  $3 million.

3

Eight potable supply production wells to depths of approximately 1,000 feet to supply approximately 28 million gallons per day of groundwater to several water retail agencies.  Estimated cost of $14 million.

7.5-million gallon per day non-potable recycled water treatment system, reservoir reconstruction, and distribution pipeline installation in cities of Fountain Valley, Huntington Beach, Newport Beach, Costa Mesa, and Santa Ana.  Estimated cost of $55 million.

6.      The District's Water Quality department employs a team of experienced environmental scientists and technicians who collect thousands of water samples per year from over 500 production and monitoring wells for a wide range of purposes including compliance with drinking water and recycled water regulations, environmental sampling for contaminant tracking, and seawater intrusion monitoring.  The District's Water Quality staff is responsible for collecting virtually all water samples for all public drinking water wells within the District, and for reporting those results to the California Department of Health Services on behalf of the water producers.  The District's Water Quality staff has the expertise to review and interpret for accuracy the analytical results reported by the District's laboratory.

7.      The District's main laboratory is California-certified in numerous analytical methods with a full-time staff of 15 chemists (including one with a Ph.D. and four with master's degrees) and 7 laboratory technicians.  Collectively, the laboratory staff has 271 total years of direct experience working at the District with an average of 12 years of service.

The District's laboratory collectively analyzes over 20,000 water samples per year from the basin's groundwater and surface waters which provide 60 percent

4

of the local water supplies.

Because of its growing responsibility and workload, the District is in the process of designing a new and larger analytical laboratory building that is scheduled to be operational in 2008 at an estimated cost of $24 million.

8.      The groundwater within the District's service area consists of multiple aquifers. These include both shallow and deep aquifers.  Although these aquifers are often separated by relatively impermeable clay or silt layers wells or other borings that penetrate these clay or silt layers, as well as natural discontinuities in the clay or silt layers, provide pathways for pollutants in the shallow aquifers to travel into deeper aquifers.

9.      Water suppliers operate drinking water wells that draw preferentially from deeper aquifers because, in general, the water in those aquifers tends to be higher quality than water in shallow aquifers.  MTBE or TBA released into a shallow aquifer not only contaminates that aquifer, but can, due to its solubility and mobility, also contaminate deeper aquifers, and drinking water wells.

10.     The effectiveness of remediation efforts in cleaning up plumes of MTBE or TBA depends upon a variety of factors, including the amount (mass) of the release, the amount of time between when the release occurs and when remediation begins, the rate and direction of groundwater movement in the aquifer where the release occurs, and the scope of remedial efforts.  Moreover, the effectiveness of any remediation effort depends in the first instance on accurate and timely delineation of the MTBE or TBA plume.

11.     MTBE presents unique remediation problems because it is more persistent in groundwater than most other constituents in gasoline, and because it travels further and faster

5

through groundwater than most other constituents in gasoline.  The goal of remediation may be to capture or control as much of a release as possible, but remediation seldom recovers all of a released contaminant, and this is particularly true with MTBE, due to MTBE's unique characteristics.

12.     While the District is concerned with all groundwater in its service area, the deeper aquifers are particularly important to the District because virtually all drinking water wells in the District produce from deeper aquifer and the water quality in deeper aquifers is generally higher (and therefore more suitable for drinking).  The District is concerned about contamination of the deeper aquifer because it is more difficult to remediate and contamination generally travels faster in production aquifers.

13.     <u>Chevron Station No. 9-1085, Located at 12012 Brookhurst Street, Garden Grove, California</u>.  I have reviewed the Declaration of Dana Thurman regarding the investigation and remediation activities at this site.  As a Certified Hydrogeologist and Licensed Professional Geologist, and based on my experience described above, Ms. Thurman's declaration fails to support the conclusion that the full extent and impact of the MTBE groundwater plume is known at the Chevron site, or that the plume is adequately addressed by current investigations and remediation.  Ms. Thurman's declaration is inadequate for the following reasons:

    a.    Ms. Thurman's declaration fails to state whether the lateral or vertical extent of the MTBE contamination in groundwater was adequately investigated, much less determined, at the Chevron site.

    b.    Ms. Thurman's declaration fails to adequately describe whether the existing remediation system at the Chevron site has addressed or

6

contained even the known extent of the MTBE groundwater
contamination plume.

    c.      Finally, Ms. Thurman's declaration fails to provide an estimate of the
mass released or the relationship of that mass to the amount of product
removed by remedial activities at the site.

14.     <u>ExxonMobil Service Station #18-668, Located at 16230 Harbor Boulevard,
Fountain Valley, California</u>.  I have reviewed the Declaration of Marla D. Guensler regarding the
investigation and remediation activities at this site.  As a Certified Hydrogeologist and Licensed
Professional Geologist, and based on my experience described above, Ms. Guensler's declaration
fails to support the conclusion that the full extent and impact of the MTBE groundwater plume is
known at the ExxonMobil site, or that the plume is adequately address by current investigations
and remediation.  Ms. Guensler's declaration is inadequate for the following reasons:

    a.      Ms. Guensler's declaration fails to state whether the lateral or vertical
extent of the MTBE contamination in groundwater was investigated, much
less determined, at the ExxonMobil site.

    b.      Ms. Guensler's declaration fails to adequately describe whether the
existing remediation system at the ExxonMobile has addressed or
contained even the known extent of the MTBE groundwater
contamination plume.

    c.      Ms. Guensler's declaration fails to provide an estimate of the mass
released or the relationship of that mass to the amount of product removed
by remedial activities at the site.

7

d.      ExxonMobil attempted for approximately *three years*, with the assistance of the Orange County Health Care Agency, to obtain permission to install a monitoring well on private property. ExxonMobil was unsuccessful and was eventually forced to install the monitoring well in another location.

15.     Unocal 76 Service Station #5226, Located at 6322 Westminster Boulevard, Westminster, California. I have reviewed the Declaration of Dan Fischman regarding the investigation and remediation activities at this site. As a Certified Hydrogeologist and Licensed Professional Geologist, and based on my experience described above, Mr. Fischman's declaration fails to support the conclusion that the full extent and impact of the MTBE groundwater plume is known at the Unocal site, or that the plume is adequately address by current investigations and remediation. Mr. Fischman's declaration is inadequate for the following reasons:

a.      Mr. Fischman's declaration fails to state whether the lateral or vertical extent of the MTBE contamination in groundwater was investigated, much less determined, at the Unocal site.

b.      Mr. Fischman's declaration fails to adequately describe whether the existing remediation system at the Unocal has addressed or contained even the known extent of the MTBE groundwater contamination plume.

c.      Mr. Fischman's declaration fails to provide an estimate of the mass released or the relationship of that mass to the amount of product removed by remedial activities at the site.

d.      The Unocal station was designated "high priority" due to its close

8

d.  The Unocal station was designated "high priority" due to its close proximity to a City of Westminster public drinking water well.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 23rd day of February, 2006, at Fountain Valley, California.

_____

Roy L. Herndon

9

# Roy L. Herndon

Mr. Herndon has over twenty years professional experience in hydrogeologic investigations pertaining to environmental and water supply projects in California, Nevada, and Arizona. These projects include the delineation of groundwater contaminant plumes over several miles long, characterization of hydrogeologic systems ranging from one-acre sites to the 300-square-mile Orange County groundwater basin, evaluation and control of sea water intrusion, and design of groundwater recharge and extraction systems for water supply and contamination remediation, respectively.

Mr. Herndon manages the Hydrogeology Department at the Orange County Water District and has directed hydrogeologic studies that have collectively entailed the construction of over 100 monitoring wells, 50 of which exceed 1,000 feet in depth. He is responsible for overseeing all departmental activities including the construction of a basin-wide numerical groundwater flow model, development of a comprehensive data management and geographic information system, and design/construction of multidepth monitoring wells and municipal water wells. Mr. Herndon acts as a liaison to state and local regulatory staff in reviewing technical reports submitted by parties performing subsurface environmental investigations. He has given numerous presentations to professional, regulatory, and industrial organizations, served as guest lecturer to university classes, and has been a continuing education program course instructor at the University of California, Irvine.

## EDUCATION

M.S., Hydrology and Water Resources (1985), University of Arizona, Tucson
B.A., Geology (1982), Colorado College, Colorado Springs

## PROFESSIONAL REGISTRATIONS

California Registered Geologist No. 4817
California Certified Hydrogeologist No. 113

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1992 - present: | Chief Hydrogeologist, Orange County Water District |
| 1988 - 1992: | Project Hydrogeologist, Orange County Water District |
| 1985 - 1988: | Project Hydrogeologist, Harding Lawson Associates |

## ACTIVITIES/MEMBERSHIPS

Chairman, Orange County Well Standards Advisory Board
Member, South Coast Geological Society
Member, MCAS El Toro Restoration Advisory Board

## REPRESENTATIVE PROJECTS

*Numerical Groundwater Flow Model of Orange County Groundwater Basin* -
Directed five-year effort to construct, calibrate, and run future basin
management scenarios with a three-layer transient model using MODFLOW.

*Regional TCE/TDS/Nitrate Groundwater Contamination Investigation* - Managed
three-year investigation to determine source and extent of groundwater
containing TCE, TDS, and nitrates in Irvine Subbasin; designed/supervised
construction of twelve monitoring wells ranging from 150 to 1,300 feet deep;
prepared two reports documenting evidence and rationale for conclusion of
MCAS El Toro as the source of a four-mile-long TCE plume; member of
Technical Review Committee, with U.S. EPA, state DTSC, and RWQCB, which
scoped and reviewed Marine Corps' remedial investigation/feasibility study for
this federal Superfund site.

*Irvine Desalter Project* - Developed numerical flow model and designed layout of
7.5-mgd production well field as part of a $35 million (capital) combined water
supply/groundwater remediation facility to remove groundwater containing
elevated TDS, nitrate, and TCE; managed construction of six production wells;
presented project concept to and negotiated with U.S. Navy for its cost share of
TCE cleanup of MCAS El Toro.

*Orange County Water Reclamation Project Feasibility Study* - Prepared
hydrogeologic portion of feasibility study report describing the piezometric and
water quality characteristics of the aquifers beneath OCWD's recharge facilities
in the city of Anaheim; evaluated the potential for recharging up to 100,000
acre-feet of reclaimed water at these facilities; developed and implemented an
ongoing isotopic tracer study with Lawrence Livermore National Laboratory to
identify groundwater flow paths and ages from the spreading basins to nearby
municipal wells.

*City of Orange VOC Study* - Managed investigation to identify source(s) and
extent of chlorinated VOC contamination that shut down a municipal water
well; directed construction of fifteen 100- to 300-foot deep monitoring wells
along the three-mile-long plume; prepared final report documenting potential
contaminant sources and evaluations of remedial alternatives.

*Anaheim/Fullerton VOC Study* - Manager of ongoing investigation to identify the
source(s) and extent of chlorinated VOC contamination over a 40-square mile
area; sited, designed, and directed construction of 60 monitoring wells ranging

in depth from 140 to 1,500 feet; prepared report summarizing findings.

*Sea Water Intrusion Barrier Management* - Technical reviewer of OCWD's Talbert sea water intrusion barrier project operations; directed development of a numerical flow model to assess the impacts to the barrier of a 14-mgd well field proposed by the city of Newport Beach; presented recommended mitigation strategies to minimize drawdown effects of the well field; Technical reviewer of hydrogeologic portion of Alamitos Barrier Reclamation Project to convert 50% of the injection to reclaimed water.

*Santa Ana River Watermaster* - Developed storm flow/base flow estimates based on USGS streamflow data; prepared Annual SAR Watermaster Report.

*Oak Creek Canyon Water Supply Evaluation* - Managed project to determine safe yield of small groundwater basin near Tehachapi, California for cement plant operations; designed and supervised construction and pump testing of two water wells; developed conceptual hydrogeologic and numerical flow models to evaluate maximum yield of basin; prepared final report.

*City of Upland Landfill Investigation* - Managed SWAT investigation to identify possible groundwater contamination at closed landfill; designed and directed construction of two monitoring wells drilled to depths of 400 to 500 feet; prepared final report for submittal to RWQCB.

*Groundwater Salinity Investigation, Laughlin, Nevada* - Developed groundwater flow and solute transport model to evaluate the effectiveness of an existing system to extract and contain a high-salinity groundwater plume at a power generating plant; supervised construction of several multidepth monitoring wells to delineate extent of saline plume; participated in seismic refraction and resistivity geophysical surveys to define alluvium/bedrock contact.

*Artificial Recharge Feasibility Study, Butler Valley, Arizona* - Conducted hydrogeologic investigation of remote desert basin, located along Central Arizona Project aqueduct, to evaluate its potential as a conjunctive-use storage basin; supervised construction of two 600-foot deep monitoring wells; performed aquifer testing and analysis; assisted with seismic and gravity surveys; constructed numerical flow model to estimate maximum basin storage potential; prepared final report.

*Petroleum Spill Investigation, Port of Los Angeles* - Managed investigation to delineate extent of fuel contamination of soil and groundwater along an abandoned pipeline; concurrent berth modification activities required close coordination with other contractors.

*City of Anaheim Groundwater Protection Program* - Developed well capture zones using analytical flow model; prepared sections of City well construction/abandonment protocol.

*Chemical Distribution Facility Investigation, Santa Fe Springs, California* - Prepared subsurface characterization portion of a RI/FS work plan to investigate chlorinated hydrocarbon contamination of vacated facility on the state Superfund list; work plan included construction of numerous monitoring wells and was subsequently accepted by state and local regulatory agencies.

Mr. Herndon has also managed and supervised field activities of numerous underground tank leak investigations throughout southern California; these studies have ranged from initial tank removal and closure to soil and groundwater contamination characterization, remediation, and monitoring.

## PUBLICATIONS/PRESENTATIONS

Clark, J.F., Hudson, G.B., Davisson, M.L., Woodside, G., Herndon, R., *Geochemical Imaging of Flow Near an Artificial Recharge Facility, Orange County, California,* Ground Water, Vol. 42, No. 2, March-April 2004.

Herndon, R.L., Woodside, G.D., Davisson, M.L., Hudson, G.B., *Use of Isotopes to Estimate Groundwater Age and Flow Path,* Southwest Hydrology, Vol. 2, No. 1, January/February 2003.

Grebbien, V., Ide, C., and Herndon, R., *Alternatives to Adjudications – The OCWD Model,* presented by V. Grebbien at CLE California Water Law Conference, Irvine, California, October 17-18, 2002.

Gamlin, J.D., Clark, J.F., Woodside, G., Herndon, R., *Large-Scale Tracing of Ground Water with Sulfur Hexafluoride,* Jour. Of Environ. Engr., February 2001.

Davisson, M.L., Hudson, G.B., Moran, J., Niemeyer, S., Herndon, R., *Isotope Tracer Approaches for Characterizing Artificial Recharge and Demonstrating Regulatory Compliance,* Annual UC Water Reuse Research Conference, Monterey, California, June 1998.

Davisson, M.L., Hudson, G.B., Herndon, R., Niemeyer, S., Beiriger, J., *Report on the Feasibility of Using Isotopes to Source and Age-Date Groundwater in Orange County Water District's Forebay Region, Orange County, California,* Lawrence Livermore National Laboratory ref. #UCRL-ID-123953, May 1996.

Crook, J., Herndon, R.L., Wehner, M.P., and Rigby, M.G., *Studies to Determine the Effects of Injecting 100 Percent Reclaimed Water from Water Factory 21*, Proceedings of Annual Water Environment Federation Conference, Miami, Florida, 1995.

Herndon, R.L., *Hydrogeology of Orange County Groundwater Basin -- An Overview*, in The Regressive Pleistocene Shoreline, Coastal Southern California, Annual Field Trip Guide Book No. 20, Edward G. Heath and W. Lavon Lewis ed., South Coast Geological Society, Inc., 1992.

Herndon, R.L., *Hydrogeology of Alamitos Gap, Los Angeles and Orange County, California,* presented at Association of Engineering Geologists/Groundwater Resources Association annual meeting, Sacramento, California, 1995.

*Two Years Down the Road of Sustainable Groundwater Pumping,* presented at Groundwater Resources Association Conference, Pasadena, California, September 2005.

*Well, Is There Water or Not?  OCWD's 12-Step Program to Recover from Drought,* presented for Gen. Mgr. Virginia Grebbien at Groundwater Resources Association Annual Conference, Rohnert Park, California, September 2004.

*How Much Can We Pump? Identifying and Overcoming the Limiting Factors of the Orange County Groundwater Basin,* presented at Association of Ground Water Scientists and Engineers Annual Conference, Orlando, Florida, December 2003.

*Building and Managing a Network of Over 200 Monitoring Wells in Orange County,* presented at Water Education Foundation/Association of Groundwater Agencies conference, Ontario, California, April 2002.

*Orange County's Groundwater:  A Resource Worth Protecting,* presented at the California Environmental Law Conference, Yosemite, October 1999.

*Hydrogeologic Aspects of Recharging 250,000+ af/year in Orange County,* presented at the American Ground Water Trust Workshop "The Latest on Artificial Recharge," Scottsdale, Arizona, September 1999.

*Measuring Success of Source Water Protection in Orange County, California,* presented at Source Water Assessment and Protection 98 conference, Dallas, Texas, 1998.

*Orange County Water District's Hydrogeology and Modeling Objectives*, presented at WateReuse Association of California Groundwater Recharge Workshop, Newport Beach, California, 1997.

*An Update on Groundwater Contamination in Orange County – Chlorinated Compounds and MTBE*, presented at Groundwater Resources Association Conference, Costa Mesa, California, 1996.

*Orange County Water District Groundwater Management Plan: Water Quality and Hydrogeologic Perspectives*, presented to ASCE North American Water Environment Congress, Anaheim, California, 1996.

*Orange County's Groundwater -- A Resource Worth Protecting*, presented to Orange County Chamber of Commerce environmental workshop, Irvine, California, 1993.

*Hydrogeologic Evolution of the Orange County Groundwater Basin*, presented at American Association of Petroleum Geologists Cordilleran Section annual meeting, Long Beach, California, 1993.

*El Toro TCE Investigation*, presented to Association of Hazardous Materials Professionals, Anaheim, California, 1991.

*Chlorinated VOC Investigation in Anaheim, California*, presented to Association of Engineering Geologists, southern California region, Montebello, California, 1991.

## TECHNICAL ADVISORY PANELS

AB303 Grant Program – Served on TAP for California Department of Water Resources to review and comment on grant program structure and subsequent proposals submitted for funding of groundwater monitoring and data management projects throughout the state.

Dana Point Desalination Project – Served on TAP to review and comment on proposed alternatives to construct a slant subsurface extraction well beneath the beach and near-shore seafloor for a potential future seawater desalination project to supply south Orange County, California.

Elsinore Valley Groundwater Management Plan – Served on TAP to review and comment on a groundwater management plan prepared for the Elsinore Valley Municipal Water District.

Georgia Seawater Intrusion – Served on TAP for state of Georgia to review existing seawater intrusion conditions between Hilton Head, South Carolina to Brunswick County, Georgia and recommend potential control alternatives.

Des Moines, Iowa ASR Project – Served on TAP for U.S. EPA-funded feasibility study of aquifer storage and recovery project using existing 2,000-foot wells.

## Other Presentations

*Modeling Orange County's Groundwater Basin,* presented at Orange County Water Association luncheon, Irvine, November 2002.

*Recharging 350,000 af/year in Orange County's Groundwater Basin,* presented at South Coast Geological Society meeting, Costa Mesa, June 2000.

*Groundwater Models: Powerful Tools When Used Properly,* presented at Calif. DHS reclaimed water workshops in San Bernardino and Berkeley, California, 1998.

*Development and Application of a Flow Model of the Orange County Groundwater Basin,* presented at Orange County Water Association lunch seminar, Santa Ana, 1997.

*Chlorinated VOCs in the Orange County Groundwater Basin,* presented at chlorinated VOC seminar sponsored by HLA, Irvine, 1995.

*Where Does Orange County Get Its Water?,* presented to Earth Sciences Dept., Fullerton College, 1995; and Esperanza High School students, Anaheim, 1994.

*Orange County's Groundwater--A Resource Worth Protecting,* presented to Orange County Health Care Agency staff, 1993; and Santa Ana Regional Water Quality Control Board staff, 1993.

*Hydrogeology and Groundwater Management of the Orange County Groundwater Basin,* presented to Lawrence Livermore National Laboratory, Livermore, 1996. Also presented to: IT Corp., Irvine, 1996; McLaren Hart, Irvine, 1994; Environmental Science Engineers, Fountain Valley, 1993; CH2M HILL, Santa Ana, 1992; Converse Consultants, Pasadena, 1992; and Calif. State Fullerton Earth Sciences Dept., 1992, 1997.

*El Toro TCE Investigation,* presented to U.C. Irvine Civil Engineering Dept., 1990.

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re: Methyl Tertiary Butyl Ether ("MTBE")**
**Products Liability Litigation**

Master File C.A.
No. 1:00-Civ. 1898
MDL No 1358 (SAS)

---

**This Document Relates To:**

*Orange County Water District v. Unocal Corp., et al.,*
04 Civ. 4968

**SUPPLEMENTAL DECLARATION OF DAVID BOLIN IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED**
**ON STATUE OF LIMITATIONS**

I, David Bolin, hereby declare:

1.  When gasoline containing MTBE is released into the environment at a service station, the owner/operator is required to report the release and responsible for cleaning up that contamination. Typically the responsible party retains a qualified consulting firm licensed by the State of California to conduct environmental investigations and remediation. A consultant is required to submit proposed investigation and remediation plans to regulatory agencies for review and approval.

2.  OCWD relies upon investigation and remediation oversight by regulatory agencies – the Regional Water Quality Control Board (Regional Board) and the Orange County Health Care Agency (OCHCA) – to prevent MTBE, TBA and other contaminants from escaping gas station spill sites. By statute and pursuant to a Memorandum of Understanding (MOU), the Regional Board or in some cases OCHCA, review and regulate investigation and remediation of contamination at specific gasoline station sites. Pursuant to the MOU, the District is involved in

1

oversight activities and provides cooperative technical support to the Regional Board and the OCHCA, which is often requested by one or the other agency.

3. Investigation and remediation capture efforts are not always successful. Because MTBE/TBA are soluble and highly mobile in the subsurface, prompt and aggressive action is needed to abate contamination before it escapes the site. Successful investigation and/or remediation of a site also requires a comprehensive understanding of the location and movement of the contaminant in the subsurface. Developing such information is complex and time consuming. Even under the best of circumstances, contamination may still escape detection and remediation capture efforts. Although environmental, site-specific monitoring wells can provide some information as to whether remediation is succeeding in preventing the escape of contaminants, that information is seldom perfect, and contaminants can and do escape remediation sites without being detected in environmental, site-specific monitoring wells.

4. Given the limitations of contaminant investigation and remediation, when MTBE, TBA or some other contaminant is detected in a drinking water well or an OCWD monitoring well, which is designed to detect threats to drinking water wells, OCWD reasonably assumes that the contaminant has migrated offsite from a source(s) within the capture zone of the drinking water well or upgradient of an OCWD monitoring well, whether those sources are undergoing remediation or not. Often the detection of a contaminant in a drinking water or OCWD monitoring well is the first indication OCWD receives that a contaminant has escaped remediation capture. At a number of gasoline stations in proximity to the wells associated with bellwether plumes, investigation and remedial efforts have been underway for years.

5. NB-TAMD is an active production well, which pumps approximately 3200 gallons per

2

minute ("gpm").  MTBE was first detected in NB-TAMD on August 23, 2005.  Stations designated for the Plume associated with well NB-TAMD (Plume 1) are generally upgradient of NB-TAMD and/or within the predicted capture zone of the well.  Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations.  Before MTBE was detected in NB-TAMD, OCWD assumed that the responsible party would make reasonable efforts to contain and remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations.  Since MTBE has been detected in NB-TAMD, it is likely that MTBE has escaped remediation capture at one or more of the stations and is contaminating NB-TAMD.

6.  MCWD-3B, MCWD-5, MCWD-7, and IRWD-7 are all active production wells, which pump approximately 2,000 gpm, 2,200 gpm, 1600 gpm, and 1,500 gpm, respectively.  MTBE was first detected in MCWD-3B, MCWD-5, and MCWD-7 on August 2, 2005.  Although MTBE has not yet been detected in IRWD-7, IRWD-7 is in close proximity the other wells and is expected to test positive for MTBE in the near future.  Stations designated for the Plume associated with MCWD-3B, MCWD-5, MCWD-7, and IRWD-7 (Plume 2) are generally upgradient and/or within the predicted capture zones of these wells.  Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated.  Before MTBE was detected in MCWD-3B, MCWD-5, and MCWD-7, OCWD assumed that the responsible party would make reasonable efforts to contain and remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations.  Since MTBE has been

3

detected in MCWD-3B, MCWD-5, MCWD-7, it is likely that MTBE has escaped remediation capture at one or more of the stations, and is contaminating these wells; and is threatening to contaminate IRWD-7.

7.   OCWD-M10 and OCWD-M11 are monitoring wells that monitored injection water from Water Factory 21, and now monitors injection water from the Ground Water Replenishment System ("GWRS") for recharge of recycled water.  OCWD-M45 is a newly constructed compliance monitoring well required by the District's permit to also operate the "GWRS" for injection and recharge of recycled water.  MTBE was first detected in OCWD-M45 on September 9, 2005.  Stations designated for the Plume associated with OCWD-M10 (Plume 3) are generally upgradient of OCWD-M10.  Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated.  Before MTBE was detected in OCWD-M10, OCWD assumed that the responsible party would make reasonable efforts to contain and remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations.  Since MTBE has been detected in OCWD-M10, it is likely that MTBE has escaped remediation capture at one or more of the stations and is contaminating OCWD-M10.

8.   SA-16 is an active production well that pumps approximately 1,700 gpm.  MTBE was first detected in SA-16 on August 9, 2005.  Stations designated for the Plume associated with well SA-16 (Plume 4) are the most logical associations owing to proximity of the stations to well SA-16.  Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations.  Before MTBE was detected in SA-16, OCWD assumed that the responsible party would make reasonable efforts to contain and

4

remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations. Since MTBE has been detected in SA-16, it is likely that MTBE has escaped remediation capture at one or more of the stations and is contaminating SA-16.

9. IRWD-12 and IRWD-18 are active production wells that pump approximately 2,300 gpm and 1,800 gpm, respectively. Although MTBE and TBA has not yet been detected in these wells, a station designated for the Plume associated with wells IRWD-12 and IRWD-18 (Plume 5) is generally upgradient of IRWD-12 and IRWD-18 and/or within the predicted capture zone of the wells. Gasoline containing MTBE was released at the designated station with respect to this plume, but was being remediated at the station. OCWD examined investigation and remediation information for the station designated for the plume and concluded that MTBE and/or TBA has, more probably than not, escaped remediation capture at the station.

10. NB-DOLS and NB-DOLD are active production wells that pump approximately 2,500 gpm and 3,000 gpm, respectively. MTBE was first detected in NB-DOLS and NB-DOLD on August 4, 2005. Stations designated for the Plume associated with wells NB-DOLS and NB-DOLD (Plume 6) are generally upgradient of NB-DOLS and NB-DOLD and/or within the predicted capture zone of the wells. Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations. Before MTBE was detected in NB-DOLS and NB-DOLD, OCWD assumed that the responsible party would make reasonable efforts to contain and remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations. Since MTBE has been detected in NB-DOLS and

5

NB-DOLD, it is likely that MTBE has escaped remediation capture at one or more of the stations and is contaminating NB-DOLS and NB-DOLD.

11.   Well A-29 was, until 2008, an active production well that pumped approximately 600 gpm. MTBE was first detected in Well A-29 on October 10, 1995, at a level of 3.70 ppb and was detected 8 times between 1995 and 1997. MTBE was taken off line, and not restarted until 1999. No MTBE was detected after Well A-29 was restarted until October 4, 2005, when MTBE was again detected. Stations designated for the Plume associated with Well A-29 (Plume 7) are generally upgradient of Well A-29 and/or within the predicted capture zone of the well. Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations. Before MTBE was re-detected in Well A-29, OCWD that the responsible party would make reasonable efforts to contain and remediate MTBE, TBA, and other groundwater contaminants under the oversight of the regulatory agency, which could prevent MTBE from migrating away from the stations. Since MTBE has been detected in Well A-29, it is likely that MTBE has escaped remediation capture at one or more of the stations and is contaminating Well A-29.

12.   IRWD-1, IRWD-4, and Santa Ana Well No. SA-34 are active production wells that pump approximately 1,800 gpm, 2,300 gpm, and 1,850 gpm, respectively. Although MTBE and TBA has not yet been detected in these wells, stations designated for the Plume associated with wells IRWD-1, IRWD-4, and Santa Ana Well No. SA-34 (Plume 8) are generally upgradient of IRWD-1, IRWD-4, and Santa Ana Well No. SA-34 and/or within the predicted capture zone of the wells. Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations. OCWD examined

6

investigation and remediation information for each of the stations designated for the plume and concluded that MTBE and/or TBA has, more probably than not, escaped remediation capture at one or more of these stations.

13.   HB-1, HB-13, HB-4, and HB-7 are active production wells that pump approximately 350 gpm (HB-1), 2,500 gpm (HB-13), 450 gpm (HB-4), and 3,200 gpm (HB-7).   Although MTBE has not yet been detected in these wells, stations designated for the Plume associated with wells HB-1, HB-13, HB-4, and HB-7 (Plume 9) are generally upgradient of HB-1, HB-13, HB-4, and HB-7 and/or within the predicted capture zone of the wells.   Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being remediated at each of the stations.   OCWD examined investigation and remediation information for each of the stations designated for the plume and concluded that MTBE and/or TBA has, more probably than not, escaped remediation capture at one or more of these stations.

14.   WM-22 was, until May, 2007, an active production well that pumped approximately 450 gpm.   Although MTBE and TBA were not detected in this well, stations designated for the Plume associated with well WM-22 (Plume 10) are generally upgradient of WM-22 and/or within the predicted capture zone of the well.   Gasoline containing MTBE was released at each of the designated stations with respect to this plume, but was being investigated and remediated at each of the stations.   OCWD examined investigation and remediation information for each of the stations designated for the plume and concluded that MTBE and/or TBA has, more probably than not, escaped remediation capture at one or more of these stations.

7

15.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of March, 2008, at Fountain Valley, California.

_____
David Bolin

# Exhibit 5

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**MDL No. 1358
Master File C.A. No.
1:00-1898 (SAS)**

**This document relates to the following case:**
*Orange County Water District v. Unocal, et al.*,
04 Civ. 4968

## SUPPLEMENTAL DECLARATION OF ROY HERNDON IN OPPOSITION TO STATUTE OF LIMITATIONS MOTION

1.     I am the Chief Hydrogeologist at Orange County Water District

("OCWD") with responsibility for managing the Hydrogeology Department.  My

responsibilities as head of the Hydrogeology Department include overseeing the

construction of a basin-wide numerical groundwater flow model, development of a

comprehensive data management and geographic information system, and

design/construction of multi-depth monitoring wells and municipal water wells.  I also

act as the District's liaison to state and local regulatory staff such as the Santa Ana

Regional Water Quality Control Board and the Orange County Health Care Agency.

A true and correct copy of my most recent curriculum vitae is attached.

2.     I am a California licensed Professional Geologist and California

Certified Hydrogeologist with over twenty years of experience in hydrogeologic

investigations, including the delineation of groundwater contaminant plumes.

3. I submitted several prior declarations in this case in opposition to the

defendants' motion for summary judgment on the statute of limitations.  I have

reviewed the Court's initial opinion on the statute of limitations.  This declaration

summarizes my prior declarations, and addresses issues that the Court asked

OCWD to address.

4. The Court asked whether MTBE in groundwater caused OCWD to act prior

to May 6, 2000.  The answer to that question is no.  OCWD took no specific action

with respect to MTBE in groundwater at any specific locations prior to May 6, 2000,

for reasons explained below.

2

5.  The Orange County groundwater basin covers over 300 square miles. After more than 15 years of detailed groundwater monitoring and analysis, OCWD hydrogeologists and engineers have found that the groundwater basin is composed of three major aquifers, all hydraulically connected.  The District refers to these as the Shallow, Principal and Deep aquifers.  An aquifer refers in this context to a vertical grouping of aquifers that tend to have similar groundwater elevation characteristics.  Groundwater flowing from one aquifer to another may be slowed by intervening deposits of clays and silts.

6.  The Shallow aquifer reaches a depth of approximately 200 feet, while the underlying Principal aquifer reaches depths of approximately 1,500 feet.  The Deep aquifer underlies the Principal aquifer and reaches depths of 2,000 feet or greater. Each aquifer is composed of multiple interconnected layers of sands and gravels with intervening less-permeable (but "leaky") clays and silts.

7.  Most of the approximately 200 drinking water production wells in the District currently draw groundwater from the Principal aquifer at typical depths of 300 to 1,000 feet.  Water suppliers that operate drinking water wells within OCWD's service area draw preferentially from deeper aquifers because in general, the water in those aquifers tends to be higher quality than water in shallow aquifers.  The Principal aquifer is replenished by recharge water that travels from ground surface through the Shallow aquifer, including through intervening "leaky" clay and silt layers, into the Principal aquifer.  Only a few production wells are currently deep enough to draw

3

water from the Deep aquifer.  The aquifers within the District's service area provide drinking water for some 2.5 million people.

8.  Most of the recharge (i.e., vertical groundwater flow) into the Shallow and Principal aquifers occurs in what is called the "Forebay" or "recharge" area of the basin.  The Forebay area covers roughly one-third of the eastern portion of the basin (furthest from the coast) and is characterized by highly permeable sands and gravels, with relatively sparse and discontinuous low-permeability clays and silts. The relatively sparse and discontinuous low-permeability clay and slit deposits allow vast quantities of water to flow from the District's surface water infiltration facilities into the Shallow aquifer and then into the underlying Principal and Deep aquifers.  Significant groundwater recharge also occurs in the Forebay area via deep infiltration of rainfall and irrigation water.

9.  The remaining two-thirds of the groundwater basin, including much of the central and coastal portions of the basin, is known as the "Pressure" zone.  The Pressure zone is characterized by aquifers that contain and are bounded by thicker and more continuous clay and silt layers that retard (but do not completely prevent), groundwater from flowing vertically within and between the three aforementioned aquifers.  While the Shallow and Principal aquifers are largely bounded by a "leaky" clay and silt layer in the Pressure area, District hydrogeologists and the California Department of Water Resources have identified areas known as "mergence zones" where the sandy aquifer zones of the Shallow and underlying Principal aquifers are in direct contact with each other without intervening clays or silts.  Vertical groundwater

4

flow within these mergence zones is believed to be similar to what occurs in the Forebay area.

10.   Because the Shallow and underlying Principal aquifers are hydraulically connected to the ocean along the coast, seawater intrusion into these aquifers is a detrimental phenomenon that the District spends millions of dollars per year to control.  The District operates two seawater intrusion barriers, each within one to three miles of the ocean that inject fresh water into a series of injection wells to build up enough pressure to form a hydraulic "wall" within the Shallow and Principal aquifers such that salty groundwater will not flow inland beyond the barriers.  A thin margin of the basin aquifers within approximately one-half to one mile of the coast will likely always contain salty groundwater that is impractical to restore and maintain as a source of drinking water.  MTBE released into aquifers near the ocean and/or surrounded by saltwater bays does not pose a threat to drinking water.  Areas such as these, whose groundwater has been heavily impacted by seawater, are not likely to be used as drinking water sources.  The identification of the "non-threat" areas require expert hydrogeologic analysis to evaluate groundwater flow direction, degree of hydraulic connection to drinking water aquifers, and water quality data.

11.   From the aforementioned general hydrogeologic summary, it may be apparent why OCWD considers the threat of harm from contaminants such as MTBE differently, depending on the location within the groundwater basin and the depth of the contamination.  For example, an MTBE release that occurs in the Forebay area would be expected to have higher potential to spread and move to deeper aquifers

5

that are used for drinking water supply.  Alternatively, an MTBE release that occurs in the Pressure area that contains thicker and more continuous clays and silts is of concern for its ultimate threat to drinking water supplies, but the lower-permeability clays and silts are generally considered as beneficial in allowing the District time to evaluate the threat to deeper drinking water aquifers before determining the need to act.

12.  In determining whether it is reasonable for OCWD to act in response to a known release of contamination at a given location, OCWD typically considers a number of factors.  An MTBE release in some coastal areas of the groundwater basin, for example, may not be considered an actionable threat due to being within the aforementioned marginal coastal zone that is heavily impacted by seawater or within an area where the groundwater ultimately drains to the ocean rather than into the drinking water aquifers.

13.  In addition to considering the hydrogeologic conditions at a given MTBE occurrence, in ascertaining the threat of harm and the need to act, OCWD takes into account other factors, including actions taken by the Regional Water Quality Control Board and local oversight agencies, the depths and locations of nearby production wells, the potential for future production wells to be constructed in the vicinity, the potential for dispersion (defined here as the ability of a contaminant concentration to reduce as it spreads out and dilutes into an ever-increasing volume of presumably uncontaminated groundwater) to de minimis or non-detectable levels, and the

potential existence of nearby improperly destroyed (sealed) former production wells to allow shallow contamination to flow directly into the drinking water aquifers.

14.   The reported MTBE releases to groundwater at numerous gas stations would have been a major concern to OCWD if OCWD believed that they were not being cleaned up or otherwise contained to prevent them from contaminating the deeper drinking water aquifers.  Likewise, an isolated and non-continuing MTBE detection in either the Shallow or Principal aquifer would not be cause for action by OCWD.  However, the finding of repeatable and widespread MTBE detections in wells in the deeper Principal aquifer after May 6, 2000, created considerable concern as it demonstrated that MTBE could and did move rapidly into deeper aquifer zones and reach drinking water wells that were once considered largely protected from such impact.  This finding gave rise to concern that MTBE releases at many gas stations may not have been properly contained, discovered, or remediated and were potentially moving into the deeper portions of the Shallow aquifer and then into the Principal aquifer.

15.   The District shares authority to address groundwater contamination with the Regional Water Quality Control Board and with local oversight authorities.  When a release of gasoline containing MTBE is detected by a station operator, that release is required to be reported to either the Regional Board or to local oversight authorities, or both.  I am not aware of any authority that requires that such releases be reported to the District by station operators.

7

16.  OCWD relies upon the Regional Board and local oversight authorities to initiate "first responses" to reported releases.  The Regional Board and local authorities have the power to order responsible parties to engage in initial investigations and remediation efforts at release sites.  The Memorandum of Understanding between OCWD and the Regional Board, provided to the Court in response to the defendants' primary jurisdiction motion, establishes that the Regional Board will provide initial responses to releases that threaten to contaminate groundwater.

17.  OCWD has no reason to take action in response to a release of gasoline containing MTBE at a station where the Regional Board or local authority has received a notice of a release, even when the release impacts groundwater at the site of the release, if the Regional Board or local oversight agency has ordered or undertaken remedial efforts at the site.  In many cases, remedial efforts are successful and no further action is required by OCWD.  If the Regional Board or local agency elects not to order or undertake remediation, or if MTBE has escaped remediation in significant amounts, however, the MTBE may then pose a threat of appreciable harm if hydrogeologic conditions are such that the MTBE is likely to contaminate groundwater used as a drinking water source.  As explained in the Memorandum of Understanding, OCWD may also provide technical advice, conduct investigations and remediate contamination when requested to do so by Regional Board or a discharger.  OCWD received no such request with respect to any MTBE release site prior to May 6, 2000.

8

18.   Determining whether MTBE has escaped remediation efforts and poses a threat of appreciably harming groundwater used as drinking water is a time consuming, complex, and expensive process.  There is no systematic way for OCWD to determine where, when, or even if contamination has escaped remediation and entered the Principal or Deep aquifers.  Such determinations must be made on a site-by-site basis.  Often the first evidence that OCWD receives that a contaminant may have escaped remediation is when the contaminant is detected during routine testing of a drinking water well or OCWD monitoring well in proximity to a site being remediated.  OCWD must then attempt to track the contaminant backwards from the well to the contaminant's source.  Because of the complex, multiple-layer hydrogeology and dynamic hydrologic conditions of the Orange County groundwater basin, such determinations require detailed analyses and the installation of multiple-depth monitoring wells outside the area of initial remediation.  Actual threat assessments typically involve the construction of one or more monitoring wells at multiple depths to characterize the hydrogeology and extent and movement of the MTBE.  Although it is possible to vertically delineate contamination at a given site, vertical delineation is a particularly difficult and lengthy process, and is seldom required by the Regional Board in initial remediation at contaminated sites.

19.   Once the District determines that MTBE contamination presents an actual threat to useable drinking water resources, the District attempts to mitigate that impact before it actually reaches drinking water wells.  Based upon my experience as a hydrogeologist, and my knowledge of the most cost effective methods of

9

remediating contamination, it is my opinion that intercepting and extracting highly contaminated groundwater before it reaches a well is substantially less costly than groundwater remediation via well head treatment, because treatment at the well head requires treatment of larger volumes of water over a longer period of time.

20. A comprehensive and accurate picture of contaminant movement in the subsurface may require a detailed hydrogeologic investigation, including borehole drillings and geologic loggings, preparation of geologic cross-sections, monitoring well installation to various depths, groundwater level measurement over time, preparation of groundwater elevation contour maps, water quality sampling and analysis, preparation of groundwater contaminant "plume" maps, compilation and analysis of regional pumping and recharge data, investigation of possible nearby improperly abandoned wells, and in some cases groundwater flow modeling. A single site-specific determination may take several years to complete and would typically involve the installation of monitoring wells, collection of groundwater level and contaminant data under varying hydrologic conditions (e.g., winter vs. summer or "wet year" vs. "dry year"), interpretation of the stratigraphy by constructing a series of geologic cross-sections, analysis of groundwater and MTBE flow direction and rate of movement under varying hydrologic conditions, and delineation of the extent of MTBE contamination.

21. Based on a search of a leaking underground storage tank database maintained by the State of California called GeoTracker, the District has identified at least 150 gasoline releases from underground storage tanks within the District's

10

service area that occurred subsequent to May 6, 2000.  Based on an analysis of about 42 of those sites, the District determined that 20 of those releases occurred at stations within one half-mile of a drinking water well.  Five of those drinking water wells have had MTBE detections within the last year: EOCW-W, EOCW-E, MCWD-3B, MCWD-5, and MCWD-7.  Three of the affected wells are within the Pressure Zone of the Basin.  Since 2003, the District has retained an environmental consulting firm to investigate MTBE contamination which, in the District's opinion, threatens the drinking water resources in the District.  The District presently plans to conduct additional investigations of new MTBE threats to drinking water resources which have been recently identified.

22.   Recent MTBE detections in drinking water wells have not only increased in number, but are appearing in wells that draw from deeper parts of the drinking water aquifer as well as in wells which are spread out across the basin.  In 2005, for example, MTBE was detected for the first time in three wells operated by the Mesa Consolidated Water District, two wells operated by the East Orange County Water District, and two wells operated by the City of Newport Beach.  MTBE detections in drinking water wells are no longer confined to discrete locations in the Forebay area, or to relatively shallow wells.

23.   Although MTBE was detected in wells within the "Forebay" area of the District prior to May 6, 2000, those detections were sporadic, occurred at discrete locations, and were not consistently detected in the same wells.

a.  City of Anaheim Well No. 29 (A-29) first had a detection of MTBE in 1995 at 3.7 ppb.  Detections of MTBE in this well were sporadic until September 1996 when A-29 had detections of MTBE from September 1996 until August 1997.  No MTBE detections were found in A-29 from 1997 until October 2005 when MTBE was detected at 0.09 ppb.

b.  City of Anaheim Well No. 34 (A-34) had three detections of MTBE between 1996 and 1997: two at 1.1 ppb, one at 0.52 ppb.  In December 2005, A-34 had a new detection of MTBE at 0.05 ppb.

c.  Two additional City of Anaheim Wells, Nos. 33 and 27, had five MTBE detections between 1997 and 1998.  Anaheim Well No. 33 had one detection of 0.51 ppb in 1997, and Anaheim Well No. 27 had detections of 0.82, 0.55, 0.69 and 0.66 between March 1997 and February 1998.

24.  All of the City of Anaheim wells with MTBE detections were relatively shallow wells clustered in two discrete locations within the Forebay area.  None of the MTBE detections in any of the City of Anaheim wells between 1995 and 1998 exceeded the then-known taste and odor thresholds for MTBE (15 ppb to 45 ppb).  In fact, there were no regulatory standards in effect during the time period of the detections.  Moreover, none of these detections exceeded, with the exception of a few detections in well A-29, the later adopted secondary maximum contaminant level of (MCL) of 5 ppb.

25.  With the exception of A-29, there were eight detections of MTBE in three Anaheim wells over a period of two years.  MTBE detections in the Anaheim wells

12

were perceived to be isolated incidents because the detections were limited to a discrete area, the wells were relatively shallow, the levels were below the then-understood levels of concern, and the MTBE detections were sporadic and terminated after a relatively short period of time. Well A-29 was taken out of service for a relatively short period of time. When the well was put back in use, there were no MTBE detections until 2005.

26. The Southern California Water Company (SCWC) made a claim against responsible parties for MTBE detections in SCWC wells located in a separate, discrete section of the Forebay area. SCWC and the responsible parties negotiated a settlement which addressed the MTBE contamination of SCWC's wells.

27. The Court's opinion states at pages 26-27: "[A]s to two specific points of contamination – the Edinger Avenue Chevron Station and the Santa Ana River – which OCWD alleges occurred after May 6, 2000, the defendants have established that OCWD suffered an injury prior to the limitations date. As such, the claims relating to these specific contaminations are time-barred unless the plaintiff can show that the limitations period is tolled by the discovery rule."

28. The District uses approximately 200,000 acre-feet of Santa Ana River water annually to recharge groundwater within the District's service area. This Santa Ana River water constitutes approximately two-thirds of the total recharge of basin groundwater.

29. The District learned for the first time in 2001 that there were numerous and widespread detections of MTBE at relatively deep levels in wells near the

13

recharge areas where the District uses Santa Ana River water to recharge groundwater within its service area.  These detections were reported in a report titled "Low-Level Volatile Organic Compounds in Active Public Supply Wells as Ground-Water Tracers in the Los Angeles Physiographic Basin" prepared by the United States Geological Survey, dated 2001.

30.  The District samples Santa Ana River water on an ongoing basis. Although there were eleven positive samples for MTBE in 1997-98, these represent only a fraction of the Santa Ana River sampling, and at most constitute sporadic and anomalous results.  Other contemporaneous sampling of Santa Ana River water did not indicate the presence of MTBE.  The District first discovered that Santa Ana River water used to recharge groundwater may contain more than sporadic or anomalous amounts of MTBE, that would require remedial action or treatment, when the USGS reported the results of its comprehensive testing of groundwater in the vicinity of the District's recharge areas in 2001, including the finding of widespread detections of MTBE in groundwater down gradient from the District's recharge area.

31.  MTBE in Santa Ana River water diverted by the District for recharge purposes originates upstream, and is likely released into the River from multiple sources and at different times.  It is extremely unlikely that the MTBE detected by USGS near District recharge areas in 2001 would have originated from the same release or releases that caused the anomalous detections in 1997-98.

32.  I have reviewed release reports related to the Edinger Avenue Chevron station mentioned in the Court's opinion.  Those reports provide a good example of

14

how separate releases can occur at different times at the same location, and can require separate remedial actions. A release at the Edinger Avenue Chevron station appears to have occurred in or prior to 1997. This 1997 release was the subject of remedial action by the Orange County Health Care Agency (OCHCA). With respect to this earlier release, the OCHCA approved a remedial action completion certification on September 21, 2001. A true and correct copy of OCHCA's approval is attached to this declaration as Exhibit 1.

33. Another release at the Edinger Avenue Chevron station was reported to OCHCA in 2003, and appears to have occurred during the process of removing an underground storage tank. A true and correct copy of the unauthorized release report to OCHCA for this site is attached to this declaration as Exhibit 2. OCHCA is currently overseeing attempts to remediate this second release. A true and correct copy of a well installation report (w/o attachments) submitted to OCHCA by the station's consultant is attached to this declaration as Exhibit 3. This report identifies MTBE in groundwater at the site in 2005, some four years after the 1997 release had been remediated and a closure certificate approved, at levels of 4,800 ppb (report, page 4). The District has not, at this time, received any information suggesting that the MTBE released in 2003 at the site has escaped the remediation currently being overseen by OCHCA at this site.

34. The District's laboratory conducted a taste and odor study in 1996-1997 which was primarily intended to understand the potential future threat of MTBE to the groundwater basin. The District's staff does not regularly conduct taste and odor

15

studies and, in fact, has not conducted a taste or odor study on any other volatile
organic compound since the MTBE study.  The District learned only recently that the
leading manufacturer of MTBE reported that the taste and odor threshold for MTBE
in drinking water is as low as 0.04 ppb.  This taste and odor threshold is three orders
of magnitude lower than the threshold previously understood by the District in late
1990s which was 15 to 45 ppb.

        35.  The Orange County Water District installed the first facility operated in the
United States to process and reclaim water from a sewage treatment plant so that it
could be injected into a potable water aquifer.  This facility was called Water Factory
21.  To inject finished water from this plant into the aquifer so that the water could be
re-used, the district has been required to document that the water is not polluted.
Recently the district spent approximately $480 million to upgrade this facility, now
known as the Groundwater Replenishment System, to increase its capacity and
utilize new technology.  For these reasons, sampling at the compliance point is
critical to the District which must establish the quality of recycled water to maintain its
permit to operate these recharge facilities.

        36.  In February 2006, the District sampled a new monitoring well (OCWD-
M45/1) installed for the purposes of complying with the District's permit to recharge
the groundwater basin with recycled water.  One of the initial purposes of this
monitoring well was to establish baseline for ambient water quality in the area.
MTBE was detected in the monitoring well.

37.  Due to the MTBE detection in monitoring well OCWD-M45/1, the District has undertaken an investigation to locate the source of the MTBE impacting this monitoring well.  The investigation will include reviewing and analyzing data from all gasoline stations in proximity to the monitoring well, and potentially conducting a costly flow path analysis.  The District is further concerned because this monitoring well is screened in a zone that currently is being pumped by nearby drinking water production wells.

38.  The Orange County Sanitation District collects sewage from an area that serves over two million people and roughly approximates the Orange County Water District's service area.  Sewage collected by the Sanitation District is treated at two Sanitation District plants.  The Orange County Water District has historically drawn approximately five to ten million gallons per day of treated wastewater from one of these Sanitation District plants, further treated the water to potable quality, then injected that water into the groundwater basin.  MTBE was first detected in water entering the Sanitation District plant from which the Orange County Water District draws treated water subsequent to May 6, 2000.

39.  The Orange County Water District recently activated a much larger recycled water treatment facility, known as the Groundwater Replenishment System (GWRS), that accepts over thirty million gallons per day of treated wastewater produced from one of the Orange County Sanitation District's sewage treatment plants, treats that water to potable quality, and

17

injects that water into the groundwater basin. The District's GWRS permit imposes numerous requirements on the District if recharge recycled water contains contaminants such as MTBE, including an obligation to provide an alternative safe drinking water supply or approved treatment system for any drinking water well impacted by the recharge recycled water. Specifically, the District ". . . will be responsible for . . . providing an alternative source of domestic water supply, or a CDHS approved treatment mechanism . . . [if a] domestic water well is unsuitable for human consumption as a direct result of the GWRS." (GWRS permit at sec. H, par. 10.)

40. I am familiar with the boundaries of the District and attest that the cities of San Bernardino, Riverside, La Habra and Brea are not within the boundaries of the District.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 28th day of March, 2008, at Fountain Valley, California.

_Roy L. Herndon_
Roy L. Herndon

# Roy L. Herndon

Mr. Herndon has over twenty years professional experience in hydrogeologic investigations pertaining to environmental and water supply projects in California, Nevada, and Arizona. These projects include the delineation of groundwater contaminant plumes over several miles long, characterization of hydrogeologic systems ranging from one-acre sites to the 300-square-mile Orange County groundwater basin, evaluation and control of sea water intrusion, and design of groundwater recharge and extraction systems for water supply and contamination remediation, respectively.

Mr. Herndon manages the Hydrogeology Department at the Orange County Water District and has directed hydrogeologic studies that have collectively entailed the construction of over 100 monitoring wells, 50 of which exceed 1,000 feet in depth. He is responsible for overseeing all departmental activities including the construction of a basin-wide numerical groundwater flow model, development of a comprehensive data management and geographic information system, and design/construction of multidepth monitoring wells and municipal water wells. Mr. Herndon acts as a liaison to state and local regulatory staff in reviewing technical reports submitted by parties performing subsurface environmental investigations. He has given numerous presentations to professional, regulatory, and industrial organizations, served as guest lecturer to university classes, and has been a continuing education program course instructor at the University of California, Irvine.

## EDUCATION

M.S., Hydrology and Water Resources (1985), University of Arizona, Tucson
B.A., Geology (1982), Colorado College, Colorado Springs

## PROFESSIONAL REGISTRATIONS

California Registered Geologist No. 4817
California Certified Hydrogeologist No. 113

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1992 - present: | Chief Hydrogeologist, Orange County Water District |
| 1988 - 1992: | Project Hydrogeologist, Orange County Water District |
| 1985 - 1988: | Project Hydrogeologist, Harding Lawson Associates |

## ACTIVITIES/MEMBERSHIPS

Chairman, Orange County Well Standards Advisory Board
Member, South Coast Geological Society
Member, MCAS El Toro Restoration Advisory Board

## REPRESENTATIVE PROJECTS

*Numerical Groundwater Flow Model of Orange County Groundwater Basin* -
Directed five-year effort to construct, calibrate, and run future basin
management scenarios with a three-layer transient model using MODFLOW.

*Regional TCE/TDS/Nitrate Groundwater Contamination Investigation* - Managed
three-year investigation to determine source and extent of groundwater
containing TCE, TDS, and nitrates in Irvine Subbasin; designed/supervised
construction of twelve monitoring wells ranging from 150 to 1,300 feet deep;
prepared two reports documenting evidence and rationale for conclusion of
MCAS El Toro as the source of a four-mile-long TCE plume; member of
Technical Review Committee, with U.S. EPA, state DTSC, and RWQCB, which
scoped and reviewed Marine Corps' remedial investigation/feasibility study for
this federal Superfund site.

*Irvine Desalter Project* - Developed numerical flow model and designed layout of
7.5-mgd production well field as part of a $35 million (capital) combined water
supply/groundwater remediation facility to remove groundwater containing
elevated TDS, nitrate, and TCE; managed construction of six production wells;
presented project concept to and negotiated with U.S. Navy for its cost share of
TCE cleanup of MCAS El Toro.

*Orange County Water Reclamation Project Feasibility Study* - Prepared
hydrogeologic portion of feasibility study report describing the piezometric and
water quality characteristics of the aquifers beneath OCWD's recharge facilities
in the city of Anaheim; evaluated the potential for recharging up to 100,000
acre-feet of reclaimed water at these facilities; developed and implemented an
ongoing isotopic tracer study with Lawrence Livermore National Laboratory to
identify groundwater flow paths and ages from the spreading basins to nearby
municipal wells.

*City of Orange VOC Study* - Managed investigation to identify source(s) and
extent of chlorinated VOC contamination that shut down a municipal water
well; directed construction of fifteen 100- to 300-foot deep monitoring wells
along the three-mile-long plume; prepared final report documenting potential
contaminant sources and evaluations of remedial alternatives.

*Anaheim/Fullerton VOC Study* - Manager of ongoing investigation to identify the
source(s) and extent of chlorinated VOC contamination over a 40-square mile
area; sited, designed, and directed construction of 60 monitoring wells ranging

in depth from 140 to 1,500 feet; prepared report summarizing findings.

*Sea Water Intrusion Barrier Management* - Technical reviewer of OCWD's Talbert sea water intrusion barrier project operations; directed development of a numerical flow model to assess the impacts to the barrier of a 14-mgd well field proposed by the city of Newport Beach; presented recommended mitigation strategies to minimize drawdown effects of the well field; Technical reviewer of hydrogeologic portion of Alamitos Barrier Reclamation Project to convert 50% of the injection to reclaimed water.

*Santa Ana River Watermaster* - Developed storm flow/base flow estimates based on USGS streamflow data; prepared Annual SAR Watermaster Report.

*Oak Creek Canyon Water Supply Evaluation* - Managed project to determine safe yield of small groundwater basin near Tehachapi, California for cement plant operations; designed and supervised construction and pump testing of two water wells; developed conceptual hydrogeologic and numerical flow models to evaluate maximum yield of basin; prepared final report.

*City of Upland Landfill Investigation* - Managed SWAT investigation to identify possible groundwater contamination at closed landfill; designed and directed construction of two monitoring wells drilled to depths of 400 to 500 feet; prepared final report for submittal to RWQCB.

*Groundwater Salinity Investigation, Laughlin, Nevada* - Developed groundwater flow and solute transport model to evaluate the effectiveness of an existing system to extract and contain a high-salinity groundwater plume at a power generating plant; supervised construction of several multidepth monitoring wells to delineate extent of saline plume; participated in seismic refraction and resistivity geophysical surveys to define alluvium/bedrock contact.

*Artificial Recharge Feasibility Study, Butler Valley, Arizona* - Conducted hydrogeologic investigation of remote desert basin, located along Central Arizona Project aqueduct, to evaluate its potential as a conjunctive-use storage basin; supervised construction of two 600-foot deep monitoring wells; performed aquifer testing and analysis; assisted with seismic and gravity surveys; constructed numerical flow model to estimate maximum basin storage potential; prepared final report.

*Petroleum Spill Investigation, Port of Los Angeles* - Managed investigation to delineate extent of fuel contamination of soil and groundwater along an abandoned pipeline; concurrent berth modification activities required close coordination with other contractors.

*City of Anaheim Groundwater Protection Program* - Developed well capture zones using analytical flow model; prepared sections of City well construction/abandonment protocol.

*Chemical Distribution Facility Investigation, Santa Fe Springs, California* - Prepared subsurface characterization portion of a RI/FS work plan to investigate chlorinated hydrocarbon contamination of vacated facility on the state Superfund list; work plan included construction of numerous monitoring wells and was subsequently accepted by state and local regulatory agencies.

Mr. Herndon has also managed and supervised field activities of numerous underground tank leak investigations throughout southern California; these studies have ranged from initial tank removal and closure to soil and groundwater contamination characterization, remediation, and monitoring.

## PUBLICATIONS/PRESENTATIONS

Clark, J.F., Hudson, G.B., Davisson, M.L., Woodside, G., Herndon, R., *Geochemical Imaging of Flow Near an Artificial Recharge Facility, Orange County, California,* Ground Water, Vol. 42, No. 2, March-April 2004.

Herndon, R.L., Woodside, G.D., Davisson, M.L., Hudson, G.B., *Use of Isotopes to Estimate Groundwater Age and Flow Path,* Southwest Hydrology, Vol. 2, No. 1, January/February 2003.

Grebbien, V., Ide, C., and Herndon, R., *Alternatives to Adjudications – The OCWD Model,* presented by V. Grebbien at CLE California Water Law Conference, Irvine, California, October 17-18, 2002.

Gamlin, J.D., Clark, J.F., Woodside, G., Herndon, R., *Large-Scale Tracing of Ground Water with Sulfur Hexafluoride,* Jour. Of Environ. Engr., February 2001.

Davisson, M.L., Hudson, G.B., Moran, J., Niemeyer, S., Herndon, R., *Isotope Tracer Approaches for Characterizing Artificial Recharge and Demonstrating Regulatory Compliance,* Annual UC Water Reuse Research Conference, Monterey, California, June 1998.

Davisson, M.L., Hudson, G.B., Herndon, R., Niemeyer, S., Beiriger, J., *Report on the Feasibility of Using Isotopes to Source and Age-Date Groundwater in Orange County Water District's Forebay Region, Orange County, California,* Lawrence Livermore National Laboratory ref. #UCRL-ID-123953, May 1996.

Crook, J., Herndon, R.L., Wehner, M.P., and Rigby, M.G., *Studies to Determine the Effects of Injecting 100 Percent Reclaimed Water from Water Factory 21*, Proceedings of Annual Water Environment Federation Conference, Miami, Florida, 1995.

Herndon, R.L., *Hydrogeology of Orange County Groundwater Basin -- An Overview*, in The Regressive Pleistocene Shoreline, Coastal Southern California, Annual Field Trip Guide Book No. 20, Edward G. Heath and W. Lavon Lewis ed., South Coast Geological Society, Inc., 1992.

Herndon, R.L., *Hydrogeology of Alamitos Gap, Los Angeles and Orange County, California*, presented at Association of Engineering Geologists/Groundwater Resources Association annual meeting, Sacramento, California, 1995.

*Two Years Down the Road of Sustainable Groundwater Pumping*, presented at Groundwater Resources Association Conference, Pasadena, California, September 2005.

*Well, Is There Water or Not?  OCWD's 12-Step Program to Recover from Drought*, presented for Gen. Mgr. Virginia Grebbien at Groundwater Resources Association Annual Conference, Rohnert Park, California, September 2004.

*How Much Can We Pump? Identifying and Overcoming the Limiting Factors of the Orange County Groundwater Basin*, presented at Association of Ground Water Scientists and Engineers Annual Conference, Orlando, Florida, December 2003.

*Building and Managing a Network of Over 200 Monitoring Wells in Orange County*, presented at Water Education Foundation/Association of Groundwater Agencies conference, Ontario, California, April 2002.

*Orange County's Groundwater:  A Resource Worth Protecting*, presented at the California Environmental Law Conference, Yosemite, October 1999.

*Hydrogeologic Aspects of Recharging 250,000+ af/year in Orange County*, presented at the American Ground Water Trust Workshop "The Latest on Artificial Recharge," Scottsdale, Arizona, September 1999.

*Measuring Success of Source Water Protection in Orange County, California*, presented at Source Water Assessment and Protection 98 conference, Dallas, Texas, 1998.

*Orange County Water District's Hydrogeology and Modeling Objectives*, presented at WateReuse Association of California Groundwater Recharge Workshop, Newport Beach, California, 1997.

*An Update on Groundwater Contamination in Orange County – Chlorinated Compounds and MTBE*, presented at Groundwater Resources Association Conference, Costa Mesa, California, 1996.

*Orange County Water District Groundwater Management Plan: Water Quality and Hydrogeologic Perspectives*, presented to ASCE North American Water Environment Congress, Anaheim, California, 1996.

*Orange County's Groundwater -- A Resource Worth Protecting*, presented to Orange County Chamber of Commerce environmental workshop, Irvine, California, 1993.

*Hydrogeologic Evolution of the Orange County Groundwater Basin*, presented at American Association of Petroleum Geologists Cordilleran Section annual meeting, Long Beach, California, 1993.

*El Toro TCE Investigation*, presented to Association of Hazardous Materials Professionals, Anaheim, California, 1991.

*Chlorinated VOC Investigation in Anaheim, California*, presented to Association of Engineering Geologists, southern California region, Montebello, California, 1991.

## TECHNICAL ADVISORY PANELS

AB303 Grant Program – Served on TAP for California Department of Water Resources to review and comment on grant program structure and subsequent proposals submitted for funding of groundwater monitoring and data management projects throughout the state.

Dana Point Desalination Project – Served on TAP to review and comment on proposed alternatives to construct a slant subsurface extraction well beneath the beach and near-shore seafloor for a potential future seawater desalination project to supply south Orange County, California.

Elsinore Valley Groundwater Management Plan – Served on TAP to review and comment on a groundwater management plan prepared for the Elsinore Valley Municipal Water District.

Georgia Seawater Intrusion – Served on TAP for state of Georgia to review existing seawater intrusion conditions between Hilton Head, South Carolina to Brunswick County, Georgia and recommend potential control alternatives.

Des Moines, Iowa ASR Project – Served on TAP for U.S. EPA-funded feasibility study of aquifer storage and recovery project using existing 2,000-foot wells.

## Other Presentations

*Modeling Orange County's Groundwater Basin,* presented at Orange County Water Association luncheon, Irvine, November 2002.

*Recharging 350,000 af/year in Orange County's Groundwater Basin,* presented at South Coast Geological Society meeting, Costa Mesa, June 2000.

*Groundwater Models: Powerful Tools When Used Properly,* presented at Calif. DHS reclaimed water workshops in San Bernardino and Berkeley, California, 1998.

*Development and Application of a Flow Model of the Orange County Groundwater Basin,* presented at Orange County Water Association lunch seminar, Santa Ana, 1997.

*Chlorinated VOCs in the Orange County Groundwater Basin,* presented at chlorinated VOC seminar sponsored by HLA, Irvine, 1995.

*Where Does Orange County Get Its Water?,* presented to Earth Sciences Dept., Fullerton College, 1995; and Esperanza High School students, Anaheim, 1994.

*Orange County's Groundwater--A Resource Worth Protecting,* presented to Orange County Health Care Agency staff, 1993; and Santa Ana Regional Water Quality Control Board staff, 1993.

*Hydrogeology and Groundwater Management of the Orange County Groundwater Basin,* presented to Lawrence Livermore National Laboratory, Livermore, 1996. Also presented to: IT Corp., Irvine, 1996; McLaren Hart, Irvine, 1994; Environmental Science Engineers, Fountain Valley, 1993; CH2M HILL, Santa Ana, 1992; Converse Consultants, Pasadena, 1992; and Calif. State Fullerton Earth Sciences Dept., 1992, 1997.

*El Toro TCE Investigation,* presented to U.C. Irvine Civil Engineering Dept., 1990.

# EXHIBIT 1



**COUNTY OF ORANGE**
# HEALTH CARE AGENCY

**REGULATORY HEALTH SERVICES**
**ENVIRONMENTAL HEALTH**

JULIETTE A. POULSON, RN, MN
DIRECTOR

MIKE SPURGEON
DEPUTY AGENCY DIRECTOR
REGULATORY HEALTH SERVICES

STEVEN K. WONG, REHS, MPH
DIRECTOR
ENVIRONMENTAL HEALTH

MAILING ADDRESS:
2009 EAST EDINGER AVENUE
SANTA ANA, CA 92705-4720

TELEPHONES: (714) 667-3600
FAX: (714) 972-0749
E-MAIL: envhonhealth@hca.co.orange.ca.us

September 24, 2001

Lisa Thompson
Chevron Products Company
PO Box 2292
Brea, CA 92822-2292

RECEIVED
SEP 2 7 2001
BY mc

Subject:   **Remedial Action Completion Certification**

Re:        Chevron Station 9-3603
           7012 Edinger
           Huntington Beach, CA
           OCHCA Case #89UT135

Dear Ms. Thompson:

This letter confirms the completion of site investigation and corrective action for the underground storage tank(s) formerly located at the above-described location. Thank you for your cooperation throughout this investigation. Your willingness and promptness in responding to our inquiries concerning the former underground storage tank(s) are greatly appreciated.

Based on information in the above-referenced file and with the provision that the information provided to this Agency was accurate and representative of site conditions, this Agency finds that the site investigation and corrective action carried out at your underground storage tank(s) site is in compliance with the requirements of subdivisions (a) and (b) of Section 25299.37 of the Health and Safety Code and with corrective action regulations adopted pursuant to Section 25299.77 of the Health and Safety Code and that no further action related to the petroleum release(s) at the site is required.

This notice is issued pursuant to subdivision (h) of Section 25299.37 of the Health and Safety Code.

Please contact Steven Sharp of our office at (714) 667-3623 if you have any questions regarding this matter.

Sincerely,

Steven K. Wong, REHS, MPH, Director
Environmental Health

Attachment:  Case Closure Summary

cc:    Ken Williams, Santa Ana Regional Water Quality Control Board
       SB 562 Database, State Water Resources Control Board
       Cleanup Fund Manager, State Water Resources Control Board

# EXHIBIT 2

URF Final Step                                                    Page 1 of 2

# UNAUTHORIZED RELEASE FORM WIZARD

-=YOUR URF HAS NOT YET BEEN SUBMITTED TO GEOTRACKER=-
CLICK ON "SUBMIT UNAUTHORIZED RELEASE FORM" TO SUBMIT THE URF.

THIS WILL BE YOUR URF TRACKING NUMBER:

UNDERGROUND STORAGE TANK UNAUTHORIZED RELEASE/CONTAMINATION SITE REPORT

| REPORT DATE | HAZARDOUS MATERIAL INCIDENT REPORT FILED WITH OES? |
|---|---|
| 10/16/03 | N |

**I. REPORTED BY -**
**ENVIRONMENTAL CONTRACTOR FOR RP**

| CONTACT NAME | INITIALS | ORGANIZATION_NAME | EMAIL ADDRESS |
|---|---|---|---|
| CATHY FERGUSON | | SECOR INTERNATIONAL INCORPORATED | |
| ADDRESS | | CONTACT DESCRIPTION | |
| 4463 WHITE BEAR PARKWAY, #106 | | | |
| WHITE BEAK LAKE, MN  55110 | | | |

**II. RESPONSIBLE PARTY -**
**PRIMARY RESPONSIBLE PARTY**

| CONTACT NAME | INITIALS | ORGANIZATION_NAME | EMAIL ADDRESS |
|---|---|---|---|
| LISA THOMPSON | | CHEVRON PRODUCTS COMPANY | CA |
| ADDRESS | | CONTACT DESCRIPTION | |
| P O BDX 2292 P O BOX 2292 | | | |
| BREA,  828222292 | | | |

**III. SITE LOCATION**

| FACILITY NAME | FACILITY ID |
|---|---|
| FORMER CHEVRON STATION #9-3603 | 04UT006 |
| FACILITY ADDRESS | ORIENTATION OF SITE TO STREET |
| 7012 EDINGER AVENUE | |
| HUNTINGTON BEACH, CA  92647 | |
| ORANGE COUNTY | CROSS STREET |

**V. SUBSTANCES RELEASED**

| SUBSTANCE RELEASED | DESCRIPTION | QUANTITY LOST |
|---|---|---|
| GASOLINE - AUTOMOTIVE | | UNKNOWN |

**VI. DISCOVERY/ABATEMENT**

| DATE DISCHARGE BEGAN | | |
|---|---|---|
| UNKNOWN | | |
| DATE DISCOVERED | HOW DISCOVERED | DESCRIPTION |
| 10/10/03 | TANK CLOSURE | |
| DATE STOPPED | STOP METHOD | DESCRIPTION |
| 10/10/03 | CT | |

**VII. SOURCE/CAUSE**

| SOURCE OF DISCHARGE | CAUSE OF DISCHARGE |
|---|---|
| T | UNK |
| DISCHARGE DESCRIPTION | |

**VIII. CASE TYPE**

| CASE TYPE |
|---|
| OTHER GROUNDWATER AFFECTED (USES OTHER THAN DRINKING WATER) |

**IX. REMEDIAL ACTION**

| REMEDIAL ACTION | BEGIN DATE | END DATE | DESCRIPTION |
|---|---|---|---|

**X. GENERAL COMMENTS**

F Final Step
Page 2 of 2

## XI. CERTIFICATION

I HEREBY CERTIFY THAT THE INFORMATION REPORTED HEREIN
IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE.

## XII. REGULATORY USE ONLY

CURRENT STATUS
1 - LEAK CONFIRMATION

CURRENT STATUS DATE
1/27/04

LOCAL AGENCY CASE NUMBER
04UT008

REGIONAL BOARD CASE NUMBER

### LOCAL AGENCY - LEAD AGENCY

| CONTACT NAME | INITIALS | ORGANIZATION NAME | EMAIL ADDRESS |
|---|---|---|---|
| KATHRYN A. CROSS | KAC | ORANGE COUNTY LOP | kcross@hca.co.orange.ca.us |

ADDRESS
2009 E. EDINGER AVE.
SANTA ANA, CA  92705

CONTACT DESCRIPTION
GENERAL CONTACT FOR LOCAL AGENCY

| PHONE TYPE | PHONE NUMBER | EXTENSION |
|---|---|---|
| BUSINESS | (714)-667-3759 | |
| FAX | (714)-568-5116 | |

### REGIONAL BOARD

| CONTACT NAME | INITIALS | ORGANIZATION NAME | EMAIL ADDRESS |
|---|---|---|---|
| KEN WILLIAMS | | SANTA ANA RWQCB (REGION 8) | |

ADDRESS
3737 MAIN STREET, SUITE 500
RIVERSIDE, CA  92501-3339
USA

CONTACT DESCRIPTION

◄ BACK                    SUBMIT UNAUTHORIZED RELEASE FORM

LOGGED IN AS CROSSK

# EXHIBIT 3



An Employee-Owned Company ®

June 7, 2005

Ms. Kathryn Cross
Orange County Health Care Agency
Hazardous Materials Mitigation Section
1241 East Dyer Road
Santa Ana, California 92705-5611

Subject:        Well Installation Report

Site:           Former Chevron Service Station No. 9-3603
                7012 Edinger Avenue, Huntington Beach, California
                Case No. 04UT006

Dear Ms. Cross:

On behalf of Chevron Environmental Management Company (CEMC), Science Applications International Corporation (SAIC) has prepared this report for well installation activities performed at former Chevron Service Station No. 9-3603.

The well installation was performed in accordance with SAIC's *Well Installation Workplan*, submitted to the Orange County Health Care Agency (OCHCA), and dated November 15, 2004. The workplan proposed the installation of four monitoring wells (MW-05 through MW-08) and was approved by the OCHCA in the December 17, 2004 letter titled, *"Well Installation Workplan dated November 15, 2004."*

This letter report summarizes the installation activities performed at this site. The objective of these activities was to install four wells which will be used to monitor methyl tertiary-butyl ether (MtBE) concentrations and to assess the occurrence of natural attenuation of this constituent.

## SITE DESCRIPTION

The site is a former Chevron service station situated on the southeastern corner of the intersection of Edinger Avenue and Golden West Street (Plate 1). Occupying the same intersection are retail businesses, Goldenwest College, and a Shell service station (Plate 2).

The site was previously occupied by a self-service station with an automotive repair facility. Former station facilities included a station building, four fuel dispenser islands, and three 10,000-gallon gasoline and one 1,000-gallon used oil double-walled fiberglass underground storage tanks (USTs); these were removed during station demolition activities in October 2003 (Plate 3) (SAIC, 2004a).

## GEOLOGY AND HYDROGEOLOGY

The geology and hydrogeology underlying the site are described in detail in the *Soil and Groundwater Confirmation Sampling* letter report (SAIC, 2004b).

## SITE BACKGROUND

The site background, including the UST history and the subsurface investigations performed at the site, are discussed in detail in the *Soil and Groundwater Confirmation Sampling* letter report (SAIC, 2004b).

During investigative efforts in August and September 2004, petroleum hydrocarbons in soil were present below the first-encountered groundwater at 15 feet bgs; these concentrations are likely associated with dissolved-phase constituents. Furthermore, groundwater in the vicinity of the former UST excavation

June 7, 2005
Mr. Kathryn Cross
Orange County Health Care Agency
Case No. 04UT006
Page 2

contains elevated concentrations of methyl tertiary-butyl ether (MtBE) with minor tertiary-butyl alcohol (TBA) (SAIC, 2004b).

## FIELD ACTIVITIES

Field activities associated with the installation of wells MW-05 through MW-08 were conducted on March 14, April 18, and April 22, 2005. Activities included a utility clearance, drilling and sampling, well installation, well development, and surveying the wells after installation (Plate 3).

Prior to commencement of intrusive activities, the following were conducted:

- Visited the site to mark the proposed boring locations.
- Obtained permits from the OCHCA to install four wells (Appendix A).
- Contacted the CEMC Project Manager and the property owner prior to the start of field activities.
- Notified Underground Service Alert of the planned work at least 72 hours prior to initiating field activities and verified the locations of underground utilities.
- Notified the OCHCA a minimum of 48 hours prior to commencement of field activities.
- Performed a utility clearance on March 14, 2005 utilizing an air-knife to clear the proposed soil boring locations to a depth of approximately 8 feet bgs.

## Drilling and Sampling

On April 18, 2005, four soil borings were advanced to a maximum depth of 25 feet bgs by $BC^2$ utilizing a truck-mounted hollow-stem (HAS) drill rig equipped with a California-modified split-spoon sampler.

Soils were logged at approximately 5-foot intervals from 8 feet bgs to the termination of each boring. Soils were logged by SAIC personnel, working under the supervision of a SAIC California registered geologist, in accordance with the American Society for Testing and Materials Test Method D 2488-00 and Unified Soil Classification System. Soil samples for chemical analysis were collected in clean brass sleeves solely from well MW-08 at approximately 5-foot intervals starting from 10 feet bgs. Photoionization detector (PID) measurements, when taken, were recorded on the exploratory boring logs and are presented in Appendix B.

## Well Installation

The soil borings were subsequently converted into groundwater monitoring wells (Plate 3). New casing and well screen were used to construct the wells. The wells were constructed with 4-inch-diameter Schedule 40 polyvinyl chloride (PVC) casing with 0.010-inch slots and filter sand comprising #2/16 sand. Each well was secured with a locking well cap and covered with a traffic-rated, 12-inch-diameter vault box installed flush to grade. Well construction details are summarized in Table 1 and are shown on the exploratory boring log (Appendix B).

## Well Development and Groundwater Sampling

On April 22, 2005, SAIC developed the recently installed wells using a well development rig provided by $BC^2$. SAIC's field personnel measured the depth to groundwater in each monitoring well prior to development. The static groundwater level was measured to the nearest 0.01 foot with an electronic water-level indicator. Each monitoring well was developed using surging, bailing, and pumping methods.

Development proceeded until 3 borehole volumes were removed and temperature, hydronium activity (pH), and conductivity parameters had stabilized. Due to the high fine-grained soil content in the

June 7, 2005
Mr. Kathryn Cross
Orange County Health Care Agency
Case No. 04UT006
Page 3

saturated soils, a turbidity of less than 5 nephelometric turbidity units (NTUs) could not be obtained in wells MW-5, MW-6, or MW-8. Prior to sampling, however, it was observed that the turbidity of wells MW-5 and MW-6 had significantly decreased. Water-quality parameters recorded during well development activities are presented in the well development logs (Appendix C).

Groundwater samples were collected subsequent to well development utilizing disposable bailers and were containerized in 40-milliliter (ml) volatile organic analysis (VOA) vials with hydrochloric acid preservative. Each vial was checked for the absence of headspace prior to sealing with a Teflon-lined cap.

## Land Survey

A California-licensed surveyor working for Johnson-Frank & Associates, Inc. of Anaheim, California, surveyed and recorded the elevation and horizontal location of the top-of-casing for wells MW-5 through MW-8 and the elevation of the ground surface adjacent to each well vault, in accordance with AB2886. Survey data were relative to mean sea level (msl) (North American Datum 1988 [NAVD88]) and the California State Plane Coordinate System. A map depicting the survey data is included as Appendix D.

## Investigation-Derived Wastes

Soil wastes generated during drilling activities (i.e., auger cuttings), and water wastes generated during well development and equipment decontamination were containerized in Department of Transportation (DOT)-approved 55-gallon drums. The drums were removed from the site and transported by Philips Services Company for proper disposal at TPS Technologies in Adelanto, California for soils and U.S. Filter in Vernon, California for purge and decontamination water. The manifests will be provided upon request.

## Sample Collection and Chemical Analyses

A chain-of-custody (COC) record accompanying the samples to the laboratory was started in the field. Samples were submitted to the laboratory within 24 hours of collection in the field and were analyzed within the holding time requirement for each analytical method.

Soil and groundwater samples collected during this effort were analyzed by Del Mar Analytical (DMA) in Irvine, California for total petroleum hydrocarbons as gasoline (TPHg); benzene, toluene, ethylbenzene, and xylenes (BTEX); and oxygenates (i.e., MtBE, ethyl tertiary-butyl ether (EtBE), di-isopropyl ether (DIPE), tertiary-amyl methyl ether (TAME), and TBA) using U.S. EPA Method 8260B.

## RESULTS OF FIELD ACTIVITIES

Four monitoring wells were installed in April 2005. Groundwater was encountered at approximately 10 to 11 feet bgs. The analytical results of TPHg, BTEX, and oxygenates for the soil and groundwater samples collected during sampling activities are summarized in Table 2, for soil samples, and Table 3, for groundwater samples. Analytical laboratory reports associated with this investigative effort are included in Appendix E. Laboratory results above the method detection limit (MDL), but below the detection limit for reporting were flagged with a letter "J" by the laboratory, and may not be considered quantitative.

A total of 4 soil samples were collected from well MW-8 during drilling activities. TPHg, BTEX, DIPE, EtBE, TAME, and TBA were not detected in the soil samples collected during this effort. A single detection of 0.005J milligrams per kilogram (mg/kg) of MtBE was reported in the sample collected from 15 feet bgs.

June 7, 2005
Mr. Kathryn Cross
Orange County Health Care Agency
Case No. 04UT006
Page 4

A total of 4 groundwater samples were collected during this investigative effort. Groundwater samples did not contain detectable concentrations of DIPE or EtBE. TPHg, BTEX compounds, MtBE, TAME, and TBA were detected in the groundwater samples at maximum concentrations of 1,000 micrograms per liter ($\mu$g/l) (MW-6), 5.3 $\mu$g/l (MW-8), 6.7 $\mu$g/l (MW-8), 1.5J $\mu$g/l (MW-8), 7.7 $\mu$g/l (MW-8), 4,800 $\mu$g/l (MW-6), 78 $\mu$g/l (MW-6), and 860 $\mu$g/l (MW-6), respectively. Non-aqueous phase liquid was not detected in any of the wells during well installation or development activities.

The approximate average groundwater elevation at the time of well development was 11.57 feet above mean sea level with an approximate gradient of $3.7 \times 10^{-3}$ ft/ft towards the east (Plate 4).

## LABORATORY QUALITY ASSURANCE/QUALITY CONTROL (QA/QC)

Method blanks associated with the groundwater and soil samples did not contain TPHg, BTEX, or oxygenates.

## ELECTRONIC DATA FORMAT DELIVERABLES

Required file(s) has (have) been uploaded to the GeoTracker Website in accordance with AB 2886. Confirmation number(s) will be provided upon request.

## CONCLUSIONS

Well installation activities were successfully conducted at the site by SAIC in April 2005. During these activities, groundwater was encountered in the borings at approximately 10 to 11 feet bgs.

Petroleum hydrocarbons at the site appear to be present primarily in the groundwater. MtBE was detected in all of the wells with a maximum concentration of 4,800 $\mu$g/l in well MW-6. Based on the analytical results and the current groundwater gradient, SAIC recommends the monitoring of the newly installed wells for at least two quarters to obtain an overall trend in the groundwater flow direction. The groundwater flow direction information will be used to place an off-site well to monitor the approximate down-gradient extent of the MtBE in groundwater.

June 7, 2005
Mr. Kathryn Cross
Orange County Health Care Agency
Case No. 04UT006
Page 5

If you have any questions, please contact the SAIC Project Manager, Mr. Steven Draper, at (714) 257-6413.

Yours very truly,

SCIENCE APPLICATIONS INTERNATIONAL CORPORATION


for *Caroline W. Cent*

Jillian Maloney
Staff Geologist

*Steven W. Draper*

Steven W. Draper
Certified Engineering Geologist No. 1601
Project Manager

Attachments:   Table 1 – Groundwater Monitoring Well Construction
Table 2 – Soil Analytical Data
Table 3 – Groundwater Analytical Data
Plate 1 – Site Location Map
Plate 2 – Site Vicinity Map
Plate 3 – Site Plan Showing Soil Sample and Groundwater Monitoring Well Locations
Plate 4 – Site Plan Showing Groundwater Elevations and Concentrations of TPHg, Benzene, MtBE, and TBA
Appendix A – Well Installation Permit
Appendix B – Exploratory Boring Logs
Appendix C – Well Development Logs
Appendix D – Land Survey Map
Appendix E – Laboratory Reports and Chain-of-Custody Documentation

cc:   Mr. Drew Noel, CEMC
SAIC Project File

Limitation of Use: SAIC's investigation was restricted to collection and analysis of a limited number of environmental samples and visual observations obtained during the physical site visit, and from records made available by CEMC or third parties during the investigation. Because the investigation consisted of collecting and evaluating a limited supply of information, SAIC may not have identified all potential items of concern and, therefore, SAIC warrants only that the project activities under this contract have been performed within the parameters and scope communicated by CEMC and reflected in the contract. SAIC has made no independent investigations concerning the accuracy or completeness of the information relied upon. This report is intended to be used in its entirety. Taking or using in any way excerpts from this report are not permitted and any party doing so does so at its own risk.

X:\CEMC Project files\0-3601 Huntington Beach\Site Assessments\May 2005\Well Inst Rpt.doc

# REFERENCES

Science Applications International Corporation (SAIC).  2004a.  *Underground Storage Tank Removal Report*, Former Chevron Service Station No. 9-3603, 7012 Edinger Avenue, Huntington Beach, California; unpublished consultant report dated January 28.

SAIC.  2004b.  *Soil and Groundwater Confirmation Sampling*, Former Chevron Service Station No. 9-3603, 7012 Edinger Avenue, Huntington Beach, California; unpublished consultant report dated November 15.

United States Geological Survey (USGS).  1981a.  *Newport Beach Quadrangle*, 7.5-minute series (topographic), scale 1:24,000; original dated 1965, photo revised 1981.

USGS.  1981b.  *Seal Beach Quadrangle*, 7.5-minute series (topographic), scale 1:24,000; original dated 1965, photo revised 1981.

# Exhibit 6

LEXISNEXIS' FILE & SERVE
36490438
E-SERVICE
Mar 15 2011
6:35PM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:  Methyl *tertiary* Butyl Ether ("MtBE") Products Liability Litigation | Master File No. 1:00-1898 MDL No. 1358 (SAS) |
| This Document Relates To: | |
| *Orange County Water District v. Unocal Corporation, et al.,* Case No. 04 Civ. 4968 (SAS) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF ORANGE COUNTY WATER DISTRICT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT........................................................................................................3

I.     The District Submitted No Proof that Defendants Caused the Contamination .................3

      A.      Ownership, operation, or supply is insufficient to establish causation...................3

      B.      Proof of Defendants' remedial activities is insufficient ...........................................5

      C.      The District's reliance on *City of Modesto* is unavailing........................................5

II.     The District Is Not Entitled to Partial Summary Judgment under the Act .........................6

      A.      The Act's delineation of investigation and remediation costs ................................6

      B.      The District has not identified any recoverable costs under the OCWD Act ..........7

      C.      The costs the District has identified are unnecessary and unreasonable ..............10

      D.      The District's reliance on other remedial statutes is misplaced............................12

III.    Additional Fact Issues Preclude Summary Judgment on Nuisance and Trespass.............16

      A.      An issue of fact exists on substantial and unreasonable interference ...................16

      B.      The District's alleged usufructuary rights are subordinate to other water users....19

IV.    The District Failed to Show that the Alleged Nuisance and Trespass Are Continuing.....21

V.     The District Has Failed to Negate Defendants' Affirmative Defenses.............................25

## TABLE OF AUTHORITIES

**CASES**                                                                                 **PAGE(S)**

*A. Shapiro & Sons, Inc. v. Rutland Waste & Metal Co.,*
    76 F. Supp. 2d 82 (D. Mass. 1999) ................................................................14

*Adobe Lumber, Inc. v. Hellman,*
    658 F. Supp. 2d 1188 (E.D. Cal. 2009)...........................................................12

*Beck Dev. Co., Inc. v. S. Pac. Transp. Co.,*
    44 Cal. App. 4th 1160 (1996) ...........................................................18, 21, 22

*Bowen v. Georgetown University Hosp.,*
    488 U.S. 204 (1988)...........................................................................8, 24

*Cardoza v. Calkins,*
    117 Cal. 106 (1897) ........................................................................21

*Central & Western Basin Water Replenishment Dist. v. Southern California Water Co.,*
    109 Cal. App. 4th 891 (2003) .............................................................20

*City of Barstow v. Mojave Water Agency,*
    23 Cal. 4th 1224 (2000) ...............................................................19, 20

*City of Modesto Redevelopment Agency v. Dow Chemical Co.,*
    2005 WL 1171998 (Cal. Super. Ct., Apr. 11, 2005)........................................5

*City of Modesto Redev. Agency v. Sup. Court,*
    119 Cal. App. 4th 28 (2004) ..........................................................4, 5, 6

*Clean Air Constituency v. California State Air Resources Board*
    11 Cal. 3d 801 (1974) ...................................................................13

*Conn. National Bank v. Germain,*
    503 U.S. 249 (1992)......................................................................14

*County of San Diego v. Assessment Appeals Bd. No. 2,*
    148 Cal. App. 3d 548 (1983) ...........................................................24

*County of Santa Clara v. Atlantic Richfield Co.,*
    137 Cal. App. 4th 292 (2006) ..........................................................16

*Environmental Protection Information Center. v. Johnson,*
    170 Cal. App. 3d 604 (1985) ...........................................................14

*Frankel v. ICD Holdings S.A.,*
    930 F. Supp. 54 (M.D. Ala. 1996) .....................................................25

*Golden Pacific Bancorp v. FDIC,*
  375 F.3d 196 (2d Cir. 2004)................................................................12

*Haycock v. Hughes Aircraft Co.,*
  22 Cal. App. 4th 1473 (1994) ...........................................................12

*In re MTBE Products Litigation,*
  676 F. Supp. 2d 139 (S.D.N.Y 2009)................................................17

*In re MTBE Products Litigation,*
  457 F. Supp. 2d 455 (S.D.N.Y. 2006)........................................3, 4, 19

*In re MTBE Products Litigation,*
  739 F. Supp. 2d 576 (S.D.N.Y. 2010)................................................25

*Isobe v. Unemployment Insurance Appeals Board,*
  12 Cal. 3d 584 (1974) .......................................................................14

*Johnston v. Sonoma County Agric. Pres. Info. Ctr. & Open Space Dist.,*
  100 Cal. App. 4th 973 (2002) ......................................................14, 24

*Kendall-Brief Co. v. Superior Court*
  60 Cal. App. 3d 462 (1976) ..............................................................13

*Mangini v. Aerojet-General Corp.,*
  12 Cal.4th 1087 (1996) .....................................................................21

*Mangini v. Aerojet-General Corp.,*
  230 Cal. App. 3d 1125 (1991) ...........................................................21

*McCoy, v. Gustafson,*
  180 Cal. App. 4th 56 (2009) .........................................................21, 24

*McIntosh v. Brimmer,*
  68 Cal. App. 770 (1924) ....................................................................18

*National Audubon Society v. Superior Court,*
  33 Cal. 3d 419 (1983) .......................................................................19

*Natural Res. Def. Council v. Atcata National Corp.,*
  59 Cal. App. 3d 959 (1976) ...............................................................14

*Navistar Intern. Transp. Corp. v. Freightliner Corp.,*
  No. 96 C 6922, 1998 WL 786388 (N.D. Ill. Nov. 6, 1998)................25

*Nicoll v. Rudnick,*
  160 Cal. App. 4th 550 (2008) ............................................................20

*Nixon-Egli Equipment Co. v. John A. Alexander Co.,*
  949 F. Supp. 1435 (C.D. Cal. 1996) ...................................................................13

*OCWD v. Sabic Innovative Plastics US, LLC, et al.*
  Orange County Superior Court Case No. 30-2008-00078246, Notice of Ruling (Oct. 20, 2008) ...................................................................................................................15

*People ex rel. Gallo v. Acuna,*
  14 Cal.4th 1090 (1997) ......................................................................................16

*Rancho Viejo LLC v. Tres Amigos Viejos LLC,*
  100 Cal. App. 4th 550 (2002) .......................................................................19, 20

*Resolution Trust Corp. v. Rossmoor Corp.,*
  34 Cal. App. 4th 93 (1995) ................................................................................3, 4

*Rhodes-Bradford v. Keisler,*
  507 F.3d 77 (2d Cir. 2007)...................................................................................24

*Shamsian v. Atlantic Richfield Co.,*
  107 Cal. App. 4th 967 (2003) .............................................................................21

*Shields v. Wondries,*
  154 Cal. App. 2d 249 (1957) ..............................................................................18

*Sonoma County Water Coal. v. Sonoma County Water Agency,*
  189 Cal. App. 4th 33 (2010) ...............................................................................24

*State of California v. Campbell*
  138 F.3d 772 (9th Cir. 1998) ..............................................................................18

*U.S. v. Ownbey Enterprises, Inc.,*
  789 F. Supp. 1145 (N.D. Ga. 1992).....................................................................25

*United Farm Workers v. Superior Court,*
  72 Cal. App. 3d 268 (1977) ................................................................................15

*Vineyard Area Citizens for Resp. Growth, Inc. v. City of Rancho Cordova,*
  40 Cal.4th 412 (2007) .........................................................................................24

*Western States Petroleum Association v. State Department of Health Services.,*
  99 Cal. App. 4th 999 (2002) ...............................................................................18

*Wilshire Westwood Assoc. v. Atlantic Richfield Co.,*
  20 Cal. App. 4th 732 (1993) ...............................................................................24

*Wright v. Goleta Water Dist.,*
  174 Cal. App. 3d 74 (1986) ................................................................................20

STATUTES AND RULES

California Evidence Code § 601 ................................................................................12

California Evidence Code § 606 ................................................................................12

California Health & Safety Code §§ 25280-25299 .....................................................5

California Water Code App. §§ 40, *et seq.* ......................................................... *passim*

California Code of Civil Procedure § 1060 .............................................................15

Federal Rules of Civil Procedure 56(g) ...................................................................25

OTHER AUTHORITIES

5 WITKIN, SUMMARY OF CALIFORNIA LAW: TORTS § 693 (10th Ed. 2005) ...................................19

12 WITKIN: SUMMARY OF CALIFORNIA LAW: REAL PROPERTY § 954 (10th Ed. 2005) .................20

WEBSTER'S NEW NINTH COLLEGIATE DICTIONARY (1986) ............................................................8

## INTRODUCTION

Eight years ago, the Orange County Water District (the "District") sued Defendants, claiming that MTBE was contaminating drinking water in its territory.  Discovery has shown otherwise.  The drinking water wells that the District associates with the fourteen stations at issue in its Motion have never had a detection of MTBE above the California 5 ppb secondary MCL or even the 3 ppb California "detection level for reporting" (meaning the District has never reported a detection to the State for any of these wells).  Its case rests on "microdetections," which are of questionable validity and are legally "non-detects."  In response to this non-contamination, the District has done nothing.  It has not remediated anything, and its so-called "investigation" has been no more than hiring litigation consultants to summarize other people's work.

Nonetheless, the District seeks to be awarded, as a matter of law, a blank check to do whatever it wants in the future (or to do nothing and pocket the money).  It seeks a vague ruling that Defendants are "liable" as a matter of law on three claims despite the fact that the District presents no evidence (and certainly no indisputable evidence) that Defendants caused the alleged contamination at any site.  This is a required element of proof for the District's claims under the Orange County Water District Act ("OCWD Act" or "Act")[1] and for nuisance and trespass; accordingly, the District's Motion must be denied.  Rather than meeting this burden, the District's entire motion is predicated on four facts as to each station:  (1) Defendants' ownership of the tanks ("USTs"), (2) Defendants' sale of gasoline to the station, (3) the existence of MTBE at one time above 5 ppb in the shallow (non-drinking water) aquifer at the site, and (4) Defendants' clean up at the station as required by state statutes and regulations.  But under this Court's prior rulings, the District must prove more than just ownership of tanks or supply of some gasoline.  And unlike the claims at issue here, by statute a Defendant's remediation

---

[1]   Cal. Water Code App. §§ 40, *et seq.*

responsibility is based on its ownership of the USTs. The limited facts the District presents are simply insufficient to establish liability, let alone as a matter of law.

Additionally, with respect to the District's OCWD Act claim, summary judgment is improper because the District has not incurred any clean up costs. At most, it has incurred investigation costs, which are not recoverable under the Act's unambiguous language and clear structure. Recognizing this, the District attempts to characterize these costs as "other necessary remedial action." This claim is untenable. First, because the costs at issue are investigation costs (if that), they cannot be other remedial activities. At a minimum, there is a fact issue as to the nature of these costs. Second, costs related to "other necessary remedial action" are only recoverable for threatened contamination. Here, the District has put forth no evidence on summary judgment concerning threatened contamination; instead, it has repeatedly admitted that this case is about alleged *actual* contamination. Third, there are factual disputes preventing summary judgment as to whether the costs the District incurred were "necessary," which is a liability issue, and whether they were "reasonable."

The Court should also deny the District summary judgment on its continuing nuisance and trespass claims because there is no evidence, or there are disputed issues of fact, as to whether: (1) Defendants' alleged interference with the District's rights was "substantial and unreasonable;" and (2) the contamination is reasonably abatable. Moreover, for trespass, the District must show that it had exclusive rights to the property in question. The undisputed facts, however, demonstrate that its alleged usufructuary rights are subordinate to others.

Finally, the District's Motion fails because it is predicated on a sleight of hand. The District has repeatedly admitted that it is not seeking to investigate, clean up, or abate contamination at a site; instead, its Motion concedes that its alleged "damages" will relate to

2

offsite contamination.  The District, however, has presented no evidence that there is in fact offsite contamination (other than David Bolin's improper conclusory statements two years ago), that such contamination is above 5 ppb, that it has incurred costs related to such contamination, or that such contamination must be abated or is reasonably abatable.  As a result, the District has not established any of its claims as a matter of law, and summary judgment should be denied.

## ARGUMENT

### I.    The District Submitted No Proof that Defendants Caused the Contamination.

For each claim, the District must demonstrate as a matter of law based on undisputed facts that the Defendants caused the contamination.  The OCWD Act only allows for recovery of remediation costs incurred from "the person causing or threatening to cause [the] contamination."  OCWD Act § 8(c).  Nuisance requires proof that a manufacturer's actions "create[] or assist[] in the creation of the nuisance."  *In re MTBE Prod. Litig.*, 457 F. Supp. 2d 455, 463 (S.D.N.Y. 2006) (quotations and citations omitted).  Likewise, trespass requires affirmative proof of conduct that is "intentional, reckless, negligent, or the result of ultrahazardous activity."  *Resolution Trust Corp. v. Rossmoor Corp.*, 34 Cal. App. 4th 93, 100 (1995).  Instead of providing the required proof, the District attempts to transform these claims into strict product liability claims by asserting that: (1) a Defendant either owned and/or delivered gasoline to the station at one point in time, and/or (2) the Defendant is cleaning-up the contamination.  Such conduct is insufficient to establish liability, much less as a matter of law.

### A.    *Ownership, operation, or supply is insufficient to establish causation.*

This Court previously held that ownership and supply alone are not enough to establish liability for nuisance.[2]  Defendants' actions "must amount to more than simply the manufacture or distribution of the defective product—rather, a defendant must take other 'affirmative acts'

---

[2]    The District has not alleged that G&M Oil owned or supplied the subject stations.

3

that contribute 'directly' to the nuisance." *In re MTBE*, 457 F. Supp. 2d at 463; *see also City of Modesto Redev. Agency v. Sup. Court*, 119 Cal. App. 4th 28, 38 (2004) ("liability for nuisance does not hinge on whether the defendant owns . . . the property"). Here, the District has not presented any evidence of "affirmative acts" that have contributed "directly" to the contamination. For example, there is no mention of when a release occurred, who operated the site when a release occurred, how large the release was, what the cause of the release was (*e.g.*, customer drive-off, tank over-fill, leaking UST), or any other facts that would suggest—let alone prove—that Defendants took affirmative acts that directly caused the contamination here.

For these same reasons, the District has not established with undisputed evidence that the Defendants' "intentional, reckless, negligent, or . . . ultrahazardous activity" caused any trespass, as required. *See Resolution Trust*, 34 Cal. App. 4th at 100. Similarly, it has not established that Defendants caused any contamination here, as required by the Act. *See* OCWD Act §8(c); *see also Modesto*, 119 Cal. App. 4th at 43 (manufacturers "who merely placed solvents into the stream of commerce without warning adequately" are not liable under the Polanco Act).

At the very least, there exists an issue of fact regarding whether Defendants actually caused the contamination. For example, many of the stations were not operated by Defendants during much or all of the relevant time period.[3] At another site, the District has alleged releases after the Defendant sold the property and USTs. Axline Decl. at ¶13; *see also* DAF ¶ 62. Additionally, numerous third-party station operators testified at their depositions that they understood that *they* were in charge of the stations at issue here and were responsible for handling the gasoline, spills, and leaks.[4] The foregoing evidence raises a factual issue as to

---

[3]   *See, e.g.,* Defs. Add'l R. 56.1 Facts ("DAF") ¶¶ 15, 38, 98, 108, 128, 141.
[4]   *See, e.g.,* DAF ¶¶ 18, 41, 63, 64, 109, 110, 130, 142, 176.

4

whether the non-Defendant operators or someone other than the station owner may have been responsible for the contamination.

**B.    Proof of Defendants' remedial activities is insufficient.**

The District asserts that Defendants are liable for unlimited future damages in tort solely by virtue of the fact that that they are conducting remediation at the sites. Mot. at 16-17. Defendants, however, are meeting their obligations to remediate the sites under agency oversight pursuant to Chapter 6.7 (§§ 25280-25299) of the California Health & Safety Code. Significantly, and unlike the three causes of action at issue in this Motion, Chapter 6.7 does not require proof of conduct causing the contamination before a party can be ordered to take corrective action. Instead, ownership of the USTs alone is sufficient. Cal. Health & Safety Code § 25280.6 ("***Both the owner and the operator*** of [a UST] are responsible for complying with this chapter and if [a UST] is not in compliance with this chapter, ***both the owner and the operator*** of that [UST] are in violation of that requirement.") (emphasis added); *id.* § 25296.10 (corrective action requirement). Here, Defendants are remediating many of the sites solely because they owned the USTs, not because there has been a finding that they caused the contamination. *See, e.g.,* DAF ¶¶ 20, 43. The District therefore cannot circumvent the conduct and causation requirements by relying on Defendants' remediation activities.[5]

**C.    The District's reliance on City of Modesto is unavailing.**

The District relies exclusively on *City of Modesto* for its argument that owning, supplying, or remediating the stations is sufficient to establish liability. Mot. at 3, 17. OCWD grossly misreads the opinion and simply cites to a passage in which the court was itself listing a

---

[5]    Additionally, the goal of remedial statutes is to clean up the contamination. The District's theory, however, would create perverse incentives against remediation because affirmatively remediating would create liability while refusing to do so would not. *See City of Modesto Redev. Agency v. Dow Chemical Co.,* 2005 WL 1171998, at *11 (Cal. Super. Ct., Apr. 11, 2005) (explaining CERCLA's goal of clean up and the incentives used to achieve that goal).

Water Board decision relied upon by the defendants. The court in *City of Modesto* explained that

"*liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance*; the critical question is whether the defendant created or assisted in the creation of the nuisance." *Modesto*, 119 Cal. App. 4th at 38 (emphasis added). There is no evidence here that Defendants created or assisted in the creation of the contamination;[6] therefore, under *Modesto*, the District has not met its burden to establish liability.

II.      **The District Is Not Entitled to Partial Summary Judgment under the Act.**

    *A.      The Act's delineation of investigation and remediation costs.*

       The OCWD Act expressly distinguishes between (a) investigation costs, (b) costs incurred to cleanup, contain, and abate contamination, and (c) costs incurred for "other necessary remedial action" for threatened contamination. Section 8(a) of the OCWD Act addresses the District's investigation powers:

> The district may conduct any *investigations* of the quality of the surface and groundwaters within the district which the district determines to be necessary and appropriate to *determine whether those waters are contaminated* or polluted.

OCWD Act § 8(a) (emphasis added). Section 8(b) addresses the District's ability to clean up, abate, and perform remedial activities in response to actual or threatened contamination:

> The district may expend available funds to perform any *cleanup, abatement, or remedial work required* under the circumstances which, in the determination of the board of directors, is required by the magnitude of the endeavor or the urgency of prompt action needed to prevent, abate, or contain any threatened or existing contamination of, or pollution to, the surface or groundwaters . . . .

OCWD Act § 8(b) (emphasis added). Section 8(c) then defines which costs the District can recover from the party that caused the contamination:

---

    [6]   Nor has the District identified any failures to act by the Defendants that caused a nuisance. Indeed, the evidence establishes that Defendants are cleaning-up the sites and the remediation is working. *See* DAF ¶¶ 20, 43, 71-72, 83-84, 115, 124, 135-36, 147-48, 169, 177.

> *If, pursuant to subdivision (b)*, the contamination or pollution *is cleaned up or contained, the effects thereof abated*, or in *the case of threatened contamination or pollution, other necessary remedial action* is taken, the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the *reasonable costs actually incurred* in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action. . . .

OCWD Act § 8(c) (emphasis added). The statute expressly distinguishes between investigation activities (§ 8(a)), which are not recoverable, and remedial activities (§ 8(b)), which, if the proper findings are made, may be recovered.

**B.     The District has not identified any recoverable costs under the OCWD Act.**

The District does *not* allege or offer any proof that it has "cleaned up or contained" any contamination or that "the effects thereof [were] abated." Instead, it has only identified litigation costs, which at most could be considered investigation costs. Such costs are not recoverable.

In particular, the District identified costs it incurred for (1) its litigation consultants to review publicly available data to create summaries of the sites, and (2) testing its wells for contamination as part of its regular course of business. Mot. at 6-7. As an initial matter, although the District submitted evidence that its Board of Directors purportedly authorized funding for its consultants, the District has not submitted evidence that it has actually incurred either of these costs yet, or that such costs are attributable to the sites in the Motion. OCWD Act § 8(c). Similarly, the District has not allocated any of its alleged costs to any one particular station. DAF ¶¶ 4, 158. The District's OCWD Act claim fails for these threshold reasons.[7]

Additionally, these activities were all undertaken to further this litigation and are not remediation; therefore, they are unrecoverable under the Act. The District's consultant's scope of work explicitly states that the consultant is being used "in support of [this] litigation related to

---

[7]   The District has conceded that this claim does not accrue unless and until "funds are actually expended." Pl.'s Jan. 16, 2007 Supp. Br. re: Statute of Limitations.

7

Methyl tertiary Butyl Ether (MTBE) contamination," not to aid the remediation of the sites. DAF ¶ 5. Consequently, and not surprisingly, their work does not meet the dictionary definition of remedial activities either. Webster's Dictionary defines "remedial" to mean "intended as a remedy" and "remediation" as "the act of remedying."[8] WEBSTER'S NEW NINTH COLLEGIATE DICTIONARY 996 (1986). Creating summaries of the activities of others at these sites has nothing to do with remedying the contamination at the sites, and therefore is not "remedial action."[9] The expert declaration of Lester Feldman confirms this. L. Feldman Decl. ¶ 14, submitted in support of the Opposition. Nor is the regular testing of the District's wells for contaminants considered remedial action.[10] Id. ¶ 16. Indeed, the District's own designated expert Graham Fogg has admitted that these types of activities are not "remediation." DAF ¶ 2.

Furthermore, there is no evidence that the District's consultants' file review has led or will lead to remedial action at these sites. The consultant summaries do not identify any additional remediation actions that need to occur at the sites, or for that matter, find that anything

---

[8] As noted above, if anything, these litigation costs at most could be considered "investigation costs," which still are not recoverable. Webster's defines "investigate" to mean "to observe or study by close examination and systematic inquiry" WEBSTER'S NEW NINTH COLLEGIATE DICTIONARY 636 (1986). Giving the District the benefit of the doubt, that is all the District and its consultants did here—they examined the facts systemically and summarized them. As explained above, investigations costs are not recoverable pursuant to Section 8(c).

[9] The District's "determination" that these costs are actually "other necessary remedial action" should *not* be accorded deference. It is well-settled that an agency's self-serving litigation position should be accorded no deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position [is] entirely inappropriate."). The District has not presented any evidence that it has made a decision outside of this litigation that its alleged activities should be considered "other necessary remedial action" for purposes of the OCWD Act. Even if it had, the very nature of such a "decision" would make it suspect (*i.e.*, because the District can recover "remediation," it will naturally "decide" that every expense is for "remediation"). *See infra* Section V at 23-24.

[10] These testing costs are also not recoverable because the California Department of Public Health requires the District's customers to perform this routine testing, and therefore they are not directly attributable to the alleged MTBE contamination. DAF ¶ 3.

8

else is needed at all. Feldman Decl. ¶ 12. Similarly, there is no evidence that these reports were submitted to the regulators overseeing the remediation at these sites or to other involved parties so that the remedial strategy could be improved. Quite the contrary, there is evidence that the District has not even spoken to the regulators about any specific sites.[11] Moreover, there is no evidence that the District has done anything with these consultant reports outside of this litigation. These costs are simply not "remedial."

Even if these costs could be classified as "other necessary remedial activity" costs—as the District claims—they would not be recoverable here because such costs are only recoverable for threatened contamination. *See* OCWD Act §§ 8(b) and (c). The District has repeatedly claimed that this is a case about ***actual*** contamination. The District's Motion itself alleges (incorrectly) with respect to its nuisance claim that the Defendants have acknowledged "responsibility for, and control over, MTBE in the groundwater" at each of the subject sites. *See* Mot. at 17. If the MTBE is in the groundwater, then this is not a threatened contamination case. And the District admitted that this was an actual contamination case when it hired Komex in 2005, expressly charging it to identify MTBE release sites with "significant groundwater contamination problems"—*i.e.*, contamination that already existed. DAF ¶ 5. This case has never been about threatened contamination; thus, the District cannot recover costs for "other necessary remedial action" even if its investigation costs could be considered as such.

The District may claim that the contamination "threatens" water *offsite*, but that mere allegation would be insufficient to establish summary judgment liability. The District has brought forth no evidence concerning whether any alleged offsite contamination is above the MCL or that the contamination on these sites is a threat to any drinking water offsite. Indeed, the

---

[11] *See, e.g.,* DAF ¶¶ 23, 46, 65, 79, 90, 101, 112, 119, 132, 144, 151, 162, 169, 177.

9

summary judgment evidence establishes that the remediation at each site is being overseen by the proper regulators and is working.[12]  At a minimum, there is a fact issue in this regard.

Because this is an actual contamination case, a person is only liable to the District for "the reasonable costs actually incurred" by the District if it actually "cleans up, contains, or abates" the contamination. *See* OCWD Act § 8(c).  There is no evidence that the District has spent a dime on these activities.  The District has not, for example, submitted evidence that shows that it has removed contaminated dirt at any of these sites, that it has used remediation to remove MTBE from groundwater, or that it has installed any filtration systems at any drinking water wells.  The District's Motion on its OCWD Act claim fails for this additional reason.[13]

### C.  The costs the District has identified are unnecessary and unreasonable.

The plain text of the OCWD Act requires that "other remedial action" be "necessary" before liability can attach, and then the costs at issue must be "reasonable."  OCWD Act § 8(c). The District's consultants, however, simply regurgitated information that was already in reports Defendants filed with the other regulators.  Feldman Decl. ¶ 11.  To say the least, there is a fact issue as to whether this was necessary or reasonable.  Indeed, if the District thought such summaries of the remediation history would somehow help the remedial efforts, then it should have coordinated with the regulatory agencies overseeing the remediation to get them, as is required.[14]  *See id.* at ¶ 13.

---

[12]  *See* DAF ¶¶ 20, 43, 71-72, 83-84, 115, 124, 135-36, 147-48, 169, 177.

[13]  At a minimum, there is a fact issue as to whether these costs are litigation costs, investigation costs, or other remedial action costs, which precludes summary judgment.

[14]  The District's Memorandum of Understanding ("MOU") with the Regional Board requires it to "coordinate with [the Regional Board] regarding any investigations, actions or activities" related to contamination or threatened contamination.  Feldman Decl. ¶ 13 (citing the MOU ¶ 6).  There is no evidence the District did, which further indicates that its costs are litigation costs, and not remedial, necessary, or reasonable. *Id.*

10

The District cannot even contend that its costs were necessary and reasonable because the District itself has not made that determination at any site. Its testimony for Chevron #9-1921 is representative of the sites at issue:

> Q.   So on Station 1921, can the contamination that has escaped from the site be cleaned up at a reasonable cost?
>
> ***
>
> A.   It depends on what you mean by "reasonable cost." It can be cleaned up. It can be cleaned up for a cost. Whether the cost is reasonable is very subjective. In this case we don't know the extent of the contamination. We're unsure of the extent of the contamination. We don't know the degree of the contamination. That's why we're investigating it. And once we're able to collect information that will allow us to—to decide on what size remediation system or what technology to apply, then we would have a better answer. But at this stage, we don't know.

Dep. of D. Bolin (Aug. 19, 2010) at 604:7-605:1, Ex. 1.[15] The District admits that whether its costs are reasonable is a subjective, fact-intensive inquiry that cannot be evaluated at this stage. (It likewise admits that it is "investigating it.") This fact issue precludes summary judgment.

There is similarly no proof that the costs are necessary. As Defendants' evidence proves, Defendants are currently remediating the sites under regulatory oversight, and the District admits that if this process is allowed to proceed, then it can provide the full relief the District seeks in this lawsuit.[16] There is likewise no evidence that any additional action by the District is necessary or would accomplish anything. Indeed, the reasonable inference is that, as a result of this oversight, no additional work is necessary at this time.[17] See Feldman Decl. ¶ 18; Jan. 17, 2006 Paprocki Tr. at 125:20-126:22, 192:18-194:21, Ex. 48.

---

[15]   See also DAF ¶¶ 25, 47, 69, 80, 89, 100, 111, 114, 118, 121, 131, 141, 169. All cited exhibits are attached to the Declaration of Jeremiah Anderson (Mar. 15, 2011).

[16]   See DAF ¶¶ 20, 43, 71, 83, 90, 101, 115, 124, 135, 147, 169, 177; Jan. 10, 2006 Herndon Tr. at 385:2-22, Ex. 47.

[17]   As noted above, OCWD's litigation consultants have not identified a single act of remediation or regulatory oversight that should have been done differently. Feldman Decl. ¶ 11.

While the costs the District incurs in cleaning up or abating contamination (which costs

Defendants dispute the District has incurred) are presumed to be necessary and reasonable, those

are rebuttable presumptions.  OCWD Act § 8(c); Cal. Evid. Code § 601.  Defendants have

rebutted them and met their burden of proof with Mr. Feldman's declaration, their site-specific

evidence, and the District's own repeated admissions.  *See* Cal. Evid. Code § 606.  There is now

a fact issue as to whether the District's costs were necessary and reasonable, which must be

resolved in Defendants' favor at this stage, precluding summary judgment.  *See Golden Pac.*

*Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004) ("the court must credit the non-moving

party's evidence and draw all justifiable inferences in favor of that party"); *Haycock v. Hughes*

*Aircraft Co.*, 22 Cal. App. 4th 1473, 1491-92 (1994) (holding that evidence conflicting with

presumption requires issue to be presented to jury).

**D.      The District's reliance on other remedial statutes is misplaced.**

The District tries to sidestep these critical issues and its lack of evidence by borrowing

heavily from definitions in, and cases interpreting, other statutes that address remediation, and in

particular CERCLA.  Mot. at 9-11.  It claims that CERCLA and similar statutes include

investigation costs in "remedial action" and allow declaratory judgments for future costs, and

therefore this type of relief is also available under the OCWD Act.  *Id.*  Not so.

The remedial statutes the District cites are not *in pari materia* to the OCWD Act, because

the OCWD Act is not a broad remedial statute, as the District contends.  A comparison of

CERCLA and the OCWD Act demonstrates this.  CERCLA is the federal statutory scheme that

addresses contamination and cost recovery.  It is "a broad remedial measure aimed at assuring

the prompt and effective cleanup of waste disposal sites."  *See Adobe Lumber, Inc. v. Hellman,*

12

658 F. Supp. 2d 1188, 1192 (E.D. Cal. 2009) (quotations and citations omitted).[18]  Its name alone—the Comprehensive Environmental Response, Compensation, and Liability Act—is indicative of its broad purpose and goal.  An entire chapter of the U.S. Code is devoted to it. That chapter contains 44 expansive sections, creating a complex response and remediation system that promotes and effectuates the clean up of contaminated sites.  And it allows recovery of "response costs," not the narrower "remediation" costs in the OCWD Act.

Conversely, the OCWD Act is not a remedial statute.  It creates and defines the District— a unique agency in a single county in California—and how it operates on a daily basis.  It contains over 110 enumerated sections and countless subsections that define the District's geographic boundaries, explain the Board of Directors' powers, and discuss a myriad of operational topics such as rates, bonds, and maximum debt load.  Only one section discusses actions the District can take to address contamination, and only one subsection addresses recoverable remediation costs.  The OCWD Act is therefore not *in pari materia* to CERCLA.

The cases the District cites for the proposition that CERCLA is *in pari materia* with the OCWD Act are clearly distinguishable.  For example, although *Kendall-Brief Co. v. Superior Court* (Mot. at 10) states broadly that statutes concerning the same topic should be interpreted together, it was interpreting two consecutive sections in the same code.  60 Cal. App. 3d 462, 466 (1976).  Similarly, *Clean Air Constituency v. California State Air Resources Board* (Mot. at 10) was interpreting sections within the same act.  11 Cal. 3d 801, 814 (1974).  Neither case was interpreting two disparate statutes enacted for different purposes with minimal overlap.[19]

---

[18]  *See also* EPA Website, http://www.epa.gov/superfund/policy/cercla.htm (CERCLA was enacted to provide "broad Federal authority to respond directly to releases or threatened releases of hazardous substances that may endanger public health or the environment").

[19]  The other cases the District cites for its *in pari materia* argument are similarly distinguishable.  *See, e.g.*, *Nixon-Egli Equip. Co. v. John A. Alexander Co.*, 949 F. Supp. 1435,

Furthermore, even if the Court were to consider the OCWD Act and CERCLA together, CERCLA's provisions on recovery for investigation costs and the availability of declaratory judgments for future costs would not change the plain language of the OCWD Act, which clearly prohibits such relief. As the Supreme Court has recognized, "in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* at 254 (internal quotations and citations omitted). Here, the plain language of the Act prohibits the District from recovering litigation and investigation costs, and the Court's inquiry should therefore be complete.

Likewise, CERCLA's inclusion of provisions for injunctions and declaratory judgments for future costs does not change the fact that the OCWD Act does not allow the District to recover costs until they are incurred and that the OCWD Act does *not* contain a declaratory relief provision. Courts have recognized that "[a] declaratory judgment allocating liability for costs to be incurred in the future is a unique creature of CERCLA," and have refused to allow this remedy under the Declaratory Judgment Act when the CERCLA provision is unavailable. *See, e.g., A. Shapiro & Sons, Inc. v. Rutland Waste & Metal Co.*, 76 F. Supp. 2d 82, 88-89 (D. Mass.

---

1441 n.5 (C.D. Cal. 1996) (acknowledging that the HSAA is interpreted consistent with CERCLA only because the HSAA is CERCLA's "California counterpart" unlike the OCWD Act); *Isobe v. Unemployment Ins. Appeals Bd.*, 12 Cal. 3d 584, 590 (1974) (construing two sections of the same code where one section specifically referenced the other); *Johnston v. Sonoma County Agric. Pres. Info. Ctr. & Open Space Dist.*, 100 Cal. App. 4th 973, 986 (2002) (construing the interplay between two statutes to determine which applied to a transfer of open-space land); *Envtl. Prot. Info. Ctr. v. Johnson*, 170 Cal. App. 3d 604, 615 (1985) (analyzing two sections of the same code, which supplemented each other); *Natural Res. Def. Council v. Arcata Nat'l. Corp.*, 59 Cal. App. 3d 959, 965 (1976) (similar).

14

1999).  At least one California court has applied this reasoning to reject an attempt by the District to obtain CERCLA—like remedies under the OCWD Act.  In *OCWD v. Sabic Innovative Plastics US, LLC, et al.*, the court granted Defendants' demurrer to the District's claim for future costs under the OCWD Act, holding:

> The First Cause of Action is not for declaratory relief.  It seeks costs that will be incurred in the future and all past, present and future response costs as well as damages to natural resources.  *Section 8 (c)* is clear.  Plaintiff can only recover costs it has already incurred for clean up, containing or abating the contamination or other remedial acts taken.  The First Cause of Action is uncertain in that it appears to seek costs which may be incurred in the future.  Those are not recoverable.

Orange County Superior Court Case No. 30-2008-00078246, Notice of Ruling (Oct. 20, 2008), Ex. 49 (emphasis in original).[20]  *Sabic* is consistent with the statutory construction canons discussed above and the plain language of the OCWD Act.  It makes clear that the District cannot shoehorn the relief available under CERCLA into its OCWD Act claim when such relief is contrary to the express language of the OCWD Act.[21]

The District's approach is also fundamentally unfair.  The District seeks to establish liability despite incurring virtually no costs and simply having some consultants re-review the Regional Board's files.  This does not allow the Court or Defendants the opportunity to evaluate the District's liability claim in the context of actual remediation expenditures at any site.

---

[20]   *See also* Notice of Ruling (Feb. 12, 2009) (granting the defendants' motion to strike the District's amended complaint alleging declaratory relief as to defendants' liability under the OCWD Act for future remediation costs), Ex. 50.

[21]   The District's apparent argument that CERCLA and the OCWD Act are similar because the District can obtain declaratory relief pursuant to California Code of Civil Procedure § 1060 (the "Declaratory Judgment Act") is a red herring.  Mot. at 14-15.  As the District concedes and the name suggests, the Declaratory Judgment Act is separate and distinct from the OCWD Act, so it should not affect how the Court analyzes the OCWD Act.  Furthermore, the OCWD Act is a specific statute and therefore controls over the Declaratory Judgment Act, which is a general statute.  *See United Farm Workers v. Superior Court*, 72 Cal. App. 3d 268, 272 (1977).

## III.   Additional Fact Issues Preclude Summary Judgment on Nuisance and Trespass.

### A.   *An issue of fact exists on substantial and unreasonable interference.*

The law in California is well settled that contamination must interfere both "substantially" and "unreasonably" with a plaintiff's use of the property before a nuisance exists. *See County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 305 (2006). The District, however, has no evidence of either.[22] The District has not, for example, alleged that the contamination at the sites has prevented it from using the water. The District has merely alleged the highest current MTBE detections in groundwater at the sites, but it has failed to identify the depth from which those water samples were drawn. Not surprisingly, each monitoring well that the District identified with an MTBE detection draws from the shallow aquifer,[23] and the District has conceded that the water in the shallow aquifer is already unusable. *See* Herndon Decl. (Feb. 28, 2007), Ex. 12, at ¶ 3 ("shallow groundwater at service station sites . . . is simply not useable drinking water"). Indeed, the District previously submitted a declaration claiming that "virtually all drinking water wells within the District's area draw from several hundred feet below ground surface, and *certainly none draw water from shallow depths close to service stations.*" *Id.* (emphasis added). The contamination at the sites has therefore not interfered with the District's use of any drinking water.[24] Nor has the District introduced any evidence that it uses the shallow groundwater surrounding these stations for any other activity, including its recharge activities.

---

[22]   To establish a "substantial" interference, the District must prove "significant harm, defined as a real and appreciable invasion of [the District's] interests, one that is definitely offensive, seriously annoying or intolerable." *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 1105 (1997) (internal quotations omitted). Similarly, "the unreasonableness of a given interference represents a judgment reached by comparing the social utility of an activity against the gravity of the harm it inflicts, taking into account a handful of relevant factors." *Id.*

[23]   *See* DAF ¶¶ 7, 28-29, 48, 49, 73-74, 85-87, 94, 96, 97, 105, 116-17, 125-26, 137-39, 149-50, 173-74, 180-81.

[24]   At a minimum this declaration—from the District—creates a fact issue as to whether the contamination is substantially and unreasonably interfering with the District's rights.

Consequently, because the contamination around these stations has not interfered with the District's use of water, let alone "substantially" or "unreasonably" interfered, the contamination cannot support its claim for nuisance.

The District's apparent response to the complete lack of evidence of substantial and unreasonable interference is to claim that the Court already found a nuisance at each site when it "found that the District had been appreciably harmed by MTBE above the MCL in groundwater." Mot. at 16. The District's contention overstates the Court's earlier ruling and the current facts at these stations. First, and most importantly, the Court's finding that the District had suffered injury for purposes of the statute of limitations does not mean that the Court determined such injury constitutes a nuisance. That ruling and the briefing leading up to it simply acknowledged that under the District's own theory of the case, its claims were time barred. *See In re MTBE Prod. Litig.*, 676 F.Supp.2d 139, 148-49 (S.D.N.Y. 2009).[25] As a result, the Court's prior opinion is not determinative of whether a nuisance exists. Second, to the extent the Court made any ruling on this issue, it certainly did not make a finding that the contamination *substantially and unreasonably interfered* with the District's use of the water as a matter of law. Third, the Court did not determine who caused the MTBE to be present in the groundwater above the MCL. There was no evidence before the Court then, just as there is no evidence on that point now (*see* Section I). Fourth, the District has conceded that several of the stations at issue here no longer have detections above the secondary MCL, so even under the District's own theory, there is no nuisance here. *See, e.g.*, Pl. R. 56.1 Stmt. ¶ 56; DAF ¶ 106, 126, 140.

---

[25]   *See also, e.g.*, Dfs. 2008 Sec. Supp. Br. in Support of Mot. for Sum. J. at 3 n.2 ("Throughout their briefing of this motion, including the current brief, Defendants have emphasized that their references to the District's 'injuries in fact' do not concede that the District has ever suffered any actual injury, that its purported injuries constitute legally cognizable harm, or that the District's claims are meritorious in any respect.").

Because the District has no evidence indicating that the contamination under these stations is a substantial and unreasonable interference with its use of the water, it simply relies on the fact that MTBE is in the groundwater. The case law holds that is not enough. *See, e.g., Beck Dev. Co., Inc. v. S. Pac. Transp. Co.,* 44 Cal. App. 4th 1160, 1207 (1996) (explaining that the determination of a nuisance "requires consideration and balancing of a variety of factors" and finding contamination was not a nuisance); *Shields v. Wondries,* 154 Cal. App. 2d 249, 255 (1957) (stating nuisance "depends upon the facts of each particular case"); *McIntosh v. Brimmer,* 68 Cal. App. 770, 777 (1924) ("No hard and fast rule controls [whether a nuisance exists]."). Accordingly, the mere presence of contamination is but one factor for the Court to consider when analyzing whether contamination rises to the level of a nuisance. For the multiple reasons discussed in this brief, the contamination does not rise to that level.

The cases the District cites otherwise are distinguishable. For example, the District cites *Western States Petroleum,* which upheld the secondary MCL and found that certain consumers may be able to detect MTBE at that level. *See* Mot. at 16. This case had nothing to do with nuisance. *W. States Petroleum Ass'n v. State Dep't of Health Servs.,* 99 Cal. App. 4th 999 (2002). The District also cites *State of California v. Campbell* for the statement that "polluted water is a public nuisance" (Mot. at 16, 19), but that court in the very same sentence noted that only persons that "create[] or help[] create the nuisance" will be *liable* for nuisance. 138 F.3d 772, 782 (9th Cir. 1998). There, the record was replete with evidence that the defendant had actively dumped pollutants on the ground for 20 years. *Id.* at 774-75. OCWD has presented no such evidence here. And in *Campbell,* the State there was trying to obtain on order cleaning-up the property in question and had traced contamination for the site to a drinking water well. *Id.* Here, OCWD seeks to clean up alleged offsite contamination, but has submitted no evidence

concerning offsite contamination or impact to drinking water supplies.  In sum, because there is a fact issue as to whether the alleged contamination at the sites substantially and unreasonably interferes with the District's rights, summary judgment must be denied.[26]

### B.      The District's alleged usufructuary rights are subordinate to other water users.

A trespass is "an invasion of the interest in the *exclusive* possession of land." *Rancho Viejo LLC v. Tres Amigos Viejos LLC*, 100 Cal. App. 4th 550, 562, n.5 (2002) (emphasis added). California's definition of trespass is "considerably narrower" than its definition of nuisance. *Id.*; *see also* 5 WITKIN § 693 ("Trespass protects the possessor's interest in exclusive possession of property, while nuisance protects the use and enjoyment of property.").  The District's usufructuary right to water—to the extent it has one[27]—is subordinate to other water users, and as such, the District does not have exclusive control of the water and cannot assert a trespass claim.  In California, the right of property in water "is usufructuary, and consists not so much of the fluid itself as of the advantage of its use." *Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 441 (1983).  "Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive." *City of Barstow v. Mojave Water Agency*, 23 Cal. 4th 1224, 1240 (2000).  An overlying right "is the [land] owner's right to take water from the ground underneath

---

[26]   The District's trespass claims fail for the same reason.  The District has not established, as it must, that the contamination has interfered with its possessory interest in the groundwater (if any).  *See* 5 WITKIN, SUMMARY OF CALIFORNIA LAW: TORTS § 693 (10th Ed. 2005) ("WITKIN").  As explained above, there is no evidence that the contamination in the shallow groundwater has interfered with the drinking water in the District's territory, the District's purported recharge activities, or any legitimate activity of the District.

[27]   Defendants dispute that the District has established that it has a usufructuary right to the groundwater.  While the Court previously stated that "OCWD has acquired a usufructuary right through its replenishment activities," that statement was based upon a limited factual record because full discovery had not yet commenced.  457 F. Supp. 2d at 461.  As the case has developed, it has become clear that even if the District possessed a usufructuary right in the groundwater, it has not exercised that right and does not intend to with respect to the shallow groundwater.  *See* Herndon Decls. (Jan. 16, 2007 and Feb. 28, 2007), Exs. 12, 51 (noting that OCWD does not use the shallow groundwater near the stations).

19

for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto." *Id.*

Conversely, an "appropriative right" is based on the taking of groundwater. *Cent. & W. Basin Water Replenishment Dist. v. S. Cal. Water Co.*, 109 Cal. App. 4th 891, 906 (2003). A person with "overlying rights has rights superior to that of other persons who lack legal priority," including those with appropriative rights. *City of Barstow*, 23 Cal.4th at 1240. The right of an appropriator is thus subordinate to an overlying right holder. This is true for groundwater rights even if the overlying right holder is not exercising his right. *See Wright v. Goleta Water Dist.*, 174 Cal. App. 3d 74 (1986) (holding appropriative rights have a lower priority than an overlying owner's unexercised rights).

Here, the District holds neither overlying nor appropriative rights. Thus, the District's rights in the groundwater are subordinate to the State (acting pursuant to the public trust),[28] any overlying right holders (such as the Defendants as owners of the sites), and the purveyors that actually pump the water out of the ground and provide it to customers. *See City of Barstow*, 23 Cal. 4th at 1241 ("Proper overlying use . . . is paramount and the rights of an appropriator must yield[.]"); *see also Wright*, 174 Cal. App. 3d at 87 ("Private property rights in water fall before decisions made pursuant to the public trust doctrine[.]"). As a result, the District does not have exclusive (or even primary) possession of the property interest allegedly affected by the MTBE, and cannot assert a claim for continuing trespass.[29] *See Rancho*, 100 Cal. App. 4th at 562 n.5.

---

[28] The State of California "owns all of the groundwater in California." *Cent. & W. Basin*, 109 Cal. App. 4th at 905.

[29] If the District claims to possess "appropriative" rights (*see* Cal. Water Code. § 40-2), it has abandoned any such rights by failing to exercise them. *Nicoll v. Rudnick*, 160 Cal. App. 4th 550, 556 (2008) ("Appropriative rights are subordinate to the rights of riparian owners and prior appropriators, and may be lost by nonuse."); *see also* 12 WITKIN: SUMMARY OF CALIFORNIA LAW: REAL PROPERTY § 954 (10th ed. 2005) ("the appropriator forfeits the right to take the water

IV.     **The District Failed to Show that the Alleged Nuisance and Trespass Are Continuing.**

The Court's statute of limitations ruling dismissed the District's claims for "permanent nuisance" and "permanent trespass" at the vast majority of sites in this case.  The District is therefore left with only claims for continuing nuisance and trespass, which require that the District show that the contamination is "reasonably" abatable.[30]  The District has presented no evidence on abatability—neither onsite nor offsite—let alone on *reasonable* abatability.  In fact, the District admittedly does not even know the extent of the contamination, has not delineated it onsite or offsite, and has not even determined whether additional remediation is necessary, or if so, what type of remediation would be appropriate.  As a result, reasonableness cannot even be evaluated.  *See* Feldman Decl. ¶ 19.  According to the California Supreme Court, the District has thus failed to meet its burden.[31]  *Mangini*, 12 Cal.4th 1087 at 1103 (because the plaintiff failed to present evidence of the extent of the contamination or the remediation costs, there was "no substantial evidence that the nuisance is abatable"); *see also McCoy, v. Gustafson*, 180 Cal. App. 4th 56, 85-86 (2009) (if plaintiff fails to establish abatability then "that plaintiff has failed to prove [its] claims of continuing nuisance and trespass").

---

by abandonment or nonuse").  To borrow language from the California Supreme Court, "the water was open [for OCWD's] appropriation . . ., [but] the acts of [OCWD] never amounted to a valid appropriation."  *Cardoza v. Calkins*, 117 Cal. 106, 112 (1897).

[30]     *See Mangini v. Aerojet-General Corp.*, 12 Cal.4th 1087, 1095 (1996) (holding that judgment notwithstanding the verdict was proper because *plaintiff* failed to meet its burden and prove continuing nuisance); *Beck Dev. Co.*, 44 Cal. App. 4th at 1217 ("A plaintiff cannot simply allege that a nuisance is continuing . . . but must present evidence that under the circumstances the nuisance may properly be considered continuing[.]").

[31]     Additionally, whether a nuisance or trespass is continuing is a factual question and inappropriate for summary judgment where there are factual disputes over its characterization. *Shamsian v. Atlantic Richfield Co.*, 107 Cal. App. 4th 967, 980 (2003) (holding that triable issue regarding whether alleged nuisance was permanent or continuing barred summary judgment); *Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1147 (1991) (whether a trespass is permanent or continuing is a question of fact).

21

Instead of presenting actual evidence on abatability, the District presents three novel

arguments.  *First*, it argues that the contamination at the sites must be abatable because the

Defendants are remediating it.  Mot. at 22.  This argument is nonsensical.  The District

apparently claims that more remediation is needed, but there is no proof in the record that any

***additional*** remediation activities are reasonable or feasible.  Feldman Decl. ¶ 19.  Indeed, if the

District's argument were true, then continuing nuisance would always be available at a site

undergoing remediation because the nuisance would always be reasonably abatable.  *See Beck*,

44 Cal. App. 4th at 1220 ("Since a defendant could literally be ordered to move mountains to

abate a nuisance, virtually everything can be said to be abatable if all other considerations are

disregarded.").  Furthermore, the District's damages are based on alleged MTBE that has

escaped remediation at the sites,[32] and under the District's own theory, the Defendants' remedial

activities at the sites have no effect on the contamination that has allegedly escaped.

*Second*, the District claims that because the Defendants' Answers state that MTBE can be

remediated, it has shown abatability.[33]  Mot. at 22.  Again, this argument is illogical.  While

contamination may be remediated at a site, it does not necessarily mean that in every case the

contamination can be *reasonably* abated.  And again, the District's argument does not address

the alleged offsite contamination that is the focus of its case.  To establish abatability, the District

must establish that any work it proposes (as opposed to the work that is already ongoing) is

reasonable as to both scope and cost.  Furthermore, California has adopted a set of policies,

guidelines, and procedures that allow for cost-effective regulatory action, which permit

---

[32]  *See, e.g.,* Mot at 4, n. 4; *see also* Jan. 16, 2007 Herndon Decl. at ¶6. Ex. 51 ("The District
has no reason to take action in response to a release of gasoline containing MTBE . . . if the
Regional Board or local oversight agency has ordered or undertaken remedial efforts at the
site.").
[33]  Not all of the Defendants' Answers make this statement.  For example, G&M Oil's
Answer did not assert that the alleged contamination can be remediated.

regulators to conclude that active abatement is *not* reasonable or necessary in certain circumstances. Feldman Decl. ¶ 17. As a result, whether to remediate and to what levels are entirely site-specific questions, and the District has offered no site-specific evidence that remediation beyond what is already being done is reasonable or achievable.

*Third*, the District argues that *it* has made the determination that the nuisance "can and should be abated" and therefore it is so. Mot. at 22-23. The District, however, points to no evidence that indicates that it has determined the contamination can be reasonably abated. Instead, it cites to the March 23, 2005 Board of Director Minutes that loosely state that funds should be expended "to perform investigation, cleanup, abatement, and remedial work to address MTBE." *See* Axline Decl., Ex. 1. This is not a determination that MTBE can be abated, and certainly not a determination that the MTBE at these particular sites reasonably can be abated. Indeed, the Board of Director Minutes were adopted at a time when the District's consultants had not even prepared the rudimentary summaries of the sites.[34] The District's boastful rhetoric that "there is no genuine issue of material fact that the District has determined that the nuisance is abatable" simply is not true and is belied by its own testimony.[35]

The District also incorrectly claims that this alleged determination of abatability should be given deference. Mot. at 23. Although courts give certain agency factual decisions some deference, that deference is not absolute and not appropriate under these circumstances. Here, there is no evidence that the District has made an agency determination that the contamination at

---

[34] *See* Komex and Hargis Summaries, Axline Decl. Exs. 4, 6, 9, 11, 13, 15, 17, 19, 21, 23, 26, 29, 32, 34.

[35] The District's 30(b)(6) witnesses testified consistently that the District does not even know what type of remediation system is needed at the sites (if any). *See* DAF ¶¶ 25, 47, 69, 80, 89, 100, 111, 114, 118, 121, 131, 144, 169. The District cannot have determined that the sites are reasonably abatable, when it has not even determined what type of remediation should occur. Feldman Decl. ¶ 19.

the sites is reasonably abatable.  Rather, the District is advancing for the first time a purported factual finding on one of the elements of its legal cause of action, and as such, the finding should be accorded no deference.  ***"Deference to what appears to be nothing more than an agency's convenient litigating position [is] entirely inappropriate."***  *Bowen*, 488 U.S. at 213 (refusing to defer to agency's "litigating positions that are wholly unsupported by regulations, rulings, or administrative practice"); *Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007) (same).

Once again, the District's cases purportedly finding otherwise are easily distinguishable.  For example, in *Wilshire Westwood Associates*, the Department of Health Services' "finding" at issue was *not* that a nuisance was abatable, but instead that the "cleanup of the gasoline spill had been adequate and complete, and that appellants could proceed with their construction project."  *Wilshire Westwood Assoc. v. Atlantic Richfield Co.*, 20 Cal. App. 4th 732, 745 (1993).  The Court certainly did not defer to the agency's statement that it had satisfied an element of a legal claim, as the District is asking the Court to do here.  Similarly, *Sonoma County Water Coalition* simply holds that a court will give an agency's action under its governing statute deference.  *See Sonoma County Water Coal. v. Sonoma County Water Agency*, 189 Cal. App. 4th 33, 40 (2010).  Here, however, the issue is not whether the District could hire its consultants to review the public filings; rather it is whether the District's legal pronouncement in furtherance of a cause of action it has asserted is entitled to deference.  It is not, and *Sonoma* does not suggest otherwise.  Deference is simply inappropriate here.[36]

---

[36]  If the Court believes that deference to the District's legal "findings" is appropriate, then the Court must review those findings using a substantial evidence standard.  *Vineyard Area Citizens for Resp. Growth, Inc. v. City of Rancho Cordova*, 40 Cal.4th 412, 435 (2007).  The substantial evidence standard requires a court to defer to an agency's factual findings if they are supported by substantial evidence.  *County of San Diego v. Assessment Appeals Bd. No. 2*, 148 Cal. App. 3d 548, 555 (1983).  The District, however, has cited no evidence that would support an abatability finding here, let alone substantial evidence.  *See McCoy*, 180 Cal. App. 4th at 66.

24

## V.   The District Has Failed to Negate Defendants' Affirmative Defenses.

An independent ground upon which the District's motion must be denied is the fact that the District has not addressed Defendants' numerous affirmative defenses that go to the issue of liability.  It is the District's burden to show that there is no material issue of fact with respect to each affirmative defenses.  The District has not even averred that there is no genuine issue of fact as to any of the affirmative defenses, let alone cited to evidence that establishes there is no material issue of fact.[37]  *U.S. v. Ownbey Enters., Inc.*, 789 F. Supp. 1145, 1151-52 (N.D. Ga. 1992) ("[T]he burden is on Plaintiff, as the moving party, to show the absence of evidence which supports an essential element as to each of Defendant's affirmative defenses, before Defendant even has to come forward with evidence establishing that a material question of fact exists as to those defenses.").[38]  The Motion therefore must also be denied because the District failed to meet this basic requirement.[39]

---

[37]   A basic review of Defendants' defenses show that the District has not met its burden here.  For example, Defendants have pled and previously presented evidence that the District's claims are preempted by federal law.  While this Court denied summary judgment on preemption, the Court has recognized that Defendants can still argue preemption at trial.  *See In re MTBE Prods. Litig.*, 739 F. Supp. 2d 576, 598-601 (S.D.N.Y. 2010).  Because all inferences must be resolved in Defendants' favor, this affirmative defense defeats the Motion in its entirety.  *See Frankel v. ICD Holdings S.A.*, 930 F. Supp. 54, 65 (M.D. Ala. 1996) (noting that an affirmative defense "viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense.").  Defendants' Additional Rule 56.1 Facts identifies additional affirmative defenses that are applicable here.  *See, e.g.*, DAF ¶¶ 12, 58, 88, 107, 127.  Defendants reserve their right to present evidence supporting these and additional affirmative defenses at trial.

[38]   *See also Navistar Intern. Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 786388, *1-2 (N.D. Ill. Nov. 6, 1998) ("[Movants] failed to meet their burden regarding [non-movants'] affirmative defenses.  They failed by simply ignoring those defenses.")

[39]   The District's Motion seeks partial summary judgment for these three claims—nothing less—and therefore if the Court denies the Motion, it should not enter an alternative order granting lesser relief.  While Defendants acknowledge that Rule 56 allows the Court to make a finding that a material fact is not genuinely in dispute, the comments make clear that a Court should do so with caution.  Fed. R. Civ. P. 56(g), advisory com. note to 2010 amendment.  Here, Defendants have not been given notice of what the lesser relief would consist, and so have not a fair opportunity to present conflicting evidence.  *See id.*

Respectfully submitted,

Robert E. Meadows
Jeremiah J. Anderson
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone:  (713) 751-3200
Facsimile: (713) 751-3290

Charles C. Correll, Jr.
King & Spalding LLP
101 Second Street, Suite 2300
San Francisco, CA  94105
Telephone:  (415) 318-1200
Facsimile: (415) 318-1300

Richard E. Wallace, Jr.
William F. Hughes
Wallace King Domike & Branson PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone:  (202) 204-1000
Facsimile:  (202) 204-1001

*Attorneys for Defendants Chevron U.S.A. Inc. (individually and d/b/a Chevron Products Co. and Chevron Chemical Co.), Chevron Corporation (f/k/a ChevronTexaco Corporation), Unocal Corporation, and Union Oil Company of California*

26

**Certificate of Service**

I hereby certify that on March 15, 2011 a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

Jeremiah J. Anderson

### ATTACHMENT A
### Opposition to Motion for Summary Judgment
#### *Defendants Joining in Opposition*

Chevron U.S.A. Inc
Chevron Corporation
ExxonMobil Corporation
ExxonMobil Oil Corporation
Atlantic Richfield Company
BP Products North America, Inc.
BP West Coast Products LLC
ConocoPhillips Company, as successor-in-interest to defendant Tosco Corporation and Phillips
     Petroleum Corporation
Shell Oil Company
Equilon Enterprises, LLC
TMR Company
Union Oil Company of California
Unocal Corporation
G&M Oil Company

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:  Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**MDL No. 1358**
**Master File C.A. No.**
**1:00-1898 (SAS)**

---

**This document relates to the following case:**
*Orange County Water District v. Unocal, et al.,*
Case No. 04 Civ. 4968

---

**DECLARATION OF ROY HERNDON IN SUPPORT OF PLAINTIFF ORANGE COUNTY WATER DISTRICT'S RESPONSE TO COURT'S ORDER TO SHOW CAUSE WHY PARTIAL SUMMARY JUDGMENT SHOULD NOT BE GRANTED TO DEFENDANTS WITH RESPECT TO OCWD ACT CLAIMS FOR INVESTIGATORY COSTS AND TRESPASS CLAIMS**

My name is Roy Herndon and I am the Chief Hydrogeologist for the Orange County Water District.  I submit this declaration in response to the Court's opinion and Order to Show Cause dated June 20, 2011.

1.      The declaration addresses off-site migration of MTBE at the fourteen stations addressed in the Court's opinion: Arco # 1887; Arco # 1905; Chevron # 9-5401; Chevron # 9-1921; Mobil # 18-JMY; Mobil # 18-G6B; Shell # 6502; Texaco # 121681; Unocal # 5792; Unocal # 5226; Unocal # 5376;  Unocal # 5123;  G&M Oil # 4; and G&M Oil # 24.  At each of these stations significant amounts of MTBE have been migrating off site in groundwater for years.  Each of the stations is located within a pumping depression (capture zone) created by major production wells serving drinking water to residents within the Orange County Water District's service area.  Sampling by OCWD's laboratory has detected MTBE in one or more production wells within each of these pumping depressions.  Although the levels detected to date are low, within the last four years these MTBE detections have become more frequent, and in a number of wells the levels detected have shown a steadily increasing trend for the last three years.

2.      The declaration also addresses the process followed by the District to remediate MTBE that has migrated off-site and that threatens public drinking water supplies.   The District has considerable experience with designing and installing remediation systems to treat off-site contamination and protect groundwater used for domestic water supplies.  It is almost always less expensive to remediate groundwater contamination before contamination reaches production wells.  As explained below, the District has advanced beyond the investigation stage with respect to each of the fourteen stations and is currently evaluating specific design and treatment recommendations to remediate MTBE at each of the fourteen stations.   Design and

2

treatment recommendations will be presented to the Board once this evaluation has been completed. With respect to at least two of the fourteen stations (G&M Oil #4 and Mobil #18-HDR), I expect this to occur within the next six months.

3.    Although the Board must approve any recommendations before contracts are sent out for bid and construction begins, the preparation of design and treatment recommendations represents a significant step in the remedial process. Staff does not recommend initiation of design and treatment recommendations until after initial investigatory work confirms that contamination has left a site and poses a threat to drinking water supplies. For all other remedial projects undertaken by the District, once the project has reached the design stage the District has ultimately constructed and operated a treatment facility.

4.    At each of the fourteen stations addressed in the Court's June 20, 2011, opinion, enormous amounts of MTBE were discharged to groundwater and this MTBE has migrated off-site. MTBE that reached groundwater at these sites was not initially hydraulically contained by any remedial activities and immediately began moving with the groundwater.

5.    Groundwater within the District is not stationary. Groundwater flow rates within the District's service area, however, are highly variable and often dependent upon site specific conditions. Measured groundwater flow rates range from a low of 0.7 feet per day to as much as 25 feet per day. Even at the lowest end of these rates, MTBE released into groundwater can be expected to travel 255 feet in a year. Even assuming a conservative flow rate of one foot per day, MTBE detected beneath a station site in 1996 by 2010 would have traveled a minimum distance of 5,000 feet off site. (1 foot/day x 365 days/year x 14 years = 5,110 feet.) A flow rate of two feet per day would, of course, double this distance.

3

6.      I have reviewed extensive data with respect to each of the 14 stations, including consultant and expert reports. These data and reports show the following. At Arco # 1887, MTBE was migrating off-site for a minimum of 5 years between the time MTBE was first detected (during the first test for MTBE) and the time the first groundwater extraction well was installed. During this time, MTBE was in groundwater at levels as high as 14,000 ppb. At Arco # 1905, MTBE was migrating off-site for a minimum of four years between the time that MTBE was first detected (during the first test for MTBE) and the date groundwater remediation began. During this time MTBE was in groundwater at levels as high as 4,000,000 ppb. At G & M Oil # 4, MTBE was migrating off-site for a minimum of 8 months between the time MTBE was first detected (during the first test for MTBE) and the time the first groundwater extraction well was installed. During this time MTBE was in groundwater at levels as high as 2,800 ppb. Several years after groundwater remediation began MTBE was detected in groundwater at this station at even higher levels of 180,000 ppb. At Mobil # 18-G6B, MTBE was migrating off site for a minimum of 5 years between the time that MTBE was first detected (during the first test for MTBE) and the date that groundwater remediation began. At Texaco #121681, MTBE has been migrating off-site for a minimum of fourteen years. No groundwater remediation was ever conducted at this station. MTBE has been in groundwater at this station at levels as high as 14,000 ppb. At Mobil # 18-JMY, MTBE was migrating off site for a minimum of seven years between the time that MTBE was first detected (during the first test for MTBE) and the date groundwater remediation began. During this time MTBE was in groundwater at levels as high as 632,000 ppb. At G & M Oil # 24, MTBE was migrating off site for a minimum of four years between the time that MTBE was first detected (during the first test for MTBE) and the date groundwater remediation began.

4

During this time MTBE was in groundwater at levels as high as 11,300 ppb. Shortly after groundwater remediation began MTBE was detected at significantly higher levels of 1,210,000 ppb.   At Chevron # 9-1921, MTBE has been migrating off-site for a minimum of 15 years. No groundwater remediation has ever been initiated at this station.   MTBE is in groundwater at levels as high as 190,000 ppb. At Chevron # 9-5401 MTBE has been in groundwater for a minimum of fourteen years.  No groundwater remediation was ever initiated at this station. MTBE is in groundwater at levels as high as 65,000 ppb. At Unocal # 5123, MTBE was first detected in groundwater in 1996, during the first testing event for MTBE.  Although groundwater remediation was initiated at this station in 1992 to address releases of Total Petroleum Hydrocarbons (TPH), that system has operated only sporadically.  MTBE in groundwater was detected at levels as high as 32,000 ppb in 1996, and MTBE subsequently has been detected at a number of off-site monitoring wells at this station.    At Shell # 6502, MTBE was first detected in 1996, during the first testing event for MTBE.   Although a groundwater remediation system has operated sporadically at this station since 1990, MTBE was detected in groundwater at this station at levels as high as 1,100,000 ppb in 1997.  MTBE has been detected in a number of off-site monitoring wells for this station   At Unocal # 5226, MTBE was migrating off site for a minimum of six years between the time that MTBE was detected in groundwater (during the first testing for MTBE) and the time that groundwater remediation began.  During this time, MTBE was in groundwater at levels as high as 480,000 ppb.  At Unocal # 5376 MTBE was detected in groundwater during the first testing for MTBE, in 1996. Although a groundwater extraction system has operated sporadically at this station, MTBE is still in groundwater at this station at levels exceeding the MCL, and that MTBE has been migrating off site for approximately fifteen years. At Unocal # 5792 (now Conoco-Phillips #

5

5792) MTBE was migrating off site for a minimum of one and one-half years between the time

that MTBE was first detected (during the first testing for MTBE) and the time that groundwater

remediation began.  During this time, MTBE was in groundwater at levels as high as 69,000

ppb.

7.     Monitoring wells at focus plume stations are seldom screened more than 50 feet below

the surface, and most are screened at no more than 30 to 40 feet below the surface.  In addition,

monitoring wells are typically clustered on or close to the station property.  These wells,

therefore, provide a limited picture of the extent of MTBE in groundwater.  This picture is

limited to MTBE at shallow depths and in the immediate vicinity of the sites.  Monitoring

wells cannot detect MTBE that has migrated below where the wells are screened (40 – 50 feet),

or outward beyond the wells at site margins.   Thus, although substantial amounts of MTBE

have migrated off-site from the fourteen stations, on-site and near-site monitoring wells

installed by responsible parties have provided little real hydrogeologic data on the shape,

direction and rate of movement of MTBE plumes migrating away from the stations.

8.     To better understand what is happening to the MTBE plumes that are migrating away

from these stations, the District has had to commit considerable funds to drilling borings and

collecting depth-specific groundwater samples independent of data provided by responsible

parties and independent of the District's routine sampling and data gathering activities.  Such

data collection for plume delineation is an integral component of the design for remediation

systems for the plumes.  The Board has authorized expenditures of approximately $ 4 million

for bore hole drilling and groundwater sampling for plume delineation as an initial step in

remediating MTBE at these stations.  To date, the District has spent approximately $ 3 million

of these funds.   The District's experience with other remediation projects has shown that even

6

after construction of treatment facilities has begun the ongoing collection of data may lead to modifications to the design of remedial projects (such as installing additional extraction wells from which contamination is pumped to treatment facilities).

9.　　　　Public water supply wells in the District's service area draw predominantly from the "principal" aquifer. The District has spent decades studying the principal aquifer and has a well developed understanding of the aquifer and influences on the aquifer. Groundwater elevation data within the principal aquifer shows that stations associated with each separate focus plume are located over large pumping depressions in the principal aquifer created primarily by the production wells themselves. A single large-capacity production well pumping from the principal aquifer can create a capture zone of up to one-half mile or more, and pull groundwater (and MTBE) in a cross-gradient and even up-gradient direction. Pumping depressions created by multiple production wells can be several miles in diameter. Contaminants that enter these pumping depressions will be drawn into the wells that create the depressions. This is particularly true for MTBE, which is extremely persistent in groundwater.

10.　　Each focus plume (with associated stations) is located within a pumping depression. Based on the prevalent downward hydraulic gradient beneath each station, MTBE that has migrated off-site from each station will move downward into the principal aquifer and be carried to the production wells that create the pumping depressions. MTBE has been detected by the District's laboratory in one or more production wells within each pumping depression, and at a number of wells these detections have shown increasing consistency and an upward trend in levels detected. As explained in the expert report of Dr. Steven Wheatcraft, MTBE released from focus plume stations has impaired the quality of the aquifer

7

and compromised the District's ability to insure that the aquifer is available for the beneficial

uses specified in the Orange County Water District Act.

11.    The District's process for remediating groundwater contamination begins with a

comprehensive review and assessment of available data on sources and extent of groundwater

contamination. "Extent" in this context means the lateral and vertical dimensions of the

contaminant plume as well as the magnitude of the MTBE concentrations. Unfortunately, the

extent of the contamination at the fourteen stations has largely been undelineated, making it

necessary for the District to spend considerable funds to conduct field investigations and

develop the information necessary to design the appropriate remedial actions.

12.        A comprehensive review is often accompanied or followed by additional

testing of soil or groundwater conducted by the District itself to confirm, as much as

possible, the nature and extent of the contamination. The review includes an evaluation of

the degree to which the contamination will further spread into the groundwater basin and

impact production wells. Such an evaluation was performed by Dr. Steven Wheatcraft

with respect to the focus plume stations selected for trial in this matter. Based on this

comprehensive review, District staff determines whether to recommend to the District

Board that remedial actions are necessary to protect and improve the groundwater quality.

Once this determination is made, then District staff presents to the Board its review of the

contamination and a recommendation that construction of remediation facilities is

warranted. District staff requests authorization to proceed with preparation of California

Environmental Quality Act ("CEQA") documentation and supporting preliminary design.

Following Board authorization to proceed, staff then prepares the CEQA documentation

and what is known as an Engineer's or Geologist's Report that describes the remediation

8

objectives, project scope and facilities, operational aspects, estimated costs, and implementation schedule. Staff subsequently presents the CEQA documentation and Engineer's or Geologist's Report to the Board with recommendations to adopt the appropriate CEQA findings and determinations and to authorize final design and construction of the remediation system.

13.     Delineation of the extent of contamination, including the location, depth, and rate of contamination movement, is an essential step in the remedial process. Results from bore hole drillings and depth specific groundwater sampling such as those conducted by the District at focus stations, are used not only to determine the specifics of remedial action, such as the location of extraction wells, pipelines, and treatment facilities, but also to determine locations for additional monitoring wells, which serve the integral function of ongoing remedial performance evaluation.

14.     The District followed the aforementioned process in the investigation and remediation of groundwater contamination emanating from the former Marine Corps Air Station El Toro and from industrial sites in the Anaheim/Fullerton ("North Basin") area. In these cases, the District used the data from its plume delineation investigation to design remediation systems to contain VOC contamination. The monitoring wells constructed to delineate the contamination during design and implementation of the remedial system for the El Toro plume were included in a settlement reached with the federal government and those wells are considered an integral part of the remedial system. The District is also seeking recovery of costs for construction of monitoring wells and extraction wells necessary to delineate and treat VOC contamination in the North Basin Groundwater

9

Protection Project that is the subject of the recent Court of Appeal decision in *Orange County Water District v. Arnold Engineering Co. et. Al.*

15.     The cost of delineating the extent of MTBE contamination at the fourteen stations is substantial.  The District has spent over $3 million to date to delineate the extent of contamination at ten of the fourteen stations.  This effort is ongoing.  It takes years and millions of dollars to complete plume delineation, design remediation systems, acquire property access, install extraction wells and construct treatment facilities.  Operation of treatment facilities will likely be necessary for decades before MTBE is cleaned up, and additional millions of dollars will be necessary to conduct these operations.  If the District is not able to recover these costs from the parties responsible for the MTBE contamination then these costs will be borne by the water ratepayers within the District.

16.     In the case of the G & M Oil #4 station, MTBE has been detected more than one-half mile away from the site and at more than four times the secondary MCL (5.0 ppb) within 200 feet of Huntington Beach production well number HB-3A.  The depth of the MTBE plume exceeds 100 feet below ground surface.  The MTBE is within the pumping depression created by well number HB-3A and several other production wells.  Based on the extent of the contamination, proximity to the production well, and my experience on other remediation programs at the District, installation of a remediation system to contain the G & M Oil #4 station MTBE plume is warranted.  I expect to make such a recommendation to the Board within the next six months.  The cost for such a system has been estimated at approximately $13.3 million.

17.     In the case of the Mobil 18-HDR station, a drilling probe conducted by the District detected MTBE at 1,400 ppb at a depth of 70 feet below ground surface

10

approximately 1,700 feet downgradient from the site. MTBE was detected in a second probe conducted by the District at 350 ppb at a depth of 95 feet approximately 2,400 feet downgradient from the site. These data indicate that the plume is moving deeper as it spreads laterally. The Alpha and Beta aquifers occur at depths of approximately 80 and 150 feet, respectively. The plume is therefore (at least) in the Alpha aquifer and is also is either in the Beta aquifer or will soon be in the Beta aquifer. Both the Alpha and Beta aquifers are used for public drinking water supplies.

18.     Two major production wells, MCWD-6 and MCWD-11, are located approximately 2,000 feet North of the Mobil-HDR station. These wells are part of a group of wells that have created a pumping depression that is more than 3 miles in diameter. This pumping depression is created by the highest density of production wells in the basin. Based on the extent of the contamination that has reached the Alpha aquifer and is moving deeper, the fact that the plume is within a pumping depression and my experience on other remediation programs at the District, installation of a remediation system to contain the Mobil 18-HDR station MTBE plume is warranted. I expect to make such a recommendation to the Board within the next six months. The cost for such a system has been estimated at approximately $9.4 million.

I declare under the laws of the State of California that the foregoing is true. Executed this 25TH day of July, 2011, at Fountain Valley, California.

Roy L. Herndon

11

# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

In re:  Methyl Tertiary Butyl Ether ("MTBE")       :       **Master File No. 1:00-1898**
Products Liability Litigation                                        **MDL No. 1358 (SAS)**
                                                                   :       **M21-88**

                                                                   :

This Document Relates To:                                   The Honorable Shira A. Scheindlin
*Orange County Water District v. Unocal*           :
*Corporation, et al.,* Case No. 04 Civ. 4968
(SAS).                                                             :

                                                                   :

------------------------------------- X


## DECLARATION OF STEPHEN W. WHEATCRAFT, Ph.D. IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF STEPHEN W. WHEATCRAFT

I, Stephen W. Wheatcraft, hereby declare as follows:

1.      As part of my work in this case I prepared a contaminant transport model based on the geological characteristics of the aquifer in Orange County as explained in my expert report in this case.

2.      The contaminant transport model contains numerous data sets including but not limited to well pumping, water levels, recharge and flow direction. All information regarding the Talbert Gap and the seawater intrusion barrier was also included in the contaminant transport model. (See Wheatcraft Expert Report, June 23, 2011.)

3.      The contaminant transport model was calibrated and a sensitivity analysis was done to ensure the model was functioning correctly.

4.      A separate MTBE source term for each of the focus plume stations was added to the model at the location of the station. The source term for each focus plume station was calculated using actual data from MTBE detections in monitoring wells located at or associated with each individual focus plume station. The monitoring well data for each focus plume station was collected from station consultant reports or quarterly monitoring reports associated with the focus plume stations. The MTBE source term thus represents the MTBE released to groundwater from each individual focus plume station. The model thus depicts the transport of MTBE released at each focus plume station through the aquifer to production wells within the District's service area, although the model does not isolate each station. This concept is explained in detail in my expert report in sections 8, 10, 11 and 12.

5.      The MTBE that originated from defendants' stations is migrating off site and mixing with other MTBE from nearby stations to form MTBE plumes. MTBE contamination will naturally migrate down gradient or toward production wells because of the influence that pumping wells have on the movement of water in an aquifer. The model shows that MTBE from each of the focus plume stations has contributed to at least one focus plume (see opinion #5 in my Summary of Opinions in my original report).

6.      As the MTBE plumes migrate, they will intermix with each other in the subsurface of the aquifer. This migration may take years to tens of years.

7.      The widespread releases of MTBE throughout the OCWD aquifer and the widespread areas of contamination in the subsurface are predicted by the model and are expected based on my knowledge of the OCWD aquifer system and the contaminant transport model. This MTBE contamination will converge in the subsurface. Section 13.2 Transport Model Results of my expert report reads:

> "The MTBE transport model predicts that a total of 155 district production wells will be contaminated with MTBE above 5 ug/l within the next 50 years. It further predicts that 256 district production wells will be contaminated above 0.2 ug/l within the next 50 years." and

> "108 district production wells exceed 5.0 ug/l MTBE after 10 years"

8.      When the model is run with the MTBE source terms from each individual focus plume station, the model predicts that MTBE will reach the following wells associated with Focus Plume numbers 1, 2, 3, 8 and 9:

| Plume Number | Wells |
|---|---|
| 1 | NB-TAMD<br>NB-TAMS<br>HB-9<br>NB-DOLD<br>NB-DOLS |
| 2 | MCWD-3B<br>MCWD-5<br>MCWD-7<br>IRWD-13<br>IRWD-7<br>IRWD-11<br>MCWD-4 |
| 3 | OCWD-M10<br>OCWD-M11<br>OCWD-M45 |
| 8 | IRWD-1<br>IRWD-7<br>IRWD-11<br>SA-34 |
| 9 | HB-13<br>HB-4<br>HB-7 |

Graphs showing the date and concentration of MTBE predicted in each of these wells are attached to my expert report as Appendix B and C.

9.    OCWD has a manmade seawater intrusion barrier (the Talbert Gap).  If left alone this gap would allow seawater to travel inland and fresh water to travel out to sea.  OCWD controls this area with a series of seawater intrusion injection wells that prevent seawater from entering into the aquifer.  This process also keeps fresh water and contamination from flowing out to sea.

10.    Because OCWD is controlling the aquifer, the only exit for water from the aquifer is through production wells.  OCWD's 2009 Groundwater Management Plan indicates that 98% of water in the aquifer will eventually exit to production wells.  This is also verified by the mass balance of the contaminant transport model.

11.    Given the facts above it is clear that the MTBE that has been released and migrated into the subsurface will keep migrating and converge in the subsurface.  Portions of this plume will be pumped from the subsurface with normal operation of the wells for the next 50 years unless the contamination is removed before it reaches more wells.  An alternative would be to place well head treatment on all 256 wells as needed for 50 years.

12.    At the Beacon Bay Fountain Valley station, MTBE was detected in groundwater during the first testing for MTBE on 4/30/1996, at levels of 4,770 ppb in MW-3. In subsequent testing, MTBE was detected as levels as high as 115,000 ppb in MW-6. MTBE persists in groundwater for decades. Although monitoring well data from Beacon Bay Fountain Valley unequivocally shows MTBE in groundwater during these times and at these levels, the data is limited to the Beacon Bay site itself and does not indicate what has happened to the MTBE after it migrated off site.  Under these circumstances the fate and transport modeling I conducted is the best method of determining the likely fate of the MTBE

2

that was detected in groundwater beneath the Beacon Bay site. That modeling shows that MTBE from the Beacon Bay station will contribute to an MTBE plume that will impact production wells within the district. To my knowledge, I am the only expert that has performed fate and transport modeling in this case.

13.     At the Unocal 5399 station, MTBE was detected in groundwater during the first testing for MTBE on 3/15/1996, at levels of 310 ppb in MW-1. In subsequent testing, MTBE was detected as levels as high as 2,000 ppb in MW-4. MTBE persists in groundwater for decades. Although monitoring well data from the Unocal 5399 station unequivocally shows MTBE in groundwater during these times and at these levels, the data is limited to the Unocal 5399 site itself and does not indicate what has happened to the MTBE after it migrated off site. Under these circumstances the fate and transport modeling I conducted is the best method of determining the likely fate of the MTBE that was detected in groundwater beneath the Unocal 5399 site. That modeling shows that MTBE from the Unocal 5399 station will contribute to an MTBE plume that will impact production wells within the district. To my knowledge, I am the only expert that has performed fate and transport modeling in this case.

14.     At the Unocal 5123 station, MTBE was detected in groundwater during the first testing for MTBE on 2/29/1996, at levels of 32,000 ppb in MW-8. This was also the highest level of MTBE detected at this location. MTBE persists in groundwater for decades. Although monitoring well data from the Unocal 5123 station unequivocally shows MTBE in groundwater during these times and at these levels, the data does not indicate what has happened to the MTBE after it migrated off site. Under these circumstances the fate and transport modeling I conducted is the best method of determining the likely fate of the MTBE that was detected in groundwater beneath the Unocal 5123 site. That modeling shows that MTBE from the Unocal 5123 station will contribute to an MTBE plume that will impact production wells within the district. To my knowledge, I am the only expert that has performed fate and transport modeling in this case.

15.     At the Thrifty 368 station, MTBE was detected in groundwater during the first testing for MTBE on 2/15/1996, at levels of 410 ppb in MW-6. In subsequent testing, MTBE was detected as levels as high as 10,000 ppb in MW-6. MTBE persists in groundwater for decades. Although monitoring well data from the Thrifty 368 station unequivocally shows MTBE in groundwater during these times and at these levels, the data is limited to the Thrifty 368 site itself and does not indicate what has happened to the MTBE after it migrated off site. Under these circumstances the fate and transport modeling I conducted is the best method of determining the likely fate of the MTBE that was detected in groundwater beneath the Thrifty 368 site. That modeling shows that MTBE from the Thrifty 368 station will contribute to an MTBE plume that will impact production wells within the district. To my knowledge, I am the only expert that has performed fate and transport modeling in this case.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed this 21st day of July, 2014, at Reno, Nevada.

_Stephen W. Wheatcraft_
Stephen W. Wheatcraft

3

Exhibit 9

1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    CHRISTOPHER J. MCNEVIN #109603
2   725 South Figueroa Street, Suite 2800
    Los Angeles, CA 90017-5406
3   Telephone: (213) 488-7100
    Facsimile: (213) 629-1033
4

5   Attorneys for Applicant
    ORANGE COUNTY WATER DISTRICT
6

7

8

9

10              STATE WATER RESOURCES CONTROL BOARD

11                      OF THE STATE OF CALIFORNIA

12

13  In the Matter of State Water Resources Control        )  Application No. 31174
    Board Hearing on Water Rights Applications            )
14  31165 and 31370 of San Bernardino Valley              )
    Municipal Water District and Western                  )  DIRECT TESTIMONY OF CRAIG D.
15  Municipal Water District of Riverside County;         )  MILLER, P.E., ON BEHALF OF
    Application 31174 of Orange County Water              )  ORANGE COUNTY WATER
16  District; Application 31369 of Chino Basin             )  DISTRICT FOR WATER RIGHTS
    Watermaster; Application 31371 of San                 )  APPLICATION 31174
17  Bernardino Valley Water Conservation District;        )
    and Application 31372 and Waste Water                 )  Date:   May 2, 2007
18  Change Petition WW-0045 of the City of                )  Time:  9:00 a.m.
    Riverside.                                            )  Location:     Cal EPA Building
19                                                         )              Coastal Hearing Room
                                                          )
20                                                         )

21

22

23

24

25

26

27

28

                 DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                        Exhibit OCWD 1-1


                                                 OCWD-MTBE-001-199678

1         **DECLARATION OF CRAIG D. MILLER, P.E.**

2       I, Craig D. Miller, P.E., declare and state as follows:

3   I.     <u>BACKGROUND AND QUALIFICATIONS.</u>

4       1.     I am an Assistant General Manager at the Orange County Water District

5 ("OCWD"). I hold a BS degree in civil engineering from California State University

6 Long Beach and am a California professional engineer. I am responsible for overseeing

7 the departments of engineering, planning and watershed management, wetlands

8 operations, hydrogeology, and natural resources. My primary focus at OCWD is the

9 development and operation of programs that sustain and protect the Orange County

10 Groundwater Basin, as well as maximizing beneficial use of the basin. My biography is

11 Exhibit <u>OCWD 1-2</u>.

12       2.     The following written testimony was prepared by me and under my

13 supervision, with the assistance of Greg D. Woodside, Planning and Watershed

14 Management Director at OCWD and a California professional geologist and certified

15 hydrogeologist, and other OCWD staff.

16       3.     OCWD is applying for a permit to divert a wet-year maximum of 505,000

17 acre-feet annually ("AFA")[1] of water from the Santa Ana River ("SAR") at its diversion

18 facilities below Prado Dam. My testimony addresses the following matters:

19       •   The physical regime within which OCWD operates;

20       •   OCWD's operations, mandate and mission;

21       •   The importance of the SAR to California water supplies;

22       •   Coordinated planning in the SAR Watershed to maximize the use of local

23         water supplies;

24       •   OCWD's projects to maximize the beneficial use of the SAR, protect

25

26  [1] One acre-foot is the amount of water that would cover one acre of land – about a

27    football field – one foot deep (326,000 gallons).

28  600278517v1

               2

        DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                      Exhibit OCWD 1-1

OCWD-MTBE-001-199679

1   water quality, and enhance natural resources in the SAR Watershed;

2   • OCWD's plans to increase the beneficial use of available SAR flows.

3 II. LEGISLATIVE MANDATE OF OCWD.

4  4. OCWD was formed in 1933 by a special act of the California Legislature

5 for the purpose of protecting the Orange County groundwater basin. OCWD now meets

6 the water needs of over two million people, and encompasses an area of 229,000 acres,

7 covering most of the northern half of Orange County. A map of OCWD's boundary is

8 submitted as Exhibit OCWD 1-3.

9  5. OCWD's powers are defined in the District's enabling legislation[2], and

10 include:

11   • Manage, replenish, regulate, and protect groundwater supplies;

12   • Regulate and control the storage of water and the use of groundwater basin

13    storage space;

14   • Appropriate and acquire water and water rights;

15   • Conserve and reclaim water; and

16   • Provide for protection and enhancement of the environment.

17  6. OCWD's mission is to implement these powers to manage and protect the

18 groundwater basin and provide a safe, reliable water supply in an environmentally

19 responsible manner. It is important to note that OCWD is not a water retailer and does

20 not serve water to the public. Instead, OCWD manages the groundwater basin for the

21 benefit of the public. There are 19 major producers from the basin which include cities,

22 water districts, and private water companies that pump water from the basin and retail it

23

24

25

26 ————————————

27 [2] California Legislature, Ch. 924, Stats. 1933, as amended.

28 600278517v1    3

     DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

            Exhibit OCWD 1-1

OCWD-MTBE-001-199680

1   to the public[3]. There are also approximately 200 small independent well owners who

2   produce water primarily for irrigation purposes.

3   III.     THE PHYSICAL ENVIRONMENT IN WHICH OCWD OPERATES.

4       7.     OCWD's recharge facilities are located in and generally adjacent to the

5   SAR in the cities of Anaheim and Orange, approximately 10 miles below Prado Dam.

6   Exhibit OCWD 1-4 is a map of OCWD's recharge facilities. The first location where

7   OCWD diverts water from the SAR for groundwater recharge is approximately one-half

8   mile downstream of Imperial Highway, where OCWD's Imperial Inflatable Dam is

9   located in the river channel. Exhibit OCWD 1-5 is a photograph of the SAR in the

10   vicinity of Imperial Highway. Exhibit OCWD 1-6 is a photograph of the Imperial

11   Inflatable Dam.

12       8.     Starting upstream of this diversion point, in the area stretching from Weir

13   Canyon Road to the Pacific Ocean, the SAR has been modified significantly for flood

14   control purposes. A series of drop structures have been created in the river bottom and

15   the sides have been constructed with concrete and/or rip-rap. Exhibit OCWD 1-7 is a

16   photograph of one of the drop structures in the area where recharge occurs through the

17   river bottom, near Orangewood Avenue. Exhibit OCWD 1-8 is a photograph of the SAR

18   channel showing the construction of levees to increase the rate of groundwater recharge.

19       9.     Downstream of the area where the SAR channel bottom recharges the

20   groundwater basin, the Riverview Golf Course occupies and operates within the river

21   channel. Exhibit OCWD 1-9 is a photograph of the Riverview Golf Course in the SAR in

22   Santa Ana. Downstream of the golf course, the channel bottom is lined with concrete,

23   ――――――――――――

24   [3] The entities that produce water from the basin to provide to the public are the cities of
      Anaheim, Buena Park, Fountain Valley, Fullerton, Garden Grove, Huntington Beach,
25   La Palma, Newport Beach, Orange, Santa Ana, Seal Beach, Tustin, Westminster, as
      well as East Orange County Water District, Irvine Ranch Water District, Mesa
26   Consolidated Water District, Serrano Water District, Yorba Linda Water District, and
27   Golden State Water Company.

28   600278517v1             4
                      DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199681

1   except for the lower section near the Pacific Ocean.  Exhibit OCWD 1-10 is a photograph

2   of the concrete-lined channel through Santa Ana.  Downstream of the 405 Freeway, most

3   of the channel bottom is unlined and is subject to sand and vegetation removal by the

4   Army Corps and County of Orange.  Exhibit OCWD 1-11 is a photograph of sand

5   removal from the SAR channel downstream of the 405 Freeway.  Exhibit OCWD-12 is a

6   photograph of the confluence of the SAR and the Pacific Ocean.

7   IV.    IMPORTANCE OF SAR DIVERSION TO ORANGE COUNTY'S WATER

8          SUPPLY AND STATEWIDE WATER SUPPLY.

9          10.    The Orange County Groundwater Basin is the primary source of water

10  supply for the 2.3 million people that live in the OCWD service area.  The SAR is the

11  primary source of supply used to replenish the basin (see Figure 1).

12                    **Figure 1. Groundwater Basin Supplies**

13                      **(330,000 AFA average production)**



28  600278517v1                        5
                    DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                        Exhibit OCWD 1-1

OCWD-MTBE-001-199682

1    Residents, businesses, and other water users rely upon pumping from the

2  groundwater basin as their primary source of water supply.  Without the replenishment

3  supply from the SAR, production from the basin would have to be significantly reduced

4  by an average of 200,000 AFA to maintain a sustainable basin yield.  See Figure 2.  The

5  existing demands supplied from the basin would have to be replaced by an imported

6  water source, if such were available.

7                                   Figure 2

8                        Historical Groundwater Production



19    11.    The Water Quality Control Plan for the Santa Ana River Basin adopted by

20  the Regional Water Quality Control Board, Santa Ana Region, identifies Reach 2 of the

21  Santa Ana River, the portion from 17th Street in Santa Ana to Prado Dam, as having a

22  "GWR" or Groundwater Recharge beneficial use.[4]  OCWD's recharge activities that take

23  place in this reach reflect this beneficial use designation.

24

25  _____

26  [4] California Regional Water Quality Control Board, Santa Ana Region.  1995. *Water Quality Control Plan for the Santa Ana River Basin*, as amended (the "Basin Plan").

27  All references not listed as exhibits are published documents available in the public
(continued...)

28  600278517v1                          6
                   DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                              Exhibit OCWD 1-1

OCWD-MTBE-001-199683

1    12.    In the last four years, the SAR supplied more water to Orange County than

2    the Colorado River or the State Water Project.[5]  The SAR also supplies a quantity of

3    water that is generally comparable to the City of Los Angeles' Owens Valley Aqueducts.[6]

4    Given the interconnected nature of water supplies across the State, the SAR is a key

5    foundation of the water supply of California and the Colorado River Basin.

6    13.    The water OCWD manages in the Orange County Groundwater Basin also

7    is one of the key foundations of Southern California's future water supply.  This is

8    reflected in the Integrated Water Resource Plan ("IRP") prepared by the Metropolitan

9    Water District of Southern California ("Met").  This IRP projects the need for

10   420,000 AFA of groundwater production from the Orange County Groundwater Basin in

11   2025 for dry year conditions.[7]

12   14.    In the unfortunate event that the SAR was not available to replenish the

13   groundwater basin, significant water supply impacts would affect areas in Southern

14   California and beyond.  There are no other sources of supply readily available that can

15   replace the 200,000 AFA provided by the SAR.  The loss of SAR water for

16   replenishment of the Orange County Groundwater Basin would likely result in

17   significant, negative environmental impacts not only locally, but would also shift demand

18   and additional environmental impacts to the State Water Project and Colorado River

19   _____

20   (...continued)
     domain.  If a reader cannot locate such a document, OCWD will be pleased to assist in

21   getting a copy.

22   [5]  From July 1, 2002 to June 30, 2006, the SAR supplied 213,000 AFA to Orange
     County; in this same time period, the Colorado River supplied 156,000 AFA and the

23   State Water Project supplied 207,000 AFA (data from Municipal Water District of
     Orange County, 2007).

24   [6]  The Owens Valley Aqueducts operated by the City of Los Angeles are estimated to

25   provide on average approximately 250,000 AFA of existing supplies;  (Metropolitan
     Water District of Southern California. 2005. *Urban Water Management Plan*).

26   [7]  Metropolitan Water District of Southern California. 2004. *Integrated Water Resources*

27   *Plan, 2003 Update.*

28   600278517v1                                7
                        DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                        Exhibit OCWD I-1

OCWD-MTBE-001-199684

1    system, because these are the likely locations that would be used for acquiring an

2    alternative water supply.

3        15.    Replenishment of the groundwater basin also allows local water suppliers

4    to weather droughts. Due to the groundwater basin's storage capacity, the basin provides

5    a buffer against short-term declines in precipitation and the availability of replenishment

6    water. Using the basin's storage capacity, groundwater pumping from the basin can be

7    maintained over a four-year drought, even though the supply of replenishment water

8    could be reduced by as much as 200,000 AF during the drought.[8] SAR supplies are

9    critical to refilling the basin between such drawdowns.

10       16.    Climate change's potential impacts on statewide water resources heighten

11   the importance of maximizing local water supplies. In July 2006, the California

12   Department of Water Resources ("DWR") prepared a technical memorandum report

13   entitled "Progress on Incorporating Climate Change Into Management of California's

14   Water Resources."[9] DWR's report states that climate change increases the uncertainty in

15   supplies from the Sacramento/San Joaquin Delta. Potential impacts on the

16   Sacramento/San Joaquin Delta from climate change that are described in the DWR report

17   include changes in runoff timing and amount and sea level rise. These potential impacts

18   add further uncertainty with respect to supplies from the Sacramento/San Joaquin Delta

19   and increase the importance on reducing future demands on the Delta. With respect to

20   future actions and considerations, the DWR climate change report states:

21       "Lastly, we need to explore ways of increasing supply to or reducing demand of

22       SWP and CVP contractors."[10]

23   _____

24   [8] OCWD. 2004. Groundwater Management Plan.

25   [9] California Department of Water Resources. 2006. *Progress on Incorporating Climate
     Change into Planning and Management of California's Water Resources*, Technical
26   Memorandum Report.

27   [10] California Department of Water Resources. 2006.

28   600278517v1                                8
                              DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                            Exhibit OCWD 1-1

OCWD-MTBE-001-199685

1    17.    Given the challenges facing the Delta, and the additional, general

2    uncertainty due to climate change, the importance of local supplies becomes even greater.

3    Maximum reliance on local water supplies and increased recycling and re-use, as

4    opposed to increased imported water usage, are reflected in OCWD's application.

5    18.    Increased use of local supplies also reduces generation of greenhouse

6    gases like carbon dioxide. As discussed in the DWR climate change report, the

7    California Energy Commission estimated 44 million tons of carbon dioxide are emitted

8    per year to provide water in CA.[11]  Transferring water from northern to southern

9    California creates one of the largest power demands in California. On the other hand,

10   SAR water flows to OCWD's recharge facilities by gravity without the need to pump the

11   water. If SAR flows were not available to replenish the Orange County Groundwater

12   Basin, an alternative water supply would require increased energy usage and increase the

13   generation of carbon dioxide. Reducing the need to pump water into Southern California

14   will help reduce the generation of greenhouse gases such as carbon dioxide. As stated in

15   the DWR climate change report, such "reductions in energy consumption related to water

16   will help the state meet its greenhouse gas reduction goals."[12]

17   19.    As additional flows become available from the SAR, replenishment of the

18   groundwater basin with this water will help reduce the generation of greenhouse gases, as

19   compared to meeting increased water supplies through more energy-intensive means.

20   V.   <u>MAXIMIZING LOCAL WATER RESOURCES THROUGH COORDINATED</u>

21        <u>PLANNING AND COOPERATION.</u>

22        A.   <u>Coordination with Upstream Agencies.</u>

23        20.    Water supply agencies in the SAR Watershed have a long history of

24   working together to protect the SAR's environment and resources, and to maximize its

25   _____

26   [11] California Department of Water Resources. 2006.

27   [12] California Department of Water Resources. 2006.

28   G00278517v1                                9

OCWD-MTBE-001-199686

1   beneficial use as a critical water supply source. This cooperative relationship allows

2   water in the watershed to be used and reused, such that SAR flows are typically used

3   several times before water is discharged to the ocean.[13]

4       21.    The Santa Ana Watershed Project Authority ("SAWPA") was formed in

5   1968 to coordinate planning among the water agencies in the SAR Watershed. SAWPA

6   is made up of five member agencies: Eastern Municipal Water District, Inland Empire

7   Utilities Agency, Orange County Water District, San Bernardino Valley Municipal Water

8   District and Western Municipal Water District. The member agencies' boundaries

9   encompass most of the Santa Ana River watershed. Since 1968, SAWPA's mission has

10  grown to include building facilities, in addition to its planning role.

11      22.    SAWPA has prepared an Integrated Watershed Plan and Integrated

12  Regional Water Management Plan for the SAR Watershed. The plan includes a range of

13  cooperative activities and projects to protect water quality, increase available water

14  supplies, enhance natural resources, and provide recreational and community outreach

15  benefits.[14] Selected highlights of the member agencies' achievements through SAWPA

16  include:

17      •   The Santa Ana Regional Interceptor ("SARI"), a regional brineline with

18          over 40 miles of pipeline to collect high salt wastewater and transport it

19          for treatment downstream in Orange County. The SARI is a vital salt

20          management infrastructure that keeps high salt wastewater out of the

21          groundwater basins such as the Chino Basin and the Orange County

22          Groundwater Basin.

23      •   Planning, constructing and operating desalters – SAWPA has played a key

24  —————————

25  [13] Regional Water Quality Control Board. 1995. Water Quality Control Plan for the
    Santa Ana River Basin, as amended.

26  [14] Santa Ana Watershed Project Authority. 2005. *Santa Ana Integrated Watershed
27  Plan, 2005 Update*. Exhibit OCWD 1-13.

28  600278517v1                          10
                    DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                    Exhibit OCWD 1-1

OCWD-MTBE-001-199687

1    role in the Arlington desalter and Chino 1 desalter, which extract and treat

2    high salt groundwater.  Potable water produced from the desalters is

3    provided to local communities and the extracted salt is transported out of

4    the watershed through the SARI.

5    • Facilitating the Nitrogen/Total Dissolved Solids ("TDS") Task Force that

6    revised the Santa Ana River Basin Plan nitrogen and TDS water quality

7    objectives in groundwater basins throughout the region.  The Task Force

8    has also implemented a monitoring program to assess water quality in the

9    Santa Ana River and in the groundwater basins to ensure compliance with

10    water quality objectives.

11    B.    OCWD Actively Works with the Army Corps of Engineers and Flood

12    Control Agencies To Maximize Use of Local Water Supplies.

13    23.    Prado Dam was built in 1941, primarily for flood control purposes.  Since

14 its inception, the Army Corps has operated Prado Dam to also provide for water

15 conservation.  The Army Corps subordinates water conservation to the primary flood

16 control purpose of Prado Dam.  Water conservation is enabled by controlling releases so

17 that the water can be recharged downstream in the Orange County Groundwater Basin.[15]

18 Between 1941 and 1991, various changes were made to the Prado Reservoir regulation

19 schedule to accommodate water conservation.  Beginning the 1991, the Army Corps and

20 OCWD began working on a Memorandum of Agreement, signed by the Assistant

21 Secretary of the Army in 1993, which formalized water conservation activities at Prado

22 Dam.  A new Memorandum of Agreement was executed in 2006 (Exhibit OCWD 1-15).

23 The congressional authorization for storage at Prado Dam for water conservation

24 purposes is Exhibit OCWD 1-16.  The agreement with the Army Corps provides for the

25 _____

26 [15] Letter dated December 1, 2005 from Mark M. Weintraub of Army Corps of Engineers

27 to Samantha K. Olson of Division of Water Rights, SWRCB.  Exhibit OCWD 1-14.

28   600278517v1                          11
                      DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                           Exhibit OCWD 1-1

OCWD-MTBE-001-199688

1   temporary storage of water for conservation at Prado Dam up to an elevation of 498 feet
2   mean sea level during the flood season, and up to an elevation of 505 feet during the non-
3   flood season. However, if the temporarily stored water needs to be released for flood
4   control purposes based on a forecast of future precipitation or other factors, the Army
5   Corps promptly releases the water.

6       24.    The agreement for water conservation at Prado Dam was achieved after
7   extensive environmental analysis, coordination with the local flood control agencies, and
8   commitment of OCWD to mitigate for environmental impacts associated with the
9   temporary water storage. Based on this cooperative effort, up to 25,760 AF of water can
10   be temporarily stored at Prado Dam for subsequent release and recharge into the Orange
11   County Groundwater Basin.

12       25.    The County of Orange and OCWD also coordinate to utilize other flood
13   control facilities for multiple benefits. Under a cooperative agreement with the County of
14   Orange, OCWD also recharges water in Miller Basin, Raymond Basin, and Placentia
15   Basin. These facilities were originally constructed by the County of Orange for flood
16   control purposes. The County and OCWD have a long history of working together to
17   allow these facilities to serve their flood control purpose and also recharge the
18   groundwater basin.

19       C.    Additional Highlights of Cooperative, Watershed-Based Planning.

20       26.    For the past several decades, OCWD, the United States Army Corps of
21   Engineers, and others have monitored the flow of the SAR. The quantity of storm flow
22   and base flow of the SAR at Prado Dam are determined and published annually by the
23   SAR Watermaster, based on streamgaging data collected by the United States Geological
24   Survey ("USGS") and Prado Basin storage data collected by the Army Corps. The five-
25   member SAR Watermaster Committee is appointed by the Superior Court to administer
26   the provisions of the Stipulated Judgment in the case of OCWD vs. City of Chino et al,
27   entered by the court on April 17, 1969 (Case No. 117628-County of Orange). The five-
28   600278517v1                                                 12

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199689

1  member committee includes representatives from agencies above and below Prado Dam

2  and has provided an effective, consensus-based mechanism to monitor and evaluate

3  annual flows in the SAR.

4     27.    Additionally, the Santa Ana Watershed Association ("SAWA") is a

5  partnership formed by five resource conservation districts and OCWD to develop,

6  coordinate, and implement natural resources programs to support a sustainable ecosystem

7  in the SAR Watershed.  Our partnering agencies include the California Department of

8  Fish and Game, United States Fish and Wildlife Services, Army Corps of Engineers,

9  United States Forest Service, and the Santa Ana Regional Water Quality Control Board.

10  SAWA provides coordinated natural resources management from the San Bernardino

11  Mountains to the Pacific Ocean.  SAWA's work has helped restore the endangered least

12  Bell's vireo in the watershed.  SAWA has also removed approximately 3,000 acres of the

13  invasive weed Arundo Donax, resulting in approximately 11,000 AFA in water

14  conservation, enhanced habitat for endangered species, and reduced fire hazard.

15  VI.   <u>OCWD'S PROJECTS AND OPERATIONS.</u>

16     A.   <u>Current Operations.</u>

17     28.    OCWD's operations are focused on managing the groundwater basin,

18  protecting and improving water quality, replenishing the groundwater basin, and

19  enhancing the watershed's natural resources.  To replenish the groundwater basin,

20  OCWD operates 26 recharge facilities in Anaheim and Orange.  The two sources of

21  recharge water at these facilities are SAR flows and imported water purchased from Met.

22     29.    In general terms, the SAR flows that reach Prado Dam consists of base

23  flow, storm flow, and a relatively minor amount of non-tributary water.  For the purposes

24  of this discussion, non-tributary water is included in SAR base flow.  An example of non-

25  tributary water is potable water discharged into the SAR from the Arlington desalter.

26  The majority of base flow reaching Prado, especially in summer months, is composed of

27  tertiary-treated wastewater discharges from wastewater treatment facilities upstream of

28  600278517v1

13

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199690

1  Prado Dam.  From water year 2002/03 to 2004/05, the average amount of base flow at

2  Prado Dam was 148,000 AFA.[16]  OCWD recharges essentially all the base flow at the

3  OCWD recharge facilities in Anaheim and Orange.

4       30.    OCWD has invested over $92 million to capture and recharge SAR storm

5  flow.  The rate of storm flow releases from Prado Dam varies significantly through time.

6  During the winter season, storm flow releases will increase from essentially zero to 3,000

7  to 5,000 cfs under storm conditions in a matter of one to two days.  During non-storm

8  periods releases from Prado are typically less than 300 cfs.  Recharge of storm flow has

9  significant salt reduction benefits, since the TDS of storm water is typically 200 to 300

10  milligrams per liter, considerably lower than SAR base flow.[17]

11       31.    Because the SAR Watershed is very flashy, large quantities of flow reach

12  Prado in a very short time frame under storm conditions.  It is not practical to build a

13  recharge system that has the capacity to recharge 3,000 – 5,000 cfs flows released from

14  Prado because flows of that magnitude occur infrequently.  However, with the

15  conjunctive use of storage and recharge facilities it is possible to greatly improve the

16  amount of water that is captured annually.  Storage capacity, such as the Prado

17  conservation program, is used to capture the short-term, high volume storm flows.  The

18  captured water is then released slowly over time, at a rate which matches the maximum

19  recharge capacity of the downstream recharge facilities.  The District is constantly

20  striving to increase recharge capacity so that captured water can be recharged faster to

21  free up storage space for subsequent storms.

22

23

24

25  [16] Santa Ana River Watermaster. 2006. *Santa Ana River Watermaster 35th Annual*

26  *Report.* Exhibit OCWD 3-3.

27  [17] OCWD. 2004. *Santa Ana River Water Quality and Health Study Final Report.*

28  600278517v1

Exhibit OCWD 1-1

OCWD-MTBE-001-199691

1    32.    Water conservation at Prado Dam for subsequent groundwater recharge in

2  Orange County provides a substantial benefit in recharging SAR stormflow.  OCWD's

3  diversion and recharge capacity is typically limited to 500 cfs, except for short periods of

4  time.  The rate of baseflow is typically 200 to 250 cfs.  During periods when only

5  baseflow is present in the SAR, OCWD typically has unused recharge capacity.  Small

6  storms typically do not generate enough storm flow to exceed OCWD's diversion and

7  recharge capacity.  However, when the amount of runoff reaches a certain magnitude, the

8  flow rate in the SAR exceeds OCWD's diversion and recharge capacity.  When this

9  occurs, the remaining water in the SAR flows to the Pacific Ocean.  Off stream storage

10  and utilization of the Prado conservation pool are the only foreseeable methods to

11  minimize such losses to the ocean.  However, storage by itself does not create additional

12  recharge, but storage, diversion downstream in Orange County, and subsequent recharge

13  through the OCWD recharge facilities provides a valuable mechanism to replenish the

14  groundwater basin with low TDS concentration water.

15    33.    OCWD operates 26 facilities to recharge SAR flows.  Exhibit OCWD 1-4

16  shows the locations of these facilities.  OCWD diverts SAR flows from the river to

17  recharge facilities adjacent to and distal from the river primarily through two inflatable

18  dams.  The upstream inflatable dam is located near Imperial Highway in Anaheim.

19  Exhibit 1-6 is a photograph of the Imperial inflatable rubber dam.   A second inflatable

20  dam, the Five Coves inflatable dam, is located approximately three miles downstream of

21  the Imperial Highway inflatable dam.

22    34.    Additionally, there are three relatively smaller diversion points located

23  between the two inflatable dams that divert water from the SAR into the Off-River

24  recharge basin.  These three diversion points are pipes or "tubes" of 30-inch to 36-inch

25  diameter.  There are four tubes at each of these diversions.  The tubes are constructed

26  through the levee of the SAR channel.

27

28  600278517v1                          15
                        DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                          Exhibit OCWD 1-1

**OCWD-MTBE-001-199692**

1  35. The SAR bottom is also a diversion point.  The bottom of the SAR

2 channel provides for up to 300 cfs of recharge into the groundwater basin.  The locations

3 of the diversion through the SAR bottom (diversion number 7), the three sets of transfer

4 tubes (diversions number 3, number 4, and number 5) and the two inflatable dams

5 (diversion number 2 and number 6) are shown on Exhibit OCWD 1-4.

6  36. These diversions, together with the diversion to the Prado Wetlands above

7 Prado Dam and diversion at Prado Dam to the conservation pool, are summarized in

8 Table 1.  Water diverted to the Prado Wetlands at River Road is returned to the SAR

9 above Prado Dam  Water diverted to the conservation pool at Prado Dam is returned to

10 the SAR channel below Prado Dam.  Not counting the diversion to Prado Wetlands and

11 diversion to the conservation pool at Prado Dam, OCWD's existing diversion capacity is

12 1,670 cfs.

13 ///

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 600278517v1

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199693

| TABLE 1 OCWD EXISTING DIVERSION POINTS | | | | |
|---|---|---|---|---|
| | Diversion Point | Diversion Structure | Capacity (cfs) | Diverts to |
| 1 | River Road[1] | Six 36-inch tubes and gates | 150 | Prado Wetlands above Prado Dam |
| 2 | Imperial Inflatable Dam | Inflatable Dam/Headgates | 550 | Off-river recharge facilities |
| 3 | Below Lakeview | Four 30-inch tubes and valves | 100 | Off-river recharge facilities |
| 4 | Below Tustin Avenue | Four 36-inch diameter tubes and valves | 80 | Off-river recharge facilities |
| 5 | East of Glassell Street | Four 36-inch tubes and valves | 140 | Off-river recharge facilities |
| 6 | Five Coves Inflatable Dam | Inflatable Dam | 500 | Off-river recharge facilities |
| 7 | Diversion through SAR bottom | River bottom | 300 | Orange County Groundwater Basin |
| | | Total Diversion Capacity not counting diversion to Prado Wetlands and conservation pool | 1,670 | |
| 8 | Diversion at Prado Dam (conservation pool)[2] | Numerous inlets into conservation pool | 20,000[3] | Conservation pool |

[1] Water diverted at River Road is returned to SAR channel above Prado Dam.
[2] Water diverted (stored) at Prado Dam is returned to SAR channel below Prado Dam.
[3] Capacity accounts for instantaneous rate flow during storm event.

37. Exhibit OCWD 1-17 shows the characteristics of OCWD's recharge facilities. OCWD now can recharge 250,000 AFA of surface water into the groundwater basin.[18] These facilities include shallow (generally 25 feet deep or less) and deep recharge basins, as well as portions of the SAR channel bottom and the Santiago Creek channel bottom. Most of the facilities are owned by OCWD. Exhibit OCWD 1-18 shows the property owned by OCWD in the Anaheim and Orange area. Under an agreement with the

---

[18] OCWD. 2006. *Program EIR for OCWD's Application to Appropriate SAR Water.* State Clearinghouse No. 2002081024. Certified by OCWD in July 2006.

600278517v1                                      - 17 –
DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199694

1   County of Orange, OCWD also recharges in Miller Basin, Raymond Basin, and Placentia

2   Basin, which are flood control facilities owned by the county.

3       38.    In 2003, OCWD completed a Recharge Study that evaluated the recharge

4   system and recommended future projects to optimize the system's efficiency. The

5   Recharge Study identified the accumulation of fine-grained sediment as the primary source

6   of clogging in the recharge basins, and the major limiting factor to increasing recharge

7   efficiency. Fine-grained sediment accumulates on the basin bottom, along with biological

8   material, to form a thin layer that has a low permeability. This thin layer, called a 'clogging

9   layer' develops over time and reduces each basin's recharge rate.

10       39.    OCWD cleans the recharge basins to remove the clogging layer. Removal

11   of the clogging layer restores the basin's recharge rate to the highest rate possible. For over

12   30 years, OCWD has been cleaning the recharge basins using heavy construction

13   equipment such as bulldozers and scrapers. In order to clean a basin the water must be

14   removed, the basin allowed to dry and then the heavy equipment is used to scrape off a very

15   thin layer from the bottom and sides of the basin. The process can take from 2 to 12 weeks

16   depending on the size and location of the facility.

17       40.    Mechanical cleaning with heavy equipment is not the most efficient method

18   to clean the basins. Unfortunately, the process unnecessarily removes some of the native,

19   clean sediment from the recharge facilities. Additionally, the recharge basins must be

20   drained and allowed to dry before the heavy equipment can operate in them, which can take

21   weeks. OCWD has therefore conducted extensive research and testing of alternative

22   cleaning methods. Based on this research and testing, two additional methods of cleaning

23   are being employed.

24       41.    OCWD has installed four basin cleaning vehicles ("BCV") that allow for

25   basin cleaning without having to drain the basins. The BCVs utilize a floating barge with a

26   unique patented dredge type head that is connected to an undercarriage traveling at the

27   bottom of the recharge basin. The dredge spins a brush head that is located in a vacuum

28   hood which extracts the suspended solids from the basin. All electrical components,

600278517v1

18

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199695

1  controls and the operator are located on the floating barge.  Exhibit OCWD 1-19 shows a

2  photograph of the BCV in Miller Recharge Basin.  This design has demonstrated success in

3  increasing recharge in shallow recharge basins.

4       42.     OCWD has also purchased a beachcleaner to remove the clogging layer.

5  The beachcleaner, originally developed to remove trash from sandy beaches, effectively

6  removes the thin clogging layer in the bottom of recharge basins once they are dry.  A

7  picture of the beachcleaner is shown in Exhibit OCWD 1-20.

8       43.     OCWD also has a team of OCWD staff called the "Recharge Enhancement

9  Working Group" that works to enhance the operations of the District's recharge system.

10  The team initiates, tests, and implements new ideas to clean the recharge basins, remove

11  sediment from the recharge water, and other improvements to maximize recharge.  Outside

12  experts from other organizations are also invited to the Recharge Enhancement Working

13  Group meetings to evaluate concepts developed by other agencies.

14       44.     OCWD also constructed a pump station and 66-inch diameter pipeline to

15  convey SAR flows from the Burris Basin to Santiago Basin.  The Santiago Basin includes

16  Bond Pit, Blue Diamond Pit, and Smith Pit.  The pump station and pipeline can convey up

17  to 235 cfs to Santiago Basin.  OCWD can divert up to approximately 15 cfs from the 66-

18  inch diameter pipeline into Santiago Creek for groundwater recharge in the unlined portion

19  of Santiago Creek.

20       B.     New Source of 72,000 AFA of Water – The Groundwater

21              Replenishment System.

22       45.     In order to further maximize the use of local resources and replace the need

23  to import water from outside the watershed, OCWD and the Orange County Sanitation

24  District ("OCSD") are in the final stages of construction of the $480 million Groundwater

25  Replenishment System.  This system will recycle water that OCSD otherwise would

26  discharge to an ocean outfall.  Phase 1 will be completed in Fall 2007 and produce 72,000

27  AFA of new water supply.  The new water supply will be used for the seawater intrusion

28  barrier in the Talbert Gap and to replenish the groundwater basin using the Kraemer

60027851 7v1                                    19
                    DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                                            Exhibit OCWD 1-1

OCWD-MTBE-001-199696

1    Recharge Basin in Anaheim. The Groundwater Replenishment System will purify

2    secondary treated wastewater using microfiltration, reverse osmosis, and advanced

3    oxidation. The advanced oxidation treatment will be provided by ultraviolet light and

4    hydrogen peroxide. Because of the high degree of treatment, the water produced is near

5    distilled water quality and minerals need to be added back in to prevent the water from

6    dissolving minerals from the pipeline used to transport the water. The backbone of the

7    treatment plant is constructed to treat up to 110,000 AFA. Additional phases, beyond Phase

8    1, will be constructed as additional secondary treated wastewater becomes available.

9         46.    The high degree of treatment allows another increment of use for water that

10   would otherwise be disposed in the Pacific Ocean. OCSD partnered with OCWD on the

11   project because of the projects water supply and reliability benefits, and the project allows

12   the Sanitation District to defer construction of a second ocean outfall.

13   C.    OCWD's Water Quality Enhancement Program.

14        47.    OCWD's water quality protection program improves water quality in the

15   SAR and the groundwater basin. The program includes the Prado Wetlands, the Irvine and

16   Tustin Desalters, and the North Basin Groundwater Protection Project. OCWD also

17   engages in a proactive water quality monitoring program.

18        48.    OCWD re-constructed the 450-acre Prado Wetlands in 1996 to remove

19   nitrate from the SAR. Exhibit OCWD 1-21 is a map of the Prado Wetlands. From 1986 to

20   1992, base flow in the SAR exceeded the nitrate water quality objective for Reach 3 of the

21   SAR.[19] In response to this, the Regional Board required the dischargers upstream of Prado

22   Dam to provide additional treatment. In order to improve the quality of the source water to

23   the Orange County groundwater basin, OCWD constructed substantial improvement at the

24   Prado Wetlands. The wetlands had existed since the 1950s as duck hunting ponds, but were

25   not optimized to improve water quality through nitrate reduction. OCWD's reconstruction

26

27   ───────────────

28   [19] SAWPA. 2006. *2005 Annual Report on Santa Ana River Water Quality. Final Report.*

OCWD-MTBE-001-199697

1    in 1996 improved the wetlands' treatment capacity and resulted in a treatment efficiency

2    that can remove up to 90 percent of the nitrate in the SAR water diverted to the wetlands.

3          49.    OCWD and the Irvine Ranch Water District, with supporting funding from

4    the Department of Defense, constructed the Irvine Desalter to remediate volatile organic

5    compound contamination from the now closed El Toro Marine Corps Air Station.  In

6    addition to remediating the volatile organic compound contamination, the Irvine Desalter

7    also remediates high salt and nitrate concentration groundwater in the Irvine area.  The

8    desalter began operation in 2006 and is estimated to remove 2,000 tons per year of salts

9    from the groundwater basin.

10        50.    OCWD and the City of Tustin constructed the Tustin Seventeenth Street

11    Desalter, which began operation in 1996.  The desalter extracts and treats groundwater with

12    high nitrate and TDS concentration using three production wells and a reverse osmosis

13    treatment system.  The reverse osmosis treatment capacity is 2 million gallons per day.

14        51.    OCWD has completed review under the California Environmental Quality

15    Act ("CEQA") and is in final design to construct the North Basin Groundwater Protection

16    Project.  The purpose of the project is to control migration of groundwater contaminated

17    with volatile organic compounds and remove contaminated groundwater from the

18    groundwater basin.  After extraction through five wells, the water will be treated and

19    recharged back into the groundwater basin.  The estimated cost of the project is

20    $50 million.  OCWD is pursuing legal action against the parties responsible for the

21    contamination.

22        52.    OCWD is also pursuing legal action against parties that are responsible for

23    contaminating groundwater with MTBE.

24        D.    Proactive Water Quality Monitoring Program.

25        53.    OCWD has a far-reaching monitoring program for the SAR and the

26    groundwater basin.  From 1994 to 2004, OCWD voluntarily conducted the Santa Ana River

27    Water Quality and Health ("SARWQH") Study at a cost of $10 million.  The final report

28

600278517v1

21

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199698

1    for the project was published in 2004.[20]  OCWD conducted the study because of the high

2    percentage of wastewater in the SAR during non-storm periods.  The goals of the

3    SARWQH Study were to apply advanced water quality characterization methods to assess

4    the quality of the SAR water and the groundwater after SAR water is recharged.  The multi-

5    disciplinary study design included an examination of hydrogeology, microbiology,

6    inorganic and organic water chemistry, toxicology and public health.  Analyses and

7    research in the SARWQH Study were conducted by scientists, researchers, and water

8    quality experts from numerous organizations, including Stanford University, Lawrence

9    Livermore Nation Lab, USGS, Oregon State University, and Met.  The results of this

10    extensive study confirmed that current recharge practices using SAR water are protective of

11    public health.  Findings from the SARWQH Study provided information necessary for the

12    planning and permitting of other projects, such as the Groundwater Replenishment System

13    currently under construction at OCWD.  Results are also helping to shape the California

14    Department of Health Services (DHS) proposed regulations for groundwater recharge.

15         54.    OCWD requested that the National Water Research Institute ("NWRI")

16    conduct an independent review of the results from the SARWQH Study.  NWRI assembled

17    a group of experts in the fields of hydrogeology, water chemistry, microbiology, and the

18    other requisite fields to form the Scientific Advisory Panel for OCWD SARWQH Study.

19    The Scientific Advisory Panel met annually during the study to review the results and

20    provide recommendations on future work.  The panel also prepared a final report (Exhibit

21    OCWD 1-22).  The panel's report states:

22         "Based on the scientific data collected during the SARWQH Study, the Panel found

23         that:

24         • The SAR met all water-quality standards and guidelines that have been

25           published for inorganic and organic contaminants in drinking water.

26         • No chemicals of wastewater origin were identified at concentrations that are

27

28

---

[20] OCWD. 2004. *Final Report, Santa Ana River Water Quality and Health Study.*

600278517v1

22

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199699

1          of public health concern in the SAR, in water in the infiltration basins, or in

2          nearby groundwaters.

3          The constituents that were considered included non-regulated chemicals (e.g.,

4          pharmaceutically active chemicals) and contaminants of concern that arose during

5          the course of the SARWQH study (e.g., N-nitrosodimethylamine [NDMA]).

6          The unprecedented classification of the major components of DOC and the

7          transformations that occur within these chemical classes as water moves

8          downstream and into the aquifer provided significant new evidence to support the

9          conclusion that the product water is suitable for potable consumption and is also

10        becoming comparable to other sources of drinking water, such as the Colorado

11        River, in its organic profile."[21]

12        55.      To support ongoing water quality assessments, OCWD has a Water Quality

13 Department with 10 staff members that collect samples from over 500 wells across the

14 groundwater basin. OCWD's Water Quality Department also collects samples from the

15 SAR and key tributaries to the SAR. OCWD also has a Laboratory Department staffed

16 with 24 chemists and technicians that conduct over 300,000 water quality analyses per year.

17 OCWD has also finished final design and is bidding construction of a new 41,000 square

18 foot water quality laboratory. The total cost of the new laboratory is estimated to be $24

19 million.

20        56.      Over the last 20 years, OCWD has invested $92 million in recharge

21 enhancement projects in Anaheim and Orange to increase recharge of the SAR. OCWD

22 has also invested $9 million dollars in the Prado Basin to improve water quality, provide for

23 temporary water storage by the Army Corps, and enhance natural resources. These

24 program investments, together with the Groundwater Replenishment System and other

25 OCWD projects, allow OCWD to maximize the beneficial use of the SAR, protect water

26 ─────────────

27 [21] NWRI. 2004. *Report of the Scientific Advisory Panel, OCWD's Santa Ana River Water Quality and Health Study.*

28

600278517v1               23

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

**OCWD-MTBE-001-199700**

1  quality, and provide an additional use of SAR water before it is discharged to the Pacific

2  Ocean.  Like most of OCWD's programs, these efforts are funded with revenues OCWD

3  collects from the basin producers, in the form of the Replenishment Assessment and Basin

4  Equity Assessment.

5  VII.  <u>OCWD'S FUTURE PROJECTS TO MAXIMIZE USE OF THE SAR.</u>

6       57.  OCWD has a program consisting of short-term and long-term projects to

7  increase recharge of the SAR.  The projects include enhancements to OCWD's existing

8  facilities, new recharge facilities, and increased water storage.  Implementation of these

9  projects will leverage OCWD's previous investments by increasing the efficiency of

10  existing facilities.  Implementation will also allow OCWD to recharge up to 505,000 AFA.

11  Projects to expand storage and recharge are included in the future projects, since increased

12  recharge capacity is needed to drain the new storage as quickly as possible.  By draining

13  stored water as quickly as possible, new storage space is created for subsequent storms.

14       58.  The increased diversions and the proposed recharge and storage facilities

15  provide an opportunity for the District to achieve the following project objectives:

16       •  Protect beneficial uses of the Orange County Groundwater Basin;

17       •  Improve the reliability of local groundwater supply to serve local water

18         demands;

19       •  Maximize sustainable water supplies during drought periods;

20       •  Increase the sustainable yield of the Orange County Groundwater Basin in a

21         cost effective manner to maximize the use of local water supplies to serve

22         local water demands;

23       •  Improve beneficial use of local water supplies;

24       •  Reduce dependence on imported water; and

25       •  Increase operational flexibility by increasing both recharge capacity and

26         recharge location options to better manage groundwater basin conditions.

27       59.  OCWD's future projects to maximize the use of the SAR and their CEQA

28  coverage are listed in Table 2.  All the projects have undergone program-level CEQA

600278517v1

24

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199701

1    analysis, as set forth in the OCWD Application to Appropriate SAR Water Program EIR

2    (State Clearinghouse No. 2002081024) certified by the OCWD Board of Directors in July

3    2006. OCWD prepared a draft EIR, and circulated it for comments. Based on comments

4    received, OCWD recirculated the draft EIR. OCWD prepared responses to the comments

5    and a Mitigation Monitoring and Reporting Program, and certified the Final EIR in July

6    2006. This Final EIR is Exhibit OCWD 1-23.[22] OCWD also prepared a Project Summary

7    Report for the EIR, which is Exhibit OCWD 1-24. OCWD also completed project-level

8    CEQA analyses on six additional projects in 2006 and 2007. These projects are:

9          • La Jolla Recharge Basin (EIR certified in May 2006; this EIR is Exhibit

10           OCWD 1-25);

11          • Anaheim Lake BCV (Categorical exemption adopted in 2007);[23]

12          • Kraemer Basin BCV (Categorical exemption adopted in 2007);

13          • Increased water conservation at Prado Dam – Prado Basin Water

14           Conservation Feasibility Study EIR (EIR certified in August 2006; this EIR

15           is Exhibit OCWD 1-27);

16          • Burris Pit BCV (Categorical exemption adopted in 2007); and

17          • Bond Pit BCV (Categorical exemption adopted in 2007).

18        60.    At this time, ten of the projects listed in Table 2 have undergone project-

19    level CEQA analysis. With these ten projects and the 14,000 AFA recharge capacity

20    attributed to the Santiago Creek Replenishment and River View Recharge Basin Projects

21    that have completed project-level CEQA and been implemented since the OCWD

22    application to appropriate was submitted, an additional 112,000 AFA of recharge capacity

23    has undergone project-level CEQA analysis. As indicated in Table 2, when OCWD's

24

---

25   [22]  The CEQA documentation for prior OCWD projects is included in this EIR under
       Appendix M, except for a Negative Declaration for Prado Wetlands Reconstruction,
26      Exhibit OCWD 1-32.

27   [23]  The categorical exemption for the four BCVs in Anaheim Lake, Kraemer Basin, Burris
       Pit, and Bond Pit is Exhibit OCWD 1-26.

28

600278517v1                25
               DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

                                      Exhibit OCWD 1-1

OCWD-MTBE-001-199702

1    application to appropriate was submitted, OCWD's existing facilities recharge capacity was

2    250,000 AFA.  Combining OCWD's recharge capacity when the application to appropriate

3    was filed and ten new projects with project-level CEQA, 362,000 AFA recharge capacity

4    has undergone project-level CEQA review.  OCWD's remaining projects have undergone

5    program-level review, and project-level review will follow as the projects move into

6    development.

7    ///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

600278517v1

26
DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

**OCWD-MTBE-001-199703**

**TABLE 2**
**SUMMARY OF NEAR-TERM AND LONG-TERM PROJECTS**

| | | Recharge (Diversion) Capacity (AF/Y) | Storage Capacity (AF) * | CEQA Coverage |
|---|---|---|---|---|
| | **Near-Term Projects** | | | |
| 1 | La Jolla Recharge Basin | 9,000 | | La Jolla Recharge Basin EIR, SCH No. 2003041160, certified in May 2006 |
| 2 | Mira Loma Recharge Basin | 10,000 | | EIR to be prepared in future |
| 3 | Santiago Creek Expanded Recharge | 3,000 | | OCWD Application to Appropriate SAR Water EIR, SCH No. 2002061024, certified in July 2006 |
| 4 | Anaheim Lake Expanded Recharge | 2,000 | | OCWD Application to Appropriate SAR Water EIR, SCH No. 2002061024, certified in July 2006 |
| | **Basin Cleaning Vehicles [1] [BCV]** | | | |
| 5 | Anaheim Lake | 18,000 | | Categorical exemption adopted April 2007 |
| 6 | Kraemer Basin | 18,000 | | Categorical exemption adopted April 2007 |
| 7 | Miller Basin ** | 7,000 | | Categorical exemption adopted May 2003 |
| 8 | Weir Pond #3 ** | 8,000 | | Categorical exemption adopted May 2003 |
| 9 | Five Coves ** | 8,000 | | Categorical exemption adopted May 2003 |
| 10 | Prado Dam (Flood season 498 feet) [2] | | 10,000 | Prado Basin Water Conservation Feasibility Study EIR SCH No. 2004051004 certified in August 2006 |
| | **Subtotal** | 97,000 [4] | 10,000 | |
| | **Long-Term Projects** | | | |
| 11 | Prado Dam (Conservation elev. = 514) [2] | | 23,600 | Program-level review of additional long-term recharge basins and storage facilities provided in OCWD Application to Appropriate SAR Water EIR, SCH No. 2002061024 . Additional project-level CEQA to be provided in future as appropriate. |
| 12 | Fletcher Recharge Basin | 1,000 | | |
| 13 | Additional Recharge Basins [3] | 77,000 | | |
| | **Basin Cleaning Vehicle** | | | |
| 14 | Burris Pit | 15,000 | | Categorical Exemption adopted April 2007 |
| 15 | Bond Pit | 10,000 | | Categorical Exemption adopted April 2007 |
| 16 | Subsurface Collection/ Recharge System (SCARS) – Multiple Sites | 10,000 | | Program-level review of additional long-term recharge basins and storage facilities provided in OCWD Application to Appropriate SAR Water EIR, SCH No. 2002061024, Additional project-level CEQA to be provided in future as appropriate. |
| 17 | Deep Basin Filtration Recharge – 3 sites | 25,000 | | |
| 18 | Recharge Galleries – 2 sites | 20,000 | | |
| 19 | Gypsum Canyon Reservoir [2] | | 30,000 | |
| 20 | Aliso Canyon Reservoir [2] | | 30,000 | |
| | **Subtotal** | 158,000 | 83,600 | |
| | **Existing Facilities When Application Submitted** | 250,000 | | |
| | **Total** | 505,000 | 93,600 | |

OCWD-MTBE-001-199704

Notes for Table 2

[1] Deep Basin continuous cleaning device will increase percolation rates.

[2] Storm flows captured for later release to the SAR for diversion downstream at recharge facilities when capacity becomes available.

[3] 150 acres total – multiple sites.

[4] Includes 14,000 af attributed to Santiago Creek Replenishment and River View Recharge Basin projects that have been implemented since the application was submitted.

[*] Denotes size of reservoir. Reservoirs may be filled and drained multiple times per year.

[**] OCWD has completed separate CEQA review and these projects are in development.

## VIII.   PRIOR WATER RIGHTS.

61.    Historically OCWD's operations have been based on rights to use Santa Ana River ("SAR") water which arose as early as the mid-1800's. At the time that OCWD was formed, the Anaheim Union Water Company ("AUWC") and the Santa Ana Valley Irrigation Company ("SAVI") owned pre-1914 water rights dating back to the 1870s, which entitled each of them to take one-half of the normal surface flow of the SAR below the present location of Prado Dam.[24] They each also held licenses to divert 6.1 cfs of water from the SAR from June 1 through December 1 of each year. AUWC possessed License 6378 for diversion and use of SAR water. Exhibit OCWD 1-28. SAVI possessed License 6403 for diversion and use of SAR water. Exhibit OCWD 1-29. As those exhibits show, OCWD acquired the water rights held by AUWC and SAVI by condemnation of AUWC's water rights in 1967 and purchase of SAVI's water rights in 1968. It thereby acquired the license rights and pre-1914 rights to divert the surface flow of the SAR once it reaches Prado Dam.

62.    In order to resolve conflicting demands for water in the watershed, in 1963 OCWD filed an action to obtain an adjudication of water rights against substantially all water users in the area tributary to Prado Dam. Thirteen cross-complaints were filed in 1968, by which this adjudication was extended to substantially all water users within the SAR watershed. It soon became apparent to the Court and the parties that rather than define the rights of all parties in the watershed, it was necessary to develop a "physical

---

[24] See Orange County Water District vs. City of Riverside (1959) 173 Cal. App. 2d 137, 175; Yorba vs. Anaheim Union Water Company (1953) 41 Cal. 2d 265, 272.

600278517v1

28

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199705

1    solution" which would meet the needs of all parties.  The parties negotiated and stipulated

2    to such a settlement, which was embodied in a Judgment, commonly called the "1969

3    Judgment", entered in the case of OCWD v. City of Chino, et al. by the Court on April 17,

4    1969 (Case No. 117628) (Exhibit OCWD 1-30).  Said physical solution accomplishes a

5    general inter-basin allocation of the natural water supply of the Santa Ana River

6    system . . . ,"[25] allotting to OCWD a guaranteed minimum of 42,000 AFA of base flow at

7    Prado Dam, subject to certain water quality criteria, plus all of the storm flow that reaches

8    Prado.  The great merit of this physical solution lies in the fact that flows in the upper

9    watershed, after being used and re-used as necessary, ultimately flow downstream to Prado,

10    where OCWD can capture, clean and re-use the water again.

11         63.    In 1961, OCWD obtained License Nos. 006378 and 006403, each to divert

12    6.1 CFS.  These licenses were premised on salvage, based on clearing phreatophytes from

13    the stream above Prado Dam.  OCWD 1-31.

14         64.    In 1969, OCWD became party to the Stipulated Judgment which, along with

15    related documents, is described in the April 5, 2007 Stipulation submitted to the State

16    Water Resources Control Board for these proceedings.

17    IX.    PROTEST RESOLUTION STATUS.

18         65.    All of the active protests to OCWD's Application have been resolved.

19         66.    Protests to OCWD's Application were submitted to the State Board by

20    (1) the California Sportfishing Protection Alliance ("CSPA") on February 18, 2002; (2) the

21    City of San Bernardino Municipal Water Department ("SBMWD") on July 15, 2002;

22    (3) East Valley Water District ("EVWD") on July 16, 2002; (4) the City of Redlands on

23    July 16, 2002; (5) the Orange County Flood Control District, San Bernardino Flood Control

24    District, and Riverside County Flood Control and Water Conservation District (collectively,

25    "Local Sponsors") on July 16, 2002;(6) the City of Riverside on July 17, 2003; (7) the

26

27    [25] Exhibit OCWD 1-30, Stipulation and Order Re Dismissal of Certain Defendants, p. 4, lines 12-13.

28

600278517v1

29

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

OCWD-MTBE-001-199706

1    *of San Bernardino Concerning Water Rights*, Exhibit OCWD 1-36;

2    • June 23, 2006 *Agreement Between Orange County Water District and East*

3    *Valley Water District Concerning Water Rights* , Exhibit OCWD 1-37, and

4    June 29, 2006 letter to Arthur Baggett on behalf of EVWD requesting dismissal

5    of its protest, Exhibit OCWD 1-38;

6    • July 24, 2006 *Agreement Between Orange County Water District and City of*

7    *Riverside Concerning Water Rights*, Exhibit OCWD 1-39, and September 5,

8    2006 letter to Mitchell Moody enclosing same, Exhibit OCWD 1-40;

9    • September 26, 2006 *Agreement Between the Orange County Water District and*

10    *the Department of Fish and Game to Dismiss Department's Protest regarding*

11    *Water Application No. 31174*, Exhibit OCWD 1-41;

12    • September 27, 3006 letter to Victoria Whitney from the U.S. Forest Service

13    withdrawing its protest, Exhibit OCWD 1-42;

14    • January 3, 2007 letter from Robert Donlan on behalf of the Local Sponsors to

15    Jane Farwell withdrawing Local Sponsors' protest, Exhibit OCWD 1-43.

16

17    Executed under the penalty of perjury under the laws of the State of California in

18    Fountain Valley, California on April _11_, 2007.

19

20    Craig D. Miller, P.E.

21

22

23

24

25

26

27

28

600278517v1

31

DIRECT TESTIMONY OF CRAIG D. MILLER, P.E.

Exhibit OCWD 1-1

**OCWD-MTBE-001-199708**

# Exhibit 10



# State Water Resources Control Board

### Division of Water Rights
1001 I Street, 14th Floor ♦ Sacramento, California 95814 ♦ 916.341.5300
P.O. Box 2000 ♦ Sacramento, California 95812-2000
Fax: 916.341.5400 ♦ www.waterboards.ca.gov/waterrights



Linda S. Adams
*Secretary for*
*Environmental Protection*

Arnold Schwarzenegger
*Governor*

**RECEIVED**
·JUL 07 2009
ACCOUNTING DEPT

In Reply Refer
to:31174A

**JUN 3 0 2009**

Orange County Water District
18700 Ward Street
Fountain Valley, CA 92708

PERMIT 21243 (APPLICATION 31174A), SANTA ANA RIVER TRIBUTARY TO PACIFIC OCEAN, IN ORANGE AND RIVERSIDE COUNTIES

Your WATER RIGHT PERMIT is enclosed. Please note that, with respect to other water rights attaching to this source, the priority of your right is identified by the filing date of your application. Therefore, in times of water shortage, those diverters with water rights senior to yours can take their water first. Additional limitations on your diversion and use of water are specified by the terms of this permit. Please read the terms and conditions of your permit carefully so that you are familiar with your responsibilities as an appropriator of water.

The State Water Resources Control Board (State Water Board) requires that you submit annual reports showing the progress you have made in the construction of your project and the use of water made under this permit that will qualify for licensing purposes. We will mail the forms to you when the reports are due.

Annual permit fees are required. The California Board of Equalization will mail you a Notice of Determination (billing) on behalf of the State Water Board when the fee is due. Please pay the fee promptly. Nonpayment of the fee may result in revocation of your permit.

You must comply with all of the conditions in your permit. The State Water Board will not issue a license for any water diverted and used for any purpose or at any place not authorized in the permit. Nor will the State Water Board credit you for any development or use that occurs after the date specified in the permit unless you request and receive an extension of time to use the water. An extension of time to continue development of a project requires public noticing and reevaluation of then-current environmental considerations, and is becoming considerably more difficult to obtain.

After the project has been completed, an inspection will be made to determine the amount of water that has been placed to beneficial use within the terms of the permit. A license will then be issued confirming a right to that amount of water. Please keep sufficient records of your diversion and use of water to facilitate this process.

Please inform us of any changes in address or ownership. The State Water Board will mail all notices, including fee notices, to the most recent address supplied. The regulations require a water right holder to immediately file a statement informing the State Water Board of any change in ownership of the application, permit, or license. The statement shall refer to the number of the water right, and identify the name and address of the new owner. This is important because failure to supply this information could result in your liability to pay water right fees, including penalty and interest for late payment, even after you have sold the property



*California Environmental Protection Agency*

♻ *Recycled Paper*


EXHIBIT 57
woodside
7-27-11

- 2 -

JUN 3 0 2009

served by the water right.  Change in name/address or ownership forms are available at the Division of Water Rights' website, www.waterboards.ca.gov/waterrights.

Should you have any questions regarding this matter, please contact Jean McCue at (916) 341-5351.

Sincerely,

*For*   Charles L. Lindsay, Chief
Hearings Unit

Enclosure

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
STATE WATER RESOURCES CONTROL BOARD

DIVISION OF WATER RIGHTS

# PERMIT FOR DIVERSION AND USE OF WATER

## PERMIT 21243

Application 31174A of     Orange County Water District
18700 Ward Street
Fountain Valley, California  92708

filed on **November 5, 1992**, has been approved by the State Water Resources Control Board (State Water Board or Board) SUBJECT TO PRIOR RIGHTS and to the limitations and conditions of this permit.

Permittee is hereby authorized to divert and use water as follows:

1.  Source of water

Source:                                      Tributary to:

Santa Ana River                              Pacific Ocean

within the Counties of Orange and Riverside.

2.  Location of points of diversion (POD).  Points 2 – 8 are also points of rediversion.

| By California Coordinate System of 1983, Zone 6 | 40-acre subdivision of public land survey or projection thereof | Section (Projected) | Township | Range | Base and Meridian |
|---|---|---|---|---|---|
| POD #1: River Road<br><br>North 2,281,879 ft. and East 6,152,300 ft. | NW¼ of SE¼ | 10 | 03S | 07W | SB |
| POD #2: Imperial Inflatable Dam<br><br>North 2,258,721 ft. and East 6,090,696 ft. | NW¼ of NW¼ | 2 | 04S | 09W | SB |
| POD #3: Below Lakeview<br><br>North 2,258,463 ft. and East 6,085,460 ft. | SW¼ of NW¼ | 3 | 04S | 09W | SB |
| POD #4: Below Tustin Avenue<br><br>North 2,255,551 ft. and East 6,077,538 ft. | SW¼ of SE¼ | 5 | 04S | 09W | SB |

Application 31174A
Page 2 of 7

Permit 21243

| | | | | | |
|---|---|---|---|---|---|
| POD #5: Five Coves Inflatable Dam<br><br>North 2,253,771 ft. and East 6,073,539 ft. | NE¼ of NE¼ | 7 | 04S | 09W | SB |
| POD #6: East of Glassell Street<br><br>North 2,253,426 ft. and East 6,073,169 ft. | SW¼ of NE¼ | 7 | 04S | 09W | SB |
| POD #7: Diversion through Santa Ana River Bottom<br><br>North 2,258,982 feet East 6,093,998 feet<br><br>thence various instream percolation areas downstream to | NW¼ of NE¼ | 2 | 04S | 09W | SB |
| North 2,244,471 feet East 6,069,748 feet | NW¼ of NW¼ | 19 | 04S | 09W | SB |
| POD #8: Prado Dam<br><br>North 2,270,767 ft. and East 6,138,417 ft. | SW¼ of SW¼ | 20 | 03S | 07W | SB |

| 3.  Purpose of use | 4.  Place of use | Section (Projected) | Township | Range | Base and Meridian | Acres |
|---|---|---|---|---|---|---|
| Municipal,<br><br>Industrial,<br><br>Recreational,<br><br>Fish and Wildlife Preservation and Enhancement | Within the Area overlying the Orange County Groundwater Basin.* | | | | | |

*The place of use is shown on map dated April 27, 2009, and filed with the State Water Board.

5.  The water appropriated shall be limited to the quantity which can be beneficially used and shall not exceed 362,000 acre-feet per annum to be collected to a combination of underground storage and/or surface storage from January 1 to December 31 of each year.  The maximum rate of diversion to underground storage via points of diversion 2 through 7 shall not exceed 1,670 cubic feet per second.

(0000005H)

6.  The amount authorized for appropriation may be reduced in the license if investigation warrants.

(0000006)

Application 31174A                 Permit 21243
Page 3 of 7

7. Construction work and the application of water to beneficial use shall be prosecuted with reasonable diligence and be completed by December 31, 2057.

(0000009)

8. Progress reports shall be submitted promptly by permittee when requested by the State Water Board until a license is issued.

(0000010)

9. Permittee shall allow representatives of the State Water Board and other parties, as may be authorized from time to time by said State Water Board, reasonable access to project works to determine compliance with the terms of this permit.

(0000011)

10. Pursuant to California Water Code sections 100 and 275, and the common law public trust doctrine, all rights and privileges under this permit and under any license issued pursuant thereto, including method of diversion, method of use, and quantity of water diverted, are subject to the continuing authority of State Water Board in accordance with law and in the interest of the public welfare to protect public trust uses and to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of said water.

The continuing authority of the State Water Board may be exercised by imposing specific requirements over and above those contained in this permit with a view to eliminating waste of water and to meeting the reasonable water requirements of Permittee without unreasonable draft on the source. Permittee may be required to implement a water conservation plan, features of which may include but not necessarily be limited to (1) reusing or reclaiming the water allocated; (2) using water reclaimed by another entity instead of all or part of the water allocated; (3) restricting diversions so as to eliminate agricultural tailwater or to reduce return flow; (4) suppressing evaporation losses from water surfaces; (5) controlling phreatophytic growth; and (6) installing, maintaining, and operating efficient water measuring devices to assure compliance with the quantity limitations of this permit and to determine accurately water use as against reasonable water requirements for the authorized project. No action will be taken pursuant to this paragraph unless the State Water Board determines, after notice to affected parties and opportunity for hearing, that such specific requirements are physically and financially feasible and are appropriate to the particular situation.

The continuing authority of the State Water Board also may be exercised by imposing further limitations on the diversion and use of water by the Permittee in order to protect public trust uses. No action will be taken pursuant to this paragraph unless the State Water Board determines, after notice to affected parties and opportunity for hearing, that such action is consistent with California Constitution Article X, Section 2; is consistent with the public interest; and is necessary to preserve or restore the uses protected by the public trust.

(0000012)

11. The quantity of water diverted under this permit and under any license issued pursuant thereto is subject to modification by the State Water Board if, after notice to the Permittee and an opportunity for hearing, the State Water Board finds that such modification is necessary to meet water quality objectives in water quality control plans which have been or hereafter may be established or modified pursuant to Division 7 of the Water Code. No action will be taken pursuant to this paragraph unless the State Water Board finds that (1) adequate waste discharge requirements have been prescribed and are in effect with respect to all waste discharges which have any substantial effect upon water quality in the area involved, and (2) the water quality objectives cannot be achieved solely through the control of waste discharges.

(0000013)

12. This permit does not authorize any act that results in the taking of a threatened or endangered species or any act that is now prohibited, or becomes prohibited in the future, under either the California Endangered Species Act (Fish & Game Code, §§ 2050-2097) or the federal Endangered

Application 31174A                    Permit 21243
Page 4 of 7

Species Act (16 U.S.C.A. §§ 1531-1544).  If a "take" will result from any act authorized under this water right, the Permittee shall obtain authorization for an incidental take prior to construction or operation of the project. Permittee shall be responsible for meeting all requirements of the applicable Endangered Species Act for the project authorized under this permit.

(0000014)

13. Permittee shall maintain records of the amount of water diverted and used to enable the State Water Board to determine the amount of water that has been applied to beneficial use pursuant to Water Code section 1605.

(0000015)

14. Permittee shall consult with the Division of Water Rights and develop and implement a water conservation plan or actions.  The proposed plan or actions shall be presented to the State Water Board for approval within one year from the date of this permit or such further time as, for good cause shown, may be allowed by the Board.  A progress report on the development of a water conservation program may be required by the Board at any time within this period.  All cost-effective measures identified in the water conservation program shall be implemented in accordance with the schedule for implementation found therein.

(0000029A)

15. If it is determined after permit issuance that the as-built conditions of the project are not correctly represented by the map(s) prepared to accompany the application, Permittee shall, at his expense, have the subject map(s) updated or replaced with equivalent as-built map(s).  Said revision(s) or new map(s) shall be prepared by a civil engineer or land surveyor registered or licensed in the state of California and shall meet the requirements prescribed in section 715 and sections 717 through 723 of the California Code of Regulations, Title 23.  Said revision(s) or map(s) shall be furnished upon request of the Deputy Director for Water Rights.

(0000030)

16. No work shall commence and no water shall be diverted, stored or used under this permit until a copy of a stream or lake alteration agreement between the California Department of Fish and Game (CDFG) and Permittee is filed with the Division of Water Rights.  Compliance with the terms and conditions of the agreement is the responsibility of Permittee.  If a stream or lake agreement is not necessary for this permitted project, Permittee shall provide the Division of Water Rights a copy of a waiver signed by CDFG.

(0000063)

17. In order to prevent degradation of the quality of water during and after construction of the project, prior to commencement of construction, permittee shall file a report pursuant to Water Code Section 13260 and shall comply with all waste discharge requirements imposed by the California Regional Water Quality Control Board, Santa Ana Region, or by the State Board.

(0000100)

18. Prior to diversion of water under this permit, Permittee shall (1) install devices to measure the quantities of water placed into underground storage and (2) install devices to measure or provide documentation of the method to be used to determine the quantity of water recovered from underground storage and placed to beneficial use.  All measuring devices and the method of determining the quantity of water recovered from underground storage shall be approved by the State Water Board prior to diversion of water under this permit.  All measuring devices shall be properly maintained.

(0080117)

19. The Permittee shall obtain all necessary state and local agency permits required by other agencies prior to construction and diversion of water.  Copies of such permits and approvals shall be forwarded to the Deputy Director for Water Rights.

(0000203)

Application 31174A                          Permit 21243
Page 5 of 7

20. No debris, soil, silt, cement that has not set, oil, or other such foreign substance will be allowed to
enter into or be placed where it may be washed by rainfall runoff into the waters of the State.  When
operations are completed, any excess materials or debris shall be removed from the work area.

(0000208)

21. Prior to implementing the project, Permittee will conduct a Phase I Site Assessment for hazardous
waste and soil contamination for the portion of Santiago Creek between Hart Park and the Santa Ana
River. Permittee shall comply with recommendations in the Site Assessment to avoid transporting
contamination.

If the Site Assessment identifies the potential for contaminated soils to be transported by the project,
Permittee will redesign the project to avoid this area or remediate the contamination so that no
adjacent properties or the groundwater basin would be adversely affected.

(0400500)

22. Permittee will notify the owners of active production wells within 500 feet of the lower reach of
Santiago Creek between Hart Park and the Santa Ana River of its intent to increase recharge of
groundwater within Santiago Creek.  In coordination with these well owners,  Permittee will develop
and implement a groundwater monitoring plan similar to the existing plan for the upper reach of the
creek that will provide early detection of changes to groundwater chemistry resulting from the project.
If the monitoring plan identifies adverse effects to water chemistry, the State Water Board Deputy
Director for Water Rights will be notified.  The results from periodic groundwater monitoring will be
submitted to the Santa Ana Regional Water Quality Control Board.

(0400500)

23. The State Water Board adopts and incorporates by reference into this permit the hydrology and water
resources and reporting requirements identified in the Final EIR, specifically Mitigation Measures
M-HYDRO-1, M-HYDRO-2, M-HYDRO-3, M-HYDRO-4, M-HYDRO-5, and M-HYDRO-6 (see the
attached Table 1). Permittee must implement the measures to mitigate significant impacts to water
quality resources and conduct the required reporting and monitoring of those measures.  The State
Water Board reserves jurisdiction to require any reasonable amendments to these measures and
requirements necessary to ensure that they will accomplish the stated goal.

(0400500)

24. The State Water Board adopts and incorporates by reference into this permit the mitigation,
monitoring, and reporting requirements applicable to biological resources identified in the Final PEIR,
specifically Mitigation Measures M-BIO-1, M-BIO-2, M-BIO-3, M-BIO-4, M-BIO-5, and M-BIO-6 (see
the attached Table 1). Permittee must implement the measures to mitigate significant impacts to
biological resources and conduct the required reporting and monitoring of those measures. The State
Water Board reserves jurisdiction to require any reasonable amendments to these measures and
requirements to ensure that they will accomplish the stated goal.

(0400500)

25. The State Water Board adopts and incorporates by reference into this permit the mitigation,
monitoring, and reporting requirements applicable to cultural resources and hazardous materials
identified in the Final PEIR, specifically Mitigation Measures M-CULT-1, M-CULT-2, M-CULT-3, M-
HAZ-1, and M-HAZ-2 (see the attached Table 1).  Permittee must implement the measures to mitigate
significant impacts to cultural resources and hazardous materials, and must conduct the required
reporting and monitoring of those measures. The State Water Board reserves jurisdiction to require
any reasonable amendments to these measures and requirements to ensure that they will accomplish
the stated goal.

(0400500)

Application 31174A                          Permit 21243
Page 6 of 7

26. Permittee shall either:

   a.   Come into compliance, no later than December 31, 2011, with all terms of the September 26, 2006 settlement agreement between Permittee and CDFG, as follows:

       (i)   Assess sites for Santa Ana sucker (Catostomus santaanae) (sucker) re-introduction within the Santa Ana River watershed.

      (ii)   Submit a reintroduction and monitoring plan for CDFG and State Water Board Deputy Director for Water Rights (Deputy Director) review and approval. The monitoring plan shall include site specific location information with mapped GIS points, photos and annual reports.

     (iii)   Implement sucker re-introduction and monitoring at CDFG approved sites within the Santa Ana River.

     (iv)   Assess sites for experimental sucker habitat restoration above River Road Bridge in the Santa Ana River watershed.

      (v)   Submit an experimental sucker habitat restoration and monitoring plan for CDFG and Deputy Director review and approval. The monitoring plan shall include site specific location information with mapped GIS points and photos and annual reports.

     (vi)   Implement experimental sucker habitat restoration and monitoring at CDFG approved sites within the Santa Ana River watershed.

   Or

   b.   Comply with all terms and dates set out in such subsequent settlement agreement between Permittee and CDFG as supersedes the September 26, 2006 agreement. The terms and dates of any such subsequent settlement agreement are subject to approval of the Deputy Director.

                                             (0430500)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Application 31174A                    Permit 21243
Page 7 of 7

*This permit is issued and permittee takes it subject to the following provisions of the Water Code:*

*Section 1390. A permit shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with this division (of the Water Code), but no longer.*

*Section 1391. Every permit shall include the enumeration of conditions therein which in substance shall include all of the provisions of this article and the statement that any appropriator of water to whom a permit is issued takes it subject to the conditions therein expressed.*

*Section 1392. Every permittee, if he accepts a permit, does so under the conditions precedent that no value whatsoever in excess of the actual amount paid to the State therefor shall at any time be assigned to or claimed for any permit granted or issued under the provisions of this division (of the Water Code), or for any rights granted or acquired under the provisions of this division (of the Water Code), in respect to the regulation by any competent public authority of the services or the price of the services to be rendered by any permittee or by the holder of any rights granted or acquired under the provisions of this division (of the Water Code) or in respect to any valuation for purposes of sale to or purchase, whether through condemnation proceedings or otherwise, by the State or any city, city and county, municipal water district, irrigation district, lighting district, or any political subdivision of the State, of the rights and property of any permittee, or the possessor of any rights granted, issued, or acquired under the provisions of this division (of the Water Code).*

STATE WATER RESOURCES CONTROL BOARD

*James W. Kassel*

for  *Victoria A. Whitney*
*Deputy Director for Water Rights*

Dated:     JUN 3 0 2009

Attachment

# Exhibit 11

United States District Court
Southern District of New York

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

Orange County Water District v. Unocal Corp., et al.,
No. 04 Civ. 4968

## Expert Report of Anthony Brown

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4272

May 28, 2011

_____     MAY 28, 2011
Signature                   Date

1503 South Coast Drive, Suite 203
Costa Mesa, CA 92626

## Section 1:                    Opinion of Anthony Brown

### 1.1 Introduction

This written report is submitted in compliance with the disclosure requirements set forth in FRCP 26(2)(B), subject to the right to supplement the report in accordance with FRCP 26(e)(2).  This report focuses on an evaluation of releases of methyl tertiary-butyl ether (MTBE) and tert-butyl alcohol (TBA) from twenty-six (26) gasoline service stations (facilities) within the Coastal Plain of Orange County, California. These facilities have impacted the groundwater resources managed by the Orange County Water District (OCWD).

### 1.2 Qualifications

*Education*

I hold a B.A. Degree with Honors in Geography (1985) from King's College, University of London, a M.Sc. in Engineering Hydrology (1988) from the Imperial College of Science, Technology and Medicine (Imperial College), University of London, and a D.I.C. in Civil Engineering (1988) from Imperial College.

*Professional Experience*

I have 20+ years of experience as an environmental and water resources consultant. During this period, I have managed or directed an extensive number of contaminant investigations and remediation programs including facilities with multiple responsible parties, complex hydrogeology and fate and transport, multiple contaminants, and co-mingled plumes.  A substantial portion of my work has been performed on studies related to the assessment and remediation of water resources impacted by gasoline constituents, such as the fuel oxygenates MTBE and TBA.

My curriculum vitae, including a list of publications authored in the prior ten years and cases in which I served as an expert within the prior four years, is provided in Appendix A.   A schedule of my compensation regarding this matter is also included in Appendix A.

The exhibits that will be used to summarize or support the opinions expressed in this report are the exhibits which appear in, or are transmitted with, this report. The exhibits may subsequently be revised to allow for presentation in a manner appropriate to the proceeding where they are used. I reserve the right to update my opinion as new information becomes available.

### 1.3 Opinions and Basis of Opinions

For the facilities subject to this phase of litigation, the available facility specific documents indicate the following:

1.  MTBE and/or TBA have been released at the facilities.

2.  MTBE and/or TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  At most facilities, MTBE that has migrated off-site has comingled with releases from nearby facilities.

6.  To date, the responsible parties have failed to delineate MTBE and/or TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and/or off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The OCWD will need to implement additional investigation and remediation activities at these facilities to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at all facilities. At a minimum, however, the cost of additional investigation will be no less than $79,050 per facility. Unit costs for subsequent investigation activities have also been developed.

11. At select facilities, the minimum scope and cost to implement the required remediation can be estimated based on currently available data. For the facilities referred to as G&M Oil #4 and ARCO 1905, the cost to implement the minimum scope of investigation and remediation is $13,229,611 and $3,186,627, respectively

12. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at other facilities, once additional investigation has been performed at these facilities.

It has been assumed that the responsible parties will continue to perform periodic monitoring and sampling of existing groundwater monitoring wells.

Facility-specific opinions, and the basis for each opinion, are provided in Appendices B (parts B.1 through B.26).

Plumes of MTBE and TBA contaminated groundwater have, and continue to, migrate beyond the facility boundaries. This off-site contamination can be abated before it reaches drinking water wells. While the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater.

An approach to remediating facilities has been developed based on G&M Oil #4 and ARCO 1905 (Feasibility Studies in Appendices C.1 and C.2 and Remedial Action Plans in Appendices D.1 and D.2) along with reasonable costs to implement the abatement (Appendices E.1 and E.2). However, it should be noted that the full lateral and vertical extent of contamination at these facilities is not known. Therefore, the costs to fully investigate the contamination at these facilities will likely be more than the costs presented to address the currently known extent of contamination. That is, the costs presented herein are conservative.

Reasonable costs for additional investigation at each facility are included in Appendix E.3 and unit costs for subsequent investigation are presented in Appendix E.4.

References both reviewed and relied upon in development of opinions as they relate to specific facilities are presented in Appendix F.

**APPENDIX B.1**
**Facility Summary Report**

**ARCO Station #1887**
**16742 Beach Boulevard**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 16742 Beach Blvd., Huntington Beach, California (Figures 1 and 2) |
| Intersection: | Beach Boulevard and Terry Drive |
| Nearby Facilities: | None |
| Previous Facility Operations: | ARCO Service Station until June 2001 |
| Current facility Operation: | Vacant lot as of April 2011 observation |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***December 1988***                    Four soil borings and one shallow groundwater monitoring well (MW-1) were completed on-site (AROCWD188701686). Gasoline contaminated soil was found in some of the borings (AROCWD188701711).

*The vertical and lateral extent of soil contamination was not delineated by this phase of investigation. No groundwater data was available from MW-1 as part of this phase of investigation*

***April 1989***                    Contaminated soil and floating gasoline was discovered during fuel underground storage tank (UST) removal activities. Three feet of floating gasoline or light no-aqueous phase liquid (LNAPL) was measured in Well MW-1 (AROCWD188701699).

*The contaminated soil from the UST removal was placed back into the excavation. The extent of soil contamination and LNAPL was not delineated during UST removal.*

***August 1989***                    Five soil vapor extraction (SVE) wells and six additional on-site groundwater monitoring wells (MW2 – MW-7) were installed. Fuel hydrocarbons were subsequently detected in all of the wells and floating gasoline was detected in one of the monitoring wells (Delta Consultants [Delta], 2009a).

*The investigation focused only on shallow on-site groundwater and did not delineate the lateral or vertical extent of contamination. Testing for MTBE was not being conducted at this time.*

***October 1989 to September 2008***        LNAPL recovery for the entire period between October 1989 and September 2008 was conducted by either hand bailing or using a vacuum truck. From June 1993 to September 1995, LNAPL was not found in any of the wells. From September 1995 to May 1996, LNAPL was again detected in some

wells and was removed.  No LNAPL was detected again until the first quarter of 2000 and up to 0.8 feet was found in 2001 (Delta, 2009a).

*The periodic detections of LNAPL, separated by years, likely indicates separate releases to groundwater, including times when MTBE was added to gasoline.  LNAPL was removed only sporadically and no groundwater remediation was implemented until 1995.*

**April 1990 to October 1996**                    Twenty on-site and off-site monitoring wells were installed in the Semi-perched Aquifer to maximum depths of 49 feet below ground surface (bgs).  Some wells were screened across both clay and underlying sand units and later had to be destroyed or abandoned (Delta, 2009a) since they likely were acting as "a conduit for vertical transport of impacted groundwater" (AROCWD188701707

*The vertical and lateral extent of groundwater contamination was still not established.  The cross-screened wells may have allowed shallow groundwater contamination to migrate deeper into groundwater.  More than two years passed after contamination was first discovered before the first off-site wells were installed.*

**Early 1994**                    An SVE pilot test was conducted.  It was concluded from the test results that SVE would not be a feasible remediation option due to the limited air flow rates achieved (AROCWD188701689).

*The fine-grained, low permeability vadose zone soils beneath the facility prevented SVE from being considered a viable option for remediation.*

**May 1995**                    A dual-phase extraction (DPE) pilot test was conducted in the shallow zone (less than 20 feet bgs).  The test lowered water levels by about 8 feet at a pumping rate of 0.33 gallons per minute (gpm) and showed a radius of influence of 15 feet (AROCWD188701689).

**March 1996**                    MTBE was detected in groundwater below the facility when testing for MTBE first began (Figure 4) (Delta, 2009a).

*The vertical and lateral extent of MTBE was not delineated at this time.*

**March 1997 to October 1997**                    A full-scale SVE system operated at the facility using 11 SVE wells.  The system extracted approximately 625 pounds of hydrocarbons from shallow soil (AROCWD188701689).  The system was shut-down in October 1997.

*The SVE system was installed despite the conclusion in 1995 that SVE was not an effective remedial option. The SVE system did not treat deeper soil or provide groundwater treatment or containment.*

**April 1999**                    The Orange County Health Care Agency (OCHCA) noted the very high MTBE concentrations detected in groundwater at the facility (14,000 micrograms per liter (ug/L)) and stated that efforts to resume remedial activities had clearly been "inadequate" (AROCWD188700177 to AROCWD188700178).

*The SVE remediation system had been shut-down for 18 months as of the date of this letter, possibly due to a broken thermal oxidizer or lack of a proper permit to operate. This lack of action likely allowed further migration of MTBE in groundwater.*

**May 1999**                    The SVE system was restarted and operated through June 2001.  A total of about 3,800 pounds of hydrocarbons were removed from shallow soil (Delta, 2009a).

*The SVE system did not treat deeper soil or provide groundwater treatment or containment.  MTBE was continuing to migrate off-site.*

**October 2000**                    Correspondence by the OCHCA states "*This site is a high priority case due to the detection of MTBE and benzene, the proximity to municipal/domestic supply wells, and the vertical component of soil and groundwater contamination.  OCHCA is concerned about the current soil only remediation approach.  The current system appears insufficient to actively and aggressively remediate the site.*" (AROCWD188701412).

*The regulatory agency overseeing the facility clearly indicated that assessment and remediation are progressing too slowly, that groundwater is not being treated, and that the MTBE plume is a continuing risk to nearby supply wells.*

**December 2000**                    TBA was first detected in groundwater below the facility at a maximum concentration of 830 ug/L in monitoring well MW-7 (Delta, 2009a) (Figure 5).

**May and July 2001**                    OCHCA notifies ARCO that: "*ARCO's response to directives [to perform vertical assessment and develop a Remedial Action Plan (RAP)] has been unacceptably slow at this high priority site.*" (AROCWD188702515, AROCWD188702086 to AROCWD188702087).

*Seven months had passed since OCHCA approved a plan for vertical assessment of contamination and a revised RAP, and two months since OCHCA issued a letter of non-compliance to ARCO.  OCHCA clearly believed that ARCO had been acting too slowly to determine the lateral and vertical extent of contamination and to develop remedial plans, allowing the migration of MTBE to continue unabated.*

**June 2001**                    Another DPE pilot test was conducted, lasting for 90 days and the DPE pilot test removed about 2,000 pounds of hydrocarbons (Delta, 2009a).

**July 2001**                    Five soil borings were completed in an attempt to delineate the extent of hydrocarbons below the facility.  Borings were completed to a maximum depth of 50 feet bgs (AROCWD188701690).

*Twelve years after contamination was first detected at the facility, the vertical and lateral extent of contamination was still not established.  The borings did not extend below the Semi-perched Aquifer to determine if deeper soil and groundwater were contaminated. No monitoring wells were screened to the bottom of the "deeper A zone", the deepest zone investigated at the facility (about 50 feet bgs). No investigation work has ever been done below 50 feet bgs, so the vertical extent of contamination was not delineated.*

***October 2001*** Demolition activities were conducted and all USTs, dispensers and piping were removed from the facility. Soil samples were collected below the former USTs, fuel dispensers and piping. MTBE was detected in unsaturated (vadose zone) soil near a dispenser island at a reported concentration of 1.2 milligrams per kilogram (mg/kg). ARCO acknowledged three releases at the facility, and that a "fairly substantial release occurred at the location of the former western dispenser island" and that MTBE was detected in soil in this area (Delta, 2009a).

*The presence of MTBE in shallow soil indicates a leak from the dispenser or from the fuel pipelines.*

***September 2002 to May 2010*** A full scale DPE system operated at the facility in the Upper semi-perched Aquifer from September 2002 until May 2010. The system removed about 6,700 pounds of hydrocarbons as of May 2009 (last data available) (Delta, 2009a).

*The DPE system operated only in the upper groundwater zone. ARCO concluded in 2010 that DPE had remediated the site "to the extent feasible", in spite of the high concentrations of MTBE and other hydrocarbons remaining in groundwater.*

***January 2009*** Seven soil borings were completed to maximum depths of 35 feet bgs to assess previous remediation effectiveness and to collect samples to evaluate the feasibility of using in-situ chemical oxidation (ISCO) for groundwater remediation. MTBE was detected in soil up to 12 mg/kg at a depth of 25 feet bgs (Delta, 2009b).

***October and November 2010*** Pilot testing for in-situ chemical oxidation (ISCO) began. Ten soil borings were completed to inject activated persulfate into the upper zone for groundwater remediation (Environmental Resources Management [ERM], 2011).

*ISCO treatment only includes the upper water bearing zone and does not provide plume containment.*

***April 2011*** The results of ISCO pilot test monitoring were reported. The initial results of the ISCO testing show that "unintended impacts" have resulted, with gasoline (including TBA) now being detected in the deeper zone below the facility and benzene detected in a down-gradient well in the lower zone (MW-18) that had previously been clean (ERM, 2011).

*The lateral and vertical extent of groundwater contamination in deeper zones has still not been established. No assessment of any kind below 50 feet bgs had been conducted.*

***Present (May 2011)*** Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate MTBE and/or TBA contamination in groundwater laterally or vertically, and additional investigation is required.

6. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies..

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- The Semi-Perched Aquifer at the facility has recently been divided into the following 'upper', and 'lower' water-bearing zones (Delta, 2009a):

  - The Upper zone is mostly silty clay and extends from ground surface to approximately 26 to 31 bgs.

  - The Lower zone is primarily sand and extends from about 26 to 31 feet bgs to approximately 45 to 50 feet bgs.

  - The Lower zone is underlain by a clay unit to a depth of at least 50 feet bgs (the maximum depth explored by ARCO).

- Aquifer units below the lower zone (below 50 feet) are not identified or discussed by ARCO.  At a nearby facility about ¼ mile to the south (G&M #04), the semi-perched Aquifer overlies the Alpha Aquifer, which occurs between approximately 120 and 140 feet bgs.  The Alpha Aquifer is reportedly separated from the overlying Semi-Perched Aquifer by a 15 to 20 feet thick aquitard at the G&M #04 facility.

**APPENDIX B.3**
**Facility Summary Report**

**Texaco 8520**
**8520 Warner Avenue**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:        Facility Summary

### 1.1        Identification

| | |
|---|---|
| Facility Address: | 8520 Warner Avenue, Huntington Beach, California (Figures 1 and 2) |
| Intersection: | Warner Avenue and Newland Street |
| Nearby Facilities: | Shell 204359403 |
| Previous Facility Operations: | Texaco Service Station |
| Current facility Operation: | Operating service station branded as Shell as of April 11, 2011 |

### 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***November 1985 to April 1986***        Gasoline impacted soil was detected during tank removal in November 1985. Between March and April 1986, impacted soil was treated in a 10 foot deep bio-cell pit dug behind the facilities building (SHELLREMD_00260260 to 0026071 and 00260177 to 00260199). The pit was abandoned in place with the polyethylene liner ruptured to allow water to drain (SHELLREMD_00260306). Trace BTEX remained in soil when remediation was discontinued.

***March 1987***        OCHCA is satisfied that "*no significant soil contamination is present at the subject site*". Thus, closure was granted for the 1985 release (SHELLREMD_00260307).

***October 1990***        OCHCA letter states "*Based on inspections and field tests conducted on October 9, 1990 it has been determined that gasoline contaminated soil is present at the subject location*" ((SHELLREMD_00235096).

***1991***        One single cross-gradient well was tested for MTBE but none was detected.

***April to September 1991***        A preliminary environmental assessment was conducted. This included 12 borings sampled near the dispensers and three monitoring wells at the perimeter of the facility. TPHg and BTEX were detected in shallow soil (five feet bgs) near both dispenser islands. TPHg and BTEX were also detected in soil to the maximum depth explored, 25 feet bgs. Groundwater was encountered at 10 to 12 feet bgs. The highest contamination was detected in down-gradient well MW-3 near the southwest corner of the facility (i.e. benzene at 6,000 ug/l) (SHELLREMD_00260875 to 00260880). Analysis for MTBE was not performed.

*Gasoline was released at both dispenser islands. Gasoline contaminants were present in the down-gradient well near the facility boundary suggesting that TPHg and BTEX had already migrated off-site. The extent of contamination was not delineated. The extent of groundwater contamination and the depth of soil impact indicate that a release(s) occurred before April 1991.*

**April 1992 to June 1993**                Additional phases of soil and groundwater sampling were performed. Soil vapor extraction (SVE) wells were installed on-site and off-site groundwater investigation began with shallow hydropunch sampling south and southwest of the facility in the down-gradient direction. Shallow soil samples collected near one of the dispenser island contained TPHg concentration up to 6,900 mg/kg along with benzene concentrations of 27 mg/kg. TPHg and benzene concentrations of 18,000 ug/l and 4,100 ug/l were detected in groundwater at an off-site location (TWN-B17) more than 130 feet from the closest potential source (SHELLREMD_00260599 to 00260669).

*The distribution of contamination in shallow soil confirmed that gasoline releases had occurred at both dispenser islands. Similarly, contaminant distribution in groundwater is consistent with an on-site source. Dissolved-phase gasoline contamination had migrated off-site and plume delineation, while improved, was not yet achieved.*

**December 1994**                TPHG and BTEX impacted soil was discovered beneath the dispenser islands during upgrade activities. Approximately 13 cubic yards of impacted soil was removed to a depth of nine feet bgs from the northern dispenser area (SHELLREMD_00261137 to 00261145).

*TPHg concentrations of 5,800 mg/kg in shallow soil (three feet bgs) indicated that a gasoline released had occurred at the northerly dispenser island. MTBE was not tested. The excavation was incomplete leaving petroleum hydrocarbon contaminated soil in place.*

**February 1996**                Systematic MTBE testing began at five of six on-site monitoring wells. MTBE was only detected in down-gradient well MW-3, near the southwesterly property boundary, where it was present at a concentration of 120 ug/l (SHELLREMD-00236377 to 00236413). Note that in 1991 one single cross-gradient well was tested for MTBE but none was detected at the time (WPI 2011b).

*MTBE was released before February 1996 and had already migrated off-site. The MTBE plume was not delineated down-gradient west and southwest of the facility.*

**April 1997**                An aquifer pumping test was performed. The consultant estimated transmissivity ranges between 11.77 and 190.5 ft2/day. It was also concluded that the down-gradient capture would be no more than 30 feet (SHELLREMD_00236204).

**April 1997 to July 2003**                An SVE system was operating. An independently operated groundwater pump and treat (GWPT) system was reportedly started at the same time but little information is available about its history (SHELLREMD_00271567 to 00271569). SVE focused on the area around the USTs and the dispenser islands using extraction wells VE-1 to VE-6 and MW-3 to MW-6. SVE was discontinued when recovery rates had reached asymptotic levels. By then, approximately 36,526 pounds of hydrocarbons had been recovered from the subsurface (WPI 2010b).

*Limited information is available about the operation of this system but the design did not include key data such as the radius of influence, as this parameter was not evaluated during a 1995 SVE pilot test (SHELLREMD_00260965 to 00260980).*

**April 1997 to 2004 (approx.)**          Groundwater pump and treat (GWPT) in conjunction with an independently operated SVE system was started in 1997 (SHELLREMD_00271567 to 00271569; WPI 200b). Little information is available about the early operational history of the GWPT but the design was based on a pumping test conducted in 1996. Groundwater was initially extracted from two on-site wells (MW-3 and MW-4) with the intent to capture the on-site plume.

*The GWPT was clearly ineffective. GWPT began after BTEX/TPHg and MTBE contamination had already migrated off-site. The off-site plume was never recaptured. In 1997, the extent of the known MTBE plume was limited to one on-site well and gradually expanded over time. Because the GWPT failed to achieve hydraulic containment, MTBE spread off-site to the northwest, west and southwest away from the facility source area (on-site USTs and dispenser islands) (SHELLREMD_00271593; 00235770; 00235773; 0050620 to 0050623). Because of this lack of containment, a RAP had to be prepared in 2001 to address the MTBE plume escaping the facility west of the USTs (SHELLREMD00271562 to 00271575).*

**December 1998**          Soil samples were collected two feet bgs, beneath the dispensers. Samples did not contain detectable TPHg, BTEX, or MTBE (SHELLREMD_00235573 to 00235575).

*The data is inconclusive as samples were not actually collected beneath the dispensers but rather, next to them. Also, pea gravel was the only waste generated, no reference being made to soil (i.e. sand, silt or clay). As such, the soil samples collected may not have been from native soils beneath the dispensers.*

**December 1997 to March 2000**          Several phases of off-site investigation, including installations of wells in the Semi-perched aquifer (shallow) and hydropunch sampling, were conducted to improve lateral delineation and evaluate the potential of an off-site source (i.e. SAAD Shell) for MTBE detected at the facility (SHELLREMD_002235476 to 00235482; SHELLREMD_00271578 to 00271606). The highest MTBE concentrations (8,900 ug/l) were detected, in the immediate area of the on-site USTs, with concentrations decreasing away from the facility (SHELLREMD_00271593).

*MTBE distribution in groundwater suggests an on-site source and also highlights the heterogeneity of contaminant distribution as well as the complexity of contaminant pathways as MTBE migrates off-site. MTBE extends in groundwater at least 140 feet from the source area and is not delineated west and southwest of the facility in the upper semi-perched zone.*

**June 2001**          A remedial action plan (RAP) proposed to upgrade the current SVE/GWPT system by adding off-site groundwater extraction wells to address MTBE contamination detected since 1998 at well MW-10 west and immediately down-gradient of the facility (SHELLREMD_00271562 to 00271575).

**June 2003**          Five off-site wells (MW-16 to MW-20) were installed in Newland Street, immediately west and down-gradient from the MTBE source (SHELLREMD_00050736 to 0050753). Each well was completed to a depth of 35 feet bgs with filter packs from total depth of the well to within four feet of ground surface. The bottom of several of these wells (i.e. MW-18, -19 and -20) are completed in a laterally continuous sandy horizon, named herein the "34-foot sand" (refer to cross-section in WPI 2010b).

*The well filter packs connect a MTBE contaminated zone at/or near the capillary fringe with deeper coarser sediments (the "34-foot sand"), thus creating vertical pathways which can potentially accelerate downward migration of contaminants. The "34-foot sand" is a preferential pathway for lateral MTBE/TBA migration at depth.*

**February 2004 to December 2007**    GWPT was upgraded to use off-site down-gradient wells installed in Newland Street (i.e. MW-10, MW-16 and MW-20 mainly) (SHELL396308; WPI 2010b).  The system was shut down in December 2007 due to fouling of the conveyance lines and the carbon canisters.  By that time, only limited reduction in dissolved phase MTBE/TBA concentrations was observed in the core of the plume (WPI 2010b).  By the time GWPT was shut down approximately 594,101 gallons of water had been treated and reinjected into the subsurface at on-site wells.

*Partial hydraulic control was achieved after the upgrade, approximately eight years after MTBE was first detected in groundwater beneath the facility.  Over this eight year period, MTBE/TBA was allowed to escape and spread off-site beyond the monitoring well network.  Hydraulic control was lost again, starting in mid 2007 (OCHCA-MTBE-066052). GWPT was discontinued in December 2007, even though concentrations of MTBE and TBA greater than 2,000 ug/l were still present off-site and down-gradient from the facility.  The contaminant plume has been allowed to migrate off-site unabated ever since.*

**February 2005**                Soil samples collected beneath each dispenser during upgrade did not contain detectable concentrations of fuel oxygenates (SHELL392198 to 393205).

**May 2005**                Well MW-21 was installed to 35 feet bgs at a location immediately adjacent to the USTs (WPI 2010b).

*The excessive screen length at this well provided a vertical contaminant pathway from the source USTs to the "34-foot sand" until it was replaced in January 2007 by a well completed to 20 feet bgs (MW-21R). (WPI 2007b)*

**December 2004 to October 2007 (dates approximate)**    An oxygen delivery system was operating for a brief period at off-site down-gradient wells MW-18 and MW-19 (WPI 2010b).  Because no significant increases in oxygen levels were noted, the method was discontinued.

**November 2006**                Six borings were sampled immediately adjacent to the USTs and dispenser island to 20 feet bgs to evaluate current subsurface soil conditions (SHELL395365 to 395390).  Elevated concentrations of MTBE (up to 2,600 ug/kg) and TBA (up to 4,800 ug/kg) were detected in soil adjacent to both the USTs and the western dispenser at depths ranging from 10 to 20 feet bgs (WPI 2010b).

*These findings suggest that remediation by combined SVE/GWPT has not been effective in removing contamination contained in the capillary fringe.*

**June 2008**                Monitored natural attenuation (MNA) was proposed by the consultant but later rejected by OCHCA, in part because of high groundwater contamination remaining at the facility (SHELL39305 to 39366; SHELL 396461).

**June 2009 to March 2010**                A vertical groundwater contamination delineation program was conducted (WPI 2009 b; WPI 2010a).  Cone penetrometer tests (CPTs) were performed at three off-site locations to 50 feet bgs with collection of groundwater samples at total depth (WPI 2009b).  This was followed by the installation of

a well cluster at an off-site location where relatively high MTBE/TBA had historically been detected, in the upper semi-perched zone (WPI 2010a). MTBE was detected at two CPT locations west of the facility, at concentrations ranging between 1.1 and 3.2 ug/l. The CPT program also identified a sandy unit 34 feet bgs ("34-foot sand") which appears laterally continuous west of the facility in the down-gradient direction. Well MW-9A was subsequently installed and screened in the "34-foot sand". Initial groundwater samples collected from this well had reported results of of 22 and 120 ug/l for MTBE and TBA, respectively. A downward vertical gradient prevails between the upper semi-perched zone and the "34-foot sand".

*Vertical delineation was incomplete as it lacked sufficient discrete depth groundwater sampling. For example, the "34-foot sand" which is clearly a preferential pathway for lateral contaminant migration at depth, has been tested at one location only (MW-9A). This lack of targeted testing is in part due an investigative approach in which a proper facility conceptual model development and pathway analysis has not been developed. The well cluster design was based on data from a laterally distant CPT location and resulted in inadequate screen placement at well MW-9b. This resulted in the installation of MW-9b so that it was screened in a clayey silt rather than in a deeper, sandier water bearing zone.*

**November 2010**                    An on-site soil vapor survey was performed to evaluate vapor intrusion risks and one hydropunch groundwater sample (HP-9) was collected 30 feet bgs southwest of the facility near MW-16. The groundwater sample was non-detect for MTBE and TBA (WPI 20011a).

*While of some value, the location and depth at which the hydropunch sample was taken reflects the lack of recognition that wells MW-18 through MW-20 are cross-screened and that the "34-foot sand" may be a significant preferential lateral contaminant pathway.*

**December 2010**                        Fourth quarter 2010 groundwater monitoring was performed (WPI 2011b). Both MTBE and TBA continue to be detected at elevated concentrations (>1,000 ug/l) both on- and off-site. Some of the highest MTBE/TBA concentrations are detected in the off-site Newland Street wells, many of which are screened down to the "34-foot sand".

*Because the "34-foot sand", which is a preferential migration pathway, has not been sufficiently investigated (one well only), both lateral and vertical delineation are considered incomplete. Also, due to their excessively long screens, wells MW-17 through MW-20 continue to provide a potential vertical migration pathway between the highly impacted capillary fringe and the "34-foot sand".*

**Present (May 2011)**                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  MTBE that has migrated off-site has comingled with releases from Shell 204359403.

6. To date, the responsible parties have failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M-04 and Arco 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3  Hydrogeologic Issues

- First groundwater occurs within 5 to 12 feet of ground surface in the upper semi-perched zone. Groundwater flow directions typically range from northwest to southwest.

- The local vertical gradient between the upper semi-perched zone and the "34-foot sand" is not consistent. It is sometimes downward and sometimes upward, but not steep.

- W-4136 is one of several wells which could provide a vertical pathway for contaminants to migrate to deeper drinking water aquifers.  This abandoned (not in use) water production well, originally constructed without a protective sanitary seal, is located within 500 feet of the facility in the down-gradient direction. Because of the absence of a sanitary seal, and the downward vertical hydraulic gradients that generally prevail in the region, this well provides a vertical pathway for contaminants to migrate from near surface to 205 feet below ground surface (bgs), approximately 50 feet into the Alpha Aquifer (an important source of drinking water).

- Two nearby active water production wells, HB-5 (located 800 feet east of facility) and NB-TAMS (located 2,350 feet southeast of facility), have the tops of their screens and/or filter packs in the Alpha Aquifer. During periods of non-pumping, these wells become pathways for contaminants to migrate to deeper aquifers along their respective well screens and filter pack.

- Both Wells HB-5 and NB-TAMS have been impacted by other man-made contaminants from near surface sources.  Well NB-TAMD (deeper twin of NB-TAMS) has historically been impacted by MTBE (OCWD-MTBE-001260683 )

**APPENDIX B.5**
**Facility Summary Report**

**Texaco 121681**
**9475 Warner Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:      Facility Summary

### 1.1      Identification

| | |
|---|---|
| Facility Address: | 9475 Warner Ave, Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Warner Avenue and Bushard Street |
| Nearby Facilities: | Unocal 5399 |
| Previous Facility Operations: | Former Texaco/Shell Service Station |
| Current facility Operation: | Redeveloped as shopping center as of April 2011 observation |

### 1.2      Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***December 1984***      A gasoline release was reported during tank removal and reinstallation activities (OCHCA-049162). The case (#84UT023) was closed within one week (OCHCA-MTBE-049161).

***September 1992***      A gasoline release was reported, citing soil as the media potentially adversely impacted. There is no additional information regarding this release and the case (#92UT119) was closed in June 1993 (Geotracker).

***May 1992 to March 1993***      Soil samples were collected on two separate occasions beneath the dispensers (SHELLREMD_00198882 to 00198887).

*Benzene, toluene, ethylbenzene and xylene (BTEX) and total petroleum hydrocarbons as gasoline (TPHg) were not detected in these samples.*

***December 1994***      TPHg was detected in soil beneath product piping and a dispenser island in the south-central portion of the facility during upgrade/renovation activities (SHELLREMD_00198682 to 00198695). LOP Case #95UT033 was open.

***October 1995***      A limited subsurface assessment which included four borings was performed to evaluate the extent of TPHg-impacted soil and ascertain the depth to groundwater. TPHg was detected in shallow soil from two of the four borings up to a maximum concentration of 1,300 milligrams per kilogram (mg/kg) (SHELLREMD_00199613 and 0019619; WPI 2010a).

***January 1997***      An initial groundwater assessment was performed that was limited to sampling one well (MW-1) near the center of the facility (SHELLREMD_00199609 to 00199621). This also marks the

beginning of methyl tert-butyl ether (MTBE) testing.  MTBE was detected in groundwater at 41 micrograms per liter (ug/l) with concentrations increasing 100 fold within one year (WPI 2010a).

*One well is not adequate to satisfy the minimum requirements of an initial groundwater investigation as the local groundwater gradient cannot be established.*

**July to August 1998**                      Two more wells (MW-2 and MW-3) were installed near the dispenser islands to depths of 20 feet below ground surface (bgs) (WPI 2011; WPI 2010b).  MTBE was detected in groundwater from both wells, with a high of 342 ug/l in the down-gradient well.  The well near the source area contained MTBE at 23,900 ug/l (WPI 2011).

*It took more than 1½ years after MTBE groundwater impact was discovered to install the minimum number of wells necessary to begin a groundwater assessment.  The plume was not delineated in any direction at the time.*

**June 2000**                                  Four new wells were added to the groundwater monitoring program, one of which (MW-5) was the furthest down-gradient well ever installed at the facility (SHELLREMD_00199359 to 00199367).  MW-5 contained MTBE at 220 ug/l (SHELLREMD_00199129 to 00199130; WPI 2011).

*It was already apparent that the MTBE plume had migrated off-site past the facility boundary.  Yet, no subsequent investigation was ever conducted to evaluate the off-site extent of the MTBE plume.*

A soil vapor extraction (SVE) pilot test was performed (SHELLREMD_00199359 to 00199367).  The consultant concluded that SVE may be viable at the facility even though the radius of influence achieved during the test was relatively small at 25 feet.

**December 2002 to January 2003**          Tank removal and a limited remedial excavation occurred (SHELL386955 to 386973).  All five USTs and associated dispensers and product lines were removed.  MTBE and/or tert-butyl alcohol (TBA) were detected beneath each of the USTs, including at the waste oil tank, up to a concentration of 26 mg/kg of TBA and 10 mg/kg of MTBE.  MTBE was also detected in shallow soil collected beneath the product lines and one dispenser.  Over-excavation around the release areas resulted in the removal of 1,178 tons of impacted soil.  MTBE and TBA impacted soil (up to 14 mg/kg) was left in place 20 feet bgs at the UST pit.  Impacted soil also remained beneath the product lines and the waste-oil UST.  Approximately 300 pounds of oxygen release compound (ORC) was placed in standing groundwater at the bottom of the excavation before backfilling.

*Soil excavation was incomplete, leaving significant MTBE and TBA contamination in place.  The remaining contamination continues to impact groundwater.  The application of ORC compounds is an interim step but its effectiveness for the conditions at the facility has not been evaluated or proven.*

**July 2004**                                  Three deep borings and five new on-site wells were installed (SHELLREMD_00050888 to 00050919).  Soil samples from the deep borings (B13 to B15) were tested to a maximum depth of 51.5 feet bgs.  MTBE and TBA were detected from near surface to a maximum depth of 30 feet bgs.  Groundwater from four of the five new wells contained MTBE and/or TBA.

*The vertical delineation program is incomplete as it lacks discrete-depth groundwater sampling.  The new wells did little to improve plume delineation and MTBE/TBA contamination was still not laterally delineated.*

**November 2006**                              The Orange County Health Care Agency (OCHCA) rejected Monitoring Natural Attenuation (MNA) as a remedial alternative judging it inadequate given the elevated TBA concentrations at the facility.  Instead, the OCHCA required that a Corrective Action Plan (CAP) for active remediation be developed (OCHCA 2006).

**January 2007 to June 2008**                    All activities ceased while the facility was being redeveloped (WPI 2007c).  All monitoring wells were abandoned in 2007 and replaced by new ones in mid-2008 (WPI 2008b).

*Approximately 1½ years elapsed with no facility activity, delaying needed groundwater remediation, and leaving the MTBE/TBA plume to continue off-site migration unabated.*

**November 2008**                              The OCHCA requested the installation of three monitoring wells at the facility to assess the lateral and vertical extent of groundwater contamination (WPI 2010b).

**December 2009**                              The latest assessment performed at the facility included the installation of two more on-site wells (MW-22 and MW-23) (WPI 2010a).  Instead of being installed off-site, as originally planned, these wells were placed on-site, because access to the neighboring property was denied.  In addition, the scope was reduced to two wells from the original three.  The new on-site down-gradient well contained MTBE at 26 ug/l when first tested.

*The investigation that ended up being performed is redundant as it was already known in June 2000, nine years earlier, that the MTBE/TBA plume had migrated off-site in the down-gradient direction to the southwest.  Moreover, this phase of investigation did nothing to improve vertical plume delineation as was apparently requested by the OCHCA in their November 2008 correspondence.*

**May 2010**                              The OCHCA (2010) required that a CAP be submitted to address high TBA still present in the subsurface beneath the facility.

**July 2010**                              A work plan proposing to conduct pilot tests (aquifer pumping test, sparge test) to evaluate feasibility of various remediation technologies such as dual phase extraction (DPE), groundwater pump and treat (GWPT), air sparging (AS), etc. was submitted (WPI2010b).

**December 2010**                              The most recent groundwater monitoring event was conducted in December 2010 (WPI 2011).  MTBE and TBA were still present in the shallow aquifer above maximum contaminant levels (MCLs).  MTBE was present up to 32 ug/l in the furthest down-gradient well while TBA was detected at a concentration of up to 9,200 ug/l near the source area.

*Both MTBE and TBA remain laterally undelineated in the Semi-perched Aquifer.  The current well network layout does not provide adequate monitoring in the down-gradient direction.  It has now been more than 13 years since MTBE was first detected in groundwater beneath the facility and more than 10 years since MTBE is known to have*

*reached the down-gradient facility boundary. Yet, no actions to mitigate or control plume migration have been taken to date.*

***Present (May 2011)*** Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

6. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Additional on-site and off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3     Hydrogeologic Issues

- First groundwater occurs within 6 feet of ground surface in the upper semi perched zone of the regional Semi-perched Aquifer. Flow is generally to the west and-southwest.

- One well/borehole (SHELL-HOE1) that could accelerate vertical contaminant migration to deeper aquifers has been identified within one quarter mile of the facility. SHELL-HOE1, a well or borehole related to Oil

**APPENDIX B.6**
**Facility Summary Report**

**Unocal 5399**
**9525 Warner Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:          Facility Summary

## 1.1          Identification

| | |
|---|---|
| Facility Address: | 9525 Warner Ave, Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Warner Avenue and Bushard Street |
| Nearby Facilities: | Texaco 121681 |
| Previous Facility Operations: | Unocal Service Station from 1968 until March 1993 (UOC55481) |
| Current facility Operation: | Occupied by "Oil Can Henry", an oil change service (based upon April 2011 observation) |

## 1.2          Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*March 1993*                              A Phase I Environmental Site Assessment report indicated that the Unocal gas station was shut-down in March 1993 (UOC 55827).  It had operated as a gasoline service station since 1968 and was equipped with two 10,000 gallon single-wall underground storage tanks (USTs) and a 550 gallon waste oil tank.

*October 1993*                            Release report was filed when gasoline-impacted soil and groundwater were discovered during a baseline investigation (UOC 55729; UOC 56157).

*A gasoline release had occurred before that date.*

*October 1993*                            An initial soil and groundwater investigation included five wells (MW-1 through MW-5) and several borings sampled across the facility near potential source areas (UOC 56144 to UOC 56172).  Total petroleum hydrocarbons as gasoline (TPHg) and benzene, toluene, ethylbenzene and xylene (BTEX)-impacted soil was discovered near the USTs.  Groundwater impact was also noted in one well with a maximum benzene concentration of 493 micrograms per liter (ug/l) at well MW-4, immediately west of the USTs (UOC 56158). First groundwater was encountered at approximately 10 feet below ground surface (bgs) and flow was to the west (UOC 56160).  No analysis for methyl tert-butyl ether (MTBE) was performed.

*TPHg and BTEX distribution indicated a release from the USTs.  The contamination plume was not delineated down-gradient.*

*October 1993*                            A pumping test was also performed to evaluate the feasibility of dewatering using on-site wells (UOC 56098 to 56104).  Results indicate that extraction rates would not be sufficient

to allow for the development of an effective capture zone. Estimates indicate that an anticipated capture zone of 3 feet in the down-gradient direction would develop after one year of pumping (UOC 56112 to 56113).

**January 1994**                    All the USTs and product lines were removed (UOC 55916 to 55931). The USTs had no apparent holes (UOC 55922). Approximately 150 tons of soil was removed at the time. Tank pit samples contained TPHg up to 13 miligrams per kilogram (mg/kg) and benzene up to 0.74 mg/kg. Excavated soil contained up to 38,000 mg/kg TRPH (UOC 55929).

*The contaminant distribution is consistent with a gasoline release in the UST area. Contaminated soil left in place continued to be a source of contaminants to shallow groundwater.*

**March 1994**                    A preliminary remedial action plan (RAP) was issued (UOC 56072 to 56097). Soil excavation and off-site disposal was proposed. The RAP also proposed to address groundwater contamination by dewatering the excavation pit.

**March 1994**                    A clarifier was removed (UOC 56036 to 56071). The one soil sample collected contained no detectable BTEX.

**November 1994**                    An excavation work plan was issued. Any groundwater collecting in the tank pit would be removed using a vacuum truck UOC 55671 and 55672).

**December 1994**                    Approximately 1,300 cubic yards of soil was excavated near the former USTs, 780 CY of which was removed for off-site disposal (UOC 55954 to 55969). Excavation extended to 14 feet bgs, approximately 3 to4 feet below the water table at this time. Twenty five gallons of groundwater that entered the excavation were removed. Confirmation sampling indicated that residual TPHg and BTEX were left in place mostly along the westerly property boundary. The maximum benzene left in place was 0.4 mg/kg (UOC 55967).

*Source removal was incomplete. The residual gasoline impacted soil left in place provided a continuous source of groundwater contamination. The volume of excavated soil later used as backfill is unclear. In a later report, the consultant indicates that 680 CY was transported off-site and not 780 CY.*

**March 1996**                    Initial MTBE testing was performed at facility monitoring wells (UOC 48679 to 48690). MTBE was detected in three of five wells with a maximum concentration of 310 ug/l at MW-1 located immediately south of the former USTs.

*The lateral extent of the MTBE plume was not delineated down-gradient to the west and southwest, cross-gradient to the south, and up-gradient to the east.*

**April to August 1996**                    The last phase of assessment at the facility included the installation of one on-site well (MW-6) immediately down-gradient from the former USTs along the westerly property boundary (UOC 55884 to 55907). Soil samples were non-detect from 5 to 20 feet bgs, when tested for BTEX and MTBE. When initially tested, in August, groundwater from MW-6 contained MTBE at 120 ug/l (UOC 55900).

*The MTBE plume was not laterally delineated at the time. No follow-up was performed after this investigation even though the leading edge of the MTBE plume had already moved off-site.*

**May 1997**                    The last groundwater sampling event before closure of the facility was conducted (UOC 48274 to 48285). While BTEX was no longer detected in on-site wells, MTBE remains present above maximum contaminant levels (MCLs), up to 66 ug/l, in down-gradient well MW-6 (UOC 55539).

*The MTBE plume has never been laterally delineated, in particular in the down-gradient direction. Vertical delineation was never attempted.*

**September 1997**                    The facility was granted closure based on Santa Ana "low risk" criteria policy adopted in January 1996 (CHEVMDL 1358 00000541340 to 1358 00000541346). No TBA testing was performed.

**Present (May 2011)**                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and probably TBA have been released at the facility.

2. MTBE and probably TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. To date, the responsible party has failed to delineate MTBE contamination in groundwater laterally or vertically, and additional investigation is required

4. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

5. Additional on-site and off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

6. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD

7. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed

8. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

**APPENDIX B.7**
**Facility Summary Report**

**ARCO 1912**
**18480 Brookhurst Street**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1: Facility Summary

## 1.1 Identification

Facility Address:                                  18480 Brookhurst St., Fountain Valley, CA 92708 (Figures 1 and 2)

Intersection:                                      Brookhurst Street and Ellis Avenue

Nearby Facilities:                                 Beacon Bay Car Wash FV, Thrifty 383

Previous Facility Operations:                      ARCO branded service station

Current Facility Operations:                       Operating service station as of April 11, 2011

## 1.2 Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*September 1985*                            An unauthorized gasoline release and impacted soil was discovered during underground storage tanks (UST) system upgrade activities (AROCWD191208422 to 191208423).

*October 1985*                            Approximately 1,404 cubic yards of petroleum hydrocarbon-impacted soil was excavated and removed from the facility when four USTs were removed and replaced (AROCWD191208422 to 191208423). No document showing the location of the excavation is available for review.

*September 1985 to April 1986*          Initial site investigation included the installation of six on-site monitoring wells (AROCWD191205105 to 191205112). Impacted soil was detected at each location. Benzene was also present in down-gradient wells at concentrations exceeding 1,000 micrograms per liter (ug/l) (AROCWD191206591 to 191206592). No analysis for methyl tert-butyl ether (MTBE) was performed.

*It is apparent that the benzene plume was not delineated and had already moved off-site to the south and southwest.*

*November 1985*                            A soil vapor survey was conducted. Results indicate a contaminant plume spreading off-site south-southwest of the USTs. A potential secondary plume was identified at the Beacon Bay site (AROCWD191208135 to 191208139).

*October 1990*                            The waste oil UST was removed and replaced. Total petroleum hydrocarbons as gasoline (TPHg) and benzene, toluene, ethylbenzene and xylene (BTEX)- impacted soil was discovered in the tank pit and approximately 50 cubic yards of soil was excavated and removed from the site (AROCWD191208422 to 191208423, 191206565, 191206577 to 191206578, 191206595, 191207718).

*December 1991*                              A soil vapor extraction (SVE) test was performed.  The consultant concluded that conventional SVE was not a viable remedial alternative for impacted soil at the site as the radius of influence was less than 10 feet (AROCWD191206578; AROCWD191207695 to 191207696).

*June 1992*                              A groundwater pumping test was performed.  Because of low hydraulic conductivity, it was concluded that groundwater pump and treat (GWPT) would not be effective (AROCWD191206578, ARWOCWD07696 to 191207697).

*June 1992*                              Well E-14 was installed within the on-site contaminant plume (AROCWD191207727 to 191207728).

*Based on low groundwater elevation data and similar hydrographs to that of deeper Talbert Aquifer wells (see Appendix D Hydrographs – B-26 in the Talbert Aquifer, E-14 cross-screened, B-3 upper semi-perched zone) it is suspected that the bore in which this well was installed connects the upper aquifer with a deeper sand, 35 feet bgs, thus, creating a pathway accelerating downward migration of contaminants.  Based on the strong correlation between E-14's hydrograph and that of the Talbert Aquifer wells, it is also suspected that natural pathways exists, such as a natural window in the aquitard or a more permeable zone, between the bottom of E-14 and the Talbert Aquifer.*

*September 1994 to March 1995*          The first off-site well (E-15) was installed immediately down-gradient from the USTs, the known release area.  When first gauged, in March 1995, that light non-aqueous phase liquid (LNAPL) was observed in that well (AROCWD191206188).  Some reports suggest LNAPL was observed in this well as early as September 1994 (AROCWD191208423).

*More than nine years had elapsed since the initial gasoline release, before ARCO initiated an off-site down-gradient investigation.*

*September 1994 (?) to February 1998*          LNAPL removal by periodic hand bailing and vacuum truck pump-outs were performed.  Over that time, between 9.5 and 10 gallons of LNAPL had been removed from off-site down-gradient well E-15 (AROCWD191208423, 191209960).

*March 1996*                              MTBE was first included in the groundwater testing program (Stratus 2010).  By that time, MTBE was already widespread with a maximum of 71,000 ug/l adjacent to the existing USTs (Figure 4; and AROCWD191209061 to 191209067).

*The distribution of MTBE in the upper Semi-Perched aquifer suggested an MTBE-gasoline release(s) had occurred in the area of the USTs and dispensers.  The MTBE plume was already comingled with plumes emanating from up-gradient Beacon Bay, to the east, and down/cross-gradient Thrifty #383, to the south.*

*November 1998*                              MTBE-gasoline-impacted soil was discovered under both on-site dispensers, with a maximum of 580 mg/kg detected beneath the eastern dispenser (AROCWD19120720 to 19120721).

*These releases likely occurred well before that date as high MTBE was already found in groundwater in 1996 when first tested.*

***February 2000 to May 2001*** A vertical delineation program was conducted, including the installation of four deep, Talbert Aquifer wells and continuous cone penetrometer testing (CPT) soil logging. The boring log of B-26 indicates that the Talbert Aquifer occurs approximately 55 feet bgs and that overall, sand content increases with depth starting at 34 feet bgs (AROCWD191208635). Initial groundwater testing indicated MTBE concentrations up to 470 ug/l in the Talbert Aquifer immediately beneath the facility (AROCWD191206371, 191206382). Tert-butyl alcohol (TBA) was also detected in the Talbert Aquifer. BTEX and/or MTBE can be continuously traced in soil from 5 to 65 feet bgs at B26 (AROCWD191208616).

*MTBE and TBA from releases at ARCO #1912 have impacted the Talbert Aquifer. The MTBE/TBA plume has not been fully vertically delineated. This investigation suffers from a lack of discrete-depth groundwater sampling that could have help identify other contaminant pathways past 40 feet bgs.*

***August 2000*** TBA was first included in the testing program (Stratus 2010). The distribution of TBA was widespread and similar to that of MTBE, with a maximum concentration of 200,000 ug/l down-gradient from the USTs (Figure 5).

*Like MTBE, TBA was not laterally delineated and it was clear that contamination had migrated off-site where it is comingled with the plume from Thrifty #383.*

***August to September 2000*** Interim remedial action was conducted using a mobile dual-phase extraction (DPE) unit for five days at on-site wells screened in the semi-perched aquifer (AROCWD191210659). Aproximately 10,790 gallons of groundwater and 7,710 pounds of hydrocarbons were removed from the subsurface.

***March 2001 to September 2010*** A full-scale DPE system has operated since March 2001 (Stratus 2010). The focus has been on-site mass removal from the vadose zone and the upper Semi-Perched aquifer. The system was modified in October 2005 after an evaluation by ARCO's consultant indicated that the original system did not hydraulically contain the contaminant plume (AROCWD 191213550 to 1912121355, Stratus 2010). As of September 2010, the remediation system continued to operate and a total of 28,572 pounds of hydrocarbons and 903,011 gallons of groundwater had been removed (Stratus 2010).

*DPE, the first remediation effort to address dissolved phase contamination, began more than 15 years after the initial gasoline release. Until then, contaminants were left to migrate off-site unabated. By the time remediation began, the MTBE/TBA plume had already moved off-site past the monitoring well network. Because hydraulic containment was never fully achieved and demonstrated, off-site contaminant migration continued even after remediation began.*

***July 2001*** Well B-25, the furthest down-gradient along the plume axis, was first sampled. When first tested, MTBE and TBA were present at 12,000 ug/l and 190,000 ug/l, respectively (Stratus 2010).

*Plume delineation is clearly inadequate, yet no additional down-gradient wells were installed by ARCO.*

***December 2004*** MTBE was detected in shallow soil beneath a product line at the western dispensers. Up 0.15 mg/kg MTBE was detected 3 feet bgs (AROCWD191213502 to 191213510).

*This is further evidence that multiple releases have occurred.*

***November 2010***                    DPE remediation was ongoing. Both MTBE and TBA continue to be detected above MCLs on and off-site. MTBE is present in groundwater up to 88 ug/l while TBA continues to be detected at concentrations well above 10,000 ug/l. No MTBE or TBA is currently being detected in the four (4) Talbert Aquifer wells (Stratus 2010).

*Twenty five years have elapsed since the initial release and the contaminant plume has yet to be laterally delineated.*

***December 2010***                    A CPT program was performed by OCWD (2010) in the area of the facility. Groundwater collected from discrete depths confirmed the presence of TBA at 2 of 3 locations and down to depths of 89 feet bgs. MTBE was not detected.

*These results indicate that TBA has migrated off-site along multiple pathways: in the upper semi-perched zone 24 feet bgs, along a laterally continuous sand at 46 feet bgs, and in middle portions of the Talbert Aquifer at 89 feet bgs.*

***Present (May 2011)***                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from nearby facilities.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater..

8. Additional on-site and off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M-04 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3 Hydrogeologic Issues

- First groundwater is encountered between 6 and 12 feet bgs in the upper semi-perched aquifer. Groundwater flow is generally to the south and southwest.

- The top of the Talbert Aquifer occurs approximately 55 feet bgs. Groundwater flow varies over time from northwest to southwest in the Talbert Aquifer.

- A steep downward vertical gradient generally prevails between the upper semi-perched aquifer and the Talbert Aquifer. However, there are short periods of time (<22% of the time) when the gradient reverses. These reversal were observed at times between late 2005 and early 2007 and from February 2010 to November 2010.

- Several old production wells, classified as "other", that could provide vertical contaminant migration pathways down to the Talbert and or Alpha Aquifers, have been identified within a quarter mile of the facility.

- GKAW-FV2 is the nearest potentially vulnerable production well. It is a domestic well and is located approximately 1,130 feet northwest of the facility. It is screened from 120 to 125 feet bgs down to or near the Alpha Aquifer.

## 1.4 Contaminant Issues

- The lateral extent of MTBE and TBA plumes has not been delineated down-gradient from the facility.

- The vertical extent of MTBE/TBA has not been fully evaluated. MTBE and TBA have historically been detected at concentrations above regulatory levels in the deep, Talbert Aquifer wells. Moreover, a recent CPT investigation, conducted by OCWD (2010) indicated that trace (3.1 ug/l) TBA was present at 89 feet bgs, the deepest groundwater sample collected to date in the immediate area.

- The ARCO #1912 plume is co-mingled with that originating at Thrifty #383.

- The initial gasoline release occurred before September 1985 at the former USTs. MTBE testing only began in 1996. However, by that time MTBE contamination was already widespread and had migrated off-site, suggesting MTBE-gasoline was released well before it was initially tested. Some of the MTBE was also released in the same area (former and current USTs) as earlier releases.

- Significant groundwater remediation using DPE did not begin until 15 years after the initial gasoline release was discovered. By that time, MTBE had already migrated off-site past the monitoring well network. Off-site portions of the plume were never addressed. Also, because full hydraulic containment was not achieved/demonstrated, MTBE/TBA continued to migrate off-site in the down-gradient direction to the south and southwest.

**APPENDIX B.9**
**Facility Summary Report**

**Thrifty 383**
**18520 Brookhurst Street**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 18520 Brookhurst St., Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Brookhurst Street and Ellis Avenue |
| Nearby Facilities: | Beacon Bay Car Wash FV, ARCO 1912 |
| Previous Facility Operations: | Thrifty branded service station as early as 1987 (AROCWD974302786). Property leased and operated by ARCO as of May.7, 1997 (AROCWD974306051) |
| Current facility Operation: | Active gasoline service station as of April 2011; currently branded as a 76 Station |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***March 1987***        A release report was filed.  Tank test results indicated that the 10,000-gallon super unleaded tank was leaking (AROCWD974303896).  The gasoline release was confirmed in May 1987 when impacted soil was discovered during underground storage tank (UST) removal activities (AROCWD974304017; 97404021 to 97404023).  An unreported volume of impacted soil was aerated and removed from the UST area in December 1987 (AROCWD974306772).

***March 1987 to November 1997***        Free product or light non-aqueous phase liquid (LNAPL) recovery began in March 1987.  Removal was initially conducted by hand bailing a few on-site wells ("B", BW-5, and RW-1) and then by equipping some wells with skimmers (AROCWD974304018).  The free product recovery program was enhanced in December 1987 to include an 18-foot deep recovery trench along the westerly boundary of the facility (AROCWD974302772, 974302623).  When discontinued, in November 1997, over 3,559 gallons of LNAPL had been recovered (Thrifty 2010c).

*The initial widespread distribution of LNAPL suggests that a large gasoline release had occurred well before March 1987.  Due to the passive nature of the product recovery system, free product was allowed to release soluble constituents to groundwater for many years.*

***June 1987***        A soil vapor survey indicated that most of the contamination is associated with the former USTs in the north-central portion of the facility (AROCWD974304, 974304025).

**July 1987**                               An initial groundwater assessment included the installation of five on-site monitoring wells.  Benzene concentrations (up to 690 micrograms per liter [ug/l]) were detected in shallow groundwater (AROCWD9704018, 974304023).

*At the time, the benzene plume had already reached the northerly property boundary (at well BW-1 and BW-2) and was not delineated to the north and northeast. Analysis for methyl tert-butyl ether (MTBE) was not performed.*

**November 1994**                          The first and last off-site wells were installed.  No wells were installed in the down-gradient groundwater flow direction.  Both groundwater and soil from these wells were non-detect when tested for benzene, toluene, ethylbenzene and xylene (BTEX) and total petroleum hydrocarbons as gasoline (TPHg) (AROCWD974304068, 974304069).  Additional wells were installed during later phases but none were placed off-site in the down-gradient direction.

*Although these wells improved lateral BTEX and TPHg delineation, the plume remained undelineated. It has not been explained why Thrifty never investigated their contaminant plume in the apparent down-gradient direction.*

**May 1996**                               MTBE was first included in the groundwater monitoring program.  Concentrations of up to 40,000 ug/l were detected in the area of the new USTs, near the southwest corner of the facility (Thrifty 2010c).

*The MTBE distribution in shallow groundwater suggests that MTBE release(s) had occurred near the new USTs and at one or more of the dispensers.  The MTBE plume was not fully delineated to the southwest and it may be co-mingled off-site to the north and northwest with plumes originating from ARCO #1912 and Beacon Bay.*

**June 1997**                              A baseline soil investigation near the dispensers and in the area of the former and current USTs was conducted.  MTBE was widespread and detected in soil up to 57 miligrams per kilogram (mg/kg) (AROCWD974304497 to 974304503).

*Contaminant distribution confirmed that in addition to the known gasoline release at the former USTs, MTBE-gasoline releases had occurred near the new USTs, in the southwest corner of the site, and at one or more of the dispensers.*

**September 1999**                         A high vacuum extraction (HVE) or dual phase extraction (DPE) pilot test was performed.  HVE was deemed to be appropriate for both soil and groundwater remediation (AROCWD974301920 to 974301972).

**September 1999**                         Four piezometers (P1 though P4) were installed on-site to depths of 30 feet below ground surface (bgs).  The deepest sample from P-3, at 30 feet bgs contained MTBE at 0.052 mg/kg (AROCWD974301947, 9740301955).

*The MTBE plume has not been delineated vertically.*

**February 2000**                          A leaky vent line was replaced near the southeasterly corner of the facility.  Approximately 16 tons of impacted soil was removed.  Excavated soil contained MTBE at 2.3 mg/kg (AROCWD974300234 to 974300239).

*This is an additional source of MTBE. The excavation was not comprehensive and did not include verification sampling.*

**August 2000 to July 2001**                 The vertical delineation program included deep soil sampling at on-site borehole K1 and K2 and the installation of three on-site wells (DW-1 to DW-3) in the Talbert Aquifer (AROCWD974302232 to AROCWD974302244; AROCWD974301819 to 974301897). MTBE and/or BTEX compounds could be traced continuously in soil in boring K2 to 52.5 feet bgs to within 3 feet of the Talbert Aquifer. A discrete-depth groundwater sample collected at the bottom of borehole K2 contained MTBE at a concentration of 31.2 ug/l (AROCWD974302232 to AROCWD974302244). Initially, the Talbert Aquifer wells did not contain MTBE or tert-butyl alcohol (TBA) but in subsequent events a low concentrations of MTBE were detected. TBA was detected only once at a concentration of 980 ug/l (Thrifty 2010c).

*MTBE and TBA contamination from releases at the Thrifty facility has impacted the Talbert Aquifer. Multiple preferential contaminant pathways (i.e. sandy units between approximately 42 and 52.5 feet but also deeper) were identified but never investigated further even though high concentrations of MTBE had been detected in these horizons. Vertical delineation also suffered from a lack of discrete depth groundwater sampling and a continuous coring program.*

**November 2000**                 TBA was first included in the groundwater testing program. TBA was non-detect in all but one well (HVE-1) where it was present at 72 ug/l (Thrifty 2010c). MTBE was present at concentrations exceeding 1,000 ug/l and was not delineated laterally.

**January 2001 to September 2007**        DPE began in January with operation of the soil vapor extraction (SVE) system component. The groundwater component of the system was turned on in June 2001. Remediation was limited to source removal at on-site wells screened in the upper semi-perched zone. The DPE was upgraded in May 2006 after confirmation sampling demonstrated that significant contamination remained in soil and groundwater (Thrifty 2010c; AROCWD974307896 to 9740307910; AROCWD974306770 to 974306797). DPE was discontinued in September 2007 because of low influent concentrations. By that time, an estimated 37,172 pounds of hydrocarbon had been recovered and 599,100 gallons of groundwater had been extracted (Thrifty 2010c).

*DPE was the first significant phase of remediation that targeted the dissolved phase plume. The system was activated 13.5 years after the initial gasoline release had been discovered. By that time, the MTBE plume had already moved off-site and was co-mingled with contamination released from ARCO #1912 and Beacon Bay Car Wash. Off-site portions of the plume were not addressed. Moreover, hydraulic containment of the plume was not achieved at all times; thus, allowing further off-site MTBE/TBA migration over time (AROCWD974302312, 974302077, OCHCA-MTBE-075112). Although DPE resulted in significant mass removal and reduced MTBE and BTEX concentrations beneath the facility, TBA was still present in groundwater at concentrations well above regulatory levels. TBA remained undelineated to the southwest and to the north and northwest where it is co-mingled with the ARCO #1912 TBA plume (Figure 5).*

**January 2003**                 Soil samples were collected beneath dispensers and product piping during fuel system upgrade activities. MTBE was detected at 0.32 mg/kg beneath dispenser D-3 near the westerly boundary of the facility. TBA was not detected, but it should be noted that at one sample location the detection limit was 50 mg/kg (AROCWD974304543 to 974304548). Approximately 272 cubic yards of impacted soil was excavated and removed from the facility (AROCWD9740304550).

*A plan showing the extent of the excavation and the location of confirmation samples was not made available for review. Thus, the adequacy of contaminated soil removal cannot be evaluated. Also, the elevated TBA/MTBE detection limit at sample D-1 may mask a fuel oxygenate release.*

**March 2008**                              Thrifty issued a Corrective Action Plan (CAP) proposing the use of ozone sparging to reduce high TBA concentrations still detected in the upper semi-perched zone (AROCWD974310002 to 974310106).

**April 2009 to June 2010**                 Ozone sparging was performed periodically at on-site wells (Thrifty 2010c). The objective was to address high on-site TBA concentrations that remained in shallow groundwater.

*This remediation technology has been proven ineffective as TBA concentrations were not lowered significantly (Figure 5). An alternative remediation method has not been proposed to date and contaminants, in particular TBA, continue migrating off-site unabated.*

**August 2010**                             MTBE was only detected in the upper semi-perched zone at concentrations below regulatory levels (Thrifty 2010c). TBA was detected at concentrations up to 6,280 ug/L (Thrifty 2010c). The TBA plume is co-mingled to the north with a plume of contamination emanating from ARCO#1912.

*The TBA plume remains laterally undelineated (Figure 5). The lack of hydraulic control continues to allow TBA to migrate off-site unabated.*

**October 2010**                            The OCHCA rejected case closure due to high TBA concentrations in groundwater (OCHCA 2010).

**December 2010**                           A cone penetrometer testing (CPT) program was performed by OCWD (2010) in the area of the facility. Groundwater collected from discrete depths confirmed the presence of TBA at 2 of 3 locations and to depths of 89 feet bgs where a concentrations of 3.1 ug/l was detected. MTBE was not detected.

*These results indicate that TBA has migrated off-site along multiple pathways; in the upper semi-perched aquifer 24 feet bgs, along a laterally continuous sand at 46 feet bgs, and in middle portions of the Talbert Aquifer at 89 feet bgs.*

**Present (May 2011)**                       Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at this facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from nearby facilities.

6.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- First groundwater occurs in the upper semi-perched zone within 10 feet of ground surface. Groundwater is reported to flow to the north and northeast, but has also been reported to, and the contaminant distribution is more indicative of southwesterly flow direction. Interpretation of groundwater flow is difficult due to poor screening practices, as some of the deeper semi-perched wells respond to recharge in the underlying Talbert Aquifer. It is also possible that a permeable zone or window in the aquitard separating the upper-semi-perched zone provides hydraulic communication east of the facility along Ellis Avenue.

- The top of the Talbert Aquifer is encountered approximately 55 feet bgs. The flow direction has varied from southwest to northwest.

- A downward vertical gradient prevails from the upper semi-perched zone to the Talbert Aquifer at the facility. Since August 2001, reversals to upward vertical gradient were observed less than 22 percent of the time.

- Several wells that could also provide vertical contaminant migration pathways between near surface and to as deep as the Alpha Aquifer have been identified within a quarter mile of the facility. These include both private, and irrigation/agricultural wells.

- GKAW-FV2 is the nearest potentially vulnerable production well. This is a domestic well located approximately 1,130 feet northwest of the facility. It is screened from 120 to 125 feet bgs possibly into the Alpha Aquifer.

**APPENDIX B.10**
**Facility Summary Report**

**Beacon Bay Car Wash FV**
**10035 Ellis Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 10035 Ellis Ave., Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Brookhurst Street and Ellis Avenue |
| Nearby Facilities: | ARCO 1912, Thrifty 383 |
| Previous Facility Operations: | Beacon Bay Car Wash FV |
| Current Facility Operations: | Operating car wash as of April 11, 2011 |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*December 1986*                        Vadose zone soil samples collected to 10 feet bgs from four borings around the seven existing steel underground storage tank (USTs) containing gasoline were all non-detect when tested for total petroleum hydrocarbons (TPH).  Soil was not tested for benzene, toluene, ethylbenzene and xylene (BTEX) or methyl tert-butyl ether (MTBE).

*April 1989*                        TPHg and BTEX impacted soil was discovered in the tank pit when seven gasoline USTs were removed (later replaced by two dual wall USTs).  TPH was detected up to 4,616 miligrams per kilogram (mg/kg) and benzene up to 12 mg/kg.

*A gasoline release occurred on or before this date.  No analysis for MTBE was performed.  It appears as though impacted soil was left in place as there is no record of soil removal; thus, this contaminated soil provide a continuous source of soluble gasoline contaminants to groundwater for nine subsequent years.*

*October 1989*                        Seven borings were drilled to assess the lateral extent of soil contamination.  All soil samples were non-detect when tested for TPH and groundwater was encountered 10 feet below ground surface (bgs).

*The limited testing program was inadequate.  Given the shallow depth to groundwater (10 feet bgs) and the high impact previously observed in the UST pit, it should have been anticipated that groundwater was already impacted.*

*August 1990*                        An initial groundwater investigation was conducted, including the installation of three on-site wells screened in the upper semi-perched aquifer.  TPH and BTEX contamination was detected at the down-gradient well only.

*BTEX contamination was not delineated down-gradient in shallow groundwater. Low BTEX concentrations detected in soil near the dispensers also suggested that a release had occurred in that area.*

**September 1992**                           High TPH (up to 2,430 mg/kg) and BTEX concentrations were detected in shallow soil adjacent to the dispensers.

*This confirmed the October 1989 data that a release(s) had in fact also occurred at the dispensers.*

**May to September 1993**                           Approximately 1340 tons of soil was excavated from the dispenser area to a depth of approximately 6.5 feet bgs, just above the water table. Most of that soil was used as backfill after undergoing hydrogen peroxide treatment. The remainder was sent off-site for disposal. Sidewall confirmation samples indicate that soil impacted by high BTEX and TPHg (up to 15,000 mg/kg) concentrations was left in place near the carwash building.

*This remaining soil contamination provided a continuous source of soluble gasoline constituents to groundwater for many years to come. Because MTBE was not tested at the time it is not known if the hydrogene peroxide treatment was an effective treatment for this contaminant.*

**May 1993 to December 1995**                           Additional on-site wells were installed, including one in the former UST pit location and five wells to improve the lateral and down-gradient plume delineation.

*The TPHg/BTEX plume remained undelineated.*

**April 1996**                           MTBE was first included in the testing program. A maximum MTBE concentration of 4,700 micrograms per liter (ug/l) was detected in down-gradient well MW-3.

*MTBE distribution in groundwater is consistent with MTBE-gasoline releases at both the old USTs and the former dispenser area. The MTBE plume appears to have moved off-site and is not delineated up-gradient to the east, cross-gradient to the south, and down-gradient to the southwest. The MTBE plume appears co-mingled with that originating at ARCO#1912 and possibly also that originating at Thrifty #383.*

**February 1997**                           A soil vapor extraction (SVE) pilot test was conducted. A radius of influence of 73 feet was reported.

**May 1997**                           A Corrective Action Plan (CAP) was prepared that proposed Air Sparging/SVE (AS/SVE) as the preferred remedy.

*This technology was chosen even though a comprehensive conceptual model of the facility had not yet been developed. For example, as the vertical extent of contamination had not been investigated, there was no understanding of vertical contaminant distribution below the water table (i.e. past 10-11.5 feet bgs). Similarly, because boring logs were of poor quality and often only logged to 10 feet bgs, little was known or presented about the hydro-stratigraphic characteristics of the Semi-perched Aquifer beneath the facility. In addition, no sparge test was performed to evaluate if that technology was in fact applicable.*

**April 1998 to March 2000**                           Subsurface remediation by AS/SVE was conducted. This is the first phase of remediation designed to address dissolved-phase groundwater contamination beneath the facility. Remediation by AS/SVE focused on on-site source removal only.

*Remediation began nine years after subsurface contamination was first identified. By the time remediation began, portions of the MTBE plume had already moved off-site. It appears as though AS/SVE has resulted in decreased BTEX and MTBE concentrations in on-site wells.*

**July 2000** A soil and groundwater sampling program was conducted to evaluate the origin of the MTBE spike detected in April 2000 in down-gradient wells MW-6 and MW-7.

*Results of this investigation suggest that most, but not all, of the MTBE detected in the down-gradient wells was related to the plume emanating from ARCO #1912. Similarly, tert-butyl alcohol (TBA) detected near the facility boundary is likely related to the ARCO #1912 plume.*

**March to April 2002** The two remaining USTs were removed. Approximately 520 tons of contaminated soil was also removed from areas near the dispensers and near well MW-6 to a maximum depth of 15.5 feet bgs. Although excavation extended past the water table, some soil with residual BTEX and MTBE contamination was left in place.

*The residual contamination left in place is a potential source of continued groundwater contamination.*

**January 2005** The last groundwater monitoring event was performed at the facility prior to closure. While lower than historic concentrations, MTBE was still present in down-gradient wells at concentrations greater than the maximum contaminant level (MCL). TBA was also detected in down-gradient wells at concentrations exceeding 1,000 ug/l.

*The MTBE/TBA plume was never fully laterally delineated, and the vertical extent of contamination was never evaluated. Much of the high MTBE/TBA concentrations still detected at the facility are likely related to the ARCO #1912 plume.*

**April 2006** The case was granted closure. The regulating agencies were satisfied that the spike in MTBE detections in April 2000, and high MTBE and TBA still remaining in the western portion of the facility, were associated with the ARCO#1912 release.

**November 2010** ARCO now samples Beacon Bay wells near the property boundary. The maximum MTBE concentration was now 12 ug/l immediately adjacent to the facility boundary. Like MTBE, TBA detections are limited to wells adjacent to the facility boundary.

*Spatial MTBE/TBA distribution suggests that the current detections are primarily associated with the ARCO #1912 plume.*

**Present (May 2011)** Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement

5.  MTBE that has migrated off-site has comingled with releases from nearby facilities.

6.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation would be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M-04 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for any additional remediation required at this facility, once additional investigation has been performed at this facility and nearby facilities.

## 1.3    Hydrogeologic Issues

- First groundwater is encountered in the upper semi-perched zone within five feet of ground surface. Flow is generally to the southwest.

- Although not evaluated at Beacon Bay, investigations at neighboring facilities (i.e. ARCO #1912 and Thrifty #383), indicate that a steep downward vertical gradient generally prevails between the upper semi-perched zone and the Talbert Aquifer.

- Several wells have been identified within a quarter of a mile of the facility that could provide vertical contaminant migration pathways to deeper aquifers (i.e Talbert, Alpha, Lambda). These include wells used for agriculture and irrigation, both active and abandoned, and a regional monitoring well.

- GKAW-FV2 is the nearest potentially vulnerable production well. It is a domestic well and is located approximately 1,090 feet northwest of the facility. It is screened from 120 to 125 feet bgs down to or near the Alpha Aquifer.

**APPENDIX B.11**
**Facility Summary Report**

**G&M 24**
**3301 South Bristol Street**
**Santa Ana, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 3301 South Bristol Street, Santa Ana, California (Figures 1 and 2) |
| Intersection: | Bristol Street and West Alton Avenue |
| Nearby Facilities: | None |
| Previous Facility Operations: | G & M gas station until at least May 2005 (RWQCB 026606) |
| Current Facility Operation: | Chevron gas station and active as of April 2011 (facility observation) |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***February 1997***                    The underground storage tanks (USTs) were removed from the facility. The amount of soil excavated was not indicated in the documents available for review; however, methyl tert-butyl ether (MTBE) impacted soil was detected beneath the USTs during excavation activities (RWQCB 026611).

*The extent of the soil contamination was not determined.*

***July 1997***                    Monitoring wells MW-1, MW- 3, MW- 4, MW- 7 and MW-9 were installed (all above 20 feet below ground surface [bgs]). All groundwater samples from the monitoring wells had detectable concentrations of MTBE.

*The extent of MTBE contamination in groundwater was not delineated. No soil and groundwater remedial activities were implemented.*

***July 1999***                    Pilot studies were performed at the facility to establish the feasibility of treatment using high vacuum dual-phase extraction (HVDPE) technology.

***November 2000***                    Additional on-site monitoring wells (MW-2, MW-5, and MW-6) were installed (all above 20 feet bgs) but were not sampled until June 2001.

***July 2001***                    A Dual Phase Extraction (DPE) treatment system began operation at the facility and additional on-site monitoring wells (MW-11 and MW-12) were installed.

*After more than four years of no remedial actions, a DPE system was finally in operation, yet the extent of both the soil and groundwater contamination was still unknown.*

**October 2002**                    Two additional monitoring wells were installed (MW-10 and MW-13) but only MW-13 was installed down-gradient of the on-site contamination. Tert-butyl alcohol (TBA) was also detected in monitoring wells across the facility.

**April 2003**                    Monitoring wells MW-14, MW-15, MW-16, MW-17 and MW-18 were installed (all above 20 feet bgs) but only MW-15 is down-gradient of the on-site contamination.

**September 2004 to March 2005**   Monitoring wells MW-19, MW-20, MW-21, MW-22, MW-23 and MW-24 were installed (all above 20 feet bgs).

*Finally, eight years after the contamination was detected, the extent of the MTBE and TBA contamination in the Semi-Perched Aquifer can be more fully evaluated.*

**February 2007**                    The DPE system ceased operation.

**July 2009**                    A revised Remedial Action Plan (RAP) proposed ozone sparging on-site and mobile DPE off-site.

**October 2010**                    The extent and concentration in groundwater has been significantly reduced. Confirmation soil sampling was completed for sparging locations with the projected installation and startup for the first quarter of 2011.

**2011**                    Mobile DPE treatment off-site was re-evaluated due to low recharge rates.

*After three years of no treatment, TBA is still being detected in off-site wells and the extent of contamination has not been delineated.*

**Present (May 2011)**                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate TBA contamination in groundwater laterally or vertically, and additional investigation is required.

6. Remediation performed to date has failed to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Additional on-site and off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050 per facility. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Monitoring wells have not been installed to depths greater than 20 feet either on-site or off-site.

- Between approximately 1,000 and 1,800 feet south of the facility there are seven water wells not in use (abandoned) or of unknown status. These wells were generally installed between 1930 and 1960 and do not have a sanitary seal (OCWD), and thus, represent preferential vertical conduits for contaminant migration. MTBE and TBA originating from the facility could migrate down-gradient through the Semi-Perched Aquifer, and downward through these preferential pathways into the Alpha Aquifer and the Middle Aquifer System. The driving force for this migration is a downward gradient from the shallow semi-perched zone to the Middle Aquifer System.

- Well IRWD-2 is located approximately 3,200 feet east-northeast of the facility. This well is screened from 385 to 855 feet bgs in the Beta Aquifer; however, the well is in hydraulic connection with the Alpha Aquifer since the gravel pack begins at 84 feet bgs. Therefore, groundwater contamination entering the Alpha Aquifer could possibly impact well IRWD-2.

## 1.4      Contaminant Issues

- MTBE was released at the facility prior to February 1997 and impacted groundwater beneath the facility. Groundwater contamination has never been hydraulically contained and the historical extent of TBA contamination has never been fully delineated.

- The vertical extent of the MTBE and TBA plumes has not been investigated in the source area or down-gradient of the facility.

- Significant concentrations of TBA (39,700 micrograms per liter (ug/L) on-site and 18,100 ug/L off-site) are currently detected in groundwater beneath the facility.

**APPENDIX B.14**
**Facility Summary Report**

**ARCO 3085**
**3361 South Bristol Street**
**Santa Ana, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

Facility Address:                    3361 South Bristol Street, Santa Ana (Figures 1 and 2)

Intersection:                        S. Bristol Street and W. MacArthur Blvd.

Nearby Facilities:                   None

Previous Facility Operations:        ARCO gas station #3085 until 1997 (RWQCB 022320)

Current facility Operation:          In and Out Restaurant as of April 2011 facility observation

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*May 1993*                          Two soil borings were installed adjacent to a waste oil Underground storage tank (UST) to evaluate the extent of petroleum contaminated soil.

*December 1996*                     Twenty-five soil borings were installed to evaluate the extent of soil and groundwater contamination from petroleum hydrocarbons at the facility. Four of the soil borings were converted to monitoring wells AS/SVE-1 through AS/SVE-4 and sampled (SECOR, 2001).  MTBE contamination was detected in all four wells (SVE-1, 85,000 µg/l; SVE-2, 15 µg/l; SVE-3, 34,000 µg/l; SVE-4, 11,000 µg/l) (STRATUS, 2011).

*February 1997*                     Five underground storage tanks (USTs), dispensers and fuel piping were removed from the facility.

*June 1998*                         Monitoring wells AS/SVE-11, MW-1 through MW-4 were installed and sampled and the first analysis for methyl tert-butyl ether (MTBE) was performed.  All of the monitoring wells had detectable concentrations of MTBE except MW-2 (SVE-11, 260 µg/l; MW-1, 3,500 µg/l; MW-3, 38 µg/l; MW-4, 92 µg/l) (SECOR, 2011)

*February 1999*                     A soil vapor extraction/air sparging (SVE/AS) system was started on-site using wells AS/SVE-1 and AS/SVE-5 through AS/SVE-19.

*July 2000*                         Analysis for tert-butyl alcohol (TBA) began in groundwater for MW-1, MW-2, MW-3, MW-4 and SVE-1 in June 2000, but there were no detectable levels until October 2000 (MW-1, 620 µg/l; MW-4, 25 µg/l; SVE-1, 85 µg/l) (SECOR, 2011).

*May 2001*                          The Regional Water Quality Control Board (RWQCB) deemed the SVE system to be ineffective and requested that another remedial technology be employed.

*At least five years after the first investigation, no attempt to control the migration of groundwater contamination had been implemented.*

*October 2001*                      Monitoring wells MW-5 and MW-6 were installed and sampled.

*June 2002*                         The SVE system ceased operations at the facility.

*September 2002*                    Monitoring wells MW-7 through MW-11 were installed along with two dual phase extraction wells (DPE) number 1 and 2. In addition, a mobile DPE system began operations at the facility.

*March 2003*                        A permanent DPE system was started at the facility that eventually consisted of wells DPE-1, DPE-2, SVE-1, SVE-15, and SVE-19.

*September 2006*                     Monitoring wells MW-12 and B9 were installed and sampled.

*November 2007*                      DPE-10 and DPE-14 were installed.

*November 2010*                      The current data show that MTBE contamination is still being detected in off-site wells MW-10 (220 µg/l) and MW-11 (4µg/l) while TBA contamination is still being detected in off-site to the east in MW-3 (170 µg/l), MW-9 (470 µg/l), and to the south in MW-10 (24,000 µg/l) and MW-11 (2 µg/l).

*Present (May 2011)*                 Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  The responsible party has failed to delineate the vertical extent of MTBE and TBA contamination and additional investigation is required.

6.  Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.  Additional off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- Monitoring wells in the semi-perched zone at the facility are generally screened from approximately 3 to 30 feet below ground surface (bgs).

- There are six wells of unknown status (W-2130, W-2126, W-4516, W-4478, W-4475 and W-21280 and one abandoned well (W-17191) within 800 feet of the facility. These wells are generally private wells installed between 1930 and 1960 and often did not have a sanitary seal, and thus, represent preferential vertical conduits for contaminant migration. Well W-4475 is located within the MTBE and TBA contaminated groundwater plume, does not have a sanitary seal, and is screened from 205 to 230 and 379 to 384 feet bgs. Well W-4478 is located approximately within the facility boundaries and may be within the MTBE and TBA plumes. Well W-4478 is screened from 367 to 450 feet bgs with a gravel pack extending from ground surface to 450 feet bgs.

- The annulus of wells W-4475 and W-4478 represents a direct conduit for MTBE and TBA in the Semi-Perched Aquifer beneath the facility to migrate downward into the Alpha Aquifer and the Middle Aquifer System. The driving force for this migration is a downward head gradient from the shallow semi-perched zone to the Middle Aquifer System.

## 1.4    Contaminant Issues

- MTBE was released at the facility prior to November 1996 and can be traced from the source to groundwater in the Semi-Perched aquifer beneath the facility.

- The lateral extent of MTBE and TBA plumes has not been delineated to the southeast and southwest of the facility.

- The vertical extent of the MTBE and TBA plumes have not been fully delineated.

**APPENDIX B.13**
**Facility Summary Report**

**Chevron 1921**
**3801 South Bristol Street**
**Santa Ana, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:      Facility Summary

## 1.1      Identification

Facility Address:                    3801 South Bristol Street, Santa Ana, California (Figures 1 and 2)

Intersection:                        Bristol Street and Callens Common

Nearby Facilities:                   None

Previous Facility Operations:        Chevron Service Station

Current facility Operation:          Chevron Service Station as of April 2011

## 1.2      Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*November 1984*                      A site investigation for leaking underground storage tanks (USTs) identified gasoline contaminated soil directly above groundwater (approximately 12 feet [below ground surface (bgs)]). Monitoring wells MW-1, MW-2 and MW-3 were installed. The groundwater flow direction was not reported. Hydrocarbons were not detected in groundwater (Harding, 2000).

*October 1988*                       Four USTs were replaced along with the removal of 706 cubic yards of contaminated soil. A sheen of hydrocarbons was identified on groundwater within the excavation. All three monitoring wells were destroyed during the UST removal. MW-2 was reinstalled (Harding, 2000).

*November 1989*                      Monitoring wells MW-4, MW-5, MW-6 and MW-7 were installed (to 25 ft bgs). Several feet of gasoline free product or light non-aqueous phase liquid (LNAPL) were measured in MW-4 and MW-5, but none of the wells were sampled (SAIC, 2010).

*1990*                               Manual bailing to remove light non-aqueous phase liquid (LNAPL) from monitoring wells began (amounts unknown).

*April 1990*                         Monitoring wells MW-8 through MW-12 were installed to 25 ft bgs but not sampled (Harding, 2000; SAIC, 2010).

*December 1990*                      Monitoring wells MW-13 and MW-14 were installed (to 25 ft bgs) and not sampled (Harding, 2000; SAIC, 2010).

*March 1991*                         A soil vapor extraction (SVE) /air permeability test was conducted on monitoring wells MW-4 and MW-5; however, amounts of recovered hydrocarbons were not reported.

**July 1991**                              Sampling and analysis of MW-4 through MW-14 began.

**March 1993**                            Monitoring wells MW-15 and MW-16 were installed to approximately 36.5 ft bgs (Harding, 2000).

**January 1994**                          A groundwater recovery well (RW-1) was installed to aid in fluid recovery of LNAPL (Harding, 2000).

**1995**                                  Fifty-five cubic yards of soil from five areas impacted with hydrocarbons were excavated and stockpiled for off-site treatment.

**July 1996**                             Analysis for methyl tert-butyl ether (MTBE) began and MTBE was detected on-site (e.g., 830 µg/l in MW-2 and 300 µg/l in MW-14).

**September 2000**                        LNAPL was reported in MW-4, MW-5 and MW-8 (Harding, 2000).

*After eleven years, when LNAPL was known to be present on-site, there had been no reported remedial action.*

**October 2000**                          Analysis for tert-butyl alcohol (TBA) began, but TBA was not detected in on-site wells until January 2001 (e.g. 59,000 µg/l in MW-6).

**December 2005**                         The over-purging of five monitoring wells was completed but had little or no effect on MTBE or TBA concentrations. The three on-site monitoring wells sampled before and after the December 2005 over-purging reported the following concentrations for MTBE: MW-2R, 26 µg/l to 44 µg/l after; MW-5R, 5,300 µg/l to 2,700 µg/l after; MW-6R, 100 µg/l to 180 µg/l after.  For TBA: MW-2R, 750 µg/l to 3,600 µg/l after; MW-5R, 6,400 µg/l to 16,000 µg/l after; MW-6R, 12,000 µg/l to 9,300 µg/l after.

**April 2007**                            Groundwater extraction wells EW-1 and EW-2 were installed.

**February 2010**                         The Dual Phase Extraction (DPE) system proposed for installation in 2008 was still not installed.

*After 20 years since the first detection of groundwater contamination, there are virtually no reported amounts of LNAPL recovered, and no remedial actions have been implemented.*

**Present (May 2011)**                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE and TBA contamination in groundwater and additional investigation is required.

6.  No remediation has been performed to date to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Monitoring wells in the Upper Semi-perched Zone are generally screened from approximately 5 to 25 feet bgs.

- Within a quarter mile radius of the facility there are six wells (W-4516, W-2126, W-4478, W-4475, W-17191, and W-2128) that could provide vertical contaminant migration pathways:

    - Unknown type or unknown status well W-4516 was constructed in 1925 and is located approximately 473 feet northeast of the facility. Information regarding well W-4516's screen interval and sanitary seal are unavailable; however, the well was completed within a 250-foot boring.

    - Unknown type or unknown status well W-2126 is an agricultural/irrigation well located approximately 1,080 feet north of the facility. Information regarding well W-2126's screen interval and sanitary seal are unavailable.

    - Unknown type or unknown status well W-4478 is an agricultural/irrigation well located approximately 1,300 feet northeast of the facility. Well W-4478 is screened from 367 to 450 feet bgs and does not have a sanitary seal.

- Unknown type or unknown status well W-4475 is a domestic well constructed in 1960 and is located approximately 1,300 feet north of the facility. Well W-4475 is screened from 205 to 384 feet bgs and does not have a sanitary seal.

**APPENDIX B.12**
**Facility Summary Report**

**Beacon Bay Car Wash SA**
**1501 MacArthur Boulevard**
**Santa Ana, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 1501 MacArthur Boulevard, Santa Ana, California (Figures 1 and 2) |
| Intersection: | S. Plaza Drive and W. MacArthur Blvd. |
| Nearby Facilities: | None |
| Previous Facility Operations: | Beacon Bay Car Wash |
| Current facility Operation: | Redeveloped as shopping center per April 2011 observed during a site visit |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

**November 1983**                Six (8 to 10 feet deep) product extraction wells were installed on-site (SARWQCB-MTBE-026818 to 026820). According to the Case Closure report (CRWQCB, 2004), one of the borings was 20 feet deep.

**December 1983**                By December 12th, 3,200 gallons of free product or light non-aqueous phase liquid (LNAPL) were recovered from product extraction wells (SARWQCB-MTBE-026818 to 026820).

**August 1987**                By this date, another 1,602 gallons of free product had been recovered (CRWQCB, 2004).

**June 1990**                Six steel underground storage tanks (USTs) were removed from the facility (CRWQCB, 2004).

*After six years of known groundwater contamination, other than LNAPL recovery, no soil or groundwater remedial actions were under taken.*

**March 1991**                Groundwater monitoring wells MW-1 through MW-4 were installed on-site while MW-5 was installed off-site directly east of the facility (no well logs were available for review). LNAPL was found in MW-3 and MW-4 (CRWQCB, 2004).

*Again, no remedial action was taken.*

***September 1993***                    Monitoring well MW-6 was installed on-site, while MW-7 through MW-10 were installed off-site to the south and west of the facility (SARWQCB-MTBE-026818 to 026820). The boring logs for these wells show that they were all completed to 10 feet bgs (SARWQCB-MTBE-026279 to 026283).

***November 1993***                    A groundwater pumping well (MW-11; no well log available) was installed on-site (SARWQCB-MTBE-026818 to 026820).

***February 1994***                    Monitoring well MW-12 (no well log available) was installed off-site west of the facility (SARWQCB-MTBE-026818 to 026820).  After the installation of MW-12, no further groundwater monitoring wells were installed.

*Based on the depth of the product extraction wells and the well logs for MW-6 through MW-10, it is assumed that all of the on-site monitoring wells were completed to a depth of 10 feet bgs.*

***August 1995***                    A groundwater pump and treat (GWPT) system (using MW-2, MW-3, MW-4 and MW-11) began operation at the facility (CRWQCB, 2004).

*For almost 12 years, before the GWPT system began operation contamination had been allowed to migrate in groundwater both laterally and vertically.*

***June 1996***                    Analysis of groundwater samples for Methyl tert-butyl ether (MTBE) began.  All of the on-site wells that were samples and the two off-site wells (MW-7 and MW-8) that were sampled were contaminated with MTBE (James 2004).

***August 1996 to December 1997***        A soil vapor extraction (SVE) system was installed at the facility but operated only briefly since it was believed to be ineffective (CRWQCB, 2004).

***October 1998***                    The GWPT system ceased operations (after the extraction of 193,339 gallons of groundwater) even through soil contamination as a source for further groundwater contamination was no longer being addressed (CRWQCB, 2004).

***August 2000***                    Analysis of groundwater samples for tert-butyl alcohol (TBA) began. However, TBA was not detected until December 2000 in on-site groundwater monitoring wells MW-2, MW-3, MW-6 and MW-11 and off-site MW-8 (James 2004).

***January 2001 to February 2001***        Almost three years after active groundwater treatment was ended, a total of 3,793 tons of contaminated soil were removed from beneath dispensers 1 and 2 and transported off-site. During the excavation process, 34,615 gallons of groundwater was recovered and removed from the facility. Two shallow (17 feet bgs) horizontal extraction wells (MW-A and MW-B) were installed in the excavation (CRWQCB 2004). Monitoring wells MW-1, MW-2, MW-4 and MW-6 were removed with the excavation activities and replaced with MW1A, MW-2A, MW-4A and MW-6A in June 2001.

***April 2001 to January 2002***        During this time period, post-remedial dewatering with MW-A and MW-B removed 11,050 gallons of groundwater (CRWQCB, 2004) equivalent to <0.03 gpm. With the completion of all post-remedial dewatering, no further groundwater remedial activities were implemented after January 2002 (CRWQCB, 2004). However, the on-site groundwater was still contaminated with significant concentrations of both MTBE and TBA (i.e., MW-2A with 500 µg/l MTBE and 200 µg/l TBA; MW-3 with 8,400 µg/l MTBE and 7,900 µg/l TBA;

MW-6A with 610 μg/l MTBE and 4,700 μg/l TBA, as well as the off-site MW- 8 11,000 μg/l MTBE and 1,500 μg/l TBA) (James, 2004).

Clearly, *shallow groundwater dewatering has not significantly addressed the lateral and vertical migration of groundwater contamination.*

**October 2003** (last data available).                    MTBE was detected in groundwater at concentrations up to 130 ug/L.

**February 2004**                              The Regional Water Quality Control Board (RWQCB) issued a Site Closure and No Further Action letter for the facility. At this point in time, the Site Closure allowed 130 μg/l MTBE to remain in groundwater beneath the facility.

*Given the decline in both MTBE and TBA concentrations since January 2002 (see monitoring well hydrographys in Appendix D), a period during which no further groundwater remediation was conducted at the facility, the decrease in both MTBE and TBA concentrations could be the result of one or both of the following: (i) either the MTBE and TBA contamination has migrated off-site to the west of the facility boundary or, (ii) the MTBE and TBA contamination has migrated vertically into deeper groundwater zones. In either case, the further lateral and vertical migration of groundwater contaminants from the facility remains uncontrolled.*

**Present (May 2011)**                          Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to investigate the off-site lateral extent to the west of the facility and vertical extent of MTBE and TBA in groundwater and additional investigation is required.

6. Remediation performed to date has failed to effectively address probable off-site and deeper groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Remediation of off-site and/or deeper groundwater contamination may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050 per facility. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3 Hydrogeologic Issues

- There is no data to suggest that groundwater monitoring wells with screens to depths greater than 20 to 25 feet bgs have been installed either on-site or off-site.

- Well MTSN-SA is an irrigation well located approximately 1,700 feet southwest of the facility. This well was installed in 1949 to a total depth of 914 feet bgs. Impellors for the pump are located at 130 feet bgs; however, the exact screened interval and presence of a sanitary seal are unknown. Therefore, this well could provide a preferential pathway for contaminant migration.

- There are seven wells either not in use (abandoned) or of unknown status (W-2130, W-2126, W-4516, W-4478, W-4475, W-2128 and W-17191) located within 1,200 feet of the facility. These wells are generally private wells installed between 1930 and 1960 and often did not have a sanitary seal. Wells W-17191 and W-2128 are located 250 feet southeast of the facility. Well W-17191 is currently not in use (abandoned). The well construction details for these two wells are unknown; however, given the time period that they were installed, they probably were completed without a sanitary seal. Therefore, these two wells likely provide a preferential pathway for vertical contaminant migration. Well W-2130 is located approximately 600 feet east of the facility and is screened from 123 to 130 and 175 to 180 feet bgs without a sanitary seal. Well W-2130 provides a conduit for preferential vertical contaminant migration since it was completed without a sanitary seal. The driving force for this migration is a downward head gradient from the shallow semi-perched zone to the Middle Aquifer System.

## 1.4 Contaminant Issues

- MTBE was released at the facility prior to June 1996. MTBE can be traced from the source to groundwater beneath the facility. Once MTBE reached groundwater it spread laterally, particularly to the northwest. The historical on-site extent of the maximum MTBE and TBA plumes has never been fully delineated. The vertical extent of MTBE and TBA in groundwater beneath the facility has not been investigated.

**APPENDIX B.21**
**Facility Summary Report**

**Huntington Beach Arco**
**6002 Bolsa Avenue**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:     Facility Summary

## 1.1     Identification

| | |
|---|---|
| Facility Address: | 6002 Bolsa, Huntington Beach, California (Figures 1 and 2) |
| Intersection: | Springdale Street and Bolsa Avenue |
| Nearby Facilities: | Unocal 5123 |
| Previous Facility Operations: | Service station as of 1978 (KOMEX-MTBE-241699) |
| Current facility Operation: | Operating ARCO branded  service station as of April 2011 observation |

## 1.2     Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***November 1994***                    High levels of fuel contamination were detected in soil samples during an upgrade to fiberglass product piping (OCHCA-MTBE-032890, 032896).

*Analytical results indicate that fuel releases occurred from the former steel product piping.*

***May-December 1995***                    During the removal of three fuel underground storage tanks (USTs) in December 1995, soil samples were determined to contain fuel contamination (RWQCB 035770).  Groundwater was observed within the UST cavity at 15 to 18 feet bgs (OCHCA-MTBE 032881).

***March 1997***                    During a Station re-build in March 1997, a soil sample collected at 3-feet below ground surface (bgs) beneath dispenser island contained fuel contamination including methyl tert-butyl ether (MTBE) (OCHCA-MTBE-032869).

*Results indicate a release of MTBE containing gasoline occurred beneath the fuel dispenser island sometime prior to March 1997.*

***June 1998 to April 2001***                    In June 1998, quarterly groundwater monitoring and sampling was initiated at the facility and MTBE was first analyzed and detected in groundwater in two wells: MW-5 (14,000 micrograms per liter [ug/L]) and MW-6 (7,100 ug/L) (EnviroMonitoring Services – EMS, 2011a). From June 1998 to April 2001, seven soil boreholes and 12 upper zone groundwater monitoring wells (maximum depth of 21 feet bgs) were drilled at facility (EMS, 2011a).  Fuel contamination, including MTBE, was detected in soil samples taken from 5 to 20 feet bgs.  MTBE contamination in the shallowest soil samples (5 feet bgs) was detected immediately adjacent to the former USTs, and within 15 feet of the former dispenser islands.  Groundwater during this period ranged from 3 to 11 feet bgs, indicating that the contamination at 5 feet bgs occurs in the groundwater contaminant smear zone and

had spread from the point of release. MTBE in soil to a depth of 20 feet bgs was detected at northerly, westerly, and easterly facility boundaries, and within 30 feet of southerly facility boundary (EMS, 2011a).

*These results are consistent with a release of gasoline containing MTBE at the former USTs and dispenser islands that spread laterally and vertically in groundwater.*

In February 1999, MTBE was confirmed in groundwater at the southwestern and southerly property boundaries of the facility (in MW-7 and MW-8). In April 2001, the high concentration core (>10,000 ug/L) of the MTBE and tert-butyl alcohol (TBA) plumes extended across the former UST and dispenser islands to the southerly facility boundary (Figures 4 and 5).

*The lateral extent of the groundwater MTBE/TBA plume was not delineated to the northeast, west and southwest of the Station (Figures 4 and 5). The vertical extent of MTBE and TBA in soil and groundwater was not delineated.*

**July 2002 to July 2004**          In July 2002, a dual phase extraction (DPE) system began operating (RWQCB 036146). By November 30, 2003, it was estimated that 950 pounds of hydrocarbons had been removed from the subsurface at the facility (RWQCB 035942). There were problems with TBA treatment using the DPE system, which resulted in effluent discharge limit violations (RWQCB 036073). In July 2004, a groundwater pump and treat (GWPT) system began operating at facility, with three extraction wells in upper zone and one extraction well in zone C (EMS, 2005a). The zone C well was removed in December 2004 because of low flows from the limited 3-foot screen section. In 2004, the DPE system was shut-down due to a substantial reduction in influent vapor concentrations (EMS, 2011b).

*The DPE and GWPT systems began operation 4 years and 6 years, respectively, after high concentrations of MTBE and TBA were first detected in groundwater beneath the facility, and 3½ years and 5½ years, respectively, after MTBE was confirmed at the southerly and southwesterly facility boundaries. Operation of the GWPT system represents the first time any hydraulic influence was established for the upper zone MTBE and TBA plumes. Prior to this time, the MTBE and TBA plumes were allowed to migrate laterally off-site and vertically deeper. As the extent of the upper zone plume was never delineated and the capture zone of the extraction wells never determined, hydraulic capture of the upper zone plume has never been demonstrated.*

**June - December 2004**          In July 2004, three well clusters were installed with short well screens in two deeper groundwater-bearing zones: Zone B between 37 to 40 feet and zone C between 56 to 59 feet (EMS, 2011a). Low concentrations of TBA was detected in soil to as deep as 60 feet bgs in one well borehole next to former UST cavity, and low concentrations of MTBE were detected to as deep as 55 bgs in borehole near the southern (down-gradient) boundary of facility (EMS, 2008).

*These results indicate that MTBE and TBA had migrated much deeper into the Semi-Perched Aquifer, and were still undelineated vertically. In June and July 2004, MTBE concentrations in groundwater increase downward, with maximum concentrations in upper, B and C zones of 3.6, 9.5 and 969 ug/L, respectively (Figure 4). Significant MTBE and TBA concentrations were detected in zone C in the first sampling event for this zone in July 2004 (Figures 4 and 5). Therefore, these constituents migrated laterally off-site and vertically to deeper aquifer for several years prior to 2004.*

***March 2005 to October 2006*** In March 2005, three soil boreholes were drilled to 60 feet bgs; two in the high concentration core, and one up-gradient, of the upper zone MTBE/TBA plume (EMS, 2005b). At one borehole in the high concentration core of plume, high levels of TBA were detected in soil sample (1,060 micrograms per kilogram [ug/kg]) and a discrete-depth groundwater sample (14,300 ug/L) at 60 feet (corresponding to zone C), which was the highest TBA concentration detected during the investigation (EMS, 2005a). In September 2006, a groundwater GWPT extraction well (EW-15D) with 20-feet of screen was installed to a depth of 66 feet (in zone C) adjacent to this borehole. TBA was detected in an upper zone discrete-depth groundwater sample in the up-gradient borehole (EMS, 2005b). In September and October 2006, concentrations of MTBE and TBA in excess of 100 ug/L were detected in a zone C monitoring well (Figure-2).

*These results confirm that the vertical extent of the oxygenate plume has not been adequately delineated, and that concentrations beneath the high concentration core increase significantly with depth. The zone C extraction/monitoring well has a long screen which allows for significant contaminant dilution in samples. In spite of the TBA detection in the up-gradient borehole, and a consultant recommendation to install a monitoring well at this location, to date (April 2011), no well has ever been installed at up-gradient northerly facility boundary.*

In September 2006, the GWPT system was shut-down due to low flow rates. Two of the extraction wells with longer screened wells in the upper zone and zone B were proposed to be drilled out and replaced along with the installation of a zone C extraction well. The GWPT system, with two upper zone, one zone B and one zone C extraction well, resumed operation in October 2006 (EMS, 2006b).

*This was the first groundwater remediation in zone B, and the first groundwater remediation in zone C since December 2004. The first significant hydraulic influence in zone C was established when EW-15D began pumping in October 2006, over two years after high levels of MTBE and TBA were first detected in zone C. As the extent of the zone C plume was never delineated and the capture zone of EW-15D never determined, hydraulic capture of the zone C plume has never been demonstrated.*

***April 2010 to April 2011*** In at least four letters and several meetings between April 2010 and April 2011 (OCHCA, 2010, 2011a, 2011b, 2011c), the OCHCA notified the responsible party (RP) of several deficiencies and violations, including:

- Not performing groundwater sampling events on a quarterly basis;

- Not notifying the agency of sampling events;

- Screened intervals that are too broad in several wells;

- GWPT system turned off in January 2009 without agency authorization; and

- The need for additional vertical delineation.

In response to directive for vertical delineation, the RP consultant initially states (EMS, 2011a) that vertical delineation of the plume was completed in March 2005.

*This statement was made in spite of high levels of TBA detected in soil and groundwater at 60 feet bgs, the maximum depth investigated*

In a subsequent draft work plan (EMS, 2011c) the installation of three 5-feet screen wells at the plume hot spots to depths of 60, 70 and 75 feet was proposed.

*This work will represent the first attempt at further vertical contaminant plume delineation since March 2005.*

February 2011 groundwater analytical results (Figure 4), when compared to earlier historical results, show the following:

1.    In the upper zone, TBA levels in the high concentration core did not decrease and remain >2,000 ug/L;

2.    In zone B, TBA suddenly appeared, and

3.    In Zone C, TBA levels decreased but MTBE suddenly re-appeared in one well (15.7 ug/L).

*These results demonstrate persistence of TBA and MTBE to the present time in all three semi-perched zones and downward migration of MTBE and TBA to the maximum depth investigated to date (66 feet bgs). Some of this downward migration is probably due to the effect of pumping from a zone C well (bottom of screen at 66 feet bgs) from October 2006 to January 2009.*

**Present (May 2011)**                              Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.   MTBE and TBA have been released at the facility.

2.   MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.   MTBE has been present in groundwater at the facility for more than a decade.

4.   MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.   MTBE that has migrated off-site has comingled with releases from Unocal #5123.

6.   To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.   Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- The litho-stratigraphy logged in the three soil boreholes drilled in March 2005 to a depth of 60 feet consists of a silt sequence, with occasional traces of sand or gravel, from surface to total depth. Monitoring well screens have been installed across various depth intervals that do not appear to correspond to distinct lithologic contacts. The well screens in well clusters at the locations for MW-8, MW-10 and MW-14 are set from (average depths): 5 to 20 feet bgs (upper zone), 37 to 40 feet bgs (zone B) and 55 to 58 feet bgs (zone C). Hydrographs indicate that the three zones are in hydraulic communication. Based on relative head differences, there appears to be more hydraulic separation between the upper zone and zone B than between zones B and C (see discussion below).

- The contaminated groundwater-bearing zones at Huntington Beach Arco and former Unocal Station #5123 (across Bolsa Avenue to north) can be approximately correlated as follows:

| *Huntington Beach Arco* | *Former Unocal Station #5123* |
|---|---|
| Upper zone (5-20 feet) | Combined upper A zone (10-15 feet bgs) and lower A zone (18-23 feet bgs) |
| Zone B (37-40 feet bgs) | B zone (30-40 feet bgs) |
|  | C zone (40-50 feet bgs) |
| Zone C (55-58 feet bgs) |  |

- Since July 2004, the vertical groundwater gradient at well cluster MW-8 has been mostly downward between the upper zone and Zone B, with an average head difference of -1.63 feet and average vertical gradient of -0.06. The vertical gradient was upwards from December 2005 to June 2006 and December 2006 to March 2007. Since June 2007, the vertical gradient has been constantly downward; with a head

**APPENDIX B.16**
**Facility Summary Report**

**Unocal 5123**
**14972 Springdale Street**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 14972 Springdale Street, Huntington Beach, CA |
| Intersection: | Springdale Street and Bolsa Avenue |
| Nearby Facilities: | Huntington Beach Arco |
| Previous Facility Operations: | Former Unocal gas station prior to 1978 (KOMEX-MTBE-241699) and closed in November 1994 (RWQCB 015265) |
| Current facility Operation: | Vacant lot as of April 2011 observation |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***April –July 1987***                              In April 1987, three steel fuel underground storage tanks (USTs) were replaced with two double-walled fiberglass USTs. High concentrations of fuel contamination were detected in the UST excavation (CHEVMDL 135800000-543952). 400 to 440 tons of fuel impacted soil were removed (ARCADIS, 2011a). In June 1987, three groundwater monitoring wells were installed (UOC 19979). Groundwater was encountered at 15 feet below ground surface (bgs) (UOC 19979). Separate phase fuel (free product or light non-aqueous phase liquid [LNAPL]) was detected on groundwater (ARCADIS, 2011a). Fuel contamination was detected in soil from 10 to 15 feet in a well next to the UST cavity (UOC 19983, UOC 20006). In July 1987, fuel contamination was detected in groundwater in all three wells (UOC 20130).

*Fuel contamination in soil was detected from the source (USTs) to groundwater. Three monitoring wells are screened to a depth of 22 feet, crossing two discrete Semi-perched Aquifer groundwater-bearing zones (upper and lower A zones), facilitating the downward migration of fuel contamination in groundwater.*

***January - August 1990***                              In July 1990, two on-site and two off-site groundwater monitoring wells were installed.

*All four wells are screened across upper and lower A zones.*

LNAPL was detected in two on-site wells (UOC 19979), with the thickest layer (3.36 feet) detected in January 1990 (UOC 19989). Bailing of free product was performed between August 1990 and June 1992, recovering 35-41 gallons (ARCADIS, 2011a).

*LNAPL bailing was initiated 7-months after the 3.36 feet layer of LNAPL was detected in one well, during which time the well the screen allowed contamination to migrate from the upper to lower A zone.*

In August 1990, benzene was detected in groundwater in three wells, including just off-site to southeast at a concentration of 3,500 micrograms per liter (ug/L) next to the UST cavity and near eastern property boundary (UOC 19985).

*These results indicate that a benzene plume extended off-site to the east and southeast at this time.*

**October 1990**                                     In October 1990, a leaking super product line was discovered and repaired. In May-June 1991, multiple leaks under product dispensers were discovered and repaired.

**November 1991**                                  Three additional on-site groundwater monitoring wells were installed to depth of 35 feet bgs (UOC 19979). Fuel contamination, including intermittent traces of LNAPL (UOC 19990, UOC 19991), were detected in groundwater in all three new wells.

*All three wells were screened across the upper and lower A zones and B zone, allowing fuel contamination to migrate downward into the B zone.*

Fuel contamination was detected in soil samples collected between 6.5 and 16.5 feet bgs in a well drilled next to western dispenser island (UOC 19984).

*This demonstrates that that fuel released at the dispenser island had migrated to groundwater.*

A groundwater pumping test showed an effective radius of influence (to 0.1 foot drawdown) of 45 feet (UOC 20389).

**May - June 1992**                                In May 1992, two off-site and one on-site groundwater monitoring wells were installed to a depth of 35 feet bgs (19980).

*All three wells were screened across the upper and lower A zones and B zone (see Hydrogeology Issues section), allowing fuel contamination to migrate downward into the B zone.*

In June 1992, the newly installed and previously installed wells were sampled.

*A groundwater contaminant plume, with benzene concentrations >1,000 ug/L in five of the 11 wells sampled, extended across all but the northern quarter of the facility property and probably extended off-site to the south and east (Map-1). The high concentration core of the plume corresponded with contamination sources at the USTs and at both dispenser islands.*

In June 1992, the groundwater pump and treat (GWPT) system began operation in conjunction with a free-product recovery system using five recovery wells. In 1992, a trace of LNAPL was detected in four of the five recovery wells (UOC 19987- UOC 19991), which were screened across three discrete groundwater bearing zones (upper and lower A zone and B zone).

**November 1992**                                A vapor extraction test report, dated November 16, 1992 indicated that soil vapor extraction (SVE) is a feasible remedial option (CHEVMDL 135800000-544092).

*This was the first feasibility testing for in-situ remediation of soil, over five years after soil contamination down to groundwater was confirmed beneath the facility.*

**February - May 1993**                          From February to May 1993, three off-site groundwater monitoring wells were installed to depths of 25 to 30 feet bgs (ENSR/AECOM, 2007).

*All three wells were screened across the upper and lower A zones, providing potential conduits for fuel contamination to migrate downward into the lower A zone.*

In May 1993, high levels of contamination were detected in groundwater in a well drilled about 27 feet east of facility (UOC 19597).

*This is the first confirmation that the high-concentration core of the fuel contaminant plume extended off-site. The well is located approximately 57 feet from the nearest GWPT recovery well, which is outside of the effective radius of influence (UOC 20389), indicating that the GWPT system did not hydraulically contain a portion of the high-concentration core of the plume.*

**February 1994**                                As late as February 1994, LNAPL was present in three of the recovery wells (UOC 19586, UOC 19589). Between February and August 1994, LNAPL was not observed in the recovery wells (UOC 19839).

**November 1994 – April 1995**                   In December 1994, two fiberglass coated steel USTs, product lines and facility improvements were removed during facility demolition. The UST excavation area advanced to 12 feet bgs. The excavation was backfilled from 3.5 to 9 feet bgs with 185 cubic yards of fuel contaminated soil taken from the UST excavation. A Tank Closure Report stated that fuel contaminated soil would be treated in-situ using vapor extraction. High contaminant concentrations was detected in soil samples from the UST excavation and beneath the former dispensers (CHEVMDL 135800000-362794). The depth to groundwater in the vicinity of the UST at the time was about 6 to 7 feet bgs (ARCADIS, 2011a).

*Contamination detected in soil beneath the USTs and dispensers provides further confirmation that the fueling system at the facility released fuel to soil in contact with groundwater. Contaminated soil was used to backfill a portion of the UST cavity, some of which was below groundwater.*

**June 1995 – February 1996**                    In June 1995, the GWPT system shut-down due to the presence of methy tert-butyl ether (MTBE) in effluent samples (UOC 19661).

*This is the first detection of MTBE at the facility, indicating that MTBE was in groundwater and that the GWPT system was not designed to treat MTBE.*

Seven months later in February 1996, MTBE was analyzed and detected for the first time in groundwater monitoring wells. The results showed a MTBE plume that covered the southern two-thirds of the facility and extended at least

27 feet off-site to the east. The highest MTBE concentration (32,000 ug/L) was detected in a well at the western dispenser island.

*This indicates that a leak of MTBE-containing gasoline occurred at this dispenser.*

**August 1996 – May 1997**                    The GWPT system operations were suspended from August 1996 to February 1997 due to low influent concentrations, and then continued until May 1997 (CHEVMDL 135800000-558075). In July 1997, two months after the final shutdown of the first GWPT system, MTBE concentrations exceeded 10,000 ug/L at the western dispenser island and exceeded 100 ug/L in an off-site well 27 feet east of facility boundary (Figure 2).

*All of the seven wells in which MTBE was detected were cross-screened either across the upper two or the upper three Semi-perched Aquifer groundwater-bearing zones (upper and lower A zones and B zone). The four highest MTBE detections (990 to 13,000 ug/L) were in GWPT extraction wells screened to a depth of 35 feet, across the upper three groundwater-bearing zones. The analytical results indicate that cross-screening and groundwater pumping from these wells facilitated downward migration of MTBE. The vertical and lateral extent of the MTBE plume was not delineated at this time.*

**November 1997 – June 2001**                    During this period, soil and groundwater characterization activities were performed, including 39 soil borings, 27 on-site and off-site cluster groundwater monitoring wells (discretely screened in individual groundwater-bearing zones) and 18 cone penetrometer/rapid optical screening tool (CPT/ROST) borings. 19 geoprobe soil borings advanced in November 1997, detected fuel contamination in soil from first groundwater at 8 feet bgs to total depth of 25 feet bgs (CHEVMDL135800000-558075).

*The geoprobe investigation results indicate that fuel contamination migrated downward through the Semi-perched Aquifer system to at least as deep as the lower A zone, possibly facilitated by the large number of cross-screened wells and operation of the GWPT system (all but one of the extraction wells were screened from 5 to 35 feet bgs). The thick contaminant smear zone created by the cross-screened wells and pumping represented a continuing source of contamination to groundwater.*

In January 2001, seven groundwater monitoring wells were abandoned, and in April 2001, one groundwater monitoring wells was abandoned (ENSR/AECOM, 2007).

*The seven wells abandoned in January 2001 all had screens from about 5 to 35 feet bgs that crossed the upper three groundwater zones (upper and lower A zones and B zone). The well abandoned in April 2001 had a screen from 5 to 30 feet bgs that crossed the upper and lower A zone. These long well screens were conduits for contaminated groundwater to migrate from the upper A zone into the lower A and B zones and had been in place for 8 to 9 years.*

**November 2001 – April 2002**                    A dual phase extraction (DPE) system was installed with operation starting in April 2002 (ENSR/AECOM, 2007). The DPE system included SVE and groundwater extraction components (CHEVMDL 135800000-562337). In February 2002, just prior to DPE system start-up, MTBE was detected in A (upper and lower), B and C zones (ARCADIS, 2011a) (Figure 3). In the upper and lower A zones, the MTBE plume covered the southern two-thirds of the facility and the low concentration plume fringe (<10 ug/L) extended off-site to the south and east. There were insufficient wells to evaluate the lateral distribution of MTBE in the B and C zones.

*The lateral and vertical extent of the MTBE plume was not delineated at this time. From May 1997 to April 2002, a period of almost 5 years, no remediation system for soil or groundwater contamination operated at the facility, allowing additional time for the MTBE plume to spread laterally and downward through the Semi-perched Aquifer system.*

**January 2004 – July 2004**          From January to June 2004, the DPE system was shut-down for repairs. Analysis for tert-butyl alcohol (TBA) first occurred in water samples collected from the facility in March 2004 and was first reported as detected in on-site groundwater monitoring wells in July 2004 (ARCADIS, 2011a).  The outline of the TBA plume at this time was similar to that for MTBE (Figure 5).  The highest TBA concentration was detected in a cluster well at the southwestern corner of the facility in the deepest zone tested (B zone).  The C zone well at the same well cluster was not sampled, for unknown reasons.

*The TBA plume at this time extended off-site to the southwest, south and east, and was not delineated laterally or vertically.*

**October – November 2004**          In October 2004, two additional well clusters, each with three wells screened discretely in the upper and lower A zones, and the B zone, were installed in the area of highest MTBE and TBA concentrations, including at the former western dispenser island.  In the November 2004 quarterly groundwater sampling event, TBA was detected at concentrations up to 3,200 ug/L in five of the six newly installed cluster wells, in all three groundwater-bearing zones screened (ARCADIS, 2011a).  TBA was detected in only one other well that quarter, in the B zone at the southwestern corner of the facility.

*Though MTBE was detected in C zone wells in previous sampling events, the new well clusters did not include C zone wells, making it less likely that the MTBE/TBA plume would be vertically delineated at these locations.  The highest TBA detection and second highest MTBE detection were in the well cluster at the western dispenser, providing more evidence that a leak of MTBE/TBA containing gasoline occurred at this location.  The lateral and vertical extent of the MTBE and TBA plumes were not delineated at this time.*

**August 2006 – February 2008**          In August 2006, the responsible party's consultant responded to an Orange County Health Care Agency (OCHCA) letter (ENSR/AECOM, 2006a).  OCHCA requested well screen intervals in a table and indicated concern that water levels had risen above the top of the well screens, making the remediation system ineffective.  ENSR/AECOM said they would include well screens in future tables, but did not address the OCHCA concern regarding water levels above well screens.

*The OCHCA concern reveals a conceptual and design flaw in the DPE system design which included three GWPT extraction wells (Well IDs never provided in reports) and 18 SVE wells (ENSR/AECOM, 2008).  Of the 18 SVE wells only 7 were upper A zone wells with static water levels below the top of the well screen about half of the time.  The remainder of the SVE wells were screened across confined zones (lower A zone, B zone and C zone) with water levels were consistently above the top of the well screens.  The purpose of the SVE should be to remediate a contaminant smear zone exposed by the cone of depression produced by the groundwater extraction wells.  However, as there were an insufficient number of groundwater extraction wells to produce the required cone of depression, and the groundwater recovered by the SVE wells was probably minimal, the SVE wells were mostly volatilizing*

*contamination from water in the wells rather than residual hydrocarbons in soil around the wells, which represents the source of groundwater contamination.*

In December 2006, the DPE system was shut-down and not restarted until February 2008 (AECOM, 2009).

**March 2009 – July 2010**          In March 2009, the SVE portion of DPE system was shut-down due to the *"condition of the system and required upgrades"* (AECOM, 2009). The GWPT portion of DPE system was shut-down in July 2009 for discharge exceedance and not restarted until July 2010 (ARCADIS, 2011a).

*The DPE system experienced significant maintenance problems and lengthy shut-downs, in addition to limited effectiveness for the reasons described above.*

**April – June 2010**          DPE pilot testing, including aquifer pumping test and DPE testing, was performed at the facility (ARCADIS, 2011a). According to the DPE Pilot Test Work Plan (ARCADIS, 2010), the test would consist of groundwater extraction and SVE using two pumps in a single extraction well screened across the upper and lower A zones (7 to 25 ft bgs), and monitoring at two observation wells with the same screened interval. The work plan was developed in response to an OCHCA letter (OCHCA, 2009) indicating that *"…more aggressive remediation is required at the site".*

*The work plan does not evaluate other remedial options (as requested in the OCHCA letter), but rather proposes to pilot test the same remedial technology that has already proven ineffective at the facility, without discussing the problems of the previous DPE system nor explaining how this DPE would be more effective. In addition, the DPE pilot test only addresses the upper and lower A zones, even though the highest levels of TBA are in the B zone and groundwater contamination extends downward to at least the C zone.*

**August 2010**          In the August 2010 quarterly groundwater sampling event, TBA and MTBE were detected in all four groundwater-bearing zones, and TBA concentrations were higher than MTBE (ARCADIS, 2011a) (Figures 4 and 5). In most on-site well clusters, TBA concentrations increased downward from upper to lower A zones, and from lower A zone to B zone

*In the deeper B and C zones, TBA concentrations are in the same general range, or higher than ever, since first detected in July 2004, and MTBE concentrations have decreased but remain elevated since prior to start of the DPE system in April 2002. These results confirm that the 1992 and the 2002 remediation systems have been ineffective in preventing downward migration of TBA and MTBE into lower Semi-perched Aquifer zone (rather they have facilitated this migration), and have not lowered TBA concentrations in the lower zones. During the same period, the lateral and vertical extents of the MTBE and TBA plumes have not been delineated. The lack of adequate B and C zone monitoring wells, especially to the south, southwest and west, have made it impossible to adequately track plume migration or evaluate plume capture and remediation by the existing P&T system.*

**March 2011**          An OCHCA letter lists several overdue items, including the pilot test report, GWPT system operation and monitoring reports, well over-purge reports, the CAP, and update on soil vapor sampling activities (OCHCA, 2011).

*The letter contents indicate a general disregard for agency directives and deadlines.*

***Present (May 2011)***                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  MTBE that has migrated off-site has comingled with releases from Huntington Beach Arco.

6.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Four discrete groundwater-bearing sandy zones have been identified:

    o   Upper A zone: 10–15 feet bgs

    o   Lower A zone: 18-23 feet bgs

    o   B zone: 30-40 feet bgs

    o   C zone: 40-50 feet bgs

**APPENDIX B.20**
**Facility Summary Report**

**Westminster Shell**
**5981 Westminster Boulevard**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:    Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 5981 Westminster Boulevard, California (Figures 1 and 2) |
| Intersection: | Brookhurst Street and Ellis Avenue |
| Nearby Facilities: | Chevron 9-5401 |
| Previous Facility Operations: | Former Shell branded service station (closed November 2001 – RWQCB 021934) |
| Current Facility Operations: | Vacant lot as of April 11, 2011 |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***November 1985 to November 1986***        In November 1985, the waste oil underground storage tank (UST) was removed. Petroleum hydrocarbons were detected in a single soil sample (Wayne Perry, 2009a). In November 1986, petroleum hydrocarbons were detected in soil samples collected during waste oil UST area site assessment with a maximum concentration at a depth of 10 feet below ground surface (bgs) (SHELLREMD_00365974).

*This depth approximately corresponds to the top of groundwater, indicating that petroleum hydrocarbon contamination had impacted first groundwater beneath the facility.*

***September 1992***                        A diesel leak was detected at the dispenser island next to Springdale Street. An estimated 17 gallons of diesel fuel was released (SHELLREMD_00365973).

***June 1994 to March1995***                Analyses of soil samples collected from seven soil borings and nine groundwater monitoring wells demonstrated that fuel contamination was highest between 9 and 13 feet bgs in the area around the western dispenser island and east of the USTs ((SHELLREMD_00365974). In March 1995, fuel contamination was detected in groundwater in seven of nine wells, with the high concentration core of the plume approximately coinciding with area and depth of high levels of soil contamination (SHELLREMD_00338853, SHELLREMD_00366001). Fuel contamination was detected in a soil sample taken at 5 feet bgs next to southern dispenser ((Wayne Perry, 2009a).

*These results show that fuel contamination can be traced from near surface (5 feet bgs) to groundwater (9 to 13 feet bgs), and that the fuel storage and dispensing system was the source of the contamination. In March 1995, a groundwater contaminant plume was confirmed to extend at least 30 feet southwest of the facility.*

***May 1995 to October 1995***                     A soil vapor extraction (SVE) test and aquifer pumping test (APT) were performed to evaluate feasibility and derive design parameters for a dual phase extraction (DPE) system (Pacific Environmental Group (PEG), 1995). The SVE radius of influence ranged from 39 to 54 feet, and the groundwater capture zone for three pumping wells extended approximately 30 feet south (down-gradient) of facility boundary. Results of tests indicated that DPE would be feasible (PEG, 1995). A Remedial Action Plan (RAP) prepared in October 1995 proposed a fixed/installed DPE system (PEG, 1995). The RAP and the January 1996 CAP ([CAP] addendum to 1995 RAP) was approved by Orange County Health Care Agency (OCHCA) (SHELLREMD 00336841).

***April 1996***                     In April 1996, the first analysis and detection of MTBE occurred in five monitoring wells on the facility at concentrations ranging from 370 to 38,000 ug/L (Wayne Perry, 2011).

*The concentration core of the MTBE plume was beneath the USTs and southern dispensers in southeastern portion of the facility. MTBE was not yet detected in off-site wells.*

***April 1997***                     MTBE was first detected in an off-site, down-gradient monitoring well (Wayne Perry, 2011).

***September 1997***                     OCHCA indicated that the October 1995 RAP (and January 1996 addendum) was never implemented at the facility, and directs Shell to begin cleanup activities within 45 days (SHELLREMD_00336840). In October 1997, the project consultant, on behalf of Shell, recommends a modified remedial approach that substitutes a fixed DPE system with weekly overpurging of 4 wells using drop tubes and a vacuum truck (6 hours per weekly event) (SHELLREMD_00336854). The project consultant stated that the primary advantage of this "batch" approach over the originally proposed fixed system is significant savings in capital and operating costs (SHELLREMD_00336855).

*One year and eight months elapsed from time the OCHCA directed Shell to implement the October 1995 CAP (and January 1996 addendum) to when Shell responded with a revised CAP that substituted fixed DPE system with weekly over-purging. Unlike the fixed DPE system proposed in the October 1995 CAP (subsequently rejected to save money), the "batch" approach was not designed for, nor capable of, containing the groundwater contaminant plume, including MTBE. The "batch" approach also was not designed to remove contamination from the vadose zone. Each weekly event had a six-hour duration, or about 1.5 hours per well per week, representing approximately 1% "up-time", which results in a significantly slower contaminant mass recovery rate than for a fixed DPE system. The decision to implement the "batch" approach was made in spite of the fact that the MTBE plume was not delineated off-site in August 1997, and MTBE detections in on-site wells ranged from 900 to 88,000 ug/L in January 1997 (Wayne Perry, 2011).*

***January 1998 to November 1999***     From January 1998 to March 1999 (14 months), weekly vacuum truck over-purging (referred to by Shell as DPE) was conducted at the facility, removing less than 217 pounds of fuel contamination from soil and groundwater (Wayne Perry, 2009a). OCHCA stated in a chronological summary of the facility dated November 9, 1999 that Shell performed vacuum truck events from January to March 1998 (3 months) (SHELLREMD_00365520). Shell stated in their 2000 CAP that the vacuum truck events occurred from January to May 1997 (SHELLREMD_00365974).

*Due to inconsistencies in reporting, the period of operation of this remedial activity is approximate. In November 1999, 8-months after the last over-purging event, one well still had gasoline floating on groundwater, and five wells, including two off-site wells, had MTBE at concentrations ranging from 8 to 56,000 ug/L (Wayne Perry,*

*2011). Based on the small mass of fuel contamination recovered and high levels of contamination remaining in shallow groundwater monitoring wells located at the facility, vacuum truck over-purging is judged to have been ineffective, and allowed the groundwater contaminant plume to continue migrating unchecked for four years after fuel contamination was confirmed in off-site down-gradient wells, and for three years after high levels of MTBE were detected in shallow groundwater monitoring wells located at the facility,*

**June 2000 to July 2000**                    Nine DPE and one groundwater monitoring well were installed at the facility in the area of the USTs and dispenser islands (Wayne Perry, 2009a). The highest historical MTBE concentrations in soil was detected at depths of 12 and 15 feet in DPE boreholes (at and below the groundwater surface) (Wayne Perry, 2009a).

**January 2001**                    Operation of the fixed DPE system began, involving a combination of SVE and groundwater pump and treat (GWPT) (Wayne Perry, 2009a; SHELLREMD_00365968).

*This is the first time that any hydraulic influence on the contaminant plume was established, over eight years after the first confirmed fuel release, nearly six years after fuel contamination was confirmed in off-site down-gradient wells, and nearly five years after high levels of MTBE were detected in groundwater monitoring wells located on the facility. The GWPT capture zone did not hydraulically contain the known down-gradient extent of benzene or MTBE. Immediately prior (December 2010) to the startup of the DPE system, MTBE concentrations ranging from 1.4 to160 ug/L were reported in three off-site wells, beyond the down-gradient extent of GWPT well's capture zone.*

**February 2002 to August 2003**                    The service station was demolished and USTs, dispensers and associated piping removed. Approximately 251 cubic yards of fuel contaminated soil was excavated and removed. Fuel contamination (including MTBE) was detected at the base of the UST excavation (19 feet bgs) and beneath the eastern and southern dispenser islands (to 8 feet bgs) (Wayne Perry, 2009a). The DPE system was shut-down for almost 11 months (February to December 2002) during demolition activities (Wayne Perry, 2009a). In August 2003, two additional DPE wells were installed in the area of the former USTs to remediate the remaining contamination (Wayne Perry, 2009a).

*Soil sampling provided more evidence that the facility fuel storage and dispensing system had released MTBE that subsequently migrated through soil to groundwater beneath the facility.*

**July 2005 to February 2006**                    The SVE system was shut-down in July 2005 due to low inlet vapor concentrations. The SVE system recovered 5,317 pounds of vapor phase hydrocarbons (Wayne Perry, 2009a).

*The up-time percentage of SVE system over the approximately four and one half years of operation was 46%.*

The GWPT was shut-down in February 2006 (Wayne Perry, 2009a). The GWPT system recovered approximately 56.7 pounds of dissolved-phase hydrocarbons, and 1,378,089 gallons of water (a flow rate of 0.51 gallons per minute, considering total elapsed time over five years) (Wayne Perry, 2009a). In May 2006, shortly following the shut-down of the GWPT system , MTBE and/or TBA were detected in 7 of 14 wells sampled, including 2 off-site wells.

*Compared to MTBE concentrations in December 2000 (just prior to start-up of the DPE system), MTBE concentrations in wells in the high concentration core of the plume had dropped by approximately one order of magnitude, from a maximum of 54,000 to 1,100 ug/L (in same well). These results indicate that DPE reduced on-site contaminant concentrations but did not completely eliminate the source of MTBE and TBA to groundwater. Due to the lack of*

*hydraulic containment of the MTBE/TBA plume, the year-long period during demolition at the facility (2002) when GWPT wells did not operate, and the low operating time of the SVE system, MTBE and TBA persisted in off-site down-gradient wells, and the plume was allowed to migrate off-site unabated.*

***August 2007***                                          Soil underlying the former dispenser island west of the USTs was excavated to depth of 20 feet removing 2,607 tons of soil (Wayne Perry, 2009a)

***August 2008***                                          In August 2008, two additional monitoring wells were installed and 16 soil borings were drilled to a depth of 20 feet bgs (Wayne Perry, 2008). The highest concentrations of soil contamination (including MTBE and TBA) were detected at 10 to 15 feet bgs in the south-central portion of the facility near the southern-most dispenser island (Wayne Perry, 2008).

*These results indicate that MTBE and TBA containing gasoline was released to the subsurface at the southern dispenser island.*

***August to September 2009***                  Remedial excavation was conducted north and northwest of the former USTs to a depth of 20 feet bgs removing 1,422 tons of contaminated soil (Wayne Perry, 2009b). Dewatering in the excavation removed approximately 24,500 gallons of contaminated groundwater (Wayne Perry, 2009b). MTBE and TBA were detected in separate soil samples taken at the base of the eastern end of the excavation at a depth of 18 feet bgs (Wayne Perry, 2009b). MTBE and TBA were also detected in the single groundwater grab sample collected from the excavation at a depth of 18 feet bgs (Wayne Perry, 2009b). Approximately 800 pounds of Oxygen Releasing Compound (ORC™) were mixed with clean backfill and placed in the excavation from 10 to 20 feet bgs (Wayne Perry, 2009b).

***December 2010***                                      Groundwater monitoring and sampling was performed. MTBE and TBA persist in on-site and off-site monitoring wells, with maximum TBA concentration of 1,200 ug/L in well at the southerly (down-gradient) facility boundary.

***Present (May 2011)***                               Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  MTBE that has migrated off-site has comingled with releases from nearby Chevron 9-5401.

6.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater vertically, and additional investigation is required.

7.  Additional on-site and off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3     Hydrogeologic Issues

- Depth to the first Semi-Perched Aquifer groundwater beneath Westminster Shell has historically ranged between 8 and 14 feet bgs.

- Hydrostratigraphy at the facility was never adequately defined due to lack of continuous sampling or other method of high resolution logging (e.g. cone penetrometer testing or geophysical logging), and use of long well screens (most are 5-30 or 10-30 feet). One well cluster (MW-13A, MW-13B and MW-13C) existed in the southwestern corner of the facility from September 2001 until they were abandoned in August 2003. The zones screened in the cluster wells are designated for this report as A-zone (5 to 20 feet bgs), B-zone (33 to 41 feet bgs) and C-zone (51 to 54 feet bgs). These zones correspond to sandy intervals within a silt, sandy clay and sandy silt sequence.

- The contaminated groundwater-bearing zones at former Westminster Shell and Chevron #9-5401 (across Westminster Boulevard to south) can be approximately correlated as follows:

| *Chevron #9-5401* | *Former Westminster Shell* |
|---|---|
| Upper semi-perched zone (15-20 feet) | A-zone (5-20 feet bgs) |
| Lower semi-perched zone (25-55 feet bgs) | B-zone (33-41 feet bgs) |
| | C-zone (51-54 feet bgs) |
| Deeper A-zone (70-86 feet bgs) | |

- Based on historical water levels from cluster wells MW-13A, MW-13B and MW-13C, from September 2001 to August 2003:

    o  Between zones A and B, the historical net vertical gradient has been slightly upward, with a weak downward gradient measured only in September 2001 and from May to December 2002. The

**APPENDIX B.15**
**Facility Summary Report**

**Chevron 9-5401**
**5992 Westminster Boulevard**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 5992 Westminster Blvd., Westminster, California (Figures 1 and 2) |
| Intersection: | Westminster Boulevard and Springdale Street |
| Nearby Facilities: | Westminster Shell |
| Previous Facility Operations: | Chevron Service Station |
| Current facility Operation: | Chevron Service Station |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***August 1978 to February 1985***        From August 1978 to 1983, the facility had a different fuel system layout from the current -four gasoline underground storage tanks (USTs) were located in the northeastern portion of the facility and dispensers were along the northern and eastern facility boundaries.  In 1981, soil with a diesel odor was detected on the property adjacent to the site (CHEV/OCWD 352564 and CHEV/OCWD 005477).+

In 1981, the supreme and unleaded UST failed integrity tests (Harding ESE, 2002).

In 1982, an inventory audit indicated a loss of 1,007 gallons of unleaded and 318 gallons of supreme fuel (CHEV/OCWD 005485).  Subsequently, four soil borings detected strong odor in soil and a fuel sheen on the groundwater surface at 11 feet below ground surface (bgs) (CHEV/OCWD 005477 to CHEV/OCWD 005478; CHEV/OCWD 005500 to CHEV/OCWD 005503).

*This is the first report of a release of fuel contamination impacting groundwater beneath the facility.*

In February 1985, the northern dispensers remained in place, but the eastern dispenser island had been removed (Harding ESE, 2002).  At some point between 1985 and 1996, the northern dispensers had been removed and replaced by new fuel dispensers in the center of the facility.  There are no details available regarding replacement of the former USTs and dispensers.

***July to November 1996***        In July 1996, diesel fuel was detected floating on groundwater in two leak detection wells near the diesel UST.  Approximately two gallons of diesel and 150 gallons of water were

removed from the wells (Harding ESE, 2002). In November 1996, fuel contamination was detected in soil samples from three groundwater monitoring wells installed around the diesel UST. Methyl tert-butyl ether (MTBE) was detected in several soil samples, including from 5 to 15 feet bgs just north of the fuel dispensers (Harding ESE, 2002). In March 1997, groundwater was detected in the three monitoring wells between approximately 10 and 11 feet bgs (Conestoga-Rovers & Associates (CRA), 2011).

*These results demonstrate that a release of fuel containing MTBE at the dispensers had migrated to below the groundwater surface. This was the first detection of MTBE at facility.*

**March 1997**                               In the first analysis for MTBE in groundwater at the facility, MTBE was detected in two of the wells. The highest MTBE concentration in groundwater (54,000 ug/L) was detected in a well just north of the fuel dispenser island that also had the highest MTBE concentrations in soil samples (taken at and below the groundwater surface).

*These results confirm that one or more releases of MTBE at the dispensers impacted groundwater.*

**April 1997 to July 1998**                 In April 1997, during replacement of dispenser islands and product lines, fuel contamination was detected in soil samples collected beneath product lines and dispensers (CHEV/OCWD 0044965 to CHEV/OCWD 004977) samples were analyzed for MTBE, but none was detected. In March 1998, during drilling of three additional groundwater monitoring wells, fuel contamination was detected in one sample taken below groundwater (CHEV/OCWD 004711 to CHEV/OCWD 004721) (no analysis for MTBE was performed). In July 1998, the first groundwater sampling of all six wells indicated a MTBE plume with high concentrations beneath the current UST cavity and dispenser islands (CRA, 2011). The highest MTBE concentration (>10,000 ug/L) was detected in a well next the current dispensers. The second highest MTBE concentration was detected at the northerly boundary of the facility (Figure 1).

*This was the first confirmation that high concentrations of MTBE in groundwater extended to the northerly boundary of the facility. The MTBE groundwater contamination was not delineated off-site to the southeast or northeast of the facility.*

**May 2000**                                 Seven soil borings were drilled in the area of former and current dispenser islands (CHEV/OCWD 003724 to CHEV/OCWD 003752). MTBE was only detected in soil samples collected adjacent to the current dispenser islands at and below the depth of shallow groundwater. MTBE was also detected in grab groundwater samples from six of the soil borings.

*The distribution of MTBE in soil and grab groundwater samples is consistent with a release of MTBE from the current fuel dispensers.*

**September to October 2000**               In response to an Orange County Health Care Agency (OCHCA) directive, Chevron installed four additional wells in the shallow groundwater zone to improve the lateral delineation of the contaminant plume, and three wells in a deeper groundwater zone to evaluate possible downward contaminant migration (CHEV/OCWD 003553 to CHEV/OCWD 003566). MTBE was not detected in any soil sample, or in groundwater samples from the deeper groundwater zone.

*Additional shallow zone wells provided some additional delineation.  Three and one-half years after MTBE was first analyzed and detected in groundwater at the facility, and over two years after high MTBE concentrations were first detected in wells at the northerly and southerly property boundaries, the lateral delineation of the shallow contaminant plume was still not achieved.  The first attempt at vertical groundwater contaminant plume delineation bypassed the intermediate groundwater zones (between upper semi-perched zone and deeper zone A) that would have facilitated identification of vertical and other lateral contaminant migration pathways.*

**January to April 2001**                    The first analysis for, and detection of, tert-butyl alcohol (TBA) in groundwater samples occurred (CRA, 2011) (Figure 5).

**July 2001-November 2002**                    In July 2001, MTBE was first detected in the deeper "A-zone" (in DW-02 at the westerly boundary of the facility) at concentration of 6.4 ug/L.  From July 2001 to November 2002, MTBE was detected at low concentrations (maximum 12 ug/l) in DW-02 over five quarterly sampling events, in DW-01 over one sampling event (January 2002) and in DW-03 over two sampling events (January and July 2002).  TBA was detected once (November 2002) in DW-02 at a concentration of 34 ug/L.

*These results indicate that MTBE and TBA migrated to as deep as 86 feet bgs beneath the facility, impacting the deeper A-zone.  The lateral and vertical extent of MTBE and TBA plumes were not delineated at this time.  Despite these detections, no additional monitoring wells screened in the deeper A-zone, underlying zones, or intermediate zones were installed in an attempt to delineate the lateral and vertical extent of deeper MTBE and TBA plumes.*

**September to November 2001**                    Four additional groundwater wells were installed at the facility: two monitoring wells between the dispenser islands in the center of the facility and two extraction wells through the former (1978) UST cavity in the northeastern corner of the facility (Harding ESE, 2002).  The highest concentration of MTBE and TBA detected in soil was from a single sample collected below the groundwater surface at one of the borings between the dispenser islands.

*This finding provides further confirmation that the current dispensers are a source of MTBE and TBA in soil and groundwater beneath the facility.*

Soil samples from the two wells drilled through the 1978-1983 UST cavity area detected high levels of gasoline contamination (no MTBE) at 9 and 10 feet.

*This finding is consistent with contamination detected in a 10-foot bgs soil sample from September 2000 just north of 1978-1983 USTs.  These results confirm that non-MTBE gasoline was released from the 1978 USTs before their removal sometime prior to 1983, and had migrated to groundwater beneath the facility.*

**April 2002**                    The Chevron consultant made the following recommendation: "*Based on field indications and analytical data collected to date, it is recommended that wells MW-11, MW-12, MW-13 and MW-14 be used as extraction wells to remediate soil surrounding these source areas using dual-phase extraction (DPE).  Due to the high priority ranking of this site, the DPE event will also serve as a pilot study for the future evaluation of remedial alternatives*" (Harding ESE, 2002).

**June 2004**                          An off-site shallow zone monitoring well was drilled 118 feet northwest of facility, on the north side of Westminster Boulevard.  No fuel contamination was detected in soil or groundwater (CHEV/OCWD 295276; CRA, 2011) at this well.

*The monitoring well was drilled six years after high concentrations of MTBE were detected in a shallow zone groundwater well at the northerly facility boundary.*

**April 2005 to October 2006**                In a quarterly groundwater monitoring and progress report dated April 2005, the Chevron consultant stated that a request for addition of oxygen reducing compound (ORC) socks in wells would be made (SAIC, 2005a).

*No records have been found indicating that this request was acted upon.*

In December 2005, in a quarterly groundwater monitoring and progress report, the Chevron consultant stated than no corrective and remedial techniques were planned for the future (SAIC, 2005b).  In October 2006, Chevron began to collect natural attenuation parameters from facility groundwater monitoring wells.

*In November 2005, MTBE and TBA groundwater concentrations detected in the northwestern corner of the facility exceed 100 ug/L and 1,000 ug/L, respectively.  Both plumes were undelineated off-site to the west of the facility (Figure 3).  At this time, Chevron rejected any active remedial actions and began monitoring for natural attenuation indicator parameters.*

**December 2007 to January 2009**         In December 2007, the Chevron consultant prepared a work plan for an additional off-site groundwater monitoring well to delineate the TBA plume to the west of facility, and to conduct periodic oxygen injection and groundwater over-purge events in four on-site shallow zone monitoring wells (CRA, 2007).

*This was the first proposal for active remedial activities at the facility.*

In December 2008, OCHCA requested a Corrective Action Plan (CAP) with recommendations for alternative remedial actions (OCHCA, 2008).  In January 2009, the Chevron consultant stated that they will submit a CAP during the first quarter 2009 and that they performed enhanced fluid recovery (EFR – "over-purging") from four wells between April and October 2008 (CRA, 2009).

**August 2010 to December 2010**           In August 2010, the Chevron consultant indicated they are preparing a CAP (CRA, 2010a).

*This statement was made 1 year and 8 months after the OCHCA made a request for such a document.*

Three months later, in October 2010, the consultant stated that they will submit a report requesting site closure, and therefore, will not implement the previously proposed ozone injection nor complete the installation of the requested monitoring well (CRA, 2010b).  In December 2010, (CRA, 2011), high concentrations of TBA (up to 5,200 ug/L) persisted in monitoring wells at the northerly and westerly facility boundaries (Figure 4).  TBA was also detected in the deeper A-zone (3 J ug/L in DW-01) for the first time in eight years.

*In spite of these groundwater contaminant conditions, the Chevron consultant repeated their intention to prepare a site closure report. Nearly 29 years after groundwater contamination was first detected at site and over 12 years after high concentrations of MTBE were confirmed at the site boundaries, Chevron has:*

- *Not achieved lateral delineation of the upper semi-perched zone MTBE/TBA plume (In December 2010, a TBA concentration of 4,000 ug/L was detected in a well at the westerly boundary);*

- *Not investigated intermediate groundwater zones;*

- *Not achieved lateral or vertical delineation of the deeper A-zone MTBE/TBA plume (in December 2010, TBA was detected for the first time in eight years); and*

- *Never installed and operated a soil or groundwater remediation system.*

*In the 14 years since the discovery of MTBE in groundwater, and the 10 years since the discovery of TBA in groundwater, Chevron did not contain or remediate the MTBE and TBA groundwater plumes, allowing the plumes to migrate unmonitored and unchecked off-site and deeper. Recommendations for active remedial measures made in 2002 and 2007 were rejected in favor of continued groundwater monitoring.*

**Present (May 2011)**   Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from nearby Westminster Shell.

6. To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE and TBA contamination in groundwater and additional investigation is required.

7. No remediation has been performed to date to effectively address on-site and off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCD 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3 Hydrogeologic Issues

- Based on facility investigations, three discrete groundwater-bearing zones in the Quaternary-age Semi-perched Aquifer have been informally designated for this report:

  o Upper semi-perched zone: ground surface to approximately 15 to 20 feet bgs;

  o Lower semi-perched zone: from approximately 25-30 to 55 feet; and

  o "Deeper A-zone": from 70 to 86 feet bgs (maximum depth drilled).

  All but three of the facility groundwater monitoring wells were completed in the upper semi-perched zone (generally screened from 5 to 20 feet bgs), while the remaining three wells (DW-01, DW-02 and DW-03) were screened in the deeper A-zone at depth intervals ranging from 76-79 to 83-86 feet bgs. No wells have been installed in the lower semi-perched zone, though hydrographs of former cluster wells MW-13B and MW-13C at Westminster Shell demonstrate that the lower semi-perched zone (screened from 51 to 54 feet bgs in MW-13C) is hydraulically separate from the upper semi-perched zone, with a consistent downward gradient between the two zones.

- Approximate depth to groundwater has ranged from 7 to 12 feet bgs in the upper semi-perched zone and from 8 to 23 feet in the deeper A-zone.

- The contaminated groundwater-bearing zones at Chevron #9-5401 and former Westminster Shell (across Westminster Boulevard to north) can be approximately correlated as follows:

| Chevron #9-5401 | Former Westminster Shell |
|---|---|
| Upper semi-perched zone (15-20 feet) | A-zone (5-20 feet bgs) |
| Lower semi-perched zone (25-55 feet bgs) | B-zone (33-41 feet bgs) |
| | C-zone (51-54 feet bgs) |
| Deeper A-zone (70-86 feet bgs) | |

- Upper semi-perched zone MW-6 and Deeper A-zone well DW-03 are located next to one another at the facility and form a well cluster. From the time groundwater elevation was first monitored in DW-03 in

**APPENDIX B.18**
Facility Summary Report

**Thrifty Oil #368**
**6311 Westminster Avenue**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:      Facility Summary

### 1.1      Identification

| | |
|---|---|
| Facility Address: | 6311 Westminster Avenue, Westminster, California (Figures 1 and 2) |
| Intersection: | Westminster Avenue and Willow Lane |
| Nearby Facilities: | Unocal 5226 |
| Previous Facility Operations: | Service station branded as Thrifty |
| Current facility Operation: | Active gasoline service station as of 03/29/11; property owned by Thrifty Oil and Station operated by BP West Coast Productions (previously known as ARCO) since April 1997 |

### 1.2      Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

**September 1988**                    Soil sampling at the base of the waste oil tank excavation cavity detected soil contamination (AROCWD-973400441).

**June 1989**                    Three soil borings (one converted to a groundwater monitoring well) confirmed soil contamination extended continuously from five feet below ground surface (bgs) to below the groundwater surface, and that groundwater was contaminated (AROCWD-973400441).

*These results confirm that Thrifty Station 368 is the source of hydrocarbon contamination in soil and first groundwater beneath the facility.*

**October 1990 to April 1991**                    Six additional groundwater monitoring wells were installed on-site, and one well was installed just to the west of the facility (AROCWD-973400542, AROCWD-973400479). In April 1991, floating gasoline or light non-aqueous phase liquid LNAPL on groundwater was detected in a well located at the westerly edge of property (AROCWD-973400480), and benzene was detected in three wells (AROCWD-973400481). The well at the southern boundary of the property had a benzene concentration of 360 micrograms per liter (ug/L).

*These results indicate that contamination probably extended off-site at this time.*

**November 1991**                    Thrifty submitted a Corrective Action Plan (CAP) to the Orange County Health Care Agency (OCHCA ) proposing soil vapor extraction (SVE) and groundwater pump and treat (GWPT) for remediation of soil and groundwater contamination (AROCWD-973400076).

*The SVE/GWPT systems were not designed to remediate MTBE and TBA groundwater contamination.*

**July 1992 to August 1993**                    A benzene concentration of 47,000 ug/L was detected in a well at the southerly boundary of the property (Thrifty, 2011). The OCHCA requested additional investigation to the south of this well. In 1993, Thrifty stated that they are in the process of applying for permits to install additional wells (AROCWD-973400981).

*Thrifty installed a well at the requested location in 1999, six years after the OCHCA request, allowing an extended period of time for groundwater contamination to spread off-site unmonitored and unabated.*

**February 1996**                    The first analysis for methyl tert-butyl ether (MTBE) in groundwater from monitoring wells was conducted. MTBE was detected in five wells with the highest concentration (410 ug/l) detected in MW-6 located at the southerly facility boundary (RWQCB 012466).

**July 1995 to June 1998**                    A SVE and a GWPT system operated from July 1995 to June 1998 when the California State Water Resources Control Board (SWRCB) requested shut-down of the system for re-evaluation and further assessment (Thrifty, 2011). In July 1998, the Thrifty consultant stated: "*Interpretations made from the groundwater elevation data indicated the occurrence of a localized groundwater mound beneath the site, with apexes around wells BW-4 and MW-7. This occurrence may be due to the ongoing vapor and groundwater remedial effort, extracting vapor and fluid from wells BW-3, BW-4 and MW-7*" (AROCWD-973401661, AROCWD-973401662, AROCWD-97341687).

*The SVE/GWPT system was not designed to treat MTBE and TBA in groundwater. The GWPT system extracted groundwater from only one well, which was inadequate to contain the groundwater contaminant plume. The remediation system did not affect the southeastern part of the facility, where the highest benzene concentrations in groundwater occurred. The remediation system started nearly four years after the CAP for soil and groundwater remediation was submitted to the agency, over four years after the detection of floating gasoline on groundwater, and six years after confirmation that a gasoline release at the facility had contaminated soil and groundwater.*

**February 1998**                    Three gasoline underground storage tanks (USTs) and associated piping were excavated and replaced. Gasoline impacted soil was removed and contaminated groundwater was extracted during dewatering of the excavation. Three holes were detected in one of the steel USTs, and MTBE was detected in a sample collected beneath the USTs, as well in soil borings near the UST excavation and fuel dispenser island between 5 and 14 feet bgs (AROCWD-973401487 to AROCWD-973401503).

*MTBE contamination in soil and groundwater was detected directly beneath the gasoline storage and dispensing systems at the facility.*

**August 1999**                    After modifications, the SVE/GWPT system was re-started, with GWPT from one well, SVE from four wells, and air sparging (AS) from 4 wells (Thrifty, 2007).

*For over a year, no remediation system operated at the facility and there was no containment of the groundwater contaminant plume. The system re-started using a single groundwater extraction well. This was inadequate to contain the groundwater contaminant plume (AROCWD-973401866, AROCWD-973405021).*

***March to November 2005***                  The SVE system was shut-down in March 2005 after three months of pulsed operations. Vacuum truck over-purging of contaminated groundwater from three wells was also performed during this period (Thrifty, 2011).

***February to May 2007***                  Verification soil sampling to below the groundwater surface detected contamination in soil in specific areas on-site (Thrifty, 2011). MTBE and TBA were detected in soil borings in the southern part of the facility, at and below the groundwater surface, near the well with the highest concentrations of MTBE and TBA in groundwater.

*MTBE and TBA were persistently detected in a well at the southern boundary of the facility and MTBE was detected in a down-gradient well about 90 feet south of the facility. Almost 12 years after groundwater remediation was first initiated at the facility, MTBE and TBA contamination persists in soil beneath the facility, representing a continuing source for off-site plume migration. The extent of MTBE and TBA in soil was still not delineated vertically in the area of the dispenser island.*

***October 2007 to December 2010***                  Three Dual Phase Extraction (DPE) events were performed in three on-site wells between October and December 2007 (Thrifty, 2011). Periodic well over-purging with a vacuum truck had been performed at wells located on the facility from November 2001 to December 2010 (Thrifty, 2011). At least three additional DPE events were planned (Thrifty, 2011).

*Since 2005, only periodic remediation events have been performed (well over-purging or DPE). These are not designed for, nor capable of, capturing the groundwater contaminant plume. Almost 16 years after groundwater remediation was first initiated at the facility, MTBE and TBA contamination persists in groundwater beneath the facility. The extent of MTBE and TBA in groundwater was still not delineated laterally or vertically.*

***Present (May 2011)***                  Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from Unocal #5226.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

11.  The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Groundwater beneath the facility occurs in a Semi-Perched Aquifer zone, with historical groundwater levels between depths of about 6.5 and 10 feet bgs.  Six discrete zones have been defined in the Semi-Perched Aquifer based on Thrifty Station 368, Unocal Station 5226 (located just across Westminster Ave. to south) and Hargis CPT investigations (to bottom of CPT at 122 feet bgs):

  ☐  Semi-perched zone-A (8–20 feet bgs)

  ☐  Semi-perched zone-B (40-44 feet bgs)

  ☐  Semi-perched zone-C (47-58 feet bgs)

  ☐  Semi-perched zone-D (61-63 feet bgs)

  ☐  Semi-perched zone-E (86-114 feet bgs)

  ☐  Semi-perched zone-F (118-122 feet bgs)

  All but two groundwater monitoring wells at Thrifty Station 368 and Unocal Station 5226 were screened across zone-A.  Unocal wells MW-13s and MW-13d were screened across zones B and D, respectively.  In 2010, Hargis collected Hydropunch groundwater samples in zones A, B, C and E at a location off-site adjacent to service station Unocal 5226.

- The historical prevailing groundwater gradient beneath the facility, when not affected by soil/groundwater remediation system operation, has been towards the south-southwest at an approximate gradient of 0.007.  Including groundwater level data from Unocal Station 5226, the groundwater surface since 2003 has formed a westward directed trough whose axis bisects In-and-Out Burger, with groundwater flowing southward into the trough from Thrifty Station 368 and westward into the trough from Unocal Station 5226.

- Based on historical water levels from Unocal Station 5226 wells MW-9, MW-13s and MW-13d since October 2000 (first records for MW-13s and MW-13d), the direction of vertical gradients were:

**APPENDIX B.19**
**Facility Summary Report**

**Unocal #5226**
**6322 Westminster Avenue**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 6322 Westminster Avenue, California (Figures 1 and 2) |
| Intersection: | Westminster Avenue and Willow Lane |
| Nearby Facilities: | Thrifty 368 |
| Previous Facility Operations: | Unocal branded service station as early as 1984 (2MDLCP00274356). |
| Current facility Operation: | Active gasoline service station branded as 76 and Circle K as of April 2011. |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

**December 1984 to February 1985**        In December 1984, one diesel and two gasoline underground storage tanks (USTs) were removed and replaced (Conestoga-Rovers & Associates [CRA], 2010). Holes were found in the USTs (2MDLCP-002748877). Excavated soil and soil samples collected below the USTs were tested and found to contain fuel contamination (2MDLCP-00275796, CRA, 2010). Groundwater in the excavation, at 10 feet below ground surface (bgs), had a sheen of fuel contamination (2MDLCP00274871).

*Fuel contamination detected in soil and groundwater confirmed that leaking USTs were a source of contamination.*

In February 1985, six groundwater monitoring wells were installed around the UST cavity (CRA, 2011). Groundwater contamination was detected in the three wells sampled (2MDLCP00275797).

**July-August 1992**        In July 1992, five additional on-site groundwater monitoring wells were installed. In August 1992, all 11 wells were sampled and fuel contamination was detected in six wells around the UST cavity, and one well located south-southwest of the USTs at southerly property boundary. The highest concentration was detected in the well located at the southern property boundary (TRC, 2010).

*The distribution of contamination in groundwater was consistent with a fuel release at the USTs and migration in the prevailing direction of groundwater flow at the time (southwestward) to at least the southerly property boundary, and possibly off-site (Map-1).*

**January 1994**        The northern dispenser island and associated product piping was removed and replaced. 119 tons of contaminated soil was excavated and removed. Fuel contamination was detected

in soil samples taken between depths of 5 and 7 feet bgs (CRA, 2010), with the highest concentration detected in soil beneath the eastern end of the southern dispenser island (2MDLCP00274262).

***January-October 1996***          In January 1996, seven groundwater monitoring wells were sampled and methyl tert-butyl ether (MTBE) was analyzed and detected for the first time in groundwater, with the highest concentration (1,100 micrograms per liter [ug/L]) in a well located next to the northerly dispenser islands (TRC, 2010). The MTBE plume extended southwestward to a well near the westerly property boundary, which had a MTBE concentration of 470 ug/L.

*The MTBE plume probably extended beyond the westerly and southerly property boundaries at this time.*

During facility renovation conducted in September 1996, the waste oil tank, clarifier, and hydraulic hoists were removed.  Dispensers and product piping were also removed and replaced.   20 tons of contaminated soil was excavated and removed (CRA, 2010).  In September and October 1996, gasoline contamination, including MTBE, was detected in soil samples taken between depths of 4 and 11 feet bgs in the area of the northerly dispenser islands, and in groundwater grab samples from eight soil borings.  At the time of soil sampling, depth to groundwater was approximately 8.5 feet (2MDLCP-00274262 to 2MDLCP00274269).

*These results confirm that the former northerly dispenser islands at the facility released gasoline containing MTBE that subsequently migrated through soil to groundwater, and then spread in groundwater off-site to the west and south.*

***May-December 1997***          In December 1997, a sudden and significant increase in groundwater contaminant levels was detected in the three monitoring wells immediately surrounding the UST cavity (TRC, 2010). This jump in contamination levels included MTBE, which increased in the three wells by the following amounts from the previous sampling event in May 1997: 1,200 to 46,500 ug/L; 920 to 114,000 ug/L; and non-detect to 13,100 ug/L (TRC, 2010).

*This sudden increase, together with the lack of an immediate increase in wells farther from the UST cavity, is an indication that a new release of gasoline containing MTBE occurred at the USTs between May and December 1997.*

***April 1999***          Two monitoring wells next to the UST cavity were over-purged, recovering 1,500 gallons of MTBE-impacted groundwater in vicinity of UST cavity (CRA, 2010; 2MDLCP-00275195).

*This remedial action represented a delayed and inadequate response to the gasoline release at the USTs in the second half of 1997.*

***April 2000***          The Orange County Health Care Agency (OCHCA) indicated that interim remedial action that *"...contains or pulls the MTBE plume back..."* is required (OCHCA, 2000).

***August 2000***          The deep monitoring well MW-13-D (screen from 61-66 bgs) was installed at the end of August with the shallow well (MW13-S, screened from 40-45 feet bgs) completed on September 1.

**October-November 2000**          An aquifer pumping and dual phase extraction (DPE) test were performed. The calculated capture zone for GWPT system wells was shown to have a 50 feet radius and extend about 20 feet off-site to the west and south of facility. DPE was determined not to be a feasible remedial option due to low influent concentrations (Block Environmental, 2000).

**April 2001 to February 2002**          In April 2001, the highest MTBE levels (for that event) were detected in the three most down-gradient on-site wells (1,700 to 7,800 ug/L) at the westerly and southerly boundaries of the property.

*The high concentration core of the MTBE plume had migrated west of the source areas (former northern dispensers and USTs) and probably extended off-site to the west and south.*

In July 2001, high levels of fuel contamination were detected in the initial sampling of the first off-site monitoring well (MW-15), located 30 feet to the west, and down-gradient, of the facility (TRC, 2010). In February 2002 (Map-2), the high concentration core of MTBE and tert-butyl alcohol (TBA) plumes (>1,000 ug/L) extended to the westerly facility boundary and MTBE was confirmed for the first time (43 ug/L) in an off-site well just east of the In-and-Out Burger Restaurant. TBA may have been present in this well at a concentration below the elevated detection limit of 2,000 ug/L (TRC, 2010).

*These results confirm that fuel contamination including MTBE had migrated at least 25 feet off-site.*

**March 2002 to February 2004**          A groundwater pump and treat (GWPT) system extracting from three wells in the westerly half of the facility was started on March 2002 (2MDLCP00276117) and operated until February 2004. By February 2004, 660,000 gallons of contaminated groundwater were recovered.

*The capture zone of the GWPT wells determined by the aquifer pumping test performed in October 2000 did not extend to the known down-gradient off-site edge of the contaminant plume.*

In February 2004, OCHCA approved shut-down of GWPT system and initiation of two-years of post-remediation groundwater monitoring and sampling (CRA, 2010). Wells sampled in April 2004 (Map-3) show that MTBE and TBA concentrations had been reduced in on-site wells (TRC, 2010).

*High TBA concentrations persisted in on-site wells (up to 960 ug/L at the southerly facility boundary) and MTBE distribution was more widespread laterally and vertically, with low detections in all three off-site wells and in the deeper B and O zones. The GWPT system was installed:*

- *Over 17 years after groundwater contamination was first detected;*

- *Almost 10 years after groundwater contamination was detected at the facility boundary;*

- *Over six years after MTBE contaminated groundwater was detected at the facility boundary; and*

- *Almost five years after an additional release of MTBE occurred from the USTs.*

*The GWPT system operation had no apparent impact on contaminant concentrations in the off-site well just east of In-and-Out Burger, which had the highest contaminant concentrations of any facility well during this period. The highest MTBE and TBA concentrations detected in this well (5,600 and 890 ug/L, respectively) were in samples collected in August 2004, six months after the GWPT system was shut-down.  This indicates that the GWPT system did not capture the off-site portion of the groundwater contaminant plume (including MTBE and TBA) that had already migrated off-site prior to GWPT system start-up.  No active in-situ soil remediation was ever performed at the facility, leaving soil contamination (especially in the  contaminant smear zone) as a continuing source of contaminants to shallow groundwater.*

***September to December 2010***       In September 2010, elevated concentrations of TBA persisted in off-site and the most down-gradient well (74 ug/L), as well as in an on-site well on the southerly property boundary (12 ug/L) (TRC, 2010) (Map-4).  The lowest levels of MTBE persisted in several on-site wells and in the off-site well mentioned above. In December 2010, Hargis performed cone penetrometer testing (CPT) and Hydropunch groundwater sampling at one location approximately 300 feet west of the facility.  No MTBE or TBA was detected in four discrete groundwater zones between 12 and 97 feet bgs.

***Present (May 2011)***       Based on review and evaluation of the investigation and remedial activities performed at the  facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from Thrifty #368.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3 Hydrogeologic Issues

- The depth to the first Semi-Perched Aquifer groundwater beneath Unocal Station 5226 has historically ranged from 7 to 11 feet bgs.  Six discrete zones in the Semi-Perched Aquifer have been defined from ground surface to a depth of 122 feet bgs (the bottom of CPT) based on Thrifty Station 368 (located just across Westminster Avenue to north), Unocal Station 5226, and Hargis CPT investigations:

    ☐ Semi-perched zone-A (8–20 feet bgs)

    ☐ Semi-perched zone-B (40-44 feet bgs)

    ☐ Semi-perched zone-C (47-58 feet bgs)

    ☐ Semi-perched zone-D (61-63 feet bgs)

    ☐ Semi-perched zone-E (86-114 feet bgs)

    ☐ Semi-perched zone-F (118-122 feet bgs)

    All but two groundwater monitoring wells at Thrifty Station 368 and Unocal Station 5226 were screened across zone-A.  Unocal wells MW-13S and MW-13D were screened across zones B and D, respectively.  Hargis collected Hydropunch groundwater samples in zones A, B, C and E.

- The Semi-Perched Aquifer directly overlies the Pleistocene-age Alpha Aquifer, estimated to occur in the facility vicinity at approximately 150 feet bgs.  The western sub-crop boundary of the Bolsa Aquifer occurs approximately 1.2 miles southeast of the facility.

- Based on historical water levels from Unocal wells MW-9, MW-13S and MW-13D since October 2000 (first records for MW-13S and MW-13D), the direction of vertical gradients were:

    ☐ Between zones A and B: the historical net vertical gradient has been slightly upward, and has varied from  downward to May 2002, upward to March 2008, and then downward again to present.  The average vertical head difference is 0.28 feet and the average vertical gradient is 0.01.

**APPENDIX B.23**
**Facility Summary Report**

**Conoco Philips 5792**
**4002 Ball Road**
**Cypress, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 4002 Ball Rd, Cypress, California (Figures 1 and 2) |
| Intersection: | Bloomfield Avenue and Ball Road |
| Nearby Facilities: | Former Shell Service Station (north) and former Chevron service station (9-8145) to the northwest. |
| Previous Facility Operations: | Service station |
| Current facility Operation: | Unocal Service Station |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

**August 1997**                995 tons of soil were removed from facility during underground storage tank (UST) removal.

*The regulatory agency concluded that sidewalls of the excavation showed "obvious signs of contamination" and that "soil contamination, especially methyl tert-butyl ether (MTBE), extends to 8' below grade" (capillary fringe)". Further, the regulatory agency concluded that "the lateral extent of the plume is unknown."*

**April 1998**                The first groundwater monitoring wells were constructed at facility.

**May 1998**                Groundwater samples were collected on May 11, 1998 and analyzed for MTBE (Geotracker 041091). The maximum MTBE concentration detected in that sampling event was 19,000 micrograms per liter (ug/l) at monitoring well B-2 located in the vicinity of the gasoline USTs.

**August 2000**                Groundwater samples collected on August 2, 2000 were the first analyzed for tert-butyl alcohol (TBA). They were all non-detect, but detection limits ranged from 2,000 to 30,000 ug/l (Geotracker 041091). The first TBA detections were in June 2001 in B-1 (4,400µg/l) and B-2 (1,900 µg/l).

**October 2000**                The Interim Remedial Action Plan (RAP)/Interim Corrective Action Plan (IRAP (ICAP) was approved by the regulatory agency, with the condition that subsequent assessment be performed to address the detections of MTBE contamination (1.5 milligrams per kilogram [mg/kg]) in soils above the shallow

groundwater that had been presented by the responsible party within the ICAP as "low-risk" contamination and acceptable to leave in place.  Further, the regulatory agency requested that a remedial program for contamination in soil be prepared for approval and implementation.

*With the exception of a limited vacuum truck assisted purging of shallow groundwater wells in 2001 and one-day groundwater remediation pilot test in 2002.  To date, (eleven years following the regulatory agencies initial request) no soil remedial program has taken place at the facility.*

**December 2000 to June 2001**              Six monthly eight-hour groundwater extraction events (over-purging with vacuum truck) were performed for the remediation of contamination. A reported total of less than 15,000 gallons of water was removed from the aquifer during this remedial program.

**June 2001**                                This was the first reported detection of other oxygenates in groundwater samples collected from shallow groundwater monitoring wells at the facility.  By September 2001, both TAME and ETBE, in addition to MTBE, TBA, and other contaminants are reported in groundwater samples collected from the shallow on-site groundwater monitoring wells.  The nested monitoring well MW-7 (D, I, S) was installed approximately 175 feet south of the facility.

**July 2001**                                The first off-site monitoring well was constructed.  This well is the only off-site well and the only nested well constructed to assess the vertical extent of groundwater contamination. Groundwater contamination was reported in all three nested shallow groundwater monitoring wells.

*This sole off-site shallow, nested groundwater monitoring well was constructed in a cross-gradient to down-gradient direction from the facility.*

**November 2001**                            In addition to reiterating a request for the preparation of a CAP to address soil remediation, the regulatory agency also requested a CAP for the implementation of "active groundwater remediation."

**January to February 2002**:             A dual phase extraction (DPE) pilot test was performed.  Approximately 1 gallon of gasoline and 2,800 gallons of groundwater were removed from the aquifer during this 24-hour pilot test.

**June 2002**                                Six on-site and four off-site (cross-gradient) shallow groundwater sampling locations were completed using direct push sampling techniques (cone penetrometer testing [CPT]).  A qualitative assessment of contamination in the on-site CPT sampling locations was performed using rapid optical screening tool (ROST), a tool that can detect the presence of pure gasoline in the subsurface.

Results of this assessment confirm the presence of on-site contamination in soil above groundwater and are contrary to subsequent groundwater sampling events, in that, contaminants that are present have moved downwards into deeper groundwater zones.

**March 2003**                               An initial CAP was submitted to the regulatory agency proposing the injection of ozone into shallow groundwater beneath the facility for the remediation of contamination.

***July 2003***                              Eleven ozone injection (sparging) points were installed.  No sparge points were installed near or down-gradient of the shallow groundwater monitoring well B-6 located at the facility boundary.  This well had among the highest concentrations of MTBE and TBA in groundwater samples.  The estimated radius of influence of the sparging points was 10 feet from each sparging location.

***December 2005***                          Groundwater remedial activities using ozone injection were initiated at locations originally constructed in July 2003.  The approximate operating time of the ozone sparging system was 75% between December 2005 and November 2010.

***2008***                                   In the down-gradient direction of the facility (southwest), the current MTBE plume in the upper semi-perched zone had not been laterally delineated, with MTBE concentrations remaining in on-site monitoring well MW-6 (1,900 ug/l) located at the southwest property boundary.  In the down-gradient direction (southwest), the current TBA plume in the upper semi-perched zone had not been laterally delineated, with TBA concentrations remaining in monitoring well B-6 (1,100 ug/l) located at the west facility boundary.  MTBE and TBA had been detected in groundwater at the maximum depth of groundwater investigation (49 feet bgs) in the deeper B zone well (MW-7D).  The vertical extent of the MTBE and TBA plumes had not been investigated in the source areas of the facility.

***March 2010***                             A revised CAP was submitted to the regulatory agency to use a one-time injection of oxygen releasing compound (ORC) in place of ozone to address increasing concentrations of MTBE in down-gradient shallow groundwater monitoring wells that are located outside the radius of influence of the existing ozone injection wells.

***Present (May 2011)***                     Based on review and evaluation of the investigation and remedial activities performed at the  facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE and TBA contamination in groundwater and additional investigation is required.

6.  Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.  Additional off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- Within a quarter mile radius of the facility, there is one well of unknown status (W-14850) that could provide a vertical contaminant migration pathway (OCWD WRMS) (Figure 2). Well W-14850 is a well of unknown current status located approximately 1,200 feet northwest of the facility. Well W-14850 is an irrigation well screened from 154 to 189 feet bgs with unknown sanitary seal status. Wells completed below the Semi-perched Aquifer could provide a preferential pathway for vertical contaminant migration.

- Production well SCWC-LABL2 is the nearest potentially vulnerable production well located approximately 770 feet southwest of the facility. Production well SCWC-LABL2 is screened in the Lambda and Omicron Aquifers and has been moderately used for production with an average pumping rate of approximately 119 acre feet per month over the last ten years. MTBE and TBA have not historically been detected in this well

- Production wells FJC-LAK2 and SCWC-LAFL are potentially vulnerable production wells located approximately 4,250 feet southwest and 4,500 feet southeast of the facility, respectively. These production wells are screened in the Beta and Lambda Aquifers. Production wells FJC-LAK2 and SCWC-LAFL have been lightly used for production with average pumping rates of approximately 14 and 63 acre feet per month over the last ten years. MTBE and TBA have not historically been detected in these wells (Table 2).

## 1.4    Contaminant Issues

- MTBE is currently (2010) detected at 240 ug/l in MW-6 at the southwest corner of the facility.

- TBA is currently (2010) detected at 56 ug/l to the south of the facility at MW-7D.

- MTBE was released at the facility. No analysis for MTBE and TBA have been performed for vadose zone soil samples; however, MTBE and TBA are present in the Semi-perched Aquifer groundwater beneath the facility. Groundwater contamination has not been fully hydraulically contained and the historical and current lateral extent of the MTBE and TBA plumes has not been fully delineated.

- The vertical extent of the MTBE and TBA plumes has not been fully investigated in the source area or down-gradient of the facility.

**APPENDIX B.24**
**Facility Summary Report**

**Arco 6036**
**131423 Goldenwest Street**
**Westminster, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:       Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 13142 Goldenwest Street, Westminster, CA 92683 (Figures 1 and 2) |
| Intersection: | Golden West Street and Natal Drive |
| Nearby Facilities: | None |
| Previous Facility Operations: | Arco Service Station |
| Current facility Operation: | Arco Service Station as of April 2011 observation |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*December 1986 to January 1987*        Fuel underground storage tanks (USTs) were removed from the facility and new USTs were installed at a new on-site location. Between the two excavations, approximately 900 cubic yards of contaminated soil was excavated and removed from the facility. Soil samples collected from the bottom of both the new and old tank cavities were contaminated with fuel related hydrocarbons at a depth of 12 feet below ground surface (bgs). Floating gasoline or light non-aqueous phase liquid (LNAPL) was seen on groundwater within the new UST excavation.

*The extent of soil contamination was not delineated at the time of excavation and contaminated soil was left in place. No groundwater samples were collected and no assessment of groundwater contamination was performed.*

*June 1987*                        An initial groundwater assessment was completed and included the installation of three shallow and one deeper on-site groundwater monitoring well. Results of this initial shallow groundwater assessment confirmed: 1) contamination in soil extended to below groundwater, and 2) groundwater was contaminated.

*All four groundwater monitoring wells were screened across a fine grained layer of soil (aquitard) separating two shallow water-bearing zones (i.e., cross-screened). The cross-screened wells and downward vertical gradient between the two zones allowed the contamination to migrate deeper.*

*April 1990*                        A soil vapor extraction (SVE) system operated at the facility for a period of seven days.

*Contaminated soil beneath the station provided a continual source of groundwater contamination for approximately four years after soil contamination was confirmed to extend to the groundwater surface.*

**June 1994**                              The first Corrective Action Plan (CAP) was prepared that proposed the purging of selected on-site groundwater monitoring wells to remove contaminated groundwater and floating gasoline. The CAP was limited to six bi-weekly well purging events resulting in a limited amount of groundwater being removed from the aquifer.

**August 1995**                           An air sparging/SVE (AS/SVE) system pilot test was performed.

**December 1995**                         The first reported analytical results for methyl tert-butyl ether (MTBE) in groundwater were reported from samples collected from on-site groundwater monitoring well MW-6 at a reported concentration of 9,300 micrograms per liter (µg/l).

**March 1998**                            A second CAP proposing periodic (monthly) groundwater extraction by vacuum extraction in combination with an in-situ groundwater remediation approach was approved by the regulatory agency.

**June 1998**                             Discrete depth groundwater sampling was initiated in the deepest groundwater monitoring well located on the facility (MW-4). Initial results indicate the presence of MTBE in groundwater samples collected from this well. After several subsequent discrete depth groundwater sampling events at this same well, MTBE was no longer detected in groundwater. By August 2000, the concentration of MTBE reported in groundwater samples from this well increased by more than one order of magnitude. This deeper groundwater monitoring well (MW-4) was destroyed less than one year after the increased concentrations of MTBE were reported. The deep on-site groundwater monitoring well was eventually replaced in 2001 with MW-13.

**November 1998 to January 1999**        The March 1998 CAP was implemented without the in-situ groundwater remedial component of the remedial approach proposed in March 1998. Groundwater extraction was performed using a vacuum truck from two shallow groundwater monitoring wells located near the USTs. By January 1999 groundwater vacuum extraction was discontinued. A minimal 440 gallons of water was purged from the wells

**June 1999**                             Based upon the occurrence of LNAPL in two on-site shallow groundwater monitoring wells, the agency concluded that a recent release of gasoline at the facility had occurred. Further, the Orange County Health Care Agency (OCHCA) noted that the periodic groundwater extraction required in the March 1998 CAP was not being performed.

**April 2000**                            Two off-site nested groundwater monitoring wells (VA-1S,1D and VA-2S,2D) were constructed to assess vertical distribution of MTBE and other contaminants in groundwater.

**May 2000 to July 2000**                 A revised CAP (RCAP) and addendum to the RCAP recommended the use of a modified dual phase extraction (DPE) remedial approach for MTBE in groundwater.

**August 2000 to September 2000**         A groundwater remediation pilot test utilizing DPE was performed at the facility. After 22 days, however, 62,860 gallons of groundwater were recovered and a limited radius of influence of 50 feet was calculated. However, it was concluded that DPE would be be an ineffective remedial option for MTBE and other contaminants in groundwater at the facility.

***September 2000***          The first analysis for tert-butyl alcohol (TBA) in groundwater samples collected from on-site shallow groundwater monitoring well MW-12, located adjacent to the former USTs, detected a concentration of 530 ug/L.

***December 2001***          A groundwater extraction and treatment system using a single shallow groundwater extraction well (MW-6) was started at the facility.  A second shallow on-site groundwater extraction well was added to the system (MW-11) in May 2001.

***May 2005***          MTBE was detected (37 µg/l) in the deeper (i.e., 28-29 feet bgs) off-site groundwater monitoring well (VA-2D) approximately four years after the groundwater extraction and treatment system began operation.

***July 2008***          The GWTS operation was transitioned to a cyclical operation on a monthly basis.

***Present (May 2011)***          Based on review and evaluation of the investigation and remedial activities performed at the  facility to date, the following opinions are presented:

1.   MTBE and TBA have been released at the facility.

2.   MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.   MTBE has been present in groundwater at the facility for more than a decade.

4.   MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.   To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE and TBA contamination in groundwater and additional investigation is required.

6.   Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.   Additional off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.   The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.   The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

10.  The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

**APPENDIX B.25**
**Facility Summary Report**

**Chevron 9-5568**
**12541 Seal Beach Boulevard**
**Seal Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:     Facility Summary

## 1.1     Identification

| | |
|---|---|
| Facility Address: | 12541 Seal Beach Boulevard, Seal Beach, California (Figures 1 and 2) |
| Intersection: | Seal Beach Boulevard and St. Cloud Drive |
| Nearby Facilities: | None |
| Previous Facility Operations: | Chevron service station |
| Current facility Operation: | Chevron station demolished January/February 2011.  Currently a vacant lot undergoing remedial soil excavation as of April 15, 2011. |

## 1.2     Characterization and Remedial Action Chronology

**February 1986**                       A failed tightness test on a gasoline fuel-dispensing line and diesel fuel underground storage tank (UST) was reported.  The diesel fuel UST and all subsurface fuel dispensing lines were replaced.  Hydrocarbon impacted soil and groundwater was observed during removal and replacement activities (SAIC, 2008a).

*Gasoline had leaked from the fuel line into soil and groundwater below the facility and may have been leaking for some time.*

**February to April 1986**                       Three groundwater monitoring wells and two soil borings were completed on-site.  Dissolved gasoline was found in groundwater below the southeastern part of the facility (down-gradient).  Benzene was detected in groundwater in this area at a maximum concentration of 23,700 micrograms per liter (ug/L) (SAIC, 2008b).

*Gasoline had clearly been released from the fuel lines and/or USTs to soil and groundwater below the facility.  The vertical and lateral extent of soil and groundwater contamination was not delineated by these wells and borings.*

**February 1987 to October 1991**                       Ten additional monitoring wells were installed on-site and off-site.  One groundwater recovery well (RW-1) was installed for potential future remediation (SAIC, 2008b).

*The lateral and vertical extent of groundwater contamination was still not fully delineated by these wells (Figures 4 and 5).  The wells were installed with 20 to 30 feet of screen, sometimes across multiple sand units separated by fine-grained silt or clay zones (i.e. cross screened).  No attempt was made to identify or assess individual water-bearing units and possible vertical gradients. Gasoline contamination in groundwater was found on-site and off-site. No remediation or groundwater containment was being conducted to keep the plume from migrating off-site.*

**July 1990**                       A used-oil UST was removed from the facility.

**July to August 1994**                       Four USTs, all pump islands, and piping lines were removed and an unknown amount of soil was excavated.  Gasoline-contaminated soil was found during the excavation activities (total

petroleum hydrocarbons as gasoline [TPHg] up to 15,000 milligrams per kilogram [mg/kg]).  A remedial action plan
(RAP) was prepared which recommended soil vapor extraction (SVE) to remediate the facility (SAIC, 2008b)..

*No groundwater remediation was proposed or conducted at this time.*

**April 1995**                                    A SVE system was installed on-site in August 1994 and began operation
in April 1995.  The SVE system included four extraction wells.  The system operated until December 1995 and
approximately 4,602 pounds of hydrocarbons were removed from the subsurface (SAIC, 2008b).

*More than nine years had passed since the first release of gasoline was reported and groundwater and soil
contamination was confirmed before any remediation began at the facility. The SVE system operated for less than a
year and did not directly address groundwater contamination on-site or off-site.  No groundwater treatment or
containment was being performed to address on-site or off-site contamination and dissolved gasoline was continuing
to migrate off-site.*

**May 1996**                                    Methyl tert-butyl ether (MTBE) was first detected in groundwater
samples when testing for MTBE first began. MTBE was found at a maximum MTBE concentration of 2,500 ug/L in a
well located near the existing USTs (SAIC, 2008b).

**August 2000**                                  A 72-hour dual phase extraction (DPE) pilot test was conducted at the
facility.  An estimated 138 pounds (22 gallons) of petroleum hydrocarbons was recovered (SAIC, 2008b).

*Almost five years passed since SVE was stopped and no remediation had been conducted in the interim.  The fact
that a DPE test was conducted indicates that Chevron recognized that groundwater contamination should be
addressed, but no permanent system for groundwater treatment or containment was installed.  In the meantime,
MTBE and other contaminants were continuing to migrate off-site.*

**January 2001**                                  Tert-butyl alcohol (TBA) was first detected in groundwater samples from
the facility.  The maximum TBA concentration (1,360 ug/L ) was collected in a monitoring well located near the
existing USTs (SAIC, 2008b). .

**March 2001**                                    A 30-hour DPE test was conducted and approximately 2.5 pounds of
petroleum hydrocarbons (0.4 gallons) and 2,690 gallons of groundwater were recovered. A groundwater level above
the top of extraction well screens during the testing reduced effectiveness of removing vapor phase hydrocarbons
(SAIC, 2008b).

**December 2001 to April 2002**                  Over-purging was performed at four wells on a monthly basis to remove
contaminated groundwater.  Chevron states this work was conducted *"as a means of slowing the potential migration
and reducing the amount of groundwater containing elevated levels"* of contamination (SAIC, 2008b).

*This simplistic remediation method did not remove a significant amount of contamination or effectively slow the
migration of contamination as it was only conducted once a month.*

**June 2002**                         A full-scale DPE system was installed and began operation. Existing Semi-perched Aquifer monitoring wells MW-04 and MW-05 were used for DPE in the full-scale system. The remediation system was shut-down in July 2002 and removed in April 2003 due to operational problems. From June to July 2002 approximately 274 pounds (44 gallons) of petroleum hydrocarbons were destroyed, and 1,587 gallons of groundwater was recovered. The DPE system was replaced in December 2003 and began operation in January 2004. Due to difficulty in maintaining system up-time, the DPE system was shut-down in August 2004 (SAIC, 2008a).

*Over 16 years had passed since groundwater contamination was first discovered before full-scale groundwater treatment began. The failure of the DPE system to operate continuously and efficiently indicates poor conceptual design and implementation. The lack of continuous groundwater treatment allowed additional off-site migration of MTBE and other contaminants.*

**August 2004**                         A 72-hour DPE pilot test was conducted and a total of 1,392 gallons of groundwater and 4.3 pounds (0.7 gallons) of hydrocarbons were removed. Results of the test indicated DPE using existing conventionally designed monitoring wells at the facility results in high-uptake of fine grained materials.

*The results of this test confirm that the original DPE system was not properly designed and implemented.*

**December 2004**                         MTBE was first detected in soil samples collected in the vadose zone at a maximum concentration of 0.023 mg/kg at a soil boring located in the vicinity of the dispenser islands (SAIC, 2008a).

**March 2005**                         Discrete-depth soil and groundwater sampling was conducted at on-site borings completed to depths between 30 to 35 feet below ground surface (bgs). Results indicated MTBE and TBA in groundwater below the facility at concentrations up to 3,600 ug/L and 410 ug/L, respectively. MTBE and TBA were also detected in soil samples (SAIC, 2005; SAIC, 2008a).

*These data confirm that MTBE has impacted groundwater at relatively high concentrations below the facility and indicate that MTBE has migrated vertically downward to at least 30 to 35 feet bgs.*

**August 2006**                         A 68-hour DPE pilot test was conducted at two newly installed wells. A total of 208 gallons of groundwater and 96 pounds (15 gallons) of hydrocarbons were removed. Results of the test indicated DPE is a not viable remediation alternative for impacted soil and source area groundwater at the facility SAIC, 2008a).

*More than four years passed and four DPE pilot tests were performed before the DPE design was shown to be flawed and DPE was abandoned as a treatment option. In the meantime, additional MTBE and other contaminants were continuing to migrate off-site.*

**May 2007**                         A Work Plan was prepared for installation of a dual-nested groundwater monitoring well to determine vertical gradients and distribution of groundwater contamination between the two water-bearing zones below the facility (SAIC, 2008b).

The OCHCA found the Work Plan unacceptable and requested that a Site Conceptual Model be prepared for the facility to address concerns regarding potential cross contamination and other issues. The nested well was not installed and has not been installed as of May 2011

**June 2008**                              A revised Site Conceptual Model Report was submitted for the facility. The report detailed the presence of four discrete soil units below the facility. These included two coarse-grained water-bearing units separated by relatively thick (5 to 10 foot thick) silt or clay units to a depth of about 40 feet bgs (SAIC, 2008b).

This report identifies multiple water-bearing zones and the 2007 work plan clearly describes the need to define vertical gradients and the vertical distribution of contamination. This evaluation had still not been performed as of May 2011 so the vertical extent of MTBE and other contaminants could not be established, nor could vertical gradients be assessed.

**October 2009**                              An air sparge (AS)/SVE system was installed and began operation. As of the first quarter 2010 approximately 4,489 pounds of hydrocarbons have been removed from the subsurface. (Geotracker 040965).

The treatment system does not provide hydraulic containment of the MTBE plume on-site or off-site.

**November 2010**                              An off-site soil vapor investigation was conducted. Four soil vapor samples were collected from a depth of 6 feet bgs at locations approximately 80 feet south of the facility. Results indicated concentrations of total petroleum hydrocarbons (TPH) up to 23,000 micrograms per cubic meter (ug/ m³) and benzene concentrations up to 14 ug/m³ in soil vapor. MTBE and TBA were not detected (SAIC, 2011a).

Although MTBE and TBA were not detected in soil vapor, the data indicate that petroleum hydrocarbons are present in soil vapor off-site and down-gradient of the facility.

**April 2011**                              The OCHCA indicated in a letter dated April 7, 2011 that discrete-depth groundwater samples should be collected at down-gradient locations to determine if a "diving plume" exists (i.e. a contaminant plume migrating into deeper groundwater zones) (OCHCA, 2011).

The OCHCA clearly recognizes that MTBE and other contaminants may be present in deeper groundwater that is not currently being monitored. No assessment or remediation of deeper groundwater contamination has yet been conducted.

**Current May 2011**                              The AS/SVE system has been shut down and on-site groundwater monitoring wells have been destroyed or buried while the facility is demolished and prepared for redevelopment. Remedial excavation was conducted in early 2011 and the facility is currently vacant as of May 2011. MTBE and TBA remain in groundwater below the facility (January 2011) at concentrations up to 360 ug/L and 320 ug/L, respectively (SAIC, 2011b).

*The lateral extent of MTBE and TBA off-site to the northeast has not been determined in spite of the high MTBE and TBA concentrations in the northeast corner of the facility. The vertical extent of MTBE and TBA has not been determined below the facility or off-site.*

**Present (May 2011)**        Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE and TBA contamination in groundwater and additional investigation is required.

6. Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Additional off-site remediation may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- The Semi-Perched Aquifer has been divided into four discrete units by the facility consultant (SAIC, 2008b). These included two coarse-grained water-bearing units separated by relatively thick (5-10 foot thick) silt or clay units to a depth of about 40 feet bgs. The units are identified as:

**APPENDIX B.26**
**Facility Summary Report**

**World Oil 39**
**3450 Ball Road**
**Anaheim, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:        Facility Summary

## 1.1        Identification

Facility Address:                3450 Ball Road, Anaheim, California (Figures 1 and 2)

Intersection:                    Ball Road and Knott Avenue

Nearby Facilities:               None

Previous Facility Operations:    World Oil Service Station

Current facility Operation:      ExxonMobil branded Service Station

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***May 1986***                              A Release Report filed in August 1989 indicates that an unleaded gasoline release was discovered in 1986 as a result of subsurface monitoring (SEC 1989). Other facility reports indicate a 1987 date for the release (YESC 1992).

***October 1988***                          A facility field audit indicates that wells (BH-1 to BH-5, later renamed MW-1 to MW-5) were already present on-site in the area of the underground storage tanks (USTs) (Ensco 1989a). Each well was reported to have one foot of free product or light non-aqueous phase liquid (LNAPL). Groundwater flow was to the south-southwest.

***July 1989***                             The Santa Ana Regional Water Quality Control Board (RWQCB) (1989) requests that LNAPL be removed and the extent of groundwater contamination be assessed.

***1989 to October 1993***                  LNAPL recovery commenced using a combination of hand bailing and skimmers (BEI 1992a; SGI 2008c; CAPUD 2009). An estimated 325 gallons of LNAPL was removed over that period. LNAPL was noted as late as November 2000 at off-site monitoring well MW-11, located approximately 45 feet south of the USTs, the closest source area (SGI 2008c).

*The free product recovery methods used were of a passive nature and had limited influence, leading to slow and incomplete source removal.*

***May 1990***                              A soil gas survey showed gasoline contamination along the western half of the facility (AEC 1990).

*This survey indicated that releases had occurred near the northern end of the USTs as well near the dispenser islands.*

**October 1990 to July 1992**                    Several phases of groundwater investigation were conducted including the installations of wells (MW-6 through MW-12) installed on-site near the dispensers and off-site, west, southwest and south of the facility (AEC 1990; BEI 1992b). This investigation was supplemented by on-site hydropunch groundwater sampling (HP-1 to HP-5). Groundwater was encountered at approximately 15 feet below ground surface (bgs) in a sand aquifer with a perching clay at approximately 28 feet bgs. Gasoline impacted groundwater was observed on-site near the USTs and west of the dispensers, and in the off-site wells west and south of the facility. These were the last lateral delineation wells ever installed at the facility. The consultant (AEC 1990) recommended as early as late 1990 to remediate soil by soil vapor extraction (SVE) coupled with a groundwater treatment system to recover LNAPL and hydraulically contain the dissolved contaminant plume.

*While these wells improved plume delineation, the benzene plume remained undelineated to the northwest and southwest. Delineation was poor toward the east in the up-gradient direction.*

**May 1992**                    A Notice of Violation letter issued by the regulatory agency to World Oil notes the delays in implementing effective free product recovery, plume delineation, and the implementation of a CAP approved in late 1991 (CAFD 1992).

**April 1993**                    A SVE test was performed (HLA 1993). A radius of influence of 42 feet was achieved when applying high vacuum at the extraction well head. The consultant recognized the possibility that soil heterogeneity may result in reduced radius of influence.

**September 1993 to April 1995**                    On-site SVE was in operation (Secor 1996). Periodically, soil vapor was extracted from on-site wells MW-1, MW-2, MW-3, MW-4, MW-5 and off-site well MW-11 (ESE 1995). SVE was discontinued when extraction rates reached asymptotic levels. By that time an estimated 18,385 pounds of petroleum hydrocarbons had been removed (CAPUD 2009). A system evaluation performed in December 1993 indicated problems with groundwater upwelling at extraction wells resulting in submerged screens (ESE 1994). It was also recognized that the system must be augmented with groundwater extraction to address contamination in the capillary fringe (ESE 1994).

*The SVE was effective in removing petroleum hydrocarbon mass from the vadose zone. However, subsequent vadose zone soil sampling indicates that removal by SVE was incomplete (Secor 1996). Moreover it is not a method suited for dissolved phase groundwater remediation. Thus, for the last 10 years, the dissolved phase contamination was left to continue its off-site migration.*

**February to March 1996**                    Five single-wall USTs, dispensers, and associated piping were excavated and removed( Fluor 1996). Three new double-wall fiberglass USTs were later placed in the same tank excavation. During these activities, approximately 870 tons of petroleum hydrocarbon-impacted soil was excavated and disposed off-site. Samples taken from the tank pit approximately 14 feet bgs and some soil samples from the dispenser area contained high Total Petroleum Hydrocarbons as gasoline (TPHg), benzene, toluene, ethylbenzene and xylene (BTEX), and methyl tert-butyl ether (MTBE) concentrations. The highest MTBE concentration was 160

milligrams per kilogram (mg/kg) in a sample taken from the UST pit. Groundwater was encountered at 14 feet bgs. The tank pit excavation was extended to 17 feet in places, but no confirmation samples were apparently taken.

*The contaminant distribution suggests that MTBE-gasoline releases have occurred at both the USTs and dispensers. The high concentrations detected also indicates that the SVE, which operated between late 1993 and 1995 did not fully address the extent of the soil contamination.*

**March to May 1996**                          MTBE groundwater testing began (WPI, 1996b). All but one well contained MTBE above the maximum concentration levels (MCLs) with a maximum of 68,000 micrograms per liter (µg/l) at an on-site well near the USTs. Wells MW-10 and MW-8, located west of the facility, contained MTBE at 23,000 µg/l and 37,000µg/l, respectively. MTBE was also detected at MW-12, the furthest off-site well across Knott Avenue.

*By the time testing began, MTBE was already widespread and had migrated off-site more than 130 feet from the USTs (the nearest source area). The MTBE plume was not laterally delineated, except to the south. The MTBE distribution indicates an on-site source near the USTs and its widespread nature suggests that MTBE was released before March 1996. Despite the high concentrations detected off-site and the inadequate well network, no additional investigations were conducted or monitoring wells installed to improve the lateral delineation of the MTBE plume off-site.*

**May 1996**                              The City of Anaheim required groundwater remediation to be implemented noting the historic presence of free product in an off-site well and MTBE in groundwater as high as 14,000 ug/l (CAFD 1996). Additional soil remediation was also required to address contamination near the USTs and dispensers.

**September 1996**                          A Remedial Action Plan (RAP) proposes high vacuum dual phase extraction (HVDPE) to address contamination in the smear zone (Secor 1996).

**December 1996**                          A high vacuum extraction (HVE) test was conducted at the facility. Significant vacuum response was observed approximately 20 feet from the extraction well. Also, the response was not isotropic. The aquifer test indicates that at an extraction rate of 1.5 gallons per minute (gpm) and that the capture envelope may extend approximately 51 feet in the down-gradient direction (Secor 1997b).

**July 1998 to February 2003**               The HVDPE was in operation (Earth Tech 2003b; CAPUD 2009). Remediation focused on soil and groundwater contamination in the immediate area of the USTs using HV-1 to HV-6 and off-site well MW-11 as the extraction wells. Over the length of this remedial effort, approximately 1,398 pounds of petroleum hydrocarbon was recovered in the vapor phase and 2,304,057 gallons of groundwater was extracted and treated (CAPUD 2009).

*HVE was the first significant mitigation measure designed to address dissolved-phase groundwater contamination. It began approximately 12 years after the initial gasoline release was reported. By the time HVE was started the leading edge of the MTBE plume had already migrated off-site beyond the reach of the remediation system. While HVE resulted in significant source removal, the contaminant plume was not hydraulically contained, thus allowing high concentrations of MTBE (up to 23,000 ug/l) to continue off-site migration (Secor 1998b; World Oil 2000; Earth*

*Tech 2002, Earth Tech 2003b). Of note is that one of World Oil's consultants had recommended groundwater treatment and hydraulic containment in late 1990. More than 7.5 years elapsed until that advice was followed.*

**June to August 2004**                    Three deep wells were installed to evaluate vertical plume profile (SGI 2004c). Xylene -impacted soil could be traced continuously in one borehole (TSG MW-14) from near surface (15 feet bgs) to the total depth of the boring of 55 feet bgs, and MTBE soil impact extended to this depth. During initial sampling, MTBE was detected in two (TSG MW-14 and TSG MW-15) of three wells with a maximum of 11 ug/l.

*This investigation indicates that the MTBE plume had migrated deeper than 55 feet bgs. The MTBE plume is not vertically delineated in groundwater as it is still detected in the deepest wells. Vertical profiling is incomplete and suffers from a lack of discrete depth groundwater sampling. The lack of continuously cored borings has also resulted in random widely spaced sampling instead of more targeted sampling focusing on preferential pathways (laterally continuous sands etc.).*

**November 2005 to March 2006**                    Air sparing/soil vapor extraction (AS/SVE) was operating at the facility using on-site wells/probes (SGI 2006b; SGI 2008b; CAPUD 2009). The SVE system was shut-down due to low influent concentrations. Approximately 2.6 pounds of petroleum hydrocarbon was removed during that phase (SGI 2008b). When the AS/SVE began, on-site MTBE concentrations were approximately 230 ug/l.

*Because of the poorly designed monitoring network (no wells southwest, north, northwest, northeast and east of the facility) and the reduced sampling at the time, the lateral extent of the plume could not be evaluated. AS/SVE is not designed to capture/hydraulically contain contaminant plumes; thus, while at reduced concentrations, dissolved-phase contamination was allowed to migrate off-site. Just before the SVE treatment component was shut-off, MTBE at 190 ug/l was detected at an off-site down-gradient well MW-11 (SGI 2008b).*

**March 2006 to May 2008**                    The AS treatment component was left to continue operating on its own through May 2008 (SGI 2008c). Groundwater testing was performed through March 2008.

*AS is designed to enhance biodegradation but is not designed to hydraulically control a contaminant plume. Thus, any residual MTBE was left to continue off-site migration unabated.*

**March 2008**                    The latest quarterly monitoring event was performed at the facility. During that period only two on-site wells contained detectable MTBE up to a maximum of 3.9 ug/l. TBA was not detected. MTBE/TBA were not detected in the deeper 50-foot wells (SGI 2008b).

*While pre-closure oxygenate concentrations were low, the full extent of MTBE/TBA groundwater contamination was never fully assessed. The widely spaced and poorly designed off-site well monitoring network was not adequate to evaluate the contaminant plume. Also, hydraulic control of the MTBE/TBA plume was never achieved and /or demonstrated even during HVE (DPE) operation.*

**August 2008**                    All wells were abandoned and the AS unit was decommissioned (SGI 2008b).

**March 2009**                    No Further Action letter issued by the City of Anaheim (CAPUD).

***Present (May 2011)***                Based on review and evaluation of the investigation and remedial
activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the
   facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate MTBE contamination in groundwater laterally or
   vertically, and additional investigation is required.

6. Remediation performed to date has failed to effectively address probable off-site groundwater
   contamination, and has failed to prevent off-site migration of MTBE in groundwater..

7. Additional off-site remediation of groundwater may be required to i) prevent additional migration of MTBE
   and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the
   OCWD, and iii) eliminate the threat to drinking water supplies..

8. The OCWD will need to implement additional investigation and remediation activities at this facility to
   mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required
   remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than
   $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905
    can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at
    this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- First groundwater occurs between approximately 10 and 15 feet bgs in the Semi-perched Aquifer. Flow direction
  varied over time from southwest to northwest.

- Flow in the deeper A zone (the 50-foot zone) has generally been toward the northwest.

- The vertical gradient between the shallow aquifer and the 50-foot zone is neutral, at times downward and at
  times upward.

United States District Court
Southern District of New York

In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability
Litigation

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This Document Relates To:

Orange County Water District v. Unocal Corp., et al.,
No. 04 Civ. 4968

# Expert Report of Robert Stollar

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4272

May 28, 2011

Signature

Date   5/27/11

Robert Stollar
Groundwater Consultant
1409 Samoa Way
Laguna Beach, California 92651

contaminants, and contaminant migration. These data have been provided by other consulting firms in the form of reports, maps, and tables . These data include information related to borings and wells constructed for the ongoing assessment at the various site, descriptions of related soil, soil vapor, and groundwater sampling activities, free phase product thickness measurements, depth to water measurements, analytical results for the analysis of soil, soil vapor, and groundwater samples collected for the assessment of these Sites. The information provided to me also includes analyses of these data in the form of maps illustrating the water table, maps of the distribution of contaminants in groundwater, distribution of LNAPL, tables of water-level and water-quality data, boring logs, and geologic cross sections.

My curriculum vitae, including a list of publications authored in the prior ten years and cases in which I served as an expert within the prior four years, is provided in Appendix A. A schedule of my compensation regarding this matter is also included in Appendix A.

The exhibits that will be used to summarize or support the opinions expressed in this report are the exhibits which appear in, or are transmitted with, this report. The exhibits may subsequently be revised to allow for presentation in a manner appropriate to the proceeding where they are used. I reserve the right to update my opinion as new information becomes available.

## 1.3 Opinions and Basis

For the facilities subject to this phase of litigation, the available facility specific documents indicate the following:

1. MTBE and/or TBA have been released at the facilities.

2. MTBE and/or TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. At most facilities, MTBE that has migrated off-site has comingled with releases from nearby facilities.

6. To date, the responsible parties have failed to delineate MTBE and/or TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at these facilities to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at all facilities. At a minimum, however, the cost of additional investigation will be no less than $79,050 per facility. Unit costs for subsequent investigation activities have also been developed.

11. At select facilities, the minimum scope and cost to implement the required remediation can be estimated based on currently available data. For the facility referred to as Mobil 18-HDR, the cost to implement the minimum scope of investigation and remediation is $9,420,843.

12. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at other facilities, once additional investigation has been performed at these facilities.

It has been assumed that the responsible parties will continue to perform periodic monitoring and sampling of existing groundwater monitoring wells.

Facility-specific opinions, and the basis for each opinion, are provided in Appendix B (parts B.1 through B.8).

Plumes of MTBE and TBA contaminated groundwater have, and continue to, migrate beyond the facility boundaries. This off-site contamination can be abated before it reaches drinking water wells. While the cost to remediate the MTBE and TBA emanating from each facility will be significant, the cost to address the contamination once it reaches drinking water wells, including operational costs, would be far greater.

An approach to remediating facilities has been developed based on Mobil 18-HDR (Feasibility Studies in Appendix C.1 and Remedial Action Plan in Appendix D.1) along with reasonable costs to implement the abatement (Appendix E.1). However, it should be noted that the full lateral and vertical extent of contamination at this facility is not known. Therefore, the costs to fully investigate the contamination at these facilities will likely be more than the costs presented to address the currently known extent of contamination. That is, the costs presented herein are conservative.

Reasonable costs for additional investigation at each facility are included in Appendix E.2 and unit costs for subsequent investigation are presented in Appendix E.3.

References both reviewed and relied upon in development of opinions as they relate to specific facilities are presented in Appendix F.

**APPENDIX B.4**
**Facility Summary Report**

**Mobil 18-HDR**
**3195 Harbor Boulevard**
**Costa Mesa, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:       Facility Summary

### 1.1       Identification

| | |
|---|---|
| Facility Address: | 3195 Harbor Boulevard, Costa Mesa, California (Figures 1 and 2) |
| Intersection: | Harbor Boulevard and Gisler Avenue |
| Nearby Facilities: | Arco 6131 |
| Previous Facility Operations: | Mobil service station until closed in November 2007 |
| Current facility Operation: | Vacant lot following demolition of on-site facility in April 2011 |

### 1.2       Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*October 1987*                                   Fuel underground storage tanks (USTs) were replaced and 752 tons of contaminated soil excavated to a depth of 15 feet (EXMO_18HDR_005273).

*The extent of soil contamination was not delineated at the time of excavation and contaminated soil was left in place. No groundwater samples were collected and no assessment of groundwater contamination was performed.*

*August 1988*                                   An initial groundwater assessment was performed that included the installation of four on-site shallow groundwater monitoring wells (MW-1 through MW-4) to a depth of 42 to 43 feet below ground surface (bgs) (EXMO_18HDR_005565). Results of this initial shallow groundwater assessment confirmed: 1) contamination in soil extended to below groundwater, and 2) groundwater was contaminated (EXMO_18HDR_005570 to EXMO_18HDR_005572).

*All four groundwater monitoring wells were screened across a fine grained layer of soil (aquitard) separating two shallow water-bearing zones (i.e., cross-screened) (RWQCB 004499 to 004514). The cross-screened wells and likely downward vertical gradient between the two zones allowed the contamination to migrate deeper.*

*June to August 1991*                                   In June 1991, three on-site shallow groundwater monitoring wells (RMC-1 through RMC-3) were installed (ETIC Engineering [ETIC], 2010a). Contaminants were detected in groundwater samples collected from the on-site shallow groundwater monitoring wells.

*The three on-site shallow groundwater monitoring wells were also screened across fine grained layers of soils (aquitard) that separated two shallow water-bearing zones (i.e., cross-screened) (RWQCB 004499 to 004514). The new cross-screened wells and downward vertical gradient between the two zones provided additional locations for the contamination to migrate deeper.*

***August 1991***                                                Floating gasoline (light non-aqeous phase liquid (LNAPL) or free-product)
was reported in several of the on-site shallow groundwater monitoring wells previously constructed at the facility
(EXMO_18HDR_004510 to EXMO_18HDR_004515).

*The newly reported floating gasoline on groundwater indicates that additional releases of contaminants have
occurred subsequent to the removal of the USTs in 1987.*

***September to October 1994***              Fuel dispensers were replaced and an additional 206 tons of
contaminated soil, likely including methyl tert-butyl ether (MTBE), was excavated to a depth of four feet from the
facility.  Gasoline impacted soil was detected in soil samples collected from several hand auger boreholes advanced
beneath the dispenser islands (ETIC, 2010a, EXMO_18HDR_006294)

*Seven years after the discovery of contamination in soil and groundwater beneath the facility, the extent of the
contamination in soil and groundwater have not been delineated, no remediation of groundwater had been initiated,
and no assessment for MTBE was performed at the time the fuel dispensers were replaced.*

***May 1995 to May 1996***                       A groundwater pump and treat (GWPT) system operated at the facility,
removing 403,790 gallons of hydrocarbon-impacted water (EXMO_18HDR_006295).  In February 1996, MTBE was
first analyzed and detected in facility groundwater monitoring wells (ETIC, 2010b).  In May 1996, at the time of GWPT
system shut-down, MTBE concentrations exceeded 10,000 micrograms per liter (ug/L)  in two upper and two lower
zone wells, and the high concentration core of the MTBE plume (>1,000 ug/L) extended from north to south across the
facility property and at least 142 feet south-southwest and down-gradient of the facility (Figure 4).

*Based on an 80 feet radius of influence (EXMO_18HDR_006294) and the subsequent known extent of MTBE and
other contaminant plumes during this period, the GWPT system did not capture the downgradient off-site extent of
the groundwater contaminant plume (Figure 4).  Seven years after discovery of groundwater contamination,
containment of the groundwater contaminant plume had not been achieved.  To date, and with the exception of
occasional purging of floating gasoline from groundwater wells,  this GWPT system has been the sole substantive
remedial effort to capture and control the migration of MTBE and other contaminants in groundwater.*

***February 1996***                                The first analytical results for MTBE in groundwater and soil collected
from on-site groundwater monitoring wells were reported (ETIC, 2010b).  MTBE was detected in groundwater and soil
at concentrations up to 51,000 ug/L in groundwater and 38,000 micrograms per kilogram (mg/kg) in soils above
groundwater.

***May 1996 to June 1999***                       A soil vapor extraction (SVE) system operated at the facility between
the periods from May 1996 to March 1997 and again from April 1999 to May 1999.  During these periods of
operation,  the  SVE  system  removed  approximately  4,142  pounds  of  vapor-phase  hydrocarbons
(EXMO_18HDR_006295).  In June 1999, following GWPT and SVE operations, MTBE concentrations exceeded 1,000
ug/L in two wells screened in a deeper groundwater zone and seven wells screened in shallow groundwater or
across both shallow and deeper groundwater zones, including two off-site and down-gradient wells (ETIC, 2010b)
(Map-2).

*MTBE and other contaminants in soil beneath the facility provided a continual source of groundwater contamination
for approximately eight years after soil contamination was confirmed to extend to the groundwater surface.
Following GWPT remediation and operation of the SVE system, MTBE concentrations in groundwater were greater*

*than 1,000 ug/L in several on-site and off-site groundwater monitoring wells and the MTBE plume was not delineated to the southwest of the facility (Figure 4), thus demonstrating the ineffectiveness of either remedial measure to control or remediate MTBE in groundwater.*

**April 2000 to June 2003**     Four DPE pilot tests for the remediation of MTBE and other contaminants in groundwater were performed at the facility, recovering approximately 501 pounds of vapor-phase hydrocarbons and 1,870 gallons of groundwater (RWQCB 004789).

**May 2004 to December 2005**     The first Corrective Action Plan (CAP), proposing DPE for the remediation of MTBE and other contaminants in soil and groundwater at the facility was submitted to the OCHCA (EXMO_18HDR_006280, EXMO_18HDR_006113), and approved by the OCHCA in July 2004 (EXMO_18HDR_006113). With respect to DPE, the CAP stated that: "... the simultaneous removal of groundwater will result in more effective removal of hydrocarbons in the capillary fringe and dewatering of the aquifer to facilitate vapor extraction" (EXMO_18HDR_006303). With respect to SVE, the CAP stated: "... residual petroleum hydrocarbons that are below the current groundwater potentiometric surface would not be affected by vapor extraction" (EXMO_18HDR_006300).

*Eight years after MTBE was first reported in groundwater and nearly one year since the final DPE pilot test concluded in 2003, contaminated soil and groundwater remained and represented a continued source of contaminants to groundwater. Four years subsequent to the start of DPE pilot tests, the first CAP proposing the implementation of DPE was prepared for the remediation of MTBE and other contaminants at the facility.*

**July 2005**     The first CAP, dated February 2004, proposing DPE for the remediation of MTBE in soil and groundwater at the facility was approved by the RWQCB.

*More than nine years since MTBE was first reported in groundwater and more than five years since the DPE pilot tests were started, contaminated soil and groundwater remained. By December 2005, the MTBE plume in groundwater extended at least 300 feet southwest of the facility (Figure 4).*

**December 2005**     The highest MTBE and tert-butyl alcohol (TBA) concentrations (>1,000 ug/L) were in off-site down-gradient well, and detectable concentrations of MTBE extended at least 300 feet southwest of the site (ETIC, 2010b) (Figures 4 and 5).

*These results show that the high concentration core of the MTBE and TBA plumes had migrated off-site and down-gradient of the facility, and that the down-gradient edge of the MTBE plume had migrated a significant distance beyond the facility's southerly boundary.*

**February 2006**     An amended CAP replacing the more effective DPE as a remedial technology for the removal of MTBE from groundwater with the less effective SVE remedial method (as noted in the initial CAP) was submitted to and approved by the OCHCA (EXMO_18HDR_006108; ETIC, 2010c). The basis for the replacement of DPE with the less effective SVE was a cost analysis that showed SVE to be $300,000 less expensive than DPE (EXMO_18HDR_006127) and a conclusion that "Since there are no production wells or other receptors downgradient from the facility, an alternative form of remediation can be considered..." (EXMO_18HDR_006124).

*The amended CAP did not point out the conclusion in the initial (2004) CAP that DPE is more effective in removing MTBE and other contaminants from groundwater. Additionally, SVE was proposed despite the non-effectiveness of the previous phase of SVE to control or remediate MTBE in groundwater.*

***July 2006 to December 2008***       The SVE system operated at the facility, removing approximately 8,449 pounds of vapor-phase hydrocarbons (ETIC, 2010a).

*While the SVE system removed MTBE and other contaminants from the soils beneath the facility, it did not address the remediation of MTBE and other contaminants in groundwater approximately 20 years after groundwater contamination was first reported at the facility.*

***December 2010 to January 2011***       ETIC proposed up to six off-site soil boreholes to depths of 70 to 75 feet bgs, and depending on the analytical results of discrete-depth soil and groundwater samples, one or more off-site groundwater monitoring wells to an approximate depth of 75 feet bgs (ETIC, 2010a).  The proposed locations for the soil boreholes and wells are approximately 660 feet south-southwest of the southerly facility boundary.  In January 2011, the OCHCA approved the ETIC work plan (OCHCA, 2011).

*This scope of work involving investigation of off-site and down-gradient MTBE and TBA plumes in deeper groundwater-bearing zones represents acknowledgement on the part of Exxon-Mobil of the existence of a laterally and vertically undelineated MTBE/TBA plume sourced at the former 18-HDR facility.*

***January 2011 to April 2011***

During this time period, 19 boreholes with multiple discreet sampling intervals (CPT) were installed by the OCWD southwest and south of the Facility. Only three borings failed to detect MTBE at some depth within the groundwater.

*With the exception of a one-year period approximately 15 years prior, substantive remedial efforts designed to remove or contain MTBE, TBA, and other contaminants in groundwater have not been performed at this facility.  Due to the lack of timely and effective remedial action, plumes of MTBE and other contaminants, such as TBA, have migrated farther (at least 1,625 feet to the south of the facility) and deeper (as much as 95 feet bgs) (Figures 4a, 5a, 6, and 7). The extent of MTBE contamination in groundwater remains undelineated both laterally from the facility and vertically beneath the facility.*

***Present (May 2011)***       Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from ARCO Station #6131.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and/or off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. At this facility, the minimum scope and cost to implement the required remediation can be estimated based on currently available data. The estimated cost to implement additional investigation and remediation is $9,420,843.

## 1.3    Hydrogeologic Issues

- The contaminated Semi-Perched Aquifer in the facility vicinity can be divided into an upper zone extending from 30-35 feet bgs and a lower zone extending from 41 feet to a minimum of 50 feet bgs.

- From August 1995 when cluster wells MW-10A (screened in upper zone) and MW-10B (screened in lower zone) were first monitored, to October 2010, the vertical hydraulic gradient between the upper and lower zones has been downward, with the exception of a period between May 1996 and December 1998 when the vertical gradient was mostly upward. From August 1995 to October 2010, the average net head difference was -0.65 feet and the average net vertical gradient was -0.06.

- The Quaternary-age Semi-perched Aquifer unconformably overlies the Pleistocene-age Alpha and Beta Aquifers. There exists a downward hydraulic gradient between the Semi-perched Aquifer, the Alpha Aquifer and the Beta Aquifer.

- Historically, the direction of groundwater flow in the upper and lower zones has been toward the southwest. In October 2010, groundwater flow in the upper zone was toward the southwest at a gradient of 0.012 and groundwater flow in the lower zone was toward the south-southwest at a gradient of 0.014 (ETIC, 2010b). The direction of groundwater flow in the Alpha Aquifer is toward the southwest.

- Cone penetrometer testing (CPT) logs show that a blocky sand between approximately 60 and 84 feet (at MHDRH) is separated from the lower zone of the Semi-perched Aquifer by a sandy and clayey silt layer. This blocky sand has an erosional top, is more tightly cemented than the overlying Semi-perched Aquifer sands, and can be correlated throughout the CPT investigation area. This sand is interpreted to occur in the Pleistocene, and may either represent the Pleistocene age Alpha Aquifer, or a sand that occurs directly above the Alpha Aquifer. Orange County Water District (OCWD) studies indicate that the Alpha Aquifer in the area occurs between depths of approximately 80 and 100 feet. The eastern sub-crop boundary of the Talbert Aquifer occurs about 2,000 feet to the northwest of the facility. Production water well MCWD-6, located approximately 2,000 feet east of the facility, is screened in the Middle Aquifer System (310-1,025 feet bgs) but has a gravel pack that begins in the Alpha Aquifer at approximately 100 feet bgs and extends

**APPENDIX B.3**
**Facility Summary Report**

**Unocal 5376**
**8971 Warner Avenue**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:       Facility Summary

### 1.1       Identification

Facility Address:                          8971 Warner Ave, Huntington Beach, California (Figures 1 and 2)

Intersection:                              Warner Avenue and Magnolia Street

Nearby Facilities:                         Unocal 5376, Exxon Service Station (#4283), Mobil 18-G6B, and a former Chevron Service Station

Previous Facility Operations:              Unocal Service Station

Current facility Operation:                Jiffy Lube as of April 2011 observation

### 1.2       Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

**June 1979**                             The first release of gasoline was reported at the facility when a leak was found during testing of fuel product lines.  An unknown amount of gasoline was released between June and July (UOC 94300).

*No investigation of soil or groundwater was conducted after the leak was discovered.  The amount of gasoline released was apparently never investigated by Unocal.*

**July 1980**                             A second release of gasoline occurred at the facility from a damaged fuel line.  At least 155 gallons of gasoline was spilled (UOC 94300).

*No assessment or remediation of soil or groundwater was performed by Unocal following this release.*

**September 1989**                        Contaminated soil and floating gasoline was discovered during the removal of fuel underground storage tanks (USTs) ENSR Corporation (ENSR), 2008).  Several gallons of gasoline were released to soil when a fuel line was not properly cleared during UST removal (UOC 94300).

*Gasoline had clearly been released from the USTs to soil and groundwater beneath the facility. The extent of soil and groundwater contamination was not delineated during UST removal.  An internal Unocal memo dated 11/22/91 acknowledges that "contamination associated with the groundwater was not removed" after UST removal and that "contaminated soil and groundwater appears to extend off-site to the south".*

**July 1990**                              Four monitoring wells (MW-1 through MW-4) were completed on-site. Gasoline contamination was found in both soil and groundwater across the facility. Floating gasoline or light non-aqueous phase liquid (LNAPL) was found in one of the wells (MW-4) in June1992 (ENSR, 2008; UOC 81440).

*More than 10 years had passed after the first gasoline release was reported before the first monitoring wells were installed to assess groundwater contamination. Gasoline contamination in groundwater was already widespread beneath the facility when these wells were installed. Each of the wells was built with 30 feet of well screen (from about 9 to 39 feet) and at least two of the wells (MW1 and MW4) were screened across two aquifer zones separated by clay or silt units (equivalent to the upper and intermediate zones identified at the Exxon and Mobil facilities across the street). The cross-screened wells likely allowed cross contamination to occur from the upper aquifer into the intermediate aquifer zone and led to inaccurate groundwater elevation interpretations. The vertical and lateral extent of gasoline contamination was not delineated by these wells. No evaluation of the lower aquifer zone was conducted. Testing for MTBE was not being done at this time.*

**1991 to 1994**                              Floating gasoline was periodically removed from on-site monitoring wells MW-4 and MW-7 and off-site wells MW-10 and MW-14 located down-gradient of the southerly facility boundary by hand bailing or pumping (Geotracker 027498, UOC 81081 and 81933).

*This simplistic remediation process did not provide hydraulic containment or effective treatment of the groundwater contamination.*

**November 1991**                              Four additional monitoring wells (MW-5 through MW-8) and seven soil borings were completed on-site. The wells were each screened from 10 to 40 feet feet below ground surface (bgs) (ENSR, 2008).   An aquifer pumping test was conducted which indicated that the aquifer is under confined or semi-confined conditions and that the pumping radius of influence (ROI) down-gradient was about 57 feet.

*Wells MW-6 through MW-8 were screened across what appear to be the upper and intermediate zones and MW-7 was located in a known area of floating gasoline down-gradient of well MW-4. The cross-screened wells likely allowed cross contamination to occur from the upper aquifer into the intermediate aquifer zone and led to inaccurate groundwater elevation interpretations. The continued installation of wells across multiple aquifer zones appears to show a poor conceptual understanding of hydrogeology and contaminant transport issues at the facility.*

An internal Unocal memo states that "*significant contaminated groundwater*" was found below the facility following the 1989 UST removal and that "*contamination associated with the groundwater was not removed*". The memo also stated that "*contaminated soils and groundwater appear to extend off-site to the south and into the adjacent right-of-way*" (CHEVMDL1358 00000541035).

*This memo clearly indicates that Unocal understands a gasoline release has occurred to groundwater at the facility and that contamination has extended off-facility.*

**December 1991**                              A soil vapor extraction (SVE) test was conducted. The vapor ROI was estimated to be 61 feet and the test results indicated that SVE was a viable option for remediation (ENSR, 2008).

**January 1992**                              Two off-site monitoring wells (MW-9 and MW-10) were installed south of the facility. The wells were screened from 10 to 40 feet.

*More than 1 ½ years passed after groundwater contamination was first found in on-site wells before any wells were installed to determine the extent of off-site contamination. The wells were again built with long well screens that may have crossed both the upper and intermediate aquifer zones. No soil was collected below 30 feet bgs in MW-9 and soil was only sampled at 5-foot intervals in MW-10 so the presence of the intermediate zone could not be confirmed in these wells (it is found just to the south at the former adjacent Exxon station). Well MW-10 was located within the extent of floating gasoline and the cross-screened well could have allowed vertical migration of contaminants. The vertical and later extent of contamination was still not determined.*

**November 1992**            Two additional off-site wells (MW-11 and MW-12) were installed to the east of the facility. The wells were screened from 13 to 43 feet bgs (ENSR, 2008).

*These wells were screened even deeper than previous wells and are cross-screened across thick (>10 foot) clayey silt or clay layers, likely allowing vertical migration of groundwater between what appears to be the upper and intermediate aquifer zones. Once again, the installation of wells across multiple aquifer zones appears to show a poor conceptual understanding of hydrogeology and contaminant transport at the facility.*

**January 1993**            Gasoline contaminated soil was found during removal of USTs, fuel dispensers, and a clarifier from the facility (CHEVMDL1358 00000547876).

*The full extent of soil contamination was not determined during UST removal. Additional contamination below the USTs and dispensers indicates continued leaks from the tanks at the facility.*

**March 1993 to January 1994**            Three additional off-site monitoring wells (MW-13 through MW-15) were installed southeast of the facility. The wells were screened to a depth of about 30 feet bgs (ENSR, 2008).

*The lateral and vertical extent of groundwater contamination was still not delineated by these wells.*

**February 1996**            A dual phase extraction (DPE) treatment system began operating using four existing on-site monitoring wells (MW-4, MW-5, MW-10 and MW-14) (ENSR, 2008).

*More than 16 years had passed after the first gasoline release was reported and more than 5 years had elapsed after groundwater contamination was confirmed before soil or groundwater remediation began. Three of the wells used in the DPE system were apparently cross-screened in both the upper and intermediate zones.*

**July 1996**            MTBE was detected in groundwater when testing for MTBE first began (ENSR, 2008) (Figure 4). MTBE was found in MW-5, located down-gradient of the former USTs (71 ug/L).

*The lateral and vertical extent of MTBE was not delineated and some wells still contained floating gasoline.*

**November to December 1997**            Two nested SVE wells and 15 soil borings were completed on-site. MTBE was detected in soil samples collected near the fuel dispensers near the southern facility boundary at concentrations greater than 50,000 ug/kg (boring GP-1 at 58,000 ug/kg from 10 feet; boring GP-7 at 73,000 ug/kg from 15 feet).

*The presence of MTBE in relatively shallow soil (10 to 15 feet bgs) clearly indicates a release of MTBE from the fuel dispensers.*

***February – October 2001***                    Diisopropyl ether (DIPE) and ethyl tert-butyl ether (ETBE) were first detected in some facility monitoring wells when testing for these compounds began (ENSR, 2008).

*The presence of these fuel oxygenates, in addition to MTBE, in on-site and down-gradient off-site wells indicates a release of gasoline from the Unocal facility.*

*The down-gradient and vertical extent of MTBE and the other oxygenates was still not established.*

***March 1998***                    The DPE system was supplemented with an air sparging (AS) system.

***January 1999***                    Six verification soil borings were completed near selected SVE and DPE extraction wells.  Gasoline constituents, including MTBE (above 400 ug/kg), were found in some of the verification borings (ENSR, 2008).

*The continued presence of MTBE in soil below the facility indicates the remediation program had not fully treated soil contamination.*

***February 1999***                    Monitoring well MW-4 was abandoned and replaced with a well screened to a shallower depth (ENSR, 2008).

*The replacement of this cross-screened well, located near a source area, with a shallower well appears to indicate an understanding by Unocal of the risk posed by the cross-screened well to deeper groundwater.  However, the other cross-screened wells were left in place, continuing to allow potential vertical migration of MTBE into the deeper aquifer zone.*

***1999 to 2000***                    The DPE system was shut down to allow development of the facility as a Jiffy Lube (ENSR, 2008).

*The shut-down of the treatment system likely allowed continued off-site migration of MTBE.*

***July 2002***                    TBA was first detected in groundwater at a maximum concentration of 290 ug/L, found in a down-gradient well (MW-14) located off-site to the south (ENSR, 2008) (Figure 5).

***2002 to 2004***                    The DPE system operated and was then shut down in 2003 pending a request for closure.  The closure request was denied by the Orange County Health Care Agency (OCHCA) and the system was re-started and operated through 2004 (ENSR, 2008).

***2005***                    The DPE system was shut-down and has not been re-started.  The system had removed approximately 37,700 pounds of hydrocarbons from vapor and about 1.24 million gallons of groundwater at the time of shut-down (ENSR, 2008).

***September 2009***                    The OCHCA submitted a letter to Chevron indicating they were concerned about the broad screening interval of some monitoring wells and the possible need for multiple-depth wells to vertically delineate the contaminant plume.  The OCHCA directed Chevron (who merged with Unocal in 2005) to perform an evaluation of the existing monitoring well network at the facility (OCHCA, 2009).  Chevron responded with a report in November 2009 stating that the long screen intervals did not affect groundwater quality and did not warrant well replacement (AECOM, 2009).

*The conclusions reached regarding the long well screens did not appear to address the fact that wells were screened across multiple aquifer zones through clay and silt units, and the potential impact on MTBE migration and groundwater elevations.*

**March 2010**                                    The OCHCA submitted another letter stating their continued concern about the broad screening interval of several wells and the distribution of residual hydrocarbons in these wells. OCHCA directed Chevron to perform discrete-depth sampling within the wells (OCHCA, 2010).

*OCHCA clearly remained concerned about the "broad screen interval" of certain wells, i.e. wells that are likely cross-screened into deeper aquifer zones. The presence of these cross-screened wells for over 10 years has potentially spread MTBE into deeper zones on-site and off-site. Results of discrete-depth sampling conducted in December 2010 show a slight increase in MTBE with depth in well MW13A, located off-site and down-gradient.*

**April 2011**                                    Groundwater monitoring is ongoing, including discrete-depth sampling of monitoring wells. No active remediation has been conducted since 2005 (ARCADIS, 2011).

*The down-gradient and vertical extent of MTBE and TBA has not been determined. Cross-screened wells are still in place, possibly allowing cross contamination into the intermediate zone to continue and affecting the interpretation of groundwater flow directions. No investigation of the lower aquifer zone (found at about 45-55 feet bgs at facilities directly across Warner Avenue) or the Talbert Aquifer, found about 55 to 60 feet below the facility, has been conducted. The most recent quarterly monitoring report for the facility (4th Quarter 2010 by ARCADIS) states that no separate phase hydrocarbon (floating gasoline or LNAPL) has been recovered from the facility to date and that there are no water wells within 2000 feet of the facility (page 1 of the quarterly report). Both statements are incorrect, suggesting that the facility consultant does not have a clear understanding of the facility history or nearby potential receptors.*

**Present (May 2011)**        Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from the Mobil 18-G6B, and the Exxon 4283 facilities.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3     Hydrogeologic Issues

- The Semi-Perched Aquifer has not been subdivided into discrete units at the former Unocal facility.  The 'upper', 'intermediate' and 'lower' water-bearing zones, which were identified at the Mobil G6B and former Exxon 4283 facilities across Warner Avenue to the south, were not investigated individually at the Unocal facility.

- Several water-bearing sandy units were identified during completion of wells and borings at the facility down to the maximum depth explored (approximately 43 feet bgs) (ENSR, 2008).  These sandy units are typically separated by silt or clay units and appear to correspond to the upper and intermediate aquifer zones identified at the Exxon and Unocal facilities located across Warner Avenue.

- Many facility monitoring wells appear to be screened across both the upper and intermediate aquifer zones (with screen lengths of 30 feet (ENSR, 2008).

- No investigation of the Lower Aquifer Zone, identified at the Exxon and Mobil facilities at a depth of 45 to 50 feet bgs, was conducted.

- The facility overlies the Talbert Aquifer, which occurs between approximately 55 to 60 feet bgs and extends to a depth of about 100 feet bgs below the facility.  No investigation of the Talbert Aquifer was conducted.

- First groundwater occurs between approximately 10 to 16 feet bgs (ENSR, 2008).

- Groundwater flow below the facility has historically been to the southeast, but the interpreted flow direction may be influenced by the cross-screened monitoring wells.

- Groundwater elevations and flow patterns have been measured at the former Exxon facility to the south and the Mobil facility to the southeast, located directly across Warner Avenue.  Flow in the upper zone from the former Exxon station is to the east or northeast, while flow from the Mobil station is typically to the west-southwest.  Flow direction in the intermediate and lower zones at the Exxon and Mobil facilities is typically to the north/northeast and southeast, respectively. (EXMO_4283_004863; ERI, 2011; RWQCB-003055; OCHCA-037575)

**APPENDIX B.1**
**Facility Summary Report**

**Exxon 4283**
**8980 Warner Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:   Facility Summary

## 1.1   Identification

| | |
|---|---|
| Facility Address: | 8980 Warner Avenue, Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Warner Avenue and Magnolia Street |
| Nearby Facilities: | Unocal 5376 and Mobil 18-G6B |
| Previous Facility Operations: | Exxon service station (#4283) |
| Current facility Operation: | Operating Chevron service station as of April 2011 |

## 1.2   Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***April 1992***                    Six monitoring wells (MW-1 through MW-6) and three soil borings were completed on-site. Gasoline contamination was found in both soil and groundwater across the facility (RWQCB-002386). Floating gasoline or light non-aqueous phase liquid (LNAPL) was found in one of the wells (MW-3) in December 1992, shortly after groundwater monitoring began (Environmental Resolutions, Inc. [ERI], 2007).

*One of the wells (MW1) was screened from 30 to 55 feet, across all three aquifer zones (upper, intermediate and lower) and three of the wells (MW2, MW5 and MW6) were screened across two aquifer zones (upper and intermediate zones). The vertical and lateral extent of gasoline contamination was not delineated by these wells and borings. The cross-screened wells likely allowed contamination to migrate from the upper aquifer into the intermediate and lower aquifer zones, and also led to inaccurate groundwater elevation interpretations. Gasoline contamination in groundwater was already widespread below the facility when these wells were installed. Testing for methyl tert-butyl ether (MTBE) was not being conducted at this time.*

***September 1992***                    Gasoline contaminated soil was discovered during the removal of fuel underground storage tanks (USTs) (ERI, 2010a; RWQCB-002386).

*The extent of soil contamination was not delineated during UST removal.*

***August 1994***                    Two additional monitoring wells (MW-7 and MW-8) were installed and one well (MW-1) was abandoned (ERI, 2011).

*The investigation continued to focus only on groundwater in the upper aquifer zone and did not delineate the lateral or vertical extent of contamination. Although one cross-screened well was removed, three cross-screened monitoring wells were still in place, possibly allowing groundwater contamination to migrate to deeper zones. Well MW-1 was abandoned, but likely allowed cross contamination into the deeper zones for the two years it was present.*

**May 1996**                                                MTBE was first detected in groundwater below the facility (when testing for MTBE began) at concentrations up to 20,000 micrograms per liter (ug/L) (ERI, 2011, RWQCB-003102).

*The highest MTBE was found near the USTs and fuel dispensers indicating that the MTBE had likely originated from those locations. The vertical and lateral extent of MTBE was still not delineated.*

**July 1996**                                                Two additional monitoring wells (MW-9 and MW-10) were installed and three hydropunch borings were completed (ERI, 2011).

*The groundwater investigation still focused only on shallow on-site groundwater and did not delineate the lateral or vertical extent of contamination. The three cross-screened monitoring wells were still in place.*

**February 1997**                                          Three gasoline USTs were installed in the northwest corner of the facility (ERI, 2011).

**June 1997**                                               16 air sparge/soil vapor extraction (AS/SVE) wells were installed in the upper aquifer zone on-site. The wells were not activated until October 1999 (ERI, 2011).

**August 1998**                                            Monitoring well MW-6 was abandoned.

*This cross-screened well was in place for over six years, likely allowing contamination to flow from the upper zone into the intermediate zone. Cross-screened wells MW-2 and MW-5 were still in place.*

**October 1999 to August 2004**            The SVE/AS system operated (ERI, 2010a; RWQCB-003152, -003153)

*Over seven years had passed after contamination was first discovered before soil or groundwater cleanup began, allowing contamination to migrate off-site. The SVE/AS system treated contamination only in the upper aquifer zone and within the footprint of the facility. No off-site treatment of the upper aquifer zone or any treatment of the deeper aquifer zones was conducted.*

**October 2000**                                          Tert-butyl alcohol (TBA) was first detected in groundwater below the facility at a concentration of 1,900 ug/L (RWQCB-003113) (Figure 5).

**December 2000**                                        The Orange County Health Care Agency (OCHCA) sent a letter to Exxon stating that this is a high priority facility based on the high levels of MTBE in groundwater (up to 120,000 ug/L) and the risk to City of Huntington Beach supply well #09, located about 700 feet to the west. OCHCA directed Exxon to investigate the unauthorized release and to define the lateral and vertical extent of MTBE contamination in groundwater (EXMREMD0118959) (Figure 4).

*More than eight years after contamination was first discovered, the OCHCA clearly indicated that the lateral and vertical extent of MTBE contamination still had not been adequately delineated.*

**August to October 2001**                      Five cone penetration test (CPT) borings and four geoprobe borings were completed to determine screen depths for new intermediate or deeper aquifer zone well clusters.

**June 2003**                                   Well clusters MW-11(i/d) and MW-12(s/i/d) were installed on-site and screened individually in the shallow, intermediate or deeper aquifer zones to a maximum depth of 50 feet below ground surface (bgs). The wells were situated in the northwest and southwest corners of the facility (ERI, 2011).

*Almost two years passed after the CPT investigation to determine depths for the intermediate and lower zone wells before the wells were installed. These well clusters were located in historically up-gradient or cross-gradient locations and, therefore, would not likely detect contamination at the facility. Over 10 years had passed since contamination was discovered before the first wells were installed to monitor contamination in the deeper aquifer zones. The concentrations of MTBE in the intermediate and lower zones were not evaluated during that 10 year period. Off-site well cluster MW-13(s,i,d) was not installed until March 2004. No investigation of the underlying Talbert Aquifer, found between about 55 – 60 feet bgs, was conducted.*

**October 2003**                                Four dual-phase extraction (DPE) wells were installed on-site in the upper aquifer zone.

**August 2004**                                 Exxon began operating the DPE system using several wells in the east-central and northeast portions of the facility (ERI, 2011).

*More than twelve years had passed since groundwater contamination was first discovered before any groundwater treatment began. Ten months had passed after the DPE wells were installed before the DPE system began operating, likely allowing additional off-site migration of MTBE. The DPE system treated only the upper aquifer zone within the facility boundary and did not provide off-site treatment or containment of MTBE.*

**March 2006**                                  MTBE was first detected in the intermediate aquifer zone in well MW-12i at 2.36 ug/L.

**April 2008**                                  MTBE was first detected in the lower aquifer zone in off-site monitoring well MW13d at 43.6 ug/L. MTBE was subsequently detected in on-site lower aquifer zone wells MW11d in November 2008 (2 ug/L) and MW12d in February 2009 (1.1 ug/L) (ERI, 2011).

*The gradual detections of MTBE in first the intermediate and then the lower aquifer zones indicates that MTBE is migrating vertically into the deeper aquifer zones. The lateral extent of MTBE in the intermediate and deeper zones has not been established since the existing monitoring wells are located either up-gradient or cross-gradient relative to groundwater flow directions in those zones.*

**March 2011**                                  The DPE system continues to operate using several wells; and groundwater monitoring is ongoing. About 1,500 pounds of total petroleum hydrocarbons (TPH) and 0.89 pounds of MTBE have been removed from soil vapor, and about 3.3 pounds of TPH and 6.6 pounds of MTBE had been removed from groundwater, as of November 2010. MTBE continues to be detected in the deep aquifer zone (ERI, 2011).

*The DPE system continues to treat MTBE only in the upper aquifer zone. The lateral and vertical extent of MTBE and TBA has not been determined in the deeper zones. MTBE was detected in the upper, intermediate and lower aquifer zones during the most recent sampling event. The placement of the intermediate and lower zone wells does not provide MTBE data immediately to the east or southeast, although groundwater flow has often been shown to be to*

*the east and southeast in those zones in the past. Cross-screened wells MW-2 and MW-5 were still in place, possibly allowing cross contamination of the intermediate zone to continue and affecting the interpretation of groundwater flow directions. No investigation of the underlying Talbert Aquifer, found about 5 to 10 feet below the deeper zone, has been conducted.*

***Present (May 2011)***                   Based on review and evaluation of the investigation and remedial activities performed at the  facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from Unocal 5376 and Mobil 18-G6B.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required, to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- The Semi-Perched aquifer at the facility has been divided into 'upper', 'intermediate' and 'lower' water-bearing zones (ERI, 2011, RWQCB-002684, 002694, 002716):

**APPENDIX B.2**
**Facility Summary Report**

**Mobil 18-G6B**
**9024 Warner Avenue**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:   Facility Summary

## 1.1   Identification

| | |
|---|---|
| Facility Address: | 9024 Warner Ave, Fountain Valley, California (Figures 1 and 2) |
| Intersection: | Warner Avenue and Magnolia Street |
| Nearby Facilities: | Unocal 5376, Exxon Service Station (#4283) and a Former Chevron Station |
| Previous Facility Operations: | Mobil Service Station |
| Current facility Operation: | Mobil Service Station |

## 1.2   Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***July 1998***                Four hand auger soil borings were completed to depths of 2 to 4 feet below ground surface (bgs) at each of the four fuel dispensers at the facility. Methyl tert-butyl ether (MTBE) was detected in soil at concentrations up to 5.74 milligrams per kilogram (mg/kg) below piping adjacent to two of the four dispensers (Environmental Resolutions, Inc. [ERI], 2007, EXMO_18G6B_001655).

*MTBE was clearly released from the dispensers to soil. The vertical and lateral extent of MTBE in soil was not determined. No assessment of MTBE in groundwater was conducted.*

***September 1999***                One monitoring well (MW-1) and two soil borings were completed on-site. MTBE was detected in soil at depths ranging from 10 to 20 feet bgs. MTBE was detected in groundwater from well MW-1 at 34,000 micrograms per liter (ug/L) in November 1999 when the well was first sampled (ERI, 2010a).

*More than a year passed after MTBE was detected in soil before the first groundwater monitoring well was installed, likely allowing MTBE to continue to migrate off-site. The vertical and lateral extent of MTBE in groundwater was not evaluated. No hydraulic containment or remediation of MTBE was conducted.*

***January to November 2000***                Approximately 135 gallons of water was pumped from well MW-1 in January, about 78 gallons was pumped in September, and 87 gallons was pumped in November 2000 (about 300 gallons total) to remove contaminated groundwater (ERI, 2007).

*This simplistic remediation method did not provide hydraulic containment of MTBE or remove a significant amount of MTBE contamination.*

**June 2000**                                   Four additional monitoring wells were installed and three soil borings completed. The wells were screened only within the upper aquifer zone (ERI, 2007). Tert-butyl alcohol (TBA) was first detected in groundwater (4,800 ug/L in well MW-1) when analysis for TBA began (ERI, 2010a; Geotracker 003071).

*The vertical and lateral extent of MTBE and TBA in groundwater was still not delineated by these wells Figures 4 and 5). No wells were installed in deeper aquifer zones. No hydraulic containment or remediation was conducted.*

**October 2000**                                The Orange County Health Care Agency (OCHCA) sent a letter to Mobil stating that this is a high priority facility based on the high levels of MTBE in groundwater (up to 74,000 ug/L) and the risk to City of Huntington Beach supply well #09, located about 700 feet to the west. The OCHCA directed Mobil to define the lateral and vertical extent of MTBE contamination and ordered the installation of a down-gradient well cluster in the deeper aquifer zones (EXMO_18G6B_001425, -001426).

*More than two years after contamination was first discovered, the OCHCA clearly indicated that the lateral and vertical extent of MTBE contamination still had not been adequately delineated.*

**July 2001**                                   A 48-hour dual phase extraction (DPE) feasibility test was conducted to assess the viability of DPE as a remediation approach. The consultant concluded that DPE was a viable remediation method (ERI, 2007).

*No other remedial alternatives for soil and groundwater cleanup were apparently considered or tested.*

**August to October 2001**                      One cone penetration test (CPT) boring and one geoprobe boring were completed in the northwest corner of the facility to a depth of 50 feet bgs to evaluate the aquifer zones below the facility. MTBE was detected in soil from the geoprobe boring at 20 feet bgs (ERI, 2007).

*These two borings apparently represent the only assessment of deeper soil and groundwater performed below the facility. The vertical and lateral extent of MTBE was still not delineated.*

**November 2002**                               A DPE system was installed at the facility, including four new wells (DPE-1 through DPE-4).

*The DPE system was installed only in the upper aquifer zone and did not provide off-site treatment or containment of MTBE. The system did not begin operating until September 2003, allowing additional MTBE to migrate off-site in the meantime.*

**February to March 2003**                      One monitoring well cluster (MW-6 s/i/d) and one monitoring well (MW-7) were installed. The well cluster contained three wells, each screened individually into the shallow, intermediate and lower aquifer zones to a maximum depth of 50 feet bgs. The well cluster (MW-6) was located off-site, about 10 feet west of the facility boundary (ERI, 2007).

*Almost five years had passed since contamination was discovered before the first (and only) wells were installed to monitor contamination in the deeper aquifer zones. Only one well cluster was installed and it was located off-site, so groundwater flow direction and MTBE contamination in the deeper zones directly below the facility could not be determined. Deeper zone well MW-6d is situated up-gradient, based on the deeper zone flow direction at the*

adjacent former Chevron facility.  No investigation of the underlying Talbert Aquifer, found between about 55 to 60 feet bgs, was conducted.

**September 2003**                                    The DPE system began operating at the facility.  Only the SVE part of the system began operating in September 2003; the groundwater extraction part of the system did not begin operating until February 2004 (ERI, 2010a).

*More than five years passed after MTBE was first discovered in groundwater before any remediation began.  The DPE system was installed only in the upper aquifer zone and did not provide off-site treatment or containment of MTBE.*

**August 2004**                                    The OCHCA sent a notice of violation to Mobil citing failure to properly monitor the underground storage tanks (USTs).  The letter stated that the tank sensors were improperly installed and that there was no way of knowing how long this violation occurred.  The OCHCA stated that civil or criminal prosecution may result if this "*illegal monitoring practice*" occurs in the future (OCHCA-MTBE-083094).

*These illegal monitoring practices violated California law and prevented potential gasoline leaks from being detected.*

**June 2005**                                    One additional upper zone monitoring well (MW-8) was installed to monitor groundwater along the southerly property boundary ERI, 2007).

*No wells were installed in this area of the facility prior to 2005, even though the groundwater flow direction in the upper zone was frequently to the south or southwest below the facility in the past.  The lateral and vertical extent of MTBE contamination was still not established.*

**January 2007**                                    Mobil prepared a Corrective Action Plan (CAP) for the facility.  The CAP reviewed various remedial alternatives by both cost effectiveness and feasibility.

*The CAP was prepared four years after the DPE remediation system was already installed and operating. Not surprisingly, the CAP concluded the DPE was the best remedial alternative.  Interestingly, the CAP concluded that SVE was not an appropriate option due to cost and lack of effectiveness in tight soils, even though SVE is an important component of the DPE system.*

**July to August 2010**                                    A vapor rebound test was performed, after which the DPE system was shut down.  Based on the results of the test, the facility consultant concluded that the DPE system had remediated MTBE and other hydrocarbons in soil "*to the extent practical*" and that the DPE system should remain shut-down (ERI, 2010b).

*The vapor test only addressed soil vapor and did not assess groundwater contamination.  Low concentrations of MTBE remained in upper zone groundwater below the facility (up to 1.9 ug/L) near the facility boundary when the system was shut-down.  Based on data provided by Mobil's consultant, the DPE system was operational approximately 50% of the time since it began treating groundwater in February 2004.*

**February 2011**                                    The OCHCA approved Mobil's request to shut-down the DPE system at the facility, but specified that quarterly monitoring of all groundwater monitoring wells (OCHCA, 2011).

**April 2011**                                    The DPE system remains offline and quarterly groundwater monitoring is ongoing.  About 201 pounds of total petroleum hydrocarbons (TPH), 1 pound of MTBE and 1.1 pounds of TBA have

been removed from soil vapor. Approximately 2.7 pounds of TPH, 3.5 pounds of MTBE and 6.6 pounds of TBA had been removed from groundwater as of August 2010 when the treatment system was shut-down. MTBE continues to be detected at low concentrations in groundwater in the Upper Aquifer Zone (ERI, 2010a).

*The vertical extent of MTBE and TBA remains undelineated. MTBE had been detected in the intermediate and lower zones in the past. The placement of the only two intermediate and lower zone wells (off-site to the northwest) does not provide any MTBE data immediately below the facility. Groundwater flow in the lower zone has often been to the southwest at the adjacent Exxon station, so the one lower zone well is actually located up-gradient relative to the release at the Mobil facility. No investigation of the underlying Talbert Aquifer, found about 5 – 10 feet below the lower zone, has been conducted.*

***Present (May 2011)***      Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  MTBE that has migrated off-site has comingled with releases from Unocal 5376 and the Exxon 4283 facilities.

6.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally and/or vertically, and additional investigation is required.

7.  Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

**APPENDIX B.5**
**Facility Summary Report**

**ARCO 6131**
**3201 Harbor Boulevard**
**Costa Mesa, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

## Section 1:        Facility Summary

### 1.1        Identification

| | |
|---|---|
| Facility Address: | 3201 Harbor Boulevard, Costa Mesa, California (Figures 1 and 2) |
| Intersection: | Harbor Boulevard and Gisler Avenue |
| Nearby Facilities: | Mobil 18-HDR |
| Previous Facility Operations: | ARCO service station |
| Current facility Operation: | ARCO service station as of April 11, 2011. |

### 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***December 1990***                           Four soil borings were drilled prior to gasoline and waste oil underground storage tank (UST) and product piping replacement. Petroleum hydrocarbons were detected at a depth of 30 feet next to fuel USTs and in the northwest corner of the facility (EXMO_18HDR_003779).

*Depth of contamination corresponds to the groundwater contaminant smear zone, indicating that prior fuel releases from the USTs had reached groundwater and spread laterally along the capillary fringe.*

***January to March 1992***                Four gasoline USTs, one waste oil UST, and product piping were excavated and removed from the facility. USTs showed signs of rusting and visible pitting. A portion of the excavated petroleum hydrocarbon contaminated soil was used to backfill the original UST cavity. Total petroleum hydrocarbons as gasoline (TPHg) concentrations ranging from 620 to 8,900 milligrams per kilogram (mg/kg) were detected in three of the eight soil samples collected at the base of the gasoline UST excavation at a depth of 14 feet bgs. TPHg concentrations over 1,000 mg/kg were also detected in two soil samples collected beneath the eastern-most dispenser island (EXMO_18HDR_003774, AROCWD613108464).

*Soil contamination detected at the base of the gasoline UST excavation confirms that USTs were the source of the contamination detected in the capillary zone in December 1990. Soil contamination was confirmed to extend from the base of USTs to groundwater.*

***September 1992 to December 1993***        From September 1992 to December 1993, eight groundwater monitoring wells were installed: six on-site and two off-site (to south and southwest of facility) between depths of 40 and 45 feet below ground surface (bgs) (Delta, 2005a). Off-site well located southwest of Facility in Cinnamon Avenue destroyed during sewer construction and never sampled (EXMO_18HDR_002296).

***August 1994*** In August 1994, which was first groundwater sampling event that included off-site well B-10 (in Gisler Avenue, about 20-feet south of facility), the highest on-site concentrations of TPHg and benzene were detected in wells installed near the highest concentrations of these constituents in vadose zone soils (at eastern-most dispenser island and southerly part of former UST cavity). The two highest benzene concentrations were detected in the most down-gradient on-site well (6,700 ug/L in B-6 at westerly facility boundary) and in the off-site well (6,200 ug/L in B-10) (EXMO_18HDR_002296 to EXMO_18HDR_002306).

*These results provide additional confirmation that the former USTs and dispenser islands were the primary sources of the TPH and benezene toluene, ethylbenzene and xylene (BTEX) in groundwater beneath the facility. By August 1994, the benzene plume extended off-site to the south and had commingled with the benzene plume originating from Mobil Station #18-HDR (Figure 4).*

***September 1994*** In September 1994, two dual-completion air-sparging (AS)/soil vapor extraction (SVE) wells were installed in the area of the former gasoline UST cavity, and an AS/SVE pilot test was conducted (EXMO_18HDR_003234). The test indicated an air sparging radius of influence of 7 feet for volatile hydrocarbon stripping and 13 feet for groundwater oxygenation, and an SVE radius of vacuum influence of 34 feet (EXMO_18HDR_003235). Based on the results of the pilot test, and an evaluation of other remedial options, an AS/SVE system was proposed for the remediation of petroleum hydrocarbon-impacted soil and groundwater at the Facility (EXMO_18HDR_003236).

***May 1996 to August 1996*** In May 1996, two additional off-site groundwater monitoring wells were installed to a depth of 35 feet bgs. Well B-8 was located 90 feet to west of the facility and Well B-9 located 10 feet to west of southwesterly corner of the facility (EXMO_18HDR_002509). The first analysis for methyl tert-butyl ether (MTBE) occurred between May and August 1996 and was detected in off-site wells B-8 (170 ug/L), B-9 (65,000 ug/L) and B-10 (11,000 ug/L).

*By May-August 1996, the high concentration core of the MTBE plume extended off-site to the south and southwest and was merged with the MTBE plume originating from Exxon-Mobil Station #18-HDR (Figure 4).*

***August 1998 to February 2005*** An AS/SVE system operated at the facility, removing approximately 5,834 pounds of vapor-phase hydrocarbons (Delta, 2005b). This total includes approximately 334 pounds of vapor-phase hydrocarbons removed in Fourth Quarter of 2000 using high-vacuum dual-phase extraction (HVDPE)(Delta, 2005b). For the quarters for which AS/SVE system up-time percentage was reported (Third Quarter 2002 through Fourth Quarter 2004), the average system up-time was approximately 58% (Delta, 2005b). For a period in 2003, overpurging was performed on Wells B-6, B-9, and EA-2 due to the detection of light non-aqueous phase liquid (LNAPL) in Well B-6 in 2002.

*The AS/SVE system was the first soil and groundwater remediation system at facility and began operation:*

- *Nearly eight years after detection of contaminants in the smear zone beneath the facility;*

- *Four years after confirmation that a groundwater plume extended an unknown distance off-site;*

- *Nearly four years after a Corrective Action Plan (CAP) proposing AS/SVE was submitted to the Orange County Health Care Agency (OCHCA); and,*

- *More than two years after confirmation that an MTBE plume extended to an unknown distance off-site.*

During this time, smear zone contamination beneath facility represented a continuous source of groundwater contamination, and groundwater plume was allowed to migrate off-site. The radius of influence of the air sparging wells extended no further than southern edge of station (EXMO_18HDR_003251), leaving the off-site and down-gradient core of the plumes unaffected. The AS/SVE was not designed for, nor capable of, hydraulically containing the contaminated groundwater plume.

*Therefore, during period of AS/SVE remediation, the off-site portion of the MTBE/tert-butyl alcohol (TBA) groundwater plume from ARCO Station #6131 continued to migrate down-gradient (southwestward), commingling with the MTBE/TBA plume from the nearby Mobil Station #18-HDR.*

**June 2005 to September 2005**      In August 2005, elevated concentrations of MTBE/TBA were detected in groundwater in Wells B-6 (710/750 ug/L) and EA-2 (270/1,300 ug/L) (Delta, 2005b). In June and September 2005, three verification soil borings (B-12 through B-14) were advanced through the former UST cavity and eastern dispenser island after SVE system vapor concentrations had reached asymptotic levels. No TPHg, BTEX or oxygenates were detected in soil samples collected above the capillary fringe; however, at 30 feet bgs (below groundwater surface) elevated concentrations of TPHg (up to 1,200 mg/kg) was detected in two boreholes and MTBE (0.096 mg/kg) was also detected in the borehole closest to Wells EA-2 and B-6 (Delta, 2005a).

*These results indicate a continuing source of groundwater contamination in the former UST cavity area (Figures 4 and 5). The off-site portion of the groundwater contaminant plume detached from the on-site portion of the plume and commingled with the Mobil Station #18-HDR plume at least 12 years earlier, and continued to migrate down-gradient of the Mobil Station.*

**March 2006:**      A No Further Action letter was issued by the OCHCA (OCHCA, 2006).

**March 2011**      *Due to the lack of timely and effective soil and groundwater remediation, and absence of hydraulic plume containment, the merged high-concentration (>1,000 ug/L) MTBE plumes from ARCO Station #6131 and Mobil Station #18-HDR have migrated vertically into deeper zones (with detectable concentrations of MTBE in Hydropunch™ samples to a depth of 95 feet bgs), and laterally at least 1,850 feet to the south of ARCO Station #6131 (Hydropunch™ location MHDRN) (Figures 4, 4a, 5 and 5a). The groundwater MTBE plume remains undelineated both laterally down-gradient and vertically.*

**Present (May 2011)**      Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. MTBE that has migrated off-site has comingled with releases from Mobil Station #18-HDR.

6. To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

7. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

8. Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

9. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

10. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

11. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3      Hydrogeologic Issues

- Groundwater monitoring wells at ARCO Station #6131 are screened within a single Semi-Perched Aquifer groundwater zone. The "upper" and "lower" Semi-Perched Aquifer zones at Exxon-Mobil Station #18-HDR appear to merge beneath the ARCO facility (Figure 3). The contaminated Semi-Perched Aquifer groundwater zone extends from about 30 to at least 45 feet below ground surface (bgs). Since it has been demonstrated that the groundwater contaminant plumes originating at ARCO Station #6131 and Exxon-Mobil Station #18-HDR completely commingled, and that the high concentration core of the commingled plume has migrated beyond the Exxon-Mobil facility to the southwest (Figures 4 and 5), further discussion of hydrogeology and groundwater contaminant issues incorporates well information from both facilities.

- From August 1995 when Exxon-Mobil cluster wells MW-10A (screened in upper zone) and MW-10B (screened in lower zone) were first monitored, to October 2010, the vertical hydraulic gradient between the upper and lower zones has been downward, with the exception of a period between May 1996 and December 1998 when the vertical gradient was mostly upward. From August 1995 to October 2010, the average net head difference was -0.65 feet and the average net vertical gradient was -0.06.

- The Quaternary-age Semi-perched Aquifer unconformably overlies the Pleistocene-age Alpha and Beta Aquifers. There exists a downward hydraulic gradient between the Semi-perched Aquifer, the Alpha Aquifer and the Beta Aquifer.

- At the ARCO facility in October 2005, groundwater flow in the merged upper/lower zones was to the southwest at a gradient of 0.003 (Delta, 2005b). At the Exxon-Mobil facility, the direction of groundwater flow in the upper and lower zones has historically been toward the southwest. In October 2010, groundwater flow in the upper zone was toward the southwest at a gradient of 0.012 and groundwater flow

**APPENDIX B.6**
**Facility Summary Report**

**Mobil 18-JMY**
**3470 Fairview Road**
**Costa Mesa, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:     Facility Summary

## 1.1      Identification

| | |
|---|---|
| Facility Address: | 3470 Fairview Road, Costa Mesa, California (Figures 1 and 2) |
| Intersection: | W. Sunflower Avenue and S. Fairview Street |
| Nearby Facilities: | None |
| Previous Facility Operations: | Former ARCO branded service station (#3083) until 1986 |
| Current facility Operation: | Mobil branded service station as of April 11, 2011 |

## 1.2      Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***November to December 1986***          The facility is a demolished ARCO service station. Gasoline underground storage tanks (USTs) were excavated prior to November 1986. Excavated soil was treated by Ensotech and used to backfill the UST excavation. Groundwater with a liquid non-aqueous phase liquid (LNAPL) hydrocarbon layer up to 1/4 inch thick was detected at the base of the excavation at 14 feet below ground surface (bgs). Three soil borings were drilled to 20 feet bgs, and one groundwater monitoring well (BH-2) installed to 35 feet bgs, next to the UST cavity. Petroleum hydrocarbons were detected in soil samples from base of excavation and in soil borings.

*One or more fuel hydrocarbon releases occurred when the facility was occupied by an ARCO station. Contaminated soil and groundwater exist at the former UST location in the northern area of the facility. It is not possible to confirm the presence of methyl tert-butyl ether (MTBE) in these releases.*

***September 1987 to 1989***          ARCO installed three additional groundwater monitoring wells at the facility (GWE-1, GWE-3, and GWE-4). It should be noted that these wells may also have been referred to as BH-1, BH-3 and BH-4 (Alton 1Q2005 report). In October 1987, benzene concentrations of 12,600 and 1,100 micrograms per liter (ug/L) were detected in wells BH-3 and BH-4. In 1989, wells BH-2, GWE-1, GWE-3, and GWE-4 were destroyed during construction of Mobil Station #18-JMY.

*ARCO maintains responsibility for facility remediation.*

***August 1991 to March 1993***          ARCO installed five additional groundwater monitoring wells (BH-5 through BH-9). All these wells currently exist and are located on-site, except for BH-5, located about 20 feet south of the facility. MTBE was first analyzed for and detected in BH-8, located next to former ARCO USTs.

*All wells were cross-screened across the perched and lower semi-perched zones, facilitating the downward migration of groundwater contamination between these two zones.*

**May to November 1994**                 In May 1994, MTBE was first detected in off-site well BH-5, at a concentration of 13 ug/L.  In November 1994, Mobil was identified by the Orange County Health Care Agency (OCHCA) as a Responsible Party (RP) for facility contamination.

**April 1997**                 In April 1997, monthly pump-outs were initiated to remove MTBE impacted groundwater from wells BH-8 and BH-9 (Alton March 3, 1998 Chronology report).

*This was the first remedial action initiated by Exxon-Mobil, three years after MTBE was first detected in an off-site well.*

**March 1997**                 A leak in the Super product line was discovered and replaced (Alton 1Q2005 report).

**September to December 1997**                 In September 1997, the highest MTBE concentration (200,000 ug/L) at facility was detected in off-site well BH-5.  In December 1997, four additional on-site groundwater monitoring wells (MW-10 through MW-13) were installed and sampled.  The high concentration core of the plume extends off-site an unknown distance beyond BH-5.  A maximum concentration of MTBE (480,000 ug/L) was detected in MW-11, next to the Mobil USTs.

**February to June 1998**                 Well TCW-1 was installed with a screened section within UST pea gravel backfill.

*An MTBE concentration of 632,000 ug/L was detected in the UST cavity sample collected from TCW-1 (Alton 4Q2008 report), confirming the Mobil gasoline USTs as a source of MTBE contamination in groundwater.*

Bi-weekly vacuum truck pump-outs were initiated and dual phase extraction (DPE) events in TCW-1, and continued bi-weekly pump-outs of other on-site wells.  In June 1998, one on-site and six off-site groundwater monitoring wells (MW-14 through MW-19-A,B) were installed and sampled to delineate off-site extent of the MTBE plume, which extended 225 feet off-site to the most down-gradient well (15 ug/L in MW-19B).

**October 1999**                 During upgrading of UST sumps, product lines and dispensers, MTBE was detected in soil (maximum concentration: 22 mg/kg) to depths of 9-10 feet beneath the dispensers and product lines, and to a depth of 14 feet beneath the existing USTs.

**March 2000**                 A groundwater pump and treat (GWPT) system was initiated at the facility using eight on-site groundwater monitoring wells.  Several groundwater pumpout events were completed during periods that the GWPT system was down.

*The first continuously operating groundwater remediation system was installed 6 years after MTBE was first detected in an off-site well.  However, based on a groundwater capture radii of 82 feet (down-gradient) and 260 feet (cross-gradient), the GWPT system did not achieve hydraulic containment of the off-site portion of the groundwater MTBE plume, which extended to MW-19A, located approximately 225 feet east of the facility.*

*August 2003*                                     Well cluster MW-22-A,B,C,D was installed approximately 160 feet east and down-gradient of facility.

*This was the first attempt to evaluate the vertical extent of the MTBE and tert-butyl alcohol (TBA) plumes.*

*February to August 2004*                   Ten nested vapor extraction wells were installed and three separate soil vapor extraction (SVE) tests ranging from 8 to 12 hours long were performed.

*To date, a SVE system has never been installed or operated at the facility.*

*November 2010*                             TBA was first detected in the lower semi-perched zone (55 to 65 feet bgs) in MW-22C (18 ug/L) 160 feet east of the facility, and in the 55 to 59 feet bgs Hydropunch™ sample at cone penetrometer testing (CPT) location MJMY-C (3.3 ug/L) 380 feet south of the facility.

*This was the fist detection of a fuel oxygenate in a groundwater zone deeper than the lower semi-perched zone.*

A groundwater GWPT system was installed in 2000 and continues to operate at facility, with influent MTBE and TBA concentrations of 3.4 and 36 ug/L, respectively (ETIC 4Q2010 report).

*March 2011*                              CPT/Hydropunch™ sampling was performed at locations MJMY-A and MJMY-B. MTBE and TBA were detected in the lower semi-perched zone (28-32 feet and 37 to 41 feet) at MJMY-B location, at concentrations of 9.4 and 7.2 ug/L (MTBE) and 2.9 and 3.8 ug/L (TBA). Note that MW-15, situated between the facility and MJMY-B and MJMY-C, might be expected to have detections of MTBE and TBA. However, MW-15 is screened discretely in the perched zone (9 to 24 feet bgs), which is above the lower semi-perched zone sand from which the MJMY-B and MJMY-C samples with MTBE and TBA detections were collected. The November 2010 and March 2011 sampling results at the CPT/Hydropunch™ locations and MW-22C indicate that dissolved MTBE and TBA have spread laterally (in the lower semi-perched zone) and deeper (to the lower semi-perched zone) at least 160 feet to the east and at least 380 to the south.

*The GWPT system operating at the facility since 2000 has not prevented migration of a detached fuel oxygenate plume. The groundwater MTBE/TBA plume remains undelineated both laterally and vertically.*

*Present (May 2011)*                       Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE in groundwater and the vertical extent of TBA contamination in groundwater and additional investigation is required.

6. Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7. Additional on-site and/or off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8. The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9. The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3 Hydrogeologic Issues

- Four groundwater zones have been investigated at the facility:

  - Perched zone (approximately 8 to 15 feet bgs);
  - Upper zone of Semi-perched Aquifer (upper semi-perched zone) (approximately 22 to between 30 and 35 feet bgs);
  - Lower zone of Semi-perched Aquifer (lower semi-perched zone) (approximately 55 to 73 feet bgs); and
  - Alpha Aquifer (79 feet to at least 103 feet bgs).

- Groundwater gradients in the four groundwater zones are as follows:

  - Perched zone: southeast;
  - Upper semi-perched zone: south, southeast and southwest;
  - Lower semi-perched zone: unknown due to insufficient number of discretely screened wells; and
  - Alpha Aquifer: southwest.

The groundwater gradient maps for lower semi-perched zone are based on water levels from monitoring wells screened within, or across both, the Perched and Upper Semi-perched Aquifers. The groundwater gradient varies significantly with time and often shows complex patterns; a reflection of both long well screens across discrete zones, as well as residual effects to static water levels caused by the GWPT system. Notwithstanding these effects, the prevailing directions of groundwater flow from 1987 to 2010 are to the

**APPENDIX B.7**
**Facility Summary Report**

**Mobil 18-HEP**
**2921 South Bristol Street**
**Santa Ana, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:       Facility Summary

## 1.1       Identification

Facility Address:                2921 South Bristol Street, Santa Ana, California (Figures 1 and 2)

Intersection:                    South Bristol Street and West Segerstrom Avenue

Nearby Facilities:               Former Chevron branded service station and former Unocal service station to west and southwest, respectively (EXMO_18HEP_000185)

Previous Facility Operations:    Mobil service station until September 1998 (RWQCB 005811)

Current facility Operation:      76 service station as of January 2004 (EXMO_18HEP_000005) and as of April 2011 observation

## 1.2       Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action. Facility well construction details are presented in Table 1. Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

***August 1998 to September 1998:***       Four underground storage tanks (USTs), four dispensers and associated product lines were removed from the facility along with contaminated soil. A sheen of light aqueous-phase liquid (LNAPL) was observed on top of groundwater beneath the USTs during excavation activities. Soil samples and one groundwater grab sample detected total petroleum hydrocarbons as gasoline (TPHg), benzene, toluene, ethylbenzene and xylenes (BTEX) compounds and methyl tert-butyl ether (MTBE).

*The extent of both soil and groundwater contamination was not determined.*

***July 1999 to August 1999:***       Seven on-site groundwater monitoring wells (MW1 through MW7) were installed and every monitoring well sampled had detections of MTBE.

*The extent of the groundwater contamination was not determined.*

***December 1999 to February 2000***       During this time, three dual phase extraction (DPE) events were conducted at the facility. Monitoring wells MW-8, MW-9 and MW-10 were installed and sampled.

***August 2000***       The monitoring wells were over-purged. After all these extraction activities, the groundwater remained contaminated with MTBE at concentrations up to 36,000 µg/L and tert-butyl alcohol (TBA) up to 6,100 µg/L.

*The lateral and vertical extent of the groundwater contamination was still not determined.*

**October 2000**        Two groundwater extraction wells (GEW1 and GEW2; above 17 feet below ground surface [bgs]) were installed to test the feasibility of groundwater extraction. The tests were conducted early in 2001.

**November 2000 to February 2001**        Two additional down-gradient monitoring wells (MW-11 and MW-12) were installed and sampled.

*The lateral and vertical extent of the groundwater contamination was still not determined.*

**January 2001 to May 2002**        Two additional DPE events, as well as two additional remedial soil excavations, were conducted at the facility. Also during this time period, a groundwater extraction feasibility study was conducted.

**September 2002**        Three additional down-gradient monitoring wells (MW-13, MW-14 and MW-15) were installed and sampled. None of the monitoring wells installed at the site were deeper than 20 feet bgs.

*The lateral and vertical extent of the MTBE and TBA groundwater contamination remained undetermined.*

**January 2004**        New USTs were installed as part of the re-branding of the facility as a 76 service station. During the installation, additional amounts of contaminated groundwater and soil were removed and transported off-site for disposal.

**September 2006**        Site Closure Request was submitted to the Regional Water Quality Control Board (RWQCB).

*The data provided in the Closure Request showed that MTBE contaminated groundwater remained off-site and that both the lateral and vertical extent of contamination remained undetermined.*

**March 2007**        The RWQCB issued a No Further Action letter relative to the UST removal.

**Present (May 2011)**        Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1. MTBE and TBA have been released at the facility.

2. MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3. MTBE has been present in groundwater at the facility for more than a decade.

4. MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5. To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE in groundwater and the vertical extent of TBA contamination in groundwater and additional investigation is required.

6.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater..

7.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3    Hydrogeologic Issues

- Monitoring wells with screens to depths greater than 20 feet bgs have not been installed either on-site or off-site.

- Well IRWD-4 is located approximately 1,500 feet northeast of the facility. This well is screened from 440 to 910 feet bgs in the Middle Aquifer System, with a sanitary seal that extends to 400 feet bgs. Contaminant compounds have been detected in groundwater from this well, including nitrate at concentrations of up to 6.2 milligrams per liter (mg/L), and a trace amount of trichloroethene (TCE). Both detections indicate that this well is susceptible to contamination originating from shallow soil or groundwater.

- Well IRWD-2 is located approximately 3,300 feet east of the facility. This well is screened from 385 to 855 feet bgs in the Beta Aquifer; however, the gravel pack begins at 84 feet bgs, which hydraulically connects the well with the Alpha Aquifer.

## 1.4    Contaminant Issues

- MTBE was released at the facility prior to August 1998 and can be traced from the source to groundwater in the Semi-Perched Aquifer beneath the facility. The MTBE plume has never been fully delineated to the southeast.

- The vertical extent of the MTBE and TBA plumes has not been investigated in the source area or down-gradient of the facility.

**APPENDIX B.8**
**Facility Summary Report**

**Mobil 18-668**
**16230 Harbor Boulevard**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

# Section 1:      Facility Summary

## 1.1        Identification

| | |
|---|---|
| Facility Address: | 16230 Harbor Boulevard, Fountain Valley, California (Figures 1 and 2) |
| Intersection: | West Edinger Avenue and Harbor Blvd. |
| Nearby Facilities: | None |
| Previous Facility Operations: | None (ETIC, 2006) |
| Current facility Operation: | Active gasoline service station as of April 2011 observation |

## 1.2        Characterization and Remedial Action Chronology

This section provides a chronology of facility characterization and remedial action.  Facility well construction details are presented in Table 1.  Groundwater analytical results for samples collected at on- and off-site locations are provided in Appendix A (by well), and Appendix B (by date), and time-series charts of contaminant concentrations and water level elevation hydrographs are provided in Appendix C.

*September 1989*                          On-site groundwater monitoring wells MW-1, MW-2, MW-3 and MW-4 were installed. These wells were also abandoned at some point but no historical data for these wells have been found in the available documents.

*June 1990*                          Four underground storage tanks (USTs) were removed and replaced at the facility.  Although petroleum hydrocarbon contaminated soil was noted in the UST excavation at that time, new tanks were installed two to three days after removal of the old UST cavity without contaminated soil excavation.  The following on-site monitoring wells were also installed: RW-1/PW-1, RW-2/PW-2, RW-3/PW-3, RW-4/PW-4, RW-5/PW-5, RW-6/EW-4, RW-8/EW-1, RW-9/EW-9, RW-10/EW-3, MW-9/EW-2, MW-10/OW-1 and MW-12/EW-12 (depths ranging from 10 to 27 feet below ground surface [bgs]).

*July 1990*          MW-10 on the south boundary of the site reported 4,200 micrograms per liter (µg/l) benzene.

*January 1992*                          Off-site groundwater monitoring wells MW-5, MW-6, MW-7 and MW-8 were installed (depths from 25 to 30 feet bgs).

*September 1992*                    The down-gradient off-site monitoring well (MW-6) reported 3,390 µg/l benzene.

*After two years of known groundwater contamination along the facility's south boundary, the southern-most monitoring well is also contaminated and the benzene plume extends off-site.*

*March 1994:*                          A soil vapor extraction (SVE) system began operation.

***September 1994***                            Off-site groundwater monitoring wells MW-13, MW-14 and MW-15 were installed (depths from 24.5 to 25 feet bgs).  Monitoring wells MW-14, down-gradient of MW-6, reported a benzene concentration 1,200 µg/l.

*Since this southern most off-site down-gradient well is contaminated, the benzene plume is further off-site and no groundwater remedial has yet been implemented.*

***June 1995***                            A groundwater pump and treat (GWPT) system began operation approximately five years after the facility was known to be contaminated.

***February 1996***                            Groundwater samples collected from the facility monitoring wells reported methyl tert-butyl ether (MTBE) with concentrations up to 72,000 µg/l.

***May 1996***                            The first time off-site monitoring well MW-14 is analyzed for MTBE, the groundwater was determined to be contaminated with 4,900 µg/l while benzene was reported at 64 µg/l.

*These concentrations exist in the southern most off-site monitoring well a year after the GWPT system began operation.*

***November 1996***                            The GWPT system ceased operation, yet the concentration on MTBE in MW14 was 4,300 µg/l.

***January to April 1997***                            The SVE system continued to be operated at the facility.

***March to August 1998***                            Monthly dual-phase extraction (DPE) events were conducted at the facility.

***September 1998***                            The GWPT system resumed operation.

***June 2000***                            Monitoring wells MW-16 and MW-17 (depths from 25 to 38 feet bgs) were installed.  Groundwater samples collected from facility monitoring wells reported tert-butyl alcohol (TBA) concentrations up to 69,000 µg/l.

***February 2001***                            The GWPT system ceased operation. Yet, the concentration of TBA in MW-14 was 8,000 µg/l on March 1 and 70,000 on June 4.

***September 2003 to March 2004***                            The GWPT system resumed operation.  A total of 16,066,164 gallons of groundwater had been treated when the GWPT system ceased operation in March 2004.

***February 2008***                            Soil confirmation borings and a soil vapor survey were conducted.

***Present (May 2011)***                            Based on review and evaluation of the investigation and remedial activities performed at the  facility to date, the following opinions are presented:

1.   MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible party has failed to delineate the lateral and vertical extent of MTBE in groundwater and the vertical extent of TBA contamination in groundwater and additional investigation is required.

6.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater..

7.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies..

8.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility.  At a minimum, however, the cost of additional investigation will be no less than $79,050.  Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at Mobil 18-HDR can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3     Hydrogeologic Issues

- Monitoring wells are screened primarily to depths between 25 to 30 feet bgs.

## 1.4     Contaminant Issues

- MTBE was released at the facility prior to February 1996 and can be traced from the source to groundwater beneath the facility.

- Although no records of gasoline releases were identified for this site, MTBE and TBA were both identified in vadose zone soils, and light non-aqueous phase liquid (LNAPL) up to 2.36 feet thick has been found on groundwater. In addition, both MTBE and TBA have been detected in groundwater at concentrations up to 130,000 and 180,000 µg/L, respectively.

- The highest MTBE historical concentrations were detected in off-site down-gradient wells in March 1998, including the furthest down-gradient well MW14.  The MTBE plume has migrated at least 87 feet south-southwest of the facility in the upper semi-perched zone (well MW-14, 130,000 µg/L in March 1998), and is undelineated in the down-gradient direction. There has been no vertical delineation of MTBE at this facility.

**APPENDIX B.8**
**Facility Summary Report**

**ARCO 1905**
**18025 Magnolia Street**
**Fountain Valley, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

***December 2002***                         The most recent off-site down-gradient well (W-30) was added to the monitoring network (Stratus 2010b).  No MTBE or TBA were detected during the initial sampling.  MTBE has, however, been detected continuously above regulatory levels since September 2005 (Stratus 2010b).

*These detections suggest that the DPE failed to capture the entire plume.*

***October 2010***                         MTBE and TBA concentrations in excess of regulatory levels continued to be detected at on- and off-site groundwater monitoring wells (Stratus 2010b).  TBA is only detected on-site at concentrations up to 2,500 ug/l.  MTBE is present in excess of 12 ug/L and remains undelineated in off-site down and cross-gradient directions in the Semi-perched Aquifer.  MTBE and TBA were not detected in the Talbert Aquifer.

*MTBE remains undelineated more than 24 years after the initial gasoline release was reported.*

***November 2010 to May 2011***          A CPT/discrete-depth groundwater sampling program was performed by the OCWD (2010) in the area of the facility.  Groundwater collected from discrete depths confirmed the presence of both TBA and MTBE at several off-site locations in the underlying Talbert Aquifer.  MTBE was detected at an estimated concentration of 0.24(J) ug/l in the 95-foot sample (A19050) at a location 400 feet west-southwest of the facility.  TBA was detected in the Talbert Aquifer both northeast and southeast of the facility at concentrations ranging from 2.1 to 3.7 ug/l and at depths between 73 to 77 feet bgs.  Other than the Talbert Aquifer detections, MTBE and TBA were detected off-site at multiple depths between 29 and 50 feet bgs.  The highest MTBE detection was 270 ug/l in a sample collected 40 feet bgs at a location 400 feet west southwest of the facility.

*Vertical plume delineation has not been achieved as MTBE and/or TBA were detected in the deepest groundwater sample at several off-site locations down to a maximum depth of 95 feet bgs.  Preferential lateral contaminat migration pathways (i.e. thin sand or channels) have been identified in an intermediate zone between the upper semi perched zone and the Talbert Aquifer.  MTBE and TBA have migrated laterally in this intermediate zone, at least 400 feet away from the source area(s) at the facility.  Transition to the Talbert Aquifer occurs somewhere between 46 and 50 feet bgs.*

***Present (May 2011)***                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible party has failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

**APPENDIX B.2**
**Facility Summary Report**

**G&M Oil Company Station No. 04**
**16990 Beach Boulevard**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

**August 2001** (RWQCB-024640).

TBA was first detected in groundwater at a concentration of 7,200 ug/L

**September 2001**

Huntington Beach drinking water well HB-3A starts pumping.

*This well is located about 1,350 feet down-gradient of the facility and recent January 2011 groundwater data show that MTBE is present in groundwater within 200 feet of this pumping well.*

**June 2003**

Fuel USTs were removed and replaced. Contaminated soil was excavated but tests showed contaminated soil (including MTBE and TBA) was still present below the USTs.

*The extent of soil contamination was not delineated during excavation and UST removal.*

**July 2003**

Mobile DPE events were started in off-site monitoring wells to try to contain the migration of floating gasoline (G&M 033622).

*The mobile DPE events were conducted only sporadically (twice per month) at each well and did not provide continuous treatment or containment. Continuous off-site treatment was evaluated but apparently considered too costly. Thus, the mobile DPE approach was selected based on cost savings, not on effectiveness. G&M's consultant had indicated in 1999 that the most effective means of remediation was incorporating the off-site wells into the on-site treatment system rather than conducting mobile DPE, but this approach was not implemented. (G&M 034388).*

**November 2004**

Four intermediate and deep zone off-site monitoring wells (W-36I, W-36D, W-39I & W-39D) were installed. G&M Oil's consultant concluded that the lateral and vertical extent of the off-site dissolved hydrocarbon plume had been delineated by these wells.

*Subsequent investigation results clearly demonstrate that the plume had not been delineated.*

**July 2007**

Approximately 3.8 million gallons of groundwater were removed through July 2007 by the DPE system (Atlas Environmental Engineering Inc. [Atlas], 2010). In-well bio-sparging was started as a replacement for DPE in on-site and off-site wells to remediate groundwater contamination. Bio-sparging was stopped in off-site wells in 2009 for repairs and has not resumed.

*The average groundwater pumping rate from 1997 to 2007 was less than one gallon per minute (gpm), likely not enough to provide plume capture or containment. Two years had passed with no off-site treatment of groundwater contamination, allowing further spread of the MTBE and TBA plume in the shallow zone. No treatment of the intermediate or deep zones was conducted, allowing MTBE to migrate vertically and laterally in those zones (Figures 4 and 5).*

**Present (May 2011)**

Groundwater monitoring is ongoing but no off-site remediation is being conducted. Recent groundwater monitoring data (January 2011) indicate MTBE has been detected at 21.9 ug/L in a deep zone monitoring well (W-48D) located near supply well HB-3A (Atlas, 2010). TPHg was detected at 953 ug/L.

*The lateral and vertical extent of groundwater contamination in deeper zones has not been established. Recent cone penetrometer testing(CPT)/hydropunch groundwater data collected by the OCWD indicates that MTBE has migrated at least one-half mile down-gradient in the deep zone below residential areas and groundwater monitoring data indicate MTBE has migrated to within 200 feet of active supply well HB-3A. These elevated concentrations of*

*hydrocarbons indicate a significant potential risk to the production well. No treatment of the intermediate or deep zones has yet been conducted.*

***Present (May 2011)***                            Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facility.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible parties have failed to delineate MTBE and TBA contamination in groundwater laterally or vertically, and additional investigation is required.

6.  Remediation performed to date has failed to effectively address off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.  Additional off-site remediation of groundwater is required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.  The Orange County Water District (OCWD) will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  At this facility, the minimum scope and cost to implement the required remediation can be estimated based on currently available data. The estimated cost to implement additional investigation and remediation is $13,229,611.

## 1.3      Hydrogeologic Issues

- The Semi-Perched Aquifer at the facility has been divided into the following water-bearing zones (Atlas, 2010, G&M 043248):

  - The Shallow semi-perched zone extends from approximately 20 to 40 feet bgs (RWQCB-025297).

  - The Intermediate semi-perched zone extends from about 56 to 80 feet bgs (RWQCB-025298).

  - The Deep semi-perched zone extends from roughly 90 to 120 feet bgs (RWQCB-025298).

  - The deep zone has recently been subdivided into deep and "deep-deep" zones by Atlas (roughly 85 to 90 feet and 111-125 feet bgs) according to the interpretations presented in the most recent groundwater monitoring report for the facility (Atlas, 2010).

**APPENDIX B.17**
**Facility Summary Report**

**Shell 6502**
**6502 Bolsa Avenue**
**Huntington Beach, California**

Prepared for

**Miller, Axline & Sawyer**
1050 Fulton Avenue, Suite 100
Sacramento, California

May 28, 2011

***July 2007***                               An addendum to the CAP requires that if performance monitoring wells (B-7, B-8, B-21, MW-52 and MW-53) exceed their performance criteria that a contingency monitoring well be installed.

***March 2008***                              Two additional monitoring wells were installed (MW-54 and MW-55).

*These wells were only drilled into the upper semi-perched zone and one of the wells identified a coarse gravel zone near the base of the well.*

***March 2009***                             The Orange County Local Oversight Program (OCLOP) issued a letter stating that sampling data from wells B-8 and B-21 indicated that the contingency trigger criteria for these wells were exceeded during the first quarter 2009. The OCLOP iterated that if these elevated concentrations persist during the second quarter 2009 sampling that the responsible party will be required to implement actions proposed in the July 8, 2007 revised CAP addendum.

***July 2009***                               The OCLOP issued a letter stating that this facility must remain on a quarterly sampling schedule.

***August 2009***                            The OCLOP issued a letter stating that sampling data from well B-21 shows a concentration increase of one order of magnitude for two consecutive quarters. As such, the implementation of remediation, as presented in the July 8, 2007 revised CAP addendum, must begin within 30 days.

***September 2009***                         The OCLOP issued a letter identifying exceedances that have occurred on the facility and directing the RP to implement the contingency remedy by September, 2009 or a notice of violation will be issued to Shell Oil.

***December 2009***                          The OCLOP issued a letter noting the requirement of the OCLOP's monitored natural attenuation (MNA) program that at a minimum one up-gradient well must be included in the monitoring program (which does not exist for this facility). Consequently, the OCLOP requested a work plan be submitted (for additional well installation) within 30 days of receipt of this letter.

***April 2011***                             The OCHCA issued a letter outlining their concern that the screening interval is too broad in several groundwater monitoring wells at the facility and that the groundwater monitoring data may not be representative of individual groundwater zones beneath the facility. The OCHCA requested an additional well be installed near EW-15 and this well must be screened from 70 to 75 feet.

*As the vertical extent of MTBE and TBA beneath the facility was never investigated, there is a possibility that these contaminants entered into deeper groundwater production aquifers beneath the facility (including the Bolsa Aquifer at 60 to 70 feet bgs and the Alpha Aquifer at an estimated 135 feet bgs). Some of the earlier monitoring wells at the facility cross-connect the upper and middle semi-perched zones and it is likely that these wells provided vertical conduits for the deeper migration of contaminants released at the facility, including MTBE and TBA.*

***January 2011 to April 2011***             During this time period, 8 boreholes with multiple discreet sampling intervals (CPT) were installed by the OCWD to the north, west and south of the Facility. Two CPT locations along Alexandria Dr. (between Edwards Street and Rice Circle) reported MTBE concentrations of 3µg/l at 49 feet bgs and 0.38 µg/l at 58 feet bgs at location S6502C and 0.54 µg/l at 44 feet bgs at location S6502D.

The CPT data show that the MTBE plume is further south than previously identified and also migrated into deeper groundwater.

***Present (May 2011)***                    Based on review and evaluation of the investigation and remedial activities performed at the facility to date, the following opinions are presented:

1.  MTBE and TBA have been released at the facilities.

2.  MTBE and TBA releases have impacted soil and groundwater beneath the facility and off-site beyond the facility boundaries.

3.  MTBE has been present in groundwater at the facility for more than a decade.

4.  MTBE has migrated off-site, beyond the facility boundaries, through groundwater movement.

5.  To date, the responsible party has failed to delineate MTBE and/or TBA contamination in groundwater vertically, and additional investigation is required.

6.  Remediation performed to date has failed to effectively address on-site and/or off-site groundwater contamination, and has failed to prevent off-site migration of MTBE in groundwater.

7.  Additional on-site and/or off-site remediation of groundwater may be required to i) prevent additional migration of MTBE and/or TBA contamination through groundwater, ii) restore the groundwater resources managed by the OCWD, and iii) eliminate the threat to drinking water supplies.

8.  The OCWD will need to implement additional investigation and remediation activities at this facility to mitigate the ongoing threat to the drinking water resources managed by the OCWD.

9.  The absence of full plume delineation inhibits comprehensive estimates of the scope and cost of required remediation at this facility. At a minimum, however, the cost of additional investigation will be no less than $79,050. Unit costs for subsequent investigation activities have also been developed.

10. The scope and costs developed for investigation and remediation activities at G&M Oil #4 and ARCO 1905 can be used as a basis to reasonably estimate the scope and costs for the additional remediation required at this facility, once additional investigation has been performed.

## 1.3     Hydrogeologic Issues

- The nearest production well for which production data are available is HB-1, located 1,750 feet west and down-gradient from the facility. The well is screened from 258 to 297 feet bgs and is not believed to have a sanitary seal. This could allow contamination in the Semi-Perched Aquifer to enter the well (OCHCA 041970). Detections of nitrate (at 10.5 mg/l) and tetrachloroethene (PCE) (at 0.25 ug/l) in this well demonstrate its susceptibility to near surface anthropogenic sources of contamination, including MTBE. The OCHCA stated that the facility was considered a high priority case due to proximity of groundwater contamination to this drinking water supply well (RWQCB 032146).

# Exhibit 12

**Darol Dodd**

| | |
|---|---|
| **From:** | Hasemanjk@aol.com |
| **Sent:** | Thursday, May 06, 2010 11:54 AM |
| **To:** | Darol Dodd; toxpathmcc@bellsouth.net; hollyhouse@att.net; Susan Borghoff Forward |
| **Subject:** | Re: Statistics and pathology sections from draft MTBE 2-yr study report |

REVIEW OF THE STATISTICS AND PATHOLOGY REPORTS FOR THE MTBE RAT CARCINOGENICITY STUDY

GENERAL COMMENT

In my opinion, both the Statistics and Pathology Reports need some work. My main concerns are (i) the statistical methods used; (ii) the possible under-interpretation of the astrocytoma and nephropathy effects; (iii) not utilizing or even reporting the available historical control data for astrocytoma; and least importantly, (iv) the over- and mis-interpretation of the pituitary gland adenoma "effect". These matters are discussed in more detail below.

SPECIFIC COMMENTS

I. Analysis of Survival Data

I see no reason to combine the recovery and core groups together when analyzing survival. These groups are kept separate in the analysis of neoplastic and non-neoplastic lesions, and in my opinion, they should be kept separate for survival also. How can this inconsistency in statistical approach be justified ? A continuous lifetime MTBE exposure is NOT equivalent to a stop exposure.

The description of the various survival analyses given in the "Statistical Evaluations" section mentions ANOVA and Chi-square, but not the log rank test (the most appropriate analysis). The problem with an ANOVA is that survival times are clearly NOT normally distributed, being clustered primarily at one extreme value (the final survival time). The problem with a Chi-square test is that it does not take the actual survival time into account. A further problem with both methods is that neither analysis takes into account the dose-response nature of the data. In fact, even the log rank test as used in this study does not take the dose-response nature of the data into account, but I suppose that this is OK, given the lack of any survival effect.

I also see no reason to be selective about including some of the 6-month and 12-month toxicity animals in the survival analysis (those that died) and ignoring those animals that survived. ALL animals -- survivors and early deaths - contribute to the overall survival pattern, so I see no reason not to include them all.

In Figure 5, the x axis heading of "Column 2" is not very informative, and I suggest that it be replaced with "Days on Study" or something similar.

I agree with the conclusion that there is no survival effect in this study. This is potentially important, as it is one justification for the lack of a survival-adjusted test such as poly-3 when assessing the tumor data (discussed below).

II. Continuous Variables

The Statistical Report states that for continuous variables Duncan's test is used in some cases (the urinalysis data), and Dunnett's test is used in others (everything else). Both tests assume underlying normality. However, the different statistical approaches imply that for the urinalysis data (and only for the urinalysis data), study investigators are interested in making all possible pairwise comparisons, including dosed group vs. dosed group, while for the other variables, it is only desired to carry out dosed group vs. control comparisons. We did not discuss this matter at our meeting, so I am not sure why the urinalysis data is the only one for which dosed group vs. dosed group comparisons are needed, but someone should be prepared to answer this question should it come up. Otherwise, why not use a consistent statistical approach for all continuous variables?

I note also that none of the results of any of these statistical analyses of continuous variables are actually given in the report that I received. It seems odd to describe in great detail statistical methods used for hypothetical data that are not reported. Is the intent to add the results of these statistical analyses at a later time? I assume that it is.

III. Statistical Analysis of Incidence Data

5/6/2010

HAMNER - CONFIDENTIAL                                                    STUDY07001-25087

CONFIDENTIAL MATERIALS (per 2008 N.H. Superior Court Order)—FOR OUTSIDE COUNSEL ONLY



I recommend that the Statistical Report explain why only brain and kidney were subjected to a Cochran-Armitage trend test (reason: these were the only organs with complete histopathology for all dosed groups, and explain why). Otherwise, the selectivity of the statistical analysis may confuse the reader. The text also states that the Fisher's exact test was used "for all neoplasms except those from the brain and kidney". Why were Fisher's exact tests not used for these two target sites? Use of a trend test does not preclude the need for pairwise comparisons, which could be significant even in the absence of a significant overall trend.

At our meeting we mentioned the possible use of more rigorous survival-adjusted methods such as poly-3 tests as a supplemental analysis for any tumors showing borderline effects. The only such tumor in this study is astrocytoma in male rats (discussed below). This additional statistical analysis may be unnecessary at this point, but it would be something to consider for the future. The lack of any MTBE effect on survival can be used as the justification for not using survival-adjusted methods in the statistical analysis of the tumor data.

This study uses a two-sided test for assessing the tumor data, and, as I mentioned at our meeting, the NTP (and most other scientific organizations) use a one-sided test. Although I personally prefer one-sided tests (isn't this basically a carcinogenicity study?), I am not insisting on this, but I strongly recommend that you have a good reason to argue for the use of a two-sided test if the issue comes up. My first reaction was to recommend that this justification be given in the report itself, but since I frankly think there really is not a strong justification for a two-sided test, a better approach may just be to say nothing and hope that no one challenges this.

The justification for a two-sided test would be this: MTBE is regarded in the scientific community as a substance capable of either increasing or decreasing tumor incidence, and thus this study is being designed to evaluate both possibilities. Moreover, use of two-sided tests assumes that increases and decreases in tumor incidence will be evaluated evenhandedly in the statistical analysis. However, the actual interpretative process used in the MTBE study strongly suggests that this is not the case, and that tumor decreases are in fact not considered important (see discussion below).

At our meeting, I suggested using the FDA Draft Guidelines in the interpretative process for the tumor data in order to adjust for multiple comparisons. This suggestion was ignored, but this may be OK for now, since by the statistical tests applied (and the use of two-sided tests), none of the tumors achieved p<0.05 anyway. However, if the reviewers do not accept the value of two-sided tests, this may become an issue later, as discussed below. I note that a completely different multiple comparison adjustment approach was applied to the non-neoplastic kidney lesion data, and I have problems with this particular multiple comparisons adjustment, for reasons discussed at our meeting and repeated below.

IV. Kidney Lesions

The Bonferroni multiple comparison "correction" is ultra-conservative and its application to the non-neoplastic kidney data in this study is questionable. The justification for using such a "correction" is to adjust for the possibility that the lesions in question are capable of achieving statistical significance by chance. In this instance, for each kidney lesion evaluated, a minimum total incidence of three affected animals is required in order for the most extreme distribution possible among the dosed and control groups (0-0-0-3) to achieve statistical significance by chance. Most of the 26 non-neoplastic kidney lesions do not meet this standard.

For example, how is it conceptually possible for a lesion to achieve statistical significance if the incidence is ZERO in all groups? This occurred in male rats for a variety of non-neoplastic kidney lesions listed among the 26, including focal osseous metaplasia of the cortex, renal tubule eosinophilic droplets, mononuclear cell infiltrate, epithelial hyperplasia of the papilla, and tubular necrosis. Upon further inspection, only seven of the 26 nonneoplastic kidney lesions in male rats are even capable of achieving statistical significance by chance with the "worst case" distribution of lesions (focal fibrosis of the cortex, cyst, hydronephrosis, nephropathy, mineralization of the papilla, inflammation of the pelvis, and mineralization of the pelvis). So even if one wanted to use the ultra-conservative Bonferroni approach (and I certainly would not), then the proper correction factor is 7, not 26, producing an adjusted p value requirement of p<0.007 (i.e., 0.05/7).

Using this corrected (but still conservative) p<0.007 Bonferroni criterion, nephropathy in male rats shows a significant (two-sided p=0.003 according to the statistical report) dose-response trend (40/50–41/50–45/50–49/50). The increased incidence at the high dose is also reported to be significant (p=0.008). A similar, but less pronounced trend in nephropathy was seen in female rats (24/50-24/50-26/50-32/50). This nephropathy response is potentially important, as it might provide evidence to support the notion that the study shows some weak toxicity to suggest that an MTD was reached or nearly reached. Right now, both the Statistics Report (which ignores severity), and the Pathology Report (which ignores incidence) dismiss the nephropathy response as a non-effect. I would not be so quick to do this.

As noted above, the Statistics Report analyzes only incidence and ignores severity. The Pathology Report "eyeballs" the data based on tables of severity and concludes that both incidence and severity are unaffected. However, the increased incidence of nephropathy is clearly significant in male rats by a Cochran-Armitage trend test (even using a two-sided test that employs the conservative Bonferroni correction), and I feel very confident that a statistical analysis that appropriately take into account both

5/6/2010

HAMNER - CONFIDENTIAL                                STUDY07001-25088

·CONFIDENTIAL MATERIALS (per 2008 N.H. Superior Court Order)—FOR OUTSIDE COUNSEL ONLY

severity and incidence will conclude that there is MTBE effect on nephropathy, certainly for males, and possibly even for females. I also recommend that the Pathology Report include in its Tables 2 through 5 a row for "None" to show the incidence data as well as the severity data.

### V. Brain Astrocytoma

The brain tumor incidences in Tables B1-Incid. and B2-Incid. appear to be correct. However, in Table B-Stat all the footnotes are missing, and it should be made clear that the reported p values are for a trend test. I have confirmed that the (two-sided) p value of 0.065 is correct for male rat astrocytoma (Cochran-Armitage trend test)

There is one potentially major problem with astrocytoma that neither the Statistics nor Pathology reports currently address. Extensive historical control data are apparently now available for astrocytoma in male Wistar rats, and it appears to be a rare tumor. The background astrocytoma incidence in 50 studies for the historical control data provided to me is only 13/3696 or 0.35%, with a range of 0-3%. The MTBE male rat high dose astrocytoma rate of 8% is more than double the maximum control rate of astrocytoma ever seen in 50 previous studies! This is very troubling.

A simple Fisher's exact test comparing the top dose MTBE male rat astrocytoma rate (4/50) to this background rate (13/3696) produces a (two-sided) p value of 0.00006. How can one ignore such a strong statistical effect, given the rarity of this tumor? I understand from Gene that one possible reason for the low historical incidence may be that some of the astrocytomas in the historical control database could be misdiagnosed as granular cell tumors (which are reportedly more common: 57/3696), but even if this were true, it is very unlikely that such mis-diagnosis can be of sufficient magnitude to account for the strong statistical significance of the MTBE astrocytoma effect in male rats when historical control data are considered.

Shouldn't the historical control data for astrocytoma be mentioned in the Pathology or Statistics Reports (or both)? In most rodent bioassays that I have been involved with, this supplementary information (if available and reliable) is critical in the overall interpretation of the study. Why are these historical control data not being reported now that they are available? The only reason that I can see (and it may be perfectly legitimate) is that Gene or others with knowledge of the database have decided that these historical control data are just not appropriate reference data for the MTBE study for some reason. Is this indeed the case? If not, a reviewer will almost certainly ask about the availability of historical control data and its impact on the interpretation of the marginal increase in astrocytoma. What will the answer be then?

### VI. Other tumors



Reporting of the decreased incidence of pituitary adenoma of the pars intermedia in male rats needs some work, especially in the Pathology Report. The incidence was 6/50 in the control group vs. 0/60 in the top dose group. The intermediate dosed groups were not examined completely, apparently because this decrease was not considered biologically important.

This very fact speaks volumes and provides a strong argument against the use of two sided tests. As noted above, using a two-sided test assumes that tumor increases and decreases are treated evenhandedly. When a marginal increase in brain astrocytoma was observed in top dose male rats relative to controls (4/50 vs. 1/50, not even statistically significant), this difference was considered potentially important, so all brains in the two intermediate dosed groups were examined.

When an even stronger (and statistically significant) decreased tumor incidence was seen in the top dose male rats for pituitary gland adenoma of the pars intermedia (6/50 vs. 0/50), this significant effect was apparently dismissed, and no examinations of the intermediate dosed groups were requested. This inconsistent approach can only mean (unless I am missing something) that a decreased tumor incidence, even a statistically significant one, is really not considered that important relative to a non-significant increase in tumor incidence. This is hardly an evenhanded approach. Hence, the underlying philosophy used in the interpretation of the MTBE study clearly is consistent with the use of a one-tailed test and inconsistent with the use of a two-tailed test. A critic could easily point this out.

The Statistics Report notes that this "inverse correlation" was also seen in the "pars distalis location" for male rats, but this statement is incorrect, since the reported p value for these tumors is p=0.824, hardly significant, or even close to significant, and not consistent with the p=0.027 seen for the pars intermedia adenoma. The Pathology Report then compounds this problem by reporting two tables (Tables 10 and 11) of pituitary gland pars distalis adenoma incidence, in which the underlying p values range from p=.488 to p=.838 (clearly no effect). The Pathology Report then claims that these non-significant effects represent an "inverse correlation", apparently confusing them with the pars intermedia tumors. The true inverse correlation with pituitary pars intermedia adenoma is not mentioned in the Pathology Report. Thus, this report needs some work also (I have not examined this report in the same level of detail that I have in my review of the Statistics Report).

Tables 10 and 11 of the Pathology Report should be deleted for other reasons also. Since not all pituitary glands in the two intermediate dose groups were examined, it is misleading to list the number of tumors observed, without noting the incomplete histopathology for the mid and low dosed groups. Since these two tables will probably ultimately be deleted, I did not check all of the incidence numbers, but the few I did check revealed an error. In Table 10 for males, the number of tumors seen for the 3 mg/ml core group should be 2, not 0.

5/6/2010

CONFIDENTIAL MATERIALS (per 2008 N.H. Superior Court Order)—FOR OUTSIDE COUNSEL ONLY

I did not have the time or energy to check all of the p value entries in Table T-Stat, but the few I did check revealed some problems. Hemangioma (which by the way is a systemic tumor) of the mesenteric lymph node was reportedly analyzed in the male rat core group even though the overall incidence of this neoplasm was zero in all groups. All mammary gland fibroadenoma (single and multiple) should be analyzed together, as should single and multiple mammary gland adenocarcinoma. Similarly, single and multiple benign ovary tumors should be combined. I also recommend that for completeness, the statistical analysis of brain tumors be added to this table. I have no idea if the reported p values in this table are correct, but they seem reasonable, since the only tumors worthy of discussion and debate (brain and pituitary gland pars intermedia) were already discussed.

CONCLUSION

As I mentioned at our original meeting, the only tumor that concerns me is brain astrocytoma, and the historical data that we have received since that time (and not included in either report draft) increases my concern, and makes this marginal tumor increase even more difficult to dismiss. I am also concerned that the significant nephropathy effect in male rats is being ignored, as well as a similar but less pronounced nephropathy effect in females. I strongly suggest that these two issues (as well as the various statistical methodology concerns noted throughout my report) be revisited, addressed, and the Statistics and Pathology Reports be revised accordingly.

The bottom line is this: The various statistical methodology issues mentioned in this review are all correctable, and will have little or no impact on the interpretation of study results. If no one challenges the use of two-sided tests, the conclusion that the study is negative will probably be accepted, since none of the neoplasm increases are significant at the p<0.05 level. The only concern is the marginal increasing trend in astrocytoma in male rats, which is significant at the p<0.05 level if a one-sided test is used.

If reviewers insist on a one-sided test, then it could be argued that the study is still negative, since this marginal increase does not satisfy the FDA Guidelines for statistical significance, regardless of whether astrocytoma is considered to be a rare or common tumor (see earlier E Mails on this matter).

The last hurdle to overcome would then be the historical control data (which frankly is my main concern at this point). Bringing in the huge historical control database indicates that the 4/50 astrocytoma incidence seen in high dose males is extremely unlikely to be a chance occurrence. Thus, an argument would have no be given as to why the historical control data cannot be used in the interpretation of this study, and that justification is beyond the scope of this review.

The final potential problem, even if the study is accepted as "negative", is that the doses may have been too low to challenge the animals sufficiently. Where is the evidence that an MTD has been achieved (or nearly achieved)? Can it be argued that the 90 day study results would not have permitted the use of a higher dose? Or perhaps it could be argued that the increase in nephropathy (especially in males), which is now dismissed as a non-effect, could be reconsidered and could indicate a weak toxicity suggesting that the doses were adequate.

I will be happy to discuss this review with you at your convenience.

Joe Haseman
5-6-10

In a message dated 5/5/2010 11:51:22 A.M. Eastern Daylight Time, DDodd@thehamner.org writes:

MTBE Expert Advisory Group,

As discussed last Friday, I'm sending the statistics and pathology sections from the draft MTBE 2-year study report. Let me know how you want to coordinate responses (e-mail, phone, face-to-face). My thought is that when the full draft MTBE 2-year study report is sent to you for review, it will have addressed your comments in these sections. To avoid delivery complications due to file size, this e-mail will contain the stats/path sections from the Study Director's report and the Study Pathologist's report (without appendices except for cause of death table). A second e-mail will contain the pathology summary incidence table (SIT) for the male Core and Recovery groups. A third e-mail will contain the pathology SIT for the female Core and Recovery groups. -Darol

<<MTBE 2-year rpt_stats and histopath.doc>> <<MTBE 2-yr draft path rpt.pdf>>

Darol E. Dodd, PhD, DABT

5/6/2010

HAMNER - CONFIDENTIAL                                                 STUDY07001-25090

CONFIDENTIAL MATERIALS (per 2008 N.H. Superior Court Order)—FOR OUTSIDE COUNSEL ONLY

# Exhibit 13

bb052214

00001
```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2
       ***********************************
 3   IN RE:  METHYL TERTIARY BUTYL
     ETHER ("MTBE") PRODUCTS LIABILITY
 4   LITIGATION
 5   Master File No. 1:00-1898
     MDL 1358 (SAS) M21-88
 6
 7     ***********************************
 8   This Document Relates to:
 9   Commonwealth of Puerto Rico, et al.
     v.
10   Shell Oil Co., et al.,
     Case No. 07-CIV-10470 (SAS)
11
       ***********************************
12
13                VIDEOTAPED
14   DEPOSITION OF BARBARA D. BECK, PH.D., DABT
15
16              Thursday, May 22nd, 2014
17                    9:57 a.m.
18
19   Held At:
20           McDermott, Will & Emery, LLP
21           28 State Street
22           Boston, Massachusetts
23
24   REPORTED BY:
25   Maureen O'Connor Pollard, RPR, CLR, CSR #149108
```

00002
```
 1   FOR THE PLAINTIFF COMMONWEALTH OF PUERTO RICO:
 2        BY:  DUANE C. MILLER, ESQ.
 3             MILLER AXLINE & SAWYER
 4             1050 Fulton Avenue, Suite 100
 5             Sacramento, California 95825
 6             916-488-6688
 7             dmiller@toxictorts.com
 8
 9   FOR CHEVRON PUERTO RICO, LLC, and the CHEVRON
10   DEFENDANTS:
11        BY:  JEREMIAH J. ANDERSON, ESQ.
12             KING & SPALDING, LLP
13             1100 Louisiana, Suite 4000
14             Houston, Texas 77002-5213
15             713-276-7417
16             jjanderson@kslaw.com
17
18   FOR SHELL OIL COMPANY:
19        BY:  JOHN W. KAMPMAN, ESQ.
20             SEDGWICK LLP
21             2900 K Street, NW
22             Harbourside, Suite 500
23             Washington, DC 20007
24             202-204-1000
25             john.kampman@sedgwicklaw.com
```

00003
```
 1   APPEARANCES (Continued):
```
                                    Page 1

bb052214

11    A.   If you look under "Conclusions."
12    Q.   Okay.  Look what he says in the next
13 paragraph you didn't mention.  "The last hurdle
14 to overcome would then be the historical control
15 data (which frankly is my main concern at this
16 point).  Bringing in the huge historical control
17 database indicates that the four out of 50
18 astrocytoma incidence seen in high dose males is
19 extremely unlikely to be a chance occurrence."
20    Do you see that statement?
21    A.   Yes.
22    Q.   Is that one of his conclusions?
23    A.   His ultimate conclusion, I think, is
24 probably most accurately reflected in the Dodd
25 2013 publication where he's listed as having

00139

1 done the statistics, and they describe it as
2 marginally statistically significant.  At the
3 time that this e-mail was written, Dr. Haseman
4 had not yet been apprised, or the publication
5 had not yet been identified with a 0 to
6 8 percent range.
7    Q.   Have you ever talked to Dr. Joe
8 Haseman about the Hamner study?
9    A.   No.
10    Q.   Are you in any position to tell us
11 what he was thinking and when?
12    MR. KAMPMAN:  Objection.  Vague and
13 ambiguous, argumentative.
14    A.   I can only describe what he was
15 thinking based on what he stated here.  And then
16 clearly he must have concluded it was not a
17 positive finding based on his being listed as
18 this person who did the statistics in the final
19 publication.
20 BY MR. MILLER:
21    Q.   When Dr. Joe Haseman states in writing
22 here that the finding of astrocytoma found in
23 the high dose males, quote, is extremely
24 unlikely to be a chance occurrence, is that
25 consistent with your claim that there was only a

00140

1 marginal finding of statistical significance?
2    A.   It is not my claim that there was a
3 marginal statistical significance.  It is my
4 statement, and it is also the statement of the
5 authors of the peer-reviewed publication where
6 Dr. Haseman was the person who did the
7 statistics.
8    Q.   When you read the earlier quote and
9 you said statistically significant means you
10 have a p-value of less than .05, if you apply
11 that standard to a p-value of 0.0006, that's a
12 number that's roughly 1,000-fold lower than .05?
13    MR. KAMPMAN:  Objection.  Form,
14 argumentative.
15 BY MR. MILLER:
16    Q.   Correct?
17    A.   Anyone can do the math.  The question
18 is is this a meaningful statement regarding
19 statistical significance under "Brain
                                    Page 60

bb052214

20  Astrocytoma." I don't know exactly why
21  Dr. Haseman did this.
22        What I can tell you is when he did the
23  Fisher exact test in the peer-reviewed
24  publication, the p-value was .03 -- sorry, was
25  .181. And I can tell you what the conclusions

00141

1  were of that peer review publication, and I can
2  also point you to his final conclusion here that
3  this is a negative result.
4        Q.  To save doing math in front of a jury,
5  I'd appreciate a direct answer to my question.
6        Isn't it a fact that a p-value of
7  0.00006 is roughly 1,000-fold lower than .05?
8        MR. KAMPMAN:  Objection.  Asked and
9  answered, argumentative.
10       A.  One can do the math, and there's
11  approximately a 1,000-fold difference.  As I've
12  said, this .0006 is not a meaningful number.
13  BY MR. MILLER:
14       Q.  Another way of describing the number
15  you just mentioned with all the zeroes is that
16  if you did the study on MTBE 100,000 times,
17  that's taking the zeros after the decimal point,
18  you would expect to find six studies by chance
19  that were false positives?
20       MR. KAMPMAN:  Objection.  Form, vague
21  and ambiguous.
22       (witness reviewing document.)
23       A.  Can you repeat the question?
24       (Whereupon, the reporter read back the
25  pending question.)

00142

1  BY MR. MILLER:
2       Q.  That's what that number means,
3  0.00006.
4       A.  If it were a valid number.  It's not a
5  valid number, and that's clear from everything
6  else in this e-mail and the other publications.
7       Q.  In arriving at your opinions, you
8  disregarded the historical control data of 13
9  out of 3,968 and the European data of 11 out of
10  2,280, you did not use those, and you did not
11  perform statistics on those, correct?
12       MR. KAMPMAN:  Objection.  Vague and
13  ambiguous, argumentative, misstates the record.
14       A.  Both of these are from European
15  studies.  The data Gene sent is also from
16  Europe.  There's no statistics to be done with
17  these.  These are simply a description of
18  background rates, but not background rates per
19  study which would give you values more like 0 to
20  3 percent.  The control values are another piece
21  of the -- of information that one uses with
22  respect to interpreting the astrocytomas.  You
23  don't do statistics on these values.
24       Q.  Do the Europeans know how to count up
25  the number of controls and count up the number

00143

1  with astrocytomas and report the results
                    Page 61

# Exhibit 14





## QUENCHING A THIRST

Orange County is a semi-arid region that receives on average 13 inches of rain a year. This sun-drenched land is home to over 3,000,000 people. Already the third most populated county in California, Orange County's population is still on the rise. Its north and central regions are projected to grow by more than 300,000 people by 2035. Its need for clean, reliable water will grow as well.

The Orange County Water District (OCWD) currently serves 2.4 million residents in north and central Orange County. Each day its Groundwater Replenishment System (GWRS) provides enough new water for nearly 600,000 residents.

# THE GEOGRAPHY OF WATER



**MAJOR WATER CONVEYANCE FACILITIES IN CALIFORNIA**

LEGEND
FEDERAL AQUEDUCT
STATE AQUEDUCT
LOCAL AQUEDUCT

Two-thirds of California's population lives in Southern California where less than one-third of the State's precipitation falls. While other Southern California counties rely mostly on imported water supplies to meet their water needs, Orange County does not. A large percentage of its water supply is derived from a large groundwater basin. This groundwater basin underlies north and central Orange County. Extending from the Pacific Ocean to Yorba Linda, it holds over 40 million acre-feet (AF), (49 billion cubic meters) of water with an annual yield of nearly 300,000 AF (370 million cubic meters) of water and an operational capacity of roughly 700,000 AF (860 million cubic meters).

Since its establishment in 1933, OCWD has been monitoring groundwater levels in the basin. In the 1940s, its role shifted. Natural recharge could no longer offset groundwater extraction. As a result, OCWD launched a groundwater replenishment program. Monitoring efforts were soon accompanied by active management of groundwater levels in order to protect the basin.

Historically the main source of water for basin replenishment had been the Santa Ana River. Flowing west from the San Bernardino Mountains, the river winds through San Bernardino and Riverside Counties before reaching Orange County. At upstream locations water conservation and recycling occur. Between these activities and periodic drier weather patterns, water flows fluctuate from year to year.

To compensate for these fluctuations in replenishment water, OCWD began importing water from other sources, first the Colorado River and later, the Sacramento-San Joaquin River Delta. Approximately 30% of the water supplied to north and central Orange County is derived from these sources. Still, relying on these distant watersheds to quench our thirst and recharge groundwater poses several challenges. Importing water from distant sources is energy-intensive and expensive. Further, the Delta is an environmentally sensitive area that is home to water-dependent threatened and endangered species.

Water rights to the Colorado River are shared among seven states and Mexico, each facing population growth and reduced precipitation. At a time when our thirst is increasing, the river's flow is decreasing.

The GWRS has become an essential component in the provision of reliable water for Orange County.



GROUNDWATER REPLENISHMENT SYSTEM

## IN THE SPIRIT OF COLLABORATION

The GWRS is the result of a collaborative effort between OCWD and the Orange County Sanitation District (OCSD). Both sought solutions to issues they faced. In the mid 1990s OCWD needed to expand Water Factory 21 (WF 21) and address continued problems with seawater intrusion. At the same time, OCSD faced the challenge of having to build a second ocean outfall. The GWRS resolved these issues.

Both districts shared the cost of constructing the GWRS ($481 million US dollars). OCSD supplied OCWD with stringently controlled, secondary treated wastewater at no charge. OCWD in turn agreed to manage and fund the GWRS operations. Through this collaboration, the GWRS emerged as one of the most celebrated civil engineering and water reuse projects in the world.

The GWRS is the world's largest advanced water purification system for potable reuse. It takes treated wastewater that otherwise would be sent to the Pacific Ocean and purifies it using a three-step advanced process. Consisting of microfiltration, reverse osmosis, and ultraviolet light with hydrogen peroxide, this purification process produces high-quality water that exceeds all state and federal drinking water standards. This water is injected into a seawater barrier and pumped to recharge basins where it naturally percolates into the groundwater basin.

Operational since January 2008, the GWRS can produce 70 million gallons (MGD) (265,000- cubic meters) of high-purity water every day. By 2015 these figures are projected to increase to 100 MGD (378,000 cubic meters) when purification facilities are expanded and excess flow stored during the day is run through the GWRS at night. Ultimate capacity for the GWRS is projected at 130 MGD (492,000 cubic meters) after facilities are expanded further and more flows are rerouted from ocean discharge for reuse.



## THE SCOPE OF GWRS

Three components comprise the GWRS:

### The Advanced Water Purification Facility at OCWD headquarters in Fountain Valley

After receiving treated wastewater from OCSD, this facility further purifies the water through microfiltration, reverse osmosis, and ultraviolet light with hydrogen peroxide.

### Seawater Intrusion Barrier in Huntington Beach and Fountain Valley

Approximately 30 MGD (113,000 cubic meters) of the final product water is conveyed by the barrier pump station to injection wells along the Seawater Intrusion Barrier.

### Kraemer, Miller, and Miraloma Basins in Anaheim

The remaining final product water is conveyed by the product water pump station to the Kraemer, Miller, and Miraloma Recharge Basins.





# MICROFILTRATION



Following treatment at OCSD, secondary effluent passes through the microfiltration (MF) process operated by OCWD. The microfiltration process uses bundles of hollow polypropylene fibers to remove particulate contaminants from water. Under a vacuum, water is drawn through the fibers' minute pores, each approximately 0.2 microns in diameter, and suspended solids, protozoa, bacteria, and some viruses are strained out.

Microfiltration works most efficiently when turbidity in the feed water is between 3 to 5 Nephelometric Turbidity Units (NTU) and when feed pressure stays within the 3 to 12 pounds per square inch (PSI) range. To prevent higher pressure from building up, each MF cell undergoes a backwash every 22 minutes and a full chemical cleaning every 21 days. These operating procedures reduce energy costs (by reducing pressure) as well as improve process recovery (allowing more



*Microphotograph of a single microfiltration fiber*

feed water to be pulled through the MF membranes). Ongoing research continues to yield advances in membrane technology that further reduce energy needs and unit costs of production.







**REVERSE OSMOSIS**

carbon ensures both the efficient operation of the membranes and adherence to water quality requirements.

The use of RO to purify wastewater was pioneered at OCWD where it was first used at WF 21 which operated from 1976 to 2004. Data derived from decades of research demonstrate the reliability and effectiveness of this advanced purification process which has now become the standard for best available treatment.

The MF product water advances to the next step in the purification process, reverse osmosis (RO). This system uses envelopes of semi-permeable polyamide membranes rolled into bundles and encased in long pressure vessels. Pressurized microfiltered water enters at one end of each vessel and passes through the membrane to the inside of the envelope where purified product water is collected, exiting through the product water pipes. Left behind in the brine concentrate are unwanted components such as dissolved salts, organic chemicals, viruses, and pharmaceuticals. The product water emerges so pure that minerals have to be added back into the water to buffer and stabilize it prior to entering distribution pipes.

Close monitoring of two key features ensures efficient operation of the reverse osmosis process. The first is electrical conductivity (EC) which acts as a surrogate for measuring salts or total dissolved solids (TDS). The second is total organic carbon (TOC) used to monitor the removal of organics. Product water TOC is also closely monitored by the Regional Water Quality Control Board (RWQCB) and the California Department of Public Health.  Monitoring of influent and product water for both electrical conductivity and total organic



Feed

Feed/Brine Spacer

Concentrate

Product

Permeate Carrier

Active Membrane Layer



**ULTRAVIOLET LIGHT WITH HYDROGEN PEROXIDE AND LIME TREATMENT**

After purification with MF/RO, water is exposed to high intensity ultraviolet light (UV) with hydrogen peroxide ($H_2O_2$) to disinfect the water and destroy remaining low molecular weight organic compounds including those that must be removed to parts per trillion levels. This process ensures that unwanted biological materials and organic chemical compounds are effectively destroyed or removed.

At the end of the process, the pH of the finished product water is checked to make sure that it remains between pH 6 and 9. The reason this is done is to assure that the stabilized water is neither corrosive to pipes nor scale forming. The post RO process is required due to the addition of acid just prior to introduction into the RO stage. Sulfuric acid improves RO performance, but results in the buildup of excess carbon dioxide which drives down pH. The RO process itself also significantly reduces alkalinity through mineral ion removal. To stabilize the product water and increase pH, excess carbon dioxide is removed by air stripping.



Finally, calcium hydroxide (hydrated lime in powder form) is blended with water in a slurry mixing box. Cationic polymers are added to improve settling of any undissolved particles. This blend is added to the final product water to stabilize and buffer it, maintaining the targeted pH range in the distribution system.

 

## COASTAL BARRIER PROJECT

## INLAND SPREADING AND PERCOLATION BASINS



The Huntington Beach coast is home to a shallow aquifer and a geological feature known as the Talbert Gap. Here alluvial deposits of sand and gravel cross a fault barrier and create conditions conducive to seawater intrusion. When water is pumped from inland wells, seawater can migrate inland through the Talbert Gap to deeper aquifers, eventually reaching drinking water wells.

Knowledge of the vulnerability of the basin to seawater intrusion goes back over half a century. In 1965 OCWD began a pilot project to determine how to halt the flow of ocean water into the aquifers. Based on experience with other seawater barriers in Southern California, it was determined that water could be injected under pressure along the Talbert Gap through a line of injection wells. This would create a hydraulic barrier to push the intruding seawater back toward the ocean.

Because of the critical importance of maintaining a protection barrier, a 100% dependable supply of water was sought. After years of pilot testing, WF21 was built to provide a safe and dependable supply of injection water from wastewater. Decades of monitoring data have shown both the effectiveness and safety of using advanced purification processes to produce utra-pure water for injection into the Talbert Barrier.

One of the principal methods for recharging groundwater involves supplying source water to OCWD's spreading basins in Anaheim. Water sources for recharge include GWRS recycled water, imported water from the State Water Project and Colorado River, and both base flow and captured storm water in the Santa Ana River. Three of these basins, Kraemer, Miller, and Miraloma, are used primarily for recharging GWRS water. Kraemer Basin consists of 31 acres (12 hectares) and has an average annual recharge volume of 35,000 AFY (11 billion gallons per year; 43 million cubic meters per year). Miller Basin is 25 acres (10 hectares) with an average annual recharge volume of 19,000 AFY (6 billion gallons per year; 23.4 million cubic meters per year). The District's newest basin, Miraloma Basin, is 13.2 acres (5 hectares) and percolates at an exceptional rate. It is estimated to recharge 10,000 acre-feet of water into the groundwater basin annually (3.25 billion gallons per year; 12 million cubic meters per year). Percolation rates with cleaner sources of water, such as GWRS and imported water, are approximately double the rates achieved with Santa Ana River water. This is because Santa Ana River water contains suspended solids, typically comprised of inorganic silts and clays that clog the basin surface.

GWRS water is conveyed to these basins through a 13-mile (20 kilometers) long pipeline that runs through the cities of Fountain Valley, Santa Ana, Orange, and Anaheim. Five feet (1.5 meters) in diameter at its end point, this pipeline is capable of delivering over 80 million gallons (302,000 cubic meters) of purified water to the basins each day. Turnouts in the pipeline could accommodate direct injection in the future.

*Cross section of an injection well*







## PROJECT COSTS AND BENEFITS

## ENSURING WATER QUALITY

The GWRS offers the following range of benefits:

- Provides a reliable supply of high-purity, near-distilled quality water even during drought

- Offers a more cost-effective and energy-efficient strategy than importing water from distant sources (uses half the energy required to import water and one-third the energy required to desalinate seawater)

- Provides a measure of protection from variations in the availability of imported water supplies

- Creates a hydraulic barrier that prevents seawater intrusion into drinking water wells

- Recharges groundwater supplies and minimizes overdraft

- Improves water quality in the basin

- Reduces the volume of wastewater discharged into the ocean and puts it to beneficial use

- Reduces the region's need for imported water

- Produces water at a unit cost of $478/AF with subsidies and $850/AF without subsidies—each less than the cost of imported water

OCWD maintains a vast network of monitoring wells within the groundwater basin, with concentrated monitoring along the seawater barrier and near the spreading basins. A number of GWRS-related monitoring wells have been added in the vicinity of the Kraemer and Miller basins to determine water levels and collect comprehensive water quality data. In addition to ensuring the protection of water quality, these wells can also be used to determine travel time from spreading basins to production wells.

Because of the long history of using advanced purified water at the coastal barrier, OCWD is able to use 100% GWRS water for injection into the barrier without blending with imported water or other sources as required for other barrier projects in Southern California. At the spreading basins blending is required and the blend of GWRS water to other water is 75%, with the balance of diluent water coming from Santa Ana River stormflows and occasional purchases of imported water.

The RWQCB permit requires adherence to rigorous product water quality specifications, extensive groundwater monitoring, buffer zones near recharge operations, reporting requirements, and a detailed treatment plant operation, maintenance, and monitoring program.

## WATER QUALITY

| Parameter Name | Units | QI | MFF | MFE | ROF | ROP | UVP | FPW | Permit Limit |
|---|---|---|---|---|---|---|---|---|---|
| Electrical Conductivity | umhos/cm | 1,502.83 | 1,590.53¹ | 1,530.00 | 1,607.867¹ | 37.03¹ | 51.47 | 79.89¹ | 900 |
| Total Dissolved Solids | mg/L | 955.19 | na | na | 964.17 | 21.96 | 22.53 | 43.24 | 500² |
| Suspended Solids | mg/L | 7.32 | 8.46 | <1 | na | na | na | na | N/A |
| Turbidity | NTU | 2.27 | 3.242¹ | 0.105¹ | 0.118¹ | 0.03¹ | na | 0.070¹ | ≤0.2 / ≤0.5 |
| Ultraviolet percent transmittance @254nm | % | na | na | 69.38 | na | 98.4¹ | na | na | >90 |
| pH | UNITS | 7.45 | 7.26¹ | 7.51 | 6.70¹ | 5.48¹ | 5.71 | 7.64¹ | 6 - 9 |
| Total Hardness (as CaCO3) | mg/L | 312.75 | na | na | 305.67 | <1 | <1 | 21.42 | 240² |
| Calcium | mg/L | 78.69 | na | na | 77.57 | 0.02 | 0.03 | 8.73 | N/A |
| Magnesium | mg/L | 28.23 | na | na | 27.18 | <0.1 | <0.1 | <0.1 | N/A |
| Sodium | mg/L | 203.33 | na | na | 188.75 | 6.53 | 6.72 | 6.50 | 45 |
| Potassium | mg/L | 16.80 | na | na | 16.63 | 0.41 | na | 0.42 | 0.38 | N/A |
| Bromide | mg/L | na | na | na | na | na | na | <0.1 | N/A |
| Chloride | mg/L | 230.33 | na | na | 215.75 | 4.56 | 5.23 | 5.23 | 55 |
| Sulfate | mg/L | 213.00 | na | na | 238.08 | 0.27 | 0.10 | 0.33 | 100 |
| Hydrogen Peroxide | mg/L | na | na | na | na | na | 2.40 | 2.29 | N/A |
| Bicarbonate (as CaCO3) | mg/L | na | na | na | 136.50 | 7.88 | 5.77 | 26.25 | N/A |
| Nitrate Nitrogen | mg/L | 9.21 | na | na | 9.28 | 0.95 | 1.07 | 0.99 | 3² |
| Nitrite Nitrogen | mg/L | 0.52 | na | na | 0.15 | <0.002 | 0.001 | 0.03 | 1² |
| Ammonia Nitrogen | mg/L | 2.36 | na | na | 2.84 | 0.45 | na | 0.33 | N/A |
| Organic Nitrogen | mg/L | 0.73 | na | na | 0.40 | 0.01 | na | 0.02 | N/A |
| Total Nitrogen | mg/L | 12.35 | na | na | 12.65 | na | na | 1.36 | 5² |
| Phosphate Phosphorus (orthophosphate) | mg/L | 0.32 | na | na | na | na | na | <0.01 | N/A |
| Iron | ug/L | 276.00 | na | na | 91.38 | 0.83 | 0.70 | 0.65 | 300 |
| Manganese | ug/L | 34.22 | na | na | 32.19 | 0.33 | 0.70 | <1 | 50 |
| Aluminum | ug/L | 11.87 | na | na | 6.99 | 1.06 | 1.44 | 2.60 | 200² |
| Arsenic | ug/L | 0.18 | na | na | 0.31 | <1 | <1 | <1 | 10 |
| Barium | ug/L | 29.66 | na | na | 27.08 | <1 | <1 | <1 | 1,000 |
| Boron | mg/L | 0.37 | na | na | 0.37 | 0.23 | 0.23 | 0.22 | N/A |
| Cadmium | ug/L | <1 | na | na | <1 | <1 | <1 | <1 | 5 |
| Chromium | ug/L | 0.34 | na | na | <1 | <1 | <1 | <1 | 50 |
| Copper | ug/L | 4.14 | na | na | 15.37 | 0.65 | 0.55 | <1 | 1,000² |
| Cyanide | ug/L | 0.91 | na | na | <5 | <5 | na | <5 | 150 |
| Fluoride | ug/L | 0.93 | na | na | na | na | na | <0.1 | 2 |
| Lead | ug/L | <1 | na | na | 8.71 | <1 | <1 | <1 | 15 |
| Mercury | ug/L | 0.16 | na | na | 0.17 | <0.1 | <0.1 | <0.1 | 2 |
| Nickel | ug/L | 5.00 | na | na | 4.65 | 0.18 | <1 | <1 | 100 |
| Perchlorate | ug/L | na | na | na | na | na | na | <2.5 | 6 |
| Selenium | ug/L | 1.60 | na | na | 1.58 | <1 | <1 | <1 | 50 |
| Silica | mg/L | 21.21 | na | na | 23.08 | <1 | 0.74 | 0.40 | N/A |
| Silver | ug/L | <1 | na | na | <1 | <1 | <1 | <1 | 100 |
| Zinc | ug/L | 23.10 | na | na | 60.20 | 0.27 | 0.19 | <1 | 5,000 |
| N-nitrosodimethylamine | ng/L | 11.95 | na | na | na | na | 0.24 | 0.66 | N/A |
| 1,4-Dioxane | ug/L | 3.47 | na | na | na | na | <1 | <1 | N/A |
| Total Trihalomethanes | ug/L | na | na | na | na | na | na | 0.70 | 80 |
| Dibromoacetic Acid | ug/L | na | na | na | na | na | na | <1 | 60:total HAA5 |
| Dichloroacetic Acid | ug/L | na | na | na | na | na | na | <1 | 60:total HAA5 |
| Monobromoacetic Acid | ug/L | na | na | na | na | na | na | <1 | 60:total HAA5 |
| Monochloroacetic Acid | ug/L | na | na | na | na | na | na | <1 | 60:total HAA5 |
| Trichloroacetic Acid | ug/L | na | na | na | na | na | na | <1 | 60:total HAA5 |
| Apparent Color (unfiltered) | UNITS | na | na | na | 25.92 | 0.53 | na | <3 | 15 |
| Total Organic Carbon (unfiltered) | mg/L | 9.96 | 10.25 | na | 8.17 | 0.15 | 0.20 | 0.16 | 0.5² |
| Surfactants (MBAS) | mg/L | 0.23 | na | na | 0.25 | <0.02 | na | <0.02 | 0.5 |
| Total Coliform (Mult. Tube Fermentation) | MPN/100 mL | 335,657 | 2,936 | <2 | na | <2 | <2 | <2 | 2.2 |
| Fecal Coliform (Mult. Tube Fermentation) | MPN/100 mL | 108,771 | 391 | <2 | na | <2 | <2 | <2 | N/A |

BGT note: ROP Aluminum = 5.16 ug/L in 2011. It was <1 ug/L in 2010.
We deleted the Al grab sample WQ result on 11/15 because it was extremely high (50.2 ug/L).
Without the 50.2 ug/L the average was 1.06 ug/L.
20110225-Revised permit limit for Boron from NL to N/A.
20110422-Confirmed high ROF lead value of 31.9 ug/L on 8/16/10. This makes the average higher than last year.
Reason is unknown. (Lead in 2009 was <1 ug/L)
20110520-added perchlorate
20110422-Confirmed high ROF zinc value ug/L on 8/16/10. This makes the average higher than last year.
Reason is unknown. (Average 2010 zinc is 2x 2009 zinc level)
20110325-Revised permit limits for NDMA and 1,4-dioxane from NL to N/A
20110325 - Added "MBAS"

| QI | Secondary Effluent (AWPF Influent) |
|---|---|
| MFF | Microfiltration Feed |
| MFE | Microfiltration Effluent |
| na | Not analyzed |
| ROP | Reverse Osmosis Product |
| UVP | Ultraviolet UV/AOP Product |
| FPW | Finished Product Water |
| N/A | Not applicable |
| ¹On-line average | |
| ²See Appendix A for more information | |






OVERVIEW OF RESEARCH

**O**CWD has a long history of supporting research on both the technical and water quality aspects of water purification. Searching for a reliable source of injection water in the 1970s, it sponsored innovative pilot projects to study advanced methods for treating wastewater. OCWD realized that research was integral to its goal of becoming a leader in water recycling and reuse. A "testing facility" was built where new technologies could be installed and evaluated on a pilot basis. This test facility prompted the need for additional water analyses, leading to expansion of the water quality laboratory. Full-time research scientists soon thereafter joined the staff at OCWD to tackle challenges associated with emerging water treatment technologies.

Early on one of the major problems that had prevented use of reverse osmosis for treating wastewater was biofouling of the membranes. Biofilms greatly increased operating costs, requiring continual cleaning and higher operating pressures. Working in close association with the academic community, OCWD scientists developed an intensive research program that ultimately generated cost-effective solutions. This research also gave OCWD a worldwide reputation for supporting a culture of innovation that exists to this day. This professionalism, combined with increasingly sophisticated water analyses, provided the confidence needed by the health and regulatory community and the general public to allow OCWD to continually push the frontiers of water recycling.

GWRS is the ultimate expression of OCWD's long-term goal of developing a dependable water supply from a resource that formerly was wasted to the ocean. Research remains an integral part of water resource development at OCWD, and the testing facility continues to evaluate new membranes and processes. OCWD's state-certified Advanced Water Quality Assurance Laboratory has gained a reputation as one of the premier water quality laboratories in the world.







## RIPPLE EFFECTS

## THE INDEPENDENT ADVISORY PANEL



The GWRS has its roots in WF 21, OCWD's original flagship treatment plant. Established in 1976, WF 21 was an innovative plant built to produce high quality supplemental water supplies for Orange County. Its facilities included a 15 MGD (56,000 m3/day) advanced water purification plant that provided lime clarification, ammonia stripping, recarbonation, multimedia filtration, granular activated carbon (GAC) adsorption, and chlorination of secondary effluent received from OCSD. By 1977 it also included a 5 MGD reverse osmosis demineralization plant to reduce total dissolved solids. WF-21 was the first plant in the world to use RO to purify wastewater to drinking water standards. The GAC-treated water and RO-treated water were blended with deep well water and injected into a series of injection wells to create a hydraulic barrier and prevent seawater intrusion, as well as augment groundwater supplies. In response to new water quality issues in 2000, WF-21 subsequently used only RO treated water combined with deep well water for injection into the barrier.

The original WF 21 ceased operations in 2004. At that time Interim Water Factory 21 (IWF-21) began operations for two years while the GWRS was being built. In addition to continuing the seawater intrusion prevention effort, IWF-21 served as a training facility, enabling staff to become familiar with the treatment processes they would operate at the GWRS facility. IWF-21 modified the existing WF-21 facilities and introduced new treatment processes that included microfiltration and low pressure-high intensity ultraviolet light with hydrogen peroxide to create an advanced oxidation process. The new processes, together with the existing RO system—now retrofitted with thin film composite polyamide membranes—resulted in increased energy efficiency and more effective removal of contaminants. The addition of hydrogen peroxide upstream of the UV light enhanced the oxidation process and enabled the destruction of resistant contaminants. IWF-21 also retained the original chlorination system to prevent biofouling of injection wells. Interim Water Factory 21 ceased operations in 2006. Until the GWRS facility was completed in 2008, OCWD used potable water from imported sources and the City of Fountain Valley for injection into the Talbert Barrier.

In addition to reports generated by OCWD's research department and water quality laboratory and the Annual GWRS report prepared by a diplomate of the American Academy of Environmental Engineering, reports produced by an Independent Advisory Panel (IAP) document on-going scientific peer review. The IAP analyzes data in OCWD's Annual GWRS Report of plant operations as well as water quality data collected throughout the groundwater basin. The IAP is appointed and administered by the prestigious National Water Research Institute to provide credible, objective review of all aspects of GWRS by scientific and engineering experts from around the world. Although the IAP reports are scientific and technical in nature, and written mainly for the health and regulatory community, they are available for review by any interested party. In addition to formal written reports, the IAP also offers suggestions for enhanced monitoring of water quality and for improving the efficiency of current GWRS technologies and for evaluation of future projects associated with the GWRS.




# HONORING GWRS

The internationally renowned GWRS is the largest advanced water purification facility of its kind in the world. It has garnered more than 35 awards. Below are some award highlights:


*Courtesy of SIWA*

- 2008 Stockholm Industry Water Award, the highest international honor given to a water project




- American Society of Civil Engineers 2009 Outstanding Civil Engineering Achievement Award, the highest national honor bestowed upon engineering projects

- 2012 American Water Works Association and American Membrane Technology Association "Membrane Facility of the Year" Award

- 2009 International Ultraviolet Association UV Engineering Project of the Year Award

- United States Environmental Protection Agency Clean Water State Revolving Fund 2009 PISCES Award

- 2009 Säid Khoury Award for Engineering Construction Excellence, bestowed upon four engineers associated with the GWRS

- 2008 Toshiba Green Innovation Award

- Orange County Coastkeeper 2008 Coastal Preservation Award

- WateReuse Association 2008 Water Recycling Agency of the Year Award

- Global Water Intelligence Award of Distinction, 2008 Water Project of the Year

- Groundwater Resources Association of California 2008 Kevin J. Neese Award

- Public Relations Society of America, Orange County Chapter (OCPRSA) 2007 Protos Award for GWRS Communications Outreach

- 2006 Silver Anvil Award, Public Relations Society of America for Excellence in Community Relations Government Award

## ORANGE COUNTY WATER DISTRICT BOARD OF DIRECTORS

Shawn Dewane
*President*

Cathy Green
*First Vice President*

Roger C. Yoh, P.E.
*Second Vice President*

Philip L. Anthony

Kathryn L. Barr

Denis R. Bilodeau, P.E.

Vincent Sarmiento, ESQ.

Stephen R. Sheldon

Harry Sidhu, P.E.

Bruce Whitaker

Michael R. Markus, P.E., D.WRE
*General Manager*





GROUNDWATER REPLENISHMENT SYSTEM

18700 Ward Street  |  Fountain Valley, CA 92708
Phone: 714.378.3200 |  Fax: 714.963.0291

**www.gwrsystem.com**





# Exhibit 15

# Orange County Water District



# FINAL DRAFT

## Budget Report
## FY 2015-2016

# WATER PURCHASE

The proposed FY 2015-16 water budget is $35.6 million and it calls for the purchase of 55,000 acre-feet of Metropolitan Water District (MWD) untreated full service water to help support the recommended 70% Basin Production Percentage (BPP). Groundwater production will be increased by 55,000 acre-feet to match these purchases. Additionally the District has committed to MWDOC to purchase on average 65,000 acre-feet per year of untreated full service water for the next ten years.

By purchasing this water and recharging it into the groundwater basin, the Groundwater Producers avoid paying for treated MWD full service water which currently cost $923/acre-foot. The MWD treatment surcharge is currently $341/acre-foot. The Producers do incur about an $80/acre-foot variable energy and O&M cost to pump this water out of the ground. However, there is an overall $261/acre-foot savings ($923 - $582 - $80) to the service territory.

The District had $11.8 million in the water reserve fund at the start of FY2014-15 and this amount is expected to decrease to zero due to additional authorized water purchases by the Board.

The groundwater basin accumulated overdraft is projected to be approximately 416,000 acre-feet on June 30, 2015. This projection increases to 432,000 acre-feet after excluding the 16,000 acre-feet of water in the MWD conjunctive use program storage account. The overdraft is 291,000 acre-feet from the District's target accumulated overdraft of 125,000 acre-feet. The general maximum desired balance in the water reserve fund is to have sufficient funding available to be able to purchase 50% of the water needed from MWD to refill the groundwater basin to the 125,000 acre-foot target. This amounts to 145,500 acre-feet (291,000 acre-feet x 50%) which is estimated to cost $97.2 million using the MWD untreated full service rate.

| | | |
|---|---|---|
| Estimated June 30, 2015 Accumulated Overdraft | | 416,000 af |
| OCWD Target Accumulated Overdraft | | 125,000 af |
| | Difference | 291,000 af |
| | 50% of Difference | 145,500 af |
| 2015-16 MWD untreated full service rate including $80/af for RTS and Capacity Charge (588+80) | | $667.5/af |
| Necessary water fund balance to purchase 145,500 af of water ($668/af x 145,500af) | | $97.2 million |
| Estimated June 30, 2015 Water Reserve Fund Balance | | $0 Million |

# Exhibit 16

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7|16|14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

This document relates to:

*Orange County Water District v. Unocal Corp., et al.,*
No. 04. Civ. 4968 (SAS)

ORDER
Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

## CASE MANAGEMENT ORDER #116
(Trial Sites and Dismissed Sites)

On May 6, 2003, Plaintiff Orange County Water District ("OCWD") filed its Complaint against Defendants Unocal Corporation, individually and formerly known as Union Oil Company of California; Tosco Corporation; ConocoPhillips Company; Chevron U.S.A. Inc.; ChevronTexaco Corporation; Texaco Refining & Marketing, Inc.; Equilon Enterprises, LLC; Shell Oil Company; Exxon Mobil Corporation; Mobil Corporation; Ultramar Inc.; Valero Refining Company – California; Valero Marketing and Supply Company; Atlantic Richfield Company; BP Products North America, Inc.; Lyondell Chemical Company, individually and formerly known as Arco Chemical Company; G&M Oil Company, Inc.; 7-Eleven, Inc.; USA Gasoline Corporation; and Does 1-600 inclusive, in Orange County Superior Court, alleging that Defendants were liable for contaminating Orange County Water District's drinking water supplies with MTBE and TBA. The Complaint was subsequently amended to add Defendants and correct Defendants' names.

The case was removed to federal court and transferred to this court, where discovery and pretrial matters have been proceeding. The parties have completed all discovery related to the stations previously identified by the parties as focus plume stations. Based upon the stations

listed on the matrix attached as Exhibit A ("Focus Plume Stations") and the stipulation of the parties attached as Exhibit B ("Stipulation"), this Case Management Order identifies the stations and Defendants at each station against whom OCWD will assert causes of action at the focus plume trial and the causes of action that will be asserted. Defendants do not stipulate to the validity and/or viability of any claims or as to any station names referenced in Exhibit A. Plaintiff does not stipulate to any lack of validity of its claims at stations or against defendants dropped from the matrix.

After considering the foregoing, the revised Focus Plume Station matrix attached hereto as Exhibit A, the Stipulation as to Defendants' ownership, operation, and/or gasoline supply relationships with the Focus Plume Stations attached hereto as Exhibit B and the arguments of counsel, it is hereby **ORDERED** that:

Plaintiff may assert claims at the Focus Plume Stations only against the Defendant(s) identified for each station in the Focus Plume Station matrix attached hereto as Exhibit A and only for the causes of action identified at each station in the Focus Plume Station matrix. The Focus Plume Station matrix may be modified to delete stations and/or Defendants as to each station, but cannot be revised to add stations and/or Defendants to a station at which they are not currently listed. Claims with regard to "focus plume" stations previously identified on the April 14, 2014, matrix in this case but not identified on Exhibit A and claims against defendants at Focus Plume Stations where the defendant is not identified in the station matrix attached hereto as Exhibit A are dismissed with prejudice. This Order does not address or apply to claims that were the subject of the Court's November 16, 2009, Opinion and Order on the statute of limitations. This Order does not address or apply to claims at any stations other than the Focus

Plume Stations listed on Exhibit A and focus plume stations previously identified on the

April 14, 2014, matrix in this case.

The Stipulation may be read to a jury to the extent indicated in Exhibit B.

SO ORDERED:

The Honorable Shira A. Scheindlin

7/15/14

**EXHIBIT A**

## Orange County Water District v. Unocal Corp., et al.
### Service Station Matrix

## EXHIBIT A

*Orange County Water District v. Unocal Corp., et al.*
Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---|---|---|---|
| 1 | Arco #1887<br>16742 Beach Boulevard, Huntington Beach | Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>*Valero Defendants*[1] |
| 1 | G&M #4<br>16990 Beach Boulevard, Huntington Beach | Nuisance<br>OCWD Act<br>Declaratory Relief | Chevron U.S.A. Inc.<br>G&M Oil<br>Lyondell<br>Tesoro<br>*Valero Defendants* |
| 1 | Texaco #8520/Texaco #121608<br>8520 Warner Avenue, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | Texaco<br>Equilon<br>Lyondell<br>Tesoro<br>*Valero Defendants* |
| 1 | Unocal #5376<br>8971 Warner Avenue, Huntington Beach | Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil<br>Lyondell<br>Tesoro<br>*Valero Defendants* |

-5-

[1] Valero Defendants include Valero Marketing and Supply, Inc., Valero Refining Company–California, and Ultramar, Inc.

# EXHIBIT A

*Orange County Water District v. Unocal Corp., et al.*

Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---|---|---|---|
| 1 | Exxon #4283/Chevron #208552<br>8980 Warner Avenue, Fountain Valley | Strict Products<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Exxon Mobil Corporation (Nuisance, OCWD Act and Declaratory Relief only)<br>Chevron U.S.A. Inc.<br>Lyondell<br>Valero Defendants |
| 1 | Mobil #18-G6B<br>9024 Warner Avenue, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | ExxonMobil Oil Corporation<br>Lyondell<br>Valero Defendants |
| 1 | Texaco #121681<br>9475 Warner Avenue, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | Texaco<br>Equilon<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 1 | Unocal #5399<br>9525 Warner Avenue, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 2 | Mobil #18-HDR<br>3195 Harbor Boulevard, Costa Mesa | Nuisance<br>OCWD Act<br>Declaratory Relief | ExxonMobil Oil Corporation<br>Lyondell<br>Valero Defendants |

-6-

## EXHIBIT A

### *Orange County Water District v. Unocal Corp., et al.*
### Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---|---|---|---|
| 2 | Arco #6131<br>3201 Harbor Boulevard, Costa Mesa | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 2 | Mobil #18-JMY<br>3470 Fairview Road, Costa Mesa | Nuisance<br>OCWD Act<br>Declaratory Relief | ExxonMobil Oil Corporation<br>Lyondell<br>Valero Defendants |
| 3 | Arco #1912<br>18480 Brookhurst Street, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 3 | Thrifty #383<br>18520 Brookhurst Street, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief<br>Strict Liability<br>Negligence | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 3 | Arco #1905<br>18025 Magnolia Street, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |

-7-

Case 8:03-cv-01742-CJC-AN Document 974-1 Filed 05/09/16 Page 421 of 499 Page ID #:2193

# EXHIBIT A

*Orange County Water District v. Unocal Corp., et al.*
Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---|---|---|---|
| 3 | Beacon Bay Car Wash FV<br>10035 Ellis Avenue, Fountain Valley | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil (Nuisance, OCWD Act and Declaratory Relief only)<br>Texaco<br>Equilon<br>Lyondell<br>Valero Defendants |
| 8 | Mobil #18-HEP<br>2921 South Bristol Street, Santa Ana | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | ExxonMobil Oil Corporation<br>Lyondell<br>Valero Defendants |
| 8 | G&M #24<br>3301 Bristol Street, Santa Ana | Nuisance<br>OCWD Act<br>Declaratory Relief | Texaco<br>Chevron U.S.A. Inc.<br>G&M Oil<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 8 | Arco #3085<br>3361 South Bristol Street, Santa Ana | Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |

-8-

EXHIBIT A

*Orange County Water District v. Unocal Corp., et al.*

Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---------|------------------------|------------------|--------------|
| 8 | Chevron #1921<br>3801 South Bristol Street, Santa Ana | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Chevron U.S.A. Inc.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 8 | Beacon Bay Car Wash SA<br>1501 West MacArthur Boulevard, Santa Ana | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil (Nuisance, OCWD Act and Declaratory Relief only)<br>Texaco<br>Equilon<br>Lyondell |
| 9 | Huntington Beach Arco<br>6002 Bolsa Avenue, Huntington Beach | Nuisance<br>OCWD Act<br>Declaratory Relief | Texaco<br>B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 9 | Unocal #5123<br>14972 Springdale Street, Huntington Beach | Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 9 | Westminster Shell<br>5981 Westminster Avenue, Westminster | Nuisance<br>OCWD Act<br>Declaratory Relief | Shell<br>Equilon<br>Lyondell<br>Tesoro<br>Valero Defendants |

# EXHIBIT A

## *Orange County Water District v. Unocal Corp., et al.*
### Service Station Matrix

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---|---|---|---|
| 9 | Chevron #9-5401<br>5992 Westminster Boulevard, Westminster | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Chevron U.S.A. Inc.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 9 | Thrifty #368<br>6311 Westminster Boulevard, Westminster | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 9 | Unocal #5226<br>6322 Westminster Avenue, Westminster | Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil<br>ConocoPhillips Defendants[2]<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 30 | Unocal #5792/ConocoPhillips #5792<br>4002 Ball Road, Cypress | Nuisance<br>OCWD Act<br>Declaratory Relief | Union Oil<br>ConocoPhillips Defendants<br>Lyondell<br>Tesoro<br>Valero Defendants |

[2] ConocoPhillips Defendants include ConocoPhillips Company and Tosco.

EXHIBIT A

*Orange County Water District v. Unocal Corp., et al.*

*Service Station Matrix*

| Plume # | Station Name & Address | Causes of Action | Defendant(s) |
|---------|------------------------|------------------|--------------|
| 63 | Arco #6036<br>13142 Goldenwest Street, Westminister | Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 72 | Chevron #9-5568<br>12541 Seal Beach Boulevard, Seal Beach | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | Chevron U.S.A. Inc.<br>Lyondell<br>Tesoro<br>Valero Defendants |
| 92 | Mobil #18-668<br>16230 Harbor Boulevard, Fountain Valley | Nuisance<br>OCWD Act<br>Declaratory Relief | ExxonMobil Oil Corporation<br>Lyondell<br>Valero Defendants |
| 127 | World Oil #39<br>3450 West Ball Road, Anaheim | Strict Liability<br>Negligence<br>Nuisance<br>OCWD Act<br>Declaratory Relief | B.P.<br>Exxon (Nuisance, OWCD Act and Declaratory Relief only)<br>Lyondell<br>Valero Defendants |

-11-

## EXHIBIT B

## THIS SECTION IS NOT TO BE READ TO OR PROVIDED TO THE JURY

OCWD alleges claims on a joint and several basis at each of the stations listed on Exhibit A. To streamline the case for dispositive motions and trial, each individual Defendant listed below makes the following stipulations as to certain Focus Plume Stations, including stipulations with respect to supply of MTBE gasoline to those stations. By entering into this stipulation, Defendants do not stipulate to the validity of any claims. By entering into this stipulation, Plaintiff does not stipulate to the validity of any defenses.

The parties agree and stipulate that nothing in this stipulation shall be construed as a waiver of OCWD's right to challenge on appeal the Court's November 16, 2009, Opinion and Order on the statute of limitations with respect to any and all stations and defendants that were the subject of that Opinion and Order. If the Court's November 16, 2009, Opinion and Order on the statute of limitations is overturned on appeal, the parties further agree and stipulate that nothing in this stipulation shall be construed as a waiver of OCWD's right to pursue negligence, strict liability and permanent nuisance claims with respect to all stations that were the subject of the Opinion and Order against those Defendants named at each such station in Exhibit A. The parties further agree and stipulate that nothing in this stipulation applies to, nor shall the stipulation be construed to apply to, claims at any stations other than the Focus Plume Stations as set forth below or previously listed "focus plume" stations not on Exhibit A.

Defendants dispute and deny the claims asserted at all stations. Plaintiff disputes and denies the defenses asserted at all stations. Notwithstanding that a Defendant has agreed, for purposes of this stipulation, that it will not argue that other Defendants' MTBE gasoline was supplied to a particular station during the period that Defendant supplied the station, all

Defendants reserve the right to seek contribution and/or indemnity from any other person (including any Defendant).

**THIS SECTION MAY BE READ TO THE JURY**

In order to streamline the case for trial, each individual Defendant listed below makes the following stipulations. Defendants dispute and deny the claims asserted at all stations and, by entering into this stipulation, do not stipulate to the validity of any claims. Plaintiff disputes and denies the defenses asserted at all stations and, by entering into this stipulation, does not stipulate to the validity of any defenses. This stipulation does not affect any claims by Plaintiff against any party who has not signed this stipulation who directly or indirectly supplied gasoline and/or MTBE to a Defendant who did sign this stipulation or that Defendant's predecessor corporations.

*Chevron U.S.A. Inc. ("CUSA")*

1. *Chevron #9-1921—3801 S. Bristol Street, Santa Ana.* CUSA owned Chevron #9-1921, including underground storage tanks (USTs), from 1986 until after December 31, 2003. Any MTBE gasoline delivered to Chevron #9-1921 between 1986 and September 19, 1995, was supplied by CUSA. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Chevron #9-1921 between September 20, 1995, and January 14, 2003, contained MTBE and was supplied by CUSA. Chevron branded gasoline was sold at Chevron #9-1921 during the entire relevant time period.

2. *Chevron #9-5401—5992 Westminster Boulevard, Westminster.* CUSA owned Chevron #9-5401, including USTs, from 1986 until January 7, 2002. Any MTBE gasoline delivered to Chevron #9-5401 between 1986 and September 17, 1995, was supplied by CUSA. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Chevron #9-5401 between September 18, 1995, and January 14, 2002, contained

MTBE and was supplied by CUSA. Chevron branded gasoline was sold at Chevron #9-5401 during the entire relevant time period.

3.   *Chevron #9-5568—12541 Seal Beach Boulevard, Seal Beach.* CUSA owned Chevron #9-5568, including USTs, from 1986 through December 31, 2003. Any MTBE gasoline delivered to Chevron #9-5568 between 1986 and September 18, 1995, was supplied by CUSA. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Chevron #9-5568 between September 19, 1995, and December 31, 2002, contained MTBE and was supplied by CUSA. Chevron branded gasoline was sold at Chevron #9-5568 during the entire relevant time period.

4.   *G&M # 4—16990 Beach Boulevard, Huntington Beach.* Any MTBE gasoline delivered to G&M #4 between December 1, 1991, and September 18, 1995, was supplied by CUSA. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to G&M #4 between September 19, 1995, and December 29, 2002, contained MTBE and was supplied by CUSA. Chevron branded gasoline was sold at G&M #4 during the entire time period between December 1, 1991, and December 29, 2002.

5.   *Chevron #208554—8980 Warner Avenue, Fountain Valley.* All gasoline delivered to Chevron #208554 between June 22, 1999, and December 31, 2002, contained MTBE and was supplied by CUSA. Chevron branded gasoline was sold at Chevron #208554 during the entire time period between June 22, 1999, and December 31, 2002.

6.   *G&M #24—3301 Bristol Street, Santa Ana.* All gasoline delivered to G&M #24 between April 4, 1997, and December 31, 2002, contained MTBE and was supplied by CUSA. Chevron branded gasoline was sold at G&M #24 during the entire time period between April 4, 1997, and December 31, 2002.

7.   CUSA makes the stipulations in Paragraphs 1-6 based on its agreement with OCWD that OCWD will not associate CUSA with the following service stations on OCWD's Station Matrix: Arco #1887; Texaco #8520/Texaco #121608; Shell #204359403; Unocal #5376; Mobil #18-G6B; Unocal #5399; Texaco #121681; Mobil #18-HDR; Arco #6131; Mobil #18-

SMRH:424784472.1                                    -14-

JMY; Arco #1912; Arco #1905; Beacon Bay Car Wash Fountain Valley; Mobil #18-HEP; Arco #3085; Beacon Bay Car Wash Santa Ana; Unocal #5123; Huntington Beach Arco; Shell #6502; Westminster Shell; Unocal #5226; Unocal #5792; Arco #6036; Thrifty #383; Thrifty #368; World Oil #39; and Mobil #18-668.

### _Union Oil Company of California ("Union Oil")_

1.   **_Unocal #5376—8971 Warner Avenue, Huntington Beach._**  Union Oil owned Unocal #5376, including the USTs, from 1986 until 1998, although the station was closed in March 1992 and the USTs were removed in January 1993.  Any MTBE gasoline delivered to Unocal #5376 between 1986 and February 18, 1992, was supplied by Union Oil.  Not all gasoline supplied during this time period, however, contained MTBE.  Union Oil branded gasoline was sold at Unocal #5376 during the entire time period between 1986 and February 18, 1992.

2.   **_Unocal #5399—9525 Warner Avenue, Fountain Valley._**  Union Oil owned Unocal #5399, including the USTs, from 1986 until 1998, although the station was closed in March 1993 and the USTs were removed in January 1994.  Any MTBE gasoline delivered to Unocal #5399 between 1986 and April 1, 1993, was supplied by Union Oil.  Not all gasoline supplied during this time period, however, contained MTBE.  Union Oil branded gasoline was sold at Unocal #5399 during the entire time period between 1986 and April 1, 1993.

3.   **_Beacon Bay Car Wash FV—10035 Ellis Avenue, Fountain Valley._**  Any MTBE gasoline delivered to Beacon Bay Car Wash FV between 1986 and August 24, 1994, was supplied by Union Oil.  Not all gasoline supplied during this time period, however, contained MTBE.

4.   **_Beacon Bay Car Wash SA—1501 West MacArthur Boulevard, Santa Ana._**  Any MTBE gasoline delivered to Beacon Bay Car Wash SA between 1986 and August 23, 1994, was supplied by Union Oil.  Not all gasoline supplied during this time period, however, contained MTBE.

5.    *Unocal #5123—14972 Springdale, Huntington Beach*. Union Oil owned Unocal #5123, including USTs, from 1986 until the station was demolished in 1994. Any MTBE gasoline delivered to Unocal #5123 between 1986 and September 30, 1994, was supplied by Union Oil. Not all gasoline supplied during this time period, however, contained MTBE. Union Oil branded gasoline was sold at Unocal #5123 during the entire time period between 1986 and September 30, 1994.

6.    *Unocal #5226—6322 Westminster Avenue, Westminster*. Union Oil owned Unocal #5226, including USTs, from 1986 until March 1997, when Unocal #5226 was sold to Tosco. Any MTBE gasoline delivered to Unocal #5226 between 1986 and April 1, 1993, was supplied by Union Oil. Not all gasoline supplied during this time period, however, contained MTBE. Union Oil branded gasoline was sold at Unocal #5226 during the entire time period between 1986 and April 1, 1993.

7.    *Unocal #5792—4002 Ball Road, Cypress*. Union Oil leased this station from 1986 until March, 1997, when Unocal #5792 was sold to Tosco. Any MTBE gasoline delivered to Unocal #5792 between 1986 and September 20, 1995, was supplied by Union Oil. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Unocal #5792 between September 20, 1995, and March 1997 contained MTBE and was supplied by Union Oil. Union Oil branded gasoline was sold at Unocal #5792 during the entire time period between 1986 and April 1, 1997.

8.    Union Oil makes the stipulations in Paragraphs 1-7 based on its agreement with OCWD that OCWD will not associate Union Oil with the following service stations on OCWD's Station Matrix: Arco #1887; G&M #4; Texaco #8520/Texaco #121608; Shell #204359403; Exxon #4283/Chevron #208554; Mobil #18-G6B; Texaco #121681; Mobil #18-HDR; Arco #6131; Mobil #18-JMY; Arco #1912; Thrifty #383; Arco #1905; Mobil #18-HEP; G&M #24; Arco #3085; Chevron #1921; Huntington Beach Arco; Shell #6502; Westminster Shell; Chevron #9-5401; Thrifty #368; Arco #6036; Chevron #9-5568; World Oil #39; and Mobil #18-668.

## _Texaco Refining and Marketing Inc. ("Texaco")_

1.     _Texaco #8520/#121608 - 8520 Warner Avenue, Fountain Valley._ Between October 1986 and December 2003, one of the Shell Defendants owned the USTs and real property at this site. Texaco leased Texaco #8520 to a dealer from before 1986 until 1998. Any MTBE gasoline delivered to this station between 1986 and September 20, 1995, was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Texaco #8520/#121608 between September 20, 1995, and 1998 contained MTBE and was supplied by Texaco. Beginning in 1998 until December 2003, Equilon Enterprises LLC leased Texaco #8520/#121608 to a dealer. All gasoline delivered to Texaco #8520/#121608 between 1998 and 2002 contained MTBE and was supplied by Equilon. Texaco-branded gasoline was sold at this station from 1986 through approximately 2002. The station became Shell-branded in approximately 2002.

2.     _Texaco #121681 - 9475 Warner Avenue, Fountain Valley._ Texaco leased Texaco #121681 to a dealer from before 1986 until 1998. Between 1989 and December 2002, Shell Defendants owned the USTs at this site. Any MTBE gasoline delivered to this station between 1986 and September 20, 1995, was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Texaco #121681 between September 20, 1995, and 1998 contained MTBE and was supplied by Texaco. Texaco-branded gasoline was sold at this station from 1986 through approximately 2002. Beginning in 1998 and until December 2002, Equilon Enterprises LLC leased Texaco #121681 to a dealer. All gasoline delivered to Texaco #121681 between 1998 and December 2002 contained MTBE and was supplied by Equilon. Shell branded gasoline was sold at this station during 2002. The station closed in December 2002.

3.   *Beacon Bay Car Wash, Fountain Valley - 10035 Ellis Avenue, Fountain Valley.* Any MTBE gasoline delivered to Beacon Bay Fountain Valley between 1994 and September 20, 1995, was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Beacon Bay Car Wash Fountain Valley between September 20, 1995, and 1998 contained MTBE and was supplied by Texaco. All gasoline delivered to Beacon Bay Fountain Valley between 1998 and 2001 contained MTBE and was supplied by Equilon Enterprises LLC. Texaco branded gasoline was sold at the Beacon Bay Fountain Valley station from 1994-2001.

4.   *Beacon Bay Car Wash Santa Ana - 1501 West MacArthur Blvd., Santa Ana.* Any MTBE gasoline delivered to Beacon Bay Santa Ana between May 1, 1994, and September 20, 1995, was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Beacon Bay Car Wash Santa Ana between September 20, 1995, and 1998 contained MTBE and was supplied by Texaco. All gasoline delivered to Beacon Bay Car Wash Santa Ana between 1998 and 2001 contained MTBE and was supplied by Equilon Enterprises LLC. Texaco branded gasoline was sold at the Beacon Bay Santa Ana station from 1994-2001.

5.   *Huntington Beach Arco - 6002 Bolsa Avenue, Huntington Beach.* If any MTBE gasoline was delivered to Huntington Beach Arco between 1989 and April 1990, it was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE. Texaco branded gasoline was sold at the station from June 1, 1987 through April 1990.

6.   *G&M #24 - 3301 Bristol Street, Santa Ana.* Any MTBE gasoline delivered to G&M #24 between December 15, 1991, and 1994, was supplied by Texaco. Not all gasoline supplied during this time period, however, contained MTBE.

7.    Texaco makes the stipulations in Paragraphs 1-6 based on its agreement with OCWD that OCWD will not make claims against Texaco with respect to the following service stations on OCWD's Station Matrix: Arco #1887; G&M #4; former Shell #204359403; Unocal #5376; Exxon #4283/Chevron #208552; Mobil #18-G6B; Unocal #5399; Mobil #18-HDR; Arco #6131; Mobil #18-JMY; Arco #1912; Arco #1905; Mobil #18-HEP; Arco #3085; Chevron #9-1921; Shell #6502; Unocal #5123; Westminster Shell; Chevron #9-5401; Unocal #5226; Unocal #5792; Arco #6036; Chevron #9-5568; Thrifty #383; Thrifty #368; World Oil #39; and Mobil #18-668.

### *Shell Oil Company ("Shell")*

1.    *Westminster Shell – 5981 Westminster Avenue, Westminster.* Shell Defendants leased the Westminster Shell to a dealer from 1991 through 1998. Shell Defendants owned USTs at this site from 1986 to December 2001. Any MTBE gasoline delivered to Westminster Shell between 1991 and September 20, 1995, was supplied by Shell Defendants. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Westminster Shell between September 20, 1995, and 1998 contained MTBE and was supplied by Shell.

2.    Shell makes the stipulations in Paragraph 1 based on its agreement with OCWD that OCWD will not make claims against Shell with respect to the following service stations on OCWD's Station Matrix: Arco #1887; G&M #4; former Shell #204359403; Texaco #8520/#121608; Unocal #5376; Exxon #4283/Chevron #208552; Mobil #18-G6B; Texaco #121681; Unocal #5399; Mobil #18-HDR; Arco #6131; Mobil #18-JMY; Arco #1912; Arco #1905; Beacon Bay Fountain Valley; Mobil #18-HEP; G&M #24; Arco #3085; Chevron #9-

1921; Beacon Bay Santa Ana; Huntington Beach Arco; Unocal #5123; Chevron #9-5401; Unocal
#5226; Unocal #5792; Arco #6036; Chevron #9-5568; Thrifty #383; Thrifty #368; World Oil
#39; and Mobil #18-668.

### Equilon Enterprises LLC ("Equilon")

1. **Texaco #8520/#121608 - 8520 Warner Avenue, Fountain Valley.** Beginning in
1998, Equilon Enterprises LLC leased Texaco #8520 to a dealer. All gasoline delivered to
Texaco #8520/#121608 between 1998 and December 2002 contained MTBE and was supplied
by Equilon Enterprises LLC.

2. **Texaco #121681 - 9475 Warner Avenue, Fountain Valley.** Beginning in 1998,
Equilon Enterprises LLC leased Texaco #121681 to a dealer. All gasoline delivered to Texaco
#121681 between 1998 and December 2002 contained MTBE and was supplied by Equilon
Enterprises LLC. Shell branded gasoline was sold at this station during 2002. The station closed
in December 2002.

3. **Beacon Bay Car Wash, Fountain Valley - 10035 Ellis Avenue, Fountain Valley.**
All gasoline delivered to Beacon Bay Car Wash between 1998 and 2001 contained MTBE and
was supplied by Equilon Enterprises LLC.

4. **Beacon Bay Car Wash Santa Ana - 1501 West MacArthur Blvd., Santa Ana.**
All gasoline delivered to Beacon Bay Car Wash Santa Ana between 1998 and 2001 contained
MTBE and was supplied by Equilon Enterprises LLC.

5. **Westminster Shell – 5981 Westminster Avenue, Westminster.** Beginning in
1998 through 2001, Equilon Enterprises LLC leased the Westminster Shell to a dealer. All
gasoline delivered to Westminster Shell between 1998 and 2001 contained MTBE and was

supplied by Equilon Enterprises LLC. Equilon did not operate the Westminster Shell. The station closed in 2001. Shell branded gasoline was sold at the station from 1991 through 2001.

6.      Equilon makes the stipulations in Paragraphs 1-5 based on its agreement with OCWD that OCWD will not make claims against Equilon with respect to the following service stations on OCWD's Station Matrix: Arco #1887; G&M #4; former Shell #204359403; Unocal #5376; Exxon #4283/Chevron #208552; Mobil #18-G6B; Unocal #5399; Mobil #18-HDR; Arco #6131; Mobil #18-JMY; Arco #1912; Arco #1905; Mobil #18-HEP; G&M #24; Arco #3085; Chevron #9-1921; Huntington Beach Arco; Unocal #5123; Chevron #9-5401; Unocal #5226; Unocal #5792; Arco #6036; Chevron #9-5568; Thrifty #383; Thrifty #368; World Oil #39; and Mobil #18-668.

### *Exxon Mobil Corporation*

*1.*     *Exxon #4283—8980 Warner Ave., Fountain Valley.* Exxon Corporation owned the property from at least 1987 until June 1996 and owned the USTs at the station from 1987 until 1992. The station was permanently closed in July 1992 and the USTs were removed in September 1992. From July 1990 through December 1990, the only gasoline supplied to this station that may have contained MTBE was Exxon Extra Unleaded. However, not all Exxon Extra Unleaded gasoline contained MTBE. Exxon branded gasoline was sold at the station and supplied by Exxon Corporation from 1987 through station closure in July 1992.

*2.*     *World Oil #39—3450 West Ball Road, Anaheim.* Beginning no earlier than July 1, 1997, and ending May 14, 2000, all gasoline delivered to World Oil #39 contained MTBE and was supplied by Exxon. Exxon branded gasoline was sold at this station during this period.

*3.*     Exxon Mobil Corporation makes the stipulations in Paragraphs 1-2 based on its agreement with OCWD that OCWD will not associate Exxon Mobil Corporation/Exxon

Corporation with the following service stations on OCWD's Second Revised Service Station

Matrix: Arco #1887, G&M #4, Shell #204359403, Texaco #8520/Texaco #121608, Unocal

#5376, Texaco #121681, Unocal #5399, Arco #6131, Arco #1912, Thrifty #383, Arco #1905,

Beacon Bay Car Wash FY, G&M #24, Arco #3085, Chevron #1921, Beacon Bay Car Wash SA,

Huntington Beach Arco, Shell #6502, Unocal #5123, Westminster Shell, Chevron #9-5401,

Thrifty #368, Unocal #5226, Unocal #5792/ConocoPhillips #5792, Arco #6036, Chevron #9-

5568, Mobil 18-G6B, Mobil #18-JMY, Mobil #18-HDR, Mobil #18-HEP, Mobil #18-668, and

USA #141.

### *ExxonMobil Oil Corporation*

1.      *Mobil #18-G6B—9024 Warner Ave., Fountain Valley.*  Mobil Oil Corporation

(now known as ExxonMobil Oil Corporation) owned the property at 9024 Warner Ave.,

including USTs, from at least 1986 to December 2003. Mobil leased the station to operators

during this time. Any MTBE gasoline delivered to the station from October 30, 1992, to

September 30, 1995, was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation.  Not

all gasoline supplied during this time period, however, contained MTBE.  All gasoline delivered

to Mobil #18-G6B between October 1, 1995, and January 9, 2003, contained MTBE and was

supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation.  Mobil-branded gasoline was

sold at the station throughout the relevant time-period.

2.      *Mobil #18-HDR—3195 Harbor Blvd., Costa Mesa.*  Mobil Oil Corporation

leased the property at 3195 Harbor Blvd., from at least 1986 to December 2003.  Mobil owned

the USTs at this station during this time.  Mobil in turn leased the station to operators during this

time.  Any MTBE gasoline delivered to the station from October 29, 1992, to September 30,

1995, was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation.  Not all gasoline

supplied during this time period, however, contained MTBE. All gasoline delivered to Mobil #18-HDR between October 1, 1995, and January 20, 2003, contained MTBE and was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation. Mobil-branded gasoline was sold at the station throughout the relevant time-period.

3.     *Mobil #18-JMY—3470 Fairview Rd., Costa Mesa.* Mobil Oil Corporation leased the property at 3470 Fairview Rd. from 1986 through at least December 2003, and owned the USTs at this station from 1988 through at least December 2003. Mobil operated the station from 1988 until at least December 2003. Any MTBE gasoline delivered to the station from October 29, 1992, to September 30, 1995, was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Mobil #18-JMY between October 1, 1995, and January 8, 2003, contained MTBE and was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation. Mobil-branded gasoline was sold at the station from at least 1988 until at least December 2003.

4.     *Mobil #18-HEP—2921 S. Bristol Ave., Santa Ana.* Mobil Oil Corporation leased the property at 2921 S. Bristol from 1968 until 1998, and owned USTs at the station from 1982 until 1998. Mobil leased the station to an operator during this time. Any MTBE gasoline delivered to the station from November 1, 1992, to September 30, 1995, was supplied by Mobil Oil Corporation/ ExxonMobil Oil Corporation. Not all gasoline supplied during this time period, however, contained MTBE. All gasoline delivered to Mobil #18-HEP between October 1, 1995, and August 31, 1998, contained MTBE and was supplied by Mobil Oil Corporation/ExxonMobil Oil Corporation. From before 1986 until 1998, Mobil-branded gasoline was sold at the station.

5.     *Mobil #18-668—16230 Harbor Blvd., Santa Ana.* Mobil Oil Corporation leased and operated the property at 16230 Harbor Blvd. from 1984 until 1993, and owned the USTs at

the station from 1984 through at least December 2003. From 1993 through the end of the
relevant time period, Mobil leased operation of the station to a third party. Any MTBE gasoline
delivered to the station from November 1, 1992, to September 30, 1995, was supplied by Mobil
Oil Corporation/ExxonMobil Oil Corporation. Not all gasoline supplied during this time period,
however, contained MTBE. All gasoline delivered to Mobil #18-668 between October 1, 1995,
and January 19, 2003, contained MTBE and was supplied by Mobil Oil Corporation/ExxonMobil
Oil Corporation. Mobil-branded gasoline was sold at the station throughout the relevant time-
period.

     6.     Mobil makes the stipulations in Paragraphs 1-5 based on its agreement with
OCWD that OCWD will not associate Mobil with the following service stations on OCWD's
Second Revised Service Station Matrix: Arco #1887, G&M #4, Shell #204359403, Texaco
#8520/Texaco #121608, Unocal #5376, Texaco #121681, Unocal #5399, Arco #6131, Arco
#1912, Thrifty #383, Arco #1905, Beacon Bay Car Wash FY, G&M #24, Arco #3085, Chevron
#1921, Beacon Bay Car Wash SA, Huntington Beach Arco, Shell #6502, Unocal #5123,
Westminster Shell, Chevron #9-5401, Thrifty #368, Unocal #5226, Unocal #5792/
ConocoPhillips #5792, Arco #6036, Chevron #9-5568, Exxon #4283, World Oil #39, and USA
#141.

_ConocoPhillips Company, individually and as successor-in-interest to Tosco Corporation and
Phillips Petroleum Company ("ConocoPhillips")_

1.    _Unocal #5226—6322 Westminster Avenue, Westminster._ ConocoPhillips owned
Unocal #5226, including USTs, from April 1, 1997, through the end of the relevant time period
(December 31, 2003).    All gasoline delivered to Unocal #5226 between April 1, 1997, and
December 17, 2000, contained MTBE and was supplied by ConocoPhillips.

2.    _Unocal #5792—4002 Ball Road, Cypress._ ConocoPhillips owned Unocal #5792,
including USTs, from April 1, 1997, through the end of the relevant time period (December 31,
2003).   All gasoline delivered to Unocal #5792 between April 1, 1997,  and December 13, 2000,
contained MTBE and was supplied by ConocoPhillips.

3.    ConocoPhillips makes the stipulations in Paragraphs 1-2 above based on its
agreement with OCWD that OCWD will not associate ConocoPhillips with the following service
stations on OCWD's Station Matrix: Arco# 1887; G&M #4; Shell #204359403; Texaco #8520/
Texaco #121608; Unocal #5376; Exxon #4283/ Chevron #208552; Mobil #18-G6B; Texaco
#121681; Unocal #5399; Mobil #18-HDR; Arco #6131; Mobil #18-JMY; Arco #1912; Thrifty
#383; Arco #1905; Beacon Bay Car Wash FV; Mobil #18-HEP; G&M #24; Arco #3085;
Chevron #1921; Beacon Bay Car Wash SA; Huntington Beach Arco; Shell #6502; Unocal
#5123; Westminster Shell; Chevron #9-5401; Thrifty #368; Arco #6036; Chevron #9-5568; and
Mobil #18-668.

_Atlantic Richfield Company, BP Products North America Inc. and BP West Coast Products
LLP (collectively "BP")_

1.    _ARCO #1887—16742 Beach Boulevard, Huntington Beach._ BP leased the real
property at ARCO #1887 from the late summer/early fall of 1989 through October 2001.  BP

owned the USTs at ARCO #1887, and leased the station to a third party, during this same time period. Any MTBE gasoline delivered to ARCO #1887 between 1989 and October, 1995 was supplied by BP. All gasoline delivered to Arco # 1887 between October 1, 1995, and October, 2001, contained MTBE and was supplied by BP. ARCO-branded gasoline was sold to this station during these time periods.

   2.     *ARCO #6131—3201 Harbor Boulevard, Costa Mesa.* BP owned the real property and USTs at ARCO #6131 from the late summer/early fall of 1989 through January 2003. BP leased the station to a third party during this same time period. Any MTBE gasoline delivered to ARCO #6131 between 1989 and October, 1995 was supplied by BP. All gasoline delivered to Arco # 6131 between October 1, 1995, and January, 2003 contained MTBE and was supplied by BP. ARCO-branded gasoline was sold to this station during these time periods.

   3.     *ARCO #1912—18480 Brookhurst Street, Fountain Valley.* BP owned the real property and USTs at ARCO #1912 from the late summer/early fall of 1989 through January 2003. BP leased the station to a third party during this same time period. Any MTBE gasoline delivered to ARCO #1912 between 1989 and October, 1995, was supplied by BP. All gasoline delivered to Arco # 1912 between October 1, 1995, and January, 2003 contained MTBE and was supplied by BP. ARCO-branded gasoline was sold to this station during these time periods.

   4.     *Thrifty #383—18520 Brookhurst Street, Fountain Valley.* BP leased the real property at Thrifty #383 from April 1, 1997, through January 2003. BP owned the USTs at

Thrifty #383, during this time period. All gasoline delivered to Thrifty #383 during this time period contained MTBE and was supplied by BP.

5. *ARCO #1905—18025 Magnolia Street, Fountain Valley.* BP leased the real property at ARCO #1905 from the late summer/early fall of 1989 through January 2003. BP owned the USTs at ARCO #1905, and leased the station to a third party, during this same time period. Any MTBE gasoline delivered to ARCO #1905 between 1989 and October, 1995, was supplied by BP. All gasoline delivered to Arco # 1905 between October 1, 1995, and January, 2003 contained MTBE and was supplied by BP. ARCO-branded gasoline was sold at this station during these time periods.

6. *ARCO #3085—3361 South Bristol Street, Santa Ana.* BP leased the real property at ARCO #3085 from the late summer/early fall of 1989 through February 1997. BP owned the USTs at ARCO #3085, and leased the station to a third party, during this same time period. Any MTBE gasoline delivered to ARCO# 3085 between 1989 and October, 1995, was supplied by BP. All gasoline delivered to ARCO 3085 between October, 1995 and February 1997, contained MTBE and was supplied by BP. ARCO-branded gasoline was sold at this station during these time periods.

7. *Huntington Beach ARCO—6002 Bolsa Avenue, Huntington Beach.* Any MTBE gasoline delivered to Huntington Beach ARCO between April 11, 1990, and October, 1995, was supplied by BP. All gasoline delivered to Huntington Beach Arco between October,

1995 and January 2003 was supplied by BP. ARCO-branded gasoline was sold at this station during these time periods.

8.    *Thrifty #368—6311 Westminster Boulevard, Westminster.* BP leased the real property at Thrifty #368 from April 30, 1997 through January 2003. BP owned the USTs at Thrifty #368 during the same time period. All gasoline delivered to Thrifty #368 between April 30, 1997 and January 2003 contained MTBE and was supplied by BP.

9.    *ARCO #6036—13142 Goldenwest Street, Westminster.* BP owned the real property and USTs at ARCO #6036 from the late summer/early fall of 1989 through January 2003. BP leased the station to a third party during this same time period. Any MTBE gasoline delivered to ARCO #6036 between 1989 and October, 1995, was supplied by BP. All gasoline delivered to ARCO #6036 between October 1, 1995 and January 2003, contained MTBE and was supplied by BP. ARCO-branded gasoline was sold at this station during these time periods.

10.    *World Oil #39—3450 West Ball Road, Anaheim.* Any MTBE gasoline delivered to World Oil #39 between late summer/early fall of 1989 and the end of 1993 was supplied by BP. ARCO-branded gasoline was sold at this station during this time period.

11.    BP makes the stipulations in Paragraphs 1-10 based on its agreement with OCWD that OCWD will not associate BP with the following service stations on OCWD's Station Matrix: G&M #4; Texaco #8520/Texaco #121608; Shell #204359403; Unocal #5376; Exxon #4283/Chevron #208552; Mobil #18-G6B; Unocal #5399; Texaco #121681; Mobil #18-HDR;

Mobil #18-JMY; Beacon Bay Car Wash Fountain Valley; Mobil #18-HEP; G&M #24; Chevron #1921; Beacon Bay Car Wash Santa Ana; Unocal #5123; Shell #6502; Westminster Shell; Chevron #9-5401; Unocal #5226; Unocal #5792/ConocoPhillips #5792; Chevron #9-5568; and Mobil #18-668.

SO STIPULATED.

Dated:  June 6, 2014

MILLER & AXLINE

By: *Michael Axline*
Duane Miller/Michael Axline
*Attorney for Plaintiff OCWD*

Dated:  June 6, 2014

KING & SPALDING LLP

By:_____
Robert E. Meadows/Charles C. Correll, Jr./
Jeremiah J. Anderson
*Attorneys for Defendants Chevron U.S.A. Inc.
and Union Oil Company of California*

Dated:  June 6, 2014

SHEPPARD MULLIN RICHTER &
HAMPTON LLP

By: _____
Jeffrey J. Parker/Whitney Jones Roy
*Attorney for Defendants Exxon Mobil
Corporation and ExxonMobil Oil Corporation*

Dated:  June 6, 2014

SEDGWICK LLP

By: _____
Richard E. Wallace, Jr./Peter C. Condron
*Attorney for Defendants Shell Oil Company,
Equilon Enterprises LLC, and Texaco
Refining and Marketing Inc.*

-29-

Mobil #18-JMY; Beacon Bay Car Wash Fountain Valley; Mobil #18-HEP; G&M #24; Chevron #1921; Beacon Bay Car Wash Santa Ana; Unocal #5123; Shell #6502; Westminster Shell; Chevron #9-5401; Unocal #5226; Unocal #5792/ConocoPhillips #5792; Chevron #9-5568; and Mobil #18-668.


SO STIPULATED.

Dated:   June 6, 2014

MILLER & AXLINE

By:_____
Duane Miller/Michael Axline
*Attorney for Plaintiff OCWD*

Dated:   June 6, 2014

KING & SPALDING LLP

By: *Jeremiah J Anderson*
Robert E. Meadows/Charles C. Correll, Jr.
Jeremiah J. Anderson
*Attorneys for Defendants Chevron U.S.A. Inc.
and Union Oil Company of California*

Dated:   June 6, 2014

SHEPPARD MULLIN RICHTER &
HAMPTON LLP

By:_____
Jeffrey J. Parker/Whitney Jones Roy
*Attorney for Defendants Exxon Mobil
Corporation and ExxonMobil Oil Corporation*

Dated:   June 6, 2014

SEDGWICK LLP

By:_____
Richard E. Wallace, Jr./Peter C. Condron
*Attorney for Defendants Shell Oil Company,
Equilon Enterprises LLC, and Texaco
Refining and Marketing Inc.*

Mobil #18-JMY; Beacon Bay Car Wash Fountain Valley; Mobil #18-HEP; G&M #24; Chevron #1921; Beacon Bay Car Wash Santa Ana; Unocal #5123; Shell #6502; Westminster Shell; Chevron #9-5401; Unocal #5226; Unocal #5792/ConocoPhillips #5792; Chevron #9-5568; and Mobil #18-668.


SO STIPULATED.

Dated:  June 6, 2014

MILLER & AXLINE

By:_____
Duane Miller/Michael Axline
*Attorney for Plaintiff OCWD*

Dated:  June 6, 2014

KING & SPALDING LLP

By: *Jeremiah J Anderson / bP  a/ptc*
Robert E. Meadows/Charles C. Correll, Jr./
Jeremiah J. Anderson
*Attorneys for Defendants Chevron U.S.A. Inc.
and Union Oil Company of California*

Dated:  June 6, 2014

SHEPPARD MULLIN RICHTER &
HAMPTON LLP

By: *Jeffrey J Parker*
Jeffrey J. Parker/Whitney Jones Roy
*Attorney for Defendants Exxon Mobil
Corporation and ExxonMobil Oil Corporation*

Dated:  June 6, 2014

SEDGWICK LLP

By: _____
Richard E. Wallace, Jr./Peter C. Condron
*Attorney for Defendants Shell Oil Company,
Equilon Enterprises LLC, and Texaco
Refining and Marketing Inc.*

Mobil #18-JMY; Beacon Bay Car Wash Fountain Valley; Mobil #18-HEP; G&M #24; Chevron #1921; Beacon Bay Car Wash Santa Ana; Unocal #5123; Shell #6502; Westminster Shell; Chevron #9-5401; Unocal #5226; Unocal #5792/ConocoPhillips #5792; Chevron #9-5568; and Mobil #18-668.

SO STIPULATED.

Dated:   June 6, 2014

MILLER & AXLINE

By:_____
Duane Miller/Michael Axline
*Attorney for Plaintiff OCWD*

Dated:   June 6, 2014

KING & SPALDING LLP

By:_____
Robert E. Meadows/Charles C. Correll, Jr./
Jeremiah J. Anderson
*Attorneys for Defendants Chevron U.S.A. Inc.*
*and Union Oil Company of California*

Dated:   June 6, 2014

SHEPPARD MULLIN RICHTER &
HAMPTON LLP

By:_____
Jeffrey J. Parker/Whitney Jones Roy
*Attorney for Defendants Exxon Mobil*
*Corporation and ExxonMobil Oil Corporation*

Dated:   June 6, 2014

SEDGWICK LLP

By:_____
Richard E. Wallace, Jr./Peter C. Condron
*Attorney for Defendants Shell Oil Company,*
*Equilon Enterprises LLC, and Texaco*
*Refining and Marketing Inc.*

Dated:  June 6, 2014

ARNOLD & PORTER LLP

By: _Laurence B. Cox_

Matthew T. Heartney/Lawrence A. Cox/
Stephanie B. Weirick
*Attorney for Defendants Atlantic Richfield*
*Company, BP West Coast Products LLC, BP*
*Products North America Inc.*

Dated:  June 6, 2014

LATHAM & WATKINS LLP

By: _____

Jon D. Anderson
*Attorneys for Defendant CONOCOPHILLIPS*
*COMPANY, individually and as successor-in-*
*interest to Defendant TOSCO*
*CORPORATION and Phillips Petroleum*
*Company*

Dated: June 6, 2014

ARNOLD & PORTER LLP

By: _____

Matthew T. Heartney/Lawrence A. Cox/
Stephanie B. Weirick
*Attorney for Defendants Atlantic Richfield
Company, BP West Coast Products LLC, BP
Products North America Inc.*

Dated: June 6, 2014

LATHAM & WATKINS LLP

By: _____

Jon D. Anderson
*Attorneys for Defendant CONOCOPHILLIPS
COMPANY, individually and as successor-in-
interest to Defendant TOSCO
CORPORATION and Phillips Petroleum
Company*

# Exhibit 17



ORIGINAL

**FILED**

San Francisco County Superior Court

APR 1 5 2002

GORDON PARK-LI/ Clerk

BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO, UNLIMITED JURISDICTION

DEPARTMENT NO. 514

| | |
|---|---|
| SOUTH TAHOE PUBLIC UTILITY DISTRICT, | CASE NO. 999128 |
| Plaintiff, | |
| vs. | **SPECIAL VERDICT [PHASE I]** |
| ATLANTIC RICHFIELD COMPANY, et al., | (3/4/02) |
| Defendants. | |

We, the jury in the above-entitled action, find as follows on the questions submitted to us:

117-001_0064027

**Question No. 1:** Was gasoline containing MTBE manufactured, sold, or supplied by any of the following defendants defective in design because the risk of harm inherent in its design outweighed the benefits of that design?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ___ | Fall/Winter 1990 to 12-31-97 |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-98 to Present |
| Texaco, Inc. | ✓ | ___ | 1983 to 12-31-1997 |
| Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

If you answer "no" as to each defendant, then go to question No. 3. If you answer "yes" as to one or more defendants, then answer the next question only as to such defendants.

**Question No. 2:** As to each defendant for which you answered "yes" in Question No. 1, did the defect exist when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" for each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective in design?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| Shell Oil Company | ✓ | ___ | Fall/Winter 1990 to 12-31-1997 |
| Equilon Enterprises LLC | ✓ | ___ | 1-1-1998 to Present |
| Texaco, Inc. | ✓ | ___ | 1988 to 12-31-1997 |
| Tosco Corporation | ✓ | ___ | April 1992 to March 1996 |

117-001-0064028

**Question No. 3:** Was gasoline containing MTBE manufactured, sold or supplied by any of the following defendants defective because of a failure to warn?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12-0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Prsnt |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 10-2 Tosco Corporation | ✓ | ___ | April 1996 to Prsnt |

**Question No. 4:** As to each defendant for whom you answered "yes" in Question No. 3, did the defect exist, because of a failure to warn, when the gasoline containing MTBE left the possession of such defendant?

Answer "yes" or "no" after the name of each such defendant. If you answer "yes" as to any defendant, during what time period was the gasoline containing MTBE manufactured, sold, or supplied by that defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | | | |
| 12-0 Shell Oil Company | ✓ | ___ | Fall/winter 1990 to 12·31·1997 |
| ✓ Equilon Enterprises LLC | ✓ | ___ | 1·1·1998 to Prsnt |
| ✓ Texaco, Inc. | ✓ | ___ | 1992 to 12·31·1997 |
| 12-2 Tosco Corporation | ✓ | ___ | April 1996 to Prsnt |

\\\
\\\
\\\

117-001_0064029

**Question No. 5:** Were the risks involved in the transportation, storage and handling of MTBE recognized by all of Lyondell Chemical Company's (ARCO Chemical Company's) California refiner and distributor customers, who transported, stored and handled MTBE in bulk? If not, during what time period were the risks not recognized?

Answer "yes" or "no." If you answer is "no," state the time period.

|  | Yes | No | If no, time period |
|---|---|---|---|
| Answer: | 12·0 ___ | ✓ | 1992 to 1996 |

If you answered "no" to Question No. 5, then answer Question No. 6. If you answered "yes" to Question No. 5, then answer Question No. 9.

**Question No. 6:** Was MTBE manufactured, sold or supplied by defendant Lyondell Chemical Company (ARCO Chemical Company) defective because of a failure to warn?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | 1992 to 1996 |

If you answered Question No. 6 "yes", answer Question No. 7. If you answered Question No. 6 "no", answer question No. 9.

**Question No. 7:** Did the defect exist, because of a failure to warn, when the MTBE left the possession of defendant Lyondell Chemical Company (ARCO Chemical Company)?

Answer "yes" or "no." If you answer "yes", during what time period was the MTBE manufactured, sold or supplied by the defendant defective due to a failure to warn?

|  | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ___ | 1992 to 1996 |

If you answered Question No. 7 "yes", answer Question No. 8. If you answered Question

117-001-0064030

1
2  No. 7 "no", answer question No. 9.

3
4      **Question No. 8:** Were the warnings of defendant Lyondell Chemical Company (ARCO
5  Chemical Company) to all of its customers, as described in Question No. 5, above, adequate to make
6  those customers aware of the risks and how to avoid or reduce such risks? If not, during what time
   period were such warnings of Lyondell Chemical Company (ARCO Chemical Company)
7  inadequate?

8      Answer "yes" or "no." If you answer "no," state the time period.
9                                        Yes          No          If no,
10                                                                 time
                                                                   period
11 Answer:                        ‖-‖_____    ✓       1987 to 1996

12

13      **Question No. 9:** If you answered "yes" to both Question No. 1 and Question No. 2 as to
14 defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both
15 Question No. 1 and Question No. 2 as to Shell Oil Company, then go to Question No. 10.

16     Do you find by clear and convincing evidence that defendant Shell Oil Company acted with
17 malice in selling gasoline containing MTBE that was defective in design because the risk of harm
18 inherent in the design outweighed the benefits of that design?

19     Answer "yes" or "no". If you answer "yes," state the time period.
20                                        Yes          No          If yes, time
                                                                   period
21 Answer:                        ‖-‖  ✓     ___    Fall/winter 1990 to 12-1997

22

23 \\\
24 \\\
25 \\\
26 \\\
27 \\\
28 \\\

117-001-0064031

**Question No. 10:** If you answered "yes" to both Question No. 3 and Question No. 4 as to defendant Shell Oil Company, answer the question below. If you did not answer "yes" to both Question No. 3 and Question No. 4 as to Shell Oil Company, then go to Question No. 11.

Do you find by clear and convincing evidence that defendant Shell Oil Company acted with malice in selling gasoline containing MTBE that was defective in design because of a failure to warn?

Answer "yes" or "no." If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ____ | Fail A winter 1990 to 12-1997 |

**Question No. 11:** If you answered "yes" to both Question No. 6 and Question No. 7 and "no" to both Question No. 5 and Question No. 8, answer the question below. If you did not answer "yes" to both Question No. 6 and Question No. 7 and "no" to both Question No. 5 and Question No. 8, please sign and return this form.

Do you find by clear and convincing evidence that defendant Lyondell Chemical Company (ARCO Chemical Company) acted with malice in selling MTBE that was defective in design because of a failure to warn?

Answer "yes" or "no." If you answer "yes," state the time period.

| | Yes | No | If yes, time period |
|---|---|---|---|
| Answer: | 11-1 ✓ | ____ | 1957 to 1996 |

DATED: _April_  _15_, 2002

_Michael S. D'Onley_
JURY FOREPERSON

117-001-0064632

Exhibit 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X
                                  :

IN RE: METHYL TERTIARY BUTYL   :
ETHER ("MTBE") PRODUCTS      :
LIABILITY LITIGATION          :
------------------------------------------------  :

This document relates to:         :

*All Cases*                       :
------------------------------------------------ X

**CASE MANAGEMENT**
**ORDER #60**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

      This Order memorializes the rulings made during the status conference held on March 4, 2010.

1.    *City of Riverside, Quincy Community Services District, City of Fresno, California-American Water Co., Silver, Machin,* and *City of Merced Redevelopment Agency*:

    A.   In cases where the Plaintiffs have not identified sources of alleged MTBE contamination, they shall do so by no later than April 5, 2010.

    B.   In each case, the parties shall submit a joint proposed scheduling order to the Court by no later than April 5, 2010.

2.    *Yosemite Springs, City of Pomona,* and *Village of Roanoke*:

    A.   In cases where the Plaintiffs have not identified sources of alleged MTBE contamination, they shall do so by no later than April 30, 2010.

    B.    In each case, the parties shall submit a joint proposed scheduling order to the Court by no later than April 5, 2010.

2. *New Jersey*:

    A.    The parties shall select forty (40) sites in total for full discovery. Each party shall select twenty (20) sites by no later than August 1, 2010. Plaintiffs shall select ten (10) receptor sites (*e.g.*, a well or a small group of closely related wells) and ten (10) release sites (*e.g.*, a gas station). The receptor sites may include multiple release sites.

    B.    After the parties take full discovery, which may include depositions, on the forty (40) "Discovery" sites, the parties shall select sites for trial based on what they have learned. Each side will select ten (10) sites by no later January 1, 2011 for a total of twenty (20) "Trial" sites.

3. *Puerto Rico*: The parties are directed to be ready to discuss a discovery schedule and picking sites for discovery and trial by the next status conference.

4. *Orange County Water District*:

    A.    Each focus plume may contain a small number of closely related wells. Accordingly, OCWD is not required to drop any wells from its focus plumes.

Case 8:03-cv-01742-CJC-AN   Document 141   Filed 10/17/16   Page 458 of 499   Page ID
#:2230
Case 1:00-cv-01898-SAS-DCF      Document 3018      Filed 03/11/2010      Page 3 of 5

B.    The issue is whether each release site identified as part of a focus
plume contributed to contamination of the wells associated with that
plume.  If OCWD provides no proof that a particular release site
contributed to such contamination, and OCWD will not drop the
release site from that focus plume, then defendants may file a motion
for partial summary judgement on that site.

5.    *Incorporated Village of Mineola, West Hempstead Water District, Carle
Place Water District, Town of Southampton, Village of Hempstead, Town of
East Hampton, Westbury Water District*:

A.    Defendant Bartco is granted leave to make its motion for summary
judgement in the *West Hempstead* case.  The motion shall be made by
no later than April 15, 2010.  Plaintiff's opposition is due May 13,
2010.  Defendant Bartco's reply is due May 27, 2010.

B.    The remaining parties – plaintiffs and the Bartco and Tartan
defendants – shall jointly propose a discovery schedule by no later
than April 5, 2010.  Discovery shall be completed by October 1, 2010.
At defendants' request, the parties are directed to bring any discovery
disputes to the attention of the Court rather than to Special Master
Warner.

C.    Defendants shall have until April 1, 2010 to amend their answer.

D.   Defendants shall answer outstanding discovery requests by no later than April 5, 2010.

6.   The next all-cases status conference is scheduled for April 14, 2010 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:

New York, New York
March 9, 2010

Case 8:03-cv-01742-CJC-AN   Document 141   Filed 10/17/16   Page 460 of 499   Page ID
#:2232
Case 1:00-cv-01898-SAS-DCF    Document 3018    Filed 03/11/2010    Page 5 of 5

## -Appearances-

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
Tel: (212) 558-5500
Fax: (212) 344-5461

**Liaison Counsel for Defendants:**

Peter John Sacripanti, Esq.
James A. Pardo, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, New York  10020
Tel: (212) 547-5583
Fax: (212) 547-5444

# Exhibit 19

Page 1

1      SUPERIOR COURT OF THE STATE OF CALIFORNIA
       IN AND FOR THE COUNTY OF SAN FRANCISCO
2

3 SOUTH TAHOE PUBLIC UTILITY     *
  DISTRICT,              *
      Plaintiff        *
4
  VS.           *  NO. 999128
5
  ATLANTIC RICHFIELD COMPANY ("ARCO"); *
6 ARCO CHEMICAL COMPANY; SHELL OIL   *
  COMPANY; CHEVRON U.S.A., INC.;    *
7 EXXON CORPORATION; B.P. AMERICA,   *
  INC.; TOSCO CORPORATION; ULTRAMAR,  *
8 INC.; BEACON OIL CO.; USA       *
  GASOLINE CORPORATION; et al.,    *
9      Defendants       *
10
  * * * * * * * * * * * * * * * * * * * * * * * * * * *
11        VIDEOTAPED DEPOSITION OF
12          BEN THOMAS, Ph.D.
13         November 15, 2000
14   * * * * * * * * * * * * * * * * * * * * * * * * * * *
15    Portions of this transcript contain confidential
16     documents, information or other things.
17
18
19     VIDEOTAPED DEPOSITION OF BEN THOMAS, Ph.D., produced
20 as a witness at the instance of the plaintiff, was taken
21 in the above styled and numbered cause on November 15,
22 2000, from 10:15 a.m. to 4:50 p.m., before Kay Howell,
23 Certified Shorthand Reporter in and for the State of
24 Texas, reported by machine shorthand, at Doubletree
25 Hotel, 400 Dallas, Houston, Texas.

Page 2

1 A P P E A R A N C E S:
2
3   FOR PLAINTIFF SOUTH TAHOE PUBLIC UTILITY DISTRICT:
3   Mr. Victor M. Sher
   Miller, Sher & Sawyer
4   100 Howe Avenue, Suite S120
   Sacramento, California 95825-8218
5
6
  FOR SHELL, TEXACO, EQUILON, AND THE WITNESS INDIVIDUALLY:
7   Mr. Berridge R. Marsh
   Sedgwick, Detert, Moran & Arnold
8   One Embarcadero Center, 16th Floor
   San Francisco, California 94111-3628
9
10
  VIDEOGRAPHER:
11   Ms. Suzy Price (for Dickman Davenport)
   P.O. Box 1433
12   Alvin, Texas 77512-1433
   254-826-7003
13
14
  REPORTER:
15   Ms. Kay Howell (for Dickman Davenport)
   3801 Kirby, Suite 246
16   Houston, Texas
   713-521-1117
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2               Page/Line
  Examination by Mr. Sher ........................ 5   17
3
  Videotape number 2 ............................ 78  19
4
  Videotape number 3 ........................... 151  19
5
  Changes and Witness Signature Page ............ 160   1
6
  Reporter's Certification .................... 162   1
7
8
9           EXHIBITS
10
  No.  Description          Page/Line
11
  1  Resume of Forrest B. (Ben) Thomas, ....... 13   7
12   Ph.D.
13 2  Paper entitled Hydrocarbon ............... 56   8
     Contamination of Groundwater.
14    Toxicology Overview
15 3  Minutes of the October 23, 1980, ......... 82   9
     Toxicology Committee meeting of the
16    Medicine and Biological Science
     Department of API
17
  4  Memo dated June 13, 1984, from Steven .... 72  12
18    T. Cragg to Task Force on the Toxicity
     of Gasoline in Groundwater with
19    transmitting overview of study proposal
20 5  Memo dated March 31, 1981, from R. N. ... 89   6
     Roth re Pre Study Conference on MTBE
21
  6  Minutes of the July 15, 1981, ........... 96  25
22    Toxicology Committee meeting
23 7  Minutes from the October 30, 1981, ..... 102   9
     Toxicology Committee meeting
24
  8  Minutes of January 11, 1984, Toxicology . 109  16
25    Committee meeting

Page 4

1   9  Minutes of March 8, 1984, Toxicology ... 117   4
     Committee meeting
2
  10  Memo dated June 18, 1984, from Steven .. 125  13
3    T. Cragg to the MTBE Task Force
    transmitting minutes of June 12, 1984,
4    meeting
5 11  Memo dated June 14, 1984, from B. K. .... 135   4
     Hoover to S. A. Ridlon re API MTBE
6    Meeting Highlights
7 12  Memo dated December 24, 1986, from .... 147   8
     Robert J. Fensterheim to members of the
8    TSCA Issues Group transmitting minutes
     of the December 11, 1986, meeting of
9    the Issues Group on Toxic Substances
     Control
10
  13  Letters dated August 27, 1984, from .... 144   8
11    Randy N. Roth of Arco to Dr. Charles
     Holdsworth and Peter H. Craig
12    transmitting draft outline for PBSC
     presentation on MTBE
13
  14  Handwritten note dated 8/30/84 from C. .. 146  11
14    E. Holdsworth to Randy N. Roth
     transmitting revised outline of HESC
15    presentation
16 15  Notice of deposition .................... 151  21
17 16  File labeled MTBE - Petroleum Marketing . 157  11
     Attorneys Meeting
18
  17  Presentations given by the witness ....... 157  25
19
  18  Published documents on MTBE .............. 158  18
20
21
22
23
24
25

1    A. Only in detail. I'm afraid I don't remember him.
2    Q. Were you a member of the Toxicology Committee
3 until you left Shell in 1990?
4    A. I was.
5        (Marked Thomas Exhibit No. 5.)
6    Q. (BY MR. SHER) I'm handing you a copy of what
7 I've marked as Exhibit 5 to your deposition. This is on
8 Atlantic Richfield Company letterhead. It's internal
9 correspondence dated March 31, 1981, from R. N. Roth to
10 file, MTBE, and it's Bates stamped ARC 035844 through 46.
11 Let's go off the record so you can have a chance to look
12 this over.
13        THE VIDEOGRAPHER: The time is 2:11 p.m.
14        (Discussion off the record.)
15        THE VIDEOGRAPHER: Back on the record at
16 2:14 p.m.
17    Q. (BY MR. SHER) Have you had a chance to look over
18 Exhibit 5 while we were off the record?
19    A. I have.
20    Q. Do you have any recollection in the first part of
21 1981 being involved with a group known as the MTBE Study
22 Group?
23    A. This memorandum refreshes my memory, yes.
24    Q. What is your recollection about that?
25    A. This was some early studies. As I recall, they

1 were -- it was a program ongoing when I joined the
2 committee, or at least under discussion when I joined the
3 Toxicology Committee. You know, I apparently have sent
4 information over to Randy Roth of Arco saying that we are
5 involved with a contamination of a township's drinking
6 water with disopropyl ether and MTBE at 100 part per
7 billion. And I reflect the information that I had, that
8 20 percent of all underground storage tanks leak, leading
9 to the possibility of groundwater contamination.
10    Q. In the middle of the page there is a reference
11 that says to date Shell and Arco are the only ones with
12 MTBE in gasoline. Do you see that?
13    A. I do.
14    Q. Do you have a recollection of a time when Shell
15 and Arco were the only companies with MTBE in their
16 gasoline?
17    A. I know Shell was a user of MTBE, but I don't know
18 what other companies used it.
19    Q. Are you aware that over the course of the 80's
20 other companies also started using MTBE?
21    A. Yes.
22    Q. Can you recall when the additional companies
23 started using MTBE in rough terms?
24    A. No, but I would assume it was in the mid-1980's,
25 mid to late 1980's.

1    Q. Was the MTBE study group referred to in this memo
2 an API-sponsored group?
3    A. Yes.
4    Q. So you said that it was already ongoing at the
5 point that you joined the Toxicology Committee?
6    A. That's my recollection. You know, I'm fairly new
7 in the toxicology group when this is being discussed. I
8 can remember that some of these studies gave us some --
9 gave me some technical concerns because of the volatility
10 of MTBE so that what we think is in the water supply of
11 these animals is slowly evaporating over the course of
12 the day. So I remember having thoughts about that and
13 what does it mean in terms of trying to calculate what
14 the dose to the animal is and practical things that
15 toxicologists do.
16    Q. You already made reference to the following
17 statement: "Although not present, Ben Thomas of Shell
18 sent a message that Shell has been involved in the
19 contamination of a township's drinking water with DIPE
20 (disopropyl ether) and 100 ppb MTBE." Do you see that
21 reference?
22    A. I do.
23    Q. Was that a reference to the Rockaway, New Jersey,
24 problem?
25    A. I'm sure it was.

1    Q. Does seeing this memo, which is dated March 31,
2 1981, help refresh your memory of when you first became
3 aware of the MTBE contamination in Rockaway, New Jersey?
4    A. Well, certainly by 1981. Like I said, I remember
5 being at Shell for a couple of years for a few years
6 whether it was first raised to me. So it may not
7 surprise me.
8    Q. Then it says: "According to Ben, approximately
9 20 percent of all underground gasoline storage tanks
10 leak, leading to the possibility of groundwater
11 contamination." Do you see that?
12    A. I do.
13    Q. Do you recall raising that issue with Dr. Roth?
14    A. I don't recall actually raising it, but I'm sure
15 that it's accurate.
16    Q. Do you have any recollection of being aware that
17 approximately 20 percent of all underground gasoline
18 storage tanks leak during your experience in the early
19 1980's?
20    A. Would you repeat your question, please?
21    Q. I garbled it. Let me try it again.
22        Do you know, sitting here today, what the basis
23 for your statement to Dr. Roth that approximately 20
24 percent of all underground gasoline storage tank leaked
25 was?

Atlantic Richfield Company                    Internal Correspondence    MAT-9

Date:        March 31, 1981

Subject:     Pre Study Conference


From/Location:  R. N. Roth, AP-479

To/Location:    File, MTBE


On March 27, 1981, I attended a conference of the MTBE study
group.  The purposes of this meeting were to review the status
of the pre-study work for Phase I of the MTBE toxicity studies;
review the studies with the third party auditor Tracor-Jitco
and to review any protocol changes made to the planned teratol-
ogy and reproduction studies.

Highlights of the discussion are given below:

General

1.   ARCO has sent technical material to the laboratory for use
     in the inhalation studies.  Analytical information on the
     material is available and will be sent out by API.

2.   Although not present, Ben Thomas of Shell sent a message
     that Shell has been involved in the contamination of a
     township's drinking water with DIPE (disopropyl ether) and
     100 ppb MTBE.   According to Ben, approximately 20% of
     all underground gasoline storage tanks leak, leading to the
     possibility of ground water contamination.
     This ground water contamination may have to be considered
     when long term testing is considered.  It might also make
     the NTRP rat study of TBA in the drinking water more appli-
     cable .
     To date, Shell and ARCO are the only ones with MTBE in
     gasoline.

Reproduction - Teratology Studies

A question arose over what supplier to obtain rats from.
Bio/dynamics has a history of SDA virus.  Charles River's
Kingston facility, the original supplier, is supposedly SDA
free.  If animals were ordered from Kingston, they were likely
to develop SDA symptoms after arrival.  The group considered
ordering animals from CR's Portage facility, where animals
would already have been exposed to SDA.

The decision was made to stay with Kingston since Bio/dynamics
has been getting animals from there for the last nine months
and has not experienced any problems.  To insure the animals
will be SDA-free when the exposure begins, animals will be
acclimated for three weeks.



THOMAS
EXHIBIT
5
CASE#

ARC 035844

A.R.CO.-1-A
(6-79)

File, MTBE
March 31, 1981
Page 2

The concentrations of MTBE given in the justification document which were said to produce narcosis were questioned by C. Conoway.  I said I would check them.

Details of the study monitoring by Tracor-Jitco will be sent to members by API.

The dates of the reproductive studies depend on when the nine-day probe study is completed.

At my suggestion, a complete water analysis will be done in the middle of the teratology study.  This is required by GLP's.

Metabolism Studies

The methods development segment of the metabolism studies is completed.  It has been found that the majority of MTBE is eliminated via the lungs within an hour after dosing in the aqueous soluble phase.

Since problems were encountered with hemolysis when MTBE was given I.V., future studies will use the I.P. method of dosing.

Nine-Day Inhalation Study

Prestudy work with the chambers and analytical methods has been completed.  The material is being atomized without heating, to consistently generate levels of 100, 300, 1000 and 3000 ppm.

Chamber concentrations will be analyzed using I.R.  For future studies, an online GC analysis will be available.  Analysis will be done automatically every 15 minutes for 100, 300, and 1000 ppm and manually every ½ hour for 3000 ppm.

Bio/dynamics recommends eliminating the charcoal grab samples of chamber concentration.  This was accepted by the group since the accuracy of these samples is questionable.

Tracor-Jitco will monitor the study once during early exposures and the day of necropsy.  C. Kerwin, of Phillips Oil will also monitor the study during the necropsies.

Mr. Van Dyke of Bio/dynamics raised a point which deserves further consideration.  The metabolic studies which have shown most of the MTBE blown off in the first hour have been done in an unsaturated atmosphere.  However, all the toxicity studies will be done in atmospheres in which MTBE concentration is quite high, preventing MTBE from being eliminated so rapidly or completely.  This may change the pharmacokinetic profile of

ARC 035845

File, MTBE
March 31, 1981
Page 3

MTBE and result in the metabolic studies not giving an accurate profile of MTBE's fate in the rat. Mr. Van Dyke felt the group may want to do future metabolic work in an MTBE saturated atmosphere. However, the group felt the planned metabolic studies should be completed before considering Mr. Van Dyke's suggestion.

It would appear that the unsaturated atmosphere in the metabolic studies more closely approximates the atmosphere workers will be exposed to.

Overall, I think the planned MTBE studies are moving along very well. If we could be assured of receiving accurate and regular progress reports from Dr. S. Ridlon, I do not think our presence would be necessary at the group meetings since ARCO seems adequately represented by Dr. Ridlon.

cc: J. A. Budny
RNR:mp

ARC 035846

# Exhibit 20

August 23, 1984


TO:     V. H. Dugan

FROM:   B. J. Hickelson

SUBJECT: MTBE Contamination of Ground Water


The following is in response to your August 8, 1984, memo to Mr. S. D. Curran requesting information on additional potential ground water contamination problems that are associated with the use of MTBE in gasoline.

First MTBE, when dissolved in ground water, will migrate farther than BTX before soil attenuation processes stop the MTBE migration.

For example, a town well in Thurmont, Maryland was contaminated by IPE, a similar ether compound, even though the soluble BTX plume migration was such that the well was not contaminated by these components. Well replacement costs are expected to exceed $500k in this case.

Another example is at Jacksonville, Maryland where the leading edge of the Gulf MTBE plume has not been controlled and migrated over twice the distance of the Exxon BTX plume migration, which has been halted. We are now facing onerous Federal EPA compliance actions which will add costs to this multimillion dollar incident.

Second, MTBE has lower odor and taste thresholds than BTX. Therefore low, non-hazardous, analytically non-detectable levels of MTBE continue to be a source of odor and taste complaints in affected drinking water. This low threshold will extend the clean up and testing time to close out a well contamination incident.

Third, MTBE cannot be removed by carbon adsorbtion. Small household carbon filtration units are used by Exxon to treat private drinking supplies contaminated by BTX. This option would not provide adequate treatment for water supplies additionally contaminated by MTBE. Air stripping or a combination of air stripping and carbon adsorbtion would be required to clean up water contaminated by BTX and MTBE. Attachment A compares initial and operating costs associated with various treatment options.

In summary, there appear to be three reasons MTBE could add to ground water incident costs and adverse public exposure.


EX EnFI 00048

CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

-2-

Based on higher mobility and taste/odor characteristics of MTBE, Exxon's experience with contaminations in Maryland and our knowledge of Shell's experience with MTBE contamination incidents, the number of well contamination incidents is estimated to increase three times following the widespread introduction of MTBE into Exxon gasoline. With 62 ground water clean up activities underway at an average annual cost of $3M, this represents an increase of some 120 or $6M to a total of 180 and $9M annual cost.

Finally, the closing-out of these incidents would take longer and treatment costs would be higher by a factor of 5 (Attachment A). Therefore, we estimate that by extending close-out times the 180 incidents would double to over 300. Shell Oil currently has over 300 ongoing contamination incidents which resulted at some 4,000 retail facilities, versus 62 incidents at Exxon's 7,000 retail facilities. The estimated additional costs involved would result in annual leaker incident costs exceeding $20M.

There is a fourth, and probably the most significant, consideration. Any increase in potential ground water contamination will also increase risk exposure to major incidents. Since 1978, Exxon has been exposed to three major ground water incidents (East Meadow, L.I.; Canob Park, R.I.; Jacksonville, MD). While the most recent cases are unsettled, the cost of these incidents can be as high as $7M each based on East Meadow. Therefore, if the trend of one $7M suit every two years is increased commensurate with the number of ongoing outstanding incidents (i.e., current 62 to over 300) then annual major incident costs would increase from $3.5M to some $18M.

Taking the above four factors into consideration, it would appear that widespread use of MTBE has the potential of increasing our ongoing contamination incidents from a current of 62 to over 300 and costs from $6.5M ($3M and $3.5M) to over $40M ($+20M and $+18M).

Please call me if you have any questions regarding the concerns outlined above.

BJM:jm

c - S. D. Curran
    J. S. Dick
    R. R. Eaton

*0499g

*Barbara J. Mickelson*

EX EnFI 00049
CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

Attachment A

Treatment Costs for 40 GPM Water Supply

| | Carbon Adsorbtion[1] | Air Stripping[2] |
|---|---|---|
| Capital Cost: | $3,000 | $15,000 |
| Annual Operating | $1,200 | $400 |

[1] 2 carbon filter units in series, with backwash capability (Calgon)
[2] 15 ft. tall, 1 ft. diameter air stripping column with 1/3 HP blower (Calgon)

0501g

# Exhibit 21

WR Leek

MTBE IN GROUNDWATER

I've been doing some looking into MTBE in relation to potential groundwater contamination - per your suggestion.  I presume you have received the information I have sent you on physical properties, etc.   The more I have been finding out about MTBE, the more interesting it becomes.

Steve Pegors asked a particularly good question.  He wanted to know what was so different about MTBE relative to groundwater contamination.  My answer was as follows (much of this you know, but it is a good summary):

1. MTBE has a relatively high water solubility (4.3 wt. % with pure MTBE, probably 0.1 to 0.5% from gasoline containing 10 volume % MTBE).  By the way, Steve is going to ask Pascagoula for analyses of water that had been in contact with gasoline blended with MTBE.  We should also update Dave Heffner's laboratory study on gasoline component solubilities into water, this time using gasoline/MTBE blends.

2. It is not practical to remove MTBE from water with activated carbon.  However, air stripping does work (with moderate difficulty.  I calculate a Henry's law constant of about 32 atm./mole fraction at 20°C versus 220 for benzene).  Note that carbon cannot be used to remove MTBE from the stripping air.  Incineration would be needed in those cases where such MTBE removal is required.

3. We suspect MTBE is suitably biodegradable.  But so far, little information is available.  A little more literature looking is in order.  However, we may want to do some preliminary testing.

3. MTBE will be a good tracer for new spills versus old spills. (How much Joy this will bring to us, I'm not sure).

4. There is an indication that MTBE will migrate more rapidly with the groundwater in the soil.  If this is true, it would likely be related to the general lack of adsorption noted above.

5. MTBE is not on the EPA list of priority pollutants.  However, we are trying to come up with an estimate of what residual concentrations are acceptable.  (I do have a little information the subject).

After you have had a chance to look this over, give me a call.  I'd like to discuss some further aspects of MTBE with you.

EXHIBIT 56

RJ HINDS
5-23-86

CHEV 14883

NJDEP-MTBE-CONTENTION-000184

# Exhibit 22

Memorandum

San Francisco. CA
June 11, 1986


EXHIBIT

2-1-0125
CALLAHAN 2

### MARKETING ENVIRONMENTAL CONCERNS REGARDING THE USE OF MTBE IN MOGAS

MR. O. T. BUFFALOW:

We are currently involved in the cleanup of an aquifer in Maryland contaminated by several different company's leaking underground storage tanks.  The companies involved, including Gulf, were utilizing MTBE (Methyl Tertiary Butyl Ether), a motor gasoline octane improver.  The EPA has shown great interest in the removal of MTBE from this contaminated aquifer.  A literature study by the API has shown that MTBE, and the related octane enhancer IPE (Isopropyl Ether), have several disturbing properties.  Both MTBE and IPE:

o   have relatively high solubilities in water - an order of magnitude higher than BTX (Benzene, Toluene, Xylene)

o   have relatively high mobility in the subsurface - will move to the leading edge of a contamination plume

o   have low odor and taste thresholds in water

o   are relatively stable with respect to biodegradation

o   are expensive to remove from water - air stripping is required with follow-up treatment probably necessary to attain the extremely low discharge concentrations likely to be mandated by a governmental agency

We understand that Chevron currently utilizes MTBE at Port Arthur extensively and to a lessor extent in Pascagoula.  We further understand that MTBE is anticipated to be used at some other Chevron refineries as the EPA mandated lead-phasedown continues to impact octane requirements.  This projected increase in MTBE utilization concerns Marketing for two major reasons:

o   MTBE utilization could increase the cost to clean up leaks at service stations and terminals; and

o   MTBE could become a significant constituent of mogas storage water-draws and attact regulatory attention to Marketing terminal effluent.  Marketing terminals generally route effluent through a simple API separator and have no facilities to treat or reduce dissolved component contamination.

CONFIDENTIAL: This document is subject to the September 21, 1999 Stipulated Protective Order entered by the San Francisco Superior Court, Case No. 999128.

CHEV 14902

MR. O. T. BUFFALOW — 2 —

June 11, 1986

Please let us know what refineries are currently using MTBE or IPE. Although we expect usage varies with operating necessities at the refineries, please let us know which blends generally utilize MTBE/IPE and at what average concentrations. Please let us know what your future plans are with respect to these additives.

Thank you for your cooperation.

D. W. CALLAHAN

JK:J-2

cc: Mr. R. W. Kreutzen — Please let us know if you are aware of any Chevron NPDES permits with MTBE limits, or expect future regulatory activity in this area.

Circulating File - 2500

CONFIDENTIAL: This document is subject to the September 1999 Stipulated Protective Order entered by the San Francisco Superior Court. Case No. 989128.

CHEV 14903

Exhibit 23

*JOB FILE 7001*

Memorandum

San Francisco
February 13, 1987

MTBE

MR. O. B. SMITH:

As per your request, we have reviewed the available health data, environmental consequence and likely regulatory action relative to MTBE (tert-Butyl methyl ether) and offer the following assessment.

### Toxicology

In November, the Interagency Testing Committee (ITC) listed MTBE in their 19th annual report to the EPA. Prior to that action, CRCS, Inc. had prepared an information review document which served as the basis for the ITC decision. A copy of the report is enclosed.

Most of the toxicology testing on MTBE has been sponsored by the American Petroleum Institute. In inhalation teratology and reproduction studies in rats and mice, no exposure-related adverse effects were observed. In a 90-day inhalation exposure to rats, the no-effect-level was 250 ppm. The principal pharmacotoxic sign was a dose-related anesthetic effect on the central nervous system. Other studies showed MTBE to be a slight skin and eye irritant and have low acute dermal and oral toxicity. We believe the acute toxicity data and 90-day inhalation study are sufficient to prepare safe handling procedures and exposure levels for workers.

*toxic effect of MTBE*

The mutagenicity data on MTBE was equivocal. While the Ames test was negative, other short-term genotoxicity assays were positive under certain conditions. A lifetime cancer bioassay has not been done with MTBE. Because the exposure potential to MTBE was high, any test rule is likely to require additional testing in these areas.

*DNA (gene) alteration of bacteria or other cells*

### Occupational Health

Occupational health concerns do not impose a problem to the manufacturing of MTBE over normal refinery operations.

TLVs exist for methanol but not for isobutylene (a second reactant) and MTBE. While monitoring of employee exposure can be accomplished, the Chevron Exposure Standards Committee would have to establish standards for isobutylene and MTBE. Detailed studies may be required before it is possible to accurately measure employee exposure on a routine basis, and the methods will require validation.

In the event of fire, all the materials, feed stock, intermediates, and process chemicals degrade to carbon monoxide, carbon dioxide and water and are not reported to form toxic combustion products. The control of occupational exposures in normal and emergency situations is similar to what is being done now in refinery operations.

**EXHIBIT** *13*

NJDEP-MTBE-CONTENTION-000055

Mr. C. B. Smith                                    - 2 -                            February 12, 1987

<u>Environmental</u>

Because of the perceived health effects, local and state regulatory agencies are concerned with the clean-up of ground water containing MTBE. Clean-up levels vary from state to state, and in some cases, between localities within a state.

Two considerations impact MTBE. One is the potential health risk, and the second is the increased solubility over normally regulated constituents of interest, i.e., benzene, toluene and xylene (BTX).

MTBE is significantly more soluble in water than BTX. Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend farther and spread faster than a gasoline leak that does not include MTBE as one of the constituents.

Further compounding the problem of increased solubility, MTBE is more difficult to remove from ground water using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

Clean-up at a gasoline leak/spill containing MTBE can be expected to initially cost more in capital and O&M than a conventional gasoline leak/spill. There are insufficient data available to determine the time required to clean up dissolved MTBE from ground water. Logically one could conclude the MTBE would not be as tightly bound to soil particles, thus could be more easily leached from the subsurface soil particles. However, due to the increased solubility, the MTBE will be dissolved into a much larger portion of the aquifer, thus offsetting a possible reduced vadose zone contamination. *unsaturated portion of subsurface above water table*

<u>Regulatory</u>

The Environmental Protection Agency (EPA) has until April, 1987, to propose a test rule for MTBE under Section 4 of TSCA. While EPA does not have to issue a test rule if they determine that current information is sufficient, this is not expected to happen. In April, the EPA is expected to outline their major concerns about MTBE and issue the required testing and monitoring needed to address these concerns.

Industry representatives from Arco, Exxon, Sun Oil and Texaco met with EPA in December, 1986 at a "focus meeting" to discuss MTBE. Arco's representative felt the EPA's major concern was the potential for ground water contamination. Their secondary concerns were the lack of animal lifetime bioassay data and consumer exposure data. Manufacturers of MTBE are attempting to establish an industry group to "negotiate" the test rule with EPA. This will probably be done through the Specialty Organic Chemicals Manufacturers Association (SOCMA).

Chevron has experience in three states involving clean-up of ground water containing MTBE (Florida, Maryland and Texas). While all states were concerned about the MTBE, none showed any increased concern due to mobility, solubility, toxicity, or difficulty of clean-up. The possible move to restrict the use of MTBE

NJDEP-MTBE-CONTENTION-000056

Mr. D. E. Smith        - 3 -        February 13, 1987

in Maine appears to be an isolated action and not a trend. However, this could change if other states perceive the threat to ground water to be great or if Maine becomes exceptionally vocal (see Enclosure 2). Considering solubility, toxicity, difficulty of detection (taste) and degree of treatment, methanol as an additive should be of greater concern than MTBE. However, several states apparently do not share those concerns about methanol.

Overseas, the European Economic Community (EEC) is concerned about all oxygenated fuel additives (i.e., methanol, ethanol, MTBE) and is considering a data call-in on these materials. Manufacturers and users would have to develop and submit the required data. We have asked Chevron Central Laboratories to monitor their actions and inform us of new developments.

If you have any additional questions please contact either Mr. Russ White (CTN 666-6027) or Mr. Jack Fraim (CTN 894-6735).

For: R. L. ABSCOTT

JWF:jdr
Enclosures

cc w/o encl: Mr. C. L. Blackwell      Mr. H. S. Quillicy
            Mr. O. T. Suffalaw      Mr. E. E. Spitler
            Mr. O. W. Callahan      Mr. R. W. Vose
            Mr. R. D. Cavalli      Mr. S. L. Dryden
            Mr. W. J. Mulligan

NJDEP-MTBE-CONTENTION-000057

# Exhibit 24

STATEMENT OF MTBE COMMITTEE

SUBMITTED TO EPA

FEBRUARY 27TH, 1987

EX EPA 00094
CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

EXHIBIT

13a

## INTRODUCTION

By way of introduction, the MTBE Committee was recently organized to provide a forum in which to address the environmental, health safety legislative and regulatory issues concerning methyl tert-butyl ether (MTBE) of importance to the public and the producers and users of MTBE. The Committee is dedicated to working cooperatively with the government and the public and to be a source of information to MTBE producers, users, the government and the public. In specific the Committee will:

- Address environmental issues relating to MTBE by (i) collecting data from member companies and other sources and (ii) sponsoring programs to develop data unavailable from other sources.

- Address federal and state regulatory issues relating to MTBE by (i) providing technical data to appropriate regulatory agencies and legislative bodies (ii) meeting with appropriate governmental officials to develop acceptable solutions.

- Make available to interested parties and the general public technical and scientific information relating to the use of MTBE in fuel.

- Provide a forum for the exchange of appropriate information between producers and users of MTBE.

### Organization of The Statement

The MTBE statement consists of three sections:

Section I - Health Effects Review Summary
Section II - Environmental Exposure
Section III - Societal Impact of MTBE Utilization

In preparing this statement, extensive efforts were undertaken by the MTBE Committee and its members to obtain all available published and unpublished health effects studies. In this regard, we would specifically like to call the Agency's attention to the fact that we have been able to locate several unpublished toxicology studies that were apparently unavailable to the ITC in its review of MTBE toxicology data. A summary of the results of these studies is provided in Section I. The full text of the studies is provided as an Appendix to this section. It is important at this point to note that these studies did not indicate any evidence that MTBE poses an unreasonable risk to human health. These studies as well as those which were reviewed by the ITC are in our opinion, sufficient to indicate that from an acute and subchronic toxicological viewpoint, MTBE does not represent such a risk. Even repeated exposures to rodents or monkeys to levels of 2,000 ppm or greater did not induce any hematological, neural tissue, or other organ effects which indicated a chemical induced toxicity. We believe these conclusions are fully supported in the health effects review summary provided.

EX EPA 00095
CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

-2-

We believe that the information contained in Section II on Environmental Exposure supports the conclusion that gasoline vapor emissions at service stations and terminals have been measured and have been found to be below levels which would adverse health effects.

In addition, Section II provides information on the positive effects on air quality, as well as an analysis of the potential effect of MTBE as a ground water contaminant in the event of an accidental spill or leakage. We believe that the information provided supports the conclusion that MTBE, from the health effect perspective, does not represent a hazard.

Section III provides information on the societal impact of the use of MTBE as a high octane component for gasoline. The use of MTBE in motor fuels has a number of advantages relative to air quality improvement, all of which are summarized in Section III. In this context if the production capacity of MTBE were to be discouraged, the environment would. in our opinion be significantly effected and octane costs increase substantially

<u>Statutory Criteria</u>

To issue a Section 4 test rule for MTBE EPA must make all of the following findings:

(1)(A)   MTBE may pose an "unreasonable risk" of harm to health or the environment; <u>or</u>

(B)   that MTBE is produced in "substantial quantity" <u>and</u> may reasonably be anticipated to result in "substantial environmental release" or "significant or substantial human exposure"; <u>and</u>

(2)   that insufficient data exists about the health or environmental effects of MTBE to reasonably determine or predict the impact on health or the environment of manufacturing, processing, distribution, use and disposal, <u>and</u>

(3)   that testing is needed to develop such data.

In addition, to making the above findings, EPA must consider the potential economic impact of the tests required under the rule.

EX EPA 00096
CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

3

<u>Conclusion</u>

The following discussion establishes that there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact because it will inhibit additional investment in MTBE plants

Sincerely,

George S. Dominguez

George S. Dominguez
Executive Director

GSD/vls

attachments

EX EPA 00097
CONFIDENTIAL - FOR USE IN LITIGATION SOLELY

# Exhibit 25

1

1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
2     ------------------------------x

3                                         00 MDL 1358
      IN RE:  METHYL TERTIARY BUTYL       00-cv-01898 (SAS)
4     ETHER ("MTBE") PRODUCTS             04-cv-04968 (SAS)
      LIABILITY LITIGATION                07-cv-10470 (SAS)
5                                         14-cv-06228 (SAS)

6     ------------------------------x

7                                         June 18, 2015
                                          2:30 p.m.
8
      Before:
9
                      HON. SHIRA A. SCHEINDLIN,
10
                                          District Judge
11
                             APPEARANCES
12
      MILLER, AXLINE & SAWYER
13         Attorneys for Plaintiffs
      BY:  MICHAEL D. AXLINE, ESQ.
14         DUANE MILLER, ESQ.

15    JACKSON GILMOUR & DOBBS, PC
           Attorneys for Plaintiffs
16    BY:  JOHN D.S. GILMOUR, ESQ.

17    WEITZ & LUXENBERG, P.C.
           Plaintiffs' Liaison Counsel
18    BY:  WILLIAM A. WALSH, ESQ.

19    COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
           Attorneys for New Jersey Plaintiffs
20    BY:  LEONARD Z. KAUFMANN

21    McDERMOTT, WILL & EMERY
           Attorneys for Defendants Exxon Mobil Corp.
22         and Defendants' Liaison Counsel
      BY:  JAMES A. PARDO, ESQ.
23         ANTHONY A. BONGIORNO, ESQ.
           STEPHEN J. RICCARDULLI, ESQ.
24
      SEDGWICK LLP
25         Attorneys for Defendant Mobil Oil Corporation
      BY:  PETER C. CONDRON, ESQ.

2

```
 1                    APPEARANCES (Cont'd)

 2    ARCHER & GREINER PC
            Attorneys for Defendant Exxon Mobil Corporation
 3    BY:   CARLOS BOLLAR
            WILLIAM STACK, ESQ.

 4

 5    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
            Attorneys for Defendant Exxon Mobil Corporation
      BY:   JEFFREY J. PARKER, ESQ.

 6

 7    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
            Attorneys for Defendant Lukoil Americas Corporation
      BY:   JAMES P. TUITE, ESQ.

 8

 9    KING & SPALDING LLP
            Attorneys for Defendant Chevron
      BY:   JEREMIAH ANDERSON, ESQ.

10

11    EIMER STAHL KLEVORN & SOLBERG
            Attorneys for Defendant Citgo Petroleum Corporation
      BY:   PAMELA HANNEBUT, ESQ.

12

13    ARNOLD & PORTER LLP
            Attorneys for Defendants Atlantic Richfield Company, BP
      Products North America Inc., Atlantic Richfield Company, BP
14    Products North America, Inc.
      BY:   STEPHANIE WEIRICK

15

16

17

18

19

20

21

22

23

24

25
```

31

1    Who am I looking at?  OCWD.  So I think that's the

2    easier one.  You'll leave with that, and that's the ruling.

3         Now, the bigger one.  This whole question about

4    declaratory relief and the history of what this Court has said

5    on different occasions apparently has caused a great deal of

6    confusion.  Declaratory relief was brought as a cause of

7    action, I'm filing an action for declaratory -- no, for

8    declaratory judgment.  Standard cause of action, we used to

9    call it a DJ action.  And then declaratory relief is also an

10   available remedy in many cases, and we don't usually find it

11   until the back end of a complaint saying, and we seek a

12   declaration that as a remedy.  So I understand the difference

13   between a cause of action and a remedy, although I'm not sure

14   it has a whole lot of real meaning.

15        But in any event, in 2006, I authored an opinion which

16   dismissed the cause of action for declaratory relief entitled

17   "Cause of Action:  Declaratory Relief Act Claim," but the basis

18   for that dismissal was I said, well, that remedy was available

19   under the Orange County's common-law causes of action, so it's

20   essentially duplicative.  And then OCWD asked for a

21   clarification and I wrote:  "If any of OCWD's remaining causes

22   of action are determined to require declaratory relief, such

23   relief remains available under those causes of action."  And

24   then later down the road, in 2011, now five years after the

25   first ruling, I wrote:  "The claims that survived included

32

 1    declaratory relief with respect to future expenses OCWD may

 2    incur."

 3           Now, that is a classic use of declaratory judgment,

 4    you know, I want a declaration that for future expenses, the

 5    defendants have to pay for.  It's got nothing to do with

 6    nuisance or being duplicative, it's a classic declaratory

 7    judgment claim, and I said that one of the claims that survived

 8    is declaratory relief with respect to future expenses.

 9           Then there was CMO116, that is 116, written in July of

10    2014, and that CMO set forth the remaining claims and which

11    defendants were at each focus site as of that date, July 16,

12    2014, and that CMO did include declaratory relief as a

13    remaining claim at various focus sites.  Well, the defendants

14    say, oh, you didn't really mean what you wrote, this only was

15    supposed to reflect what OCWD intended to pursue at the trial,

16    and we didn't think we needed to move against it because it was

17    just a list, so we didn't object at the time.  And now the

18    defendants say, look, the water district can ask the transferor

19    court, the trial court, to allow the remedy of declaratory

20    relief for continuing nuisance, but this is somewhat

21    problematic because if the trial court says it's not a remedy

22    for continuing nuisance or there is no such claim, that

23    wouldn't take care of all the declaratory relief sought in the

24    OCWD action.  That just has to do with the nuisance claim.  And

25    I specifically said there may be declaratory relief outside of

50

1          MR. PARKER:  Your Honor, Jeff Parker.  I would like to

2   address the declaratory relief point, if I could, briefly.

3          In 2006, your Honor --

4          THE COURT:  I know all that.  I stated it.  I gave you

5   the whole history of all my rulings.  I understand what I said

6   on one day, and I understand what I said on another day, and I

7   reviewed each of my statements, and I conclude, I conclude,

8   that the appropriate thing to do is to leave it in as a claim

9   because I was told -- I went through all this already.  Why

10  should I repeat myself for the record?  You can read the

11  transcript.

12         Go ahead.

13         MR. PARKER:  Your Honor, one thing, then:  With

14  respect to the 2011 opinion, they have represented in their

15  letter that your Honor held that debt relief was a viable

16  claim.  That's actually not what the opinion said.  This was in

17  the introduction, it was a preface leading into their motion,

18  which was their motion for summary judgment on the OCWD act,

19  public nuisance and trespass, which your Honor denied.  So it's

20  a statement at the beginning essentially laying the groundwork

21  or the backdrop against which you were deciding.  It was not

22  any ruling reinstating or overruling --

23         THE COURT:  No, no, I understand it wasn't reinstating

24  or overruling, but <u>declaratory judgment, in some context, was</u>

25  <u>not ruled out, such as future expenses.  I pointed that out.</u>

[6/18/2015] Hearing (Scheindlin) (06-18-15)

51

1          Also, it was in the list of claims.  For a host of

2   reasons, this is the better way to go.  Once it's back there,

3   and you want to move to dismiss that claim explaining this

4   whole history, go ahead, but I think given all the various

5   rulings I've made over time, this is the better way to go.

6          MR. PARKER:  Thank you, your Honor.  As long as we

7   have that clear in the record, that given the opportunity back

8   in the district court, we could move against that, we're fine.

9   Thank you.

10         THE COURT:  You can explain why you think it applies

11  across the board when the original opinion in '06 clearly said

12  it's duplicative of the continuing nuisance, and that's why I

13  was striking it.  But good luck, it's fine.  As I said, you've

14  got to keep that judge busy, too.

15         So I think that takes us to the Rule 12 motions in

16  Puerto Rico.  And I don't know if there's a lot to say there

17  except that defendants complain plaintiffs have basically been

18  too busy to talk to them, and that the plaintiffs have said,

19  after June 15th, we promise to sit down with you.  I realize

20  today is June 18th, which is all of three days later, but the

21  promise is there.  If everybody would sit down and try to be

22  sure that I don't have work I shouldn't have to do, the motion

23  to negotiate would be most appreciated.  I might even be

24  agreeable to letting the motion deadline slip by a week or so,

25  so you can continue these talks and be as efficient as possible

57

1   The ABA has me for something.  One second.

2          Oh, ABA is the very last week, so I guess like the

3   29th.  So everything is good except the 29th and 30th.  Those

4   aren't good, but everything else is.

5          MR. PARDO:  The 28th is a Tuesday, your Honor.

6          THE COURT:  That's okay.  I like it.  28th at 2:30?

7          MR. PARDO:  Sure.

8          THE COURT:  Done.  July 28th at 2:30.

9   Okay.  Everyone, good to see you.

10         COUNSEL:  Thank you, your Honor.

11         (Adjourned)

# Exhibit 26

Law Offices of

# MILLER, AXLINE & SAWYER
A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM

E-SERVICE
54524204
Nov 07 2013
05:42PM
File & ServeXpress

November 7, 2013

<u>VIA U.S. MAIL AND LNFS</u>

Whitney Jones Roy, Esq.
Sheppard, Mullin, Richter & Hampton
333 South Hope Street, 48th Floor
Los Angeles, California  90071-1448

Re:   *Orange County Water District v. Unocal Corp., et al.*
      **Plaintiff Orange County Water District's Claims**

Dear Ms. Jones Roy:

I am writing on behalf of plaintiff Orange County Water District (the "District") in response to your November 4, 2013, letter concerning the District's claims under the Orange County Water District Act ("OCWD Act") and its Declaratory Relief claims.  We disagree with your assertion that there is "some confusion" about the status of these claims for relief.  As explained in, my May 31, 2013, letter, these claims not only remain viable, but have been specifically recognized in Judge Scheindlin's prior rulings.

<u>OCWD Act Claims</u>

The assertion that the Court's October 25, 2011 opinion resulted in a dismissal of the District's claims under the OCWD Act is contrary to the plain language of the opinion.  As I stated in my May 31, 2013, letter, the Court only granted "partial" summary judgment on the District's OCWD Act claim, and that was limited to two specific items of damages as spelled out in the opinion:

> "I find that OCWD's claims [under the OCWD Act] are ripe with respect to the costs of production well testing and the commissioning of the consultant reports. . . . I am granting *partial summary judgment on those claims* . . . [t]his finding, however, will not prejudice OCWD's ability to seek future relief for other remedial costs."

Whitney Jones Roy, Esq.
Page 2
November 7, 2013

(Opinion & Order (Oct. 25, 2011) at 18 [emphasis added].)  The Court, moreover, explicitly
declined to rule on the recoverability of any other items of damage or cost under the OCWD Act:

>  "This new evidence does not relate to the costs of production well testing or the
>  commissioning of the consultant reports.  Rather, OCWD is asking this Court to grant
>  summary judgement for costs that were not the subject of its previous motion for partial
>  summary judgment and that OCWD has not previously presented to the Court.  I decline
>  to do so."

(*Id.* at 17.)  The "new evidence" submitted by the District included a declaration from Roy
Herndon which outlined a number of additional types of costs that the District is seeking to
recover under its OCWD Act claims.  (*See* Jun 25, 2011, Declaration of Roy Herndon in Support
of Plaintiff Orange County Water District's Response to Court's Order to Show Cause Why
Partial Summary Judgment Should Not Be Granted to Defendants with Respect to OCWD Act
Claims for Investigatory Costs and Trespass Claims.)

The District has, furthermore, provided extensive discovery responses (including
document productions) concerning its damages.  (*See e.g.* July 24, 2012, Plaintiff Orange County
Water District's Supplemental Responses to Defendants Unocal and Chevron's First Set of
Interrogatories and Request for Production Related to Damages.)  The District also produced Mr.
Herndon for two days of deposition on the issue of damages and costs incurred by the District.
(*See* July 26 and August 13, 2012, depositions of Roy Herndon and Exhibits attached thereto.)
There is, therefore, no basis for a summary judgment motion arguing that the District has no
recoverable damages or costs under the OCWD Act.

Declaratory Relief

Your assertion that District's Declaratory Relief claim was dismissed is again contrary to
the plain language of the Court's opinion, language which was provided to you in my May 31,
2013, letter.

>  "The October 10, 2006 decision dismissed OCWD's declaratory relief *cause of action* . . .
>  as duplicative of OCWD's other causes of action . . . .  Nonetheless, declaratory judgment
>  is a flexible remedy that might be useful in this case . . . [i]f any of OCWD's remaining
>  causes of action . . . are determined to require declaratory relief, underline{such relief remains
>  available under those causes of action}."

(Opinion & Order (March 6, 2007) at fn 26, pp. 10-11.)  Indeed, as further pointed out in my
May 31, 2013, letter, defendants have already conceded that the District's Declaratory Relief
claims remain viable.  ((*See* Opinion & Order (Nov. 16, 2009) at 4-5.)

Whitney Jones Roy, Esq.
Page 3
November 7, 2013

Any "confusion" on the part of defendants as to the status of the District's Declaratory Relief claims and its claims under the OCWD Act is entirely self-generated.

Sincerely,

Tracey L. O'Reilly

cc: All Counsel (via LNFS)

# Exhibit 27

Law Offices of

# MILLER & AXLINE

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

September 29, 2016

<u>VIA U.S. MAIL AND LNFS</u>

Whitney Jones Roy, Esq.
Sheppard, Mullin, Richter & Hampton
333 South Hope Street, 48th Floor
Los Angeles, California  90071-1448

Re:   *Orange County Water District v. Unocal Corp., et al.*
      **Defendants' Proposed Summary Judgement Motion and Motion in *Limine***

Dear Ms. Jones Roy:

I am writing on behalf of plaintiff Orange County Water District (the "District") in response to your September 26, 2016, letter, and pursuant to Local Rule 7-3, concerning defendants proposed Motion for Summary Judgement and Motion in *Limine* re Damages and Declaratory Relief.

While the District agrees that there is not "common ground on these issues," the District contends that, given the schedule, defendants are not entitled to file voluminous papers which rehash and repeat prior arguments already submitted to, and decided upon by, Judge Scheindlin, particularly as defendants have already filed tens of thousands of pages of briefing and evidence in connection with at least seven prior summary judgment motions.  The Court's abbreviated briefing schedule for summary judgment motions clearly reflects the Court's anticipation that any motions filed by the parties will be brief and non-duplicative.  (*See* Order Delineating Trial Structure and Schedule at 3.)

With respect to defendants' intention to file a Motion in *Limine*, the District would object on the grounds that such motions are not scheduled to be filed until January 9, 2017, and that the abbreviated briefing schedule for summary judgement motions does not account for the filing of such additional evidentiary motions.  Defendants have not articulated any reasonable basis as to why this motion must be resolved at the same time as the summary judgment motions.

1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225;  Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288;  Email: toxictorts@toxictorts.org

Whitney Jones Roy, Esq.
Page 2
September 29, 2016

    Under these circumstances, the District reserves its right to either move to strike improper pleadings and motions, or to seek additional time to file its opposition to any voluminous, duplicative, or premature motions.

Sincerely,

Tracey L. O'Reilly

cc: All Counsel (via LNFS)