1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2      Including Professional Corporations
    JEFFREY J. PARKER, Cal. Bar No. 155377
3   jparker@sheppardmullin.com
    WHITNEY JONES ROY, Cal. Bar No. 211541
4   wroy@sheppardmullin.com
    ANDREA N. FEATHERS, Cal. Bar No. 287188
5   afeathers@sheppardmullin.com
    333 South Hope Street, 43rd Floor
6   Los Angeles, California 90071-1422
    Telephone:  213.620.1780
7   Facsimile:   213.620.1398

8   Attorneys for Defendants
    EXXON MOBIL CORPORATION and
9   EXXONMOBIL OIL CORPORATION

10

11                  UNITED STATES DISTRICT COURT

12          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

14  ORANGE COUNTY WATER            Case No. 8:03-cv-01742 CJC (DFMx)
    DISTRICT,
15                                 Assigned to:  Hon. Cormac J. Carney
              Plaintiff,
16                                 **DECLARATION OF WHITNEY**
         v.                        **JONES ROY IN SUPPORT OF**
17                                 **DEFENDANTS' MOTION TO**
    UNOCAL CORPORATION, et al.,    **EXCLUDE NEWLY DISCLOSED**
18                                 **OPINIONS OF GRAHAM FOGG**
              Defendants.
19                                 *[Notice of Motion, Motion, Declaration*
                                   *of Jeffrey J. Parker  and Proposed*
20                                 *Order submitted concurrently herewith]*

21                                 Date:     January 3, 2019
                                   Time:     9:30 a.m.
22                                 Dept:     6B

23                                 The Honorable Douglas F. McCormick

24

25

26

27

28

## DECLARATION OF WHITNEY JONES ROY

I, Whitney Jones Roy, hereby declare under penalty of perjury:

1.     I am a partner in the law firm of Sheppard, Mullin, Richter & Hampton, LLP, counsel for Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation in this action, both in this court and in the multidistrict litigation in the Southern District of New York entitled *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, MDL No. 1358 (the "MDL").  I am duly admitted to practice before all courts of the State of California and in this Court.  I have personal knowledge of the facts set forth herein and, if sworn as a witness, could and would testify competently thereto, except facts which are stated upon information and belief.

2.     This declaration is made in support of Defendants' Motion to Exclude the Newly Disclosed Opinions of Graham Fogg (the "Motion").

3.     The parties in this case designated expert witnesses in early 2011. Attached as **Exhibit 1** is a true and correct copy of the February 1, 2011 designation of Dr. Fogg.

4.     OCWD served Dr. Fogg's initial report on May 31, 2011.  OCWD later provided a rebuttal report on December 15, 2011, and a supplemental rebuttal report on August 14, 2018.  Attached as **Exhibit 2** is a true and correct copy of the August 14, 2018 supplement report.  I am not attaching the prior reports because they were served before OCWD's "U-turn" diagram was first disclosed in January 2017.

5.     On January 21, 2012, Dr. Fogg was deposed in this case.  Attached as **Exhibit 7** is a true and correct copy of relevant portions of the January 21, 2012 deposition of Dr. Fogg.

6.     OCWD first disclosed its "U-turn" diagram in January 2017, as a demonstrative exhibit at the hearing regarding Defendants' motion to exclude Dr. Stephen Wheatcraft.  Attached as **Exhibit 4** is a true and correct copy of the demonstrative exhibit, labelled No. 7.

7.     On February 23, 2017, this Court set deadlines for updated reports by the parties' experts.  The Order set April 28, 2017 as the date for updated reports by OCWD's experts, and May 30, 2017 as the deadline for updated reports by defense experts.  Attached as **Exhibit 5** is a true and correct copy of the February 23, 2017 order.

8.     On March 5, 2018, the Court added in new deadlines to the expert schedule in Case Management Order No. 2.  OCWD's experts were required to submit their reports by May 18, 2018 and rebuttal reports on August 3, 2018. Attached as **Exhibit 6** is a true and correct copy of the March 5, 2018 order.

9.     On August 30 and 31, 2018, Dr. Fogg was deposed for a second time in this case.  Attached as **Exhibit 3** is a true and correct copy of relevant portions of the transcript of the deposition of Dr. Fogg from August 31, 2018.  Attached as **Exhibit 8** is a true and correct copy of the document labelled as Exhibit 20 in the deposition.

10.    After Dr. Fogg's deposition on August 30 and 31, 2018, I initiated the meet and confer process by sending OCWD's counsel a letter regarding Dr. Fogg's new undisclosed opinions.  Attached as **Exhibit 9** is a true and correct copy of my September 4, 2018 letter.  In the letter, I identified the two undisclosed opinions, explained that they had not been timely disclosed in conformance with Rule 26 and the Court's orders, and asked OCWD's counsel, Tracey O'Reilly, to confirm that Dr. Fogg would not offer these opinions, or any other undisclosed opinions, at trial.

11.    Ms. O'Reilly failed to respond substantively to my September 4, 2018 letter, despite my repeated requests for a response, until November 7, 2018.  In her November 7 letter (a copy of which is attached hereto as **Exhibit 10**), Mr. O'Reilly refused to confirm definitively that OCWD would not be offering the new opinions at trial.

12.    After receiving Ms. O'Reilly's November 7 letter, I telephoned her that same day and left a voicemail message asking her to call me so that I could clarify

-3-

her position.  She did not respond.  I sent a follow up email on November 8 asking her to call me.  She responded, advising that she was too busy to discuss.  A true and correct copy of this email correspondence is attached hereto as **Exhibit 11**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 21, 2018, at Los Angeles, California.

*/s/ Whitney Jones Roy*

WHITNEY JONES ROY

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 1

Exhibit 1
Page 5

LEXISNEXIS® FILE & SERVE
35708626
E-SERVICE
Feb 1 2011
6:49PM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re: Methyl Tertiary Butyl Ether ("MTBE")** **Products Liability Litigation** | **Master File No. 1:00-1898** **MDL No 1358 (SAS)** **M21-88** |

**This Document Relates To:**
*Orange County Water Dist. v. Unocal Corp.*
*et al.*, Case No. 04 Civ. 4968 (SAS)

## PLAINTIFF ORANGE COUNTY WATER DISTRICT'S LIST OF EXPERT WITNESSES

Pursuant to Case Management Order #82 plaintiff Orange County Water District (the "District") hereby discloses the following list of retained expert witnesses whose testimony the District currently expects to present at trial in this action and who will be submitting reports, and non-retained witnesses whose testimony the District may present at trial and who may offer expert opinions as part of such testimony. The District also hereby discloses certain retained expert rebuttal witnesses whose testimony the District currently anticipates may be needed to rebut the opinions of defendants' experts, and who will be submitting expert rebuttal reports to the extent necessary. The District's present identification of anticipated rebuttal experts is not intended as a final identification of rebuttal experts as the Defendants have not yet identified the anticipated areas of expert testimony they intend to present at trial. The District, therefore, expressly reserves the right to designate additional rebuttal experts to the extent necessary in order to respond to Defendants' experts.

Exhibit 1
Page 6

1

Plaintiff reserves all rights to amend, withdraw, replace, and/or supplement the experts listed to the extent allowed by statute, rule or Court order as well as the right to call any experts, retained or non-retained, identified by any other party to this matter.

## **RETAINED EXPERTS**

### **Hydrogeology**
(including but not limited to, fate and transport, groundwater modeling, and threats to public drinking water supply wells)

1.   Steven Wheatcraft, Ph.D.
     Wheatcraft and Associates
     3155 Heatheridge Lane
     Reno, Nevada  89509
     Phone: 775-348-9535

### **Hydrogeology**
(including but not limited to, MTBE as contaminant in soil and groundwater, persistence, MTBE characteristics, biodegradation, dispersion, and potential for attenuation)

2.   Graham Fogg
     University of California, Davis
     Land & Water Resources
     1 Shields Avenue
     Davis, California  95616
     Phone: 530-752-6810

### **Hydrogeology**
(extent and nature of contamination, remedial alternatives, recommended alternatives and damages)

3.   Anthony Brown
     Trow Global
     56 Queen Street East, Suite 201
     Barmpton, Ontario L6V 4M8
     Canada
     Phone: 905-796-3200

Exhibit 1
Page 7

2

**Hydrogeology**
(including but not limited to, site investigation and remediation, extent and severity of contamination)

4.     David Huntley, Ph.D.
       866 Cordova Street
       San Diego, CA 92197
       (619) 224-6422

**Impacts of MTBE on Drinking Water Quality, Taste and Odor**

5.     William S. Cain
       Chemosensory Perception Laboratory
       Department of Surgery (Otolaryngology)
       University of California, San Diego
       San Diego, California 92093-0957
       Phone: 858-622-5831

**Health Effects**

6.     Kenneth M. Rudo, Ph.D.
       1005 Brendan Court
       Chapel Hill, North Carolina 27516
       Phone: 919-707-5911

**Air Quality**

7.     Donald Lucas, Ph.D.
       Lawrence Berkeley National Laboratory
       90-1140B
       Berkeley, California 94720
       Phone:  510-486-7002

**Gasoline Storage Systems and Releases**

8.     Marcel Moreau
       Marcel Moreau Associates
       73 Bell Street
       Portland, Maine  04103
       Phone:  207-774-9263

Exhibit 1
Page 8

3

### Ethanol/Oxygenates, Other Alternatives to MTBE

9.     Robert Reynolds, President
Downstream Alternatives, Inc.
P.O. Box 2587
2259 Harwood Street
South Bend, Indiana 46680-2587
Phone: 574-250-2811

### Gasoline Distribution and Deliveries

10.     Kenneth Kross
10704 Gainsborough Court
Bakersfield, California 93312
Phone: 559-799-5914

11.     James W. Barrington, P.E.
10337 Birchdale Avenue
Downey, California 90241
Phone: 562-861-6425

### Water Systems, Water Quality, Regulations, Remediation Engineering, Treatment, Groundwater Management and MTBE

12.     Richard Haberman
1625 East Desert Island Drive
Fresno, California 93730

### Economics, Cost Benefit Analysis, Refinery Economics, Present Value, Net Worth

13.     W. Ed Whitelaw
EcoNorthwest
99 West 10th, Suite 400
Eugene, Oregon 97401
Phone: 541-687-0051

### Chemistry

14.     James Bruya, Ph.D.
Friedman & Bruya
3012 16th Avenue West
Seattle, Washington 98119-2029
Phone: 206-285-8282

Exhibit 1
Page 9

4

### Land Acquisition Costs, Real Estate, Eminent Domain

15.    Sharon Hennessey
Hennessey & Hennessey
17602 17 Street, Suite 102 #246
Tustin, California 92780
Phone: 714-730-0744

### Talbert Barrier Operations

(including, but not limited to, sources of water, operation of water treatment facilities and injection barrier, and MTBE contamination in reinjection water)

16.    George "Mack" Wesner
90 Mira Adelante
San Clemente, California 92673
Phone: 714-287-9349

## NON-RETAINED WITNESSES WHO MAY OFFER EXPERT OPINIONS

17.    Roy Herndon
Orange County Water District
18700 Ward Street
Fountain Valley, California 92708
Phone: 714-378-3200

18.    David Bolin
Orange County Water District
18700 Ward Street
Fountain Valley, California 92708
Phone: 714-378-3200

19.    Timothy Sovich
Orange County Water District
18700 Ward Street
Fountain Valley, California 92708
Phone: 714-378-3200

20.    Steven Fitzsimmons
Orange County Water District
18700 Ward Street
Fountain Valley, California 92708
Phone: 714-378-3200

Exhibit 1
Page 10

5

21.   Nira Yamachika
      Orange County Water District
      18700 Ward Street
      Fountain Valley, California 92708
      Phone: 714-378-3200

22.   Michael Wehner
      Orange County Water District
      18700 Ward Street
      Fountain Valley, California 92708
      Phone: 714-378-3200

23.   Kenneth R. Williams
      Gerald Thibeault
      Nancy Olson-Martin
      Rose Scott
      Patricia A. Hannon
      Tom Mbeke-Ekanem
      Leslie Alford
      Valerie Jahn-Bull
      Steven D. Overman
      Dixie Lass
      Kurt V. Berchtold
      California Regional Water Quality Control Board
      Santa Ana Region
      3737 Main Street, Suite 500
      Riverside, California 92501
      Phone: 951-782-4130

24.   James Huff, Ph.D.
      National Institutes of Environmental Health
      MD A2-01
      P.O. Box 12233
      RTP, North Carolina 27709
      Phone: 919-541-3780

25.   Christopher Ross
      Hargis & Associates, Inc.
      9171 Towne Centre Drive, Suite 375
      San Diego, California 92122
      Phone:  858-455-6500

Exhibit 1
Page 11

6

26.  Dickman Lum
     California Air Resources Board
     Compliance Division
     2020 L Street
     Sacramento, CA 95814
     Phone: 916-327-1520

27.  Terry Carrier
     Lisa Casner
     Kathryn Cross
     Seth Daugherty
     Bri Dewey
     Allan Dietz, Ph.D.
     William J. Diekmann, REHS
     Bill Edinger
     Edward J. Gallagher
     Michael Gooch
     Deborah Greco
     Patty Gwathney
     Steve Harris
     Jeffrey Higbee
     Geniece Higgins
     Karen Hodel, R.G.
     Mike Karl
     Joyce L. Krall, REHS
     Kevin D. Lambert
     Luis A. Lodrigueza
     Anthony Martinez
     Jack Miller, REHS
     Mike O'Donnell
     Tamara Padilla
     Peter Peuron
     Arghavan Rashidi-Fard
     Steven Sharp, REHS
     Stephen Speer
     James Strozier
     Shyamala K. Sundaram
     Osman Taban
     Laura Valdez
     Steven K. Wong, RS
     Gary Zimmerman
     Orange County Health Care Agency
     P.O. Box 355
     Santa Ana, California 92702

Exhibit 1
Page 12

7

28.   Tara B. Kruck
      Michael N. Clark, CEG
      Applied GeoSystems

29.   Carl Anderson
      Steve Clarke
      James Haslett
      Russel Juncal
      Joel Kloth
      Robert Distaso, PE
      RESNA

30.   Richard Rees
      Kumar Sundaresan
      Mike Higman
      Al Martinez
      Brown & Caldwell

31.   John Amato
      Ronald Bailey
      Aaron Baird
      Tony Brown
      Thomas Carroll
      Mark Gelband
      John Gonzales
      Sarah O. Hartman
      Diane Henry
      James F. Howard, Ph.D.
      John Huff, PE
      Mark I. Jirgal, RG
      Karen Jones
      Allen C. Just
      Dana P. Koschel
      Keith J. Kuhlmann
      Matthew Lucas
      Fabio Minervini
      Susan Neilsen
      Christopher Ota
      Sean Peacher
      Mehmet Pehlivan
      Steve Pence
      Jon P. Pesicka, PE
      Holly Quasem, PE
      Gerald Quindry
      Pamela Ramsay
      Jill Reichle

Exhibit 1
Page 13

Dean Richesin
Dennis Rourke
John Saddington
Sarah O. Salcedo
Richard B. Silverman
Bryan Van Wagner
Stephen Walter
Sam Wong
Delta Environmental Consultants

32.   Edward A. Battle
Greg Buchanan
Richard L. Coffman, PhD
Frank Echenique, RG
Jennifer L. Foote
Ravi Limaye, PE
Marc McWilliams
Philip G. Mihopoulos, Ph.D.
James Miller
Mehmet Pehlivan, R.G., C.H.
TAIT Environmental Management

33.   Jeff D. Aguilar
Lance Eckhart, REA
Claus M. Jakobsen, R.G.
Andre LaMontagne
Jeffrey D. Leifer
Lynleigh Lowry
Michael Mednick, REA
John Nordenstarn
Stephen Osborn
David M. Pearson
George Salley
Ben Stewart
Morley J. Weitzman
James K. Wilkinson
Steve M. Zigan
Environmental Resolutions, Inc.

34.   Denise L. Alvarez
Brian Beck
William Breedlove
Chris Callegari
Allan G. Campbell, RG
Marie Cardona
Callie Cullum

Exhibit 1
Page 14

9

Stephen Defibaugh
Gil Fry, RG
Jeffrey Fujita
Anand Helekar, PE
Jeff Hensel, RG
Karen Hodel
Michael Huggins
William T. Hunt
Steve Keane, RG
Kevin Keenan
Ronald Kofror
Charles Lee
Jeffrey R. Maxwell, RG
Girard E. Morgan, RG
Jinghui Niu
John Nordenstam
Michael Pitta
Robert Ponce
Stephan Rosen
Jeremy Russell
Ronald Santos, PE
Tom Sayles
Liz Sewell
Chris Smiga
J. Todd Stanford, REA
Stan Steinbach, PE
John Trompeter, RG
Jeffrey Wiegand
TRC Alton Geoscience

35.    Mark E. Bell
Karl Brewley
James Bryson
Amin S. Damji
David Devries
Dean O. Gregg, PE, RG
Michael Huggins, RG
Valerie Jahn
Adam Leiter
Craig Neslage
Joanne Oscar
Marina Robertson, RG, CEG
Rose T. Scott
Mark Shifflett
David Van Horsen, RG

Exhibit 1
Page 15

10

Michael Wong
Environmental Science & Engineering

36. Ahmad S. Adballat
J. Graydon Martz
Irene Nester
Marda Tyree Herbert
J. Michael Sheffer
W.W. Irwin, Inc.

37. J. Graydon Martz
Kevin Clark
Carla Lee Hollowell
Ryan Nunneley
Anne Engelhaupt
Thomas D. Smith
WGR Southwest, Inc.

38. Truedi Balsitis
Jean Bolduc
David Breen
William C. Edmund
Olivia R. Edwards
Andrew Hart
Robert J. Hays
David M. Henry
Kathleen Hughes
Chris McDonald
Deborah Mangini
David Martinez
Laura Mendoza
David Potts
Laura Takach
Michael Wielenga
Wayne Perry, Inc.

39. Carol Noland, REA
Artemis

40. Adam Zipp, PhD, REA
Sheldon E. Medall
TTI Environmental

Exhibit 1
Page 16

11

41.    Jabed Masud
Saeed Shahidi, RCE
William Hobbs
Geo Environ

42.    Scott Sankey, RG
Emanuel O. Pedram, PhD
Katie Hickling
Applied Environmental Technologies

43.    Armen Minassian, PE
Al Maurad, PE
El Capitan Environmental Services

44.    Karen Bennett
Karen Blanchard
Jay A. Boughter
Lloyd Guss, RG
Karl Kerner, RCE
Carla Lee Hollowell
Steve Pence
Tom Robbins
Jasmine Senn
Constantin Tuculescu, REA
Ross A. Williams, RG
Nadia Yglecias
Atlas Environmental Engineering

45.    Sandra Laylan
Ronald Nye, PhD
PHR Environmental Consultants

46.    William E. Malvey
Erik M. Block
Stephen T. Defibaugh, RG
Amy Hillyard
Block Environmental

47.    Jim Brown
Belshire Environmental Services

48.    Larry Freeberg
EA Engineering

Exhibit 1
Page 17

12

49.    Kyle Emerson
       Pioneer Consultants

50.    Faridah Kia
       Ensotech Inc

51.    Kevin Clark
       Joseph H. Kenny
       Richard Silverman
       Schaefer Dixon Associates

52.    Bryan Campbell
       John Haberland
       Ryan Haughy
       Patrick T. McCullough, REA
       ETIC Engineering Inc.

53.    Frank S. Muramoto, RG
       James M. Haslett, RG
       Patrice L. Martin, REA
       Mark Magargee
       Holguin, Fahan & Assoc.

54.    Scott Fagan
       Joseph Radonovich
       Stephen Niou
       Sherwin Abidi
       Kevin Sheridan
       Remedial Management Corp

55.    Ronald Bailey
       Paul D. Chang
       Peter Christianson
       Keith G. Farrell
       Michael E. Flack
       Roy Hauger
       Diane Henry
       Girard Morgan
       Lisa Morris
       Erin K. O'Connell
       EMCON/EMCON Southwest

56.    John F. Dablow III
       Hydro-Fluent, Inc.

Exhibit 1
Page 18

57. Scott L. Neville
    Craig A. Stewart, CEG
    Gray F. Stoney, CEG
    Anthony Saponara
    Robert D. Perry, CEG
    Dick Davis
    Hydrotech Consultants, Inc.

58. James S. Robert
    Ed Furu, RG
    Maurice Gallarda
    William Henry
    Carl Hulick
    Martell Washington
    The Park Corporation/Park Environmental Corp

59. James McHarry
    Robin Kim, RG
    The Tyree Organization

60. Michael Berman
    Karl D. Bowers, RG
    Charles Nussrallah
    Deryck Roberts
    Kim Sawyer
    Keli Thorne
    The Source Group, Inc.

61. John Nicolich
    JDR Environmental, Inc.

62. Laura Long
    Kelly C. Brown, RG
    SECOR

63. Richard A. Vogl
    GeoHydrologic Consultants, Inc.

64. Michael Anselmo
    Paul Lipinski
    Scott Green
    Daniel C. Oliver
    W. Heidi Hamilton
    Gregory Morgan
    MJA Consulting, Inc./C. James & Associates, Inc.

Exhibit 1
Page 19                                    14

65.     Richard R. Beauregard, REA
        W. Greg Hamer, CEG
        William J. Manker
        Radian Corporation

66.     Paul V. Mehta
        Rachel T. Martinez
        Donald A. Pape, CEG
        Harding Lawson Associates

67.     Hamid Khorzani, RG
        George E. Salley, RG
        Matthew Patton
        Darryl Pressler
        Walid Mahklouf
        T. Michael Pendergrass
        Harding ESE, Inc.

68.     Simon Chang
        Steven W. Draper
        Brett Eddington
        Loureen Gomez
        Joshua Hopp
        Jillian Maloney
        Amy Mora
        T. Michael Pendergrass
        Ronald Santos, PE
        Karen Simmons
        Peter Stumpf, PE
        SAIC

69.     Kelly C. Brown, RG
        Karl Bowers, PG
        Daniel P. Dowdy
        James M. Evensen, Jr., RG
        Grant Holliday
        Michael J. Jalonen
        Phillip R. Kinnery, RG
        Timothy P. Lindholm
        Laura Long
        Michael C. Mazzarese
        Holly Quasem, PE
        Cathy Sanford
        Aaron Swerdlow
        Greg Westling

Exhibit 1
Page 20

15

Bob C. Wilson, CEG
SEC●R

70. Russell Powers, RG
Eddie J. Rangel, PE
Roger J. Schwing
Sigma Plus Environmental Consultants

71. S. Javad Mas●udi
Reza Sobhani
EnviroMonitoring Services

72. J. Jay Badiei, RG
Jeff Suryakusuma, PE
Earth Management Co.

73. Todd Overturf
Dominic DiCarlo
ENSR International

74. Sherwin Abidi
Unitech

75. Lawrence Favilla
Gene Carpenter
James Herbert
Bruce Clark
Amir Rouhani
Quin Kennebrew
David Randell
Leighton and Associates

76. William Samoska
Reznik & Reznik

77. Mark Russell, PE
Darren B. Kitajima
George C. Solomon
Justin L. Hawkins
Phillip Larson
Pacific Environmental

78. Sarah Dent●n
William Henry
Waterstone Environmental

Exhibit 1
Page 21

16

79.   Jinghui Niu
      Environ Strategy Consultants

80.   Leobardo Chaidez
      Alex Lapostol
      Bechtel

81.   Stephen Rasmussen
      Jim Schneider
      Conestoga-Rovers

82.   Shelby Lathrop
      Paul Parmentier
      Samantha Tokash
      Kenneth Ragland, RG
      Bob Ruscitto
      Fluor Daniel GTI

83.   Patrick Fiedler
      Fred Fiedler & Associates

84.   Rex Hovey
      Harding ESE

85.   Theodore Schafnitz
      Alan Jessup
      Pacific Soils Engineering

86.   Dawn Kohlmeyer
      David Tohir
      Tanknology

87.   Joe Frey
      Gregory Morgan
      Frey Environmental

88.   Gregory Kishiyama
      Thomas Hill
      Thomas Hill & Associates

89.   James McAndrew, RG
      Dominic Meo III, PE
      Yellowstone Environmental Services

90.   Walter Haines
      Blakely Environmental, Inc.

Exhibit 1
Page 22

17

91.  John Hills
     Irvine Ranch Water District
     15600 Sand Canyon Avenue
     Irvine, California 92618
     Phone: 949-453-5300

92.  Howard Johnson
     Derek Smith
     City of Huntington Beach
     2000 Main Street
     Huntington Beach, California 92648
     Phone: 714-536-5431

93.  Robert McVicker
     Mesa Consolidated Water District
     1965 Placentia Avenue
     Costa Mesa, California 92627
     Phone: 949-631-1200

94.  George Murdoch
     City of Newport Beach
     3300 Newport Boulevard
     Newport Beach, California 92663
     Phone: 949-644-3309

95.  Rebecca Brooks
     Kim Christensen
     Robert Ghirelli
     Martin Talebi
     Orange County Sanitation District
     10844 Ellis Avenue
     Fountain Valley, California 92708
     Phone: 714-962-2411

96.  Natasha Molla
     Chevron Products Corporation

97.  Jennifer Sedlachek
     Exxon Mobil Corporation

98.  Kateri Luka
     Atlantic Richfield Company

99.  Karen Lyons
     Shell Oil Company

Exhibit 1
Page 23                                          18

100.   Shari London
       ConocoPhillips Company

101.   Lee Paprocki
       Worley Parsons
       8658 Commerce Court
       Burnaby, British Columbia, Canada

102.   Duane Bordvick
       Tosco Refining Company
       Avon 23 Refinery
       Martinez, California, 94553

103.   Timothy Buscheck
       Chevron Products Company

104.   Mary Drewry
       State Water Resources Control Board
       Clean Water Program
       1001 I Street
       Sacramento, California
       Phone:  916-341-5700

105.   Jack Fraim
       c/o Chevron Products Company

106.   Barbara J. Mickelson
       AME
       1107 Investment Blvd., #28
       El Dorado Hills, CA 95762
       (916) 939-7550

107.   Curtis Stanley
       333 Highway 6 South
       Houston, TX

Exhibit 1
Page 24

19

## RETAINED REBUTTAL EXPERTS

### Recharge Operations

(including, but not limited, to operation of the District's recharge facilities, sources of water, operation of water treatment facilities, and MTBE contamination water utilized for recharge)

108.   Jordan Clark
       Department of Earth Science
       Webb Hall
       University of California, Santa Barbara 93106
       Phone: 805-893-7838

Dated: February 1, 2011          By: _____
                                      Tracey L. O'Reilly
                                      Miller, Axline & Sawyer
                                      1050 Fulton Avenue, Suite 100
                                      Sacramento, California 95825
                                      Attorneys for Plaintiff Orange County Water
                                      District

Exhibit 1
Page 25                          20

*In Re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation:*
*Orange County Water District v. Unocal Corp., et al.*, Case No. 04 Civ. 4968

## PROOF OF SERVICE VIA LEXISNEXIS FILE AND SERVE

I am a citizen of the United States and an employee in the County of Sacramento. I am over the age of eighteen (18) years and not a party to this action. My business address is Miller, Axline, & Sawyer, 1050 Fulton Avenue, Suite, 100, Sacramento, California 95825.

On the date executed below, I electronically served the document(s) via LexisNexis File & Serve, described below, on the recipients designated on the Transaction Receipt located on the LexisNexis File & Serve website:

### PLAINTIFF ORANGE COUNTY WATER DISTRICT'S LIST OF EXPERT WITNESSES

I declare under penalty of perjury that true and correct copies of the above document(s) were served via LexisNexis File & Serve on February 1, 2011.

LORI FERGUSON

Exhibit 1
Page 26

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 2

Exhibit 2
Page 27

E-SERVICE
62348666
Aug 14 2018
10:11PM
File & ServeXpress

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

_____

*Orange County Water District v. Unocal Corp., et al.,* Case No. 8:03-cv-01742 CJC (ANx)

_____

**SUPPLEMENTAL REBUTTAL REPORT OF GRAHAM FOGG, Ph.D.**

_____                8-14-18
Signature                                          _____
                                                          Date

Exhibit 2
Page 28

1

# Contents

**1. Response to Defense Experts Daus and Feldman Regarding the LTCP ........................4**
1.1 Low Threat Closure Policy Public Comments and Concerns ...........................................4
    *1.1.1. Concern over Groundwater Quality* ...................................................... 5
    *1.1.2. The Erroneous "Tenet" of the Policy that Natural Attenuation Can be Achieved "Within a Reasonable Time".................................................................................................. 7*
    *1.1.3. Shifting the Responsibility for Cleaning up the Water from the RP to the Local Agencies. .................................................................................................................. 9*
    *1.1.4. The Policy Presumes an Accurate and Thorough Site Conceptual Model......................10*
    *1.1.5. The Policy was not Based on Good Science...................................................10*
    *1.1.6. The Lack of Discussion on TBA* ....................................................................12
    *1.1.7. Policy is Cost Driven* ...................................................................................12
    *1.1.8. The Stakeholder Group Favored Oil Industry Interests* ...............................12
1.2 Comments on the Policy and the Technical Justification Documents...............................15
    *1.2.1 The Principles the LTCP is Based on are not Supported by the Literature.....................16*
    *1.2.2 The LTCP Ignored the Conclusions and Recommendations of the Studies on which it Relied.................................................................................................................. 18*
    *1.2.3 The Technical Justification for the Policy was Severely Flawed.............................26*
    *1.2.4 The Technical Justification for the Policy Misrepresented the TBA Issue ...............31*
    *1.2.5 The Policy was cost driven.........................................................................34*

**2. Response to Dr. Williams on MTBE and TBA detections in private wells in California
............................................................................................................................36**
2.1 California GAMA Domestic Well Project ......................................................................36
2.2 MTBE and TBA impacts to private drinking water wells near release sites.......................40
    *2.2.1 Methodology* .............................................................................................41
    *2.2.2 Analytical Results* .....................................................................................42

**3. Joint Response to Mr. Daus and Dr. Williams ..............................................48**
    *3.1 Response to the opinions of Dr. Williams regarding PCE* ...............................50

**4 Response to the opinions of Dr. Williams regarding MTBE and TBA impacts on public sources of drinking water .......................................................................................54**
4.1 The DDW database ....................................................................................................54
4.2 Many PWS wells in California have not been sampled, and many more are not frequently sampled, for MTBE and/or TBA ......................................................................................55
4.3 Lack of statistical methodology ................................................................................62
4.4 An update of MTBE and TBA detections in the DDW Database .....................................63

**5. Response to the Supplementary Expert Report of Mr. Daus....................................67**
5.1 Connor et al. (2015): Misleading claims by consultants from GSI Environmental Inc. regarding MTBE, benzene and TBA plume lengths and stability ...........................................67
    *5.1.1 Connor et al. (2015) was developed for litigation purposes.................................70*
    *5.1.2 Wide gap between the opinions of Connor et al. (2015) and the authors of the surveys on which they rely.......................................................................................................72*
    *5.1.3 Most often, monitoring of plumes does not account for vertical migration of contamination.......................................................................................................79*
    *5.1.4 Statistically biased survey data ...................................................................80*
    *5.1.5 The survey of McHugh et al. (2013): roles of remediation and biodegradation in plume stability .................................................................................................................83*

Exhibit 2
Page 29

2

*5.1.6 Broken peer review process* ................................................................86

5.2 McDade et al. (2015): More misleading claims by consultants from GSI Environmental Inc. regarding MTBE plumes................................................................86

*5.2.1 Developed for litigation purposes* ........................................................88

*5.2.2 Plumes were characterized with exceptional off-site monitoring well networks* ............89

*5.2.3 Inappropriate comparison with plumes characterized with conventional monitoring networks* ........................................................................89

*5.2.4 Detached plumes* ..................................................................90

*5.2.5 The MTBE, TBA and benzene plume lengths discussed in McDade et al. (2015) contradict the conclusions in Connor et al. (2015)* ....................................90

5.3 Conspiucous omissions by McDade et al. ........................................92

*5.3.1 Misleading and biased characterizations of release volume*.........................92

*5.3.2 Migration beyond the networks of even these "exceptionally well-monitored plumes"*.....94

*5.3.3 Deer Park plume*....................................................................94

*5.3.4 East Patchogue and Hamptons Bay plumes*..........................................95

*5.3.5 Mission Valley Terminal (MVT), San Diego plumes*...................................95

*5.3.6 New Hyde Park plume*................................................................96

5.4 Theoretical plume migration predicted by Mr. Connor and his colleagues at GSI (API, 2003)................................................................................97

*5.4.1 MTBE migration without source remediation*..........................................99

*5.4.2 MTBE migration with source decay due to remediation and/or a limited source mass* ................................................................................99

*5.4.3 MTBE migration with a rapid reduction in the MTBE source due to remediation*.........99

6. References: ................................................................................104

Exhibit 2
Page 30

3

# 1. Response to Defense Experts Daus and Feldman Regarding the LTCP

The following section is in response to defense experts Daus and Feldman supplemental reports and addresses the Low Threat Closure Policy (LTCP). Mr. Daus simply presented a synopsis of the LTCP. Mr. Feldman meanwhile presented a more detailed discussion and asserted that: "the LTCP was adopted after a lengthy administrative process that included numerous opportunities for public comment, input, and opposition" (Feldman 2017). However, Mr. Feldman's discussion simply provided a detailed description of the procedural process that resulted in the adoption of the Policy and did not address any of the specifics of the "public comment, input, and opposition". Here I address the many public comments that were in fact submitted to the State Water Resources Control Board (SWRCB), many of which were in opposition to the Policy and the majority of which raised concerns regarding the different aspects of implementation. I also discuss the fact that the Policy, and its supporting Technical Justification documents, contradicted the findings and recommendations of the very documents that they stated they relied on.

## 1.1 Low Threat Closure Policy Public Comments and Concerns

The Underground Storage Tank (UST) Low Threat Closure Policy (herein referred to as LTCP or Policy), became effective on August 17, 2012[1]. The Policy established the criteria deemed satisfactory to close LUST sites it considered presented "a low threat to human health, safety and the environment"[2] and has since been implemented to close leaking UST sites in Orange County and across California. The Policy, drafted by a nine-member stakeholder group, went through a public comment period and a review process in 2011 and early 2012 before it was finalized and adopted as part of the SWRCB Resolution No. 2012-0016.

Below, I discuss the Policy in general and the public comments on the draft Policy, submitted to the SWRCB and listed on their website[3]. Those public comments reflected

---

[1] https://www.waterboards.ca.gov/ust/lt_cls_plcy.html#policy081712 last accessed July 17, 2018
[2] https://www.waterboards.ca.gov/ust/lt_cls_plcy.html#stakeholder
[3] https://www.waterboards.ca.gov/ust/policy/cmmnt110811/index.html
https://www.waterboards.ca.gov/water_issues/programs/ust/policy/cmmnt031912/index.html

Exhibit 2
Page 31

4

many concerns, and some were highly critical of the lack of scientific support for the statements made in the Policy, the lack of foresight in protecting and preserving the quality of groundwater, and the ambiguity of the language used. Many raised concern over the high concentrations of contaminants allowed to stay in place, the reliance on "natural attenuation" to achieve water quality objectives in a "reasonable timeframe," the ambiguity of what that time period might be, and the absurdity of having no way to verify if attenuation is in fact occurring and at what rate, given that the Policy requires that all monitoring wells be destroyed once a site is approved for closure. It is important to note that in contrast to the vast majority of the public comments that were critical of the different aspects of the Policy, the comments from the oil companies and their representatives were in full support of the implementation of Policy.

The following is a list of some of the primary concerns raised by many who submitted letters to the SWRCB addressing the Closure Policy. Several shared common concerns, and the comments covered a wide range of issues, but for the sake of brevity, I will only present a sampling of some of the comments

### 1.1.1. Concern over Groundwater Quality

Many voiced their concern over the intended plan to leave contamination in place and what that means for future land use and future groundwater use.

The Alameda County Health Care Services Agency (Wickham and Drogos, 2011) expressed concern over water quality impacts from the Policy:

> "Since both site assessments and cleanups that would take place at some sites under the current regulatory oversight would not occur under the Low-Threat Closure Policy, future water quality will be affected. The effect of the Low-Threat Closure Policy will be that groundwater will not be protected to the same degree as under current regulatory criteria and that future use of groundwater will be impacted. The Policy relies upon natural attenuation processes to restore groundwater quality over decades to hundreds of years."

Similarly, the Alameda County Water District (Wadlow 2011) raised concerns about contamination being left in place and "what a "reasonable period of time" is for the attenuation process to occur" and how that would impact groundwater resources in the district. The letter to the SWRCB stated: "A baseline that knowingly allows petroleum to be left in place for a longer period of time, and above the Water Quality Objectives

Exhibit 2
Page 32

5

(WQOs), does not have a primary consideration to prevent environmental damage"
(Wadlow 2011). The letter noted that "residual contaminated groundwater will no longer
be available for use by water utilities until WQOs have been achieved, which may take
tens to hundreds of years before natural attenuation will reduce the contaminants to
acceptable levels".

The Groundwater Resources Association (GRA 2011) pointed out that the Policy seemed
to be in conflict with existing policies designed to protect groundwater resources, such as
Resolution 68-16 "Statement of Policy with Respect to Maintaining High Quality of
Waters in California"; Policy 88-63 "Adoption of Policy entitled Sources of Drinking
Water"; and Policy 92-49 "Policies and Procedures for Investigation and Cleanup and
Abatement of Discharges under Water Code Section 13304." The latter, Policy 92-49,
had put forward, GRA noted, a "containment zone policy" for specific cases where ""the
Regional Water Board finds…it is unreasonable to remediate to the level that achieves
water quality objectives. The discharger is required to take all actions necessary to
prevent the migration of pollutants beyond the boundaries of the containments zone in
concentrations which exceed water quality objectives. The discharger must verify
containment with an approved monitoring program and must provide reasonable
mitigation measures to compensate for any significant adverse environmental impacts
attributable to the discharge.""[4] In contrast, the LTCP would allow for very high
concentrations of contamination to be left in place, demolish any monitoring wells that
might be needed to track that contamination, and let the polluters off the hook.

Many others expressed concern over the implications of leaving contaminated
groundwater in place given the State's heavy reliance on groundwater for drinking
supply, and the expected increase in population and corresponding demand for water. For
example, G. Barton (2012) wrote to the SWRCB:

> "Population growth is inevitable and the Policy does not take into account future
> population growth and additional needs for more clean water. The Southern California
> region already overallocates the amounts of water reserved for use at its present
> population. Please explain how the Policy will not further limit our water supply by
> allowing increased concentrations of petroleum hydrocarbons to remain in soil and
> groundwater beneath former UST sites."

[4] As quoted from Policy 92-49 by the GRA letter.

Exhibit 2
Page 33

6

A letter from the San Mateo County Health System (Peterson et al., 2011) also pointed out:

> "The current draft policy only takes into account currently-anticipated, near-future groundwater use. It does not account for changes in the future which could happen rapidly (i.e. earthquakes, change in pumping rates of existing wells) while the residual contamination is still degrading over a time frame of decades to hundreds of years. For the San Francisco Bay area, a majority of drinking water comes from piped water that traverses several major known faults that have a high probability (~70%) of a high magnitude earthquake in the next 30 years. Currently inactive wells could suddenly be re-activated, or new wells installed, and change the groundwater flow dynamics in close proximity to the more residual contaminants left in place under the proposed policy"

Olivia Jacobs of the Clearwater Group cautioned the SWRCB in her letter that with this Policy "The concept of Well Head Protection Area/well field capture zone is violated" and that:

> "Resource Valuation is ignored. Potential aquifer contamination should be valued and loss of future uses of local water (developing new groundwater resources) and water basin storage capacity should be evaluated" (Jacobs 2012)

### 1.1.2. The Erroneous "Tenet" of the Policy that Natural Attenuation Can be Achieved "Within a Reasonable Time"

One of the main principles that the Policy was based on was that contamination left in place will "naturally attenuate within a reasonable time"[5]. The Technical Justification documents the Stakeholder Group prepared to support that flawed assumption used the term "biodegradation/natural attenuation" indicating that biodegradation was the primary implied attenuation mechanism. The authors (Stakeholder Group) provided no scientific support basis other than the vague and overly general statement: "The Stakeholder Group acknowledges that the biodegradation/natural attenuation of petroleum hydrocarbon and oxygenate plumes has been documented by many researchers since the 1990s" (SWRCB 2011).

In response, many of the public comments took issue with both the reliance on biodegradation/natural attenuation (the lack of science or field experience supporting it

---

[5] The Draft Policy (SWRCB; 7/14/11) stated: "It is a fundamental tenet of this low-threat closure policy that if the closure criteria described in this policy are satisfied at a release site, water quality objectives will be attained through natural attenuation within a reasonable time, prior to the need for use of any affected groundwater"

Exhibit 2
Page 34

7

especially with regards to MTBE) and the ambiguity of the statement "reasonable time". For example, Mehler (Howard Mehler PhD., J.D., & Associates Incorporated) wrote:

> "I challenge the fundamental tenet of your proposed policy that: "Water quality objectives will be obtained through natural attenuation within a reasonable time, prior to the need for use of any affected groundwater" (Mehler 2011)

Mehler gave as an example a contaminated site in Canoga Park California, with an MTBE plume estimated at 250 feet and a maximum MTBE concentration between 200-400 ppb (which would qualify the site for closure under the Policy), and showed that estimates for MTBE to attenuate at that site were as high as 260 years. Mehler (2011) wrote:

> "There is obviously considerable uncertainty as to whether background water quality (5ppb) will ever be achieved in the impacted onsite and offsite areas. It may be reasonably likely that absent active remediation, the impacted groundwater will be permanently spoiled and can never be used as a source of drinking water"

Another public comment on the effectiveness of natural attenuation was submitted Brown (2012) who wrote:

> "Because every UST site in California has unique hydrogeochemistry and microbial characteristics, the evidence for and the rate of in-situ biodegradation should be determined at all sites impacted by petroleum hydrocarbons and fuel oxygenates. Such an evaluation could then demonstrate that contaminants will likely be removed from groundwater by natural processes within an acceptable time frame. This concept is especially important for the oxygenates MTBE and TBA, which are largely resistant to biodegradation and rely mainly on dispersion as the primary attenuation mechanism (the contaminant mass is not destroyed or depleted). To date, biodegradation of MTBE and TBA in groundwater has not been convincingly demonstrated." (Brown 2012; emphasis as published).

Similarly, the Copeland Environmental Toxicologist (2011) commented that the Policy needed to "define "reasonable time frame" or provide guidance as to how it is to be established." And the Alameda County Water District pointed out:

> "The proposed policy does nothing to speed up the cleanup process; it only speeds up the closure process. In fact, it will actually slow down the cleanup process since natural attenuation is the slowest form of groundwater cleanup"  (Wadlow 2011)

Exhibit 2
Page 35

8

### 1.1.3. Shifting the Responsibility for Cleaning up the Water from the RP to the Local Agencies.

Several letters raised concern that with the adoption of the Policy, the SWRCB was simply shifting the responsibility of cleaning contaminated groundwater from the responsible party (RP) to the local agencies. For example, the letter from the Alameda County Water District noted:

> "The Policy needs to recognize that there are numerous open LUST sites within the various groundwater basins throughout the State, and that one has to consider the cumulative impacts from all the combined sites and not look at each site as if it were an isolated case. Within the boundaries of the ACWD alone, there are approximately 141 open LUST sites with groundwater impacts. ACWD anticipates approximately 67% of these cases (95) would likely qualify for closure under the draft. Closing the majority of these sites without any further cleanup or groundwater monitoring unjustly shifts the burden of groundwater protection (monitoring and tracking the location of plumes) to local water districts and utilities such as ACWD" (Wadlow 2011).

Also:

> "In reality, the Policy transfers the legal and financial liability of managing contaminated properties to utilities, groundwater management agencies, local regulatory agencies, property owners, and developers. Closing cases with elevated concentrations of petroleum hydrocarbons in groundwater will have an impact on water quality and groundwater resources for decades to centuries, and will result in a loss of storage capacity for groundwater basins state-wide. Closing numerous sites with contaminants remaining in groundwater would also interfere with water utilities and groundwater management agencies ability to develop new groundwater resources (e.g., new water supply production wells), and given that all monitoring wells will have been destroyed, it will not be possible to confirm when those resources will be available again unless new monitoring wells are installed." (Wadlow 2011)

The Humboldt County Department of Health and Human Services (2011) expressed concern that under the Policy, a regulatory agency would be responsible for "allowing a groundwater plume to remain" noting: "If natural attenuation is relied upon to reduce remaining concentrations, there would be no method to verify it as all monitoring wells will be destroyed." And added that this "demonstrates a change in the basic assumption being made by the SWQCB that now puts the burden of proof on the regulatory agency. The burden of proof should remain with the Responsible Party (RP) to demonstrate that a site has been remediated to meet the conditions required in statue."

Exhibit 2
Page 36

9

### 1.1.4. The Policy Presumes an Accurate and Thorough Site Conceptual Model

The Groundwater Resources Association (GRA 2011) expressed concern regarding the overly general language of the Policy being applied across the State's LUST sites. GRA cautioned:

> "It is impossible to completely capture those sets of attributes that may render a site ineligible for closure based on this low-threat policy. This policy relies on an accurate and complete site characterization being performed and the use of the site conceptual model to identify the special attributes that would require specific attention prior to the application of low-threat criteria by all parties involved"

GRA (2011) continued:
> "There exists the potential that the responsible party or its agent may want to minimize the effort required to create the site conceptual model. Specifically they may be reluctant to search for and incorporate any unique site attributes into the site conceptual model that may jeopardize closure. The policy limits the regulator to use the responsible party's, or agent's, site conceptual model for identification of unique attributes. This appears to change the historic roles of responsibilities form the entity responsible for the contamination to the public as represented by regulators to adequately evaluate the contamination and justify why it is not a threat to the public and environment" (GRA 2011).

Similarly, The Humboldt County Department of Health and Human Services (2011) expressed grave concerns over the Policy's reliance on the conceptual site model (CSM):

> "Relying on the conceptual site model places added significance on the accuracy of the site conceptual model. We cannot stress strongly enough that CSM attributes must be supported with demonstrable, site specific data to substantiate site conditions. If the site conceptual model is inaccurate, evaluation will be similarly inaccurate"

### 1.1.5. The Policy was not Based on Good Science

Several comments addressed the lack of a scientific basis for the assumptions made in the Policy and the heavy reliance on non-peer reviewed articles. For example, Kevin Brown PG, CEG[6] noted in his letter to the SWRCB:

> "The policy liberally references non-peer reviewed technical documents, yet fails to utilize existing regulatory guidance documents, including several important references from the State Water Board, Regional Boards, UC-Davis, etc. Instead, the main conclusions and recommendations relate to studies completed or funded by the major oil companies. This fact should be unacceptable to California's hydrogeologic community." (Brown 2012)

---

[6] Professional Geologist, Certified Engineering Geologist.

Exhibit 2
Page 37

10

Mr. Brown also added:

> "The list of technical reports/references is minimal and contains no important and critical references from the United States Geological Survey. There are very minor technical references from the USEPA. The scientific references for MTBE are minimal and incomplete and do not even include previous policy documents from the State Water Board." (Brown 2012)

Similarly, the Groundwater Resources Association (GRA 2011) noted that the "list of technical reports/references is minimal and contains no important and critical references from the USGS or USEPA." GRA (2011) in turn noted that two papers cited in the Policy (authored by defense experts on this case, Connor and Williams) were listed as "in press" and were not provided for the commentators to review (despite having been accepted for publication). Additionally, GRA (2011) listed several references it suggested should have been included in the Policy, among them a "memorandum" by Ravi Arulanantham[7] PhD. to the San Francisco Bay Regional Water Quality Control Board titled: "Technical rationale and Recommendation to Eliminate the Use of Methyl tertiary Butyl Ether (MtBE) and Similar Oxygenates to Maintain Existing and Future Groundwater Beneficial Uses." As of the writing of this report I have not been able to get a copy of that document.

The County of Santa Cruz Health Service Agency (Fillmore 2012) went further pointing out the lack of "scientific validation" writing:

> "Our biggest concern at this time is that the draft policy has not been scientifically validated. We hope that the Board Members read through the various Draft Policy review comments cited above, because the reviewers clearly indicate the Draft Policy is critically flawed in many areas. It appears that in the various revisions to the Draft Policy, including the most recent, the authors have made some modifications in an attempt to repair these flaws and/or errors in response to some of the comments, yet they have chosen to ignore other comments. We are concerned that during this revision process, the authors of the Draft Policy lack appropriate transparency and accountability because they are not explaining their actions, or lack thereof, in a Response to Comments, or by other means. Without this accountability, it is unclear to us, why some review comments have apparently been ignored and whether the Draft Policy revisions that have occurred adequately address the significant concerns raised by the reviewers." (Fillmore 2012)

---

[7] Dr. Arulanantham, currently of GeoSyntec, served on both the UST Cleanup Task Force (discussed later in this section) and the LTCP Stakeholder Group.

Exhibit 2
Page 38

11

### 1.1.6. The Lack of Discussion on TBA

The Copeland Environmental Toxicologist (2011) wrote to the SWRCB recommending that TBA be added to the "listing of indicator chemicals" especially in light of the reliance of the Technical Justifications Document (the document that provided the basis for the criteria used to evaluate sites for closure) on Shih et al (2004). Copeland (2011) wrote: 'Shih *et al.* state because TBA has the greatest site maximum (geometric mean) concentration, "… its presence needs to be confirmed at LUFT sites so that specific cleanup strategies can be developed." '

The Groundwater Resources Association (GRA 2011) also asked that TBA be included in groundwater analysis. And a letter from the San Mateo County Health System (Peterson et al., 2011) noted:

> "The reason given in the technical justification for not including TBA essentially is that due to the current regulatory climate, very low numbers of drinking water wells have been impacted by TBA. It seems illogical to use the current regulatory system's results to justify a relaxing of the current regulatory environment. In fact, one could argue this could only make impacts worse."  (Peterson et al., 2011)

### 1.1.7. Policy is Cost Driven

In comments to the SWRCB, Ami Adini, president of Ami Adini and Associates, pointed out that "The policy is cost driven". Adini noted that: "The genesis of the contemporary call for unified *Low Threat UST Closure* is not from a scientific impetus. Rather it originates with the financial challenges faced by UST Cleanup fund starting late 2008." Adini added that: "It is correct and essential to consider cost vs. benefit in cleaning up the environment; but this very consideration is not expressly treated in the Policy" (Adini, 2011).

Similarly, F. Ousey, owner of EnviroTech Services, noted that the Policy is "flawed" and added: "This Policy appears to serve the primary function of saving money within the UST Fund Program while omitting the application of sound hydro geologic science." (Ousey, 2012).

### 1.1.8. The Stakeholder Group Favored Oil Industry Interests

In commenting on the influence the oil industry seemed to have exerted on the drafting of the Policy, Kevin Brown wrote:

Exhibit 2
Page 39

12

"The Stakeholder Group is largely comprised of oil company representatives and their consultants. This influence outside of the regulatory world gives a much too powerful voice to the polluters – the polluters are essentially the authors of the policy. The document must include the review and use of a healthy balance of studies from all applicable resources, industry and non-industry alike, and the policy writers should be unbiased." (Brown 2012)[8]

The Technical Justification documents did in fact favor references often cited by defense experts in their opinion reports (e.g., Groundwater Services 1997; Ruiz-Aguilar et al., 2003, Wilson 2003, Shih et al 2004).  More importantly, the Draft Technical Justification document (SWRCB 2011) did rely on and cite documents prepared by oil industry litigation experts (Kamath et al. in press, and Williams in press).  The Kamath document is co-written by Mr. Connor and other staff at Mr. Connor's company GSI. Mr. Connor has been a defense expert on multiple MTBE cases including the one involving OCWD. Similarly, Dr. Williams has been a defense expert on many MTBE cases including OCWD. Neither the Kamath nor the Williams papers had been published at the time of the writing of the draft Policy ("in press"), but the arguments made in those publications had already been expressed in the expert opinions offered in litigating the MTBE cases. It should also be noted that although the Kamath et al and the Williams papers had both been "accepted for publication" in 2011, they were both inexplicably removed from the Final Technical Justification document (which was finalized in April 2012). Additionally, the language used in the Closure Policy, especially as it relates to "plume lengths" echoes much of the work that has been published on this (especially with regards to MTBE plumes) by Mr. Connor's firm (GSI) and cited by Mr. Daus in his supplemental report (Daus 2017).

---

[8] The State (SWRCB website) described the make up of the stakeholder group as "group of nine individuals from several different California UST stakeholder groups including two Regional Water Quality Control Board (RWQCB) agencies, a Local Oversight Program (LOP) agency, a water district, responsible party (RP) representatives from the Western States Petroleum Association (WSPA) and California Independent Oil Marketers Association (CIOMA), two participants from Non-Government Organizations (NGOs), and one UST consultant". This group of nine members included a representative from GeoSyntec (Ravi Arulantham). However, the "List of Participants Involved in Developing the Proposed Low-Threat UST Closure Policy," as published by the State, also included ten other "contributors". Among those are three representatives from Shell Global Solutions, and one from GeoSyntec. Several defense experts on different MTBE cases have come from GeoSyntec, including Dr. Michael Kavanaugh (on the OCWD case), Dr. Mary DeFlaun, Dr. Peter Zeeb, and Mr. Joseph Niland (on the OCWD case).

Exhibit 2
Page 40

13

It should also be noted that prior to the drafting of the LTCP Policy, the State Water Resources Control Board (SWRCB) had formed a UST Cleanup Fund task Force[9] which looked into the cash shortage the Fund was facing and recommendations to improve administrative procedures[10]. Unfortunately, that task force heavily favored the Responsible Parties (RPs) as noted by three of the members of the Task Force itself (Brian Newman, Ken Williams, and Gerald O'Regan)[11].  In their Minority Opinion Letter, the three state regulators stated:

> "As regulators who served on the task force we offer the comments below as a dissenting opinion to the UST Cleanup Program Task Force Report. The regulators who served on the Task Force membership was dominated by responsible parties (RPs), and consultants who work for RPs. Regulators comprised approximately ten percent to the Task Force. This imbalanced representation resulted in proposals that primarily reflect the views of the RPs and their consultants. Dialogue within the task force was not neutral and minority views received very little consideration. The group focused on closing cases over the protection of groundwater resources and human health."

Note that in contrast to the many concerns raised by the public about the Policy, the Oil Industry representatives were in full support of implementing it. For example:

- The California Independent Oil Marketers Association (CIOMA 2012) wrote to the SWRCB "CIOMA urges swift adoption of the policy as presented to the Board."
- G&M Oil Company (2012) wrote "G&M Oil Company asks that the Board adopt the proposed policy …as quickly as possible."
- Redding Oil Company (2012) "strongly" recommended the adoption of the Policy
- Robinson Oil Corporation (2012) wrote of their "**Strong Support**" of the Policy (emphasis as published)
- The Western States Petroleum Association (2012) wrote "WSPA strongly supports the proposed policy and urges its adoption."

---

[9] (https://www.waterboards.ca.gov/water_issues/programs/ustcf/taskforce.html)

[10] Four of the members who served on the UST Cleanup Program Task Force also served on or contributed to the Low-Threat Closure policy: Dave Arrieta of Western States Petroleum Association; Ravi Arulanantham of GeoSyntec; DawnZemo of Zemo and Associates; and Curt Stanley of Shell Global Solutions.

[11] Brian Newman (Region 5 UST program manager); Ken Williams (Region 8 UST program manager); and Gerald O'Regan (Envirnomental health geologist with the Santa Clara County Hazardous Materials Compliance Division)

Exhibit 2
Page 41

14

The primary concern raised by most of the oil companies was the cost associated with cleaning up LUST sites.

Note that the SWRCB ignored most of the comments and critiques it received, including a suggestion by the Groundwater Resources Association (GRA 2011) of a "no Action Alternative" to keep sites open so that monitoring can continue to verify whether attenuation is in fact occurring at contaminated sites considered "low-threat". In their second letter to the SWRCB, GRA (2012) wrote:

> "GRA prepared detailed comments on the Closure Policy and the associated documents in their letter dated November 8, 2011 (see attached). These comments should be considered by the State Water Board for modification of the policy and the CEQA process documents."

GRA (2012) cautioned again against generalizing and over simplifying the conditions at the different USTs:

> "GRA believes that despite the State Water Board's best efforts to generalize and distill the evaluation of detailed site-specific data from various UST sites into simple closure criteria, it is impossible to say, a priori, that "cases that meet the general and media-specific criteria established in this policy satisfy the case closure requirements of Health and Safety Code section 25296.10" and State Water Board's Resolution 92-49, as stated on page 8 of the Closure Policy under the "Low-Threat Case Closure" heading. This is because of the wide natural variability between UST sites regarding contaminant plume evolution, vapor migration, nearest exposure receptors, and potential future development in terms of both new land use and new water-supply wells. By definition, every UST site will not meet the statistical norm or even the 95 percentile, and every UST site will not meet the assumed conditions of the transport modeling simulations conducted in support of the Closure Policy. To address these issues, GRA recommends that the Closure Policy be revised to emphasize the continued need for site-specific interpretation and evaluation of all data and information to support rational UST site closure decisions."

## 1.2 Comments on the Policy and the Technical Justification Documents

In this section, I discuss some of the main problems with the primary "tenet" that the Policy was based on, the lack of scientific validation for the overly vague statements made in the Policy, and specifically the technical justification documents that were used as the basis for the Policy. I also discuss the ways that the Policy contradicts the findings and recommendations of the very studies that it (the Policy) stated it relied on.

More specifically, I discuss in the sections below the document titled "Technical Justification for Groundwater Plume Lengths, Indicator Constituents, Concentrations, and

Exhibit 2
Page 42

15

Buffer Distances (Separation Distances) to receptors" (SWRCB, 2011), one of the key documents used as the basis for determining the criteria needed to close leaking UST sites. This document was later published in its final version as "Technical Justification for Groundwater Media-Specific Criteria- Final 04-24-2012" (SWRCB, 2012). These two documents will be referred to herein as the "Draft TechJust" and the "Final TechJust." The documents, written by the "stakeholder group", was predicated on two primary and flawed assumptions: 1) the subsurface contamination at leaking UST sites is well characterized and 2) contamination can be left in place because biodegradation is expected to naturally attenuate contaminants "within a reasonable time" regardless of site conditions.  Both assumptions are contradicted by a large number of scientific articles including ones cited by the authors of the document as I explain in the following sections.

### 1.2.1 The Principles the LTCP is Based on are not Supported by the Literature

The LTCP is based on a flawed and unrealistic "fundamental tenet" that "water quality objectives" can be "attained through natural attenuation within a reasonable time" (SWRCB Draft LTCP January 31, 2012). While monitored natural attenuation (MNA) may be appropriate for BTEX (benzene, toluene, ethyl benzene and xylene) in most settings, it is not the case for fuel oxygenates like MTBE and TBA as I explained in detail in my previous report in this case (see Fogg 2011 Section 4; p 23-43). As I had pointed out, scientists have repeatedly concluded that MTBE and TBA can be recalcitrant to biodegradation under natural field conditions. For example, the EPA's website on Drinking water at the time of the drafting of the Policy read:

> "Because MTBE dissolves easily in water and does not "cling" to soil very well, it migrates faster and farther in the ground than other gasoline components, thus making it more likely to contaminate public water systems and private drinking water wells. **MTBE does not degrade (breakdown) easily and is difficult and costly to remove from ground water.**" (USEPA  2009 and 2016; emphasis added).

And:

> "MTBE is generally more resistant to natural biodegradation than other gasoline components. Some monitoring wells have shown little overall reduction in MTBE concentration over several years which suggests that **MTBE is relatively persistent in ground water.**" (USEPA  2009 and 2016; emphasis added)

Exhibit 2
Page 43

16

Similarly, USEPA-OGWDW (2008) noted:

> "MTBE has several properties that increase its persistence and mobility in the environment once released" and "Once dissolved in ground water, it generally resists degradation and moves at nearly the same velocity as ground water"

Also around the time of the drafting of the Policy, the American Society for Testing and Materials (ASTM) had updated its document on attenuation, titled "Standard Guide for Remediation of Ground Water by Natural Attenuation at Petroleum Release Sites" first published in 1998, and reapproved for publication in 2010. Their assessment of MTBE natural attenuation had not changed in 12 years. With regards to attenuation of gasoline products, ASTM (1998) and ASTM 2010, both stated:

> "In addition, if constituents are present which do not readily attenuate, such as methyl-t-butyl ether (MTBE), remediation by natural attenuation may not be a suitable remedial alternative or may need to be supplemented with other remedial technologies"

Furthermore, the National Research Council (NRC 2000) had referred to MTBE as "generally resistant to biodegradation" and rated the likelihood that natural attenuation will succeed as a remediation strategy for MTBE as low (in contrast, the BTEX group was given a rating of high).

Regardless, the Policy misrepresented the available literature by issuing a generalized statement that did not address the different contaminants that can be found in petroleum fuels. The preamble of the Policy reads:

> "It has been well-documented in the literature and through experience at individual UST release sites that petroleum fuels naturally attenuate in the environment through adsorption, dispersion, dilution, volatilization, and biological degradation. This natural attenuation slows and limits the migration of dissolved petroleum plumes in groundwater. The biodegradation of petroleum, in particular, distinguishes petroleum products from other hazardous substances commonly found at commercial and industrial sites." (SWRCB resolution 2012-0016)

Note that the Policy indirectly included TBA as well in its assessment that contamination would naturally attenuate (TBA a common contaminant at UST sites was not mentioned anywhere in the final language of the Policy). Yet, the USEPA publication on the natural attenuation of TBA had concluded that:

Exhibit 2
Page 44

17

"A close examination of the available information indicates that **a default presumption that TBA is readily degraded in anaerobic ground water is not justified**." (USEPA 2007, emphasis added)

A more recent publication by the National Research Council (NRC 2013) reaffirms the general scientific consensus on this issue stating that:

"Natural attenuation is now well established for the degradation of many petroleum based compounds such as BTEX…For other organic compounds (halogenated aromatics, oxygenated hydrocarbons **evidence for natural attenuation is still minimal**" (NRC 2013; emphasis added))

The report titled "Alternatives for Managing the Nation's Complex Groundwater Sites" (NRC 2013) added that:

"The presence of the **recalcitrant** former fuel additive methyl-tert-butyl-ether (MTBE) and its daughter product and co-additive tert-butyl alcohol [TBA] could increase the cost [of remediation] per site" (NRC 2013; emphasis added).

More recent publications continue to offer further evidence of the poor biodegradability of MTBE (Sun et al., 2012; Bruce et al., 2013; Wieczorek et al 2013; Joshi et al., 2016; and Gill et al., 2016).

### 1.2.2 The LTCP Ignored the Conclusions and Recommendations of the Studies on which it Relied.

Below, I demonstrate that statements and assumptions made in the Policy were contradictory to the very documents the Policy relied upon (both in the body of the Policy and the Technical Justification documents used to provide the scientific backing for the Policy). But first, a little background:

*Background*

The Policy relied in part on two main reports previously submitted to the SWRCB (Rice et al., 1995 (also referred to as the LLNL study), and SB 1764, 1996[12]). Those two reports were among the earliest in the Nation to address the behavior of contaminant plumes from LUFT sites in the environment, and the extent that they can impact groundwater resources. Rice et al (1995), titled "California Leaking Underground Fuel

---

[12] Referenced in the Policy as Lawrence Livermore National Laboratory (LLNL) report (1995), and SB 1764 Committee report (1996) respectively.

Exhibit 2
Page 45

18

Tank (LUFT) Historical Case Analyses" provided an analysis of data from case studies across the State. Meanwhile, SB 1764 (1996), titled "Senate Bill SB 1764 Advisory Committee Recommendations Report Regarding California's Underground Storage Tank Program" was authored by a committee on which I had the privilege of serving, and provided recommendations regarding the UST program in California, including a commentary/critique of the Rice et al report.  The Rice et al., study focused primarily on benzene plumes in groundwater (monitoring well data), and concluded that the majority of benzene plumes were relatively short, and were naturally attenuating without the need for significant remediation. This was referred to as intrinsic bioremediation (the ability of naturally occurring organisms to degrade contaminants without the need for engineered tools). Rice et al., (1995) did not address other fuel/gasoline contamination, but was pivotal in changing how LUFT sites were being managed. The National Research Council report on natural attenuation NRC 2000) noted that:

> "Following release of the Lawrence Livermore report [Rice et al., 1995], the closure of underground storage tank cleanup sites in California surged as regulators signed off on remedies allowing treatment to occur by natural attenuation"  (NRC 2000; see Figure 1.1).



FIGURE 1-4  Closure of leaking underground storage tank cleanup projects in the state of California, January 1, 1991, through January 1, 1998.  SOURCE:  James Giannopoulos, California Water Resources Control Board, Sacramento, California.

Figure 1.1: Change in numbers of closures LUST cleanup projects in California between January 1, 1991 and through January 1, 1998 (from NRC 2000).

Exhibit 2
Page 46

19

Similarly, and because of increasing acceptance of biodegradation as an attenuation
mechanism, by 1997 monitored natural attenuation (MNA) and enhanced biodegradation
became dominant among remediation alternatives at contaminated sites (see Figure 1.2;
NRC 2000).



Figure 1.2: Methods employed to clean groundwater at leaking underground storage
tanks (LUSTs), as of 1997, based on survey of state program managers (from NRC
2000).

Things changed however, after MTBE started showing up in groundwater (NRC 2000).
While Rice et al., (1995) ignored MTBE in their analysis (possibly because it had not
been on the list of chemicals tested at LUFT sites), the SB 1764 (1996) report clearly
emphasized the need to include MTBE and other fuel oxygenates in site characterization
and soil and groundwater sampling:

> "MTBE is a major additive to gasoline in California, and it is much more mobile and
> resistant to biodegradation in groundwater than petroleum hydrocarbons such as BTEX.
> Effects of LUFTs on groundwater quality have been potentially underestimated because
> of the lack of monitoring for recalcitrant fuel additives such as MTBE… Insufficient data
> exist on soil and groundwater contamination from recalcitrant fuel additives (primarily
> MTBE) in California to assess fully the likely range of groundwater impacts from LUFT
> sources, as was done for benzene in the LLNL study." (SB 1764, 1996).

Exhibit 2
Page 47                                                                                      20

The presence of MTBE and TBA has indeed changed the way contaminated sites are handled and the types of remediation technologies used. For example, McHugh et al (2013; a paper written and published by defense expert Mr. Connor and his colleagues at GSI) reported that in a survey of contaminated sites in California (between 2001 and 2011), some 98% of sites underwent active remediation (with most employing more than one technology) (see Figure 1.3).  In contrast to 1997 in Figure 1.2 above (where MNA was the dominant remediation tool employed at sites across different states), McHugh et al (2013) reported:

> "The effectiveness of MNA as a remediation technology could not be directly evaluated because less than 100 sites of 3491 sites with information on remediation technology were identified as having MNA as the only remediation technology (i.e., no active remediation). The other 170 sites where MNA was identified as a remediation technology were also identified as having an active remediation technology." (McHugh et al., 2013)



Note: Chart shows remediation technologies applied at 3194 remediation sites in the GeoTracker database.  The total percentage is greater than 100%, as more than one technology was applied at some sites.

**KEY POINT**: SOIL EXCAVATION, SOIL VAPOR EXTRACTION AND GROUNDWATER PUMP AND TREAT ARE THE THREE MOST COMMONLY USED TECHNOLOGIES AT REMEDIATION SITES IN CALIFORNIA

Figure 1.3: Types of remediation technologies applied at remediation sites in California (from McHugh et al., 2012).

In other words, defense experts agree that there is no way to judge how contamination will behave in California's groundwater absent active remediation; and yet the Policy simply presumes that attenuation will control contaminant migration, and by mandating

Exhibit 2
Page 48

21

the destruction of monitoring wells and not requiring any monitoring, the State is removing the "monitored" from "Monitored Natural Attenuation". More importantly, the "tenet" the Policy is based on, that contamination left in place will attenuate within a "reasonable time period" is based on "attenuation" data from sites undergoing active remediation. Based on the data collected and published by the defense experts (McHugh 2012 and 2013) there are no significant data to support attenuation absent engineered remediation (natural attenuation).

To reiterate, SB 1764 (1996) provided several recommendations to the SWRCB to help manage the cleanup of LUFT sites while protecting and preserving groundwater resources. Yet, while the LTCP cites to SB 1764 as basis for its findings, the SWRCB is again ignoring these recommendation and greatly underestimating the long term impact from contaminants left unmonitored and untreated.

### 1.2.2.1 The LTCP ignores the recommendations of SB 1764

As explained above, The LTCP simply presumes that biodegradation/natural attenuation will slow down the spread of contamination and protect water resources, and does not specify any need to collect evidence that biodegradation is in fact removing contamination mass at what it calls low-threat closure sites. Yet, SB 1764 (1996) had specifically recommended that:

> "Analytical and hydrogeological protocols should be established to determine whether intrinsic bioremediation is sufficient to contain and remove existing contamination within a reasonable time frame."

SB1674 also added that:

> "Evidence of intrinsic bioremediation may be used to lower the priority ranking of a LUFT site for cleanup with respect to the contaminants being biodegraded."

But the LTCP (SWRCB resolution 2012-0016) simply ignored the need to collect evidence of biodegradation and did not include it in the closure criteria. The following is a list of other ways that the Policy ignored or contradicted SB1764 findings:

### a) -  LTCP Does Not Define 'Reasonable Time Frame'

The authors of SB1764 (1996) were concerned with what the SWRCB would consider a "reasonable time frame" to restore groundwater quality and recommended that:

Exhibit 2
Page 49

22

> "The SWRCB should issue written guidance regarding how the "reasonable" time frame for intrinsic bioremediation is to be determined." SB1764 (1996)

But the recent LTCP relied on that term in its draft version as well as in its final version, and did not clarify what it considered "reasonable" despite many public comments on and questions about the issue.

> "Resolution No. 92-49 does not require that the requisite level of water quality be met at the time of case closure; it specifies compliance with cleanup goals and objectives within a reasonable time frame."

However, one of the earlier versions of the Technical Justification documents (SWRCB Technical Justifications July 12, 2011) seemed to indicate it could be "multiple decades or longer":

> "**A time period of multiple decades or longer to reach WQOs has been determined to be "reasonable"** for plumes of limited extent in existing State Water Board closure orders for UST sites (e.g., Order WQ 98-04 [Matthew Walker])." (SWRCB Technical Justifications July 12, 2011; emphasis added).

Although that language ("multiple decades or longer") was taken out of the final version of the Technical Justifications for Groundwater document in the final Policy language, it is in fact consistent with what SB 1764 (1996) cautioned would be the case:

> "Because, however, groundwater resources are replenished very slowly (most groundwater in storage in California is 100s to 1000s of years old) and tend to recover from contamination impacts very slowly, the present quality of groundwater may not be sustainable in many basins if various point- and nonpoint-sources of persistent contaminants are allowed to exert their cumulative impacts over a period of decades or centuries"  (SB 1764, 1996).

### b) - Monitoring to Ensure that Attenuation is in Fact Occurring

SB1764 (1996) specifically recommended to the SWRCB that monitoring be conducted at LUFT sites to ensure containment of contamination:

> "Monitoring of the contaminant plume should be conducted during the process of intrinsic bioremediation to ensure that contamination does not spread beyond acceptable boundaries" SB1764 (1996).

But the current LTCP mandates the destruction of monitoring wells making it impossible to verify if contamination is in fact being attenuated:

> "Monitoring Well Destruction – All wells and borings installed for the purpose of investigating, remediating, or monitoring the unauthorized release shall be properly

Exhibit 2
Page 50

23

destroyed prior to case closure unless a property owner certifies that they will keep and maintain the wells or borings in accordance with applicable local or state requirements." (SWRCB resolution 2012-0016)

### c) - Focus on Plume Lengths

The groundwater-specific criteria in the LTCP were based on plume lengths (as did the "Technical Justification" documents that the Policy relied upon). Plume length (one dimensional) was used as a measure of the attenuation of the contamination plume, but as I explain in my discussion of the Technical Justification documents, plume length estimates are problematic and not necessarily reliable.  Especially since monitoring wells tend to measure contamination in shallow groundwater and not necessarily in deeper groundwater. The authors of SB1764 (1996) pointed that out in their report:

> "The length of contaminant plumes at LUFT sites is not, in itself, sufficient information to evaluate the efficacy of intrinsic bioremediation. Current sampling and analyses protocols typically used to characterize LUFT sites are inadequate to assess intrinsic bioremediation potential and predict the evolution of dissolved fuel hydrocarbon and additive plumes. From the typical data describing contaminant behavior at LUFT sites, it is generally not possible to draw firm conclusions regarding the rates of intrinsic biotransformation of fuel hydrocarbon and additives."

As I show in my discussion of the Technical Justification documents, the studies cited in those documents explained the many issues associated with monitoring and plume length.

The authors of SB1764 (1996) in fact cautioned against using plume length as a screening criteria:

> "Estimates of plume dimensions in the LLNL report are highly approximate, however, and should not be used directly as general screening criteria in risk based decision making." (SB1674 1996).

SB1674 (1996) also pointed out that downward migration of contamination (not accounted for in plume length measurements) is often ignored in monitoring:

> "Most groundwater monitoring designs at LUFT sites have not provided adequate data regarding downward chemical transport to greater depths where intrinsic bioremediation may be less effective." (SB1764, 1996).

### d) - LTCP ignored other contamination

Another of the recommendations of SB1764 was that:

> "The SWRCB should verify the LLNL report conclusions and collect and evaluate data for LUFT contaminants not considered in the LLNL report." (SB1764 1996)

Exhibit 2
Page 51

24

Yet the sole focus of the LTCP in its groundwater-specific criteria was benzene and MTBE, despite several comments from the public suggesting the addition of TBA, and others suggesting the addition of the lead scavengers 1,2-dichloroethane (1,2-DCA) and ethylene dibromide (EDB)  (Copeland Environmental Toxicologist, 2011).  In 2006, the EPA published a document titled "Lead Scavengers Compendium: Overview of Properties, Occurrence, and Remedial Technologies", in it, EPA explained:

> "With the phase out of leaded gasoline at the end of the 1980s, experts believed that alkyl lead compounds and associated lead scavengers from leaking UST systems would no longer occur in the environment. However, results published in summer 2004 of an investigation of leaking UST sites in South Carolina revealed that lead scavengers may persist for long periods of time in certain groundwater environments and, thus, may still be present at UST sites in operation through the end of the 1980s. Consequently, EPA and states are continuing their investigation into the potential presence of lead scavengers at UST sites." (USEPA 2006)

In a follow-up publication on the natural attenuation of the lead scavengers, EPA (2008) conducted groundwater sampling at 102 old gasoline release sites from 19 states. EPA reported that:

> "The survey found that significant concentrations of EDB continue to persist at many old leaded gasoline spill sites. Both EDB and 1,2-DCA were present at concentrations above their respective Maximum Concentration Level (MCL) at a significant number of sites" (USEPA 2008).

And while both chemicals are known to degrade under anaerobic conditions, and EDB can also degrade abiotically, EPA emphasized the need for site-specific data to ensure that such processes are in fact occurring:

> "To apply MNA [monitored natural attenuation] at a specific site, rate constants for attenuation over time should be extracted from site-specific data and should be verified and validated by continued long-term monitoring." (USEPA 2008).

Adding that: "The appropriate application of MNA, or risk management, requires a site-specific knowledge of the behavior of the contaminants of concern" (USEPA 2008). Note that the LTCP did not specify site-specific analysis of attenuation rates, or even monitoring to ensure attenuation of the very chemicals it considered "of concern" in groundwater (benzene and MTBE).

Exhibit 2
Page 52

25

### 1.2.3 The Technical Justification for the Policy was Severely Flawed

In this section I address the technical justification documents (with regards to groundwater) and which provided the foundation for the criteria used in the LTCP (for site closure). The two documents are:

- The first draft titled "Technical Justification for Groundwater Plume Lengths, Indicator Constituents, Concentrations and Buffer Distances (Separation Distances) to Receptors" dated 7/11/2011, herein referred to as Draft TechJust.
- The final version titled "Technical Justification for Groundwater Media-Specific Criteria Final" dated 4/24/2012 herein referred to as Final TechJust.

In the discussion below I refer to these documents as Draft TechJust and Final TechJust where needed.

### 1.2.3.1 The TechJust Documents Misrepresented the Scientific Assessment of Contaminant Degradation

As explained earlier, the Policy is founded on the conviction, "fundamental tenet," that contamination, left in place, will biodegrade/attenuate in a reasonable time period and as such will not pose a threat to people or the environment:

> "It is a fundamental tenet of this low-threat closure policy that if the closure criteria described in this policy are satisfied at a petroleum unauthorized release site, attaining background water quality is not feasible, establishing an alternate level of water quality not to exceed that prescribed in the applicable Basin Plan is appropriate, and that water quality objectives will be attained through natural attenuation within a reasonable time, prior to the expected need for use of any affected groundwater." (LTCP Final 2012)

This statement was backed by the TechJust documents:

> "The Stakeholder Group acknowledges that the biodegradation/natural attenuation of petroleum hydrocarbon and oxygenate plumes has **been documented by many researchers since the 1990s**. **All of this work** shows that biodegradation/natural attenuation of petroleum hydrocarbons and MTBE occurs under both aerobic and anaerobic conditions, but the rate of degradation/attenuation depends on the individual constituent and the plume geochemical conditions." (Draft TechJust 2011; emphasis added)

However, the authors of the TechJust did not provide any references to support these statements regarding biodegradation/natural attenuation, or elaborate on the specific contaminants or the conditions necessary for biodegradation. Instead, they used overly general and somewhat vague statements. I do agree that a lot of research has been

Exhibit 2
Page 53

26

conducted on this issue, backed by a multitude of published papers, and I have discussed that in detail in my previous opinion report in this case (see Fogg 2011, Section 4; p. 23-43). I strongly disagree however, with the overly simplistic assessment of the biodegradation potential under field conditions, especially with regards to MTBE and TBA.

Note that in response to public comments criticizing the lack of scientific peer reviewed publications addressing biodegradation/natural attenuation in the Draft version, the Final TechJust document changed the language to include one reference from 1990:

> "Natural attenuation of petroleum hydrocarbon and oxygenate plumes has been documented by many researchers since the 1990s. This body of work demonstrates that natural attenuation of petroleum hydrocarbons and MTBE occurs under both aerobic and anaerobic conditions (Howard, 1990)" (Final TechJust 2012).

Howard (1990), the only reference the Stakeholder group cites as back up of the "body of work" was published years before the vast majority of research was conducted on the biodegradation of MTBE and TBA. So I reiterate that the "technical justification" for the Policy was severely lacking in scientific content; the consensus of which does not support the overly general statements made in the Policy regarding the fate of contaminants left in place.

### 1.2.3.2 The TechJust Documents Contradicted and/or Ignored the Citations on which they relied

The TechJust documents relied primarily on plume lengths as a measure of "threat" to receptors. Both the Draft version and the Final version cited two documents as the basis for contamination involving MTBE and other oxygenates: Shih et al 2004, and Dahlen et al., 2003[13].

Shih et al (2004) examined approximately 500 LUFT sites in the Los Angeles area for its plume study.  The sites were randomly selected and plume estimates were based on one year of sampling (2000/2001). Dahlen et al (2003), meanwhile was a study commissioned by the Arizona Legislature and involved the compilation of relevant data from 323 LUST (leaking underground storage tank) sites in Arizona (identified by the Arizona

---

[13] The Draft TechJust also included Kamath et al (in press), but that reference was taken out of the Final version of the TechJust and the Policy.

Exhibit 2
Page 54

27

Department of Environmental Quality). The study which was conducted over two years, also involved the collection and analysis of an additional 700 groundwater samples at the different sites, as well as more detailed site characterization at six LUST sites chosen as representative of the range of conditions common at Arizona contamination sites.

Below I discuss how the TechJust documents ignored or contradicted the conclusions and observations of these two studies.

### a)- Poor Site characterization

The two studies (Shih and Dahlen) that the authors of the TechJust documents relied on emphasized the gaps in data collected during typical site characterization at contaminated sites.  Both studies cautioned of the potential biases in plume assessment that can result from poor site characterization and pointed out the need for more detailed data. Remember that some of the public comments also emphasized the need for better site characterization.  This was especially important given the objective of the LTCP of leaving relatively high concentrations of contaminants in place.

Shih et al., (2004) estimated plume length for a specific contaminant as the distance between the source area and "the farthest edge of the plume at a predetermined concentration contour". Accurate measurements would require a large enough network of monitoring wells to map groundwater flow direction and gradient and the potential for downward migration of contamination especially given that most monitoring wells tend to be shallow. Shih et al (2004) noted:

> "Clearly, plume length as defined is two-dimensional. The lack of depth-specific data and other site-specific knowledge across the population of LUFT sites investigated in this paper preclude evaluation of plume transport in the vertical direction. In areas of significant recharge, this can bias the measurements toward shorter plumes, since a typical monitoring well screened across the water table may fail to detect the leading edge of the plume as it is deflected downward in response to the infiltration of recharge from above. Further, fluctuating flow directions as well as errors in their determination can result in monitoring well network configurations that create additional biases in plume length measurement" (Shih et al., 2004).

Vertical plume migration, often dubbed "diving plumes," especially in connection with MTBE, has been addressed in the past by the American Petroleum Institute (API 2000, and 2006), and USEPA (2004, and 2005). For example, USEPA 2005 (on Monitored

Exhibit 2
Page 55

28

Natural Attenuation of MTBE), a document cited by the Final TechJust documents
stated:

> "**Conventional monitoring wells can provide an incomplete picture of the true
> distribution of MTBE in ground water**. If the screen of a monitoring well is long
> compared to the thickness of the plume of contamination, it can sample the plume of
> contaminated ground water and cleaner ground water above or below the plume, giving a
> false impression of natural attenuation from one well to another. **Long plumes of MTBE
> may dive below the screens of monitoring wells altogether**." (USEPA 2005; emphasis
> added)

Furthermore, it is well known that because of the combined effects of recharge and
groundwater pumping in most of California's groundwater basins, the vertical hydraulic
gradients are strongly and pervasively downward, driving downward contaminant
migration.

The other study the TechJust authors relied on for plume length data for sites with MTBE
was Dahlen et al., (2003).  This study also emphasized the problems associated with poor
monitoring and focused on site characterization as a critical part of "data interpretation
and data use in decision making." The authors (Dahlen et al) found that of 270 sites with
groundwater monitoring data, only about 70% of the LUST sites had enough hydraulic
data to determine a dominant flow direction, but within this subset, 30% of sites had no
downgradient monitoring well, and 60% had only one or two downgradient monitoring
wells. They also noted that 39% of sites with enough data showed variability in flow
direction greater than 45 degrees. Dahlen et al (2003) noted that: "Long plumes will
appear shorter if monitoring is based on errant assumptions concerning flow direction"

This, together with errors in groundwater elevation measurements (used to determine
groundwater flow direction), poor aquifer characterization, and limited data on
groundwater concentrations of oxygenates, led the authors to caution:

> "Of significance here are the implications that these observations have with respect to the
> adequacy of assessment of dissolved plume impacts at LUST sites. For example, the
> selection of proper sampling locations, the determination of the extent of dissolved
> contamination, and the use of these types of data for risk-based decision-making are
> difficult when the flow direction is uncertain, the groundwater velocity is unknown, and
> the extent of the more soluble fuel components is unknown." (Dahlen et al., 2003)

Exhibit 2
Page 56                                                                                          29

Dahlen et al., (2003) pointed out that the deficiencies and errors in data typically collected at LUST sites can lead to erroneous conclusions. For example, they noted that based on the large number of sites reviewed in their database, the data "suggested that the spatial extent of MTBE and benzene dissolved plumes were similar". However, the authors pointed out, that statement was contradicted by the results of the more detailed data collected at the six chosen sites where the results showed that MTBE plumes "attenuated with distance more slowly than the associated dissolved benzene plumes" (Dhalen et al., 2003).

In conclusion, the authors clearly cautioned:

> "Of particular interest here is the discrepancy between the observations from the comprehensive analysis of the file review database and the results from the focused supplemental characterization at six LUST sites. **This raises questions about the validity of conclusions drawn from large database analyses (especially as they are related to the spatial extent of groundwater impacts); it also suggests a need to examine the extent to which these types of analyses could be biased by typical LUST site monitoring well networks**" (Dahlen 2003; emphasis added)

### b)- Plume length

The LTCP relied on the plume length measurements reported in Shih et al (2004) as the foundation for assessing the threat to groundwater and drinking supplies from remaining contamination at LUFT sites across California. In that study, a total of 464 plumes were tracked over one year (four quarters of monitoring, from the 3rd quarter in 2000 to the 2nd quarter in 2001). The authors could not report if there were any discernible changes in the benzene and MTBE plumes and noted that the time period examined (one year) may not have been enough to see measurable changes. In contrast however, TBA plumes showed an apparent increase in length of approximately 6% over the same time period. The authors (Shih et al., 2004), acknowledged the potential shortcomings of their analysis noting that:

> "The more recent release of gasoline formulations containing significantly greater quantities of oxygenates may not have afforded sufficient time for oxygen plumes to reach maximum plume configurations."

And added:

> "While the vast majority of benzene and $TPH_G$ plumes are apparently stable

Exhibit 2
Page 57

30

> (*1, 25*) [Happle et al., 1998; Rice et al., 1995], it remains to be seen whether oxygenate
> plumes have reached steady state." (Shih et al., 2004)

And yet, despite the misgivings of Shih et al (2004) and Dahlen et al (2003) regarding the
deficiencies and errors in data collected from contaminated sites, and the potential bias in
such data as explained above, the Stakeholder group (the authors of the TechJust) made
the sweeping statement:

> "Based on the plume studies presented in the above sections, a total separation distance
> from the source area to the receptor of about 500 feet should be protective for 90% of
> plumes from UST sites, and a total separation distance from the source area to the
> receptor of about 1,000 feet should be protective for virtually all plumes from UST sites."
> (Final TechJust 2012)

### 1.2.4 The Technical Justification for the Policy Misrepresented the TBA Issue

The Final version of the LTCP, and the Final TechJust document did NOT address TBA
as a contaminant of concern. The Policy specifies that only MTBE (among fuel
oxygenates) should be tested in groundwater at contaminated site. This is because the
Draft TechJust greatly downplayed the issue of TBA as a contaminant of concern and
misrepresented the source of TBA at contaminated sites, and downplayed its potential to
persist under natural field conditions.  The authors of the TechJust documents and the
Policy ignored statements to the contrary in many published documents, including ones
that they cited.

In the Draft TechJust the authors stated:

> "**TBA is a byproduct of biodegradation of MTBE, and TBA concentrations can
> build up temporarily in the anaerobic portion of a plume.** With respect to the natural
> attenuation of TBA, Kamath et al. (in press) recently studied benzene, MTBE and TBA
> plumes at 48 UST sites (30 sites in California) and found that (1) most (68%) of the TBA
> plumes were stable or decreasing in size, and (2) in the stabilized plumes, the median
> attenuation rate for TBA was similar to the rates for MTBE and benzene." (Draft
> TechJust 2011; emphasis added).

### *1.2.4.1 Misrepresenting the source of TBA*

TBA is not simply "a byproduct of biodegradation of MTBE". The authors of the
TechJust neglected to mention that TBA was a fuel oxygenate added to gasoline (like
MTBE), and was "an impurity in MTBE and MTBE-containing fuel" (API 2000).  In my
previous opinion report in this case (Fogg, 2011; section 4.5.1) I discussed in detail the

Exhibit 2
Page 58

31

issue of the common occurrence of high TBA concentrations at MTBE contaminated sites.

Furthermore, the document that the TechJust relied on (Shih et al., 2004) explained:

> "Even though TBA was added to gasoline in significantly lesser amounts than MTBE or benzene, its high miscibility meant that small quantities of TBA could translate into high groundwater concentrations. Further, different sources of TBA (as gasoline additive, impurity, or oxidation byproduct of MTBE) could by themselves, or in combination, result in the detected TBA in groundwater at LUFT sites." (Shih et al., 2004)

Therefore it is a misrepresentation of the facts to simply state that: "TBA is a byproduct of biodegradation of MTBE" as the Stakeholders wrote. Such a statement both downplays the significance of TBA as a pollutant of its own, and over emphasizes the potential of MTBE biodegradation by implying that it is the only source of TBA at contaminated sites. This is especially important given that the document the TechJust relied upon clearly stated:

> "Excluding the composite measure total petroleum hydrocarbons as gasoline (TPHG), TBA has the greatest site maximum (geometric mean) groundwater concentration among the study analytes; therefore, its presence needs to be confirmed at LUFT sites so that specific cleanup strategies can be developed." (Shih et al., 2004)

### 1.2.4.2. Misrepresenting the Fate of TBA in Groundwater

By stating that: "TBA concentrations can build up temporarily in the anaerobic portion of a plume" the authors of the Draft TechJust misrepresent the potential fate of TBA in groundwater and disregard the references they rely on. The only citation used to support that claim is Kamath et al (in press), a paper written by defense expert Mr. Connor and his colleagues at GSI[14], and which was not yet available to the public and hence, presumably not available to the Stakeholder group. In fact, several EPA publications clearly state that TBA by itself is not necessarily proof of MTBE degradation or attenuation, and that TBA tends to persist under anaerobic conditions. For example, the USEPA (2005; relied upon by the Final TechJust) cautions that:

---

[14] It is curious how two papers (Kamath et al and Williams), both by defense experts, and both "in press" made it into the Draft Technical Justification document when they were not yet available to the public. Note that both papers were removed from the list of References in the Final Technical Justification document.

Exhibit 2
Page 59

32

> "TBA accumulation by itself is not convincing evidence of MTBE biodegradation. This makes it particularly difficult to use conventional monitoring data to document biodegradation of MTBE at field scale, or to extract rate constants for attenuation that can be used in predictions of future behavior of plumes." USEPA(2005)

Moreover, an EPA document from the National Risk Management Research Laboratory dedicated to the monitored natural attenuation of TBA clearly states:

> "A close examination of the available information indicates that **a default presumption that TBA is readily degraded in anaerobic ground water is not justified**." (USEPA 2007, emphasis added).

And,

> "To date, the performance of available approaches to document anaerobic biodegradation of TBA at specific field sites has been disappointing. These include field monitoring to show a statistically significant attenuation in concentration with distance along the flow path, microcosm studies conducted with sediment from the site, and analysis of stable isotope ratios in TBA in the plume." (USEPA 2007)

And

> "At many gasoline spill sites, TBA occurs at high concentrations in groundwater, and dilution and dispersion alone cannot be expected to bring concentrations of TBA to clean up goals before the ground water reaches a receptor. At these sites, Monitored Natural Attenuation will only be a viable option if the TBA is biologically degraded to harmless materials." (USEPA 2007)

### 1.2.4.3 Misrepresenting the Importance of Monitoring for TBA

In the Draft TechJust document, the authors (Stakeholders group) wrote, as way of justifying ignoring TBA in the closure criteria of the policy:

> "Oxygenates other than MTBE were not included as indicator constituents because Shih et al. (2004) documented that MTBE had the longest plume length of any of the oxygenates (MTBE, TBA, DIPE, TAME, ETBE) at any percentile, and Kamath et al. (in press) found that TBA plumes were comparable in length to MTBE plumes. Therefore, MTBE can be used as a conservative indicator for the other oxygenates including TBA." (Draft TechJust).

However, this is in contradiction to the emphasis Shih et al (2004) placed on TBA, as compared to the lesser known and used oxygenates, and the conclusions they reached regarding the importance of monitoring for TBA at contaminated sites:

> "Excluding the composite measure total petroleum hydrocarbons as gasoline (TPHG), **TBA has the greatest site maximum (geometric mean) groundwater concentration**

Exhibit 2
Page 60

33

> **among the study analytes; therefore, its presence needs to be confirmed at LUFT sites so that specific cleanup strategies can be developed**. The alternative ether oxygenates (DIPE, TAME, and ETBE) are less likely to be detected in groundwater beneath LUFT facilities in the area of California studied and when detected are present at lower dissolved concentrations than MTBE, benzene, or TBA" (Shih et al., 2004; emphasis added).

Note that Shih et al., (2004) emphasized the need for "specific cleanup strategies" and not natural attenuation:

> **"TBA is often the regulatory driver for treatment considerations at LUFT sites. Therefore, the presence of TBA needs to be confirmed at gasoline-impacted sites,** and if confirmed, a specific cleanup strategy needs to be developed that accounts for its presence along with any other FHC [fuel hydrocarbons] or oxygenate compounds that are present" (Shih et al., 2004)

By ignoring TBA completely in the Final TechJust and the final Policy language (no requirement for testing at contaminated sites) the authors ignored the conclusion of one of the main papers they said they relied on.

Note that USEPA (2007) also emphasized that: "Tertiary butyl alcohol (TBA) is one of the most widely distributed organic contaminants in ground water at gasoline spill sites" and added that:

> "To use monitored natural attenuation as a remedy for TBA contamination in ground water at many gasoline spill sites, it will be necessary to demonstrate that TBA is biologically degraded in the ground water at the site" (USEPA 2007)

### 1.2.5 The Policy was cost driven

The impetus for the Low Threat UST Closure Policy was the financial difficulties facing the UST Cleanup Fund as evidenced by language in the first draft of the LTCP (SWRCB 2010). The first draft references the Cleanup Fund public workshop (2009), the UST Cleanup Program Task Force report (2010), the Cleanup Fund Task Force report (2010), and the Cleanup Fund audit (2010) as the primary sources of "input" relied upon in drafting the Policy. The first draft also stated that:

> "There is a significant financial burden to the Cleanup Fund as well as a financial and time burden to UST owners in keeping UST cleanup cases open when there is little or no environmental benefit associated with continued investigation, remediation, or monitoring." (SWRCB 2010).

Exhibit 2
Page 61

34

Interestingly, that language has been taken out of the final draft of the Policy (SWRCB 2012) possibly because of the public comments that pointed out that the State was simply shifting the cost and burden onto the regulatory agencies, water agencies and community water suppliers, and property owners among others (see section on Public Comments).

Perhaps the National Research Council summed it best:

> "Given the right combination of contaminants present and site hydrology and biogeochemistry, MNA can be an effective remediation technique. However, specific chemical conditions and/or bacteria are required and the necessary reactions must occur on time scales that are *faster* than contaminant transport and must be sustainable over long periods of time (NRC, 2000). Thus, MNA might ultimately achieve restoration at many sites but probably not within a timeframe of less than 100 years. Although implementation can be straightforward if an accurate conceptual site model and appropriate site conditions exist, verification of degradation with multiples lines of evidence is necessary for MNA to survive scientific, regulatory, and public scrutiny. Indeed, NRC (2000) documented that public opinion of MNA is decidedly wary, with many communities considering it a "do nothing approach." (NRC 2013)

Exhibit 2
Page 62

35

## 2. Response to Dr. Williams on MTBE and TBA detections in private wells in California

In her 2017 supplemental report, Dr. Williams claims that: "MTBE has not had a significant adverse impact on public (or private) drinking water supplies" (p.2 Williams, 2017). However, because nearly all private drinking water wells in California, and in many other states, are not routinely monitored by specific agencies, and testing for MTBE is not routinely done or reported, it is not clear how she arrived at that conclusion. In what follows, I will show that the sparse MTBE and TBA sample data available for private wells in California shows that hundreds of private wells have been impacted by MTBA and TBA, many at high concentrations, and suggest that the actual numbers are likely in the thousands.

### 2.1 California GAMA Domestic Well Project

In her supplemental expert report, Dr. Williams updates her opinions on MTBE and TBA detections in private wells based on the Groundwater Ambient Monitoring and Assessment Program (GAMA) Domestic Well Project.  I originally responded to Dr. Williams on this subject in Section 2.7 of my Expert Rebuttal Report (Fogg, Dec. 2011). By 2010, the project had been conducted in five "county focus areas" where residents volunteered to have their well water tested for a variety of contaminants.  In 2011 GAMA added a sixth county, Monterey, and that data was not yet available in 2011.  In total, 1,146 domestic drinking water wells have now been tested.  Here I update the data Tables 3a and 3b presented in my Expert Rebuttal Report (Fogg, Dec. 2011).

Recall that Dr. Williams used those data to wrongly conclude that they "do not support the assertion that MTBE has had (or will have) a significant impact on private drinking water wells." (see p. 23 Fogg, Dec. 2011)

However, as I discussed in my Rebuttal Report, the GAMA survey was not specifically designed to characterize the extent of MTBE and TBA contamination in California.  The GAMA survey data are essentially "convenience samples,"[15] much like the available

---

[15] A convenience sample is a non-probability sample of readily available or collectable data.

Exhibit 2
Page 63

36

sample results of the DDW database used by Dr. Williams, and discussed in the section that follows.  Even so, in my rebuttal report I showed that if one uses those data from the GAMA surveys to draw conclusions about MTBE, TBA and benzene contamination in private drinking water wells in the State as a whole, the data indicate large numbers of MTBE and TBA contaminated wells, contrary to the opinions of Dr. Williams.  This result occurs because, while the detection frequencies from the study are low (e.g., approximately 1% for MTBA or TBA), the number of private wells is large (approximately 600,000).

The updated results, summarized in Tables 2.1a and 2.1b, lead to the following estimates:

- **MTBE**: between **851** to **6,091** (95% confidence limits; mean of **2,618**) private drinking water wells contaminated.
- **TBA**: between **1,154** to **3,141** (95% confidence limits; mean of **6,816**) private drinking water wells contaminated.
- **MTBE or TBA**[16]: between **2,881** to **10,266** (95% confidence limits; mean of **5,759**) private drinking water wells contaminated.
- **Benzene**: between **0** to **1,928** (95% confidence limits; mean of **0**) private drinking water wells contaminated.

It is noteworthy that even with the updated results, benzene was not detected in any of the private wells sampled in the studies.  Dr. Williams was therefore wrong when she speculated that:

> "From a public health standpoint, MTBE may actually serve as an 'early warning system' for alerting users to the fact that a leaking underground tank is nearby." (Williams, 2001).

In making that statement, Dr. Williams disregarded the physical and microbiological principles that result in the mobility and persistence of MTBE relative to benzene.  Because MTBE travels farther than benzene and is less likely to attenuate, it appears that MTBE is the primary problem, not benzene.  MTBE cannot "serve as an early warning system" for benzene that will never arrive.  One should also not ignore the TBA results of the GAMA Domestic Well Project, as Dr. Williams did in her expert report, and has done

---

[16] The estimate for "MTBE or TBA" assumes that wells with MTBE contamination do not contain TBA contamination, and vice versa, a result consistent with the studies' findings, but that is unlikely to occur everywhere within the State; i.e., it is reasonable to assume that numerous wells will be contaminated by both MTBE and TBA.

Exhibit 2
Page 64

37

again in her supplemental report.  Unfortunately, the taste and odor threshold for TBA is in the thousands.[17]  There is apparently no way to detect TBA short of sampling and testing the water.

---

[17] https://www.epa.gov/sites/production/files/2014-08/documents/ll37oxyg.pdf

Exhibit 2
Page 65

38

Table 2.1a: Results of the GAMA sampling of private wells in California for MTBE, TBA and benzene.****

| County | Sampling Date | Number of Wells Sampled | Number of Wells Found to Contain MTBE | Number of Wells Found to Contain TBA | Percent of wells found to contain MTBE | Percent of wells found to contain TBA | Percent of wells found to contain MTBE and/or TBA | Number of Wells Found to Contain Benzene |
|---|---|---|---|---|---|---|---|---|
| Monterey | 2011 | 79 | 0 | 0 | 0.00% | 0.00% | 0.00% | 0 |
| San Diego | 2008-2009 | 137 | 0 | 6 | 0.00% | 4.38% | 4.38% | 0 |
| Tulare | 2006 | 181 | 0 | 0 | 0.00% | 0.00% | 0.00% | 0 |
| Tehama | 2005 | 223 | 0 | 0 | 0.00% | 0.00% | 0.00% | 0 |
| El Dorado | 2003-2004 | 398 | 4 | 0 | 1.01% | 0.00% | 1.01% | 0 |
| Yuba | 2002 | 128 | 1 | 0 | 0.78% | 0.00% | 0.78% | 0 |
| Total | 2002-2009 | 1,146 | 5 | 6 | 0.44% | 0.52% | 0.96% | 0 |

Table 2.1b: Estimated numbers of private drinking water wells contaminated with MTBE, TBA, and benzene statewide in California based on the results of sampling of private wells as reported in Table 2.1a****

| Contaminant | Number of Wells Sampled | Number of Wells with Detections | Mean Detection Frequency | 95% Confidence Interval* | | Estimated Total number of private wells in CA | Number of wells contaminated (2002- 2009) Mean and 95% Confidence Interval | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Lower Limit | Upper Limit | | Lower Limit | Mean | Upper Limit |
| **MTBE** | 1,146 | 5 | 0.44% | 0.14% | 1.02% | 600,000 | 851 | 2,618 | 6,091 |
| TBA | 1, 146 | 6 | 0.52% | 0.19% | 1.14% | 600,000 | 1,154 | 3,141 | 6,816 |
| MTBE or TBA** | 1, 146 | 11 | 0.96% | 0.48% | 1.71% | 600,000 | 2,881 | 5,759 | 10,266 |
| Benzene*** | 1, 146 | 0 | 0% | 0.00% | 0.32% | 600,000 | 0 | 0 | 1,928 |

*95% confidence intervals were estimated using the Clopper Pearson Exact method.

**The estimate for "MTBE or TBA" assumes that wells with MTBE contamination do not contain TBA contamination, and vice versa, a result consistent with the studies' findings, but one that is unlikely to occur everywhere within the State, i.e., it is reasonable to assume that numerous wells will be contaminated by both MTBE and TBA.  Therefore, the results for MTBE or TBA should be considered an upper bound.

***Note that no wells had detections of benzene contamination.  Even so, the Clopper Pearson exact method will yield an estimate for the 95% confidence interval because it considers the probability that contaminated wells were not selected for sampling.

**** See the reports cited by Dr. Williams and corresponding data available at http://www.swrcb.ca.gov/gama/domestic_well.shtml.

Exhibit 2
Page 66

39

## 2.2 MTBE and TBA impacts to private drinking water wells near release sites

As stated previously, Dr. Williams claimed that: "MTBE has not had a significant adverse impact on public (or private) drinking water supplies" (p.2 Williams, 2017). Here I review data on MTBE and TBA contamination in private wells near release sites in California, data that were ignored by Dr. Williams and that contradict her claim.

In 2014 my staff and I examined data on the concentrations of MTBE and TBA in a subset of private drinking water wells (private DW wells) tabulated in electronically available sample results of the GeoTracker Electronic Submittal Information (ESI).  The resulting sample data for the 1,643 private DW wells identified was analyzed for maximum MTBE and TBA concentration detected, MTBE and TBA detection frequencies by year, and time to (a) first detect and (b) maximum concentration (from the release site case open date).  The results for numbers of wells with detections and detection frequencies are summarized in Table 2.2 below. Given that the GeoTracker ESI data contains some 547,000 location IDs (mostly wells), and this review only covered 0.8% of the them, there are likely many hundreds to thousands more private DW wells with MTBE and TBA impacts among those data.  The methodology and additional results are described below.

Table 2.2: Numbers of private DW wells with MTBE, TBA and MTBA and/or TBA detections and associated detections frequencies for the 1,643 wells in my analysis.

| | **MTBE** | | **TBA** | | **MTBE and/or TBA** | |
|---|---|---|---|---|---|---|
| | **Number** | **Detection Frequency %** | **Number** | **Detection Frequency %** | **Number** | **Detection Frequency %** |
| **Number of DW Wells Sampled** | 1,643 | - | 1,001 | - | 1,643 | - |
| **Wells with Detection(s)** | 241 | 14.7% | 64 | 6.4% | 264 | 16.1% |
| **Wells with Detection(s) >= 1.0 ppb** | 196 | 11.9% | 64 | 6.4% | 243 | 14.8% |
| **Wells with Detection(s) >= 5.0 ppb** | 136 | 8.3% | 57 | 5.7% | 163 | 9.9% |
| **Wells with Detection(s) >= 13.0 ppb** | 91 | 5.5% | 42 | 4.2% | 118 | 7.2% |
| **Wells with Detection(s) >= 100.0 ppb** | 45 | 2.7% | 25 | 2.5% | 56 | 3.4% |
| **Wells with Detection(s) >= 1000.0 ppb** | 19 | 1.2% | 6 | 0.6% | 23 | 1.4% |

Exhibit 2
Page 67

40

### 2.2.1 Methodology

The GeoTracker data contain millions of sample results for MTBE and TBA.  Although the sample points are mostly groundwater wells (monitoring, remediation, and drinking water), it is not possible to definitively determine if a sample point is a private DW well without reviewing the associated site files.  As a result, identifying all private DW well sample data in the database is virtually impossible.

To reduce the scope of such an analysis, a population of potential private drinking water wells analyzed was limited to the (a) 2,312 sample point types (filed point classes, FPCs) identified as drinking water[18], and (b) other sample location IDs potentially associated with drinking water, DW (drinking water) and DOM (domestic), and sample location IDs that were possible addresses associated with a private wells (beginning with 4 consecutive numbers, or containing HWY, WAY or ROAD).

Site files for sites associated with all 2,312 field (sample) points (FPs) were reviewed to:

- normalize well names,
- correct FPC, if necessary (e.g., from Domestic/Private Drinking Water Well to Remediation/Groundwater Monitoring Well),
- log any missing data associated with the FPs,
- and remove duplicate data.

During the review, a total of 1,268 (55%) of the FPs associated with drinking water were confirmed as private DW wells.  Also, 696 additional private DW wells, not identified properly in the FPC table, were identified during review of the site files associated with the 2,312 FPs, bringing the total number of confirmed private DW wells to 1,964.  Sample data for MTBE and/or TBA was available for 1,643 of the 1,964 confirmed private wells. Table 2.3 details this screening process.

The resulting sample data for the 1,643 private DW wells was analyzed for maximum MTBE and TBA concentration detected, MTBE and TBA detection frequencies by year, and time to (a) first detect and (b) maximum concentration (from the site open date).

---

[18]  FPC = Water Supply Well, Water System Facility Intake, or Domestic/Private Drinking Water Well

Exhibit 2
Page 68

41

**Table 2.3: Actions taken to filter by FPC and site file review.**

| Action | Change | Field Points Remaining |
|---|---|---|
| Total number of Field Points in ESI FPC table | - | 547,824 |
| Removed based on FPC | -545,512 | 2,312 |
| Removed through normalization of Field Point Name* | -304 | 2,008 |
| Removed Field Points not private DW wells** | -740 | 1,268 |
| Added new private DW wells *** | +696 | 1,964 |
| Removed due to lack of sample data**** | -321 | 1,643 |

*Removed duplicates and field points that do not link.
**Based on site file review we removed 11 Extraction, 39 Industrial, 36 Irrigation, 93 Monitoring, Municipal, 9 Production, 14 Remediation, 2 Surface Water, 1 Trip Blanks, 528 Unknown, 1 Waste Water.
***Domestic wells, identified during site file review, that were not identified through linking the FPC table with the ESI sample data.
****Field Points with no MTBE and/or TBA sample data in the site files and/or ESI data table.

### 2.2.2 Analytical Results

**Detection frequencies -** Table 2.4 lists the number of wells sampled per year and the numbers of detections of MTBE, TBA and MTBA and/or TBA at or above concentration limits of 1.0 ppb, 5.0 ppb, 13.0 ppb, 100.0 ppb and 1,000 ppb.  Table 2.5 summaries the data in Table 2.4 in terms of detection frequencies.  Figure 2.1 plots detection frequencies for MTBE and/or TBA by year for the 1,643 private wells identified by FPC.  For example, detection frequencies at concentrations greater than or equal to 5.0 ppb vary by year from 2.1% to 11.9% and with no apparent overall increasing or decreasing trend.

**Maximum concentrations -** Figure 2.2 plots the maximum detected MTBE concentration for each of the 1,643 private wells with sample data.  Concentrations of MTBE detected in private wells ranged from non-detect to nearly 100,000 ppb.

**Time to first sample, first detect and maximum detected MTBE concentration -** Figure 2.3 plots time to first sample, first detection and maximum detected concentration of MTBE at sites associated MTBE detections in the identified private DW wells.  It is often the case that the maximum detection occurs many years after the site was open.

**Other sample location IDs potentially associated with drinking water -** A total of 19 private DW wells were identified from the random sample of 100 of the 2,162 sample location IDs potentially associated with private DW wells.  The mean estimated number of private DW wells

Exhibit 2
Page 69

42

in the population of 2,162 is 410 (19% of 2,162).  The resulting number of private DW wells (estimated plus known) from this review of 4,474 (2,312 + 2,162) sample location IDs is 2,374.

Given that the GeoTracker ESI data contains some 547,000 location IDs, and this review only covered 0.8% of the them, there are potentially many hundreds to thousands more private DW wells with MTBE and TBA impacts among those data.

Exhibit 2
Page 70

43

**Table 2.4: Number of detections for MTBE, TBA and MTBE and/or TBA by year for the 1,643 private DW wells identified.**

| Constituent | Statistics for wells | Year | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| MTBE | Number Sampled | 47 | 157 | 225 | 249 | 588 | 521 | 329 | 379 | 374 | 325 | 335 | 331 | 232 | 51 |
| MTBE | Any Conc. | 4 | 24 | 32 | 43 | 59 | 59 | 56 | 73 | 74 | 46 | 47 | 53 | 32 | 7 |
| MTBE | %≥ 1.0 ppb | 3 | 20 | 31 | 34 | 44 | 49 | 47 | 59 | 62 | 31 | 37 | 41 | 26 | 5 |
| MTBE | %≥ 5.0 ppb | 1 | 10 | 17 | 19 | 24 | 32 | 36 | 37 | 40 | 12 | 16 | 28 | 16 | 3 |
| MTBE | %≥ 13.0 ppb | 1 | 6 | 10 | 10 | 17 | 24 | 26 | 31 | 19 | 9 | 12 | 23 | 12 | 3 |
| MTBE | %≥ 100.0 ppb | 1 | 4 | 5 | 4 | 4 | 8 | 11 | 12 | 1 | 1 | 4 | 10 | 7 | 2 |
| MTBE | %≥1,000.0 ppb | 0 | 0 | 1 | 0 | 2 | 4 | 4 | 7 | 1 | 1 | 3 | 5 | 2 | 0 |
| TBA | Number Sampled | 33 | 119 | 174 | 211 | 269 | 251 | 257 | 297 | 301 | 251 | 255 | 263 | 179 | 39 |
| TBA | Any Conc. | 0 | 2 | 6 | 8 | 9 | 8 | 7 | 17 | 16 | 6 | 6 | 15 | 3 | 1 |
| TBA | %≥ 1.0 ppb | 0 | 2 | 6 | 8 | 9 | 8 | 7 | 17 | 16 | 6 | 6 | 15 | 3 | 1 |
| TBA | %≥ 5.0 ppb | 0 | 0 | 6 | 8 | 9 | 8 | 7 | 15 | 12 | 5 | 6 | 13 | 3 | 1 |
| TBA | %≥ 13.0 ppb | 0 | 0 | 6 | 6 | 7 | 7 | 6 | 11 | 6 | 5 | 5 | 7 | 2 | 1 |
| TBA | %≥ 100.0 ppb | 0 | 0 | 2 | 3 | 0 | 4 | 4 | 8 | 4 | 3 | 5 | 6 | 1 | 0 |
| TBA | %≥1,000.0 ppb | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 1 | 0 | 0 |
| MTBE and/or TBA | Number Sampled | 47 | 157 | 225 | 249 | 588 | 521 | 329 | 379 | 374 | 325 | 335 | 331 | 232 | 51 |
| MTBE and/or TBA | Any Conc. | 4 | 25 | 36 | 49 | 65 | 64 | 58 | 76 | 74 | 48 | 49 | 58 | 33 | 7 |
| MTBE and/or TBA | %≥ 1.0 ppb | 3 | 22 | 35 | 43 | 57 | 59 | 53 | 69 | 70 | 44 | 43 | 53 | 29 | 6 |
| MTBE and/or TBA | %≥ 5.0 ppb | 1 | 10 | 21 | 26 | 31 | 38 | 39 | 41 | 42 | 17 | 19 | 32 | 17 | 3 |
| MTBE and/or TBA | %≥ 13.0 ppb | 1 | 6 | 15 | 16 | 24 | 29 | 30 | 33 | 25 | 13 | 13 | 26 | 12 | 3 |
| MTBE and/or TBA | %≥ 100.0 ppb | 1 | 4 | 6 | 7 | 4 | 10 | 13 | 13 | 5 | 4 | 8 | 16 | 8 | 2 |
| MTBE and/or TBA | %≥1,000.0 ppb | 0 | 0 | 1 | 0 | 2 | 6 | 7 | 9 | 1 | 2 | 3 | 7 | 2 | 0 |

Exhibit 2
Page 71

44

**Table 2.5: Detection frequency (percent of wells with detections) for MTBE, TBA and MTBE and/or TBA expressed as a percent by year for the 1643 private DW wells identified in the GeoTracker ESI data.**

| Constituent | Statistics for wells | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MTBE | Number Sampled | 47 | 157 | 225 | 249 | 588 | 521 | 329 | 379 | 374 | 325 | 335 | 331 | 232 | 51 | 1643 |
| MTBE | Any Conc. | 8.5% | 15.3% | 14.2% | 17.3% | 10.0% | 11.3% | 17.0% | 19.3% | 19.8% | 14.2% | 14.0% | 16.0% | 13.8% | 13.7% | 14.7% |
| MTBE | %≥ 1.0 ppb | 6.4% | 12.7% | 13.8% | 13.7% | 7.5% | 9.4% | 14.3% | 15.6% | 16.6% | 9.5% | 11.0% | 12.4% | 11.2% | 9.8% | 11.9% |
| MTBE | %≥ 5.0 ppb | 2.1% | 6.4% | 7.6% | 7.6% | 4.1% | 6.1% | 10.9% | 9.8% | 10.7% | 3.7% | 4.8% | 8.5% | 6.9% | 5.9% | 8.3% |
| MTBE | %≥ 13.0 ppb | 2.1% | 3.8% | 4.4% | 4.0% | 2.9% | 4.6% | 7.9% | 8.2% | 5.1% | 2.8% | 3.6% | 6.9% | 5.2% | 5.9% | 5.5% |
| MTBE | %≥ 100.0 ppb | 2.1% | 2.5% | 2.2% | 1.6% | 0.7% | 1.5% | 3.3% | 3.2% | 0.3% | 0.3% | 1.2% | 3.0% | 3.0% | 3.9% | 2.7% |
| MTBE | %≥1,000.0 ppb | 0.0% | 0.0% | 0.4% | 0.0% | 0.3% | 0.8% | 1.2% | 1.8% | 0.3% | 0.3% | 0.9% | 1.5% | 0.9% | 0.0% | 1.2% |
| TBA | Number Sampled | 33 | 119 | 174 | 211 | 269 | 251 | 257 | 297 | 301 | 251 | 255 | 263 | 179 | 39 | 1001 |
| TBA | Any Conc. | 0.0% | 1.7% | 3.4% | 3.8% | 3.3% | 3.2% | 2.7% | 5.7% | 5.3% | 2.4% | 2.4% | 5.7% | 1.7% | 2.6% | 6.4% |
| TBA | %≥ 1.0 ppb | 0.0% | 1.7% | 3.4% | 3.8% | 3.3% | 3.2% | 2.7% | 5.7% | 5.3% | 2.4% | 2.4% | 5.7% | 1.7% | 2.6% | 6.4% |
| TBA | %≥ 5.0 ppb | 0.0% | 0.0% | 3.4% | 3.8% | 3.3% | 3.2% | 2.7% | 5.1% | 4.0% | 2.0% | 2.4% | 4.9% | 1.7% | 2.6% | 5.7% |
| TBA | %≥ 13.0 ppb | 0.0% | 0.0% | 3.4% | 2.8% | 2.6% | 2.8% | 2.3% | 3.7% | 2.0% | 2.0% | 2.0% | 2.7% | 1.1% | 2.6% | 4.2% |
| TBA | %≥ 100.0 ppb | 0.0% | 0.0% | 1.1% | 1.4% | 0.0% | 1.6% | 1.6% | 2.7% | 1.3% | 1.2% | 2.0% | 2.3% | 0.6% | 0.0% | 2.5% |
| TBA | %≥1,000.0 ppb | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 1.2% | 1.0% | 0.0% | 0.4% | 0.4% | 0.4% | 0.0% | 0.0% | 0.6% |
| MTBE and/or TBA | Number Sampled | 47 | 157 | 225 | 249 | 588 | 521 | 329 | 379 | 374 | 325 | 335 | 331 | 232 | 51 | 1643 |
| MTBE and/or TBA | Any Conc. | 8.5% | 15.9% | 16.0% | 19.7% | 11.1% | 12.3% | 17.6% | 20.1% | 19.8% | 14.8% | 14.6% | 17.5% | 14.2% | 13.7% | 16.1% |
| MTBE and/or TBA | %≥ 1.0 ppb | 6.4% | 14.0% | 15.6% | 17.3% | 9.7% | 11.3% | 16.1% | 18.2% | 18.7% | 13.5% | 12.8% | 16.0% | 12.5% | 11.8% | 14.8% |
| MTBE and/or TBA | %≥ 5.0 ppb | 2.1% | 6.4% | 9.3% | 10.4% | 5.3% | 7.3% | 11.9% | 10.8% | 11.2% | 5.2% | 5.7% | 9.7% | 7.3% | 5.9% | 9.9% |
| MTBE and/or TBA | %≥ 13.0 ppb | 2.1% | 3.8% | 6.7% | 6.4% | 4.1% | 5.6% | 9.1% | 8.7% | 6.7% | 4.0% | 3.9% | 7.9% | 5.2% | 5.9% | 7.2% |
| MTBE and/or TBA | %≥ 100.0 ppb | 2.1% | 2.5% | 2.7% | 2.8% | 0.7% | 1.9% | 4.0% | 3.4% | 1.3% | 1.2% | 2.4% | 4.8% | 3.4% | 3.9% | 3.4% |
| MTBE and/or TBA | %≥1,000.0 ppb | 0.0% | 0.0% | 0.4% | 0.0% | 0.3% | 1.2% | 2.1% | 2.4% | 0.3% | 0.6% | 0.9% | 2.1% | 0.9% | 0.0% | 1.4% |

Exhibit 2
Page 72

45



Figure 2.1: Number of wells sampled for MTBE and detection frequency by year for detections at any concentration, and detections at concentrations ≥ 1.0 ppb, ≥ 5.0 ppb and ≥ 13.0 ppb for the 1,643 private wells identified by FPC.  Detection frequencies for greater than or equal to 5.0 ppb vary from 2.1% to 11.9% and are relatively stable with no apparent trend.



Figure 2.2: Maximum detected MTBE concentration for each of the 1,643 private DW wells. Non-detect is plotted as 0.1 ppb.

Exhibit 2
Page 73

46



Figure 2.3: Time to first sample, first detection and maximum detected concentration at MTBE sites associated with private DW wells with detectable MTBE.

Exhibit 2
Page 74

47

## 3. Joint Response to Mr. Daus and Dr. Williams

Both Mr. Daus and Dr. Williams have expressed opinions related to detections of MTBE and
TBA in PWS wells in California.  The discussion by Mr. Daus on this topic is limited to a single
paragraph spanning pages 3 and 4 of his supplemental report (Daus, 2017).  Therein he
summarizes McHugh et al (2014), a paper authored by Mr. Connor and his colleagues at GSI
Environmental, Inc. (see Section 5 for a series of publications authored by GSI for litigation
purposes).  The analysis of McHugh et al. (2014) is similar to that of Dr. Williams.

My general opinions on this subject are discussed in Section 8.2, "Historical MTBE and TBA
Detections in California", of my 2011 Expert Report, and they have not changed.  Although the
specific numbers have changed in the 7 years since my Expert Report was authored, the opinions
in my report generally address the claims of McHugh et al. and Williams, many of which are
misleading.

Of the six numbered opinions expressed on page 2 of Williams (2017), here I will respond to
numbers one and two pertaining to the impacts that MTBE and TBA, respectively, have had on
public water supply (PWS) groundwater sources in California; my response to number four
pertaining to the impacts that MTBE has had on private drinking water supplies, specifically
those in California, was covered in the previous sections of this rebuttal.

Before discussing the specific opinions of Dr. Williams, it is important to consider the overall
content of Dr. Williams' supplemental report.  Dr. Williams' has stated elsewhere, that her
expertise lies

> "in the areas of exposure, risk, and decision analysis, which includes ***retrospective*** exposure
> assessment [emphasis added]."[19]

Accordingly, Dr. Williams' supplemental report is focused solely on statistics related to
*historical* MTBE, TBA and PCE detections in public water supply and other groundwater wells,
and lacks a scientific perspective and hydrogeologic explanation for the observed results.

---

[19] Wilson (you mean Williams?) 2010 Expert Report in Crescenta Valley Water Dist. v.
Exxon Mobil Corp., et al., Case No. 07 Civ. 9453 (SAS).

Exhibit 2
Page 75

48

Dr. Williams' analysis of MTBE, TBA and PCE detections in California public water supply wells (PWS wells) is based solely on information contained in the Department of Drinking Water (DDW) database.  Nearly all of the results presented in Dr. Williams' report are presented in terms of aggregate statistics, averages and average detection frequencies.  In a study covering a wide geographic region, reporting results in terms of an average concentration or an average detection frequency almost always obscures the most contaminated regions from review.  Also, MTBE is generally associated with point sources of contamination that, although numerous, occupy a small fraction of the overall landscape.  While MTBE plumes are still relatively young, impacts to drinking water will be greatest in wells close to release sites.

Dr. Williams knows that the DDW database, on which her analysis is based, has severe limitations:

> "*Drinking water sources are not routinely sampled for MTBE.*  Our analysis reveals that many drinking water wells in California have not been sampled at all, or are not routinely sampled for MTBE.  As a consequence, it is difficult to evaluate the actual impact of MTBE on drinking water supplies in California." (*Williams*, 2001 p.83; emphasis as published).

This statement was true then (2001), and even though testing for MTBE in public water supplies of California was mandated in 1994; it was true when I authored my report in 2011; and I will show that it is still true today.  Despite this severe limitation, Dr. Williams continues to omit groundwater sources not sampled for MTBE and TBA from her statistics and from her discussion (many of the limitations of the DDW database were discussed in my expert report in this case, Section 8.2 Fogg, May 2011).  Not surprisingly, McHugh et al. (2014) also omits consideration of groundwater sources not sampled for MTBE and TBA in discussing their results.

Dr. Williams' focus on the DDW database, with its severe limitations, combined with a lack of hydrogeologic analysis and consideration for the fate and transport of MTBE, TBA and PCE, provide little perspective on the MTBE and TBA problems as a whole in California, and underestimate historical exposures to these chemicals.

Notably, in addition to the omissions in her analysis and lack of science perspective in her discussion, Dr. Williams originally developed and published the methodology used in her expert and supplemental reports in this case to support her expert testimony in the 2003/2004 case of

Exhibit 2
Page 76

49

Methanex Corporation vs. the United States of America (Williams et al., 2000). In that publication, Williams et al. failed to acknowledge sources of funding, stating that: "This work was conducted by scientists at Exponent and no financial support was provided from other sources." [20]   In a recent publication using the same methods, Dr. Williams explicitly acknowledges her sources of

> "This work was funded by the MTBE joint defense group, comprising oil and chemical companies that have historically sold, manufactured, delivered, and/or stored gasoline containing MTBE in the United States and who have been involved in MTBE-related litigation. The author, who currently serves as an expert witness in litigation matters related to MTBE, had sole responsibility for the writing and content of this article." (Williams, 2011)

In what follows, I will update, and provide a hydrogeologic perspective to, the numbers discussed in my expert report.

## 3.1 Response to the opinions of Dr. Williams regarding PCE

Like the rest of Dr. Williams' report, her discussion regarding PCE is about statistics, and void of science and scientific perspective.  In the section of her Supplemental Expert Report titled "PCE", Dr. Williams expresses her opinion that:

> "According to California's State Water Resources Control Board, PCE is among the more frequently detected organic contaminants in California drinking water based on recent testing data (2012– 2015), with 465 sources having a peak detection above the PHG and 119 sources having a peak detection above the MCL for PCE." (Williams, 2017 p.8)

I reported similar findings in my May, 2011 Expert Report. (Fogg, May 2011 Section 8.2.2)

For a hydrogeologic perspective on the numbers,

> "Recall that the essence of the MTBE problem is that present-day impacts, which are significant, are not an accurate measure of the ultimate impacts of MTBE because of the long lag time (commonly decades to centuries) between introduction of groundwater contaminants and their arrival at drinking water supply wells. Contaminants like nitrate, TCE, **PCE**, DBCP, and many others introduced initially in elevated quantities circa 1940-1950 did not cause appreciable pollution in drinking water wells until the 1970's through the present." (p. 101 Fogg May 2011, emphasis  added,)

---

[20] Co-author Paustenbach lists on p.19 of his 1/21/04 resume, "NAFTA litigation involving MTBE (Toronto, Canada).   In 1999, retained by Methanex Corp. to address the environmental and human health hazards associated with the use of MTBE by the United States as an oxygenate.  Their claim was that California banned MTBE in an arbitrary manner.  Case will be argued in World Court in 2003 or later."

Exhibit 2
Page 77

50

In contrast to MTBE and TBA, PCE is an older contaminant, with extensive use from the 1940s through the 1980s.  MTBE was introduced en masse nationwide in gasoline in the mid 1990s and was still in use in some parts of the country until 2006.  Thus, in hydrogeologic terms, the MTBE and TBA problem is still young, with most releases having occurred within the last fifteen to twenty years.  The full impacts from compounds like MTBE evolve over a decadal time scale, not over a few years, in alluvial groundwater basins like those upon which California depends for nearly half its drinking water supply.  Much of the MTBE released to groundwater can therefore be expected to still remain en route to wells.

Dr. Williams' discussion of PCE detections in Orange County illustrates an important point: that PWS wells in the Orange County Water District are generally vulnerable to contamination:

> "The DDW water quality monitoring database also includes PCE sampling data for OCWD member cities or water agencies. Specifically, 284 drinking water sources served by groundwater belonging to OCWD areas were sampled for PCE from January 1995 to March 2007 (Table S19). PCE was detected in 17 [6%] of these sources: 13 (out of 66) samples from Well 014 (AR), 2 (out of 7) samples from Well 023 (DS), 23 (out of 51) samples from Well 026 (DS), and 3 (out of 3) samples from Well 035 (DS) in the City of Anaheim water system; 38 (out of 41) samples from Fire Station Well 13 (AB), 72 (out of 72) samples from Kimberly 01 (AB), 226 (out of 256) samples from Kimberly 02 (AR), 15 (out of 171) samples from Sunclipse Well 10 (AR), 37 (out of 172) wells from Well 04 (AR), 51 (out of 169) wells from Well 05 (AR), 9 (out of 169) samples from Well 06 (AR), 27 (out of 140) samples from Well 07 (AR), and 46 (out of 172) samples from Well 08 (AR) in the City of Fullerton water system; 43 (out of 83) samples from Well 03 (AR) in the Irvine Ranch Water District; and 11 (out of 141) samples from Concerto 02 (IR), 12 (out of 12) samples from Ballad (DS), and 28 (out of 30) samples from Concerto 01 (DS) in Golden State WC–Yorba Linda water system. Four [out of 17 with detections of PCE, 24%] of these sources (20 samples) had PCE detections above California's primary MCL of 5 ug/L." (Williams, 2017 p. 9 and 10)

As shown in Figs. 3.1 and 3.2, Orange County is home to two large comingled groundwater plumes of volatile organic chemicals (PCE, TCE, 1,4 dioxane and and 1,1 DCE, among others). These plumes are the result of chemicals released to groundwater in decades past by dozens of potentially responsible parties.  Like MTBE and TBA, the VOC contaminants are known to biodegrade and transform, and yet obviously are sufficiently persistent and mobile to threaten drinking water supplies.  The overall comingled North Basin plume has grown to approximately five miles long, two miles wide and extends in some places to hundreds of feet below the land surface (Fig. 3.1).  The overall comingled South Basin plume has grown to approximately four miles long, and 3/4 miles wide (Fig. 3.2).  Therefore, despite the long time since releases have occurred, the plumes continue to result in new impacts to drinking water wells.

Exhibit 2
Page 78

51



Figure 3.1. The estimated 5 mile by 2 mile composite VOC plume in the Forebay region of the basin in 2008 (source OCWD).

Exhibit 2
Page 79

52



Figure 3.2. The estimated 4 mile by 3/4 mile composite VOC plume in the South Basin region of Orange County (source OCWD).  .

Exhibit 2
Page 80

53

# 4 Response to the opinions of Dr. Williams regarding MTBE and TBA impacts on public sources of drinking water

In this section I respond to the opinions of Dr. Williams expressed in her 2017 Supplemental Expert Report regarding MTBE and TBA impacts on public sources of drinking water in California (Williams, 2017).

## 4.1 The DDW database

To arrive at her number, Dr. Williams relies on data in the Department of Drinking Water (DDW) database[21].  These data include seven tables:

- SITELOC (sample points/sources): information related to sample points (referred to as sources; there may be more than one sample point for water from a groundwater well)
- WATSYS (water systems): descriptions of the water systems associated with the sample points in SITELOC
- STORET (water quality parameters): a list of water quality parameters contained in the tables of sample results.
- CHEMICAL, CHEMHIST, CHEMARCH, and CHEMXARC (sample results): tables, each spanning a different date range, of sample results for sample points (in SITELOC) and the water quality parameters (in STORET).

These tables contain no information about when a source was installed, or when a change in status, if any, occurred.  They also provide no systematic way to relate a particular sample point to the actual source of water (e.g., a well).  Although many sample points are actually the raw water from a well, others are located elsewhere in a distribution system (e.g., before and after treatment, or from a tap).  As a result, there can be more than one sample locations for water from a particular well.

My response to Dr. Williams will use the August 1, 2018 DDW database and will be restricted to the following:

- groundwater sources (WATER_TYPE = G)
- status designations of active, inactive, standby, combined (mixed sources), distribution system, or purchased. For each of these the water can be raw, treated

---

[21] The DDW database was formerly called the California Department of Public Health (CDPH) water quality database, and before that the California Department of Health Services (DHS) water quality database.

Exhibit 2
Page 81

54

or untreated. Additional status designations of pending, abandoned or destroyed
are also included.

## 4.2 Many PWS wells in California have not been sampled, and many more are not frequently sampled, for MTBE and/or TBA

In addition to the lack of science and scientific perspective, in Dr. Williams supplemental report, absent from the numbers of Dr. Williams is an "elephant in the room": an accounting for the number of groundwater sources in California, and the number of those sources that have not been sampled for MTBE and/or TBA.  As discussed previously, Dr. Williams knows that the DDW database has severe limitations with regards to sampling:

> "*Drinking water sources are not routinely sampled for MTBE.  Our analysis reveals that many drinking water wells in California have not been sampled at all, or are not routinely sampled for MTBE.  As a consequence, it is difficult to evaluate the actual impact of MTBE on drinking water supplies in California.*" (*Williams*, 2001 p.83; emphasis as published).

Yet one would never construe this from her supplemental expert report (Williams, 2017).

As was discussed in Section 8.2.1 of my Expert Report, most groundwater sources in the DDW database have not been sampled for MTBE and/or TBA (Fogg, May 2011, p. 91 Figure 8.2). Furthermore, most of the sources that have been sampled are sampled infrequently (Fogg, May 2011).  The following provides an update to the information in Figure 8.2 of my expert report illustrating the frequency of MTBE and TBA sampling of groundwater sources in California. My results show that the situation has changed little since 2001.

Figures 4.1a and b show timelines for MTBE and TBA sampling of PWS groundwater sources relative to the groundwater sources available for sampling.  These charts were created by (1) defining a date range available for monitoring for each source with sample data[22], (2) displaying a constant for sources with no sample data and for which it is not possible to determine the date range during which they were available for monitoring, and (3) plotting the actual number of sources sampled for MTBE and TBA in any given year.  The results for MTBE and TBA shown in Figs. 6a and b clearly illustrate the infrequent and incomplete sampling for MTBE and TBA in PWS groundwater sources.

---

[22]The monitoring date range for active, distribution, and combined sources was defined as the years spanning the first sample year to the present; for inactive, standby, abandoned and destroyed sources it was defined as the years spanning the first sample to last sample.

Exhibit 2
Page 82

As shown in Tables 4.1a and 4.1b, the DDW database SITELOC table of sources (sample points) includes 46,244 groundwater sources that meet the criteria discussed previously.  Of these, only 16,334 (35.3%) have been sampled for MTBE, and 11,231 (24.3%) have been sampled for TBA. In other words, the vast majority of the groundwater sources have not been sampled for MTBE or TBA.  Moreover, only 21.4% of groundwater sources were sampled for MTBE in four or more years; and only 4.8% of groundwater sources were sampled for TBA in four or more years.

Despite acknowledgement in 2001 that many sources have not been sampled for MTBE, in her supplemental report Dr. Williams paints a different, and misleading picture for MTBA and TBA sampling because she does not disclose to the reader that she has omitted sources not sampled for MTBE and/or TBA from the denominator used to compute her statistics.  For example, for MTBE, she begins by stating the obvious:

> "Public drinking water sources served by groundwater in California have been sampled for MTBE over the last 23 years (Table S2)." (Williams, 2017 p. 3)

and then follows immediately with:

> "Approximately 9,400 (60%) of these sources have been sampled for four or more years ... (Table S2)." (Williams, 2017 p. 3)

To arrive at 60% of sources were sampled in four or more years, she has divided the 9,400 sources (sampled for MTBE in four or more years) by the 15,737 sources sampled for MTBE, as opposed to dividing by the number of sources 46,244 (see my calculations in Table 4.1a).  To illustrate further how this is misleading, consider the following hypothetical:

Assume that only one of the 46,244 groundwater sources available for sampling was sampled for MTBE.  Further, assume that that source was sampled for MTBE in five years since 1995.  In this case, Dr. Williams would compute that 100% (1/1) of the sources were sampled in four or more years.  However, in fact only 0.0022% (1/46,244) of the groundwater sources in the database were sampled in four or more years.  Clearly the result of 100% is a misleading statistic.

A comparison between Dr. Williams numbers and my own shows that the main difference is that Dr. Williams omitted sources never sampled for MTBE (see Table 4.2). Dr. Williams' rebuttal is similarly misleading with regards to statistics computed for TBA.

Exhibit 2
Page 83

56

The statistics presented by Dr. Williams are expressed in terms of the number of times a source has been sampled.  However, because sampling for MTBE was mandated beginning in 1994, this begs the question: How many years elapsed between testing of sources? Dr. Williams fails to address this question.

Here I address the years elapsed between samples.  To compare with the statistics of Dr. Williams regarding sampling frequency, I will also address only those wells sampled for MTBE (i.e., I will not include the numerous sources never sampled for MTBE and TBA).  Table 4.3 shows the average number of years or more between testing for MTBE (for sources sampled for MTBE at least once since 1995, and for all sources).  For example, 66.8% of sources tested for MTBE after 1/1/1995 (and 88.3% of all sources) averaged three or more years between testing. Approximately 1/4 (28%) of sources tested for MTBE after 1/1/1995 (and 3/4, 74.6% of all sources) averaged six or more years between testing.

The situation is much worse for TBA. Table 4.4 shows the average number of years or more between testing for TBA (for sources sampled for TBA at least once since 2001).  For example, 90.4% of sources tested for TBA after 1/1/2001 (and 97.7% of all sources) averaged three or more years between testing.  Approximately 50% of sources tested for MTBE after 1/1/2001 (and 92.0% of all sources) averaged seven or more years between testing.

In other words, most sources are not sampled for MTBE and/or TBA and the sources that are sampled are sampled so infrequently that it is impossible to ascertain the extent of contamination on a "statewide basis" as Dr. Williams has claimed to have done.  As was discussed in my Expert Report: "due to infrequent sampling, many new and intermittent MTBE and TBA impacts to drinking water wells could go undetected" (Fogg May 2011, p. 92).  Due to a complete lack of sampling of many sources, and the infrequent sampling of others, many people are potentially consuming MTBE and TBA at high concentrations from sources with inadequate monitoring.

Exhibit 2
Page 84

57



(a)

(b)

Figures 4.1a and 4.1b: MTBE and TBA sampling relative to the sources available for sampling.
These charts were created by (1) defining a date range available for monitoring for each source
with sample data[23], (2) displaying a constant for sources with no sample data and for which it is not
possible to determine the date range during which they were available for monitoring, and (3)
plotting the actual number of sources sampled for MTBE and TBA in any given year.

Table 4.1a: Number of years (or more) groundwater sources in the DDW database were
sampled for MTBE by year 2017.  (this is an update to Figure 8.2 of Fogg, May 2011; DDW
database, Aug. 2018). Note that the August DDW database has no sample results for MTBE in
64.7% of PWS groundwater sources, and no sample results for TBA in 75.7% of PWS
groundwater sources.

| PWS Groundwater Sources | Number | Percent |
|---|---|---|
| Total Number of Sources | 46,244 | 100.0% |
| Sources with No Sample Results | 15,113 | 32.7% |

---

[23]The monitoring date range for active, distribution, and combined sources was defined as the years spanning
the first sample year to the present; for inactive, standby, abandoned and destroyed sources it was defined as
the years spanning the first sample to last sample.

Exhibit 2                                                                                                              58
Page 85

| | | |
|---|---|---|
| Sources with No Sample Results for **MTBE** | 29,910 | 64.7% |
| Sources with Sample Results for **MTBE** | 16,334 | 35.3% |
| Sources with **MTBE** Sample Results in Two or More Years | 13,656 | 29.5% |
| Sources with **MTBE** Sample Results in Three or More Years | 11,716 | 25.3% |
| Sources with **MTBE** Sample Results in Four or More Years | 9,919 | 21.4% |
| Sources with **MTBE** Sample Results in Five or More Years | 6,917 | 15.0% |

Table 4.1b: Number of years (or more) groundwater sources in the DDW database were sampled for TBA by year 2017.  (this is an update to Figure 8.2 of Fogg, May 2011) Note that the August DDW database has no sample results for TBA in 75.7% of PWS groundwater sources.

| **PWS Groundwater Sources** | **Number** | **Percent** |
|---|---|---|
| Total Number of Sources | 46,244 | 100.0% |
| Sources with No Sample Results | 15,113 | 32.7% |
| Sources with No Sample Results for **TBA** | 35,013 | 75.7% |
| Sources with Sample Results for **TBA** | 11,231 | 24.3% |
| Sources with **TBA** Sample Results in Two or More Years | 7,256 | 15.7% |
| Sources with **TBA** Sample Results in Three or More Years | 4,342 | 9.4% |
| Sources with **TBA** Sample Results in Four or More Years | 2,231 | 4.8% |
| Sources with **TBA** Sample Results in Five or More Years | 852 | 1.8% |

Table 4.2: Comparison between the numbers presented by Williams (2017) and those in this report shows that the main difference occurs due to Williams omission of sources not sampled for MTBE (and/or TBA).  Her omissions result in misleading statistics for the percent of sources sampled.

| Statistic | Williams, 2017 | This report (Table 4.1a) |
|---|---|---|
| Number of PWS groundwater sources | Not Reported | 46,244 |
| Sampled for **MTBE** | 15,737 (Table S2) | 16,334 |
| Sampled for **MTBE** in four or more years | 9,400 (page 3) | 9,919 |
| Percent sampled for **MTBE** in four or more years | 60% (page 3) | 21.4% |

Table 4.3: The average number of years or more between testing for MTBE (for sources sampled for MTBE at least once since 1995).[24]  For example, 66.8% of sources tested for MTBE after 1/1/1995 averaged three or more years between testing.  Approximately 1/4 (28%) of sources tested for MTBE after 1/1/1995 averaged six or more years between testing.

| **Average Number of Years or** | **Number of Sources** | **Percent** | **Percent** |
|---|---|---|---|

---

[24] If status is active, distribution or combined, the last year available for sampling was specified as 2018, otherwise it was specified as the year of the last sample for any constituent.  The first year available for sampling was specified as the greater of the first year sampled for any constituent, or 1995.  The average number of years between samples was computed as:  the number of years sampled between 1995 and 2018, divided by the range available for sampling (first minus last year available).

Exhibit 2
Page 86

59

| More Between Testing for MTBE | | of Sources Sampled | of All Sources* |
|---|---|---|---|
| 24 | 388 | 2.4% | 65.5% |
| 23 | 417 | 2.6% | 65.6% |
| 22 | 446 | 2.7% | 65.6% |
| 21 | 467 | 2.9% | 65.7% |
| 20 | 512 | 3.1% | 65.8% |
| 19 | 548 | 3.4% | 65.9% |
| 18 | 641 | 3.9% | 66.1% |
| 17 | 778 | 4.8% | 66.4% |
| 16 | 887 | 5.4% | 66.6% |
| 15 | 982 | 6.0% | 66.8% |
| 14 | 1047 | 6.4% | 66.9% |
| 13 | 1120 | 6.9% | 67.1% |
| 12 | 1567 | 9.6% | 68.1% |
| 11 | 1731 | 10.6% | 68.4% |
| 10 | 1902 | 11.6% | 68.8% |
| 9 | 2173 | 13.3% | 69.4% |
| 8 | 2960 | 18.1% | 71.1% |
| 7 | 3346 | 20.5% | 71.9% |
| 6 | 4574 | 28.0% | 74.6% |
| 5 | 5971 | 36.6% | 77.6% |
| 4 | 7704 | 47.2% | 81.3% |
| 3 | 10904 | 66.8% | 88.3% |
| 2 | 13763 | 84.3% | 94.4% |
| 1 | 16332 | 100.0% | 100.0% |

*Includes all sources sampled and not sampled for MTBE.

Exhibit 2
Page 87

60

Table 4.4: The average number of years or more between testing for TBA (for sources sampled for TBA at least once since 2001, and of all sources).[25]  For example, 90.4% of sources tested for TBA after 1/1/2001 averaged three or more years between testing.  Approximately 50% of sources tested for MTBE after 1/1/2001 averaged seven or more years between testing.  Approximately 25% of sources tested for MTBE after 1/1/2001 averaged twelve or more years between testing.

| Average Number of Years or More Between Testing for TBA | Number of Sources | Percent of Sources Sampled | Percent of All Sources* |
|---|---|---|---|
| 18 | 1780 | 15.9% | 79.6% |
| 17 | 2023 | 18.0% | 80.1% |
| 16 | 2199 | 19.6% | 80.5% |
| 15 | 2334 | 20.8% | 80.8% |
| 14 | 2481 | 22.1% | 81.1% |
| 13 | 2622 | 23.4% | 81.4% |
| 12 | 2754 | 24.6% | 81.7% |
| 11 | 2927 | 26.1% | 82.1% |
| 10 | 3044 | 27.1% | 82.3% |
| 9 | 5062 | 45.1% | 86.7% |
| 8 | 5434 | 48.5% | 87.5% |
| 7 | 5717 | 51.0% | 88.1% |
| 6 | 7534 | 67.2% | 92.0% |
| 5 | 8655 | 77.2% | 94.5% |
| 4 | 9442 | 84.2% | 96.2% |
| 3 | 10133 | 90.4% | 97.7% |
| 2 | 10666 | 95.1% | 98.8% |
| 1 | 11215 | 100.0% | 100.0% |

*Includes all sources sampled and not sampled for TBA.

[25] If status is active, distribution or combined, the last year available for sampling was specified as 2018, otherwise it was specified as the year of the last sample for any constituent.  The first year available for sampling was specified as the greater of the first year sampled for any constituent, or 1995.  The average number of years between samples was computed as:  the number of years sampled between 1995 and 2018, divided by the range available for sampling (first minus last year available).

Exhibit 2
Page 88

61

## 4.3 Lack of statistical methodology

The opinion of Dr. Williams that MTBE and TBA have "not had a significant or worsening adverse impact on public drinking water sources served by groundwater on a statewide basis in California" relies exclusively on the data in the DDW database and is therefore unreliable and lacks scientific foundation (Williams, 2017 p. 2).  As discussed above, the population of groundwater sources listed in the DDW database that potentially have been available for sampling number some 45,000 (Tables 4.1a and 4.1b).  Furthermore, as discussed above, for many of the sources that have been sampled, the sampling was infrequent.  Unfortunately, a detailed investigation of the large numbers of sources with no sample data (~29,000 for MTBE and ~35,000 for TBA) is impractical, and there is no way to reasonably correct for the infrequent sampling.

Faced with the limitations of the DDW database, limitations acknowledged by Dr. Williams as early as 2001, Dr. Williams chose a "sample" composed of the available test results for MTBE (15,737) and TBA (10,893) in groundwater sources, ignoring the majority of sources in the database, those not sampled for MTBE and/or TBA (Tables S2 and S8 of Williams, 2017).  By so doing, she employed a non-probability sampling methodology, referred to in statistics as "convenience sampling":

> "Sometimes it is not possible or not practical to choose a random sample [of the population]. In those cases, a convenience sample might be used. Sometimes it is plausible that a convenience sample could be considered as a random sample, but often a convenience sample is biased."[26]

As a result:

> "Statistical inference with convenience samples is a risky business."[27]

Furthermore:

> "Unlike error related to random variability, bias cannot be assessed without external knowledge of the world"[28]

---

[26] https://www.ma.utexas.edu/users/mks/statmistakes/biasedsampling.html
[27] Freedman, D.A. (2009), Statistical Models and Causal Inference: A Dialogue with the Social Sciences, 1st Edition, p. 23.
[28] Weisberg, H.I. (2010), Bias and Causation: Models and Judgment for Valid Comparisons, p. 26

Exhibit 2
Page 89

62

Dr. Williams, whose the expertise lies "in the areas of exposure, risk, and decision analysis, which includes *retrospective* exposure assessment [emphasis added],"[29] can provide little "external knowledge" or scientific (hydrogeologic) perspective on the fate and transport of MTBE and TBA in California's groundwater. Moreover, a convenience sample composed of the available data in the DDW Database, and that disregards the majority of groundwater sources in the DDW Database, is unreliable for characterizing MTBE and TBA detections in PWS groundwater sources on a "statewide basis."

## 4.4 An update of MTBE and TBA detections in the DDW Database

Dr. Williams claims that the "Average detected concentrations of MTBE in public drinking water sources served by groundwater in California have not changed significantly since 1997" (Williams 2017 p. 5).  However, as was discussed in my expert report, some sources impacted by MTBE are subsequently inactivated, destroyed or abandoned and therefore systematically removed from review by the DDW database.  The fact that the range for MTBE detection frequency remains relatively stable, while simultaneously sources impacted by MTBE are systemically removed from review, means that new sources are continually impacted.  In fact, as shown below, new impacts to groundwater sources continue to accrue and the rate of new impacts over time appears relatively constant since the 2006 ban on MTBE use in California.

In my 2011 expert report I relied on the September(2010?) DDW database.  Table 4.5 shows the increase in the number of PWS groundwater sources with new impacts (first detections) since mid 2010. The numbers shown for 2010 and 2018 were computed from the current database.[30] The new impacts are groundwater sources with first detections that occurred after mid 2010.  In cases where multiple sources were sampled per well, only one source per well is included in the numbers.  The percent increase from 2010 to 2018 in PWS groundwater sources with detections for the first time is 22% for MTBE (242), 108% for TBA (246), and 54% for MTBE and/or TBA (451).

---

[29] Williams 2010 Expert Report in Crescenta Valley Water Dist. v. Exxon Mobil Corp., et al., Case No. 07 Civ. 9453 (SAS).
[30] The Santa Monica Charnock system equalization tank is a new source that  is included in the numbers.  That source combines water from several wells, some or all which may have been impacted in the past.

Exhibit 2
Page 90

63

Table 4.5: Increase in the number of PWS groundwater sources with impacts since mid 2010. These are sources with first detections that were not logged in, and occurred after the publication of the September 2010 database used in my Expert Report, Fogg 2011. The percent increase in PWS groundwater sources impacted by MTBE, TBA and MTBE or TBA has been 22%, 108% and 54%, respectively.

| Cumulative Number of PWS Sources with at least One Detection | Month and Year of DDW Database | | Percent Increase From 2010 to 2018 |
|---|---|---|---|
| | September 2010 | August 2018 | |
| MTBE | 201 | 242 | 20% |
| TBA | 120 | 246 | 105% |
| MTBE and/or TBA | 297 | 451 | 52% |

Figure 4.2 plots the cumulative number of first detections in groundwater sources for (a) MTBE, (b) TBA, and MTBE and/or TBA impacts (DDW database, 2018; update to Figure 8.5 of Fogg, May, 2011).  Figure 4.3 plots the maximum concentration by year detected for each PWS groundwater source in which MTBE (242) or TBA (246) has been detected sometime in the past (DDW Database, Feb 2018).  Note that the number of sources impacted by TBA (246) is rising faster than, and have now surpassed those that have been impacted by, MTBE (242).



Figure 4.2: Cumulative number of first detections in groundwater sources for (a) MTBE, (b) TBA, and MTBE and/or TBA impacts (DDW database, 2018; update to Figure 8.5 of Fogg, May, 2011). Note that the number of sources impacted by TBA have now surpassed those that have been impacted by MTBE.

Exhibit 2
Page 91

64



Figure 4.3: The maximum concentration detected for each PWS groundwater source in which MTBE (242) or TBA (246) has been detected sometime in the past (DDW Database, Feb 2018).

Table 4.6: A breakdown of the detections in Figure 4.3 by concentration.

| Concentration (ppb) | MTBE Percent | TBA Percent |
|---|---|---|
| Any concentration | 100% | 100% |
| Greater than or equal to 1.0 ppb | 81% | 100% |
| Greater than or equal to 10.0 ppb | 26% | 17% |
| Greater than or equal to 100.0 ppb | 6% | 2.4% |

Table 4.6 provides a breakdown of the detections in Figure 4.3 by concentration. For the concentrations plotted in Figure 4.3, 81% (MTBE ) and 100% (TBA) are greater than or equal to 1.0 ppb, and 26% (MTBE) and 17% (TBA) are greater than or equal to 10.0 ppb.

Figure 4.4 plots maximum concentrations detected in PWS groundwater sources with their first MTBE and/or TBA detection ever occurring after mid 2010.  Figure 4.5 plots MTBE concentrations for selected PWS groundwater sources with their first MTBE detection ever for occurring after mid 2010. Only groundwater sources with at least one detection greater than 1.0 ppb are shown. A concentration of 0.1 ppb is used to represent non-detect.

The data show that new impacts to groundwater sources continue to accrue and the rate of new impacts appears relatively constant since the 2006 ban on MTBE use in California.

Exhibit 2
Page 92

65



Figure 4.4: Maximum concentrations detected in PWS wells with their first MTBE and/or TBA detection ever occurring after mid 2010.



Figure 4.5: MTBE concentrations for selected PWS groundwater sources with their first MTBE detection ever occurring after mid 2011. Only groundwater sources with at least one detection greater than 1.0 ppb are shown. A concentration of 0.1 ppb is used to represent non-detect (DDW Database, Feb 2018).

Exhibit 2
Page 93

66

# 5. Response to the Supplementary Expert Report of Mr. Daus

In his May 30, 2017 Supplemental Expert Report, Mr. Daus relies on recent "technical literature" stating that:

> "Since my 2011 Expert Report, several papers have been published in peer-reviewed journals that discuss the persistence, fate and transport of MTBE in groundwater." (Daus, p. 2)

These publications include three publications by Connor and his colleagues at GSI Environmental Inc.:

1. Review of Quantitative Surveys of the Length and Stability of MTBE, TBA and Benzene Plumes in Groundwater at UST Sites (Connor, et. al, 2014 [sic] 2015])
2. Exceptionally Long MTBE Plumes of the Past Have Greatly Diminished (McDade, et. al, 2015)
3. Life Cycle of Methyl tert-Butyl Ether in California Public Water Supply Wells (McHugh, et. al 2014). This paper will be addressed in a joint response to Mr. Daus and Dr. Williams.

These publications together rely on two other recent publications by Connor and his colleagues at GSI Environmental Inc.:

4. Use of Long-Term Monitoring Data to Evaluate Benzene, MTBE, and TBA Plume Behavior in Groundwater at Retail Gasoline Sites (Kamath, 2012)
5. Progress in Remediation of Groundwater at Petroleum Sites in California (McHugh et al., 2013). Mr. Daus also appears as an author on this publication.

These publications and the reliance of Mr. Daus on them are reviewed below.

## 5.1 Connor et al. (2015): Misleading claims by consultants from GSI Environmental Inc. regarding MTBE, benzene and TBA plume lengths and stability

As its title states, Connor et al. (2015), cited by Daus (2017), presents a " review of [12] quantitative surveys of the length and stability of MTBE, TBA and Benzene Plumes in groundwater at [underground storage tank] UST sites." The twelve surveys relied on by Connor et al. (2015) for plume length data are listed in Table 1 of Connor et al. The 13th survey listed in Table 1 of Connor et al. was not used for estimating plume lengths, but rather stability/attenuation of plumes. Mr. Daus, who is also employed by GSI Environmental, Inc. (GSI), relies on Connor et al. (2015) for his opinions on MTBE and TBA plume lengths and plume stability (p. 3 Daus, 2017). Coincidentally, the technical justification for the Low Threat Closure Policy, also referred to by Daus (2017), relied on many of the same surveys compiled by Connor et al. The following is a summary of why the conclusions of Connor et al., e.g., (a) that the statistical distributions of MTBE, TBA and benzene plume lengths are comparable, and that

Exhibit 2
Page 94

67

(b) approximately 90% of these plumes are stable, are unreliable, misleading and scientifically unsound.

- **Litigation driven -** The paper was developed for litigation purposes by consultants from GSI Environmental, Inc. (GSI) and the obvious funding sources were not disclosed.
- **Wide analytical gap between the conclusions of Connor et al. (2015) and the authors of the surveys on which they rely-** Connor et al. (2015) mischaracterized limitations of the survey, ignoring statements and caveats by the authors of the surveys that explain obvious phenomena that affected results observed. Instead, they falsely claimed that "These limitations have been addressed by the authors of the 13 plume studies in a variety of manners." Limitation include, but are not limited to:
  - ➢ **Bias towards early time-frame data -** Several authors of the surveys discussed the limitations of the time frame of the survey data. Three quarters (9) of the surveys were conducted between the early 1990's and the early 2000's, i.e., using data from when most MTBE plumes were still young or not yet born.
  - ➢ **Limited monitoring well networks -** Several of the authors reported that a majority of the plumes had likely moved off site and beyond the networks.
  - ➢ **Differential transport properties -** The authors of the surveys generally acknowledge that MTBE is relatively mobile and recalcitrant compared to BTEX.
- **Most often, monitoring of plumes does not account for vertical migration of contamination -** Very often, monitoring was limited to shallow depths and did not account for vertical contaminant migration deeper into the aquifers.
- **Lack of statistical methodology -** Of the nine survey studies compiled by Connor et al. (2015) and used to estimate MTBE and/or TBA plume lengths, only three used a statistical methodology for site selection. Moreover, those three surveys suffer from other issues related to sample bias. Therefore, the samples used in the surveys, and therefore the results of Connor et al., are unreliable.
- **Did not address MTBE -** Of the 12 plume length surveys compiled, 3 (one fourth) do not address MTBE and/or TBA. (Rice et al., 1995, Buscheck et al., 1996, Mace et al., 1997)
- **Not peer reviewed -** At least 4 of the 9 surveys used to compute MTBE plume lengths do not appear to have undergone a peer or scientific review process (see Table 5.1 herein).
- **Remediation -** Many of the sites in the surveys were undergoing remediation. Not only was remediation intended to reduce plume lengths, the effects of remediation would differ by, among other things: (1) the contaminant of interest, benzene, TBA and MTBE, due to their differential transport properties, (2) release history and the timing of the remediation, (3) remediation design and implementation, and (5) site conditions.
- **Broken peer review process -** Connor et al. (2015) was published in the journal Groundwater a journal that had run an editorial expressing concerns related to peer review.

These problems with Connor et al. (2015) are considered in more detail below.

Exhibit 2
Page 95

68

Table 5.1: Location, time frame, plume remediation, and peer review status of the nine surveys addressed by Connor et al. (2015) used to report MTBE and/or TBA plume lengths (note that the other 4 surveys either did not include MTBE or were not used to estimate plume lengths).

| Publication | Location studied | Time Frame | Remediation | Support and/or Author Affiliation | Peer Reviewed |
|---|---|---|---|---|---|
| Happel et al. (1998) | California | 1995/1996 | Varied | LLNL | Unknown |
| Mace and Choi (1998) | Texas | 1995 - 1997 | Varied | America Petroleum Institute | Unknown |
| Reid et al. (1999), Reisinger et al. (2000) | Florida | Prior to 1999 | Varied | British Petroleum, Integrated Science & Technology, Inc | Unclear |
| Rifai and Rixey (2004) | Texas | Prior to 2003 | Varied | Gulf Coast Hazardous Substance Research, Texas Advanced Technology Program, Texas Natural Resource Conservation Commission | No |
| Wilson (2003) | South Carolina | Prior to 2002 | Varied | Dynamic Corporation | No |
| Shih et al (2004) | Los Angeles | Only data from the 3rd quarter 2000 to 2nd quarter 2001 | Varied | UCLA , Cal EPA | Yes |
| Stevens et al. (2006) | Connecticut | 2 years before and 2 years after January 2004 | Only sites with no remediation. | Weston Solutions, Inc. | No |
| Tarr and Galonski, (2007) | New Hampshire | 2001-2006 | " majority using [MNA][31] ... In many cases soil ... removal ... followed by MNA" | Corporate Environmental Advisors Inc. | No |
| Kamath et al. (2012) | California, New Jersey, Alaska, Oregon, Nevada | "median time ... 15 years for benzene, 11 years for MTBE, 8 years for TBA." | Varied | GSI Environmental, Inc., Stanford | Yes |

[31] MNA is "Monitored Natural Attenuation"

Exhibit 2
Page 96

69

### 5.1.1 Connor et al. (2015) was developed for litigation purposes

Mr. Connor and his colleagues at GSI developed Connor et al. for litigation purposes. The nexus of Connor et al., authored solely by personnel from Connor's consulting firm GSI, began circa 2008 and versions of the figures and text in Connor et al. were subsequently published expert reports of Mr. Connor in at least six MTBE cases (Table 5.2).  Although the details and presentation of Mr. Connor on this subject have changed somewhat from 2009 to 2015, the essence of his opinions and his reliance on the associated studies have generally not.  Indeed, as summarized in Table 5.3, the section headings and figures that appear in Connor et al. (2015) are in many cases identical to, and in others closely mirror, those found in the expert report of Connor (2011) in this case, developed some four years prior to the publication of Connor et al. (2015).  In addition, Connor et al. (2015) does not disclose its obvious sources of funding.

In all of the cases listed in Table 5.2, I have rebutted the opinions of Mr. Connor, and in one Mr. Daus, regarding the plume length survey studies cited in Connor et al.

**Table 5.2:  Cases in which Mr. Conner (and Mr. Connor and Mr. Daus jointly in Puerto Rico-MTBE) presented versions of the survey study published as Connor et al. (2015)**

| Date | Case | Reference |
|---|---|---|
| March, 2009 | City of New York vs. Amerada Hess et al., U.S. District Court, Southern District of New York, Case No. 04-Civ-3417 | Connor NY-MTBE, 2009. |
| September, 2010 | Crescenta Valley Water District vs. Exxon Mobil Corporation et al. U.S. District Court, Southern District of New York, Case No. 07-Civ-9453 | Connor CVWD-MTBE, 2011. |
| May, 2011 | City of Merced vs. Chevron U.S.A., Inc. et al., Superior Court of the State of California in and for the County of Merced, Case No. 148451 | Connor Merced-MTBE, 2011. |
| October, 2011 | Yosemite Springs Park Utility Company vs. Chevron U.S.A., Inc. et al, Superior Court of the State of California in and for the County of Contra Costa, Case No. 08-02938 | Connor Yosemite-MTBE, 2011. |
| October, 2011 | Orange County Water District vs. Unocal Corporation et al., U.S. District Court. Southern District of New York, Case No. 04-Civ-4968 | Connor, 2011 (in this case) |
| April, 2014 | Commonwealth of Puerto Rico et al. vs. Shell Oil Company et al., U.S. District Court, Southern District of New York, Case No. 07-Civ-10470 (SAS) | Daus and Connor Puerto Rico-MTBE, 2014. |

Exhibit 2
Page 97

70

**Table 5.3:  Correspondence between section headings and figures in the Expert Report of Connor (2011) in the case and the publication Connor et al. (2015)**

| Section Headings | |
|---|---|
| **Expert Report of John Connor (Connor, 2011)** | **Review of Quantitative Surveys of the Length and Stability of MTBE, TBA, and Benzene Plumes in Groundwater at UST Sites (Connor et al., 2015)** |
| Statistics on Plume Lengths | Statistical Distribution of MTBE, Benzene, and TBA Plume Lengths |
| Consistency of Observed Plume Lengths from Different Regions | Consistency of MTBE and Benzene Plume Lengths Among Various Studies |
| Exceptionally Long and/or Detached MTBE Plumes | Exceptionally Long Plumes |
| Stability Conditions of MTBE and BTEX Plumes | Stability Condition of Plume Lengths Over Time |
| Diminishing MTBE Plume Concentrations Following Termination of Use | Concentration Trends in Individual Monitoring Wells Over Time |

| Figures | |
|---|---|
| **Expert Report of John Connor (Connor, 2011)** | **Review of Quantitative Surveys of the Length and Stability of MTBE, TBA, and Benzene Plumes in Groundwater at UST Sites (Connor et al., 2015)** |
| Exhibit 8 | Figure 1 (identical) |
| Exhibit 10 | Figure 2 (identical) |
| Exhibit 9 | Figure 3 (identical) |
| Exhibit 11 Part A | Figure 4 (columns were rearranged, results for TBA were added, and additional category of detached was added and it appears that some the "exhausted" MTBE plumes were instead characterized as detached) |
| Exhibit 11 Part B | Figure 5 (columns were rearranged, results for TBA were added, minor changes in the numbers; number of benzene plumes increased from 895 to 905) |

Exhibit 2
Page 98

71

### 5.1.2 Wide gap between the opinions of Connor et al. (2015) and the authors of the surveys on which they rely

Connor et al. discuss some of the "limitations" of the survey studies on which they relied, including:

- "groundwater plumes are not [necessarily] fully delineated"
- "if the plume stability condition is not considered, comparison of older, stable plume lengths to younger, expanding plumes could be misleading, as the expanding plumes will not have achieved full length"
- "differences in MTBE and benzene plume lengths could reflect the effect of variable site conditions if the MTBE and benzene plumes are from different sites"

Connor et al. then follow their discussion of those limitations with the false claim that:

> "These limitations have been addressed by the authors of the 13 plume studies in a variety of manners."

However, in general the authors of those surveys did little, and most cases could do nothing, to address the limitations of the available data.

Moreover, several statements by the authors of the surveys contradict the main conclusion of Connor et al., that MTBE and benzene plume lengths are comparable.  For example, the Mace et al. (1997) survey (survey #3 in Table 1 of Connor et al., 2015), relying on data from sites in Texas compiled in 1993 and 1995, found that:

- "About 61 percent of measured MTBE concentrations are greater than their companion benzene concentrations, although there are still many cases where the concentration of MTBE is much lower than that of benzene."
- "Benzene concentration is approximately correlated with toluene, ethyl-benzene, and total xylenes but not with MTBE (figs. 17 and 18)."
- "there were 890 events where MTBE was detected but benzene was not" and only "331 events where benzene was detected but MTBE was not."

Additionally, contrary to the thesis of Connor et al. (2015) regarding benzene and MTBE plume lengths, Rifai and Rixey (2004) (survey #7 in Table 1 of Connor et al., 2015) found that

> "In fact, when MTBE plumes and toluene plumes are contoured using the 5 ppb levels as in the case of benzene, MTBE plumes outstretch benzene and toluene by approximately 35%."

Moreover, the survey by Reid et al. (1999) (survey #6 in Table 1 of Connor et al., 2015) conducted in Florida also contradicts the conclusions of Connor et al.  Note that in Florida MTBE was used mainly as an octane enhancer, found primarily in premium

Exhibit 2
Page 99

72

unleaded gasoline at lower concentrations compared to those found in reformulated gasoline (2 to 6 percent of gasoline). Yet, Reid et al (1999) found that:

> "M*t*BE plumes are, on average, 34 percent larger than their benzene counterparts. These results are consistent with the difference in mobility of the two compounds as reflected in their physiochemical characteristics."

Similarly, Shih et al. (2004) (survey #9 in Table 1 of Connor et al., 2015) concluded that:

> "the results demonstrate MTBE to pose the greatest problem, followed by TBA and benzene"

Happel et al., (1998) (survey #4 in Table 1 of Connor et al., 2015) qualified their results, acknowledging the need for more data:

> "Ideally, time-series data from hundreds of LUFT sites representing all hydrogeologic regions of California should be utilized to characterize the behavior and impact of MTBE plumes. Analyses of an expanded dataset are important to confirm our initial findings regarding the mobility and recalcitrance of MTBE at California LUFT sites."

and that

> "[O]wing in part to their molecular structure, ether oxygenates [MTBE] including MTBE have been shown to resist biodegradation...The persistence and mobility of MTBE in subsurface environment, combined with its relative quantity in oxyfuel and RFG [reformulated gasoline] as compared to other gasoline constituents, have contributed to its dominant presence and frequent detection in groundwater plumes…and community water systems (CWS)".

Moreover, Tarr and Galanski (2007) (survey #11 in Table 1 of Connor et al., 2015) state that:

> "The primary attenuation mechanism for MtBE is dispersion. It is well understood that MtBE may be regarded as recalcitrant under site-specific conditions. If MtBE resists biodegradation, then these plumes will eventually attenuate to regulatory concentration goals due to dispersion, although in contrast to benzene, toluene, ethylbenzene, and xylenes, (BTEX compounds), the mass would not be depleted and significantly longer distances and time frames would be required."

Similar points were raised by the document from the American Petroleum Institute (API, 2000) that cautioned that

> "MTBE releases are often younger than BTEX releases"

and that

> "such historical considerations must be addressed."

To clarify, API (2000) explains:

> "If BTEX and ether oxygenates are released simultaneously at a given site, then the

Exhibit 2
Page 100

73

> plume lengths are unlikely to remain equal. The BTEX plume will be more subject to retardation and biodegradation, so it will be more likely to remain near the source area. The ether oxygenate plume will be more mobile and persistent, and so it is likely to extend further downgradient."

Furthermore, API (2000) explained:

> "If a BTEX release at a given site predates an ether oxygenate release, then the BTEX plume may be as long (or even longer) than the oxygenate plume. However, the older BTEX plume is more likely to have been affected by changing flow directions or fluctuating water levels, while the younger oxygenate plume is more likely to have experienced fewer variations in groundwater conditions. Given these factors, the older BTEX plume may be wider and thicker, and the younger oxygenate plume may be narrower and thinner. Thus, an ether oxygenate plume may be more difficult to detect and delineate, even when its overall length is similar to that of the associated BTEX plume."

### 5.1.2.1 Early time frame of the data

When evaluating data on plume lengths, the time frame of the survey is an important consideration; a consideration given little weight by Connor et al.  Connor et al. (2015) argue that: "The observed statistical distributions of MTBE and benzene plumes show the two plume types to be of comparable lengths ... ."  However, as shown in Table 5.1 and Fig. 5.1 herein, the survey studies compiled by Connor et al. (2015) were primary conducted in the 1990's and early 2000's and relied on data shortly after the widespread use of MTBE in the United States (circa 1992).  Statements by the authors of the studies cited by Connor et al. (2015) point to the fact that many MTBE plumes were still very young (or not yet developed) while many BTEX (benzene, toluene, ethyl benzene and xylene) plumes were likely decades old, having had time to grow (gasoline having been in general use for approximately 100 years).

In the study from Lawrence Livermore National Labs (LLNL), Happle et al. (1998) (survey #4 in Table 1 of Connor et al., 2015) explained that

> "Monitoring for this compound [MTBE] at California sites has been required only since July 1996. **As a result, sufficient MTBE data for even the simplest statistical and timeseries analyses are just now becoming available.**" (Happle et al., 1998; emphasis added, see Fig. 5.1 for the time frame of the Happle et al. (1998) study).

and

> "It is important to realize that, for the majority of LUFT sites, release histories for MTBE and benzene most likely differed significantly; recent releases of gasoline containing significant quantities of MTBE may have occurred at sites with a long history of contamination with less or non-oxygenated fuels…Thus, plume lengths measured at a

Exhibit 2
Page 101

74

single point in time, e.g., 1995/96, **cannot be indicative of future MTBE plume behavior and its relationship to that of benzene**." and "MTBE plumes are more mobile than BTEX plumes."  (Happle et al., 1998; emphasis added)

This was recognized by the American Petroleum Association (API) in 2000:

"MTBE was used as an octane booster in gasoline as early as 1979, but most oxygenated fuel programs in the U.S. were not initiated until 1992 to 1996 …. Thus, MTBE releases are often younger than BTEX releases. Such historical considerations must be addressed during the site assessment process."  (API, 2000)

Similarly, the study by Shih et al. (2004) (survey #9 in Table 1 of Connor et al., 2015) relied on by Connor et al. (2015), and the only study of which was conducted with a potentially statistically unbiased sample, raised concern about the release histories:

"It remains to be seen whether oxygenate plumes have reached steady state. The different release histories of these compounds can be a factor in interpreting the plume length results. If the oxygenate plumes have not reached steady state, then the **observed plume length results may not be indicative of future plume lengths**." (Shih et al., 2004; emphasis added).

Contrary to the claim of Connor et al. (2015), discussed previously, that "these limitations have been addressed" by the authors, it is clear that there is essentially nothing that these authors of the survey studies could do about the time frame of the available data.  Clearly, Connor et al. (2015) failed to give proper weight to the limited time frame of the data.

Exhibit 2
Page 102

75



(a)

(b)

(c)

Figure 5.1: Plots from (a) Happel et al. (1998), (b) Rifai and Rixey (2004) and (c) Reid et al. (1999) provide examples that illustrate the early time-frame of the data used in the survey studies.

### 5.1.2.2 Limited monitoring networks

Table 5.4, below, shows the criteria for site selection and/or statistics regarding number of monitoring wells per site for the 13 survey studies compiled by Connor et al.  The criteria and statistics suggest that the monitoring well networks of the sites surveyed were minimal in many cases.  As a result, despite the early timeframe of the data, many of the

Exhibit 2
Page 103

76

studies relied on by Connor et al. (2015) concluded that MTBE plumes had already traveled offsite and beyond their monitoring networks:

"almost 40 percent of the [600 plus] sites [surveyed] have dissolved hydrocarbon plumes that reportedly extend offsite" (Mace et al., 1997, survey #3 in Table 1 of Connor et al., 2015)

and

"The MTBE and benzene plumes at many of the sites had traveled off-site and the existing monitoring networks did not capture the full extent of the plume. During the course of the research, it was determined that the monitoring well network at 91 sites [out of 127 examined] was not sufficient for delineating the dissolved phase hydrocarbon plumes; in almost every case this was true for both MTBE and benzene plumes." (Rifai and Rixey, 2004, survey #7 in Table 1 of Connor et al., 2015; see Fig. 1 for the time frame of the tank installation data used in Rifai and Rixey, 2004 survey data)

and

"a portion of the monitoring points was outside the impacted groundwater plume…Thus, well placement has had a significant effect on not only constituent distribution, but also on the summary statistics generated." (Reid et al., 1999, survey #7 in Table 1 of Connor et al., 2015; see Fig. 5.1 for a time frame of the Reid and Reisinger survey data)

Table 5.4: Number of monitoring wells per site for survey studies compiled by Connor et al. (2015).  Notably, the minimum requirements explain why monitoring networks fail to delineate the plumes.

| Survey | Number of Monitoring Wells |
|---|---|
| Rice et al. (1995) | Minimum of 6 |
| Buscheck et al. (1996) | Not Reported |
| Mace et al. (1997) | Minimum of 6 |
| Happel et al. (1998) | Minimum of 8 |
| Mace and Choi (1998) | Not reported (~9 sample events per site) |
| Reid et al. (1999), Reisinger et al. (2000) | Minimum of 3 |
| Shorr and Rifai (2002), Rifai et al. (2003), Rifai and Rixey (2004) | Minimum of 6 |
| Wilson (2003) | Not Reported |
| Shih et al. (2004) | Average of approx. 8 per site |
| Stevens et al. (2006) | Average of approx. 4 per site |
| Tarr and Galonski (2007) | average of approx. 3 per site |
| Kamath et al. (2012) | Minimum of 6 |
| McHugh et al. (2013) | median number sampled during a sampling event was 13 |

Exhibit 2
Page 104

77

In discussing the Mace and Choi (1998) survey (survey #5 in Table 1 of Connor et al., 2015), Fiorenza and Rifai (2003) similarly proposed that the researchers (Mace and Choi):

> "did not observe an increase in MTBE concentration at any wells, possibly because the monitoring wells in the database were not at the leading edge of the plume."

Similarly, Happel et al. (1998) (survey #4 in Table 1 of Connor et al., 2015), using data from 1995/1996, found that:

> "Among these 63 sites, data were insufficient to define the benzene and/or MTBE plume lengths at approximately 20 percent of the sites."

Conspicuously missing from the publication of Connor et al. is a 2003 study from Arizona State University where researchers looked at more than 400 LUST files from the Arizona Department of Environmental Quality, to assess impacts from leaking underground storage tanks to groundwater resources in Arizona (Dahlen et al., 2003).  In comparing plume lengths for MTBE and BTEX, Dahlen et al. (2003) concluded that there is

> "little confidence in conclusions drawn for distances beyond 300ft because of lack of data."

The researchers also noted that:

> "long plumes will appear shorter if monitoring is based on errant assumptions concerning flow direction."

In Arizona, they found that 75% of sites show more than 20 degrees variability in flow direction, and 39% show more than 45 degrees variability.

Based on the limited data, Dahlen et al., (2004) noted that the MTBE and benzene plumes appeared similar in spatial extent. However, when they examined six sites in more detail, with additional investigation/characterization, the data showed that the dissolved MTBE plumes were attenuated more slowly with distance compared to benzene plumes. The authors noted:

> "Of particular interest here is the discrepancy between the observations from the comprehensive analysis of the file review database and the results from the focused supplemental characterization at six LUST sites. This raises questions about the validity of conclusions drawn from large database analyses (especially as they are related to the spatial extent of groundwater impacts); it also suggests a need to examine the extent to which these types of analyses could be biased by typical LUST site monitoring well networks." (Dahlen, 2004).

Exhibit 2
Page 105

78

Like the limitations of the early time frame of the data, discussed previously, the claim of
Connor et al. that these limitations with regards to limited monitoring well networks
"have been addressed" by the authors is generally false.  None of the survey studies
adequately addressed this limitation of the available data.  The results from these early
studies, along with the passage of time allowing for yet more plume growth, indicate that
long ago many if not most MTBE plumes without adequate remediation have migrated
offsite, and beyond monitoring networks.  Clearly, Connor et al. (2015) failed to give
proper weight to the limitations of the monitoring well networks.

### 5.1.3 Most often, monitoring of plumes does not account for vertical migration of contamination

In my previous rebuttal reports to Mr. Connor on this subject, I emphasized the
importance of plume delineation and the limitations of using standard groundwater
monitoring data (used in many of the plume studies Connor relies on) to gauge the length
of plumes and make generalizations about future trends.  Mr. Connor all but omitted
consideration for that information when developing Connor et al. (2015).

To further explain, consider the API publication (2006) on plume migration and "diving"
specifically as it applies to MTBE:

> "Dive is typically more evident in longer and older dissolved-phase plumes.  MTBE is
> often associated with the phenomena of "diving plumes" because it is highly soluble,
> does not sorb significantly, is often slow to biodegrade, and consequently will often
> migrate greater distances from a source than other LNAPL constituents such as BTEX. If
> the magnitude of dive is significant, chemicals may migrate below shallow monitoring
> well screens and go undetected at sites with monitoring networks that rely on single well
> screens positioned near the water table. Several implications arise from missing a diving
> plume. If a diving plume is not adequately characterized, samples collected from water
> table wells screened in the overlying accumulation of clean groundwater may be falsely
> interpreted, which could lead to inadequately characterizing risk to receptors, or
> overestimating the significance of natural attenuation"

To emphasize the point, API (2006) gave the following example:

> "At one site, comparison of MTBE analytical results from depth-discrete monitoring
> wells to vertically averaged results falsely indicated that although averaged
> concentrations fell below New York State's threshold value of 10 µg/l, significant
> concentrations of almost 8,000 µg/l occurred at depth in the downgradient portions of the
> aquifer…At another site, downward migration of constituents was further induced by
> nearby supply well pumping from deeper aquifers."  (API, 2006)

Exhibit 2
Page 106

79

Indeed, very often monitoring is limited to shallow depths and does not account for vertical contaminant migration deeper into the aquifer. Similarly, Shih et al. (2004) (survey #9 in Table 1 of Connor et al., 2015) stated:

> "Clearly, plume length as defined is two-dimensional. The lack of depth-specific data and other site-specific knowledge across the population of LUFT sites investigated in this paper preclude evaluation of plume transport in the vertical direction. In areas of significant recharge, this can bias the measurements toward shorter plumes, since a typical monitoring well screened across the water table may fail to detect the leading edge of the plume as it is deflected downward in response to the infiltration of recharge from above. Further, fluctuating flow directions as well as errors in their determination can result in monitoring well network configurations that create additional biases in plume length measurement."

Similarly, USEPA (2005):

> "Conventional monitoring wells can provide an incomplete picture of the true distribution of MTBE in ground water. If the screen of a monitoring well is long compared to the thickness of the plume of contamination, it can sample the plume of contaminated ground water and cleaner ground water above or below the plume, giving a false impression of natural attenuation from one well to another.  Long plumes of MTBE may dive below the screens of monitoring wells altogether. Any evaluation of natural attenuation between monitoring wells should consider the screened intervals of the wells, the depth interval contaminated with gasoline (if that information is available), and the lithological features sampled by the wells."

Yet, despite all those deficiencies, Connor et al. (2015) relied upon the plume survey studies to make unsubstantiated, unreliable claims regarding plume length and stability.

I reiterate the opinion from my Expert Report (Fogg, May 2011) that traditional monitoring, e.g., as reported in the surveys compiled by Connor et al. (2015), is most often inadequate to use as a basis for evaluating plume length.

### 5.1.4 Statistically biased survey data

As shown in Table 5.5, of the nine surveys used by Connor et al. (2015) to estimate MTBE plume lengths, 6 surveys did not select sites using a statistical method (e.g., random, or random stratified selection).  As a result, the survey samples are likely biased and unreliable for computing statistics.  Included among the six is Kamath et al. (2012), also authored by consultants from GSI.

Exhibit 2
Page 107

80

Table 5.5: Summary of the sample selection for the 9 survey relied on by Connor Et al. (2015) for MTBE and/or TBA plume length analysis. Six of the nine surveys used samples that were not randomly selected.  Of the remaining three random samples, Happel (1998) only includes data from 1995/1996, Tarr and Galonski (2007) suffer from a small sample size, and Shih et al. (2004) only include a small subset of the available data sampled.

| Publication | Sample Selection | Description of Sample |
|---|---|---|
| Happel et al. (1998) | Likely Biased (random, very early time frame 1995/1996) | "The State Water Resources Control Board first requested monitoring of MTBE at all open gasoline LUFT sites in California on July 30, 1996. Prior to this, several major oil companies began monitoring for MTBE in 1995 and voluntarily submitted this information to regulatory agencies per a request by the Western States Petroleum Association. ... data for 236 LUFT sites located in 24 counties in California. Five major oil companies voluntarily submitted this data to the SWRCB in 1996." |
| Mace and Choi (1998) | Likely Biased (not random, early time frame) | Combined data from TNRCC Texas state files, along with data from Chevron and Mobile. |
| Reid et al. (1999), Reisinger et al. (2000) | Likely Biased (not random, early time frame) | Historical data from 148 environmental case files for British Petroleum retail gasoline marketing outlets in Florida. |
| Rifai and Rixey, 2004, Shorr and Rifai (2002), Rifai et al. (2003), | Likely Biased (not random, early time frame, small sample size) | "This study develops a database of 127 MTBE sites and uses the historical data gathered at the selected sites to evaluate the MTBE plume spatially and temporally." |
| Wilson (2003) | Likely Biased (not random, early time frame) | The state of South Carolina provided "Information on 144 active corrective action (ACA) and 68 monitored natural attenuation (MNA) sites were provided for a total of 212 sites." Data prior to 2002. Specific Time frame not specified. |
| Shih et al (2004) | Potentially Unbiased (random, early time frame) | Random sample from sites in the greater Los Angles, California area. Note that a non-random sample of the available data from the sites was used in their analysis (only data from the 3rd quarter 2000 to 2nd quarter 2001). |
| Stevens et al. (2006) | Likely Biased (not random, small sample size) | "Twenty-two retail gasoline stations were chosen for this study ... that meet the following criteria ... No free product observed or apparent at site during the study period; Site not undergoing active remediation (e.g., soil-venting system, ground water pump-and-treat system, source area excavation) during the study period" |
| Tarr and Galonski, 2007 | Likely Biased (random, small sample size) | "the study consisted of data from 25 sites across New Hampshire. The sites were randomly chosen based on location, suitability of the MtBE data, and historical extent of temporal data available. At a given site monitor wells were selected based on whether the target wells had detections of MtBE both prior to and subsequent to the time when MtBE was removed from the gasoline supply." |
| Kamath et al. (2012) | Likely Biased (not random, small sample size) | "This study was conducted using monitoring records from a database of 48 retail gasoline sites ... solicited from regulatory agencies, energy companies, and environmental consultants." |

Exhibit 2
Page 108

81

The three studies that used random selection, Happel et al. (1998), Tarr and Galonski (2007), and Shih et al. (2004), suffer from other issues that introduce bias.

**Biased by time frame -** For example, as discussed previously, Happel et al. (1998) (survey #4 in Table 1 of Connor et al.), with regards to the statistical limitations of the survey data used, stated that:

> "Monitoring for this compound [MTBE] at California sites has been required only since July 1996. **As a result, sufficient MTBE data for even the simplest statistical and timeseries analyses are just now becoming available.**" (Happle et al., 1998; emphasis added).

**Biased by location -** Tarr and Galonski (2007) (survey #11 in Table 1 of Connor et al., 2015) selected sites randomly based on location, which would tend to over represent sites in rural areas with less sites, and under represent sites in urban areas with more sites.  The Kamath et al. (2012) survey  (survey #12 in Table 1 of Connor et al., 2015) also suffers from location related sample bias.  Three of the five states from which GSI chose sites for the plume length survey of Kamath et al. (2012) (survey #12 in Table 1 of Connor et al.) did not even use significant amounts of MTBE in their gasoline (Oregon, Nevada, and Alaska, where MTBE was banned in 1993). According to a graph from Kamath et al. (2009), a power point by Kamath et al. that preceded publication of Kamath et al. (2012), these three states would have accounted for less than 1% of MTBE yearly consumption, compared to other states in the US (Figure 5.2).



Figure 2: Slide 9 from Kamath et al. (2009) showing that together Oregon, Nevada, and Alaska these would have accounted for less than 1% of MTBE yearly consumption, compared to other states in the US.

Exhibit 2
Page 109

82

**Small sample size -** Moreover, Tarr and Galonski (2007) suffers from small sample size bias (only 25 sites were included in their study).  In addition, the Tarr and Galonski (2007) survey was conducted by consultants at Corporate Environmental Advisors Inc. and underwent no formal peer review. Other surveys selected by Connor et al. (2015) are also likely biased by small sample sizes, e.g., Shorr and Rifai (2002), Rifai et al. (2003), Rifai and Rixey (2004) (36 site, survey #7 in Table 1 of Connor et al.) and Stevens et al. (2006) (22 sites, survey #10 in Table 1 of Connor et al.).

**Shih et al. (2004) -** The survey by Shih et al. (2004) (survey #9 in Table 1 of Connor et al.) includes the only potentially unbiased sample of sites.  However, Shih et al. (2004) selected to analyze data from the 3rd quarter 2000 to 2nd quarter 2001, only.  This biased selection of the available benzene and MTBE sample data (from an unbiased, random selection of sites) is problematic because for example, as discussed in Happle et al. (1998), MTBE concentrations in groundwater respond to precipitation:

> "Within the entire population of sites, mean concentrations appeared to be stable throughout the time history (no overall increasing or decreasing trends) (Figure 5.5) however, this does not indicate stability at individual sites. **Most importantly spikes in MTBE and benzene concentrations are documented for both sets of wells. These spikes appear to be related to previous precipitation events.** Fluctuation in the water table most certainly does influence concentration profiles; however, this effect was not clearly evident in the mean results but may be apparent on a site-by-site basis. Among nearsource-area wells, surges in MTBE and benzene concentrations were approximately equal in magnitude, however, **the mean MTBE concentration was approximately 5 to 6 times greater than that of benzene.** Spikes in MTBE concentrations were especially pronounced for low TPH wells and deserve particular attention. **In these wells, surges in MTBE concentrations were approximately one order of magnitude, significantly greater than surges in benzene concentrations. Thus, in wells outside of the source area, MTBE appears to be very responsive to hydrologic forcing. In addition, the highest MTBE concentrations may appear only briefly.** As a result, low concentrations may be particularly deceptive during extended periods of drought." (Happel et al., 1998, p. 53, emphasis added)

As a result, it is not possible to reliably estimate plume length and rate of expansion from intermittent sample data collected during a limited time frame.

### 5.1.5 The survey of McHugh et al. (2013): roles of remediation and biodegradation in plume stability

The survey of McHugh et al. (2014) (survey #13 in Table 1 of Connor et al.) is yet another paper on MTBE published by Mr. Connor and his colleagues at GSI, and funded

Exhibit 2
Page 110

83

by the American Petroleum Institute (API).  The survey by McHugh et al. was aimed at assessing the effects of remediation in controlling concentrations in the source zones of plumes in California. In fact the title is "Progress in Remediation of Groundwater at Petroleum Sites in California." The study states that:

> "We utilized the GeoTracker database to evaluate the progress in groundwater remediation from 2001 to 2011 at over 12,000 sites in California with contaminated groundwater."

**98% of sites were undergoing remediation -**The database contained information on remediation for 3,491 sites:

> "The types of remediation technologies identified included air sparging (406 sites), chemical oxidation (253 sites), dual phase extraction (862 sites), in situ enhanced bioremediation (172 sites), soil excavation (1638 sites), monitored natural attenuation ([MNA] 270 sites), groundwater pump and treat (952 sites), NAPL recovery (681 sites), soil vapor extraction (1558 sites), and other technologies (633 sites). For this population of sites where the remediation technology was identified, active remediation (i.e., any remediation technology other than MNA) was conducted at 98% of the sites." (McHugh et al., 2013)

Therefore, nearly all sites addressed (98%) underwent active remediation; often with more than one remediation technology.  Importantly, the authors clearly explain that they could not address Monitored Natural Attenuation (MNA), i.e., sites without active remediation because:

> "The effectiveness of MNA as a remediation technology could not be directly evaluated because less than 100 sites of 3491 sites with information on remediation technology were identified as having MNA as the only remediation technology (i.e., no active remediation). The other 170 sites where MNA was identified as a remediation technology were also identified as having an active remediation technology." (McHugh et al., 2013)

In other words, most of the 270 sites labeled as MNA were undergoing active remediation; and this assumes that the list of remediation efforts in Geotracker was complete - that is not my experience.

**The survey of McHugh et al. is logically flawed -** Despite the fact that 98% of the sites studied underwent active remediation, the McHugh et al. study in the section titled "TBA Concentrations as Function of MTBE Degradation" erroneously attributed, over a ten year period, all of the changes in MTBE and TBA concentrations at all sites (active remediation and/or MNA) with continuous monitoring records for the entire state of California to biodegradation using a "a simple sequential degradation model:"

Exhibit 2
Page 111

84

> "Biodegradation of MTBE can yield TBA as a degradation product (USEPA 2005; Hyman 2012). As a result, the TBA concentration in groundwater is a function of both TBA generation rates (from MTBE degradation) and TBA degradation rates. For the subset of sites with continuous monitoring data from 2001 to 2011, the link between MTBE and TBA concentrations was evaluated using a simple sequential degradation model ... For the subset of sites with continuous monitoring records ... The MTBE attenuation rate (0.36/year) was based on the best-fit attenuation rate for the MTBE concentration data for this set of sites." (McHugh et al., 2013)" (McHugh et al., 2013)

Why the authors mistakenly attribute all concentration changes to biodegradation when they explained in the previous section that 98% of sites were undergoing active remediation is a mystery.  Moreover, it is well known that TBA is a component of MTBE reformulated gasoline, a fact conspicuously omitted by McHugh et al. (2014), and that remediation by soil vapor extraction and/or dual phase extraction, used at more than 50% of the sites studied by McHugh et al., are much more effective at removing MTBE than TBA (Eweis et al., 2007).  Therefore, it is not surprising that McHugh et al. found that MTBE concentrations were falling in many monitoring wells while TBA concentrations were rising.

Moreover, conspicuously absent from the processes, listed in McHugh et al., that affect near source concentrations is migration of groundwater away from the site (advection), the most fundamental of hydrogeological processes:

> "Because this analysis is based on the overall change in the maximum concentration over time at each site, the resulting attenuation rates reflect the combined effects of the primary source zone attenuation processes that are occurring at each site (e.g., biodegradation, dissolution from non-aqueous phase liquid (NAPL), volatilization, physical removal from active remedies, etc.) during the time period covered by the monitoring record." (McHugh et al., 2013)

Also there is no mention of the MTBE ban in California when comparing MTBE with BTEX.

This inherently flawed line of reasoning by McHugh et al. (2013), on which Mr. Connor is a coauthor and on which Mr. Daus relies, does not provide a scientifically reliable foundation for defense experts' opinions on MTBE and TBA natural attenuation and plume behavior.  Instead, the McHugh et al. study stands as a clear and simple example of the flaws common in the litigation driven "research" of GSI.  Furthermore, in failing to address plume migration, the McHugh et al. study cannot be relied on to assess the

Exhibit 2
Page 112

85

effects of remediation on MTBE sources. However, it is clear from McHugh et al. that remediation can be effective in reducing source concentrations.

### 5.1.6 Broken peer review process

The papers authored by consultants from GSI Environmental, Inc. discussed above, Connor et al. (2015) and two surveys studies on which it relies (Kamath et al. (2012) and McHugh et al. (2013), were all published in the journal Groundwater.  In a 2015 editorial titled  " Journal Paper Peer-Review: A Broken System?", published in the Journal of Groundwater, Thomas Missimer, Executive Editor, muses that: "The entire peer-review system appears to be in a state of crisis with a proliferation of new journals and a narrowing of the pool of qualified and willing reviewers."  Indeed, the peer review process is far from perfect.  Perhaps this explains how these three papers from Mr. Connor's group passed through the peer review process.

In the following section I review the paper by McDade et al. (2015), also authored by Mr. Connor and consultants from GSI in the same year as Connor et al. McDade et al. relies on the results of Connor et al. (2015) for statistics on plume lengths to claim that several MTBE plumes to which I have cited are "exceptionally long."  In addition, the information in McDade et al. contradicts Connor et al. in that the MTBE and TBA plume lengths cited therein are up to 29 times longer than those of benzene (whereas Connor et al. claim that the lengths of MTBE and benzene plumes are comparable).

### 5.2 McDade et al. (2015): More misleading claims by consultants from GSI Environmental Inc. regarding MTBE plumes

Mr. Daus (2017) relies on the paper by McDade et al. (2015), authored by Mr. Connor and other consultants from GSI Environmental, Inc., to conclude that long MTBE plumes are the exception and that the plumes cited have greatly diminished due to remediation and natural attenuation.  It is no coincidence that the plumes discussed in McDade et al. (2015) are the same plumes to which I have referred in my past expert reports.  Mr. Connor has responded to my expert reports in the MTBE cases discussed previously (Table 5.2), in many cases with essentially same opinions that he expressed in McDade et al. (2015).  Like with Connor et al. (2015), GSI Environmental, Inc. (GSI) consultants

Exhibit 2
Page 113                                                                                                              86

took information from the expert reports of Mr. Connor, and information from my own expert reports, and produced McDade et al. (2015) for litigation purposes.  Moreover, although McDade et al. (2015) acknowledged American Petroleum Institute (API) and GSI as funding sources, they failed to disclose the fact that Mr. Connor and GSI were paid in MTBE litigation over the course of nearly a decade to develop the opinions expressed in McDade et al. (2015).

As I discuss below, the claim by McDade et al. that the study plumes are "exceptionally long" is not supported by the literature on which they rely, in part because the comparison is made to other plumes described in the unreliable survey studies discussed above, based on early time frame data, limited monitoring networks and/or lack of statistical methodology (Happel et al. 1998; Mace and Choi 1998;  Reid et al. 1999; Reisinger et al. 2000; Shorr and Rifai 2002; Rifai et al. 2003; Wilson 2003; Shih et al. 2004;  Kamath et al. 2012 (also published by GSI), and Connor et al. 2014, an in press version of Connor et al., 2015 ).

In this case, I have already responded to Mr. Connor regarding many of the plumes discussed in McDade et al. (2015) (Section 6 of Fogg, December 2011).  Herein I will include some additional information that contradicts the findings of McDade et al. (2015), and shows that:

- McDade et al. was developed for litigation purposes
- The MTBE plumes discussed in McDade et al. are exceptional because they have been exceptionally well monitored with extensive off-site monitoring networks - that is why they appear relatively long.
- The MTBE and TBA plumes are characterized by hot spots downgradient from the source (detached plumes).
- The MTBE, TBA and benzene plume lengths discussed in McDade et al. contradict the conclusions of Connor et al. (2015): for nearly every plume the MTBE and TBA plumes are significantly (up to 29 times) longer than the benzene plumes.
- In some cases, even the plumes discussed in McDade et al. migrated beyond their extensive monitoring well networks, and in others they were cut short because they terminated in surface water bodies.
- Other authors have commented on the inaccurate plume characterizations of McDade et al.

These issues are discussed in more detail below.

Exhibit 2
Page 114

87

### 5.2.1 Developed for litigation purposes

As mentioned above, in response to my expert reports, Mr. Connor began presenting elements of McDade et al. (2015) in his expert reports beginning as early as 2009.  For example, Table 5.6 shows the opinions of Mr. Connor expressed in his expert report in the Merced MTBE case correspond with those of McDade et al. (2011).  Moreover, Table 5.7 shows that, for litigation purposes, McDade et al. (2015) mirrored the list of plumes discussed in my past expert reports.

**Table 5.6 The opinions and information of Mr. Connor in past MTBE cases, e.g., those of Merced MTBE (Connor Merced-MTBE, 2011) shown, correspond with, and were used to develop, McDade et al. (2015) for litigation purposes.**

| Expert Report of Mr. Connor in Merced MTBE (2011) | McDade et al. (2015) |
|---|---|
| At a relatively small number of UST sites in the U.S., very long MTSE plumes (greater than 2,000 ft) have been measured ... However, as shown by surveys of MTBE plumes across the nation, these very long MTBE plumes are the exception «< 1 % of Sites) and not the rule. Most commonly, MTBE plumes are of similar length and behavior to BTEX plumes and, at over 99% of UST sites, MTBE plumes do not extend more than 1400 ft from the location of the gasoline spill (at either a 5 ug / L of 10 ug/L level; see Exhibit 9). | For the purpose of this evaluation, MTBE plumes of 600 m (2000 ft) or more in length have been characterized as "exceptional" with respect to the common lengths of BTEX and/or MTBE plumes reported in a number of studies (Happel et al. 1998; Mace and Choi 1998;  Reid et al. 1999; Reisinger et al. 2000; Shorr and Rifai 2002; Rifai et al. 2003; Wilson 2003; Shih et al. 2004; Kamath et al. 2012, Connor et al. 2014). Based on these prior studies ... the 99th percentile length is approximately 430 m (1400 ft). Consequently, MTBE plumes greater than 600 m (2000 ft) in length represent much less than 1% of plumes. |

**Table 5.7 The plumes discussed my past expert reports (e.g., in OCWD MTBE: Fogg, October 2011; Fogg, December 2011) were used in developing McDade et al. (2015) for litigation purposes.**

| Rebuttal Report of Graham E. Fogg, Ph.D. in County of Suffolk and Suffolk County Water Authority v. Amerada Hess Corp., et al., 04 Civ. 5424 (2007) | Expert Report of Graham Fogg in OCWD MTBE (Fogg, October 2011); Expert Rebuttal Report of Graham Fogg in OCWD MTBE (Fogg, December 2011) | McDade et al. (2015) |
|---|---|---|
| • Deer Park, NY<br>• East Patchogue, NY<br>• Hampton Bays, NY<br>• Lindenhurst, NY<br>• Riverhead, NY<br>• Uniondale, NY | • Deer Park, NY<br>• East Patchogue, NY<br>• Hampton Bays, NY<br>• Lindenhurst, NY<br>• Riverhead, NY<br>• Uniondale, NY<br>• Port Hueneme, CA<br>• Leuna (Rhineland), Germany | • Deer Park, NY<br>• East Patchogue, NY<br>• Hampton Bays, NY<br>• Lindenhurst, NY<br>• Riverhead, NY<br>• Uniondale, NY<br>• Port Hueneme, CA<br>• Rhineland, Germany |
| | • Vandenberg AFB, CA<br>• New Hyde Park, NY<br>• Elmont, NY | • San Diego, CA |

Exhibit 2
Page 115

88

### 5.2.2 Plumes were characterized with exceptional off-site monitoring well networks

McDade et al. (2015) state that:

> "Each of the nine sites evaluated in this study had been delineated in 3 dimensions
> (length, width, depth), providing evidence that "diving" plumes had not escaped the
> monitoring well network (API 2006)."

This is exceptional indeed. Notably, six of the nine exceptionally well-monitored plumes
discussed in McDade et al. (2015) are located on Long Island.  The reason why those
plumes were well monitored is two fold: (1) Joe Hass, a regulator for New York, was
very enthusiastic about the need to characterize plume, and (2) characterization in the
glacial drift geologic environment was cheap, with multilevel monitoring wells
constructed of simple bundles of plastic PVC pipe in ten inch augur holes typically
costing between $5,000 to $10,000 to install.

### 5.2.3 Inappropriate comparison with plumes characterized with conventional monitoring networks

By comparison, the criteria for site selection, specifically the minimum number of
monitoring wells, of the survey studies compiled by Connor et al. (2015) indicate far
fewer monitoring wells than those of the "exceptionally well monitored" plumes
discussed in McDade et al.  For example, the Deer Park plume had 11 monitoring wells
onsite, and 414 monitoring wells off-site by 2003 (Fogg, December 2011, p. 40).
Similarly, the New Hyde Park MTBE plume, New Hyde, New York in 2007 had
approximately 8 monitoring wells onsite and 77 off-site monitoring wells (Fogg,
December 2011, p. 43).  By comparison the surveys compiled by Connor et al. (2015)
include minimum criteria of between 3 and 8 monitoring wells per sites, typical of more
conventional monitoring networks (Table 5.4).

For example, deficiencies in conventional (standard) plume monitoring were highlighted
in a study of the gasoline release in East Patchogue, New York where researchers
concluded that:

> "If the service station LUST site had been characterized in a traditional manner, without
> vertical delineation, the estimated plume length and detachment of the MTBE plume
> would have been completely misinterpreted; the benzene plume at the site would have
> been judged to be 3,500 feet shorter than actual and the MTBE pulse would have been
> mischaracterized as below the State of New York's level of concern. [detected MTBE

Exhibit 2
Page 116

89

concentrations were as high as 9,600 ppb]"  (Delaware Department of Natural Resources and Environmental Control, August,  2000).

This quote encapsulates why authors of those surveys compiled in Connor et al. (2015) reported that many plumes had migrated beyond their conventional networks.  Therefore, the fact that the nine exceptionally well-monitored plumes discussed in McDade et al. "exhibited maximum historical MTBE groundwater plume lengths ... exceeding the lengths of 99% of MTBE plumes, as characterized **[with more conventional monitoring networks]** in multiple surveys at underground storage tank sites across the United States" is no surprise. (McDade et al., 2015, clarification added)

Furthermore, as the survey data show, this problem was evident from data in the 1990's, shortly after the onset of widespread MTBE use with the Clean Air Act Amendments (circa 1992), and those plumes have had significant time to grow since then.  As I have pointed out elsewhere herein, the logic of Connor and his colleagues has been consistently flawed, and in this case it does not provide a reliable scientific foundation for the conclusions of the defense experts Connor and Daus regarding MTBE plume lengths.

### 5.2.4 Detached plumes

Notably, the off-site migration noted in the survey studies is consistent with data from the "exceptionally well monitored" plumes in McDade et al. that indicates downgradient plume "hot spots" (detached plumes) like those discussed in Section 6 of my Expert Rebuttal Report (Fogg, December 2011).  At points in time, all of the plumes discussed in McDade et al. were characterized by downgradient "hot spots" that would likely have gone undetected in conventional monitoring networks.  Moreover, this behavior is consistent with the theoretical plume descriptions developed by Mr. Connor and his colleagues at GSI for the American Petroleum Institute (API), discussed later in Section 5.4.

### 5.2.5 The MTBE, TBA and benzene plume lengths discussed in McDade et al. (2015) contradict the conclusions in Connor et al. (2015)

Contrary to the conclusions of Connor et al. (2015), the measured length of the MTBE and TBA plumes studied in McDade et al. are all, with the exception of East Patchogue,

Exhibit 2
Page 117

90

considerably (up to 29 times) longer than the associated measured lengths of the benzene plumes. Notably, benzene had been in use many decades longer than MTBE.  If MTBE and TBA were indeed readily biodegradable, as suggested in McDade et al. and in McHugh et al. (2014) (another paper authored by consultants from GSI and reviewed later in this rebuttal) the plumes would not have reached the lengths that they did in these studies.

Table 5.8: Comparison of MTBE and TBA plume lengths with those of benzene for the plumes studied by McDade et al. (2015) contradict the main conclusion of Connor et al. (2015), that MTBE, TBA and benzene plumes are of similar lengths, and support the fact that the surveys relied on by Connor et al. were biased by the early time-frame of the data, limited monitoring well networks, and biased sampling methods.

| MTBE Plume Location | BTEX Plume Length (ft) | MTBE Plume Length (ft) | TBA Plume Length (ft) | Ratio of Lengths MTBE/benzene | Ratio of Lengths TBA/benzene |
|---|---|---|---|---|---|
| Deer Park, NY[a,e] | 1,214 | **10,499** | -- | **8.6** | -- |
| East Patchogue, NY[a,d,e] | 5,217 | **4,167** | -- | 0.8 | -- |
| Hampton Bays, NY[a,e] | 2,001 | **2,690** | 2690 | 1.3 | **1.3** |
| Lindenhurst, NY[a] | 1,608 | **4,495** | -- | **2.8** | -- |
| Riverhead, NY[a] | 886 | **3,904** | -- | **4.4** | -- |
| Uniondale, NY[a] | 1,312 | **6,102** | -- | **4.7** | -- |
| Port Hueneme, CA[a] | 164 | **4,790** | 4,692 | **29.2** | **28.6** |
| San Diego, CA[a] | 2,657 | **7,415** | 8,000[b] | **2.8** | **2.2** |
| Rhineland, Germany[c] | 984 | **5,577** | -- | **5.7** | -- |

[a] McDade et al. (2015)
[b] Richard Jackson and Greg Cross, Comment on Exceptionally Long MTBE Plumes of the Past Have Greatly Diminished, by McDade et al., 2015, v. 53, no. 4: 515–524, Vol. 54, No. 2–Groundwater–March-April 2016.
[c] Martienssen et al., 2006
[d] The benzene plume is longer than the MTBE at this site because its release began much more early than that of MTBE.
[e] Terminated at a surface water body.

Exhibit 2
Page 118

91

## 5.3 Conspiucous omissions by McDade et al.

In Section 6 of my Expert Rebuttal Report (Fogg December 2011) and later in Section 3.3.3 in my Expert Rebuttal Report in Puerto Rico v. Shell Oil et al.[32], both prior to the publication of McDade et al. (2015), I explained that Mr. Connor presented an incomplete and misleading assessment of the MTBE plumes discussed in McDade et al. Nevertheless, Mr. Connor and his coauthors in McDade et al. chose to omit the information that I presented, information necessary to accurately portray the origin and character of the plumes.

### 5.3.1 Misleading and biased characterizations of release volume

As discussed In Section 6 of my Expert Rebuttal Report in this case, many of the releases associated with the MTBE plumes discussed in McDade et al. occurred prior to the adoption of the Clean Air Act Amendment (CAAA) (Fogg December 2011):

> "Additionally, Mr. Connor did not address relevant facts in his Table 6 that indicate that these plumes could have been much longer or that many releases occurred before the widespread use of MTBE at the higher concentrations needed to meet oxygenated fuel requirements. Prior to the advent of the Clean Air Act Amendments (CAAA), MTBE was added to gasoline as an octane enhancer at much lower concentrations." (Section 6 of Fogg December 2011)

Table 5.9 summarizes the information with regards to release volume presented in Section 6 of Fogg December 2011).  This information was conspicuously omitted from McDade et al.

---

[32] Expert Rebuttal Report Graham E. Fogg, Ph.D. in Commonwealth of Puerto Rico v. Shell Oil Co. et al., Case No. 07 Civ. 10470 (SAS), May 2014.

Exhibit 2
Page 119

92

**Table 5.9: Facts regarding MTBE releases, the omission of which by McDade et al. (2015) resulted in a misleading and biased characterization of the plumes discussed therein.**

| Location | Some important facts regarding the releases omitted by McDade et al. (from my Expert Rebuttal Report, Fogg, December 2011) |
|---|---|
| Deer Park, NY | Release detected in 1990, prior to Clean Air Act Amendment (CAAA). The estimated release volume most likely contained a high fraction of leaded gasoline (no oxygenate) |
| East Patchogue, NY | The release date is unknown, but the gasoline station responsible for the release was active in the 70's and 80's, and was abandoned in 1988 (Weaver et al., 1999), prior to CAAA and most likely contained a high fraction of leaded gasoline (no oxygenate) |
| Hampton Bays, NY | --- |
| Lindenhurst, NY | --- |
| Riverhead, NY | The contamination was traced back to "two service stations" which had documented releases in 1989 (station A) and in 1991 (station B; which was abandoned in 1991), prior to CAAA and most likely contained a high fraction of leaded gasoline (no oxygenate) |
| Uniondale, NY | --- |
| Port Hueneme, CA | An estimated 4,000 gallons of that release was in fact leaded gasoline (no MTBE) and an estimated 6,800 gallons were unleaded gasoline, presumably containing MTBE |
| San Diego, CA | --- |
| Rhineland, Germany | --- |

Exhibit 2
Page 120

93

### 5.3.2 Migration beyond the networks of even these "exceptionally well-monitored plumes"

In my Expert Rebuttal Report in Puerto Rico v. Sell Oil et al. (2014), I explained (with examples) that, contrary to the claims of Connor, Daus, and McDade et al., even the exceptionally well-monitored plumes discussed in McDade et al. are not all adequately characterized.  Despite having been presented with data and examples, McDade et al. chose to omit that information, again leading to a misleading and inaccurate characterization of the plumes discussed therein.

### 5.3.3 Deer Park plume

For example, as shown in Figure 5.3 below, at 9,000 feet downgradient from the source, the detached plume at Deer Park had migrated vertically beyond the network by 2010. This is evidenced by the fact that the maximum MTBE concentration detected (470 ppb) at 9,000 feet from the source came from the deepest point monitored, indicating that higher concentration likely exist deeper in the system where the plume is not monitored. Also, this plume terminates in a surface water body, indicating it would have grown even larger than reported.



Figure 5.3: MTBE concentrations from MW-91 in the Deer Park MTBE plume showing that the maximum MTBE concentration detected (470 ppb) at 9,000 feet from the source came from the deepest point monitored, indicating that higher concentration likely exist deeper in the system and that the plume has migrated beyond the monitoring network (Data from EnviroTrac 2010 First Quarter Groundwater Monitoring Report).

Exhibit 2
Page 121

94

### 5.3.4 East Patchogue and Hamptons Bay plumes

Like the Deer Park plume, these two MTBE plumes also terminate in surface water
bodies, indicating they would have grown even larger than reported.

### 5.3.5 Mission Valley Terminal (MVT), San Diego plumes

A 2015 review[33] of McDade et al. published in Groundwater by Jackson and Cross,
consultants that were working for the City of San Diego and who were obviously
intimately familiar with the contamination site, indicates that the conclusions of McDade
et al. regarding the San Diego MTBE and TBA plumes were inaccurate and misleading,
as summarized below:

> **Industry sources -** "Unfortunately, the Supporting Information listed by McDade is
> predominantly from industry sources and, in the San Diego case, does not cite publicly
> available reports (see GeoTracker 2015) prepared independently by the City of San
> Diego. This oversight results in an erroneous statement that we wish to correct and
> ignores the critical role that responsive groundwater monitoring must play in preventing
> the generation of such large plumes even when contamination by long MTBE plumes had
> been anticipated, just as McDade notes."

> **Misleading plume length characterization -** "McDade indicates that the San Diego
> TBA plume is "likely shorter in length than the corresponding MTBE [plume] because of
> remediation systems located downgradient of the source." The MTBE plume, originating
> at the Mission Valley Terminal (MVT), was originally underestimated when mapped in
> 1999 following the release of more than 1 million liters of gasoline. By 1992, LNAPL
> had migrated approximately 400m from the MVT source."

> **Misleading characterizations regarding the effectiveness of the remediation -**
> "Contrary to McDade (520), the remediation system did not effectively limit the
> downgradient plume lengths for either MTBE or TBA because remedial response was
> delayed on the north side and absent on the south side of the river (see
> Geofirma/INTERA 2013, 12)."

> **Long-term resource degradation -** "The MVA [Mission Valley Aquifer] supplied more
> than 2 million gallons per day for municipal needs before World War II (Sengebush et al.
> 2015) and is being returned to use by the City.  During a 72 [hour] pumping test at DB-2
> in March 2015, the MVA produced 20–26 ug/L TBA at 85 gpm. Because the centroid of
> this fugitive TBA plume (600–900 ug/L) is migrating toward this well, TBA
> concentrations are expected to soon increase."

---

[33] Richard Jackson and Greg Cross, Comment on Exceptionally Long MTBE Plumes of
the Past Have Greatly Diminished, by McDade et al., 2015, v. 53, no. 4: 515–524, Vol.
54, No. 2–Groundwater–March-April 2016.

Exhibit 2
Page 122

95

In response to Jackson and Cross, McDade et al. (2016)[34] stated:

> "We disagree with the criticisms raised by Jackson and Cross, and find that the updated data do not change the overall conclusions of our paper."

Jackson, Heagle and Sengebush published a follow up response to McDade et al. (2016), in the proceedings of the Canadian Geotechnical Society 2017 GeoOttawa conference, stating that:

> "The MTBE/TBA plume underflowed the river and was detected by the City's new DB-2 wells when they were installed in 2011. This unexpected detection of the front of the MTBE/TBA plume explained the path taken by the plume after migrating beyond R-28 (see Jackson and Cross, 2016a). Earlier interpretation of the plume had it migrating in a more northerly direction as shown by McDade et al. (2016). However, both KMEP's consultant and ourselves, acting on behalf of the City of San Diego, concluded in 2007 that McDade et al.'s MTBE plume leading edge was more appropriately ascribed to a "peripheral source" other than the MVT, e.g., a leaking underground storage tank to the north of the MTBE/TBA plume. The argument for the 2007 conclusion is contained in Jackson and Cross (2016b)."

### 5.3.6 New Hyde Park plume

Although well aware of it, McDade et al. ignored the conspicuous, large plume in New Hyde Park, New York (Fig. 5.4).  By 2007, this dissolved plume of MTBE extends about 5,000 feet downgradient of several gasoline stations with active NYSDEC spill numbers. Site investigations commenced in 2001. The estimated plume volume is more than 15,000 pounds of MTBE and other oxygenates.  MTBE has been detected at more than 1,000,000 ppb over 1,000 feet down gradient of the release site(s).

---

[34] McDade, J.M., Connor, J.A., Paquette, S.M., and Small, J.M. (2016), Reply to Jackson and Cross' Comment on "Exceptionally Long MTBE Plumes of the Past Have Greatly Diminished", Groundwater, Vol. 54, No. 2, March-April 2016.

Exhibit 2
Page 123

96



Figure 5.4. New Hyde Park MTBE plume, New Hyde, New York in 2007. The plume had a length of at least 4,600 ft, a width of at least 800 ft, and extends to a depth of at least 134 ft. Site investigations commenced in 2001. The estimated plume mass was more than ~15,000 pounds of MTBE, TBA, and other oxygenates. The plume was characterized by 8 to 9 feet of gasoline floating on top of the water table. Peak sample concentrations were found to be over 1,000,000 ppb MTBE more than 1,000 feet from the source. Remediation included NAPL recovery of 17,000 gallons; 51 million gallons water treated; 16 air sparging and 6 soil vapor extraction wells (From New York City Department of Environmental Conservation).

## 5.4 Theoretical plume migration predicted by Mr. Connor and his colleagues at GSI (API, 2003)

As discussed in my expert report, MTBE cannot be presumed to biodegrade under natural conditions in groundwater. Furthermore, the rates of "attenuation" cited are generally for sites with active remediation (McHugh et al., 2013). The theoretical analysis of MTBE plumes under these conditions leads to MTBE plume behavior that is consistent with the behavior observed in the plume studies discussed above for the "exceptionally well monitored" and long plumes cited by McDade et al. and discussed herein. Case in point: those plumes, which the defense experts describe as "exceptionally long," would never have become exceptionally long if biodegradation were effective in controlling plume migration.

The theoretical plume behavior under the conditions described above, little or no biodegradation and active remediation of the MTBE source, is characterized by a stable

Exhibit 2
Page 124

97

or shrinking MTBE plume in the region near the source where plumes are monitored and a detached offsite MTBE plume that is typically beyond the monitoring network.  This characterization was actually developed and described by Mr. Connor in the "Groundwater Remediation Strategies Tool," a publication by the American Petroleum Institute and authored by Mr. Connor and his colleagues at his company GSI (API, 2003).

API (2003) describe the purpose for the Groundwater Remediation Strategies Tool as follows:

> "Potential impacts on groundwater receptors and the need for and relative benefits of alternative remedial measures may be evaluated on the basis of the mass flux of contaminants from the source zone to the receptor. This mass-based approach to site assessment and remediation has been described by various researchers (Einarson & Mackay, 2001a,b; Gallagher et al, 1995) and identified by USEPA as a key consideration in the evaluation of natural attenuation remedies (USEPA, 1998)."

The approach relies on predicted theoretical plume behavior and the use of plume monitoring at cross-sectional transects to evaluate:

> " i) potential water quality impacts on downgradient supply wells (as determined from a mass balance analysis of the supply well pumping rate), ii) the natural attenuation of the contaminant mass with distance downgradient of the source (as defined by the reduction in mass flux between transects), and iii) the relative benefits of alternative remedies (based on their anticipated reductions in mass flux from source to receptor)." (API, 2003)

The remedies evaluated include active source remediation such as SVE, DPE and groundwater extraction.

In what follows, I show three series of figures from API (2003), developed by Mr. Connor and his colleagues at GSI, that describe (1) MTBE plume migration without remediation, (2) MTBE plume migration with remediation, both under conditions where biodegradation is ineffective at controlling the plume migration, and (3) MTBE migration with a rapid reduction in the MTBE source due to remediation.  In evaluating those figures, one can equate the "Mass Flux" on the vertical axis, expressed as a percent of the original source, as a percentage of the original source concentration, i.e., at 100% the plume concentration is equal to the original source concentration and at 50% the plume concentration is equal to half the original source concentration.

Exhibit 2
Page 125

98

### 5.4.1 MTBE migration without source remediation

Without remediation and with a persistent source like MTBE, the MTBE plume becomes arbitrarily long (Figure 5.5). Figure 5.5 shows a series of three figures for different groundwater velocities, $v_s$ = 50 ft/yr, 100 ft/yr, and 200 ft/yr, in the range of velocities seen in aquifers of Puerto Rico as discussed elsewhere herein.  Each figure plots "Mass Flux" (which as discussed above is proportional to the original source concentration) at four different times, 1 year, 5 years, 10 years and 20 years. The theory shows that the MTBE plume lengths at any point in time depend on the plume velocity, the elapsed time and dispersion.  An increase in the time always leads to a longer plume, regardless of the velocity.  The theoretical plumes of API (2003) extend to thousands of feet at long times, consistent with the real world plumes discussed following this section. In the real world the plume would eventually run out of MTBE in the source which is necessarily finite. That depends on either the time elapsed, or on any remediation.  The effects of a reduction in the MTBE source on theoretical MTBE plume behavior was addressed by API (2003) as discussed below and the results show a near source plume that is stable or shrinking, depending on the scenario, and downgradient detached plume, consistent with the exceptionally well-monitored plumes discussed later.

### 5.4.2 MTBE migration with source decay due to remediation and/or a limited source mass

As shown in Figure 5.6, with decay of the MTBE source due to remediation and/or a limited source mass that has completely dissolved into groundwater, at long times the near source plume shrinks and the offsite plume is detached, beyond the typical monitoring network, thousands of feet downgradient (API, 2003).

### 5.4.3 MTBE migration with a rapid reduction in the MTBE source due to remediation

As shown in Figure 5.7, with a rapid reduction in the source of MTBE, for example, due to remediation with SVE as discussed by the authors in their examples, at long times the near source plume is stable and there is an offsite detached plume "hot spot," beyond the typical monitoring network, thousands of feet downgradient (API, 2003). The foregoing illustrations of theoretical MTBE plume migration developed for API by Mr. Connor and his colleagues at his company GSI clearly show that for a range of velocities and source

Exhibit 2
Page 126

remediation scenarios, MTBE plumes are characterized by stable or shrinking plumes in the monitored regions near the source, and an offsite detached plume "hot spot" which at long times is located far from the source, beyond the typical monitoring network.

Exhibit 2
Page 127

100



Figure 5.5: MTBE plume behavior in the absence of source remediation, and under conditions where biodegradation is ineffective in controlling plume migration. Here the MTBE plume can become arbitrarily long given enough time. "Mass Flux" on the vertical axis, expressed as a percent of the original source, is equivalent to a percentage of the original source concentration, i.e., at 100% the plume concentration is equal to the original source concentration and at 50% the plume concentration is equal to half the original source concentration.

Exhibit 2
Page 128

101



Figure 5.6: MTBE plume behavior for source decay (from either a limited source mass and/or remediation), and under conditions where biodegradation is ineffective in controlling plume migration. Results show a shrinking plume near the source and a detached plume "hot spot" beyond the extent of typical monitoring networks. "Mass Flux" on the vertical axis, expressed as a percent of the original source, is equivalent to a percentage of the original source concentration, i.e., at 100% the plume concentration is equal to the original source concentration and at 50% the plume concentration is equal to half the original source concentration.

Exhibit 2
Page 129



Figure 5.7: MTBE plume behavior for a rapid reduction in the source due to remediation, and under conditions where biodegradation is ineffective in controlling plume migration. At long times, results show a stable plume near the source and a detached plume "hot spot" beyond the extent of typical monitoring networks. "Mass Flux" on the vertical axis, expressed as a percent of the original source, is equivalent to a percentage of the original source concentration, i.e., at 100% the plume concentration is equal to the original source concentration and at 50% the plume concentration is equal to half the original source concentration.

Exhibit 2
Page 130

103

# 6. References:

API, (2000), American Petroleum Institute Strategies for Characterizing Subsurface Releases of Gasoline Containing MTBE. Regulatory and scientific Affairs Publication number 4699, pp 116

API (2003), API Groundwater Remediation Strategies Tool, Groundwater Services, Inc., Houston, Texas Newell, C.J., John A. Conner, Dana L. Rowen, 2003

API (2006). Downward Solute Plume Migration: Assessment, Significance, and Implications for Characterizing and Monitoring of "Diving Plumes". API Soil and Groundwater Technical Task Force, Bulletin 24 April 2006.

Barton, G. (2012). Letter "Re: Draft Low-Threat Underground Storage Tank Case Closure Policy". Submitted to SWRCB March 19, 2012.

Brown, K. (2011). "Memorandum. Comment Letter - Low-Threat UST Site Closure Scoping Document" Letter submitted the State Water Resources Control Board, November 7, 2011.

Brown, K. (2012). "Comments on the Draft Low-Threat UST Closure Policy". Letter submitted the State Water Resources Control Board, March 19, 2012.

Bruce, CL., JP. Salanitro, PC Johnson, and GE. Spinnler (2013). "Bioaugmentation for MTBE Remediation" in Bioaugmentation for Groundwater Remediation, Chapter 10. HF. Stroo, A. Leeson, and CH. Ward eds. Springer, NY

CIOMA (2012). California Independent Oil Marketers Association letter to the SWRCB titled "**Strong Support** for the Proposed Low-Threat UST Closure Policy" February 17, 2012.

Clearwater Group Environmental Services (2012) Letter submitted to C.R. Hoppin, Chair at the State Water Resources Control Board; signed by Olivia Jacobs, CEO of the Clearwater Group

Connor, J.A. (2011). Expert Opinion of John A. Connor in *Orange County Water District v. Unocal Corp., et al., No. 04 Civ.4969*. Submitted October 24, 2011

Connor, J.A., Kamath, R., Walker, K., and T. McHugh. 2014. Review of Quantitative Surveys of the Length and Stability of MTBE, TBA, and Benzene Plumes in Groundwater at UST Sites. Groundwater.

Copeland Environmental Toxicologist (2011). "Letter Re: Technical Review of *Proposed Low-Threat UST Closure Policy* (SWRCB Low-Threat UST Closure Policy Task Force, July 14, 2011)"

Dahlen, P., E.J. Henry, M. Matsumura, and P.C. Johnson (2003). Impacts to Groundwater Resources in Arizona from Leaking Underground Storage Tanks (LUSTs). A report prepared for the Arizona Underground Storage Tank Policy Commission.

Dahlen, P., E.J. Henry, M. Matsumura, and P.C. Johnson (2004). Arizona Groundwater Study in Underground Tank Technology Update Vol 18 No. 5, September/October 2004.

Daus, AD. (2017). Supplemental Expert Report of Anthony D. Daus, III, PG in Orange County Water District v. Unocal Corporation et al U.S. District Court, Central District of California.

Eweis, J.B., E.M. LaBolle, D.A. Benson, and G.E. Fogg (2007) Role of Volatilization in Changing TBA and MTBE Concentrations at MTBE-Contaminated Sites. Environmental Science and Technology 41:6822-6827

Feldman, L. (2017). Supplemental Expert Report of Lester Feldman on Orange County Water District v. Unocal Corporation et al., Case No. 8:03-cv-01742

Exhibit 2
Page 131

104

Fillmore, T. (2012) Letter to the SWRCB "*Comment re: Low-Threat Underground Storage Tank Closure Policy*" County of Santa Cruz Health Services Agency, March 19, 2012.

Fogg, G.E. (2011). Expert report of Graham Fogg in *Orange County Water District v. Unocal Corp., et al., No. 04 Civ.4969*. Submitted May 31, 2011

G&M Oil Company (2012). Letter "**Strong Support** for the Proposed Low-Threat UST Closure Policy" submitted to the SWRCB March 14, 2012

Gill, RT. SF. Thornton, MJ. Harbottle, and JWN. Smith (2016). Sustainability assessment of electrokinetic bioremediation compared with alternative remediation options for a petroleum release site. Journal of Environmental Management 184: 120-131.

GRA (2011).  Groundwater Resources Association letter "GRA Technical Committee Review of the State Water Resources Control Board's (State Water Board) Draft Low-Threat Underground Storage Tank (UST) Closure Policy (Closure Policy) and Low-Threat UST Closure Policy CEQA Scoping Document" submitted to the SWRCB November 8, 2011

Happel, AM, Beckenbach, EH and Halden, RU. (1998), An evaluation of MTBE impacts on California groundwater resources. Livermore, CA, Lawrence Livermore National Laboratory.

Humboldt County Department of Health and Human Services (2011). Letter "Humboldt County Local Oversight Program Comments Addressing The Criteria For Low-Threat Closure Policy" submitted to SWRCB November 7, 2011.

Jacobs, O. (2012). Letter to the SWRCB "Comment re: Draft Water Quality Control Policy for Low-Threat Underground Storage Tank (UST) Case Closure (Policy)" Clearwater Group Environmental Services, March 19, 2012.

Joshi, G., R. Schmidt, KM. Scow, MS. Denison, and KR. Hristova (2016). Effect of benzene and ethylbenzene on the transcription of methyl-*tert*-butyl ether degradation genes of *methylibium petroleiphilum* PM1. Microbiology 162: 1563-1571.

Kuder, T., and P. Philp (2008) Modern Geochemical and Molecular Tools for Monitoring In-Situ Biodegradation of MTBE and TBA. Rev. Environ. Sci. Biotechnol 7:79-91.

Mace, R.E., R.S. Stephen Fischer, D.M. Welch and S.P. Parra, (1997). Extent, Mass, and Duration of Hydrocarbon Plumes from Leaking Petroleum Storage Tank, Bureau of Economic Geology, Geologic Circular, 97-1

Mace, Robert E., and Wan-Joo Choi, (1998), The Size and Behavior of MTBE Plumes in Texas, Bureau of Economic Geology, The University of Texas at Austin

Mackay, D., De Sieyes, N., Einarson, M., Feris, K., Pappas, A., Wood, I., Jacobson, L., Justice, L., Noske, M., Wilson, J., Adair, C., and Scow, K. (2007). Impact of Ethanol on the Natural Attenuation of MTBE in a Normally Sulfate-Reducing Aquifer. Environmental Science & Technology 41:2015-2021.

McDade, J.M., Connor, J., Paquette, S., and J. Small. 2015. Exceptionally Long MTBE Plumes of the Past Have Greatly Diminished. Vol. 53, No. 4-Groundwater-July-August 2015.

McHugh, TE, R. Kamath, PR Kulkarni, CJ Newell, JA Connor, and S. Garg (2012). Remediation Progress at California LUFT Sites: Insights from the GeoTracker Database. API Technical Bulletin #25.

McHugh, TE, PR Kulkarni, CJ Newell, JA Connor, and S. Garg (2013). Progress in Remediation of Groundwater at Petroleum Sites in California. Groundwater doi:10.1111/gwat.12136.

Exhibit 2
Page 132

105

Mehler, HS. (2011). "Letter Re: Southern California Outreach Meeting – Proposed Low Threat UST Closure Policy" Howard S. Mehler, PhD., J.D. & Associates Incorporated. Submitted to the SWRCB, September 15, 2011.

Newman, B., K. Williams, and G. O'Regan (2010). "Resolution 2009-0042 – UST Cleanup Program Task Force, Minority Opinion" Letter to the SWRCB dated January 4, 2010.

NRC (National Research Council) (2000), Natural Attenuation for Groundwater Remediation. National Research Council. National Academy Press, Washington, D.C.

NRC (2013). Alternatives for Managing the Nation's Complex Contaminated Groundwater Sites. National Research Council, Committee on Future Options for Management in the Nation's Subsurface Remediation Effort. National Academy of Sciences, Washington DC

Ousey, F. (2012). Letter "Re: Concerns regarding the Low-Threat UST Fund Case Closure Policy" submitted to the SWRCB March 15, 2012.

Peterson, DD., GJ. Smith, and C. Ice (2011) Letter to the SWRCB "Comments on Low-Threat UST Closure Policy Scoping Document" San Mateo County Health System, November 1, 2011.

Redding Oil Company (2012). Letter "Request for approval – proposed low-threat UST Closure Policy" submitted to the SWRCB March 7, 2012.

Reid, J.B., H.J., Reisinger, P.G. Bartholomae, J.C. Gray, and A.S. Hullman (1999), A comparative assessment of the long-term behavior of MtBE and benzene plumes in Florida, USA, in *Proceedings of The Fifth International In Situ and On-Site Bioremediation Symposium*, edited by B.C. Alleman and A. Leeson, San Diego, CA, April 19-22, 1999, 97-102

Reisinger, H.J., J.B. Reid, and P.J. Bartholomae (2000), MTBE and Benzene plume behavior a comparative perspective, Soil, Sediment and Groundwater MTBE Special Issue, 29-33

Rice DW, Grose RD, Michaelsen JC, Dooher BP, MacQueen DH, Cullen SJ, Kastenberg WE, Everett LG, ,Marino MA (1995), California Leaking Underground Fuel Tank (LUFT) Historical Case Analyses. Environmental Protection Department UCRL-AR-122207

Rifai, Hanadi S., Gretchen L. Shorr; and Ashish Bagga; University of Houston, TX, MTBE Behavior at Field Sites and Plume Characterization (2003)

Robinson Oil Corporation (2012). Letter "**Strong Support** for the Proposed Low-Threat UST Closure Policy" submitted to the SWRCB March 13, 2012.

SB 1764 (1996). Senate Bill 1764 Advisory Committee Recommendations Report Regarding California's Underground Storage Tank Program. Submitted to the California State Water Resources Control Board May 31, 1996.

Schmidt, T. C., Schirmer, M., Wei, H., Haderlein, S. B. (2004), Microbial degradation of methyl tert-butyl ether and tert-butyl alcohol in the subsurface. J. Contam. Hydrol., 70, 173-203.

Shih, T., Rong, Y., Harmon, T., Suffet, M. (2004), Evaluation of the impact of fuel hydrocarbons and oxygenates on groundwater resources. Environ. Sci. Technol., 38, 42-48.

Sun, W., X. Sun, and A.M. Cupples (2012). Anaerobic Methyl tert-Butyl Ether-Degrading Microorganisms Identified in Wastewater Treatment Plant Samples by Stable Isotope Probing. Applied and Environmental Microbiology 78(8): 2973-2980

Sun, W., X. Sun, and A.M. Cupples (2012). Anaerobic Methyl tert-Butyl Ether-Degrading Microorganisms Identified in Wastewater Treatment Plant Samples by Stable Isotope Probing. Applied and Environmental Microbiology 78(8): 2973-2980

Exhibit 2
Page 133

106

SWRCB (2010). Draft Underground Storage Tank Low-Threat Site Closure Policy 9/7/10.

SWRCB (2011). Technical Justification for Groundwater Plume Lengths, Indicator Constituents, Concentrations and Buffer Distances (Separation Distances) to Receptors.

SWRCB (2012a). Technical Justification for Groundwater Media-Specific Criteria Final 04-24-2012.

SWRCB (2012b). Staff Response to Written Comments on the January 31, 2012 Version of the Substitute Environmental Document and Policy.
https://www.waterboards.ca.gov/ust/lt_cls_plcy.html#stakeholder

Tarr, J.M. and AM. Galonski. (2008). MtBE After the Ban. Main Water Conference.
http://www.umaine.edu/waterresearch/mwc/presentations_O8/Tarr_NGWA_Presentat ion.pdfUSEPA (2005)

Thuma, J., G. Hinshalwood, V. Kremesec, and R. Kolhatkar (2001), Application of ground water fate and transport models to evaluate contaminant mass flux and remedial options for a MTBE Plume on Long Island, NY, In *Proceedings of the 2001 Petroleum Hydrocarbons and Organic Chemicals in Ground Water: Prevention, Detection, and Remediation Conference* & *Exposition,* National Ground Water Association, Houston, TX, 3-14

USEPA (2001) Monitored Natural Attenuation: USEPA Research Program- An EPA Science Advisory Board Review. Review by the Environmental Engineering Committee (EEC) of the EPA Science Advisory Board (SAB). EPA-SAB-EEC-01-004.

USEPA (2004) MTBE Diving Plumes. US. EPA National Risk Management Research Laboratory Ground Water and Ecosystems restoration Research.

USEPA (2005), Wilson, J. T., Kaiser, P. M., Adair, C. Monitored Natural Attenuation of MTBE as a Risk Management Option at Leaking Underground Storage Tank Sites, USEPA EPA/600/R-04/1790 January 2005 pp74.

USEPA (2006). Lead Scavengers Compendium: Overview of Properties, Occurrence, and Remedial Technologies. May 2006  https://www.epa.gov/sites/production/files/2015-03/documents/compendium-0506.pdf

USEPA (2008) Natural Attenuation of the Lead Scavengers 1,2-Dibromoethane (EDB) and 1,2-Dichloroethane (1,2-DCA) at Motor Fuel Release Sites and Implications for Risk Management. EPA 600/R-08/107

USEPA (2007) Monitored Natural Attenuation of Tertiary Butyl Alcohol (TBA) in Ground Water at Gasoline Spill Sites. J.T. Wilson and C. Adair, USEPA Office of Research and Development EPA/600/R-07/100.

USEPA-OGWDW (2008). Regulatory Determinations Support Document for CCL2, Chapter 13: MTBE. EPA Report: 815-R-08-012.

USEPA (2009) Methyl Tertiary Butyl Ether (MTBE) Drinking Water
http://www.epa.gov/mtbe/water.htm last updated February 5th 2009; last accessed 7/20/2009

USEPA (2016) Methyl Tertiary Butyl Ether (MTBE) Drinking Water
https://archive.epa.gov/mtbe/web/html/water.html last updated February 20th 2016; last accessed 7/29/2018

Wadlow, W. (2011) Letter- Low-Threat Underground Storage Tank Closure Policy Scoping Document from the Alameda County Water District. Walter Wadlow General Manager. Letter dated November 8, 2011.

Exhibit 2
Page 134

107

Western States Petroleum Association (2012). Letter "Comments in Support of the Proposed Low Threat UST Case Closure Policy" March 19, 2012.

Wickham, J., and D. Drogos (2011) Comment Letter- Low Threat UST Closure Scoping Document; Alameda County Health Care Services Agency. November 3, 2011.

Wieczorek, A., K. Przybulewska, K. Karpowicz, and M. Nowak (2013). The Screening of Microorganisms Capable of Methyl Tert-Butyl Ether (MTBE) Biodegradation. Polish Journal of Microbiology 62(2): 141-147

Williams, P.R.D. (2001) MTBE in California Drinking Water: An Analysis of Patterns and Trends. Environmental Forensics 2:75-85

Exhibit 2
Page 135

108

1    *In Re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation:*
      *Orange County Water District v. Unocal Corp., et al.,* Case No. 04 Civ. 4968
2    **U.S.D.C. Central District of CA Case No. SACV 8: 03-01742-CJC-ANx**

3                    **PROOF OF SERVICE VIA LEXISNEXIS FILE AND SERVE**

4            I am a citizen of the United States and an employee in the County of
      Sacramento.  I am over the age of eighteen (18) years and not a party to this
5    action.  My business address is Miller & Axline, 1050 Fulton Avenue, Suite, 100,
      Sacramento, California 95825.
6

7            On the date executed below, I electronically served the document(s) via
      LexisNexis File & Serve, described below, on the recipients designated on the
8    Transaction Receipt located on the LexisNexis File & Serve website:

9

10   **SUPPLEMENTAL REBUTTAL REPORT OF GRAHAM FOGG, PH.D.**

11

12

13           I declare under penalty of perjury that true and correct copies of the above
      document(s) were served via LexisNexis File & Serve on August 14, 2018.

14

15                                                           _____
                                                             KATHY HERRON
16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 2
Page 136

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 3

Exhibit 3
Page 137

281

1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
2

3                              - - -


4
      IN RE:  METHYL TERTIARY BUTYL:   Case No. 8:03-cv-
5     ETHER ("MTBE")            :    01742-CJC (ANx)
                                :
6     This Document Relates to:     :
                                :
7     ORANGE COUNTY WATER DISTRICT :
      v. UNOCAL CORPORATION, et     :
8     al.,                      :
      Case No. 04CIV.4968 (SAS)     :
9

10                             - - -

11                          VOLUME II
                     Friday, August 31, 2018
12
                               - - -
13

14          Continued videotaped deposition of GRAHAM E.

15   FOGG, Ph.D., held at SHEPPARD MULLIN RICHTER & HAMPTON,

16   L.L.P., 333 S. Hope Street, 43rd Floor, Los Angeles,

17   California, commencing at approximately 9:01 a.m.,

18   before Rosemary Locklear, a Registered Professional

19   Reporter, Certified Realtime Reporter and California CSR

20   (#13969).

21

22                             - - -

23

24              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 971.591.5672 Fax
25                  deps@golkow.com

Exhibit 3
Page 138                 [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

303

1    existence of plumes out in the basin, MTBE plume

2    behavior.  Same kinds of things that are in the rebuttal

3    report.

4    Q.    Okay.  You mentioned yesterday -- well, strike

5    that.

6          Have you looked at any of the MTBE plumes that

7    are at issue in this case specifically?

8    A.    Yes, I've -- as I mentioned yesterday, I've

9    taken a look at the Mobil 18-HDR plume.

10   Q.    Any other ones?

11   A.    No.

12         I've looked at data.  I have -- you know,

13   there's a number of data files that -- there's data on

14   MTBE and TBA monitoring data from the basin.  I've

15   browsed through that.

16   Q.    And --

17   A.    And I've looked at --

18   Q.    I'm sorry.

19   A.    On the Mobil 18, I've looked at the -- since I'm

20   a hydrogeologist and I work on the geology and the

21   hydrology, I've looked at the geologic and the

22   hydrologic plausibility of the posited plume behavior at

23   Mobil 18.

24   Q.    And did you draw any conclusions?

25   A.    Yes.

Exhibit 3
Page 139                    [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

304

1    Q.      And what were they?

2    A.      That the interpretation that the plume moves

3    south of the station, mostly in the shallow aquifer, and

4    then near the southern terminus of the plume, as it's

5    characterized, where it coincided with the mergent zone,

6    which is a zone of better geologic connection

7    vertically, that the plume moved down into the deeper

8    aquifer in which the flow direction is the opposite

9    direction, more or less, south to north, and then moved

10   north almost the same amount of distance and potentially

11   contaminated some wells up in that area.

12          But that -- but my opinion is, in looking at the

13   geology and in looking at the groundwater flow in the

14   shallow and the deep aquifer, my opinion is that that's

15   a plausible argument.

16   Q.      Can you say it's --

17   A.      And the groundwater velocity is -- I've done

18   some back-of-the-envelope calculations on what

19   groundwater velocities it would take to do that, and it

20   appears that the groundwater velocities that would make

21   that possible are not unreasonable.

22   Q.      Can you say it's more likely than not?

23   A.      I haven't looked at it in sufficient detail to

24   say that.  But I would just say that, based on what I

25   know of the geology and the hydrology and

Exhibit 3
Page 140
                    [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

305

1    three-dimensional aquifer behavior, that the -- that

2    scenario is quite reasonable, quite plausible.

3          I think to some people it looks crazy, but

4    it's -- if you've seen what I've seen in hydrogeologic

5    systems and in geologic systems, it's not crazy at all.

6    Q.    Do you plan on expressing an opinion about the

7    plausibility of that at trial?

8    A.    If called upon to, I will.  I think since I --

9    because of my expertise in geology and hydrology, I

10   suppose I might be called upon to provide more opinion

11   on that.

12         MR. HEARTNEY:  Since that opinion was not

13   disclosed in any of the expert reports, we will move to

14   strike that.

15         THE WITNESS:  I think yesterday I was asked if I

16   had any more opinions.

17         MR. CONDRON:  Right.

18   BY MR. CONDRON:

19   Q.    Have you spoken with any of the other experts

20   for Orange County Water District about anything?

21   A.    Regarding this case?

22   Q.    Correct.

23   A.    No.

24   Q.    Have you spoken at all with Mr. Robert Stollar?

25   A.    No.

Exhibit 3
Page 141                [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

315

1    around in the groundwater.

2    Q.     Did it mention anything about MTBE in Orange

3    County, the book?

4    A.     I don't recall if it did.

5    Q.     Do you recall that it also mentioned that it

6    appeared that the contaminants in Orange County had not

7    gone into the deeper aquifer?

8    A.     I -- yeah, it may have said that.  At that time,

9    that may have been true.

10   Q.     Okay.  Is that not true today?

11   A.     Well, I think there's evidence to suggest it's

12   happened at -- related to the Mobil 18 site.  And it's

13   only a matter of time, since the deep aquifer is being

14   pumped and it's kind of dependent on where and how much

15   is being pumped, it's only a matter of time before

16   contamination moves down there.

17          The deep aquifer gets sustained by the overlying

18   aquifers.  So we see this everywhere on long time

19   frames, eventually contaminants will get down there.

20   All the water in this basin exits by wells, or about 95,

21   97 percent of the water exits by wells.

22   Q.     And what's your basis for saying that?

23   A.     The Orange County groundwater management model,

24   which is -- it's a well-calibrated groundwater model

25   that simulates the groundwater flow and the groundwater

Exhibit 3
Page 142                [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

418

1   described it verbally this morning in testimony -- the

2   plume traveled south, then turned east, according to --

3   Q.      Can I --

4   A.      -- according to an interpretation.

5   Q.      Uh-huh.

6   A.      And what I was considering was the plausibility

7   from the point of view of a hydrogeologist of that

8   explanation or hypothesis on the path of this plume.

9           And my -- the scope of my testimony on that is

10  quite broad, which is simply that, based on the geology

11  and the groundwater flow directions in three dimensions,

12  this is a plausible explanation.

13          I did not -- my scope is not to determine what

14  is correct.  My scope in this case is to comment on the

15  plausibility.

16  Q.      When were you asked to comment on the

17  plausibility of this sort of U-shaped plume?

18  A.      A couple weeks ago.

19  Q.      In August of 2018?

20  A.      Yes.

21  Q.      Was it after you'd prepared your rebuttal report

22  in this case?

23  A.      Yes.

24  Q.      At any point prior to submitting your rebuttal

25  report, were you ever asked to comment on the

Exhibit 3
Page 143                [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

419

1    plausibility of a plume in the shape of a U for Mobil

2    18-HDR?

3    A.      I'm sorry.  The question again?

4    Q.      Were you ever asked prior to the preparation of

5    your rebuttal report in this case to comment on the

6    plausibility?

7    A.      No.

8    Q.      Did you have any understanding as to why you

9    were being asked to comment on it in August?

10   A.      I'm considered a world expert on groundwater and

11   complex hydrogeologic environments in which complex

12   geology plays a strong role in controlling the movement

13   of the groundwater, including solutes, so my

14   understanding is folks wanted my take on it.

15   Q.      Is there a reason that you did not include your

16   take on it in your rebuttal report?

17   A.      I --

18          MS. O'REILLY:  Vague and ambiguous.  Asked and

19   answered.

20          THE WITNESS:  I looked at this after I submitted

21   my rebuttal report.

22   BY MS. ROY:

23   Q.      Have you been asked to put in writing your

24   opinions related to Mobil 18-HDR?

25   A.      No.

Exhibit 3
Page 144                    [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

424

1    level of detail.  Again, my -- the scope of my opinion

2    on this is quite broad.

3    Q.      So if it's not in the documents that are in your

4    pile right there that we've talked about, then you

5    didn't look at it.

6    A.      Correct.

7    Q.      Is that right?

8    A.      That's right.

9    Q.      When we take a break, I'd like to look at those

10   documents --

11   A.      Okay.

12   Q.      -- and then maybe make them exhibits.

13   A.      Okay.

14   Q.      In addition to the plausibility of this sort of

15   U-shaped plume that's in the diagram, you mentioned this

16   morning that it was your opinion that there is evidence

17   that contamination from Mobil 18-HDR has reached the

18   deep aquifer.

19           Are you planning to offer that opinion at trial?

20   A.      No.  My opinion would be --

21   Q.      Thank you.

22   A.      -- on -- on --

23   Q.      That's all.  It was just a yes or no.

24   A.      -- plausibility.

25   Q.      Are you planning to issue a report stating the

Exhibit 3
Page 145                 [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)

425

 1    opinion that contamination from Mobil 18-HDR has reached

 2    the deeper aquifer?

 3    A.      No.

 4    Q.      What did you rely upon to draw this conclusion

 5    that contamination from Mobil 18-HDR has reached the

 6    deeper aquifer?

 7    A.      There's several lines of evidence.  They're

 8    principally the nature of the geology at the site and

 9    the position of the mergent zone that creates additional

10    interconnection between the shallow aquifer and the

11    deeper aquifers.

12           The vicinity of where the suspected downward

13    vertical movement occurred does coincide with the

14    general location of the mergent zone and the direction

15    of driving force for the groundwater is strongly

16    downward there.

17           The direction of flow in the shallow aquifer is

18    due south in that area and the direction of groundwater

19    flow in the deeper aquifer is in the north-northeastward

20    direction.

21    Q.      All right.

22    A.      So the -- and I've seen things like this happen

23    before.  So I'm simply looking at the hypothetical

24    interpretation, or the interpretations, and commenting

25    that, yes, from the perspective of someone who works on

Exhibit 3                [8/31/2018] Fogg, Graham Vol. 2 ( 08/31/2018)
Page 146

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 4

Exhibit 4
Page 147



Exhibit 4
Page 148

WHEATCRAFT DAUBERT HEARING
PLAINTIFF'S EXHIBIT NO. 7

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 5

Exhibit 5
Page 149

Case 8:03-cv-01742-CJC-DFM Document 490-1 Filed 12/21/18 Page 150 of 181 Page ID
Case 8:03-cv-01742-CJC-ANx Document 259 Filed 02/23/17 Page 1 of 15 Page ID #:19650
#:21475

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

|  |  |
|---|---|
| ORANGE COUNTY WATER DISTRICT, Plaintiff, v. UNOCAL CORPORATION, *et al.*, Defendants. | Case No.: SACV 03-01742-CJC(ANx) SCHEDULING ORDER |

     In light of the parties' stipulation filed February 21, 2017, (Dkt. 250), the Court issues the following Scheduling Order regarding case management and deadlines in advance of the trial in this case.

Exhibit 5
Page 150

-1-

Case 8:03-cv-01742-CJC-RFM Document 1490-1 Filed 12/21/18 Page 151 of 181 Page ID
#:21476
Case 8:03-cv-01742-CJC-RFM Document 253 Filed 02/23/17 Page 2 of 151 Page ID #:21651

**A. Trial**

As stated at the status conference held on February 10, 2017, trial is set to begin on **October 17, 2017, at 8:30 a.m.**

**B. Updating Discovery**

The parties shall use the following schedule to update certain discovery items:

    1. Production of Data

The parties shall produce updated data regarding water quality and testing by **March 31, 2017**. Included in this production, Plaintiff shall provide a complete copy of the LIMS and WRMS databases and documents related to all investigation and/or remediation that was performed by or on behalf of OCWD. Each Defendant shall provide the results of any water quality testing conducted by it or on its behalf in electronic format such as Excel (to the extent it exists and is reasonably available) since the date of its last production of site remediation files.

    2. Production of Agency or Water Producer Correspondence

The parties shall produce all correspondence and materials related to any Focus Plume well or station submitted to or received from any federal, state, regional, or local regulator (*e.g.*, California Department of Public Health (CDPH), California Department of Toxic Substances Control, California State Water Resources Control Board, Regional Water Quality Control Board, Local Oversight Program (LOP), and Certified Unified Program Agency (CUPA)), or Water Producer regarding water quality and testing by **March 31, 2017**.

Exhibit 5
Page 151

### 3.  Updated Expert Reports

By **April 5, 2017**, the parties will exchange lists of expert witnesses for whom they intend to serve updated expert reports.  The parties are to promptly meet and confer concerning the scope of updated expert discovery, and if the parties are unable to reach an agreement, they will promptly seek the assistance of the Court to resolve any disputes.

To the extent that Plaintiff wishes to update its experts' reports based on new data, such updated reports are due on **April 28, 2017**.  To the extent that any Defendant wishes to update its experts' reports, such updated defense expert reports are due on **May 30, 2017**.  If any party wishes to take the deposition of an expert regarding the content of an updated report, the parties are directed to meet and confer.  If an agreement cannot be reached, the parties may seek leave of Court for a hearing or conference to resolve the issue.

### 4.  Damages

Plaintiff is directed to update its responses to Defendants' damages interrogatories to provide all relevant information regarding damages and costs it seeks to recover at trial no later than **June 2, 2017**.  At a minimum, Plaintiff's response must include a chart detailing each item of cost, the date the cost was incurred, the amount of the cost, and a brief explanation of what the cost was for.  The response shall include all past costs Plaintiff seeks to recover and, for any stations for which future damages are available, a description of all future damages Plaintiff is seeking.  At the same time, to the extent it has not already done so, Plaintiff shall produce all documents supporting its claim for damages.  After Plaintiff has served its updated damages discovery responses, the parties shall meet and confer regarding the need for any follow-up depositions.  If the parties are not able to reach a resolution, the parties shall seek leave of the Court for a brief

Exhibit 5
Page 152

-3-

conference or hearing to resolve the issue. The purpose of the supplementation is to update damages evidence, not to assert new damages theories.

### 5. Dr. Wheatcraft

By **March 31, 2017**, Plaintiff shall identify the 87 wells referenced in ¶ 27 of Dr. Wheatcraft's January 9, 2017, Declaration, (Dkt. 168-2 ("Of the 87 wells that the model predicts breakthrough at some time before the present, every single well that Friedman and Bruya sampled has tested positive with MTBE.")).

## C. Chevron's Motion for Summary Judgment

Pursuant to the Court's October 6, 2016, Order Denying Without Prejudice Chevron's Motion for Summary Judgment, (Dkt. 132), should Defendant Chevron wish to file a second independent motion for summary judgment, such motion shall be filed and briefed as follows:

- Motion due **May 1, 2017**
- Opposition due **June 9, 2017**
- Reply due **June 26, 2017**

The Court will hold a hearing on Chevron's motion, if necessary, at **9:00 a.m. on July 26, 2017**.

//
//
//
//

Exhibit 5
Page 153

-4-

**D.  Motions in Limine**

If parties wish to join in any of the motions in limine that have already been heard by the Court, they may file brief joinders no later than **May 31, 2017**.

New motions in limine are ***strongly disfavored***.  As discussed by the Court repeatedly and at length, motions in limine should only be used to challenge narrow, discrete pieces of evidence.  They will be granted *only* in the rare instance where the evidence is *clearly* inadmissible on *all* potential grounds.  Motions in limine are not to be used as another bite at a motion to dismiss or a motion for summary judgment.  The parties are strongly encouraged to heed the Court's direction regarding motions in limine, particularly in light of the Court's denial of all fifteen of the previously filed motions that ran afoul of this Court's guidance.  Finally, the Court reminds the parties once again of its strong belief that in nearly all instances "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."  *Hawthorne Partners v. AT & T Techs., Inc.*, 831 F. Supp. 1398, 1400–01 (N.D. Ill. 1993).

Nevertheless, should the parties believe that additional motions in limine, unlike the prior set of fifteen, fit within this Court's parameters and expectations, have merit, and are necessary, the parties shall follow the briefing schedule set forth below:

- Motions due **June 19, 2017**
- Oppositions due **July  10, 2017**
- Replies due **July 24, 2017**

The Court will hold a hearing on any motions in limine at 3:00 p.m. on **July 31, 2017**.

Exhibit 5
Page 154

-5-

### E. Jury Qualification/Questionnaire Conference

The Court will hold a conference for all parties at **3:00 p.m. on June 26, 2017**, for the purpose of finalizing the Jury Qualification letter and Jury Questionnaire to be sent to prospective jurors.

In advance of this conference, the parties are to meet and confer regarding the content of the Jury Questionnaire.

The parties shall submit to the Court a draft Joint Jury Questionnaire no later than **June 14, 2017**. To the extent that the parties are not able to agree on certain questions, the parties should identify the disputed questions for the Court and provide brief statements explaining the parties' respective positions.

### F. Jury Instructions Conference

The Court will hold a conference at **3:00 p.m. on September 11, 2017**, for all parties for purposes of preparing the jury instructions and verdict form. The parties are directed to meet and confer regarding jury instructions and verdict form prior to this conference and prepare a joint submission. The parties are directed to exchange proposed jury instructions on **August 1, 2017**. The joint submission is due **September 1, 2017**.

The joint submission shall include the following: (1) agreed upon jury instructions; (2) disputed jury instructions offered by Plaintiff; and (3) disputed jury instructions offered by Defendant(s). To the extent that certain instructions are disputed, the parties shall provide brief statements explaining the dispute. The joint submission shall include a brief statement of the case to be read to the jury. The joint submission shall also

Exhibit 5
Page 155

-6-

include a proposed verdict form.  If the parties are not able to agree on a verdict form, the parties may submit competing versions.

### G.  Working Session and Final Status Conference

The Court will hold a Working Session with all parties at **3:00 p.m. on September 25, 2017**, and Final Status Conference at **3:00 p.m. on October 2, 2017**.

#### 1.  Working Session

The purpose of the Working Session will be to review and resolve issues regarding the witness list and exhibit list.  In advance of this Working Session, the parties are to meet and confer and prepare the following documents:  (1) Joint Witness List; and (2) Joint Exhibit List.  These documents must be submitted to the Court no later than **September 18, 2017**.

In order to meet the September 18 deadline, the parties will use the following schedule to guide their meet and confer efforts:

- Parties shall exchange list of expert witnesses that they intend to call at trial by **August 4, 2017**.
- Parties shall exchange preliminary list of fact witnesses that they intend to call at trial and note which witnesses will be presented via deposition testimony by **August 11, 2017**.
- Parties shall exchange preliminary exhibit lists by **August 25, 2017**.

//

//

Exhibit 5
Page 156
-7-

### 2. Final Status Conference

The purpose of the Final Status Conference will be to resolve any remaining issues regarding trial preparation and to review and finalize deposition designations.  On **September 25, 2017**, the parties shall file a Joint Designation of Testimony To Be Presented Via Deposition.  This submission shall contain all of the parties' designations and highlight for the Court objections that the parties have not been able to resolve. In order to prepare the Final Status Conference, the parties will use the following schedule:

- Parties shall exchange deposition designations for witnesses that Plaintiff intends to offer in its case-in-chief via deposition and witnesses that Defendants anticipate they may offer in their defense via deposition by **August 18, 2017**.
- Parties shall exchange deposition counter-designations for witnesses the opposing party designates to testify via deposition by **September 8, 2017**.
- If a party designates a deposition testimony witness on an issue for which the opposing party needs to designate a rebuttal witness to testify via deposition, the opposing party shall provide deposition designations for such rebuttal witness(es) by **September 15, 2017**.
- To the extent rebuttal witness designations are made, the opposing parties shall provide rebuttal witness counter-designations by **September 20, 2017**.

DATED:    February 23, 2017

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

Exhibit 5
Page 157                                    -8-

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 6

Exhibit 6
Page 158

1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

13

14

15

16

17

18

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT, | Case No. 8:03-cv-01742 CJC (ANx) |
| Plaintiff, | *Assigned to: Hon. Cormac J. Carney* |
| v. | **CASE MANAGEMENT ORDER NO. 2** |
| UNOCAL CORPORATION, et al., | |
| Defendants. | |

19
20
21
22
23
24
25
26
27
28

Case 8:03-cv-01742-CJC-DFM Document 330-1 Filed 03/05/18 Page 2 of 60 Page ID #:10483

## **SCHEDULING ORDER**

**A.    Adjustment to Case Management Order No. 1**

Section E(2) of Case Management Order No. 1 (Agency Correspondence) is amended to provided that Defendants must produce responsive materials by **March 15, 2018**.  OCWD's deadline is moved from April 1, 2018 to **April 2, 2018**.

**B.    Expert Discovery**

Expert discovery will proceed under the following schedule:

- OCWD's Expert Reports due **May 18, 2018**.
- Defendants' Expert Reports due **June 29, 2018**.
- OCWD's Expert Rebuttal Reports due **August 3, 2018**.
- Expert depositions shall be completed by **August 24, 2018**.

**C.    Motions**

To the extent that parties wish to join in any of the motions *in limine* that have already been heard by the Court, the parties may file brief joinders no later than **June 11, 2018**.  To the extent that any of the parties wish to join in motions that have previously been resolved by the Court, they are encouraged to stipulate that they would have joined in those motions and that the result would be the same as previously reached by the Court.

No party shall file any new motion *in limine*, any Daubert motion, or any other expert-related motion without permission from the Court.  Any request for permission to file such a motion shall be made by **June 11, 2018**. Such motions are strongly discouraged. "Motions in limine that seek exclusion of broad and unspecific categories of evidence" are disfavored. *Jackson v. Cty. of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016). "[A] motion in limine

Case 8:03-cv-01742-CJC-DFM Document 490-1 Filed 02/21/18 Page 161 of 181 Page ID #:21486
Case 8:03-cv-01742-CJC-DFM Document 397-1 Filed 03/05/18 Page 3 of 51 Page ID #:16484
#:21486

1  should not be used to resolve factual disputes or weigh evidence." *Id*. (citation
2  omitted).

3       If the Court grants any party permission to file a motion *in limine*, *Daubert*
4  motion, or other expert-related motion, the Court will set a briefing and hearing
5  schedule for that motion.

6       In the event of a discovery dispute, the parties shall bring the dispute before
7  Magistrate Judge McCormick for resolution.

8

9  **D.**    <u>**Working Session #1 – Jury Instructions**</u>

10       The purpose of Working Session #1 is to review and prepare the jury
11  instructions and verdict form to be used at trial. The parties shall proceed under the
12  following schedule for preparing jury instructions and the verdict form:

13       • **October 1, 2018** – The parties shall exchange proposed jury
14       instructions and verdict form. After the exchange, the parties are
15       directed to meet and confer regarding jury instructions and verdict form
16       prior to the conference and prepare a joint submission.

17       • **October 26, 2018** – Joint submission re jury instructions due.

18       • **November 5, 2018 at 3:00 p.m.** – Working Session #1 re Jury
19       Instructions.

20       The joint submission shall include the following: (1) agreed upon jury
21  instructions; (2) disputed jury instructions offered by plaintiff; and (3) disputed jury
22  instructions offered by defendant(s). To the extent that certain instructions are
23  disputed, the parties shall provide brief statements explaining the dispute. The joint
24  submission shall include a brief statement of the case to be read to the jury. The
25  joint submission shall also include a proposed verdict form. If the parties are not
26  able to agree on a verdict form, the parties may submit competing versions.

27

28

**E.** <u>**Working Session #2 – Witness & Exhibit Lists**</u>

The purpose of Working Session #2 is to review and resolve issues regarding the witness list and exhibit list.  The parties shall proceed under the following schedule for preparing the witness and exhibit lists:

- **October 5, 2018** – Parties shall exchange list of expert witnesses that they intend to call at trial.
- **October 12, 2018** – Parties shall exchange preliminary list of fact witnesses that they intend to call at trial and note which witnesses will be presented via deposition testimony.
- **October 24, 2018** – Parties shall exchange preliminary exhibit lists.
- **November 14, 2018** – Parties shall file a Joint Witness List and Joint Exhibit List.
- **November 26, 2018 at 3:00 p.m**. – Working Session #2 re Witness & Exhibit Lists

**F.** <u>**Working Session #3 – Deposition Designations**</u>

The purpose of Working Session #3 is to resolve any remaining issues regarding trial preparation and to review and finalize deposition designations.  The parties shall proceed under the following schedule for preparing deposition designations:

- **November 9, 2018** – Parties shall exchange deposition designations for witnesses that OCWD intends to offer in its case-in-chief via deposition and witnesses that Defendants anticipate they may offer in their defense via deposition.
- **November 21, 2018** – Parties shall exchange deposition counter-designations for witnesses the opposing party designates to testify via deposition.

Exhibit 6
Page 162

- **November 26, 2018** – If a party designates a deposition testimony witness on an issue for which the opposing party needs to designate a rebuttal witness to testify via deposition, the opposing party shall provide deposition designations for such rebuttal witness(es) by this date.

- **December 5, 2018** – To the extent rebuttal witness designations are made, the opposing parties shall provide rebuttal witness counter-designations by this date.

- **December 10, 2018** – The parties shall file a Joint Designation of Testimony To Be Presented Via Deposition. This submission shall contain all of the parties' designations and highlight for the Court objections that the parties have not been able to resolve

- **December 17, 2018 at 3:00 p.m.** – Working Session #3 re Deposition Designations.

**G.    Final Status Conference**

The Court will hold a final status conference on **January 7, 2019 at 3:00 p.m.** The purpose of the Final Status Conference will be to resolve any remaining issues regarding trial preparation. The parties shall submit a Joint Status Report and Proposed Agenda for the Final Status Conference on **January 2, 2019**.

IT IS SO ORDERED.

Date: March 5, 2018

_____

HON. CORMAC J. CARNEY

Exhibit 6
Page 163

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# **Exhibit 7**

Exhibit 7
Page 164

1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2
     IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
 3            PRODUCTS LIABILITY LITIGATION
     Master File C.A. No. 1:00-1898(SAS) MDL 1358
 4   _____

 5

     This Document Relates to:
 6
              ORANGE COUNTY WATER DISTRICT
 7            v. UNOCAL CORPORATION, et al.,
              Case No. 04 CIV.4968 (SAS)
 8   _____

 9

10                  --   --  --

11            SATURDAY, JANUARY 21, 2012

12                  --   --  --

13      Videotaped Deposition of GRAHAM E. FOGG, Ph.D.,
     Expert Witness, held at the Law Offices of Latham &
14   Watkins, 505 Montgomery Street Street, Suite 1900,
     San Francisco, California, beginning at 9:03, before
15   Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR #3032

16                  --   --  --

17

18

19

20

21

22   _____

23            GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph|917.591.5672 fax
24              Deps@golkow.com

25
```

Exhibit 7
Page 165                    [1/21/2012] Fogg, Graham E. (01/21/2012)

59

 1    those times when I have -- when I have to be away.

 2           And there's other things that take me out of

 3    town that are university business.  So, you know,

 4    it's -- professors do have to manage these kinds of

 5    scheduling quirks.  But it's -- I am aware that there

 6    are times when defense attorneys want to conduct

 7    multiday, perhaps even multiweek deposition.

 8    BY MR. JON ANDERSON:

 9           Q.    Have you ever participated in a

10    multiweek deposition?

11           A.    More than a week, I have.

12           Q.    Which case was that?

13           A.    Tahoe.

14           Q.    Was that your first deposition in an

15    MTBE case?

16           A.    Yes.

17           Q.    Were you asked to do any

18    site-specific work in this case?

19           A.    No.

20           Q.    Do you know what sites are involved

21    in this case?

22           A.    I -- you know, I've looked at some of

23    the site data from -- that have been written up in

24    other expert reports.

25           Q.    Other than looking at site data that

Exhibit 7
Page 166                    [1/21/2012] Fogg, Graham E. (01/21/2012)

114

1          MR. JON ANDERSON:  Let's get some foundation

2     here, then.

3          Q.    Is it your expert view, Dr. Fogg,

4     that the absence of an adequate monitoring well

5     network necessarily means that MTBE has migrated

6     off-site?

7          MS. O'REILLY:  Misstates testimony.

8          Go ahead.

9          THE WITNESS:  Yes.  If the monitoring well

10     network is inadequate and there's MTBE in the distal,

11     the most distal wells, and the end of the MTBE plume

12     has not been found -- or like in many MTBE plumes,

13     the plumes are complex, with multiple bifurcating

14     plumes, perhaps, which can happen, and you're trying

15     to define that with a handful of wells, yeah, it's

16     inadequate.

17          We know from the behavior of the chemical

18     that it can move quite extensively.  We have data

19     from other systems on big plumes.  There are systems

20     in California that indicate big plumes.  There's

21     systems in Orange County where I've seen, you know,

22     plumes on the order of thousands of feet, up to a

23     mile.

24          But, again, my testimony is not on specific

25     sites and specific plumes.  It's more of a general

Exhibit 7
Page 167                    [1/21/2012] Fogg, Graham E. (01/21/2012)

1    characterization of, you know, how the chemical has

2    been dealt with and where -- what's likely happening

3    to the MTBE in the system now.

4    BY MR. JON ANDERSON:

5            Q.    Okay.  So I just want to clarify so

6    there's no doubt on the record.  Dr. Fogg, is there

7    any specific station of the 34 where you have an

8    opinion that a significant amount of MTBE has

9    migrated off-site?

10           MS. O'REILLY:  Asked and answered.

11   Argumentative.  Abusive.

12           THE WITNESS:  Again, I've answered.

13   BY MR. JON ANDERSON:

14           Q.    You've done a lot of things, but you

15   haven't given me a "yes" or "no" to that question.

16           MS. O'REILLY:  Objection.  Misstates --

17   BY MR. JON ANDERSON:

18           Q.    Do you have an opinion --

19           A.    It's not answerable with a "yes" or

20   "no."

21           MS. O'REILLY:  Hold on.

22   BY MR. JON ANDERSON:

23           Q.    Okay.  If it's not answerable with a

24   "yes" or "no," then tell me the name of one station

25   where you hold that opinion?

Exhibit 7
Page 168                   [1/21/2012] Fogg, Graham E. (01/21/2012)

126

1          MS. O'REILLY:  Misstates -- materially

2     misrepresents testimony and opinion.  Exceeds the

3     scope of his designation.

4          Go ahead.

5          THE WITNESS:  My opinion is not that

6     specific.

7     BY MR. JON ANDERSON:

8          Q.    So you don't have that -- you don't

9     have an opinion as to any specific opinion among

10    the -- any specific station among the 34, right?

11         A.    That's right.

12         Q.    Did you do any modeling in connection

13    with your work on this case?

14         A.    No.

15         Q.    Did you review or consider anyone

16    else's modeling in connection with your work in this

17    case?

18         A.    No.

19         Q.    Have you read Dr. Wheatcraft's

20    report?

21         A.    I'm aware of the report.  And I've

22    looked at it, and my staff has read it.

23         Q.    When you read Dr. Wheatcraft's

24    report, do you recall anything in it that you

25    disagreed with?

Exhibit 7
Page 169                [1/21/2012] Fogg, Graham E. (01/21/2012)

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 8

Exhibit 8
Page 170



Exhibit 8
Page 171

OCWD-MTBE-001-464609

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 9

Exhibit 9
Page 172

# Sheppard Mullin

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
213.620.1780 main
213.620.1398 fax
www.sheppardmullin.com

September 4, 2018

File Number: 0MH4-115296

*VIA ELECTRONIC MAIL*
Tracey O'Reilly, Esq.
Miller & Axline
1050 Fulton Ave., Suite 100
Sacramento, CA 95825-4272

Re:  <u>Orange County Water District v. Unocal Corp. et al.</u>

Dear Tracey:

The purpose of this letter is to initiate the meet and confer process with you regarding the new opinions Dr. Fogg offered at his deposition on Friday regarding Mobil 18-HDR. Specifically, Dr. Fogg stated that he had developed two new opinions in this case: (i) that the path of MTBE depicted in the "U-turn" diagram (Depo Exhibit No. 20) is "plausible"; and (ii) that there is evidence that MTBE released from Mobil 18-HDR has reached the deep aquifer. These new opinions are improper for a multitude of reasons and we request that you confirm that OCWD does not intend to offer these opinions at trial.

**Failure to Issue Written Opinion**:  As you know, the Federal Rules of Civil Procedure require an expert to timely set forth all opinions in a written report.  Fed. R. Civ. Proc. 26(a)(2)(B).  During the deposition, Dr. Fogg acknowledged that he has <u>never</u> issued a written report addressing these two new opinions.  A review of his reports in this case confirms that he has not.  The failure to disclose his opinions in writing, *alone*, justifies excluding them at trial.  Fed. R. Civ. Proc. 37(c)(1); *see also Cotton v. City of Eureka*, 860 F. Supp. 2d 999, 1023 (N.D. Cal. 2012).

**Unfair Delay**:  Your decision to not disclose Dr. Fogg's new opinions until his deposition on the last two days of August is fundamentally unfair.  OCWD first disclosed the U-turn diagram in January 2017.  OCWD was obligated to provide updated expert reports regarding Plume 2 no later than April 28, 2017 and again by May 21, 2018.  If OCWD wanted Dr. Fogg to prepare opinions related to Mobil 18-HDR and the diagram, OCWD should have asked him to do the work at some point prior to these two report deadlines.  Instead, Dr. Fogg testified that you did not ask him to analyze these issues until mid-August, well *after* the deadline for OCWD to serve updated expert reports and even after the deadline for OCWD to serve rebuttal reports.

You and I have been in constant contact over the last month working through the expert deposition schedule and you have never once alerted me to the fact that Dr. Fogg prepared new opinions.  Furthermore, you have had multiple opportunities to alert Judge McCormick and Judge Carney to these new opinions.  The result of your unfair delay is that Defendants were prevented from having a fair opportunity to prepare for Dr. Fogg's deposition on these topics and prevented from having their experts respond to Dr. Fogg's new opinions.  This litigation gamesmanship is wholly improper, particularly in light of the age of this case and the impending January trial date.

Exhibit 9
Page 173

# Sheppard Mullin

September 4, 2018
Page 2


        Please confirm that Dr. Fogg will not be offering site-specific opinions related to
Mobil 18-HDR or Plume 2 at trial.  If, for any reason, OCWD anticipates that it will ask Dr. Fogg
to offer these opinions at trial, please provide us with a detailed explanation of why OCWD
thinks such opinions would be admissible so that we can evaluate whether we need the
assistance of Judge McCormick on this issue.

Sincerely,

/s/ Whitney Jones Roy

Whitney Jones Roy
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


SMRH:487666575.1

Exhibit 9
Page 174

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 10

Exhibit 10
Page 175

Law Offices of

# MILLER & AXLINE

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

November 7, 2018

<u>VIA U.S. MAIL AND LNFS</u>

Whitney Jones Roy
Sheppard, Mullin, Richter & Hampton
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448

Re:   *Orange County Water District v. Unocal Corp., et al.*
       **Expert Deposition of Graham Fogg**

Dear Ms. Jones Roy:

I am writing on behalf of plaintiff Orange County Water District (the "District") to meet
and confer in response to your September 4, 2018, letter concerning the deposition testimony of
the District's expert Graham Fogg.

First, we disagree with you that Dr. Fogg's testimony concerning the direction of
groundwater flow within the Orange County Water District basin constitutes "new" opinions.
Dr. Fogg previously testified that there is a general downward flow throughout the basin from the
shallow to the deep aquifers towards drinking water wells. (Fogg Depo. (Jan. 21, 2012) at
195:16-196:24; *see also* 151:25-152:2.) Dr. Fogg further testified that, as a result of this
property, MTBE contamination will, therefore, reach drinking water wells within the basin unless
it is remediated in the shallow aquifers. (Fogg Depo. (Jan. 21, 2012) at 110:9-24; *see also* 97:11-
16, and 197:24-198:14.) Dr. Fogg specifically testified that any of the 34 focus sites "can
contaminate public supply wells" such as MCWD-8. (Fogg Depo. (Jan. 21, 2012) p. 97:2-16.)
The opinions expressed by Dr. Fogg were consistent with this prior testimony.

Second, Dr. Fogg's opinions and testimony were prepared in rebuttal to voluminous and
numerous expert reports which were only issued on July 6, 2018, so that Dr. Fogg had very little
time to formulate and prepare his rebuttal opinions.

Exhibit 10
Page 176

1050 Fulton Avenue, Suite 100, Sacramento, CA 95825-4225; Telephone: (916) 488-6688
Facsimile: (916) 488-4288; Email: toxictorts@toxictorts.org

Whitney Jones Roy
Page 2
November 7, 2018

      We are prepared, nonetheless, to confirm that we do not intend to present Dr. Fogg's specific testimony concerning Mobil #18-HR during our case-in-chief at trial in this matter. We reserve the right, however, to present Dr. Fogg's testimony on this issue during any pertinent *Daubert* hearing as well as in rebuttal to opinions offered by defendants' experts at trial if necessary.

                    Sincerely,

                    Tracey L. O'Reilly

cc: All Counsel (via LNFS)

Exhibit 10
Page 177

Declaration of Whitney Jones Roy
ISO Motion to Exclude Newly Disclosed
Opinions of Graham Fogg

# Exhibit 11

Exhibit 11
Page 178

**Whitney Roy**

| | |
|---|---|
| **From:** | Tracey O'Reilly <toreilly@toxictorts.org> |
| **Sent:** | Thursday, November 8, 2018 10:25 AM |
| **To:** | Whitney Roy |
| **Cc:** | Duane Miller; Mike Axline |
| **Subject:** | RE: 2018-09-04 Letter to T. O'Reilly re New Fogg Opinions |

Whitney,

As you know, we have a deadline tomorrow to file deposition designations and another deadline on Monday to file jury instructions, as well as numerous other pre-trial deadlines over the next few weeks.  Trial does not start until January 15, 2019, so a resolution concerning the potential scope of Dr. Fogg's testimony does not reasonably require immediate attention.  Indeed, there is not even a underline deadline to file any motions concerning the admissibility or scope of any expert's testimony.  Threatening to file immediately file a motion under these circumstances would certainly not be considered necessary or good faith.

We are more than willing to engage in good faith meet and confer on this issue, be we believe that complying with Judge Carney's direction to meet and confer on jury instructions takes immediate precedence.  I will review your letter and respond as promptly as time permits.

Sincerely,

Tracey


Tracey O'Reilly
Miller & Axline
1050 Fulton Avenue, Suite 100
Sacramento, California  95825
Tel: 916-488-6688
Fax: 916-488-4288
Email: toreilly@toxictorts.org

---

**From:** Whitney Roy <WRoy@sheppardmullin.com>
**Sent:** Thursday, November 08, 2018 9:21 AM
**To:** Tracey O'Reilly <toreilly@toxictorts.org>
**Subject:** FW: 2018-09-04 Letter to T. O'Reilly re New Fogg Opinions

Tracey – following up on my voicemail from yesterday.  Please call me to discuss the Fogg opinions.  I would hate to have to file a motion if you and I can get on the same page.


**Whitney Jones Roy**
+1 213-617-4292 | direct
WRoy@sheppardmullin.com | Bio

**Sheppard**Mullin
333 South Hope Street, 43rd Floor

Exhibit 11
Page 179

1

Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com | LinkedIn | Twitter

---

**From:** Kathy Herron <kherron@toxictorts.org>
**Sent:** Wednesday, November 7, 2018 2:28 PM
**To:** Whitney Roy <WRoy@sheppardmullin.com>; Tracey O'Reilly <toreilly@toxictorts.org>; Duane Miller <dmiller@toxictorts.org>
**Cc:** Jeffrey Parker <JParker@sheppardmullin.com>; 'Peter C. Condron(pcondron@crowell.com)' <pcondron@crowell.com>; Correll, Charles <CCorrell@KSLAW.com>; 'jjanderson@kslaw.com' <jjanderson@kslaw.com>; Kenneth A. Ehrlich <KEhrlich@elkinskalt.com>; 'Ernest J. Guadiana' <EGuadiana@elkinskalt.com>; 'abanerji@elkinskalt.com' <abanerji@elkinskalt.com>; Heartney, Matthew T. <Matthew.Heartney@arnoldporter.com>; Stephanie.Weirick@arnoldporter.com; Macdonald, Timothy R. <Timothy.Macdonald@arnoldporter.com>
**Subject:** RE: 2018-09-04 Letter to T. O'Reilly re New Fogg Opinions

Ms. Jones Roy,

Attached please find a letter from Tracey O'Reily re Expert Deposition of Graham Fogg.  Thank you.

Kathy Herron
Miller & Axline / phone (916) 488-6688 / fax (916) 488-4288 This private communication may be confidential or privileged. If you are not the intended recipient, any disclosure, distribution, or use of information herein or attached is prohibited.

---

**From:** Whitney Roy <WRoy@sheppardmullin.com>
**Sent:** Tuesday, September 4, 2018 4:14 PM
**To:** Tracey O'Reilly <toreilly@toxictorts.org>; Duane Miller <dmiller@toxictorts.org>
**Cc:** Jeffrey Parker <JParker@sheppardmullin.com>; 'Peter C. Condron(pcondron@crowell.com)' <pcondron@crowell.com>; Correll, Charles <CCorrell@KSLAW.com>; 'jjanderson@kslaw.com' <jjanderson@kslaw.com>; Kenneth A. Ehrlich <KEhrlich@elkinskalt.com>; 'Ernest J. Guadiana' <EGuadiana@elkinskalt.com>; 'abanerji@elkinskalt.com' <abanerji@elkinskalt.com>; Heartney, Matthew T. <Matthew.Heartney@arnoldporter.com>; Stephanie.Weirick@arnoldporter.com; Macdonald, Timothy R. <Timothy.Macdonald@arnoldporter.com>
**Subject:** 2018-09-04 Letter to T. O'Reilly re New Fogg Opinions

Tracey & Duane – Please see attached.

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

Exhibit 11
Page 180

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>PROOF OF SERVICE VIA FILE AND SERVE XPRESS</u>

*Orange County Water District v. Unocal Corp. et al.*

I, Dori Dellisanti, the undersigned, hereby declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and am not a party to the within action.  I am employed by Sheppard, Mullin, Richter & Hampton LLP in the City of Los Angeles, State of California.  My business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071.  On **December 21, 2018**, I served a copy of the attached documents titled**:**

**DECLARATION OF WHITNEY JONES ROY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE NEWLY DISCLOSED OPINIONS OF GRAHAM FOGG**

on all parties hereto by:

Posting it directly to the File and Serve Xpress website:  www.fileandservexpress

I declare under penalty under the laws of the State of California that the foregoing is true and correct.  Executed this **December 21, 2018** in Los Angeles, California.

*/S/ Dori Dellisanti*
Dori Dellisanti