Duane C. Miller, #57812
dmiller@toxictorts.org
Michael Axline, #229840
maxline@toxictorts.org
Tracey O'Reilly, #206230
toreilly@toxictorts.org
**MILLER & AXLINE**
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, California 95825-4225
Telephone: (916) 488-6688
Facsimile: (916) 488-4288

Counsel for plaintiff Orange County Water District

Exempt from filing fees
per Govt. Code § 6103

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| ORANGE COUNTY WATER DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNOCAL CORPORATION, et al.,<br><br>Defendants. | Case No. SACV 03-01742-CJC (ANx)<br><br>**DECLARATION OF TRACEY O'REILLY IN SUPPORT OF PLAINTIFF OCWD'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF GRAHAM FOGG**<br><br>Judge: Hon. Douglas F. McCormick<br>Dept: 6B<br>Date: January 3, 2019<br>Time: 10:00 a.m. |

0

Declaration of Tracey O'Reilly in Support of Plaintiff OCWD's Opposition to Defendants' Motion to Strike Opinions of Dr. Graham Fogg

Tracey L. O'Reilly, declare:

1. I am an attorney at Miller & Axline, counsel of record for plaintiff Orange County Water District. I have been a lead attorney on the above-titled suit since its inception in 2003. I make this declaration from personal knowledge, and I could and would testify competently hereto.

2. Attached as **Exhibit 1** is a true and correct copy of excerpts from the deposition transcript of Graham Fogg taken in this matter on January 21, 2012.

3. Attached as **Exhibit 2** is a true and correct copy of excerpts from the Expert Rebuttal Report of Graham Fogg, Ph.D. served in this matter on December 15, 2011.

4. Attached as **Exhibit 3** is a true and correct copy of excerpts from the deposition transcript of Graham Fogg taken in this matter on August 30, 2018.

5. Attached as **Exhibit 4** is a true and correct copy of excerpts from the deposition transcript of Graham Fogg taken in this matter on August 31, 2018.

6. Attached as **Exhibit 5** is a true and correct copy of the February 4, 2016, Letter from L. Babcock, California State Water Resources Control Board, to D. Bolin, Orange County Water District.

7. Attached as **Exhibit 6** is a true and correct copy of excerpts from the July 2013, Current Conditions Report, Mobil Station #18-HDR, prepared by Aquilogic Inc.

8. Attached as **Exhibit 7** is a true and correct copy of the January 14, 2014, Letter from D. Bolin, Orange County Water District, to A. Cooper, State Water Resources Control Board.

9. Attached as **Exhibit 8** is a true and correct copy of the June 11, 2015, Letter from D. Bolin, Orange County Water District to G. Lockwood, State Water Resources Control Board.

Declaration of Tracey O'Reilly in Support of Plaintiff OCWD's Opposition to Defendants' Motion to Strike Opinions of Dr. Graham Fogg

1       10.     Attached as **Exhibit 9** is a true and correct copy of the May 5, 2015,

2  Letter from D. Bolin, Orange County Water District to A. Cooper, State Water

3  Resources Control Board.

4       11.     Attached as **Exhibit 10** is a true and correct copy of the July 5, 2016,

5  Letter from J. Leist, Cardno, to O. Taban, Orange County Health Care Agency.

6       12.     Attached as **Exhibit 11** is a true and correct copy of the January 3,

7  2017, Letter from O. Taban, Orange County Health Care Agency, to D. Choe,

8  ExxonMobil Environmental Services Company.

9       13.     Attached as **Exhibit 12** is a true and correct copy of the December

10  21, 2018, Email from C. Luna to T. O'Reilly.

11       14.     Attached as **Exhibit 13** is a true and correct copy of the November 7,

12  2018, Letter from T. O'Reilly to W. Jones Roy.

13       15.     Attached as **Exhibit 14** is a true and correct copy of the resume of

14  Roy L. Herndon.

15       16.     Attached as **Exhibit 15** is a true and correct copy of excerpts from

16  the deposition transcript of Roy Herndon taken in this matter on June 22, 2018.

17       17.     Attached as **Exhibit 16** is a true and correct copy of Exhibit 8 to the

18  deposition of Roy Herndon taken in this matter on June 22, 2018.

19       18.     Attached as **Exhibit 17** is a true and correct copy of Defendants'

20  Motion to Strike Roy Herndon's Declaration served in this matter on August 11,

21  2011.

22       19.     Attached as **Exhibit 18** is a true and correct copy of excerpts from

23  the October 25, 2011, Opinion and Order, MDL Dkt. 280.

24

25

26

27

28

Declaration of Tracey O'Reilly in Support of Plaintiff OCWD's Opposition to Defendants' Motion to
Strike Opinions of Dr. Graham Fogg

1        I declare under penalty of perjury under the laws of the State of California

2   that the foregoing is true and correct.

3

4        Executed this 28th day of December, 2018, at Sacramento, California.

5

6

7                  TRACEY L. O'REILLY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Tracey O'Reilly in Support of Plaintiff OCWD's Opposition to Defendants' Motion to Strike Opinions of Dr. Graham Fogg

# Exhibit 1

# EXHIBIT 1

Graham E. Fogg, Ph.D.

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:  METHYL TERTIARY BUTYL ETHER ("MTBE")
        PRODUCTS LIABILITY LITIGATION
Master File C.A. No. 1:00-1898(SAS) MDL 1358

_____

This Document Relates to:

        ORANGE COUNTY WATER DISTRICT
        v. UNOCAL CORPORATION, et al.,
        Case No. 04 CIV.4968 (SAS)

_____


-- -- --

SATURDAY, JANUARY 21, 2012

-- -- --


        Videotaped Deposition of GRAHAM E. FOGG, Ph.D.,
Expert Witness, held at the Law Offices of Latham &
Watkins, 505 Montgomery Street Street, Suite 1900,
San Francisco, California, beginning at 9:03, before
Sandra Bunch VanderPol, FAPR, RMR, CRR, CSR #3032


-- -- --

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
Deps@golkow.com

Graham E. Fogg, Ph.D.

Page 27

1          THE WITNESS:  That --

2          MS. O'REILLY:  Go ahead.

3          THE WITNESS:  That is the most logical

4   explanation, and it fits the data and it fits our

5   knowledge of the behavior of the chemical, and it

6   fits our knowledge and our information showing that

7   the monitoring well networks are inadequate to track

8   the plumes.

9   BY MR. JON ANDERSON:

10          Q.     By defining it that way, therefore,

11   the monitoring networks are inadequate, if you say

12   that, by definition, the MTBE is moving away from

13   those networks, right?

14          A.     No.  You're twisting what I'm saying.

15          Q.     Dr. Fogg, you also think that

16   100 percent of the water that's been contaminated by

17   MTBE is going to end up leaving the subsurface of

18   Orange County Water District through drinking water

19   production wells, right?

20          MS. O'REILLY:  Misstates report.

21          THE WITNESS:  More like between 90 and a

22   hundred percent.

23   BY MR. JON ANDERSON:

24          Q.     Between 90 and a hundred percent.

25   That's a large number, right?

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

1        A.       Sure.  Yeah.

2        Q.       Okay.

3        A.       That's what the -- the modeling by

4   Orange County Water District indicates in that

5   system.

6        Q.       And this process of the MTBE escaping

7   off the sites and getting away from the monitoring

8   well networks, implicitly that means that the water

9   is moving toward the production wells, right?

10       MS. O'REILLY:  Objection.  Misstates

11  testimony.

12       THE WITNESS:  Well, ultimately much of the

13  water, yes.

14  BY MR. JON ANDERSON:

15       Q.       Ninety to a hundred percent of it is

16  moving toward and will exit through the production

17  wells, right?

18       A.       About 98 percent of the water in that

19  basin, according to the OCWD district model, is going

20  to exit or is exiting through pumping wells.

21       Q.       And do you have a hypothesis or an

22  opinion as to why we haven't seen that MTBE showing

23  up in those production wells now that it's been

24  moving off-site and away from the monitoring well

25  networks?

Graham E. Fogg, Ph.D.

Page 77

1        THE WITNESS:  I have not directly spoken to

2   regulatory authorities in quite some time.  But in

3   the past, you know, I've given public statements --

4   this was back in the late '90s -- on the behavior of

5   MTBE and the adequacy of monitoring networks.

6   BY MR. JON ANDERSON:

7        Q.      Which of the 34 focus stations in

8   this case have you formed an opinion that their

9   monitoring well network is inadequate?

10        MS. O'REILLY:  Vague and ambiguous.

11        THE WITNESS:  Again, I'm not prepared to

12   talk about specific sites here today.  But I -- my

13   recollection of Anthony Brown's report is that the --

14   characteristically the monitoring that has been done

15   on these sites is typical of what's -- what's done in

16   many, many other MTBE contaminated areas, which is

17   where the monitoring well network is limited to the

18   general vicinity of the property from which the

19   release occurred.

20        And that -- that is most definitely not

21   enough monitoring or not enough of a lateral

22   footprint and vertical footprint of monitoring to

23   figure out what's happening to these plumes.

24   BY MR. JON ANDERSON:

25        Q.      Dr. Fogg, I need to know, just so we

Golkow Technologies, Inc. - 1.877.370.DEPS

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

1  have some definition for this case, do you have an

2  opinion in this case with respect to any of the

3  34 focus stations that that station or more than one

4  station has an inadequate monitoring well network?

5          A.       My opinion is of the sites as a

6  whole, based on what I just said.

7          Q.       Okay.  I'm not sure what you mean by

8  "the sites as a whole."

9          A.       The collection of sites in the --

10         Q.       Do you believe that the 34 stations

11  are all part of a unified need for a monitoring

12  network?

13         MS. O'REILLY:  Vague and ambiguous.

14         THE WITNESS:  No, I don't think that's what

15  I said.

16  BY MR. JON ANDERSON:

17         Q.       Okay.  So are there any of the 34

18  stations in this case that you have an opinion has an

19  inadequate monitoring well network?

20         MS. O'REILLY:  Misstates testimony.

21  Argumentative.

22         Go ahead.

23         THE WITNESS:  As I said earlier, I have not

24  investigated specific sites and provided a specific

25  opinion on adequacy of monitoring at specific sites.

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 97

1    BY MR. JON ANDERSON:

2         Q.    Can you tell me the identity of any

3    of the 34 stations involved in this case where you

4    have formed an opinion that at least that particular

5    station poses a threat to a drinking water well or

6    more than one drinking water well within Orange

7    County Water District?

8         MS. O'REILLY:  Purposefully misstates the

9    scope of his opinions.  Vague.  Ambiguous.

10   Overbroad.

11        THE WITNESS:  Well, given that all of the

12   focus sites are potential sources of MTBE into the

13   greater groundwater system, and given that about

14   98 percent of the groundwater recharged into the

15   system exits by well, then all of those sites

16   potentially can contaminate public supply wells.

17        But the specific supply wells connected to

18   specific sites, again, is beyond the scope of my

19   testimony.

20   BY MR. JON ANDERSON:

21        Q.    I understand the term "potential,"

22   but I think I heard within that last answer that you

23   don't have an opinion that any particular station

24   itself poses a threat to any one or more Orange

25   County drinking water wells, right?

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 151

1  lateral -- and the plume starts migrating or

2  starts -- starts disappearing, that's evidence that

3  it's -- that it's probably going away.  You know, if

4  you have enough data to feel confident that there's

5  not some other excursion of a contaminant mass moving

6  away from that plume.

7  BY MR. JON ANDERSON:

8        Q.    Well, let's say you're looking at a

9  situation, as is probably the case with most of the

10  34 stations here, that the initial on-site detections

11  of MTBE took place some time in the late 1990s and

12  only on-site monitoring has been done.  And then in

13  roughly 2008, 2009, 2010, in that time frame, someone

14  investigates off-site and finds nondetects off-site.

15        Would you necessarily conclude that that

16  means that the plume has escaped, or might it also

17  mean that the plume didn't get that far?

18        MS. O'REILLY:  Incomplete hypothetical.

19  Assumes facts.

20        THE WITNESS:  Well, depending on the

21  circumstances, either one of those conclusions could

22  apply.  It depends on the scale, the groundwater

23  velocity, the density of the monitoring well network.

24  Did they track what happened vertically, as many of

25  the plumes do go down.  There's a universal direction

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 152

1    of groundwater flow along the vertical in basins like
2    this that is downward.  That's also typical for the
3    monitoring well networks not to monitor very deep
4    below the water table.
5            So if those if's are satisfied, you know,
6    then it's possible to reach either one of those
7    conclusions, depending on the circumstances.
8            It's also -- I mean, what often happens,
9    also, is there's so many of those if's that are
10   not -- not addressed that, basically, one has to
11   conclude that you don't know where the mass is and
12   when and where it escaped.
13   BY MR. JON ANDERSON:
14           Q.    With respect to the 34 stations that
15   are part of this case, have you analyzed whether
16   off-site investigations that have occurred in the
17   last three or four years -- whether the results of
18   those investigations mean that the plume has migrated
19   off-site?
20           MS. O'REILLY:  Incomplete hypothetical.
21   Assumes facts.  Lacks foundation.
22           THE WITNESS:  I've seen evidence.  For
23   example, on Joe Niland's deposition, it appears to me
24   from that that, you know, he's looked at data and
25   done some site characterization that would be

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 197

1    Yes.

2    Q.    What are those opinions?

3    A.    Remediation difficulty can be related

4  to chemical behavior of the compound and also to size

5  of the plume.  The bigger the plume and the more

6  aquifers or layers, zones that the plume

7  contaminants, typically then the more expensive the

8  remediation or the more difficult the remediation.

9    Q.    What is the solubility of MTBE in

10  gasoline in the OCWD area?

11    MS. O'REILLY:  Vague.  Ambiguous.

12  Overbroad.

13    THE WITNESS:  I don't remember the

14  solubility in gasoline.  In water the solubility

15  limits 5 to 6 million parts per billion.

16  BY MR. JON ANDERSON:

17    Q.    We spoke this morning about your

18  estimate of the amount of water -- well, strike

19  that -- the amount of MTBE contamination that will

20  eventually have to come out of the OCWD subsurface

21  and through drinking water wells.  Do you recall

22  that?

23    A.    Yes.

24    Q.    And you gave a number, I think, of

25  about 90 percent will be pumped through existing

Graham E. Fogg, Ph.D.

Page 198

1    drinking water wells?

2         A.    I said 90 percent of the recharge

3    water that enters the groundwater system exits via

4    the wells.

5         Q.    Does that include 90 percent of the

6    contaminants as well?

7         A.    Well, to the extent --

8         MS. O'REILLY:  Vague.  Ambiguous.

9    Overbroad.  Misstates testimony.

10        Go ahead.

11        THE WITNESS:  To the extent that that system

12   contains contamination, then, yes, most of that

13   contamination will ultimately end up exiting by wells

14   unless it biodegrades, or something like that.

15   BY MR. JON ANDERSON:

16        Q.    On what did you base your estimation

17   or opinion about 90 percent of the water exiting

18   through drinking water wells?

19        A.    The Orange County Water District's

20   modeling assessment and its, you know, water budget

21   work on how water gets into and out of the system.

22   And usually this sort of thing is pretty easily

23   quantified -- quantifiable with a groundwater model.

24   And they have a good one with which to do that.

25        Q.    If that number holds for one year, is

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 214

1        MS. O'REILLY:  Objection.  Misstates
2   testimony.  Argumentative.
3        THE WITNESS:  No.  But if one goes with her
4   estimates of numbers of private wells as a percentage
5   of total wells -- private wells in California that
6   are impacted, you know, you get numbers that -- that
7   appear to be large and plausible.
8   BY MR. JON ANDERSON:
9        Q.    In that case I don't want you to
10  depend on anything that Pamela Williams said.  I want
11  you to tell me if you, Dr. Fogg, have made a
12  determination based on objective data about how many
13  private wells in Orange County have been impacted by
14  MTBE?
15       MS. O'REILLY:  Asked and answered.
16  Argumentative.
17       THE WITNESS:  No.  The data do not exist.
18  But it's possible that in the WRMS database, that we
19  have used to compile groundwater quality information,
20  it is possible that there's some private well data
21  there that -- that I have not specifically delved
22  into that for Orange County.
23  BY MR. JON ANDERSON:
24       Q.    Do you believe that the various
25  factors that determine the travel time of MTBE from a

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 215

1    source to the wellhead of a drinking water well in

2    Orange County collectively are distributed randomly

3    throughout the county wells or would you expect that

4    there would be very pronounced clusters at different

5    travel times?

6              MS. O'REILLY:  Vague.  Ambiguous.

7    Overbroad.  Incomplete hypothetical.  Exceeds the

8    scope of his opinions.

9              THE WITNESS:  Well, it's not totally -- the

10   travel times are not simply random.  There's a random

11   aspect to them or a highly variable aspect to them in

12   the groundwater system.  And there are -- there are

13   conditions in the system where one might expect

14   clusters of, you know, shorter travel times in some

15   areas than others.

16   BY MR. JON ANDERSON:

17             Q.    I agree one would expect shorter

18   travel times with respect to some compared to others.

19   Okay.  So my question is:  How did it come to pass

20   that two wells were impacted with above MCL

21   contamination of MTBE more than ten years ago and

22   none have been so impacted since then?

23             MS. O'REILLY:  Misstates facts.  Vague.

24   Ambiguous.  Overbroad.  Asked and answered.

25   Argumentative.

Graham E. Fogg, Ph.D.

Page 216

1    THE WITNESS:  So these are public supply

2  wells, right.  So public supply wells tend to be the

3  deeper wells, and they tend to be drilled in areas

4  where there is potable water.  And in many cases

5  water districts and water purveyors seek out parts of

6  a system where there's some protective conditions

7  from overlying confining beds to -- to slow down the

8  downward movement of contamination.

9    So in most systems that have deep public

10  supply wells, or relatively deep ones, you know, the

11  impacts that have occurred have been those -- in my

12  view a minority of cases -- where there are some

13  short-circuit flow paths between the surface and the

14  wells.

15    THE REPORTER:  Short --

16    THE WITNESS:  Short-circuit.

17    Or just, you know, naturally-occurring,

18  shorter, faster flow paths, like in Santa Monica and

19  Tahoe.

20    But in these same systems, there are long

21  flow paths.  We documented that in a single water

22  sample, the groundwater transit time from recharge to

23  the screen that supplied that sample within the same

24  glass of water, the transit times can vary from years

25  to centuries.  So even within, you know, the flow

Graham E. Fogg, Ph.D.

Page 217

1   paths to one well, you can get a mixture of travel

2   times.

3           And some wells are sufficiently protected by

4   aquitards that it may take 40, 50, or more years

5   before anything that's a contaminate at the surface

6   reaches the well.  So we see that all up and down

7   California for many different systems.

8           So the fact that, you know, two wells were

9   hit and you're seeing low level -- or lower level

10  concentrations in some of the production wells now,

11  that's not surprising, but it certainly doesn't --

12  doesn't tell you that, oh, well, we're in the clear

13  and nothing is going to come through in the future,

14  concentrations won't increase.

15  BY MR. JON ANDERSON:

16          Q.    If you're seeing low-level detections

17  in some of the production wells now, and if your

18  theory is correct that MTBE plumes are heading toward

19  production wells, wouldn't you expect over the course

20  of a year or two to see those low levels in those

21  production wells increasing?

22          MS. O'REILLY:  Objection.  Misstates

23  testimony.  Argumentative.

24          THE WITNESS:  I would expect it to commonly

25  or typically take more than a year or two.  It might

Golkow Technologies, Inc. - 1.877.370.DEPS

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 218

1    take ten years of monitoring.  And it's the kind of

2    thing where you need to monitor more frequently than

3    people typically monitor within a year, even.

4    BY MR. JON ANDERSON:

5          Q.    Why would it take one or two or ten

6    years of monitoring to see the concentration in a

7    production well begin to increase if those

8    concentrations are from plumes that started at

9    gasoline stations?

10          A.    Because the --

11          MS. O'REILLY:  Hold on.

12          Argumentative.  Asked and answered multiple

13    times.  Misstates testimony.  Vague.  Ambiguous.

14    Overbroad.

15          Go ahead.

16          THE WITNESS:  Because if you take a plume

17    and imagine the plume is made up of a million

18    particles, some of those particles are traveling, you

19    know, a hundred, a thousand, ten thousand times

20    faster than other particles.  So the travel times of

21    the materials or the particles in that plume range

22    over orders of magnitude.

23          So you can translate those orders of

24    magnitude in terms of year.  You can think in terms

25    of a fraction of a year, a year, ten years, multiple

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

1    tens of years.

2           So, you know, in the leading edge of the

3    plume, you could have a curly, really small

4    concentration breakthrough at that time.  Other clean

5    water can be coming in the well that also dilutes

6    that concentration.

7           As time goes on -- and it may take a decade,

8    two decades, three decades.  We see those with other

9    contaminants we have monitored over a long time

10   period, more and more of the contaminant can come in

11   and the concentration can gradually rise, or it can

12   stay flat for a long time until another part of the

13   plume comes through or some other plume.

14          So it's not -- it's not -- you know, it's

15   just -- that's how --

16   BY MR. JON ANDERSON:

17          Q.    So --

18          A.    -- you know, transport and

19   groundwater systems operate.  There's a lot of

20   variability in them.

21          Q.    So your plumes with these racing

22   molecules that get way out ahead of the rest of them

23   are really shaped more like swordfish than they are

24   oblong plumes, aren't they?

25          MS. O'REILLY:  Vague.  Ambiguous.

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 220

1    BY MR. JON ANDERSON:

2        Q.    They are long, long, very skinny

3    leading edge to them, that's more like a needle, of

4    low concentration MTBE that persists in wells for

5    two, three, four years at a relatively constant level

6    before we see the meatier part of the plume --

7    m-e-a-t-i-e-r -- part of the plume arrive, right?

8        MS. O'REILLY:   Objection.   Misstates

9    testimony.   Argumentative.   Vague.   Ambiguous.

10   Overbroad.

11       THE WITNESS:   Well, no.   You can -- if -- if

12   there's no pumping going on in the groundwater basin,

13   you can get sliver plumes that are very skinny and

14   the leading edge is, you know, way out ahead of the

15   rest of the plume.   And, you know, that plume could

16   go right past a well and never hit the well,

17   especially if the well is not pumping.

18       But in basins like this, you have wells

19   pumping.   So when well pumps are turning on and off,

20   the plumes don't stay as these skinny little

21   features.   They get pulled hither and yon from place

22   to place in the basin.   So, you know, kind of like

23   the Tahoe simulations of plumes, where wells are

24   pumping, turning on and off, and mass moves around.

25       So that's the kind of thing that I would

Golkow Technologies, Inc. - 1.877.370.DEPS

66e2c95b-b165-4dc1-883f-7efad2e2de42

Graham E. Fogg, Ph.D.

Page 221

1    expect here.  And there can be multiple plumes within

2    what we regard as -- as, you know, one -- one big

3    plume.

4              You mention that you would expect the

5    concentrations to be, you know, constant.  And that

6    most definitely is -- is something we do not see.

7    And from research we have done, we don't expect it

8    either.  We expect lots of variability in

9    concentration with time.

10             So if you're monitoring a well, you know,

11   once every three months or once a year or twice a

12   year, the variability that we expect in time

13   concentration is enough that it makes me worry that

14   whether we even know what that monitoring data mean.

15   BY MR. JON ANDERSON:

16             Q.     I said nothing --

17             A.     And I presented data in my report

18   that illustrate that as well.

19             Q.     I said nothing about me expecting the

20   concentrations to be constant.  I was observing that

21   they have been in these wells, and you have not seen

22   increasing amounts of MTBE in the very, very small

23   number of drinking water wells in Orange County that

24   have MTBE, but, rather, you've seen concentrations in

25   the two digit parts per trillion range for a number

# Exhibit 2

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re: Methyl Tertiary Butyl Ether ("MTBE")**
**Products Liability Litigation**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

---

**This Document Relates To:**

*Orange County Water District v. Unocal Corp., et al.,*
*No. 04 Civ. 4968*

---

**EXPERT REBUTTAL REPORT OF GRAHAM FOGG, Ph.D.**

_____
Signature

December, 15 2011
_____
Date

---

## Table of Contents

1. INTRODUCTION .................................................................................................................. 3

2. DEFENSE EXPERTS DOWNPLAY THE MTBE RISK TO GROUNDWATER ..................... 3

2.1 MTBE CONCENTRATIONS IN MONITORING WELLS ARE ABOVE MCL AT A MAJORITY OF SITES ..................... 3
2.2 DETECTIONS IN GROUNDWATER DO NOT ACCOUNT FOR ALL CONTAMINATION FROM UNKNOWN AND/OR
UNREPORTED RELEASES .................................................................................................................... 5
2.3 DR. WILSON DOWNPLAYS THE IMPACT OF GASOLINE RELEASES ................................................ 8

3.0 BIODEGRADATION ......................................................................................................... 10

3.1 CONTRADICTORY CLAIMS REGARDING BIODEGRADATION ......................................................... 10
3.2 AEROBIC/ANAEROBIC BIODEGRADATION OF MTBE ............................................................... 12
3.3 DEFENSE EXPERTS IGNORED AVAILABLE STUDIES ON MTBE "DEGRADATION" IN ORANGE COUNTY ........ 14
3.4 MTBE VERSUS BENZENE .......................................................................................................... 16

4. THE PUBLIC WATER SUPPLY WELLS IN THE OCWD GROUNDWATER BASIN ARE
VULNERABLE TO SHALLOW MTBE CONTAMINATION ....................................................... 16

4.1 DEFENSE EXPERTS DOWNPLAY VULNERABILITY OF DRINKING WATER WELLS THROUGH OMISSIONS ....... 18
4.1.2 DEFENSE EXPERST HAVE IGNORED THE FOREBAY, HIGHLY VULNERABLE TO MTBE AND TBA
CONTAMINATION ............................................................................................................................. 22
4.1.3 NUMEROUS WELLS IN THE FOREBAY HAVE ALREADY BEEN IMPACTED BY MTBE AND TBA ..................... 24
4.2 MR. CONNOR AND DR. WILSON HAVE MISCHARACTERIZED THE VULNERABILITY OF THE PRESSURE AREA
.................................................................................................................................................. 25
4.3 GROUNDWATER FLOW EXITS THE BASIN THROUGH PRODUCTION WELLS ................................... 30

5. THE ROLE OF TIME ............................................................................................................ 32

5.1 VOCS RELEASED IN DECADES PAST HAVE MIGRATED TO DEEPER AQUIFERS ............................... 33

6. MR. CONNOR PRESENTS AN INCOMPLETE AND MISLEADING ASSESSMENT OF THE
"EXCEPTIONAL MTBE PLUMES" .......................................................................................... 40

7. OTHER CONTRADICTORY STATEMENTS BY DEFENSE EXPERTS ................................ 45

8. DR. WILSON'S POST AUDIT OF MY SOUTH LAKE TAHOE GROUNDWATER MODEL .............. 47

9. REFERENCES ..................................................................................................................... 59

APPENDIX A: GEOTRACKER GAMA RESULTS FOR MTBE IN GROUNDWATER MONITORING
WELLS IN ORANGE COUNTY DURING THE LAST YEAR .................................................... 64

APPENDIX B: SELECTED CONE PENETROMETER SAMPLING RESULTS ......................... 65

APPENDIX C: MERCED REBUTTAL REPORT ..................................................................... 81

# 1. Introduction

Defense experts' (Dr. Wilson, Mr. Connor, and Mr. Sloan) reports and rebuttals to my expert opinion report in this case are based primarily on speculation and presumptions. Dr. Wilson and Mr. Connor wrongly assert that the public supply wells in the pressure area are protected from contamination because of the presence of aquitards. However, as I show below, existing data and multiple studies by the USGS point to the vulnerability of drinking water in the deep aquifers in the pressure area despite the apparent "protection" provided by the aquitards. Additionally, Dr. Wilson, Mr. Connor and Mr. Sloan downplay the threat that MTBE has posed, and continues to pose to groundwater resources and drinking water supplies in Orange County, and elsewhere. Their assessment of the fate and transport of MTBE, in fact, runs contrary to statements endorsed by the oil industry, and ones they made in past publications. In the following I address some of the main points. To avoid repetition (where the same or similar arguments were repeated), I have also included my response to defense experts in the Merced case as Appendix C.

# 2. Defense Experts downplay the MTBE risk to groundwater

### 2.1 MTBE concentrations in monitoring wells are above MCL at a majority of sites

Dr. Wilson is wrong to claim: "MTBE above the MCL has been detected in surficial aquifer groundwater monitoring wells at **some** gasoline release sites" (Wilson, 2011, p.27; emphasis added). Dr. Wilson does not present any statistics to support this claim.  In reality, the study by Happel et al., (1998) reported that while 78% of LUFT sites studied had "detectable levels of MTBE", "74% had maximum concentrations above 5 µg/L" and 70% had concentrations above 20 µg/L. In other words, and contrary to Dr. Wilson's assertion above, of the sites with MTBE detections, about 94% of sites had MTBE concentrations above 5 µg/L (the secondary MCL), and approximately 90% of sites had MTBE concentrations above 20 µg/L[1]. Dr. Wilson also disregarded the data I presented in my previous report (Fogg, 2011). Figure 8.6 (p. 104) showed that based on data from Geotracker GAMA database, more than 42,000 monitoring wells in California had MTBE detections exceeding the secondary MCL (5 µg/L), and more than 30,000 monitoring wells had TBA detections exceeding the MCL of 12 µg/L.  In Orange County, MTBE has been detected at concentrations above the MCL of 5 ppb in more than 5,000 monitoring wells as discussed (Figure 1; Geotracker Gama, 2011; Fogg, 2011).

---

[1] 20 µg/L was the "recommended" lower limit for MTBE based on the "US EPA Drinking Water Advisory" (Happel et al., 1998.)



10,175 MATCHING WELLS FOR MTBE (51.92% > COMPARISON CONCENTRATION OF 5 PPB)

Figure 1. Results from querying the California State Geotracker Gama database show that there are at least 10,000 monitoring wells, mostly shallow, in Orange County and that MTBE has been detected at concentrations greater than the secondary MCL (5 ppb) in approximately 5,200 of those wells.
http://geotracker.waterboards.ca.gov/gama/gamamap/public/?CMD=runreport&myaddress=orange+county accessed Dember, 2011.

As I noted in my expert report, concentrations in monitoring wells are declining as MTBE migrates off-site and remediation efforts reduce concentrations proximal to release sites. Recall that MTBE use in gasoline was discontinued in 2004. Clearly the extensive shallow MTBE contamination is now making its way horizontally, and vertically through long screen wells, poorly constructed wells, abandoned wells, etc., and natural pathways (SWRC, 2011). Eventually, nearly all of the potable groundwater water in the OCWD will exit wells. See discussion in Section 4.3 in this report.

The foregoing has been completely ignored by all of the defense experts in their responses to my expert report.  In fact, defense experts make contradictory statements and have misinterpreted the data.  For example, Mr. Connor states that:

> "Additionally, most recent sampling of groundwater monitoring wells installed at UST sites in the Orange County Basin indicates that less than 12% of the wells historically tested for MTBE currently exceed the MCl, suggesting that: i) MTBE is not as prevalent in the semi-perched zone as reported by Dr. Fogg, and ii) MTBE impacts are decreasing over time as a result of natural attenuation and remediation activities at the UST sites."

On the contrary, in the last year MTBE has been detected  in 23% of monitoring wells tested (Geotracker Gama, 2011; Appendix A).  Furthermore, Mr. Connor's speculation that the decline in detections above the MCL is attributed to natural attenuation is logically flawed given that he cannot quantify for the effects of remediation and off-site migration, two processes that we know are ongoing and most likely explain the decline.  Mr. Connor commits the same logical flaw when he claims that:

> "With regard to groundwater within the semi-perched zone, MTBE has been shown to diminish in groundwater, and, as discussed in the prior sections, MTBE plumes at the 8 subject properties are stable or diminishing."

However, plumes are migrating off-site: High MTBE concentrations (more than 100 ppb) have been detected in deeper groundwater through sampling using a cone penetrometer in the Pressure Area at focus sites (Appendix B).

## 2.2 Detections in groundwater do not account for all contamination from unknown and/or unreported releases

It is important to remember that data discussed above accounts only for known and monitored releases. As I discussed in my previous report (Fogg, 2011, p.107), studies show that many releases have gone unreported or undocumented. To further elaborate, consider the results of a study conducted jointly by the USEPA and the New York State Department of Environmental Conservation (NYSDEC) (NYSDEC, 2008):

A pilot study funded by the USEPA was conducted by the NYSDEC to investigate the extent of MTBE contamination in groundwater at sites with "previously unidentified and/or unreported MTBE blended gasoline releases throughout the Long Island aquifer system", and specifically Nassau and Suffolk counties where the groundwater aquifers are the sole source of drinking water in those counties. The study involved installation of groundwater monitoring wells at active gasoline retail stations that had **no identified or reported MTBE blended gasoline**

# Exhibit 3

# EXHIBIT 3

Graham E. Fogg, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
 2

 3                      - - -

 4
      IN RE:  METHYL TERTIARY BUTYL:   Case No. 8:03-cv-
 5    ETHER ("MTBE")             :   01742-CJC (ANx)
                                 :
 6    This Document Relates to:  :
                                 :
 7    ORANGE COUNTY WATER DISTRICT :
      v. UNOCAL CORPORATION, et   :
 8    al.,                       :
      Case No. 04CIV.4968 (SAS)   :

 9

10                      - - -

11                     VOLUME I
              Thursday, August 30, 2018

12

                        - - -

13

14         Videotaped deposition of GRAHAM E. FOGG,

15    Ph.D., held at SHEPPARD MULLIN RICHTER & HAMPTON,

16    L.L.P., 333 S. Hope Street, 43rd Floor, Los Angeles,

17    California, commencing at approximately 9:02 a.m.,

18    before Rosemary Locklear, a Registered Professional

19    Reporter, Certified Realtime Reporter and California CSR

20    (#13969).

21

22                      - - -

23

24              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 971.591.5672 Fax
25                  deps@golkow.com
```

Graham E. Fogg, Ph.D.

1    equipment at sites.

2    Q.      Okay.  All right.

3    A.      I've, you know, monitored groundwater.  My

4    research concerns contaminant transport in groundwater,

5    in general.  So my research is constantly looking at

6    contaminant plumes, not specifically MTBE, but it could

7    be anything, and their behavior in the environment and

8    what the nature of the subsurface environment is.

9            And to do that, we drill wells, we collect data

10   and we monitor, which is -- you know, that overlaps

11   quite a bit with the activities of investigation of

12   leaking fuel tank sites.

13   Q.      Any wells that you drill and any data that you

14   collect is not part of the investigation and remediation

15   activities at individual UST groundwater sites -- or UST

16   release sites that's being overseen by the California

17   regulatory agencies; correct?

18           MS. O'REILLY:  Vague and ambiguous.  Overbroad.

19           THE WITNESS:  If you're asking if I've drilled

20   any wells or done any specific characterizations on

21   California LUFT release sites, the answer is no.  But

22   I've evaluated multitudes of site investigations and

23   data from those.

24           MR. HEARTNEY:  Okay.

25

Graham E. Fogg, Ph.D.

```
 1   bibliographic work by my team.

 2           But it was mainly -- it's pretty simple stuff,

 3   really, and it's mainly evaluating the reliability and

 4   the efficacy of the policy and the conclusions and the

 5   assumptions upon which they were based.

 6   Q.      And your focus was very much on the scientific

 7   basis for the policy?  Is that fair?

 8   A.      The scientific and you could say practical basis

 9   for it.

10   Q.      Okay.  And you attempted to be comprehensive in

11   what you looked at?

12   A.      Yes.

13   Q.      Now, for the next series of questions I'm going

14   to be asking I want to be sure that you understand that

15   this upcoming trial that we're going to have is going to

16   address 27 defendant stations, which are sometimes

17   referred to as focus plume stations, and all of them are

18   ones in which there was a UST case opened by one of the

19   regulatory agencies.

20           Do you understand?

21   A.      Yes.

22   Q.      Okay.  So when you prepared your August 2018

23   rebuttal report, did you review any documents, data, or

24   information about how the low-threat closure policy has

25   been applied or utilized at any of the focus plume
```

Graham E. Fogg, Ph.D.

1    stations?

2    A.      No.   I have looked at some of the data that the

3    other plaintiff experts have put together on plumes out

4    in the system from the standpoint of understanding the

5    state of the MTBE problem.

6    Q.     Apart from looking at what other experts had

7    written about the focus plume stations, did you do any

8    work of your own to review documents, data, or

9    information, apart from the expert reports of the other

10   experts, of course, about how the low-threat closure

11   policy was actually applied at the focus plume stations?

12   A.      Not specifically looking at how the low-threat

13   closure was applied, but more looking at there's -- you

14   know, there's some large plumes in the basin that are

15   important to me because, you know, they tell me

16   something about what has happened since 2011 and since

17   before that to MTBE and the environment.

18          But in terms of, you know, looking at

19   site-specific activities and how that relates to the

20   low-threat closure policy, no, I have not done work like

21   that.

22   Q.     You didn't look at any data or information

23   specifically with the purpose of determining whether the

24   low-threat policy had been correctly applied or utilized

25   or not at any of the focus plume stations.  Is that

Graham E. Fogg, Ph.D.

1   fair?

2          MS. O'REILLY:  Vague and ambiguous.

3          THE WITNESS:  I didn't seek to do that.  You

4   know, I've seen a plume that, it's my understanding that

5   the -- there was an effort to close the site with the

6   low-threat closure policy, but the District collected

7   data on this plume showing that it was pretty big, and

8   it's my understanding the District objected --

9          MR. HEARTNEY:  Okay.

10          THE WITNESS:  -- to that low-threat closure

11   policy application.

12          But I -- that's not my purview in this case,

13   but, you know, that kind of information is useful to me

14   from the perspective of what it says about the behavior

15   of MTBE in the environment unfettered.  You know, once

16   the MTBE gets beyond the monitoring well networks, which

17   it commonly does, what happens.

18   BY MR. HEARTNEY:

19   Q.     And did you look at the evaluation that the

20   State Water Board made of the analysis of the alleged

21   plume that -- as to whether, in fact, the Aquilogic

22   conclusions about that plume were correct?

23   A.     I'm not --

24          MS. O'REILLY:  Argumentative.  Vague and

25   ambiguous.

Graham E. Fogg, Ph.D.

```
 1            THE WITNESS:  I don't know what plume you're

 2    referring to.

 3            MR. HEARTNEY:  The Mobil 18-HDR plume that I

 4    believe was the one you were describing because you said

 5    there was an application for closure.

 6            THE WITNESS:  Yeah.  Yeah.  I've looked at some

 7    of the information on that.

 8    BY MR. HEARTNEY:

 9    Q.      But I'm asking whether you looked at the

10    evaluation that the State Water Board made as to whether

11    the Aquilogic conclusions about that plume attributing

12    it to the Mobil station were correct or incorrect.

13            MS. O'REILLY:  Argumentative.

14            THE WITNESS:  I've only looked at that plume

15    from the standpoint of whether it's hydrologically

16    plausible that it traveled in the pathways that someone

17    suggested that it did.

18            And in terms of the -- I have those State Board

19    evaluations and I'd be happy to look at them and offer

20    an opinion, but I -- it might be something best done

21    tomorrow.

22            MR. HEARTNEY:  Okay.

23    BY MR. HEARTNEY:

24    Q.      I'm not asking you to offer opinions on anything

25    that you haven't looked at up to now.
```

Exhibit 4

EXHIBIT 4

Graham E. Fogg, Ph.D.

1                     UNITED STATES DISTRICT COURT

                     CENTRAL DISTRICT OF CALIFORNIA

2

3                              - - -

4

      IN RE:  METHYL TERTIARY BUTYL:   Case No. 8:03-cv-

5     ETHER ("MTBE")                :   01742-CJC (ANx)

                                     :

6     This Document Relates to:     :

                                     :

7     ORANGE COUNTY WATER DISTRICT  :

      v. UNOCAL CORPORATION, et     :

8     al.,                          :

      Case No. 04CIV.4968 (SAS)     :

9

10                             - - -

11                           VOLUME II

                     Friday, August 31, 2018

12

                               - - -

13

14           Continued videotaped deposition of GRAHAM E.

15    FOGG, Ph.D., held at SHEPPARD MULLIN RICHTER & HAMPTON,

16    L.L.P., 333 S. Hope Street, 43rd Floor, Los Angeles,

17    California, commencing at approximately 9:01 a.m.,

18    before Rosemary Locklear, a Registered Professional

19    Reporter, Certified Realtime Reporter and California CSR

20    (#13969).

21

22                             - - -

23

24              GOLKOW LITIGATION SERVICES

             877.370.3377 ph | 971.591.5672 Fax

25                    deps@golkow.com

Graham E. Fogg, Ph.D.

```
 1    estimated about two weeks.

 2    Q.      And when you say "two weeks," how much time per

 3    day does that account for?

 4    A.      Well, that's like eight-hour days.

 5    Q.      And is that five days a week or seven days a

 6    week?

 7    A.      Seven.

 8    Q.      Okay.  So that would be about 112 hours?

 9    A.      Something like that.

10    Q.      And have you gotten invoices from Dr. LaBolle or

11    Dr. Eweis on the rebuttal report work?

12    A.      Not yet.

13    Q.      Now, you indicated that you spent three days

14    prepping for the deposition; is that right?

15    A.      Yes.

16    Q.      What did you do?

17    A.      Re-read materials.  Everything I could have the

18    time to read.  Re-read reference materials.  The --

19    there's a long list of files in my production.

20    Studying.

21    Q.      Did you talk with anyone?

22    A.      I talked with my colleagues, Dr. LaBolle and

23    Dr. Eweis.

24    Q.      What did you discuss with them?

25    A.      Oh, the rebuttal, the underlying materials, the
```

Graham E. Fogg, Ph.D.

```
 1   existence of plumes out in the basin, MTBE plume

 2   behavior.  Same kinds of things that are in the rebuttal

 3   report.

 4   Q.      Okay.  You mentioned yesterday -- well, strike

 5   that.

 6           Have you looked at any of the MTBE plumes that

 7   are at issue in this case specifically?

 8   A.      Yes, I've -- as I mentioned yesterday, I've

 9   taken a look at the Mobil 18-HDR plume.

10   Q.      Any other ones?

11   A.      No.

12           I've looked at data.  I have -- you know,

13   there's a number of data files that -- there's data on

14   MTBE and TBA monitoring data from the basin.  I've

15   browsed through that.

16   Q.      And --

17   A.      And I've looked at --

18   Q.      I'm sorry.

19   A.      On the Mobil 18, I've looked at the -- since I'm

20   a hydrogeologist and I work on the geology and the

21   hydrology, I've looked at the geologic and the

22   hydrologic plausibility of the posited plume behavior at

23   Mobil 18.

24   Q.      And did you draw any conclusions?

25   A.      Yes.
```

Graham E. Fogg, Ph.D.

1    Q.        And what were they?

2    A.        That the interpretation that the plume moves

3    south of the station, mostly in the shallow aquifer, and

4    then near the southern terminus of the plume, as it's

5    characterized, where it coincided with the mergent zone,

6    which is a zone of better geologic connection

7    vertically, that the plume moved down into the deeper

8    aquifer in which the flow direction is the opposite

9    direction, more or less, south to north, and then moved

10   north almost the same amount of distance and potentially

11   contaminated some wells up in that area.

12            But that -- but my opinion is, in looking at the

13   geology and in looking at the groundwater flow in the

14   shallow and the deep aquifer, my opinion is that that's

15   a plausible argument.

16   Q.        Can you say it's --

17   A.        And the groundwater velocity is -- I've done

18   some back-of-the-envelope calculations on what

19   groundwater velocities it would take to do that, and it

20   appears that the groundwater velocities that would make

21   that possible are not unreasonable.

22   Q.        Can you say it's more likely than not?

23   A.        I haven't looked at it in sufficient detail to

24   say that.  But I would just say that, based on what I

25   know of the geology and the hydrology and

Graham E. Fogg, Ph.D.

1    three-dimensional aquifer behavior, that the -- that

2    scenario is quite reasonable, quite plausible.

3            I think to some people it looks crazy, but

4    it's -- if you've seen what I've seen in hydrogeologic

5    systems and in geologic systems, it's not crazy at all.

6    Q.    Do you plan on expressing an opinion about the

7    plausibility of that at trial?

8    A.    If called upon to, I will.  I think since I --

9    because of my expertise in geology and hydrology, I

10   suppose I might be called upon to provide more opinion

11   on that.

12           MR. HEARTNEY:  Since that opinion was not

13   disclosed in any of the expert reports, we will move to

14   strike that.

15           THE WITNESS:  I think yesterday I was asked if I

16   had any more opinions.

17           MR. CONDRON:  Right.

18   BY MR. CONDRON:

19   Q.    Have you spoken with any of the other experts

20   for Orange County Water District about anything?

21   A.    Regarding this case?

22   Q.    Correct.

23   A.    No.

24   Q.    Have you spoken at all with Mr. Robert Stollar?

25   A.    No.

Graham E. Fogg, Ph.D.

1    other MTBE plumes, as that's not part of my scope in

2    this case.  It's not a main part of my scope.

3    Q.    Okay.  Well, to the extent it's part of your

4    scope, have you taken any look at those plumes?

5    A.    The other MTBE plumes in the basin?

6    Q.    Correct.

7    A.    Well, I did in my prior -- the work prior to

8    2012, and I've got some writing in the -- my 2011 report

9    on other plumes in the basin.  And some of these papers

10   on MTBE plume behavior and the survey papers and EPA

11   papers on MTBE and TBA were done on some sites that --

12   some of which are in Orange County.

13         So I've looked at a lot of the data on that for

14   general purposes, but not -- unless -- except for the

15   part that I did prior to 2012, not in specific reference

16   to this case so --

17   Q.    With regard to the USGS -- excuse me -- EPA, not

18   USGS -- EPA papers on MTBE and TBA for which some of the

19   work was done in Orange County, do you know whether any

20   of the stations that might have been analyzed as part of

21   that work are part of this case?

22   A.    I think so, but that's something that would have

23   been covered in my previous report.  I recall perhaps

24   some sites in this basin that are mentioned in that

25   context, but I have -- I'd have to double-check.

Graham E. Fogg, Ph.D.

1    Q.      What I really am trying to determine here, my

2    client has three stations at issue in this case.

3    A.      Uh-huh.

4    Q.      I'm trying to determine whether or not you have

5    been asked to provide opinions or whether you have

6    opinions regarding those stations.

7    A.      I have not been asked to provide specific

8    opinions on those stations.

9    Q.      And when you say "specific opinions on those

10   stations," that includes the adequacy of the monitoring

11   network?

12   A.      Yes.

13   Q.      Okay.  And the adequacy of remediation.

14   A.      Yes.

15   Q.      Okay.  And whether or not those stations present

16   a threat to drinking water in Orange County.

17           MS. O'REILLY:  Vague and ambiguous.

18           THE WITNESS:  Well, part of my -- well, that --

19   that's a little bit more of a gray area, because part of

20   my scope concerns the behavior of MTBE and its ability

21   to move beyond monitoring well networks.

22           So, I mean, many of my opinions bear in general

23   on this problem of what do you do about the mass that's

24   gone beyond the monitoring well networks, even

25   monitoring well networks that seem -- that for things

Graham E. Fogg, Ph.D.

1    like BTEX seem perfectly fine.

2    BY MR. CONDRON:

3    Q.      But with respect to specific stations, you

4    haven't looked at whether or not that's the case; is

5    that right?

6    A.      Correct.

7    Q.      Now, yesterday you mentioned a National Research

8    Council report regarding remediation.

9            Do you recall that?

10   A.      Yes.  2013.

11   Q.      Correct.

12           And the title of that was something along the

13   lines of alternatives for managing the nation's complex

14   contaminated groundwater sites?

15   A.      Yes.

16   Q.      Words to that effect.

17           Did you participate in that effort at all?

18   A.      No.

19   Q.      Do you know how that site was compiled -- or,

20   I'm sorry -- that publication was compiled, who worked

21   on it?

22   A.      Yeah.  The lead author was Michael Kavanaugh and

23   it was -- it's a -- it was an NRC committee.  So those

24   committees, as I understand it, are appointed by the

25   National Academy of Sciences, Water Science and

Graham E. Fogg, Ph.D.

1   around in the groundwater.

2   Q.      Did it mention anything about MTBE in Orange

3   County, the book?

4   A.      I don't recall if it did.

5   Q.      Do you recall that it also mentioned that it

6   appeared that the contaminants in Orange County had not

7   gone into the deeper aquifer?

8   A.      I -- yeah, it may have said that.  At that time,

9   that may have been true.

10  Q.      Okay.  Is that not true today?

11  A.      Well, I think there's evidence to suggest it's

12  happened at -- related to the Mobil 18 site.  And it's

13  only a matter of time, since the deep aquifer is being

14  pumped and it's kind of dependent on where and how much

15  is being pumped, it's only a matter of time before

16  contamination moves down there.

17          The deep aquifer gets sustained by the overlying

18  aquifers.  So we see this everywhere on long time

19  frames, eventually contaminants will get down there.

20  All the water in this basin exits by wells, or about 95,

21  97 percent of the water exits by wells.

22  Q.      And what's your basis for saying that?

23  A.      The Orange County groundwater management model,

24  which is -- it's a well-calibrated groundwater model

25  that simulates the groundwater flow and the groundwater

Graham E. Fogg, Ph.D.

1    budget for the basin.

2    Q.    Have you done anything independently to

3    determine whether it's the case that 95 percent or

4    approximately 95 percent of the water in the ground in

5    Orange County comes out of a well?

6    A.    I and my team have -- in connection with other

7    cases, have reviewed the Orange County groundwater model

8    and concluded that it's a very good and reliable flow

9    model for the basin, for the regional scale and for the

10   water budget.

11          And they -- Orange County Water District is, you

12   know, a poster child in California for a district that's

13   well run, with good data and quality scientific analysis

14   of its groundwater system, and then applying that

15   analysis to better management of the system.  It's one

16   of the few really well-managed groundwater basins in the

17   United States.

18   Q.    How many supply wells in Orange County have had

19   detections of MTBE above a part per billion?  Do you

20   know?

21   A.    I don't know.  I have something that I think has

22   been produced by others, data on the -- on well

23   detections.

24   Q.    And do you know --

25   A.    But it's -- you know, I've perused a spreadsheet

Exhibit 5

EXHIBIT 5





**State Water Resources Control Board**

February 4, 2016

David Bolin, Principal Hydrogeologist
Orange County Water District
PO Box 8300
Fountain Valley, CA 92728-8300

Subject: Fund Recommendation regarding Case Closure of Mobil #18-HDR:
Claim 5462 for Site Address: 3195 Harbor Boulevard, Cost Mesa

Mr. Bolin:

The responsible party requested case closure in 2012. State Water Board staff prepared a UST Case Closure Review Summary Report dated November 6, 2013, recommending case closure. During the public comment period, Orange County Water District submitted comments in a letter dated January 14, 2014. The letter included a soil and groundwater investigation report prepared by Aquilogic, Inc.

The investigation included the installation monitoring of monitoring wells in the vicinity of Harbor Boulevard. MTBE was detected in groundwater which underlies and is downgradient from a number of petroleum release sites. The deeper groundwater which supplies public supply wells appears to flow in the opposite direction from shallow groundwater.

State Water Board staff reviews of the data shows a complex groundwater flow regime, MTBE in groundwater which may be from a number of petroleum release sites, and possibly a regional plume. The data collected do not support identification of the contributors to local releases or a regional plume.

The Mobil HDR case could be closed like the other closed cases that are potential contributing sources and then reopened in the event it was determined to be a contributor to offsite occurrence of MTBE. However, case closure is no longer recommended at this time. It is recommended that the responsible party work with regulatory agencies and other responsible parties whose sites overlie the impacted groundwater to determine whether they have contributed to groundwater contamination that may or may not be a continuous plume, and that the regulatory agencies, the responsible parties, and Orange County Water District develop a site conceptual model that supports collection of data related to shallow and deep groundwater flow directions to determine the groundwater capture by public water supply wells, and subsequently investigate all the potential sources which are likely to have contributed MTBE that may affect public water supply wells, and develop and implement a corrective action workplan if corrective action is feasible.

Mobil #18-HDR, Costa Mesa
Claim 5462                                    - 2 -                              February 2016

In the event the Mobil HDR site is determined not be a contributor of MTBE or if Mobil HDR is
determined to be a contributor and feasible corrective action renders the Mobil HDR site to not
be a significant impact to human health or the environment, then closure of the Mobil HDR case
is recommended.

This response to comments and a revised UST Case Closure Review Summary Report will be
posted in the usual manner.

*Lisa Babcock*

Lisa Babcock, P.G., C.E.G.
UST Cleanup Fund Manager

Cc:  Ken Williams, Santa Ana Regional Water Quality Control Board
      Geniece Higgins, Orange County Health Care Agency

Exhibit 6

EXHIBIT 6



aquilogic, Inc.

*environment • water • strategy*

245 Fischer Avenue, Suite D-2
Costa Mesa, CA 92626
Tel. +1.714.770.8040
Web: www.aquilogic.com

# CURRENT CONDITIONS REPORT
## MOBIL STATION #18-HDR
### 3195 Harbor Boulevard,
### Costa Mesa, California

Prepared for:
Orange County Water District
18700 Ward Street
Fountain Valley, California 92780-6930

Project No.: 002-02

July 2013

OCWD-MTBE-001-467851



## EXECUTIVE SUMMARY

This Current Conditions Report has been prepared for gasoline service station Mobil #18-HDR (the Site) located at 3195 Harbor Boulevard in the City of Costa Mesa, California, on the southwestern corner of the intersection of Harbor Boulevard and Gisler Avenue (Figure 1). The primary chemicals of concern at Mobil #18-HDR are the fuel oxygenates methyl tert-butyl ether (MTBE) and tert-butyl alcohol (TBA). Both chemicals are significant groundwater contaminants because of their mobility in the environment, recalcitrant nature, and potential toxicity.

The Site has undergone multiple phases of investigation and remedial actions over the last 25 years (1987 to 2012) to characterize and address the contamination present both on-site and off-site. However, while there is limited on-site contamination remaining, significant off-site groundwater contamination exists. The lateral and vertical extent of off-site groundwater contamination has not been delineated. The dissolved phase MTBE plume extends more than 5,300 feet to the south and to a depth of 120 feet below ground surface (bgs). Documented remedial measures from 1988 to date have included underground storage tank (UST) removal, piping and fuel dispenser replacements, upgrades and removal, soil excavation, light non-aqueous phase liquid (LNAPL) recovery, groundwater extraction (GWE), soil vapor extraction (SVE), and dual phase extraction (DPE).

OCWD-MTBE-001-467859



since 2000 for MCWD-11 and MCWD-6 are approximately 25 AF/year and 293 AF/year, respectively.

The groundwater quality of the major drinking water aquifers of the OCGB, generally meets all drinking water standards. However, in a few areas of the OCGB, mitigation actions have been implemented to address water quality degradation. Elevated nitrate and total dissolved solids (TDS) levels have warranted the construction of treatment systems to provide potable water to some cities within the OCGB. In, addition, volatile organic compounds (VOCs) have impacted a few wells and a regional groundwater containment system is being planned (OCWD, 2007). Other investigations of the industrial contamination in the Shallow Aquifer System are ongoing to evaluate the potential for the contamination to migrate to deeper drinking water aquifers (OCWD, 2007).

Methyl tert-butyl ether (MTBE) and other fuel oxygenates have been detected in regional production wells in the vicinity of the Site. The concentrations of MTBE detected in the production wells are summarized below and are also presented in Table 1:

- MCWD-7 (0.05 micrograms per liter [µg/L], 8/5/2005);
- MCWD-8 ( 0.5 µg/L, 7/28/2011); and
- MCWD-9 (0.16 µg/L, 8/26/2010).

Regional monitoring wells are also present in the vicinity of the Site. These wells were installed and are monitored by the OCWD, and the Mesa Consolidated Water District (MCWD). The nearest regional wells are shown on Figure 1 and the analytical data are presented in Table 1. MTBE has been detected in the following regional monitoring wells:

- HMEM-COS/1 (0.6 µg/L, 3/15/2007); and
- OCWD-M43 (2.6 µg/L, 3/17/2010).

There are several wells in the vicinity of the Site for which little information is available. The following wells are of unknown type and/or status, and are down-gradient of the Site (Figure 1):

- W-4083;
- W-4079; and
- W-4094.

These wells may have been used as production or monitoring wells, and it is unknown how they were constructed (with or without a seal) and if, or how, they were abandoned. These wells could potentially act as conduits allowing contaminants from shallower aquifers to migrate vertically into underlying aquifers.

OCWD-MTBE-001-467867



and southeast corners of the Site near wells RMC-1A and RMC-3, which contained relatively low concentrations of MTBE.  Concentrations of TPHg and BTEX constituents were detected in the soil samples from CB-02 (ETIC, 2009c) installed near the eastern pump islands facing Harbor Boulevard.  TPHg concentrations ranged from 0.82 mg/kg (CB-02, 20 feet bgs) to 14,000 mg/kg (CB-02, 10 feet bgs).  Toluene was detected at a concentration of 100 mg/kg (CB-02, 10 feet bgs).  Ethylbenzene was detected in four soil samples at concentrations ranging from 0.012 mg/kg (CB-02, 5 and 20 feet bgs) to 320 mg/kg (CB-02, 10 feet bgs).  Total xylenes were detected in six soil samples at concentrations ranging from 0.011 mg/kg (CB-02, 30 feet bgs) to 2,100 mg/kg (CB-02, 10 feet bgs).

### 2010
In October 2010, 11 groundwater monitoring wells (MW-1, MW-2, MW-3, MW-4, MW-8A/B, MW-9A/B, MW-14, MW-17A/B, RMC-1A, RMC-2, and RMC-3), nine vapor extraction wells (VEW-1, VEW-2, VEW-3, VEW-4, VEW-5, VEW-6, VEW-7, VEW-8, and VEW-9A/B), and two observation wells (OW-1 and OW-2) were abandoned by ETIC (ETIC, 2012).

### 2011
In February 2011, six off-site soil borings (SB-7 through SB-11) were advanced in the Harbor Lawn – Mt. Olive Memorial Park and Mortuary to a maximum depth of 75 feet bgs to assess groundwater conditions in HSU2, southwest of the Site (Figures 2 and 3).  Three of the off-site soil borings were converted to groundwater monitoring wells (SB-7, SB-9, and SB-12); SB-9 and SB-12 were installed in HSU2 and SB-7 was installed in the underlying Alpha Aquifer.  TPHg, benzene, and MTBE were detected at maximum concentrations of 100 µg/L (SB-12), 1.9 µg/L (SB-12), and 250 µg/L (SB-9), respectively (ETIC, 2012).  This further indicates that contamination migrated off-site, more than 800 feet down-gradient.

The Mobil #18-HDR service station was closed in November 2007.  The service station building was demolished in April 2011.  From August to November 2011, approximately 1,696 tons of contaminated soil was excavated for off-site disposal.  Remaining TPHg concentrations at 2,100 mg/kg were detected in the confirmation sample (SED-2) collected at 10 feet bgs, indicating that on-site remediation was not complete.  Currently, the Site has been redeveloped for various commercial uses (ETIC, 2012).

OCWD-MTBE-001-467877



## 4.0   RECENT OFF-SITE INVESTIGATIONS

### 4.1    Cone Penetrometer Testing

From January through May 2011, 21 cone penetration test (CPT) borings (MHDRA through MHDRU) were advanced (Figure 4) by Hargis Associates, Inc., consultant to Orange County Water Distrcit (OCWD).  Approximately four depth-discrete groundwater samples were collected from each location to investigate the off-site vertical and lateral magnitude and extent of groundwater contamination.

### 4.1.1    Pre-Field Activities

The sampling locations were marked with a 20-foot box, and DigAlert was contacted to locate known subsurface utilities within each area marked in the vicinity of the CPT boring locations. Depending on locations of subsurface utilities, the CPT borings were moved accordingly.

### 4.1.2    Encroachment Permits

All of the CPT boring locations were within public rights-of-way.  Temporary encroachment permits were obtained, where necessary, and traffic control plans were approved by City Engineers.  Temporary boring installation permits were obtained from the OCHCA.

### 4.1.3    Utility Clearance

Each CPT location was cleared of subsurface utilities using geophysical equipment.  In addition, prior to drilling the borings, they were cleared to 10 feet bgs using either hand auger or air-knife equipment.  The soil removed during the utility clearance was deposited back in the boring and compacted prior to advancing the CPT drill rods.

### 4.1.4    Geologic Logging

CPT boring logs are provided in Appendix H.

### 4.1.5    Pore Pressure Dissipation Tests

During advancement of the CPT boring, pore pressure dissipation tests (PPDTs) were conducted at selected intervals to evaluate the water yield of the sediments prior to attempting to collect the depth-discrete groundwater samples.

The PPDTs were conducted at multiple depths at each CPT boring location based on CPT readings, at an average of up to six intervals per CPT location.  The PPDTs targeted depth intervals that were 20 feet or deeper than first groundwater and within predominantly coarser-grained sediments with thicknesses of 3 feet or more.  The PPDTs were conducted by maintaining the CPT point at a specific depth and measuring pore pressure dissipation.  For

OCWD-MTBE-001-467878



coarser water bearing intervals, the tests were relatively quick, less than several minutes per depth interval. However, if pressure dissipation was not observed within five minutes, the dissipation test was discontinued and the CPT was advanced to the next PPDT interval or total depth of the boring, whichever was reached first. After the boring was complete, the drill rods were removed and the CPT boring location was sealed using bentonite-cement and/or neat cement grout from the bottom of the borehole to the surface. The PPDT results are presented in Appendix I.

### 4.1.6    Groundwater Sampling

Depth-discrete groundwater sampling was conducted next to each CPT boring location. Up to four depth-discrete groundwater samples were collected at each sampling location.

The CPT rods were advanced to the target sample depth and a groundwater sample was collected using a hydropunch-type sampling system. After the sample was collected, the boring was sealed using bentonite-cement and/or neat cement grout from the bottom of the borehole to the surface.

The depth-discrete groundwater samples were collected at various depths in HSU2, as well as in the Alpha Aquifer. Three CPT locations (MHDRJ, MHDRN and MHDRR) define what appears to be the centerline of the MTBE plume (Figure 7). MTBE concentrations in these three CPT locations ranged from 350 µg/L to 1,400 µg/L. TBA concentrations in these three CPT locations ranged from not detected to 270 µg/L. CPT summary information and analytical results are presented in Table 3. CPT analytical results for all 20 CPT locations are presented in Figure 7 and laboratory reports are presented in Appendix J.

## 4.2      Sonic Borings

From June 2011 to December 2012, eight sonic borings (MHDR-S2, MHDR-S4 through MHDR-S10) were advanced to investigate the off-site vertical and lateral extent of groundwater contamination (Figure 3). Groundwater samples were collected at various depths (from 92 feet bgs to 274 feet bgs) in the Alpha, Beta, Lambda, Rho, and Main Aquifers using a hydropunch-type sampling system.

### 4.2.1    Pre-Field Activities

The sampling locations were marked with a 20-foot box, and DigAlert was contacted to locate known subsurface utilities within each area marked in the vicinity of the sonic boring locations. Depending on locations of subsurface utilities, the sonic borings were moved accordingly.

OCWD-MTBE-001-467879



### 4.2.2    Encroachment Permits

All of the sonic boring locations were within public rights-of-way.  Temporary encroachment permits were obtained, where necessary, and traffic control plans were approved by City Engineers.  Temporary boring installation permits were obtained from the OCHCA.

### 4.2.3    Utility Clearance

Each sonic boring location was cleared of subsurface utilities using geophysical equipment.  In addition, prior to drilling the borings, they were cleared to 10 feet bgs using either hand auger or air-knife equipment.  The soil removed during the utility clearance was deposited back in the boring and compacted prior to advancing the sonic drill rods.

### 4.2.4    Geologic Logging

The sonic borings were logged continuously using a six-inch core barrel.  The sonic boring logs are provided in Appendix K.

### 4.2.5    Groundwater Sampling

The sonic drill rods were advanced to the target sample depth and a groundwater sample was collected using a hydropunch-type sampling system.  After the last groundwater sample was collected, the boring was sealed using bentonite-cement and/or neat cement grout from the bottom of the borehole to the surface.

MTBE concentrations in these sonic boring locations ranged from not detected (ND) to 120 µg/L (MHDR-S8 at 120 feet bgs).  TBA concentrations in these sonic boring locations ranged from ND to 41 µg/L (MHDR-S7 at 140 feet bgs).  Sonic boring summary information and analytical results are presented in Table 3.  Analytical results for all eight sonic boring locations are presented in Figure 8 and laboratory reports are presented in Appendix L.

OCWD-MTBE-001-467880

 aqui**logic**

µg/L (Alpha, Beta, and Lambda Aquifers), and 0.26J µg/L (Rho Aquifer), respectively. Additionally, MTBE was detected in the OCWD-M43 screen interval from 136 to 146 (Lambda Aquifer) at a concentration of 2.6 µg/L on March 17, 2010. CPT and sonic boring locations where the deepest groundwater sample had detectable concentrations of MTBE are summarized below:

- MHDRI (110 µg/L, 80.5 feet bgs, Alpha Aquifer);
- MHDRJ (570 µg/L, 77 feet bgs, Alpha Aquifer);
- MHDRR (350 µg/L, 95 feet bgs, Alpha Aquifer);
- MHDR-S7 (8.6 µg/L, 163 feet bgs, Lambda Aquifer);
- MHDR-S6 (2.0 µg/L, 134 feet bgs, Alpha and Beta Aquifers);
- MHDR-S5 (0.44 µg/L, 132 feet bgs, Beta Aquifer);
- MHDR-S4 (5.4 µg/L, 137 feet bgs, Beta Aquifer);
- MHDR-S2 (2.5 µg/L, 141 feet bgs, Beta Aquifer);
- MHDRD (0.65 µg/L, 89 feet bgs, Alpha Aquifer);
- MHDRG (0.38 µg/L, 84 feet bgs, Alpha Aquifer); and
- MHDRC (0.56 µg/L, 82 feet bgs, Alpha Aquifer).

### 6.3.4    Summary of Plume Dimensions

The recent CPT and sonic boring data shows that the MTBE and TBA plumes have migrated more than 5,850 feet to the south-southeast in the Alpha, Beta, and Lambda Aquifers. The contaminant plume is up to 1,000 feet wide. The MTBE plume generally extends from Gisler Avenue to the north to just north of Merimac Way to the south-southeast, and from Royal Palm Drive to the west-southwest to approximately 720 feet east of the intersection of Harbor Boulevard and Adams Avenue to the east. The MTBE and TBA plumes appear to have migrated from the Site due south. Just north of Adams Avenue the plumes turn to the southeast, potentially due to a hydraulic barrier at the BFF. The lateral extent of the MTBE and TBA plumes has not been delineated to the south-southwest, near the intersection of Adams Avenue and Harbor Boulevard. The MTBE and TBA plumes extend to a depth of at least 163 feet bgs (MHDR-S7) to the Lambda Aquifer. The MTBE concentrations greater than the MCL (13 µg/L) are detected generally in the groundwater samples collected from 60 to 140 feet bgs. This indicates that the MTBE and TBA plumes are migrating in the vertical direction, from the shallow aquifer system to the deep aquifer system.

OCWD-MTBE-001-467891



### 7.5.7    Summary

The Site has undergone a staged approach over the last 26 years (1987 to 2013) to identify and characterize the contamination present in soil beneath the Site and in groundwater both on- and off-site.  Documented remedial measures from 1987 to date have included the following: UST, piping, and fuel dispenser replacements and upgrades; soil removal; LNAPL removal; SVE; GWE; and DPE.  However, groundwater contamination has never been hydraulically contained. The groundwater pump and treat system that operated from 1995 to 1996, and multiple SVE systems, have not prevented the lateral or vertical off-site migration of MTBE and TBA.

The lateral and vertical extent of contamination has not been delineated.  MTBE has been detected at the following locations:

- To the north – MCWD-7 (0.05 µg/L, August 5, 2005);
- To the northeast – MCWD-8 (0.5 µg/L, July 28, 2011) and MCWD-9 (0.16 µg/L, August 26, 2010);
- To the southeast – MHDR-S10 (0.26J ug/L, 168 feet bgs), 5,850 feet from the Site;
- To the south – MHDRJ (570 µg/L, 77 feet bgs), MHDRN (1,400 µg/L, 70 feet bgs), MHDRR (350 µg/L, 95 feet bgs), MHDRS-6 (110 µg/L, 100 feet bgs), and MHDRS-8 (120 µg/L, 120 feet bgs); and
- To the southwest – HMEM-COS/1 (0.6 µg/L, March 15, 2007).

Therefore, MTBE and TBA are migrating more than 5,800 feet down-gradient and migrating vertically below the Alpha Aquifer.

OCWD-MTBE-001-467899

Exhibit 7

EXHIBIT 7



DIRECTORS
**PHILIP L. ANTHONY**
**KATHRYN L. BARR**
**DENIS R. BILODEAU, P.E.**
**SHAWN DEWANE**
**CATHY GREEN**
**VINCENT F. SARMIENTO, ESQ.**
**STEPHEN R. SHELDON**
**HARRY S. SIDHU, P.E.**
**BRUCE WHITAKER**
**ROGER C. YOH, P.E.**

OFFICERS
**President**
**SHAWN DEWANE**

**First Vice President**
**CATHY GREEN**

**Second Vice President**
**ROGER C. YOH, P.E.**

**General Manager**
**MICHAEL R. MARKUS, P.E., D.WRE**

SINCE 1933
Celebrating 80 Years

## ORANGE COUNTY WATER DISTRICT
ORANGE COUNTY'S GROUNDWATER AUTHORITY

January 14, 2014

Andrew Cooper
State Water Resources Control Board
1001 I Street, 16th Floor
Sacramento, California 95814

Subject:        Comment Letter – Mobil #18-HDR Case Closure Summary

Orange County Water District (District) opposes underground storage tank (UST) case closure for
Orange County Health Care Agency case number 87UT226, Mobil #18-HDR at 3195 Harbor
Boulevard in Costa Mesa (Mobil 18-HDR).  The District manages the large groundwater basin that
provides reliable, high quality groundwater to 19 municipal and special water districts that serve 2.4
million customers in north and central Orange County.  Contamination originating from Mobil 18-
HDR, which has impacted groundwater supplies, does not meet the required criteria for closure
under the state's 2012 Low Threat Closure Policy (LTCP) and remains a threat to drinking water in
the Orange County Basin.

The State Water Resources Control Board (SWRCB) issued a notice of opportunity for public
comment for Mobil 18-HDR, signed on November 8, 2013, in which the state's Fund Manager is
recommending closure of the Mobil 18-HDR UST case.  The recommendation for closure is based
at least in part on the SWRCB's UST Case Closure Review Summary Report dated June 2013,
which is associated with UST Cleanup Fund (USTCF) No. 5462.  However, it is apparent that the
SWRCB does not have or has not considered all of the data and information associated with Mobil
18-HDR.

For example, the SWRCB states in the June 2013 UST Case Closure Review Summary Report that
this case meets Policy Criteria 1 by Class 1 [defined in the LTCP] – the contaminant plume that
exceeds water quality objectives is less than 100 feet in length.  To the contrary, however, the
contaminant plume is much longer than 100 feet.  The District conducted a groundwater
investigation of the off-site contamination in 2011 and 2012 that originates from the Mobil 18-HDR
site.  Results from the investigation shows that methyl tertiary butyl ether (MTBE) groundwater
contamination emanating from the Mobil 18-HDR site, exceeds 1,000 micrograms per liter (ug/L),
and extends more than 5,000 feet downgradient from the site with concentrations almost 10 times
the maximum contaminant limit (MCL) more 100 feet below ground surface.  Based on this
additional information, it is clear that the off-site groundwater contamination not only warrants
additional investigation, but it warrants off-site remediation as well.

PO Box 8300
Fountain Valley, CA 92728-8300

18700 Ward Street
Fountain Valley, CA 92708

(714) 378-3200
(714) 378-3373 fax

www.ocwd.com

David Bolin of the District staff contacted Robert Trommer at the SWRCB by telephone in January 2013 concerning Mobil 8-HDR after learning that ExxonMobil would request closure of Mobil 18-HDR. Mr. Bolin asked Mr. Trommer whether the District could submit data and information directly to the SWRCB for consideration when reviewing Mobil 18-HDR for closure. Mr. Trommer instructed Mr. Bolin to wait until the SRWCB published a Notice of Opportunity for Public Comment.

While at least some of the District's investigation data was provided to ExxonMobil prior to their June 29, 2012 Closure Request report, none of the District's data was included in ExxonMobil's publication. But even without the benefit of the District's investigation data, data and information that ExxonMobil reported from their own investigations includes MTBE groundwater detections at over 50 times the MCL (760 ug/L MTBE) in sample locations (SB4 and SB6) 400 feet or more from the Mobil 18-HDR site. This defines the Mobil 18-HDR site as a Class 5 site, which requires the responsible party to estimate the time-frame required to meet water quality objectives and the regulatory agency would need to determine whether that time-frame is reasonable.

The attached Current Conditions Report and Review of Mobil 18-HDR Recommendation for Closure prepared by the District's technical team, Aquilogic, Inc., is provided in support of the District's opposition to closing Mobil 18-HDR at this time. Please consider this additional data and information in your decision whether to close Mobil 18-HDR. This site poses a significant risk to drinking water sources in the Orange County Basin.

District staff is available for discussion. Please contact David Bolin if you have any questions. In the mean time, the District requests a reply to this opposition letter to advise whether the SWRCB will close Mobil 18-HDR notwithstanding results from the District's investigation.

Sincerely,

David Bolin
Principal Hydrogeologist

Attachments

CC:   Ken Williams, RWQCB-Santa Ana
      Geniece Higgins, OCHCA

2

Exhibit 8

EXHIBIT 8



DIRECTORS
PHILIP L. ANTHONY
DENIS R. BILODEAU, P.E.
SHAWN DEWANE
JAN M. FLORY
CATHY GREEN
DINA NGUYEN
ROMAN A. REYNA
STEPHEN R. SHELDON
HARRY S. SIDHU, P.E.
ROGER C. YOH, P.E.

OFFICERS
President
CATHY GREEN

First Vice President
DENIS R. BILODEAU, P.E.

Second Vice President
PHILIP L. ANTHONY

General Manager
MICHAEL R. MARKUS, P.E., D.WRE

**ORANGE COUNTY WATER DISTRICT**

ORANGE COUNTY'S GROUNDWATER AUTHORITY

June 11, 2015

Mr. George Lockwood
Chief - UST Cleanup Unit 15 – 17
State Water Resources Control Board
1001 "I" Street, 15th Floor
Sacramento, California 95814

Subject:    Former Mobil Station 18-HDR, 3195 Harbor Boulevard, Costa Mesa
            USTCF No. 5462; OCHCA Case No. 87UT226

Dear Mr. Lockwood,

Orange County Water District (District) herewith submits new groundwater analytical data indicating continuing migration of the MTBE contaminant plume originating from former Mobil Station 18-HDR at 3195 Harbor Boulevard in Costa Mesa. Please consider this new information in the State Water Resources Control Board's (SWRCB) pending decision on whether or not to close this site. The data indicate that the MTBE groundwater plume is not shrinking, is not stable, and continues to impact groundwater resources. Therefore, the site does not meet necessary closure criteria under the State's Low-Risk Underground Storage Tank Site Closure Policy.

In a recent March 2015 sampling event, MTBE was detected at an elevated concentration (17 ug/L) in District monitoring well OCWD-M43/1. As shown in the attached map, monitoring well OCWD-M43 is located near the leading edge of an MTBE plume extending approximately one mile downgradient from the Mobil 18-HDR site and documented in an OCWD report that was provided to your agency in January 2014. The March MTBE sample concentration was confirmed after resampling and reanalysis by OCWD's state-certified laboratory. Prior to this event, the maximum concentration of MTBE detected in this well was 2.6 ug/L in March 2010. As indicated by the chart below, MTBE concentrations in well M43/1 were fairly flat for 6 years, ranging from 0.9 to 2.6 ug/L, before spiking ~900% in March 2015.

PO Box 8300
Fountain Valley, CA 92728-8300

18700 Ward Street
Fountain Valley, CA 92708

(714) 378-3200
(714) 378-3373 fax

www.ocwd.com

OCWD-MTBE-001-464597

Page 2 of 3
Mr. George Lockwood
June 11, 2015



Well M43 has five discrete screened intervals; however, neither MTBE nor TBA have been detected in the four lower zones (M43/2 to M43/5). The five zones are screened as follows (ft bgs):

- **M43/1: 136 – 146,**
- M43/2: 290 – 310,
- M43/3: 340 – 350,
- M43/4: 380 – 400,
- M43/5: 520 – 540.

As these recent results demonstrate that the MTBE plume continues to spread, the District remains opposed to closing the Mobil site and encourages the State Water Resources Control Board and/or the Santa Ana Regional Water Quality Control Board to direct Exxon/Mobil to properly characterize the MTBE plume and implement an effective remediation system to prevent further contaminant spread.

Page 3 of 3
Mr. George Lockwood
June 11, 2015

Please call me at (714) 378-3245 if you have any questions.

Sincerely,

David Bolin
Principal Hydrogeologist

CC.    Lisa Babcock, State Water Resources Control Board
       Geniece Higgins, Orange County Health Care Agency
       Denamarie Baker, Orange County Health Care Agency
       Ken Williams, Regional Water Quality Control Board
       Rose Scott, Regional Water Quality Control Board

OCWD-MTBE-001-464599

Exhibit 9

EXHIBIT 9



**DIRECTORS**
PHILIP L. ANTHONY
DENIS R. BILODEAU, P.E.
SHAWN DEWANE
JAN M. FLORY
CATHY GREEN
DINA NGUYEN
ROMAN A. REYNA
STEPHEN R. SHELDON
HARRY S. SIDHU, P.E.
ROGER C. YOH, P.E.

**OFFICERS**
President
CATHY GREEN

First Vice President
DENIS R. BILODEAU, P.E.

Second Vice President
PHILIP L. ANTHONY

General Manager
MICHAEL R. MARKUS, P.E., D.WRE

SINCE 1933

# ORANGE COUNTY WATER DISTRICT
ORANGE COUNTY'S GROUNDWATER AUTHORITY

May 5, 2015

RECEIVED HCA/ACCOUNTING

Andrew Cooper
State Water Resources Control Board
1001 I Street, 16th Floor
Sacramento, California 95814

MAY 1 1 2015

ENVIRONMENTAL HEALTH

SUBJECT:   Mobil 18-HDR, OCHCA Case No. 87UT226, USTCF No. 5462

Dear Mr. Cooper,

The Orange County Water District (District) is inquiring as to when the State Water Resources Control
Board (SWRCB) expects to render a decision concerning the proposed closure of the case file for Mobil
18-HDR, located at 3195 Harbor Boulevard in Costa Mesa, California, under the State's Low Threat
Closure Policy (LTCP).  The SWRCB published a notice of opportunity for public comment, dated
November 8, 2013, that reported a deadline for written comments of January 15, 2014.  On January 14,
2014, the District provided extensive and detailed comments in a letter with attachments in opposition to
closing the site.   After waiting for over one year, the District has yet to receive any substantive response
from the SWRCB to the District's written comments.  We have inquired with SWRCB staff including
yourself, Robert Trommer, and George Lockwood, on a number of occasions as to the status of the
SWRCB's deliberations and have only been told that the SWRCB would review and respond to the
District's comments.

The District's rationale in opposing closure of the Mobil 18-HDR case is well supported in our January 14,
2014, documents, so we will not restate our reasons here.  In conversations with UST Section Chief Ken
Williams with the Santa Ana Regional Water Quality Control Board (RWQCB) and Supervising Hazardous
Waste Specialist Geniece Higgins with the Orange County Health Care Agency (OCHCA), staff of both
agencies have expressed concurrence with the District and strong opposition to closing the Mobil 18-HDR
case.

The District is concerned that delays in remediation are allowing groundwater contamination from the
Mobil 18-HDR site to continue to migrate thousands of feet away from the site, increasing the threat to
drinking water supplies.  Therefore, the District requests that the SWRCB respond substantively to the
District's comments without further delay. .

Sincerely,

David P. Bolin
Principal Hydrogeologist

cc:   George Lockwood, SWRCB Chief - UST Cleanup Units 15 - 17
       Robert Trommer, SWRCB Senior Engineering Geologist
       Ken Williams, Santa Ana RWQCB Chief UST Section
       Geniece Higgins, OCHCA Supervising Hazardous Waste Specialist ✔

PO Box 8300
Fountain Valley, CA 92728-8300

18700 Ward Street
Fountain Valley, CA 92708

(714) 378-3200
(714) 378-3373 fax

www.ocwd.com

# Exhibit 10

EXHIBIT 10



July 5, 2016
Cardno 013559COT.L06

Cardno

25371 Commercentre Drive
Suite 250
Lake Forest, CA 92630
USA

Mr. Osman Taban
Orange County Health Care Agency
Division of Environmental Health
1241 East Dyer Road, Suite 120
Santa Ana, California 92705-5611

Phone: +1 800 499 8950
Fax:    +1 949 457 8956
Contractor: #997036

**SUBJECT**   **Agency Response - Case Closure Denial**
Former Mobil Station 18HDR
3195 Harbor Boulevard
Costa Mesa, California
OCHCA Case No. 87UT226

www.cardno.com

Dear Mr. Taban:

At the request of ExxonMobil Environmental Services Company (EMES) on behalf of ExxonMobil Oil Corporation (ExxonMobil), Cardno is providing comment to the State Water Resources Control Board's (SWRCB) letter dated February 4, 2016 (enclosed).  The SWRCB letter states that it no longer recommends case closure due to concerns brought forth by the Orange County Water District (OCWD) during the case closure process and the public notification period.  The SWRCB letter recommends that ExxonMobil coordinate with regulatory agencies and other responsible parties to determine the degree of contribution to off-site methyl tertiary butyl ether (MTBE) concentrations, and requests that all parties develop a site conceptual model to assist with the hydrogeological understanding of the area.  Of note, EMES and Cardno only recently became aware of the SWRCB letter addressed to the OCWD as neither ExxonMobil nor Cardno were carbon-copied.

A brief timeline of events related to case closure for former Mobil Station 18HDR follows:

- 01/30/12 – Orange County Health Care Agency (OCHCA) completes review of the site's environmental case and provides a letter to EMES stating that it should submit a case closure report.
- 06/29/12 – EMES submits a *Closure Request* to the OCHCA.
- 11/08/13 – The SWRCB issues a *Notice of Opportunity for Public Comment* letter, where objections to closure were to be received by January 15, 2014.
- 01/14/14 – The OCWD submits a letter to the SWRCB objecting to the closure of the environmental case, stating that low threat closure protocol is not suitable for this case due to concentrations of MTBE not being delineated and detected above maximum contaminant levels at depths greater than 100 feet below ground surface.  The document included the results of a 2011 and 2012 subsurface investigation conducted by Aqualogic, Inc., and included a map indicating that the area of MTBE concentrations exceeds 5,000 feet in length.  In addition, Aquilogic, Inc., presented arguments against closure of the case.
- 05/05/15 – The OCWD submits a letter to the SWRCB requesting the status of the decision in regards to the proposed closure of the case.
- 02/04/16 – The SWRCB submits a letter to OCWD acknowledging that there are a number of other petroleum release sites in the area, a groundwater flow disparity exists between shallower and deeper water-bearing zones, possible regional hydrocarbon-affected groundwater conditions might exist, and concludes that the case closure of Mobil's 18HDR is no longer recommended.

Australia • Belgium • Canada • Colombia • Ecuador • Germany • Indonesia •
Kenya • New Zealand • Nigeria • Papua New Guinea • Peru • Philippines • Singapore •
United Arab Emirates • United Kingdom • United States • Operations in over 100 countries

**EXHIBIT 3**
Date: 07/19/18
Wit: BRASHER
VanderPol, CSR#3032

July 5, 2016
Cardno 013559COT.L06  Former Mobil Station 18HDR, Costa Mesa, California



There are approximately 70 underground storage tank (UST) sites within 1 mile of former Mobil Station 18HDR.  In its February 2016 letter, the SWRCB recommends that ExxonMobil work with "the regulatory agencies, the responsible parties, and Orange County Water District [to] develop a site conceptual model that supports collection of data related to shallow and deep groundwater flow directions to determine the groundwater capture of public water supply wells, and subsequently investigate all the potential sources which are likely to have contributed MTBE that may affect public water supply wells, and develop and implement a corrective action workplan if corrective action is feasible."

The SWRCB requests that ExxonMobil take the lead in working with the various agencies and responsible parties when there is a strong potential for others to contribute to the identified area of MTBE concentrations.  Please note that of the approximately 70 UST sites that are within the 1-mile radius, all but three are closed presumably with the relatively low concentrations similar to those existing at the former Mobil 18HDR property.  Cardno requests that the OCHCA require that at least the financially viable responsible parties participate in the investigative effort to determine if there are multiple MTBE-affected areas or one regional area.

ExxonMobil and Cardno are willing to meet and discuss the OCHCA's planned investigative approach where all potentially responsible parties can come to an amicable agreement for joint investigation.  It is ExxonMobil's and Cardno's position that the case still meets low-threat closure criteria but are mindful of the OCWD's concerns in regards to maintaining groundwater resources.  ExxonMobil and Cardno request that all potential contributors be required to fulfill similar obligations to further understand subsurface conditions in regards to hydrocarbon distribution.

If you have questions, please call me at 949 457 8929.

Respectfully submitted,

James A. Leist
Senior Project Manager
for Cardno
Direct Line 949 457 8929
Email: james.leist@cardno.com

Enc:   SWRCB Letter Dated February 4, 2016

cc:    w/enclosure:
       Mr. Dok Choe, EMES
       Ms. Rose Scott, California Regional Water Quality Control Board, Santa Ana Region
       Mr. Todd Leger, Commerce Realty
       Ms. Lisa Babcock, SWRCB

# Exhibit 11

EXHIBIT 11



MARK A. REFOWITZ
DIRECTOR

RICHARD SANCHEZ
ASSISTANT DIRECTOR

STEVE THRONSON
DEPUTY AGENCY DIRECTOR
REGULATORY/MEDICAL SERVICES

LIZA FRIAS, REHS
DIRECTOR
ENVIRONMENTAL HEALTH

## REGULATORY/ MEDICAL HEALTH SERVICES
## ENVIRONMENTAL HEALTH

1241 E DYER ROAD, SUITE 120
SANTA ANA, CA 92705

TELEPHONE: (714) 433-6000
FAX: (714) 754-1732
E-MAIL ehealth@ochca.com

January 3, 2017

Dok Choe
ExxonMobil Environmental Services Company
Project Manager
17853 Santiago Boulevard, Suite 107-306
Villa Park, California 92861

Subject:   **Case Status and Agency Response – Case Closure Denial dated July 5, 2016**

Re:   Mobil Station #18-HDR
      3195 Harbor Boulevard
      Costa Mesa, CA 92626
      OCHCA Case #87UT226

> **EXHIBIT 5**
> Date: 07/19/18
> Wit: BRASHER
> VanderPol, CSR#3032

Dear Mr. Choe:

The Orange County Local Oversight Program (OCLOP) has reviewed the case file and the above referenced ExxonMobil document responding the State Water Resources Control Board's (SWRCB) February 2016 letter for the site. In November 2013, the SWRCB issued a Review Summary Report (RSR) which recommended case closure and requested public comments to the proposed case closure. In January 2014, the Orange County Water District (OCWD) responded to SWRCB objecting to the proposed case closure based on evidence of a diving MTBE plume extending over 5,000 feet from the site. In February 2016, the SWRCB UST Cleanup Fund Manager revised the RSR and recommended "the responsible party work with regulatory agencies and other responsible parties whose sites overlie the impacted groundwater to determine whether they have contributed to groundwater contamination that may or may not be a continuous plume, and that the regulatory agencies, the responsible parties, and OCWD develop a site conceptual model that supports collection of data related to shallow and deep groundwater flow directions to determine the groundwater capture by public water supply wells, and subsequently investigate all the potential sources which are likely to have contributed MTBE that may affect public water supply wells, and develop and implement a corrective action work plan if corrective action is feasible."

In March 2016, following the SWRCB recommendations, a meeting was held between the OCLOP, Santa Ana Regional Water Quality Control Board (RWQCB), and OCWD to evaluate the offsite MTBE plume. During the meeting, the OCWD presented MTBE/TBA plume maps originating from the referenced site extending more than 5,000 feet down gradient to the southwest

Dok Choe
January 3, 2017
Page 2 of 2

and southeast of the site. The OCLOP also presented geologic and hydrogeologic evaluation of the site that included historical soil and groundwater analytical results and historical depth to groundwater levels from 1988 to 2015. It appears that residual petroleum hydrocarbons in the source area, as well as offsite, are mobilized by periodic fluctuations of the water table. In addition, review of geologic conditions indicates that groundwater gradually becomes deeper and separated from upper zones with mostly clay and silt layers south of well MW-16A and that preferential migration pathways are present due to underlying sand units south of the site.

Mobil Station #18-HDR is located directly upgradient of the MTBE plume identified offsite. Based on the above hydrogeological observations, the vertical and horizontal extent of soil and groundwater contamination must be further assessed offsite downgradient of the site. The OCLOP recommends a minimum of two transects perpendicular to the MTBE plume migration (south of well MW-15A/B) to investigate vertical and hydrogeologic transition as it relates to contaminant migration from the shallow to deeper zone as well as current concentrations of MTBE/TBA in soil and groundwater. The boreholes must be drilled using direct push sampling methods. The OCLOP may request additional transects further downgradient, if the two required transects do not adequately assess horizontal and vertical extent of the plumes based on the investigation conducted by the OCWD. A work plan addressing the concerns cited above must be submitted within 60 days of your receipt of this letter. Please be advised that the intent of the requested assessment is to generate a document that provides a clear understanding of the three dimensional extent of the contaminant plume(s), evaluation of groundwater level fluctuations and potential migration pathways, and identification and evaluation of nearby sources of MTBE/TBA. To expedite the attainment of data that will fulfill this objective, please prepare a work plan which includes contingencies for additional assessment based on initial findings.

The OCLOP understands that many UST sites are located within one mile of Mobil Station #18-HDR. If sufficient evidence is produced that suggests that other UST sites have, in part, contributed to the MTBE release, the OCHCA may coordinate with other potentially responsible parties for future assessment of the MTBE plume.

If you have any questions, please call me at (714) 433-6254.

Sincerely,

Osman Taban, PG#5986, CHG#455
Geologist
Hazardous Materials Mitigation Section
Environmental Health Division

cc:    Rose Scott, Santa Ana Regional Water Quality Control Board (electronic copy)
       Lisa Babcock, SWRCB (electronic copy)
       James Leist, Cardno ERI (electronic copy)
       David Bolin, Orange County Water District (electronic copy)

Exhibit 12

EXHIBIT 12

**Tracey O'Reilly**

| | |
|---|---|
| **From:** | Claudia Luna <cluna@sheppardmullin.com> |
| **Sent:** | Friday, December 21, 2018 4:27 PM |
| **To:** | Tracey O'Reilly |
| **Cc:** | Macdonald, Timothy R.; Ehrlich (kehrlich@elkinskalt.com); Whitney Roy; Jeff Parker; Charles Correll (ccorrell@kslaw.com); Jeremiah Anderson; Peter Condron (pcondron@crowell.com); Matthew Heartney (matthew.heartney@arnoldporter.com) |
| **Subject:** | OCWD - Mobil 18-HDR Supplemental Production |
| **Attachments:** | Mimecast Large File Send Instructions |

I'm using Mimecast to share large files with you. Please see the attached instructions.

Dear Ms. O'Reilly,

Attached is a second supplemental production regarding 18-HDR.  The bates range is EXMO_18HDR_046139 – 046230.

**Claudia M. Luna** | Paralegal
+1 213-617-5531 | direct
cluna@sheppardmullin.com

## SheppardMullin

333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
+1 213-620-1780 | main
www.sheppardmullin.com

1

# Exhibit 13

# EXHIBIT 13

Law Offices of

# MILLER & AXLINE

A Professional Corporation

DUANE C. MILLER
MICHAEL AXLINE

TRACEY L. O'REILLY
DANIEL BOONE
JUSTIN MASSEY
BRYAN BARNHART
DAVE E. BLUM
MOLLY MCGINLEY HAN

November 7, 2018

<u>VIA U.S. MAIL AND LNFS</u>

Whitney Jones Roy
Sheppard, Mullin, Richter & Hampton
333 South Hope Street, 48th Floor
Los Angeles, California  90071-1448

Re:     *Orange County Water District v. Unocal Corp., et al.*
         **Expert Deposition of Graham Fogg**

Dear Ms. Jones Roy:

I am writing on behalf of plaintiff Orange County Water District (the "District") to meet and confer in response to your September 4, 2018, letter concerning the deposition testimony of the District's expert Graham Fogg.

First, we disagree with you that Dr. Fogg's testimony concerning the direction of groundwater flow within the Orange County Water District basin constitutes "new" opinions. Dr. Fogg previously testified that there is a general downward flow throughout the basin from the shallow to the deep aquifers towards drinking water wells. (Fogg Depo. (Jan. 21, 2012) at 195:16-196:24; *see also* 151:25-152:2.) Dr. Fogg further testified that, as a result of this property, MTBE contamination will, therefore, reach drinking water wells within the basin unless it is remediated in the shallow aquifers. (Fogg Depo. (Jan. 21, 2012) at 110:9-24; *see also* 97:11-16, and 197:24-198:14.) Dr. Fogg specifically testified that any of the 34 focus sites "can contaminate public supply wells" such as MCWD-8. (Fogg Depo. (Jan. 21, 2012) p. 97:2-16.) The opinions expressed by Dr. Fogg were consistent with this prior testimony.

Second, Dr. Fogg's opinions and testimony were prepared in rebuttal to voluminous and numerous expert reports which were only issued on July 6, 2018, so that Dr. Fogg had very little time to formulate and prepare his rebuttal opinions.

Whitney Jones Roy
Page 2
November 7, 2018

     We are prepared, nonetheless, to confirm that we do not intend to present Dr. Fogg's specific testimony concerning Mobil #18-HR during our case-in-chief at trial in this matter. We reserve the right, however, to present Dr. Fogg's testimony on this issue during any pertinent *Daubert* hearing as well as in rebuttal to opinions offered by defendants' experts at trial if necessary.

                    Sincerely,

                    Tracey L. O'Reilly

cc: All Counsel (via LNFS)

# Exhibit 14

# EXHIBIT 14

# Roy L. Herndon

Mr. Herndon has over twenty years professional experience in hydrogeologic investigations pertaining to environmental and water supply projects in California, Nevada, and Arizona. These projects include the delineation of groundwater contaminant plumes over several miles long, characterization of hydrogeologic systems ranging from one-acre sites to the 300-square-mile Orange County groundwater basin, evaluation and control of sea water intrusion, and design of groundwater recharge and extraction systems for water supply and contamination remediation, respectively.

Mr. Herndon manages the Hydrogeology Department at the Orange County Water District and has directed hydrogeologic studies that have collectively entailed the construction of over 100 monitoring wells, 50 of which exceed 1,000 feet in depth. He is responsible for overseeing all departmental activities including the construction of a basin-wide numerical groundwater flow model, development of a comprehensive data management and geographic information system, and design/construction of multidepth monitoring wells and municipal water wells. Mr. Herndon acts as a liaison to state and local regulatory staff in reviewing technical reports submitted by parties performing subsurface environmental investigations. He has given numerous presentations to professional, regulatory, and industrial organizations, served as guest lecturer to university classes, and has been a continuing education program course instructor at the University of California, Irvine.

## EDUCATION

M.S., Hydrology and Water Resources (1985), University of Arizona, Tucson
B.A., Geology (1982), Colorado College, Colorado Springs

## PROFESSIONAL REGISTRATIONS

California Registered Geologist No. 4817
California Certified Hydrogeologist No. 113

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1992 - present: | Chief Hydrogeologist, Orange County Water District |
| 1988 - 1992: | Project Hydrogeologist, Orange County Water District |
| 1985 - 1988: | Project Hydrogeologist, Harding Lawson Associates |

## ACTIVITIES/MEMBERSHIPS

Chairman, Orange County Well Standards Advisory Board
Member, South Coast Geological Society
Member, MCAS El Toro Restoration Advisory Board

## REPRESENTATIVE PROJECTS

*Numerical Groundwater Flow Model of Orange County Groundwater Basin* -
Directed five-year effort to construct, calibrate, and run future basin
management scenarios with a three-layer transient model using MODFLOW.

*Regional TCE/TDS/Nitrate Groundwater Contamination Investigation* - Managed
three-year investigation to determine source and extent of groundwater
containing TCE, TDS, and nitrates in Irvine Subbasin; designed/supervised
construction of twelve monitoring wells ranging from 150 to 1,300 feet deep;
prepared two reports documenting evidence and rationale for conclusion of
MCAS El Toro as the source of a four-mile-long TCE plume; member of
Technical Review Committee, with U.S. EPA, state DTSC, and RWQCB, which
scoped and reviewed Marine Corps' remedial investigation/feasibility study for
this federal Superfund site.

*Irvine Desalter Project* - Developed numerical flow model and designed layout of
7.5-mgd production well field as part of a $35 million (capital) combined water
supply/groundwater remediation facility to remove groundwater containing
elevated TDS, nitrate, and TCE; managed construction of six production wells;
presented project concept to and negotiated with U.S. Navy for its cost share of
TCE cleanup of MCAS El Toro.

*Orange County Water Reclamation Project Feasibility Study* - Prepared
hydrogeologic portion of feasibility study report describing the piezometric and
water quality characteristics of the aquifers beneath OCWD's recharge facilities
in the city of Anaheim; evaluated the potential for recharging up to 100,000
acre-feet of reclaimed water at these facilities; developed and implemented an
ongoing isotopic tracer study with Lawrence Livermore National Laboratory to
identify groundwater flow paths and ages from the spreading basins to nearby
municipal wells.

*City of Orange VOC Study* - Managed investigation to identify source(s) and
extent of chlorinated VOC contamination that shut down a municipal water
well; directed construction of fifteen 100- to 300-foot deep monitoring wells
along the three-mile-long plume; prepared final report documenting potential
contaminant sources and evaluations of remedial alternatives.

*Anaheim/Fullerton VOC Study* - Manager of ongoing investigation to identify the
source(s) and extent of chlorinated VOC contamination over a 40-square mile
area; sited, designed, and directed construction of 60 monitoring wells ranging

in depth from 140 to 1,500 feet; prepared report summarizing findings.

*Sea Water Intrusion Barrier Management* - Technical reviewer of OCWD's Talbert sea water intrusion barrier project operations; directed development of a numerical flow model to assess the impacts to the barrier of a 14-mgd well field proposed by the city of Newport Beach; presented recommended mitigation strategies to minimize drawdown effects of the well field; Technical reviewer of hydrogeologic portion of Alamitos Barrier Reclamation Project to convert 50% of the injection to reclaimed water.

*Santa Ana River Watermaster* - Developed storm flow/base flow estimates based on USGS streamflow data; prepared Annual SAR Watermaster Report.

*Oak Creek Canyon Water Supply Evaluation* - Managed project to determine safe yield of small groundwater basin near Tehachapi, California for cement plant operations; designed and supervised construction and pump testing of two water wells; developed conceptual hydrogeologic and numerical flow models to evaluate maximum yield of basin; prepared final report.

*City of Upland Landfill Investigation* - Managed SWAT investigation to identify possible groundwater contamination at closed landfill; designed and directed construction of two monitoring wells drilled to depths of 400 to 500 feet; prepared final report for submittal to RWQCB.

*Groundwater Salinity Investigation, Laughlin, Nevada* - Developed groundwater flow and solute transport model to evaluate the effectiveness of an existing system to extract and contain a high-salinity groundwater plume at a power generating plant; supervised construction of several multidepth monitoring wells to delineate extent of saline plume; participated in seismic refraction and resistivity geophysical surveys to define alluvium/bedrock contact.

*Artificial Recharge Feasibility Study, Butler Valley, Arizona* - Conducted hydrogeologic investigation of remote desert basin, located along Central Arizona Project aqueduct, to evaluate its potential as a conjunctive-use storage basin; supervised construction of two 600-foot deep monitoring wells; performed aquifer testing and analysis; assisted with seismic and gravity surveys; constructed numerical flow model to estimate maximum basin storage potential; prepared final report.

*Petroleum Spill Investigation, Port of Los Angeles* - Managed investigation to delineate extent of fuel contamination of soil and groundwater along an abandoned pipeline; concurrent berth modification activities required close coordination with other contractors.

*City of Anaheim Groundwater Protection Program* - Developed well capture zones using analytical flow model; prepared sections of City well construction/abandonment protocol.

*Chemical Distribution Facility Investigation, Santa Fe Springs, California* - Prepared subsurface characterization portion of a RI/FS work plan to investigate chlorinated hydrocarbon contamination of vacated facility on the state Superfund list; work plan included construction of numerous monitoring wells and was subsequently accepted by state and local regulatory agencies.

Mr. Herndon has also managed and supervised field activities of numerous underground tank leak investigations throughout southern California; these studies have ranged from initial tank removal and closure to soil and groundwater contamination characterization, remediation, and monitoring.

## PUBLICATIONS/PRESENTATIONS

Clark, J.F., Hudson, G.B., Davisson, M.L., Woodside, G., Herndon, R., *Geochemical Imaging of Flow Near an Artificial Recharge Facility, Orange County, California*, Ground Water, Vol. 42, No. 2, March-April 2004.

Herndon, R.L., Woodside, G.D., Davisson, M.L., Hudson, G.B., *Use of Isotopes to Estimate Groundwater Age and Flow Path*, Southwest Hydrology, Vol. 2, No. 1, January/February 2003.

Grebbien, V., Ide, C., and Herndon, R., *Alternatives to Adjudications – The OCWD Model*, presented by V. Grebbien at CLE California Water Law Conference, Irvine, California, October 17-18, 2002.

Gamlin, J.D., Clark, J.F., Woodside, G., Herndon, R., *Large-Scale Tracing of Ground Water with Sulfur Hexafluoride*, Jour. Of Environ. Engr., February 2001.

Davisson, M.L., Hudson, G.B., Moran, J., Niemeyer, S., Herndon, R., *Isotope Tracer Approaches for Characterizing Artificial Recharge and Demonstrating Regulatory Compliance*, Annual UC Water Reuse Research Conference, Monterey, California, June 1998.

Davisson, M.L., Hudson, G.B., Herndon, R., Niemeyer, S., Beiriger, J., *Report on the Feasibility of Using Isotopes to Source and Age-Date Groundwater in Orange County Water District's Forebay Region, Orange County, California*, Lawrence Livermore National Laboratory ref. #UCRL-ID-123953, May 1996.

Crook, J., Herndon, R.L., Wehner, M.P., and Rigby, M.G., *Studies to Determine the Effects of Injecting 100 Percent Reclaimed Water from Water Factory 21*, Proceedings of Annual Water Environment Federation Conference, Miami, Florida, 1995.

Herndon, R.L., *Hydrogeology of Orange County Groundwater Basin -- An Overview*, in The Regressive Pleistocene Shoreline, Coastal Southern California, Annual Field Trip Guide Book No. 20, Edward G. Heath and W. Lavon Lewis ed., South Coast Geological Society, Inc., 1992.

Herndon, R.L., *Hydrogeology of Alamitos Gap, Los Angeles and Orange County, California*, presented at Association of Engineering Geologists/Groundwater Resources Association annual meeting, Sacramento, California, 1995.

*Two Years Down the Road of Sustainable Groundwater Pumping*, presented at Groundwater Resources Association Conference, Pasadena, California, September 2005.

*Well, Is There Water or Not? OCWD's 12-Step Program to Recover from Drought*, presented for Gen. Mgr. Virginia Grebbien at Groundwater Resources Association Annual Conference, Rohnert Park, California, September 2004.

*How Much Can We Pump? Identifying and Overcoming the Limiting Factors of the Orange County Groundwater Basin*, presented at Association of Ground Water Scientists and Engineers Annual Conference, Orlando, Florida, December 2003.

*Building and Managing a Network of Over 200 Monitoring Wells in Orange County*, presented at Water Education Foundation/Association of Groundwater Agencies conference, Ontario, California, April 2002.

*Orange County's Groundwater: A Resource Worth Protecting*, presented at the California Environmental Law Conference, Yosemite, October 1999.

*Hydrogeologic Aspects of Recharging 250,000+ af/year in Orange County*, presented at the American Ground Water Trust Workshop "The Latest on Artificial Recharge," Scottsdale, Arizona, September 1999.

*Measuring Success of Source Water Protection in Orange County, California*, presented at Source Water Assessment and Protection 98 conference, Dallas, Texas, 1998.

*Orange County Water District's Hydrogeology and Modeling Objectives*, presented
at WateReuse Association of California Groundwater Recharge
Workshop, Newport Beach, California, 1997.

*An Update on Groundwater Contamination in Orange County – Chlorinated
Compounds and MTBE*, presented at Groundwater Resources Association
Conference, Costa Mesa, California, 1996.

*Orange County Water District Groundwater Management Plan: Water Quality and
Hydrogeologic Perspectives*, presented to ASCE North American Water
Environment Congress, Anaheim, California, 1996.

*Orange County's Groundwater – A Resource Worth Protecting*, presented to
Orange County Chamber of Commerce environmental workshop, Irvine,
California, 1993.

*Hydrogeologic Evolution of the Orange County Groundwater Basin*, presented at
American Association of Petroleum Geologists Cordilleran Section annual
meeting, Long Beach, California, 1993.

*El Toro TCE Investigation*, presented to Association of Hazardous Materials
Professionals, Anaheim, California, 1991.

*Chlorinated VOC Investigation in Anaheim, California*, presented to Association
of Engineering Geologists, southern California region, Montebello,
California, 1991.

## TECHNICAL ADVISORY PANELS

AB303 Grant Program – Served on TAP for California Department of Water
Resources to review and comment on grant program structure and subsequent
proposals submitted for funding of groundwater monitoring and data
management projects throughout the state.

Dana Point Desalination Project – Served on TAP to review and comment on
proposed alternatives to construct a slant subsurface extraction well beneath
the beach and near-shore seafloor for a potential future seawater desalination
project to supply south Orange County, California.

Elsinore Valley Groundwater Management Plan – Served on TAP to review and
comment on a groundwater management plan prepared for the Elsinore Valley
Municipal Water District.

Georgia Seawater Intrusion – Served on TAP for state of Georgia to review
existing seawater intrusion conditions between Hilton Head, South Carolina to
Brunswick County, Georgia and recommend potential control alternatives.

Des Moines, Iowa ASR Project – Served on TAP for U.S. EPA-funded feasibility study of aquifer storage and recovery project using existing 2,000-foot wells.

## Other Presentations

*Modeling Orange County's Groundwater Basin,* presented at Orange County Water Association luncheon, Irvine, November 2002.

*Recharging 350,000 af/year in Orange County's Groundwater Basin,* presented at South Coast Geological Society meeting, Costa Mesa, June 2000.

*Groundwater Models: Powerful Tools When Used Properly,* presented at Calif. DHS reclaimed water workshops in San Bernardino and Berkeley, California, 1998.

*Development and Application of a Flow Model of the Orange County Groundwater Basin,* presented at Orange County Water Association lunch seminar, Santa Ana, 1997.

*Chlorinated VOCs in the Orange County Groundwater Basin,* presented at chlorinated VOC seminar sponsored by HLA, Irvine, 1995.

*Where Does Orange County Get Its Water?,* presented to Earth Sciences Dept., Fullerton College, 1995; and Esperanza High School students, Anaheim, 1994.

*Orange County's Groundwater–A Resource Worth Protecting,* presented to Orange County Health Care Agency staff, 1993; and Santa Ana Regional Water Quality Control Board staff, 1993.

*Hydrogeology and Groundwater Management of the Orange County Groundwater Basin,* presented to Lawrence Livermore National Laboratory, Livermore, 1996. Also presented to: IT Corp., Irvine, 1996; McLaren Hart, Irvine, 1994; Environmental Science Engineers, Fountain Valley, 1993; CH2M HILL, Santa Ana, 1992; Converse Consultants, Pasadena, 1992; and Calif. State Fullerton Earth Sciences Dept., 1992, 1997.

*El Toro TCE Investigation,* presented to U.C. Irvine Civil Engineering Dept., 1990.

Exhibit 15

EXHIBIT 15

Roy Herndon

```
  1                 UNITED STATES DISTRICT COURT

                   CENTRAL DISTRICT OF CALIFORNIA

  2

  3                         - - -

  4

        IN RE:  METHYL TERTIARY BUTYL:   Case No. 8:03-cv-

  5     ETHER ("MTBE")              :    01742-CJC (ANx)

                                     :

  6     This Document Relates to:    :

                                     :

  7     ORANGE COUNTY WATER DISTRICT :

        v. UNOCAL CORPORATION, et    :

  8     al.,                         :

        Case No. 04CIV.4968 (SAS)    :

  9

 10                         - - -

 11              Friday, June 22, 2018

 12                         - - -

 13

 14          Videotaped 30(b)(6) deposition of ROY

 15   HERNDON, held at SHEPPARD MULLIN RICHTER & HAMPTON,

 16   L.L.P., 650 Town Center Drive, 4th Floor, Costa Mesa,

 17   California, commencing at approximately 9:00 a.m.,

 18   before Rosemary Locklear, a Registered Professional

 19   Reporter, Certified Realtime Reporter and California

 20   CSR (#13969).

 21

 22                         - - -

 23

 24              GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 971.591.5672 Fax

 25              deps@golkow.com
```

Roy Herndon

```
 1    with your understanding or someone's understanding of

 2    the overall flow system.  And, yeah, data should not be

 3    ignored.  It needs to be considered.

 4           MR. PARKER:  All right.  Why don't we take our

 5    lunch break.

 6           VIDEO OPERATOR:  We're now going to go off the

 7    record.

 8           And the time is approximately 12:17 p.m.

 9           (Luncheon recess, 12:17-1:16 p.m.)

10           (Exhibit Herndon-8 was marked for

11    identification.)

12                       AFTERNOON SESSION

13           VIDEO OPERATOR:  We're now going to go back on

14    the record.

15           And the time is approximately 1:16 p.m.

16    BY MR. PARKER:

17    Q.     Mr. Herndon, I've provided Exhibit 8, and it's

18    an OCWD Bates stamp Number OCWD-MTBE-001-464609.  And it

19    looks to be some type of a plume figure that someone has

20    created.

21           Have you ever seen that before?

22    A.     Yes.

23    Q.     Who prepared it?

24    A.     I did.

25    Q.     And what was the purpose for which you prepared
```

Roy Herndon

```
 1    it?

 2    A.       I remember we were having detections of MTBE at

 3    some monitoring wells and a production well, and so I

 4    was looking at that data, both the time series graphs or

 5    the time series data for those MTBE occurrences at those

 6    wells.

 7             And I remember I think I was trying to explain

 8    to people how it might happen, basically to explain how

 9    the groundwater flows south in the shallower aquifers,

10    but then in the vicinity of M43, once you get down into

11    the beta aquifer, the gradient starts following that of

12    the deeper aquifer, the principal aquifer, which then

13    takes the flow back in the vicinity of the Mesa wells

14    and Mesa Water District wells.

15             So this was really just a way of illustrating

16    kind of a hypothesis that I have on how groundwater may

17    flow or how the MTBE may have arrived at COSM-1 and

18    Mesa-8.

19    Q.       Who did you -- you said we were having

20    detections.

21             Who did you prepare this for or give it to?

22    A.       Well, I think I used it to help with David

23    Bolin.  I don't remember if this was shared with any

24    regulatory agencies, but I think that's -- I -- that's

25    all I can say at this time.
```

Roy Herndon

```
 1   Q.        Did OCWD tell Mesa Water District that any of

 2   the results of sampling showing MTBE in its wells was

 3   not representative of actual conditions in the wells

 4   because those wells were not in routine service?

 5   A.        Not that I know of.  I don't believe so.

 6   Q.        Has the District traced any MTBE from the Mobil

 7   18-HDR site to any MTBE detections in drinking-water

 8   wells?

 9             MR. MILLER:  Goes beyond the scope of the

10   Notice.

11             You can answer if you are prepared to.

12             THE WITNESS:  I have just shown you in one of

13   the exhibits, I forget -- that one map, I guess it's

14   the -- Exhibit 8, where I illustrate a potential path

15   from this plume to Mesa Well Number 8.

16             Have I concluded that that is actually what has

17   happened?  No.  But that is a potential outcome.

18             I understand that there are other stations, such

19   as Mobil 18-JMY, that also may be sources that could be

20   attributed or the concentrate -- that can -- MTBE at

21   Well Number 8 could be attributed to those stations.

22   BY MR. PARKER:

23   Q.        Is Mesa Well 8 an operating drinking-water well?

24   A.        It's now closed and it's been grouted up.

25   Q.        And it's actually been out of service for close
```

# Exhibit 16

# EXHIBIT 16



# Exhibit 17

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:  Methyl *tertiary* Butyl Ether ("MtBE") Products Liability Litigation<br><br>This Document Relates To:<br><br>*Orange County Water District v. Unocal Corporation, et al.,* Case No. 04 Civ. 4968 (SAS) | Master File No. 1:00-1898<br>MDL No. 1358 (SAS) |

## DEFENDANTS' MOTION TO STRIKE ROY HERNDON'S DECLARATION

# INTRODUCTION

The Court should strike Roy Herndon's improper expert declaration, submitted months after the expert discovery deadline and in violation of the Court's prior orders. Case Management Order #82 and the Court's February 15, 2011 oral ruling required the Orange County Water District ("OCWD") to produce its expert reports by April 15, 2011, including reports for OCWD employees that regularly give expert testimony. The Court specifically held that Mr. Herndon had to file an expert report if OCWD intended to offer his expert opinions in this case. OCWD, however, did not produce a single expert report for any of its employees. Two months later, on June 20, 2011, the Court issued an Opinion and Order denying OCWD's motion for partial summary judgment as to its OCWD Act and trespass claims, and ordering OCWD to show cause why summary judgment on these claims should not be granted to Defendants. OCWD filed a response to the Court's Order on July 25, 2011, which included a declaration by Mr. Herndon, one of its internal hydrogeologists, in support thereof. Mr. Herndon's declaration consists almost entirely of his purported expert opinions. Because OCWD failed to disclose Mr. Herndon's expert opinions in a written report by the deadline in compliance with the Court's prior orders, his declaration is both improper and prejudicial, and the Court should strike it entirely.

## ARGUMENT

I.   **OCWD failed to provide an expert report for Roy Herndon.**

Federal Rule of Civil Procedure 26(a)(2)(B) states that the disclosure of expert witnesses "must be accompanied by a written report . . . if the witness is one retained or specially employed to provide expert testimony in the case **or one whose duties as the party's employee regularly involve giving expert testimony**." FED. R. CIV. P. 26(a)(2)(B) (emphasis added). Parties must make such disclosures and reports "at the times and in the sequence that the court

orders." Fed. R. Civ. P. 26(a)(2)(D).  On February 15, 2011, the Court ruled that OCWD's six

employee experts, including Mr. Herndon, fall under the clause "one whose duties as the party's

employee involve giving expert testimony" and that these OCWD employee experts were

required to write an expert report if they were going to offer expert testimony later. *See* Hearing

Tr. 20:8–20:25, 21:3–21:4 (Feb. 25, 2011).[1]  The Court further ruled that those employees'

opinions would be limited to their reports. *See id.* at 22:11–22:20.

Case Management Order #82 required OCWD to produce all of its expert reports by

April 15, 2011, yet OCWD neither produced a report for Mr. Herndon nor sought an extension to

do so.  Anderson Decl. at ¶ 4.  In fact, Defendants sent a letter to OCWD on April 20, 2011,

stating that they had not received an expert report for Mr. Herndon or other employees that the

District has previously claimed were experts, thereby confirming that because no expert reports

for these individuals were produced by the April 15 deadline, these individuals would not be

providing expert opinions in the case. *See* Ltr. from N. Vanderlaan Smith to T. O'Reilly (Apr.

20, 2011).[2]  OCWD never responded to the contrary.  Anderson Decl. at ¶ 5.

## II.  The Court Should Strike Roy Herndon's Declaration.

Federal Rule of Civil Procedure 37(c)(1) provides that a party failing to comply with

Rule 26(a)(2) **"is not, unless such failure is harmless, permitted to use as evidence at a trial,**

**at a hearing, or in a motion any witness or information not so disclosed."** Fed. R. Civ. P.

37(c)(1) (emphasis added); *see also Ebewo v. Martinez*, 309 F. Supp. 2d. 600, 607 (S.D.N.Y.

2004) ("The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party

with new evidence.").  Furthermore, the Court has already ruled that the expert testimony of

OCWD's employee experts would be limited to their reports. *See* Hearing Tr. 22:11–22:20 (Feb.

---

[1]  *See* Ex. A to Jer. Anderson Decl. (8/8/2011), submitted in support hereof ("Anderson Decl.").

[2]  *See* Ex. B to Anderson Decl.

15, 2011). Thus, because OCWD failed to serve a report for Mr. Herndon, he cannot provide

any expert opinions in this case.

Nevertheless, in defiance of the Court's order, Mr. Herndon's declaration is replete with

expert testimony including opinions on groundwater flow, migration of MTBE in groundwater,

and remediation activities. *See* Herndon Decl. For example, Mr. Herndon's declaration includes

the following opinions:

- ". . . significant amounts of MTBE have been migrating off site in groundwater for years." *Id.* ¶ 1.

- "It is almost always less expensive to remediate groundwater contamination before contamination reaches production wells." *Id.* ¶ 2.

- ". . . once the project has reached the design stage the District has ultimately constructed and operated a treatment facility." *Id.* ¶ 3.

- "The cost of delineating the extent of MTBE contamination at the fourteen stations is substantial." *Id.* ¶ 15.

In addition, Mr. Herndon offers wide-ranging expert opinions on the fourteen stations at issue in

the summary judgment briefing, including:

- opinions based on his alleged review of "extensive data, including consultant and expert reports." *Id.* ¶ 6.

- the screening of monitoring wells to detect MTBE and the purported hydrogeologic significance thereof. *Id.* ¶ 7.

- data collection efforts for designing purported MTBE remediation systems, and MTBE's asserted impact on the principal aquifer. *Id.* ¶¶ 8–9.

- opinions regarding costs and remediation associated with particular service stations. *Id.* ¶¶ 16–18.

Mr. Herndon should not be permitted to offer these expert opinions. Put simply, OCWD

chose not to produce a timely expert report for Mr. Herndon, and OCWD should not be allowed

to do so now to survive summary judgment. *See Shea v. Royal Enters., Inc.*, No. 09 Civ 8709,

slip op., 2011 WL 2436709 (S.D.N.Y. June 6, 2011) (excluding expert testimony for failing to comply with Rule 26 expert disclosures and the Court's Scheduling Order). To hold otherwise and allow Mr. Herndon to provide expert testimony would significantly prejudice Defendants. Defendants have repeatedly asked Mr. Herndon his opinions in depositions, but OCWD's attorneys refused to let him offer them, objecting that the questions called for premature expert discovery. Anderson Decl. at ¶ 6. Moreover, Defendants have not had an opportunity to depose Mr. Herndon regarding the expert opinions he provided in his declaration, or conduct the necessary extensive discovery concerning the matters stated therein. Anderson Decl. at ¶ 7. Furthermore, with expert discovery nearly complete, the inclusion of Mr. Herndon's expert testimony would create significant additional litigation costs in terms of time and money, and cause unnecessary delay in this case. Allowing Mr. Herndon to provide expert opinions for the first time at this late date would undo much of what has already been accomplished by the parties in meeting the current expert discovery schedule.

## CONCLUSION

OCWD relies on the expert opinions in Roy Herndon's declaration to support its response to the Court's June 20, 2011 Opinion and Order. Because OCWD failed to provide a timely expert report for Roy Herndon as required by the Federal Rules of Civil Procedure and the Court's prior rulings, Mr. Herndon's declaration is improper and prejudicial. Defendants respectfully request that the Court strike it entirely.

## Certificate of Service

I hereby certify that on August 8, 2011 a true, correct, and exact copy of the foregoing document was served on all counsel via LexisNexis File & Serve.

Jeremiah J. Anderson

# Exhibit 18

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------- X

                   :

**IN RE: METHYL TERTIARY BUTYL**  :
**ETHER ("MTBE") PRODUCTS**     :     **OPINION AND ORDER**
**LIABILITY LITIGATION**          :

--------------------------------------------------- :     **Master File No. 1:00-1898**
                   :     **MDL 1358 (SAS)**

**This document relates to:**    :     **M21-88**

                   :

*Orange County Water District v. Unocal, et*  :
*al.*, 04 Civ. 4968                :

                   :

--------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/25/11

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      In this consolidated multi-district litigation ("MDL"), plaintiffs seek

relief from contamination, or threatened contamination, of groundwater from

various defendants' use of the gasoline additive methyl tertiary butyl ether

("MTBE") and/or tertiary butyl alcohol, a product formed by the natural

degradation of MTBE in water.  In February 2011, Orange County Water District

("OCWD" or "the District") moved for partial summary judgement under Federal

Rule of Civil Procedure 56(a) on three claims against certain defendants associated

with fourteen gasoline service station sites.[1]  In a June 20, 2011 Opinion and Order,

---

       [1]     The sites included in the motion were: Arco # 1887; Arco # 1905;
Chevron # 9-5401; Chevron # 9-1921; Mobil # 18-JMY; Mobil # 18-G6B; Shell #

Case 8:03-cv-01742-CJC-DFM   Document 499-1   Filed 12/28/18   Page 105 of 110   Page ID
#:21950
Case 1:04-cv-04968-SAS   Document 280   Filed 10/25/11   Page 10 of 23

of investigative and remedial costs, the potential differences between the two
categories of costs or their treatment under the OCWD Act.[35]  Instead, in reaching
its holding that OCWD was bringing the litigation on its own behalf, the *Arnold
Engineering* court focused on the nature of OCWD's claims.[36]  As dicta, the
statement on which OCWD relies does not alter this Court's previous finding that
the plain language of the OCWD Act prohibits recovery of OCWD's investigatory
costs.[37]

###   B.       Non-Investigative Costs

###       1.       Herndon's Declaration

In response to the June 20 Opinion and Order, OCWD now offers a
declaration by its Chief Hydrogeologist, Roy Herndon, to argue that "significant

---

[35]       In fact, the *Arnold Engineering* court seems to ignore the difference
between the two categories of costs altogether.  For example, the court first noted
that "The Water District's pleading makes clear that . . . this is an action to recover
remediation costs" but then later states that OCWD's first cause of action asked for
"recover[y] [of] all costs it paid, or will pay in the future, *to investigate* and
remediate the groundwater contamination." *Arnold Eng'g.*, 127 Cal. Rptr.3d at 337
(emphasis added).

[36]       *See id.* at 339 ("We conclude the trial court correctly determined the
Water District's lawsuit is essentially an action seeking to recover the costs to
*investigate and remediate* the contaminated groundwater, not a public nuisance
abatement action prosecuted on the public's behalf.  *Clancy* and *Santa Clara* do
not apply to the Water District's lawsuit.") (emphasis added).

[37]       *See In re MTBE Prods. Liab. Litig.*, 2011 WL 2565771, at *5.

Case 8:03-cv-01742-CJC-DFM   Document 499-1   Filed 12/28/18   Page 106 of 110   Page ID
#:21951
Case 1:04-cv-04968-SAS   Document 280   Filed 10/25/11   Page 11 of 23

amounts of MTBE have migrated off-site at each of the fourteen stations" and that
"OCWD has moved beyond investigating off-site MTBE and has begun designing
remedial systems for MTBE that has migrated off-site."[38]  Defendants are moving
to strike Herndon's declaration on the grounds that OCWD failed to produce an
expert report for Herndon in violation of Rule 26.[39]  OCWD contends that an
expert report was not needed because Herndon's testimony does not fall under
Rule 26's definition of expert testimony.[40]  OCWD argues that Herndon's
testimony "is based on facts personally known to him through his work at
[OCWD] and merely relates conclusions reached by him in the course of his
employment"[41] and is therefore "percipient rather than expert in nature."[42]

---

[38]     OCWD Mem. at 6.

[39]     *See* Defendants' Motion to Strike Roy Herndon's Declaration ("Def.
Mot. to Strike") at 1 ("Because OCWD failed to disclose Mr. Herndon's expert
opinions in a written report by the deadline in compliance with the Court's prior
orders, his declaration is both improper and prejudicial, and the Court should strike
it entirely."). *See also* Defendants' Reply to Plaintiff Orange County Water
District's Response to Show Cause Order ("Def. Mem.") at 6. n. 5.

[40]     *See* Plaintiff Orange County Water District's Opposition to
Defendants' Motion to Strike the July 25, 2011, Declaration of Roy Herndon in
Support of Orange County Water District's Response to Order to Show Cause Re
Summary Judgment ("OCWD Opp. to Def. Mot. to Strike") at 2-3.

[41]     *See id.* at 3.

[42]     *Id.* at 2.  Specifically, OCWD argues that "[a] substantial portion of
Mr. Herndon's declaration, however, simply relates facts concerning the District's
practices and internal procedures for addressing groundwater contamination within

11

Case 8:03-cv-01742-CJC-DFM   Document 499-1   Filed 12/28/18   Page 107 of 110   Page ID
#:21952
Case 1:04-cv-04968-SAS   Document 280   Filed 10/25/11   Page 12 of 23

Much of Herndon's declaration, however, is not based on his

perceptions, but on his experience and specialized knowledge.  For example,

Herndon's declaration covers, among other things, the typical costs of remediating

groundwater contamination, typical groundwater flow rates, the extent of the

MTBE off-site migration – which was based on his review of consultant and expert

reports rather than his own investigation – as well as the significance of OCWD's

commitment of funds for "drilling borings and collecting depth-specific ground

water samples" to OCWD's remediation efforts.[43]  Herndon could not have drawn

these conclusions from his first-hand perceptions or investigatory findings.[44]  To

---

the District's service area." *Id.*

[43]     7/25/11 Declaration of Roy Herndon, Chief Hydrogeologist for
OCWD, in Support of Plaintiff OCWD's Response to Court's Order to Show
Cause Why Partial Summary Judgment Should Not Be Granted to Defendants with
Respect to OCWD Act Claims for Investigatory Costs and Trespass Claims
("Herndon Decl.") ¶¶ 2, 5, 6, 8.

[44]     *See* Fed. R. Evid. 701 (stating that lay opinion must be "rationally
based on the perception of the witness"). *See also Solvent Chem.*, 685 F. Supp. 2d
at 420 (classifying portions of testimony as expert opinion where witness relies on
specialized and particularized knowledge gained from professional experience)
("Mr. Brown provided testimony about his direct involvement in the remediation
of Gill Creek which was rationally based on his first-hand perception . . . .
[However, the] testimony regarding Solvent's liability for a share of the common
costs associated with the entire Gill Creek remediation project represents Mr.
Brown's opinion on allocation based not on his experience as a percipient witness,
but rather on his specialized knowledge gained as a result of his extensive
experience as a chemical and environmental engineer with overall responsibility
for Olin's environmental remediation affairs, as well as his particularized

reach these conclusions, Herndon "necessarily relied upon a reasoning process utilizing technical knowledge beyond that normal to the activities of everyday life, triggering the application of the expert disclosure rules."[45]

Although the Herndon declaration may contain expert testimony, under Rule 26(a)(2)(A), defendants are not entitled to an expert report unless Herndon is "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony."[46] Defendants have not submitted evidence showing that Herndon's "duties . . . regularly involve giving expert testimony."[47] Instead, defendants contend that this Court had already ruled that OCWD's six employee

---

knowledge of the Gill Creek remediation project gained by virtue of his role as team leader/liaison with Dupont and the DEC.").

[45] *Solvent Chem.*, 685 F. Supp. 2d at 421. *Accord Bank of China v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (allowing testimony grounded in the investigation employee conducted in his role at the bank because the statements were based on his perceptions but striking portions that were not a result of his investigation) ("However, to the extent Huang's testimony was not a product of his investigation, but rather reflected specialized knowledge he has because of his extensive experience in international banking, its admission pursuant to Rule 701 was in error.").

[46] Fed. R. Civ. P. 26(a)(2)(B).

[47] *Id.*

Case 8:03-cv-01742-CJC-DFM   Document 499-1   Filed 12/28/18   Page 109 of 110   Page ID
#:21954
Case 1:04-cv-04968-SAS   Document 280   Filed 10/25/11   Page 14 of 23

experts – which included Herndon – are required to submit a report.[48] I disagree.

Although I had assumed during that particular hearing that the six employees

would testify as experts – and would therefore be required to submit an expert

report – the subject was not fully discussed or briefed and I made no such ruling.[49]

Defendants have not proffered any evidence indicating that Herndon's duties

include regularly giving expert testimony.  Defendants are therefore not entitled to

an expert report.[50]  Defendant's motion to strike Herndon's declaration is denied.

———————————

[48]      *See* Def. Mot. to Strike at 1 ("The Court specifically held that Mr.
Herndon had to file an expert report if OCWD intended to offer his expert opinions
in this case.").

[49]      *See* Transcript of Status Conference held on 2/15/11 ("2/15/11 Tr.") at
20-21 (discussing the number of potential OCWD employees OCWD intends to
call to offer opinions at trial) ("THE COURT: . . . But [OCWD employees] do fall
under the "or" clause [of Rule 26]: Or one whose duties as the party's employees
involve giving expert testimony.  MR. MILLER: They have given expert testimony
in a number of - -[.] THE COURT: They would be required to do a report under
26(a)(2)(B). That is what I was just checking.  So anyway, still potentially a
reasonable number, even 16 and 6."). *See also id.* at 22 ("MR. PARKER: And we
would request that any opinion [given by the six OCWD employees] be allowed to
give at trial be limited to what they gave during those depositions. THE COURT:
No, they're entitled to submit a report. That's what I just read in the rule.  They can
write an expert report, they are being proffered as an expert witness.  The fact that
they are employees doesn't preclude that . . . .  They can do a report.  And then
they are limited to their report.").

[50]      *See Bank of China*, 359 F.3d at 182 n. 13 (stating that defendants are
only entitled to notice and not an expert report under Rule 26) ("Where the witness
is not specially retained or employed to give expert testimony, or does not
regularly give expert testimony in his or her capacity as an employee, no expert
report is required.") (citation omitted).

14

focused on the nature of OCWD's claims and the fact that they were being brought on OCWD's own behalf.[73] Because OCWD has failed to show cause as to why judgment should not be granted against it, summary judgment is entered in favor of defendants on the trespass claim.

## IV.   CONCLUSION

For the reasons previously stated, defendants' motion to strike the declaration of Roy Herndon is denied; however ExxonMobil's motion to strike portions of the declaration relating to Mobil #18-HDR is granted. The Clerk of the Court is directed to close these motions (Docket Nos. 276 and 277). Furthermore, partial summary judgment is entered in favor of the defendants for OCWD's claims for costs associated with testing production wells and commissioning consultant reports as well as for OCWD's claim for trespass.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             October 24, 2011

---

[73]      *See id.* at 336.

21